**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>AKORN HOLDING COMPANY LLC, *et al.[1]*<br><br>Debtors. | Chapter 7<br>Case No. 23-10253 (KBO)<br>(Jointly Administered)<br><br>**Proposed Bid Procedures Hearing Date:**<br>**April 27, 2023**<br><br>**Proposed Bid Procedures Objection Deadline:**<br>**At the Hearing**<br><br>**Proposed Sale Hearing Date:**<br>**May 19, 2023**<br><br>**Proposed Sale Objection Deadline:**<br>**May 16, 2023** |

**TRUSTEE'S MOTION FOR ENTRY OF (I) AN ORDER
(A) APPROVING BIDDING PROCEDURES IN CONNECTION
WITH SALE OF SUBSTANTIALLY ALL OF THE ESTATES' ASSETS,
(B) SCHEDULING AN AUCTION AND HEARING TO CONSIDER THE
PROPOSED SALE, AND (C) APPROVING THE FORM AND MANNER OF NOTICE
THEREOF; AND (II) AN ORDER (A) APPROVING THE SALE, (B) AUTHORIZING
THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND
UNEXPIRED LEASES, AND (C) GRANTING CERTAIN RELATED RELIEF**

George L. Miller, in his capacity as the chapter 7 trustee (the "Trustee") for the estates (the "Estates") of the above-captioned debtors (the "Debtors"), respectfully files this motion (the "Motion") for entry of an order, substantially in the form attached hereto as Exhibit A (the "Bidding Procedures Order"): (a) establishing bidding and auction procedures (collectively, the "Bidding Procedures"), a copy of which is attached hereto as Exhibit B, in connection with the potential sale(s) of substantially all of the Estates' assets with the exception of certain excluded assets (the "Purchased Assets"), free and clear of all claims and any other interests, liens,

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of their federal tax identification numbers, and cases numbers are Akorn Holding Company LLC (9190), Case No. 23-10253 (KBO); Akorn Intermediate Company LLC (6123), Case No. 23-10254 (KBO); and Akorn Operating Company LLC (6184), Case No. 23- 10255. The Debtors' headquarters is located at 5605 CenterPoint Court, Gurnee, IL 60031.

mortgages, pledges, security interests, rights of first refusal, obligations, and encumbrances of any kind whatsoever (collectively, the "Interests"), except to the extent otherwise identified in a Successful Bidder's (as defined below) asset purchase agreement; (b) approving the form and manner of sale notices (the "Notice Procedures"); (c) scheduling an auction (the "Auction") if, subject to the Bidding Procedures, the Trustee receives more than one Qualified Bid (as defined below), and setting a date and time for a sale hearing (the "Sale Hearing") for the sale (the "Sale") of the Purchased Assets; and (d) granting certain related relief.

The Trustee further requests that, subject to the results of the Auction and the Bidding Procedures, the Court enter an order, substantially in the form attached hereto as Exhibit C (the "Sale Order"): (i) approving and authorizing the Sale of the Purchased Assets to the Successful Bidder(s) free and clear of all Interests except to the extent otherwise set forth in a Successful Bidder's asset purchase agreement; and (ii) authorizing the assumption and assignment of executory contracts and unexpired leases as may be applicable. In support hereof, the Trustee respectfully states:

## JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction to consider this Motion pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      Pursuant to Rule 9013-l(f) of the Local Rules of Bankruptcy Practice and Procedure of this Court (the "Local Rules"), the Trustee consents to the entry of a final order with respect to this Motion if it is determined that the Court lacks adjudicatory authority under Article III of the United States Constitution to enter such final order absent consent of the parties.

## BACKGROUND

3.      On February 23, 2023 (the "Petition Date"), the Debtors commenced these jointly administered bankruptcy cases (collectively the "Bankruptcy Cases") by each filing a voluntary petition in this Court for relief under chapter 7 of the Bankruptcy Code.

4.      On or about the Petition Date, the Office of the United States Trustee appointed the Trustee as the chapter 7 trustee to the Estates.

5.      The Debtors' businesses included developing, manufacturing, and marketing specialty pharmaceuticals, including prescription, consumer health, and animal health products. The Debtors were an industry leader in branded and generic products in alternate dosage forms such as ophthalmics, injectables, oral liquids, topicals, inhalants, and nasal sprays. The Debtors operated at numerous locations in the United States, both owned and leased, and were headquartered in Gurnee, Illinois.

6.      The Debtors' operations in the U.S. have all ceased. However, their Swiss affiliate, non-Debtor Akorn AG, continues to operate. Debtor Akorn Operating Company LLC ("Akorn Operating") owns 100% of the equity in Akorn International S.á.r.l, a non-debtor based in Luxembourg. Akorn International S.á.r.l, in turn, owns 100% of the equity in Akorn AG.

### A.      The Debtors' Company History and Prior Marketing of Assets.

7.      The Debtors' predecessors (together with the Debtors, as applicable, the "Company") founded their business in 1971 in Abita Springs, Louisiana, and initially focused on ophthalmic drugs. In 1997, the Company relocated its corporate headquarters to the Chicago, Illinois area. In April 2007, the Debtors' predecessor Akorn, Inc.'s stock was listed publicly on the NASDAQ exchange.

8.      Between 1971 and 2018, the Company made strategic acquisitions to grow the business, including Taylor Pharmacal in 1992 (a contract manufacturer of injectables, based in

Decatur, Illinois), Advanced Remedies Inc. in 1998 (which owned an ophthalmic manufacturing and research and development facility in Somerset, New Jersey), Advanced Vision Research, Inc. in 2011 (an ophthalmic company that developed and marketed eye care products under the TheraTears and MacuTrition brand names), Hi-Tech Pharmacal in 2014 (which traces its roots back to the Success Chemical Co., founded in Brooklyn, New York in 1930), and VersaPharm in 2014 (which focused on niche therapeutic categories of dermatology, tuberculosis, and hemophilia). The Company also grew by launching its animal health business in 2012, expanding its manufacturing presence into Europe in 2015 with the acquisition of its Swiss operations, which include a plant in Hettlingen, Switzerland, and laboratory and office space in Winterthur, Switzerland.

9.      In 2018, after nearly fifty years of growth, the Company began to struggle under the weight of expensive litigation, and significant remediation costs and other burdens. By 2019, the Company found itself capital-constrained, and, with the help of legal and financial advisors, it explored restructuring options to refinance or pay down debt. In 2020, after those efforts had proven unsuccessful, the Company commenced cases under chapter 11 of the Bankruptcy Code (the "2020 Cases"). Following a marketing and sale process, the 2020 Cases culminated in a going-concern sale of the Company's business, including substantially all of its assets, to its then-lenders.[2]

---

[2] *See* Order (A) Approving the Asset Purchase Agreement, (B) Authorizing the Sale of Assets, (C) Authorizing the Assumption and Assignment of Contracts and Leases, and (D) Granting Related Relief, Case No. 20-11177 (KBO) (Bankr. D. Del. Sept. 2, 2020), Docket No. 656. Concurrently with the approval of the sale, the Court entered an order approving a chapter 11 plan of liquidation. *See* Case No. 20-11177 (KBO) (Bankr. D. Del., September 4, 2020), Docket No. 673. Akorn, Inc.'s stock stopped trading publicly upon the effective date of the 2020 Plan. As of the Petition Date, one of the 2020 Cases remains open for the plan administrator to complete the wind-down process.

10.     The sale closed on October 1, 2020. At approximately this same time, the three entities that are the Debtors in these chapter 7 cases were formed.  The Debtors streamlined operations, including through the sale of their consumer health business to Prestige Consumer Healthcare for $230 million in June of 2021, and the sale of their branded ophthalmics businesses to Thea Pharma Inc. for an undisclosed amount in March of 2022.

11.     In June of 2022, having recently streamlined their operations and made significant investments and upgrades, including to their Decatur, Illinois facility, the Debtors launched a sale process for substantially all of their assets as a going-concern. With the assistance of an investment bank Greenhill & Co. ("Greenhill"), the Debtors thoroughly marketed their assets and solicited bids over a period of approximately seven months. In all, Greenhill contacted ninety-seven (97) potentially interested parties (including sixty-four (64) strategic investors and thirty-three (33) financial investors) to solicit interest in a transaction to purchase all or a portion of the Debtors' assets. Forty-two (42) of these parties expressed interest in one or more of the Debtors' assets and received process materials.

12.     Ultimately however, the Debtors did not receive any bids exceeding the aggregate amount of their secured debt, due in material part to a lack of liquidity and certain regulatory issues that dampened the Debtors' ability to sell their U.S. based operations on a going-concern basis. By early 2023, it was apparent that a chapter 7 bankruptcy filing, and an accompanying cessation of U.S. operations, was inevitable in order to preserve the value of the Debtors' assets and obtain maximum possible value through a sale on a non-operating (in the U.S.) basis.

### B.     The Debtors' Debt Structure.

#### (i)     The ABL Facility

13.     Akorn Operating and Akorn Intermediate are parties to that certain Credit Agreement, dated as of October 1, 2020 (as amended, supplemented or modified from time to time,

and together with all related agreements and other documents, the "<u>ABL Pre-Petition Financing</u> <u>Documents</u>" or the "<u>ABL Facility</u>"), together with the lenders thereunder (the "<u>ABL Lenders</u>"), and MidCap Funding IV Trust (as successor-by-assignment to MidCap Financial Trust) as administrative agent (the "<u>ABL Agent</u>"), pursuant to which Akorn Operating as borrower received a revolving line of credit in an initial aggregate amount of $160,000,000. As of the Petition Date, there was approximately $46,369,390.84 in principal outstanding under the ABL Facility.

14.    The ABL Facility is secured by first and second priority liens on certain of the Debtors' assets, as described in the applicable ABL Pre-Petition Financing Documents and the Intercreditor Agreement (as defined below).

### (ii)    <u>The Term Loan Facility</u>

15.    Akorn Operating and Akorn Intermediate are also parties to that certain Senior Secured Term Loan Agreement, dated as of October 1, 2020 (as amended, supplemented or modified from time to time, and together with all related agreements and other documents, the "<u>TL</u> <u>Pre-Petition Financing Documents</u>" or the "<u>TL Facility</u>"), together with the lenders thereunder (the "<u>TL Lenders</u>" and, together with the ABL Lenders, the "<u>Lenders</u>"), and Wilmington Savings Fund Society, FSB as administrative agent and collateral agent (the "<u>TL Agent</u>"), pursuant to which Akorn Operating as borrower received a senior secured term loan facility in an initial aggregate amount of $370,000,000. As of the Petition Date, there was approximately $134,454,589 in principal outstanding under the TL Facility.

16.    The TL Facility is secured by first and second priority liens on certain of the Debtors' assets, as described in the TL Pre-Petition Financing Documents and the Intercreditor Agreement (as defined below). Together, the Lenders have first and/or second priority liens on a substantial portion of the Debtors' assets.

6

### (iii)    The Intercreditor Agreement

17.    The ABL Agent and the TL Agent are parties to that certain Intercreditor Agreement, dated as of October 1, 2020 (the "Intercreditor Agreement"), pursuant to which the parties thereto set forth, among other things, (a) their relative lien priorities in the portion of the Debtors' assets that serve as their collateral and enforcement rights and obligations related thereto, (b) the method by and the order in which proceeds of their collateral shall be applied by the ABL Agent and TL Agent, respectively, (c) the impact on the respective liens of the ABL Agent and TL Agent arising from the sale or disposition of their collateral, and (d) the relative rights and obligations of the ABL Agent and TL Agent upon and during the occurrence of any Insolvency Proceeding of any Loan Party (as defined in the Intercreditor Agreement).

### C.    The Marketing Process, and the Trustee's Need for Expediency.

18.    Almost immediately following his appointment, the Trustee began preparing to conduct a sale process for substantially all of the assets of the Estates. The Trustee began negotiating with the Lenders regarding the use of cash collateral to fund the sale process, and regarding a sharing agreement to carve out a portion of the proceeds. The Trustee is in the process of finalizing a sharing agreement with the Lenders (the "Sharing Agreement")[3], under which the Trustee will have the ability, subject to the terms and conditions therein, to use cash collateral to conduct the sale process, and under which the Lenders agreed to carve out from the sale proceeds certain amounts, including amounts to pay compensation for the Trustee and his professionals, amounts for payment of reasonable costs and expenses necessary to administer, recover, preserve,

---

[3] The terms and conditions of the Sharing Agreement, as applicable to the Sale, shall be incorporated into any order to approve the Bidding Procedures.

market, sell or otherwise dispose of property of the Estates, and amounts to be retained by Estates for distribution by the Trustee in accordance with section 726 of the Bankruptcy Code.[4]

19.     Additionally, Greenhill, whose retention application is pending, launched a new marketing process for the sale of all of the Debtors' assets with the exception of inventory, accounts receivable and labeler codes (the "Excluded Assets") and, among other things, contacted previously interested parties as well as additional parties, opened a data room, and began coordinating due-diligence requests and site visits. Since the Petition Date, Greenhill has communicated with two hundred eight (208) parties. One hundred twenty-eight (128) are under non-disclosure agreements. In total, as of the date of this Motion Greenhill has received non-binding offers to purchase at least some portion of the Debtors' assets from sixty-four (64) interested parties.

20.     Certain of these non-binding offers are for substantially all of the Debtors' assets, (except for the Excluded Assets) while others are for various combinations of assets or single assets, including without limitation certain parcels of owned real property, leasehold interests in certain premises, equipment, Abbreviated New Drug Applications ("ANDAs"), Abbreviated New Animal Drug Applications ("ANADAs"), intellectual property, and Akorn Operating's 100% equity interest in non-Debtor Akorn International S.á.r.l (which, in turn, owns 100% of the equity in Akorn AG – the operating non-debtor entity based in Switzerland).

21.     The Trustee believes that the circumstances of these cases justify a relatively short sale timeline. As described above, the Debtors' assets have been exposed to the marketplace in one way or another since prior to the 2020 Cases. An extensive marketing process occurred throughout the second half of 2022. Prior to that, the Debtors had been engaged in marketing some

---

[4] The Trustee expects to file a motion for approval of the Sharing Agreement in the near future.

or all of their assets – and successfully sold portions of them – on an almost continual basis since the sale and plan confirmation in the 2020 Cases. Prior to that, the Company marketed and sold substantially all of its assets in the 2020 Cases. And prior still to that, in 2019 the Company combed the marketplace for investors to provide refinancing as an alternative to bankruptcy. In short, by now virtually every major party who may have an interest in any of the Debtors' assets has been aware for some time of the opportunity to acquire them.

22.    The chance that further marketing will uncover new bidders is significantly outweighed by the harm that may result from delay. For example, based on the indications and bids received to-date, the Trustee believes that much of non-debtor Akorn AG's value – and, consequently, the value of the Estate's stock in Akorn International S.á.r.l – lies in the fact that Akorn AG is still operating. If Akorn AG were to shut down, it would likely incur significant costs associated with the shut-down, including significant liability under Swiss labor law, which would sap much of its value. In addition, if its operations were to cease, its facility would become "non-sterile," resulting in a further significant loss of value. Akorn AG only has enough working capital and funding in place to maintain its operations for a short time.

23.    As mentioned above, the Debtors' U.S. operations have entirely shut down. The rate of depreciation for static and idle assets in the pharmaceutical industry is steep, and the Debtors' ongoing storage costs are high.  Especially considering the robust pre-petition marketing process, and the fact that the Debtors' assets have been largely exposed to the marketplace for years prior to the start of these cases, the Trustee submits that an expedited sale timeline is justified.

24.    Perhaps as important, the Trustee notes that some of the ANDAs owned by the Debtors which are going to be sold herein relate to drugs which are presently in short supply in the marketplace in the United States, and which were manufactured in the Debtors' U.S. facilities.

LEGAL\62837797\6 6010823/00574256
04/20/2023

Because those facilities are shuttered, these drugs are not being manufactured, which has obviously exacerbated the shortages. The sooner the Trustee can transfer the Debtors' ANDAs to an operating purchaser (or purchasers), the sooner production of these drugs can resume and supply chain disruptions in the delivery of these needed drugs to the public can be minimized.

### D.    The Trustee's Anticipated Sale Process.

25.    The Trustee intends to sell the Purchased Assets pursuant to a competitive sale process under section 363 of the Bankruptcy Code (the "Sale Process").

26.    The Trustee's marketing process with assistance of Greenhill has generated a tremendous level of interest, and while certain parties have indicated an interest in serving as the stalking horse bidder for all, or a portion of, the Purchased Assets, the Trustee with the consent of the Consultation Parties has not (yet) reached an agreement with any party to serve as the stalking horse bidder for all, or a portion of, the Purchased Assets.

27.    The Trustee has presently decided to proceed with an open auction process for the Purchased Assets. The Trustee is willing to consider a sale of all Purchased Assets to one purchaser or, alternatively, multiple sales of different combinations of Purchased Assets to various purchasers. Accordingly, the Trustee in consultation with his professionals has devised a competitive bidding process (the "Bidding Process") designed to afford him the flexibility that he needs to maximize the level of participation in the Sale Process, and maximize the value received for the Purchased Assets.

LEGAL\62837797\6 6010823/00574256
04/20/2023

### E.  The Bidding Procedures.

28.    The Trustee proposes that the Bidding Process be governed by the Bidding Procedures, which include the following provisions.[5]

### (i)  Consultation with the Lenders and their Advisors

29.    Each reference in these Bidding Procedures to "consultation" (or similar phrase) shall mean consultation in good faith providing sufficient time for the applicable parties to confer with each other and their clients, as applicable. The following parties constitute the "Consultation Parties": (a) the ABL Lenders (including the ABL Lenders' advisors) and (b) the Required Lenders (as defined in the Senior Secured Term Loan Agreement), including the advisors to the Required Lenders.

### (ii)  Potential Bidders

30.    To participate in the Bidding Process, each interested person or entity must (i) deliver to Greenhill an executed confidentiality agreement in form and substance satisfactory to the Trustee and (ii) be deemed by the Trustee, after consultation with his professionals, to be reasonably likely to be able to fund and complete the consummation of the proposed transaction within the time frame acceptable to the Trustee if selected as a Successful Bidder (as defined below).  Each Potential Bidder shall comply with all reasonable requests for information and due diligence access by the Trustee and his professionals regarding the ability of such Potential Bidder, as applicable, to consummate its contemplated transaction.  As promptly as reasonably possible, the Trustee will determine (in consultation with the Consultation Parties) if such person or entity is acceptable and deem such person or entity a "Potential Bidder."

---

[5] In the event of any inconsistencies between the description of the Bidding Procedures contained in this Motion and the language of the Bidding Procedures themselves, in the form attached to the Bidding Procedures Order, the language of the Bidding Procedures themselves shall govern.

LEGAL\62837797\6 6010823/00574256
04/20/2023

**(iii)   Qualified Bids**

31.   A proposal ("Bid") received from a Potential Bidder is a "Qualified Bid" if it complies with all of the following; provided that the Lenders shall be deemed a Qualified Bidder (and any bid submitted by them, a Qualified Bid) without the need to satisfy any of the other requirements placed on Qualified Bidders hereunder:

(i)   is received by the Bid Deadline (as defined below);

(ii)   provides for the purchase of all or some portion of the Purchased Assets by the Potential Bidder on an "as is, where is" basis;

(iii)   clearly identifies the particular Purchased Assets to be purchased;

(iv)   allocates value and/or a portion of the aggregate purchase price for each class of property (e.g. real estate, equipment, intellectual property, ANDAs, ANADAs and stock);

(v)   if purchasing ANDAs or ANADAs on an individual basis, then must allocate purchase price per ANDA and ANADA;

(vi)   includes a copy of a definitive asset purchase agreement (in substantially the form of one or more of the template asset purchase agreements posted in the data room maintained by Greenhill for Purchased Assets, as applicable (the "Template Asset Purchase Agreements"), signed by an authorized representative of such Potential Bidder;

(vii)   is accompanied by a redline comparison showing any changes that the Potential Bidder has made to the applicable Template Purchase Agreement(s);

(viii)   is not subject to any due diligence or financing conditions, or board or other approval;

(ix)   is accompanied by a cash deposit of not less than 10% of the proposed purchase price (the "Required Deposit"); provided, that any Bid by Lenders shall not be required to be accompanied by a deposit;

(x)   includes written evidence of an unconditional commitment for financing (by a creditworthy bank or financial institution that shall provide such financing without alteration of conditions or delays) or other evidence of ability, as determined in the reasonable business judgment of the Trustee, in consultation with the Consultation Parties, to consummate the transaction. Such funding commitments or other financing must be unconditional and must not be subject to

any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Trustee (in consultation with the Consultation Parties);

(xi)    includes evidence that the Qualified Bidder has obtained authorization or approval from its board of directors (or comparable governing body) acceptable to the Trustee with respect to the submission, execution, and delivery of its Bid and Bid Documents, participation in the Auction, and closing of the proposed transaction(s) contemplated in such Bid. The Bid shall further state that any necessary filings under applicable regulatory, antitrust, and other laws will be made in a timely manner and that payment of the fees associated therewith shall be made by the Qualified Bidder;

(xii)    disclaims any right to receive a fee analogous to a break-up fee, expense reimbursement, "topping" or termination fee, or any other similar form of compensation. For the avoidance of doubt, no Qualified Bidder will be permitted to request, nor be granted by the Trustee, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code;

(xiii)    includes (if applicable) a designation of contracts and/or leases to be assumed and assigned to the Potential Bidder, agreement to pay in full any associated cure costs, and evidence of the Potential Bidder's ability to perform future obligations under such contracts and/or leases;

(xiv)    is reasonably likely (based on availability of financing, regulatory issues, experience, and other considerations) to be consummated, if selected as a Successful Bid (as defined below), within a timeframe acceptable to the Trustee (with the consent of the Consultation Parties);

(xv)    contains a binding agreement by the Potential Bidder to serve as an "Alternate Bidder," (as defined below), if so selected by the Trustee in accordance with the Bidding Procedures; and

(xvi)    is irrevocable until the earlier of: (a) thirty (30) days after the Bankruptcy Court authorizes and approves a Successful Bid, or Bids, for the Purchased Assets that are the subject of the Bid; and (b) the closing of the sale(s) for the Purchased Assets that are the subject of the Bid.

32.    A Potential Bidder that makes a Qualified Bid is a "<u>Qualified Bidder</u>." The Trustee,

in his reasonable business judgment (in consultation with the Consultation Parties), shall determine

whether the Bid of a Potential Bidder meets the foregoing requirements to become a Qualified Bid.

Notwithstanding anything herein to the contrary, the Trustee reserves the right to work with Potential Bidders (in consultation with the Consultation Parties) to aggregate bids into a consolidated Qualified Bid, or otherwise improve bids to be Qualified Bids, prior to the Bid Deadline. Additionally, the Trustee will be authorized to approve joint Bids in his discretion (in consultation with the Consultation Parties) on a case-by-case basis.

33.    For the avoidance of doubt, any Bid that requires any form of future or current payment from the estate or the Lenders in the form of an expense reimbursement, purchase price adjustment or working capital adjustment, termination or breakup fee, or similar arrangement, shall not be considered a Qualified Bid until such concept is removed from the Bid.

## F.    Right to Credit Bid.

34.    The Lenders shall have the right to at the Auction to credit bid all or any portion of the aggregate amount of their applicable outstanding secured obligations pursuant to section 363(k) of the Bankruptcy Code, and any such credit bid will be considered a Qualified Bid to the extent such bid complies with section 363(k) of the Bankruptcy Code; provided that a credit bid shall not constitute a Qualified Bid if the bid does not include a cash component sufficient to pay in full, in cash, the carve-out amount as provided for in the Sharing Agreement and all claims for which there are valid, perfected, and unavoidable liens on any assets included in such Bid that are senior in priority to those of the party seeking to credit bid (unless such Lender consents to alternative treatment), if applicable.  There shall be no obligation for any Lender to provide a Bid by the Bid Deadline if the full purchase price of the Bid is paid pursuant to a credit bid and such Lender shall be entitled to full participation at any future Auction (defined below) as a Qualified Bidder notwithstanding any requirement contained in the Bidding Procedures.  In the event a Lender submits a credit bid or other Bid, any obligation of the Trustee to consult with the Lender as set forth herein and in the Bidding Procedures shall be waived, solely with respect to the

14

evaluation, negotiation, and qualification of Bids and the determination of Successful Bids and Alternate Bids for the applicable Lot(s) of Purchased Assets included in the Lender's Bid.

**G.**     **Template Asset Purchase Agreements.**

35.     The Template Asset Purchase Agreement in the data room identified as "General Asset Purchase Agreement" should be used for the purchase of any or all assets with the exception of real property and Akorn Operating's equity interest in Akorn International S.á.r.l. The Template Asset Purchase Agreement in the data room identified as ("Real Estate Asset Purchase Agreement") should be used for real estate, and the Template Asset Purchase Agreement in the data room identified as ("Stock Asset Purchase Agreement") should be used for Akorn Operating's equity interest in Akorn International S.á.r.l.[6]

**H.**     **Due Diligence.**

36.     The Trustee may, in his reasonable business judgment, afford each Potential Bidder such access to due diligence materials concerning the Purchased Assets as the Trustee deems appropriate. Due diligence access may include access to written materials, verbal discussions, on-site inspections, and other material that a Potential Bidder may reasonably request and as to which the Trustee, in his reasonable business judgment, may agree. The Trustee may, in the exercise of his reasonable business judgment (in consultation with the Consultation Parties), extend a Qualified Bidder's time to conduct due diligence after the Bid Deadline (as defined below) until the Auction. The Trustee may, in his reasonable business judgment, coordinate due diligence efforts such that multiple Potential Bidders have simultaneous access to due diligence materials and/or simultaneous attendance at site inspections. The Trustee makes no representation or warranty as to the information to be provided through this due diligence process.

---

[6] Word versions of the Template Asset Purchase Agreements are available from Greenhill upon request. Additionally, Greenhill shall post a Word version of each Template Asset Purchase Agreement in the data room.

15

37.    Each Qualified Bidder shall be deemed to acknowledge, and shall represent in any asset purchase agreement, that it has had an opportunity to inspect and examine the Purchased Assets and to conduct any and all due diligence prior to making its offer, that it has relied solely upon its own independent reviews, investigations, and/or inspections in submitting its Bid, and that it did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Purchased Assets or the completeness of any information provided in connection with the Bidding Process.

### I.    **Bid Deadline.**

38.    A Potential Bidder that desires to make a Bid must deliver written copies of its Bid, via electronic mail, hand delivery or overnight mail, to: (i) the Trustee, care of his counsel, Cozen O'Connor, 1201 N. Market St., Ste. 1001, Wilmington, DE 19801, Attn. John T. Carroll, III, Esq. (jcarroll@cozen.com) and Simon Fraser, Esq. (sfraser@cozen.com); (ii) MidCap Funding IV Trust, care of its counsel, Proskauer Rose LLP, One International Place, Boston, MA 02110, Attn: Charles A. Dale, Esq. (cdale@proskauer.com); (iii) WSFS Institutional Services, care of its counsel, Wilmer Cutler Pickering Hale and Dorr LLP, 7 World Trade Center, 250 Greenwich Street, New York, NY 10007, Attn: Andrew N. Goldman, Esq. (andrew.goldman@wilmerhale.com) and Nathan J. Moore, Esq. (nathan.moore@wilmerhale.com); (iv) Ad Hoc TL Lender Group, care of their counsel, Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, NY 10166-0193, Attn: Matt J. Williams, Esq., (mjwilliams@gibsondunn.com) and AnnElyse Scarlett Gains, Esq., (agains@gibsondunn.com); and (v) Greenhill & Co., LLC, 1271 Avenue of the Americas, New York, NY 10020, Attn: Neil A. Augustine (neil.augustine@greenhill.com), Rupert Hill (rupert.hill@greenhill.com), Nicholas Drayson (nicholas.drayson@greenhill.com) and Sean

16

Wright (sean.wright@greenhill.com) so that the Bid is actually received by **12:00 p.m. (Noon) (ET) on May 4, 2023** (the "Bid Deadline"). The Trustee may (in consultation with the Consultation Parties) extend the Bid Deadline once or successively but is not obligated to do so. If the Trustee extends the Bid Deadline, he shall promptly notify all Potential Bidders of such extension.

39.     Without the prior written consent of the Trustee (in consultation with the Consultation Parties), a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the consideration contemplated by, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; provided that any Qualified Bid may be improved at the Auction as set forth herein. Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures.

### J.    No Qualified Bids.

40.     If the Trustee does not receive any Qualified Bids, the Trustee shall report the same to the Court and declare the Auction a "failed auction."

### K.    Only One Qualified Bid.

41.     In the event that the Trustee receives only one Qualified Bid, the Trustee will not hold the Auction and may instead seek approval of such Qualified Bid and the associated asset purchase agreement at the Sale Hearing. However, in the event that only one Qualified Bid is received, the Trustee may determine in his reasonable business judgment (in consultation with the Consultation Parties) that such Qualified Bid is insufficient, and shall have the right to either postpone the Auction and Bid Deadline or declare the Auction a "failed auction."

LEGAL\62837797\6 6010823/00574256
04/20/2023

## L.    **Auction Procedure.**

42.     If at least two (2) Qualified Bids have been received, the Trustee shall conduct the Auction commencing on **May 10, 2023 at 10:00 a.m. (ET), and, as may be necessary, continuing through and including May 12, 2023**, at the offices of Cozen O'Connor, One Liberty Place, 1650 Market Street, Suite 2800, Philadelphia, PA 19103, or such later time or other place or manner as the Trustee shall notify all Qualified Bidders. Only Qualified Bidders shall be eligible to participate in the Auction and only Qualified Bidders shall be entitled to make any subsequent Qualified Bids at the Auction. The Trustee shall not consider a particular Bid unless the bidding party has submitted a Qualified Bid and attends the Auction.

43.     Prior to the start of the Auction, the Trustee shall evaluate all Qualified Bids received and shall determine (in consultation with the Consultation Parties) which Qualified Bid(s) constitutes the best offer(s) for all, or for one or more lots (each, a "Lot") of, the Purchased Assets (the "Starting Auction Bid(s)"); provided that the Trustee shall consult with the Consultation Parties prior to making any decision on which Bid shall be the Starting Auction Bid(s).  The Trustee, in his discretion and in consultation with the Consultation Parties, may accept as a single Qualified Bid, multiple Bids for non-overlapping Lots.   The Trustee shall announce the Starting Auction Bid(s), and, if applicable, the make-up of each Lot, at the commencement of the Auction. The make-up of each Lot shall be within the discretion of the Trustee, in consultation with his professionals and the Consultation Parties.

44.     The Trustee, in his sole discretion, and in consultation with his professionals, may at any time during the Auction conduct separate rounds of bidding for different Lots. The Trustee, in his sole discretion and in consultation with his counsel, may alter or combine one or more Lots, and/or divide the Purchased Assets into additional Lots, as he deems appropriate at any point during the Auction.

45.    The Trustee, after consultation with his professionals and the Consultation Parties, may employ and announce at the Auction additional and/or modified rules or procedures for conducting the Auction, provided that such rules are (i) not inconsistent with the Bidding Procedures Order or any other order of the Court, or the Bankruptcy Code, and (ii) disclosed to each Qualified Bidder at the Auction.

## M.    Minimum Overbids.

46.    The minimum initial overbid and any subsequent overbids must be in increments of at least $100,000 in cash consideration with respect to a single Lot, and at least $1,000,000 in cash consideration with respect to all of the Purchased Assets (which amount the Trustee, in his reasonable business judgment, may modify at the Auction with respect to all of the Purchased Assets and/or one or more Lots) until the Trustee declares a Successful Bidder or Bidders.

## N.    Successful Bidder.

47.    At the conclusion of the Auction, the Trustee, in consultation with his counsel and in consultation with the Consultation Parties, shall (i) review each Qualified Bid (as may have been increased and/or modified at the Auction) on the basis of financial and contractual terms and the factors relevant to the Sale Process, including those factors affecting the speed and certainty of consummating the Qualified Bid, and (ii) identify the best bid or bids for either all of the Purchased Assets or for each Lot, as applicable (each such bid, a "Successful Bid") and the bidder making such best bid or bids (each such bidder, a "Successful Bidder").  The Trustee, in his discretion and in consultation with the Consultation Parties, may group as a single Qualified Bid the Successful Bids for non-overlapping Lots to participate in an Auction for such non-overlapping Lots as a single Lot, or to participate in an Auction for all of the Purchased Assets as a single Lot.

19

### O.   Alternate Bidder.

48.     If the Trustee receives more than one Qualified Bid either for all of the Purchased Assets or for a given Lot, as applicable, then, at the Sale Hearing, the Trustee will seek approval of the Successful Bids, and, at the Trustee's election, in consultation with the Consultation Parties, the next best Qualified Bid(s) (the "Alternate Bid(s)" and the bidder(s) making such Alternate Bid(s), the "Alternate Bidder(s)"). The Trustee's presentation to the Court of the Successful Bid(s) and, if applicable, the Alternate Bid(s) will not constitute the Trustee's acceptance of such Bids until such Bids are approved by the Court at the Sale Hearing. Following approval of the Sale to a Successful Bidder, if the Successful Bidder fails to consummate the Sale for any reason, then the applicable Alternate Bid will be deemed to be the Successful Bid and the Trustee will be authorized, but not directed, to effect the Sale to the Alternate Bidder subject to the terms of the Alternate Bid of such Alternate Bidder without further order of the Court. The Alternate Bid shall remain open until the earlier of (a) thirty (30) days following the entry of the Sale Order or (b) the consummation of the Sale to the Successful Bidder unless further extended by agreement of the Trustee and Alternate Bidder.

### P.   Consent to Jurisdiction.

49.     All Qualified Bidders at the Auction shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and to have waived any right to a jury trial in connection with any disputes related to the Auction, and the construction and enforcement of the Qualified Bidder's proposed purchase agreement.

### Q.   Incremental Deposits.

50.     Upon a Qualified Bidder's declaration of its Bid at the Auction, it must commit on the record to pay promptly following the Auction, if such Bid were to be Successful Bid or the Alternate Bid, the incremental amount of its Deposit calculated based on the increased purchase

20

price of such bid, if applicable; provided that this requirement shall not apply to any Bid by the Lenders.

### R.    Return of Deposits.

51.    All Required Deposits, but excluding the Required Deposits of a Successful Bidder and Alternate Bidder (which, in the case of the Required Deposit of the Alternate Bidder, shall be returned within three (3) business days of the closing of the Sale to the Successful Bidder), shall be returned to Qualified Bidders within five (5) business days after the date of the Auction. The Trustee shall be required to maintain Required Deposits in a non-interest bearing account. Required Deposits may only be used in accordance with the provisions of these Bidding Procedures. The Trustee shall not have any liability with respect to any Required Deposits. If a Successful Bidder fails to consummate an approved sale as a result of its own default or the terms of the relevant asset purchase agreement between the Trustee and such Successful Bidder would allow the Trustee to retain such Successful Bidder's Required Deposit, the Trustee will not have any obligation to return the Required Deposit of such Successful Bidder, and such Required Deposit will become property of the Estates.

### S.    Sale Hearing.

52.    The Trustee shall request that the Court schedule the Sale Hearing on, or as soon as practicable after, **May 19, 2023**. At the Sale Hearing, the Trustee shall seek entry of the Sale Order, among other things, authorizing and approving the proposed transaction(s) with the Successful Bidder(s), as determined by the Trustee in consultation with his counsel and the Consultation Parties and in accordance with the Bidding Procedures, pursuant to the terms and conditions set forth in the Successful Bids. The Trustee, in his reasonable business judgment, may adjourn or reschedule the Sale Hearing. The Trustee shall notify all relevant parties of such adjournment or rescheduling in an appropriate manner.

## T.    Reservation of Rights.

53.    The Trustee reserves his right, in the exercise of his fiduciary obligations, after consultation with his professionals, subject to the terms and conditions in the Sharing Agreement, and in the exercise of his reasonable business judgment, to: (a) determine which Qualified Bid(s), if any, are the highest or otherwise best offer, either for all of the Purchased Assets or for each Lot, as applicable; (b) reject, at any time, any bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, the Bidding Procedures Order or any other orders applicable to the Estates or the terms and conditions of the Sale, or (iii) contrary to the best interests of the Estates; and (c) modify the Bidding Procedures, including, without limitation, by (1) extending any of the deadlines set forth above for the Bidding Process, (2) modifying bidding increments, (3) adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without prior notice, (4) withdrawing from the Auction the Purchased Assets, or any Lot or portion thereof, at any time prior to or during the Auction, and/or (5) canceling the Auction, and rejecting all Qualified Bids if, in the Trustee's reasonable business judgment, and in consultation with his counsel, no such bid is for a fair and adequate price. Notwithstanding the forgoing, the Trustee shall consult with the Consultation Parties on each of the determinations above and shall not agree to any modifications of the Bidding Procedures or other terms and conditions of any Sale that conflict with the Sharing Agreement absent the consent of the Consultation Parties.

54.    Approval of the Bidding Procedures would establish the following timeline:

> i.    Three (3) business days after entry of the Bidding Procedures Order – Issuance of Notice of Auction and Sale Hearing.

> ii.    Three (3) business days after entry of the Bidding Procedures Order – Issuance of Cure Notice.

LEGAL\62837797\6 6010823/00574256
04/20/2023

     iii.  May 16, 2023 at 4:00 p.m. (ET) – Sale and Cure Objections Deadline.

     iv.  May 4, 2023 at 12:00 p.m. (ET) – Deadline to Submit Qualified Bids.

     v.  May 10, 2023 at 10:00 a.m. (ET) (and continuing through May 12, 2023 as may be necessary) – Auction.

     vi.  May 19, 2023 – Proposed Sale Hearing.

  **U.**  **The Notice Procedures.**

55.  The Trustee proposes the following Notice Procedures in connection with the Sale:

    (i)  **Notice**

56.  The Trustee will give notice (the "<u>Notice of Auction and Sale Hearing</u>") within three (3) business days after the entry of the Bidding Procedures Order of the Bidding Procedures, the time and place of the Auction, the time and place of the Sale Hearing, and the objection deadline for the Sale Hearing by sending a notice, substantially in the form attached hereto as <u>Exhibit D</u> to: (i) the Office of the United States Trustee; (ii) the Debtors' counsel; (iii) counsel to the ABL Agent, (iv) the Required Lenders, (v) counsel to the TL Agent; (vi) known counsel to any other Lenders; (vii) the Internal Revenue Service, (viii) all federal, state, and local taxing authorities identified in the Debtors' Schedules or otherwise known by the Trustee to have jurisdiction over the Purchased Assets; (ix) the Counterparties (as defined below); (x) the United States Department of Justice and applicable state attorneys general; (xi) largest thirty (30) unsecured creditors with names and addresses appearing in Schedule F of the Schedules of Assets and Liabilities prepared by the Debtors; (xii) all parties that have requested notice pursuant to Bankruptcy Rule 2002; and (xiii) any other parties known by the Trustee to have expressed an interest in a transaction with respect to all or part of the Purchased Assets (collectively, the "<u>Notice Parties</u>").

(i)    **Objections**

57.    The Notice of Auction and Sale Hearing will specify that objections to the relief requested by this Motion, including objections related to the assumption or assignment of any unexpired lease or executory contract, shall be set forth in writing and specify with particularity the grounds for such objections or other statements of position, and shall be filed and served on or before the date that is three (3) business days prior to the Sale Hearing (the "Objection Deadline"), on: (i) the Trustee, care of his counsel, Cozen O'Connor, 1201 N. Market St., Ste. 1001, Wilmington, DE 19801, Attn. John T. Carroll, III, Esq. (jcarroll@cozen.com) and Simon Fraser, Esq. (sfraser@cozen.com); (ii) MidCap Funding IV Trust, as ABL Agent care of its counsel, Proskauer Rose LLP, One International Place, Boston, MA 02110, Attn: Charles A. Dale, Esq. (cdale@proskauer.com); (iii) WSFS Institutional Services as TL Agent, care of its counsel, Wilmer Cutler Pickering Hale and Dorr LLP, 7 World Trade Center, 250 Greenwich Street, New York, NY 10007, Attn: Andrew N. Goldman, Esq. (andrew.goldman@wilmerhale.com) and Nathan J. Moore, Esq. (nathan.moore@wilmerhale.com); (iv) Ad Hoc TL Lender Group, care of their counsel, Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, NY 10166-0193, Attn: Matt J. Williams, Esq., (mjwilliams@gibsondunn.com) and AnnElyse Scarlett Gains, Esq. (agains@gibsondunn.com); and (v) the Office of the United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19081, Attn: Richard Schepacarter, Esq. (Richard.Schepacarter@usdoj.gov) (collectively, the "Service Parties"). The Trustee requests that the Court order that the failure to file and serve objections by the Objection Deadline, and in accordance with the foregoing procedure, shall be deemed a waiver of such objections and the objecting party shall be forever barred from asserting such objections with respect to the consummation and closing of the Sale, including, without limitation, any objections relating to the

LEGAL\62837797\6 6010823/00574256
04/20/2023

proposed assumption and assignment of any agreement. The Notice of Auction and Sale Hearing will further state that any objections filed and served in accordance with the foregoing procedure will be heard by the Court at the Sale Hearing.

### V. Assumption and Assignment of Executory Contracts and/or Unexpired Leases.

58.    In conjunction with the Sale, the Trustee will seek to assume and assign to each Successful Bidder the executory contacts and/or unexpired leases identified in its Successful Bid.

59.    Within three (3) business days after entry of the Bidding Procedures Order, the Trustee shall file and serve upon counterparties to the Debtors' executory contracts and unexpired leases (the "Counterparties") a notice substantially in the form attached hereto as Exhibit E (the "Cure Notice"), informing Counterparties that the Debtors' executory contracts and unexpired leases may be assumed and assigned, and setting out what the Debtors' records show to be the applicable cure amounts, if any (the "Cure Amounts").

60.    All objections to the relief sought at the Sale Hearing, including objections to the Cure Amounts and objections to the proposed assumption and assignment of the executory contracts and/or unexpired leases identified in any Bid, must: (i) be in writing; (ii) state with specificity the nature of such objection (with appropriate documentation in support thereof); (iii) comply with the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the Local Rules; and (iv) be filed with the Court and served upon (so as to be received by) the Service Parties on or before the Objection Deadline.

61.    A party failing to file and serve a timely objection to the Cure Amounts and/or the Trustee's assumption and assignment of any executory contract or unexpired lease shall be forever barred from objecting to the Cure Amounts and/or assumption and assignment, and will be deemed to consent to the Cure Amounts and/or assumption and assignment. In the event that timely

objection to the Cure Amounts and/or assumption and assignment of any executory contract or unexpired lease is filed, and the parties are unable to consensually resolve the dispute prior to the Sale Hearing, such objection will be determined either at the Sale Hearing, or at such other hearing as may be scheduled by the Court.

## RELIEF REQUESTED

62.     The Trustee seeks expedited entry of the Bidding Procedures Order: (a) approving the Bidding Procedures, (b) scheduling the Auction and Sale Hearing, (c) approving the Notice Procedures, and (d) granting certain related relief.

63.     For the reasons described above, including those in paragraphs 22-24, the Trustee believes that entry of the Bidding Procedures Order on an expedited basis is warranted. Contemporaneously with this Motion, the Trustee is filing a motion requesting a shortened notice period and scheduling of an expedited hearing regarding the relief requested in the Bidding Procedures Order.

64.     In addition, at the conclusion of the Sale Hearing, the Trustee will seek entry of the Sale Order: (i) authorizing the sale of the Purchased Assets to the Successful Bidder(s), (ii) authorizing the assumption and assignment of executory contract(s) and/or unexpired lease(s) as may be applicable, and (iii) granting certain related relief.

## BASIS FOR REQUESTED RELIEF

### A.     The Bidding Procedures Should Be Approved.

65.     The Bidding Procedures are designed to generate the highest and best value for the Estates' assets by facilitating a competitive Bidding Process in which all Potential Bidders are encouraged to participate and submit competing bids.

66.     The Debtors operated in a very specialized and sophisticated industry. The Trustee with the assistance of his professionals and by virtue of the renewal of prior sales efforts by the

26

Debtors has already largely familiarized himself with many of the parties who may have a realistic interest in bidding for the Purchased Assets. The Trustee does not believe that extensive marketing beyond what he proposes here would uncover any further serious bidders.

> **B.**      **Credit Bidding Should Be Authorized Under Section 363(k) of the Bankruptcy Code.**

67. A secured creditor is allowed to "credit bid" the amount of its claim in a sale. Section 363(k) of the Bankruptcy Code provides, in relevant part, that unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of the sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property." 11 U.S.C. § 363(k). Even if a secured creditor is undersecured as determined in accordance with section 506(a) of the Bankruptcy Code, section 363(k) of the Bankruptcy Code allows such secured creditor to bid the total face value of its claim and does not limit the credit bid to the claim's economic value. See In re Submicron Sys. Corp., 432 F.3d 448, 459-60 (3d Cir. 2006) (explaining that "[i]t is well settled among district court and bankruptcy courts that creditors can bid the full face value of their secured claims under section 363(k)").

68. In this district, absent cause for restricting credit bidding, courts have consistently ruled in favor of reserving a secured creditor's right to credit bid its claim. See e.g. In re Dura Automotive Systems, LLC, No. 19-12378 (KBO) (Bankr. D. Del. Nov. 19, 2019); In re PES Holdings, LLC, No. 19-11626 (KG) (Bankr. D. Del. Nov. 14, 2019) (order approving bid procedures which authorized parties with secured claims to credit bid); In re Z Gallerie, Inc., No. 19-10488 (LSS) (Bankr. D. Del. Apr. 11, 2019) (same); In re Things Remembered, Inc., No. 19-10234 (KG) (Bankr. D. Del. Feb. 21, 2019) (same); In re GST Autoleather Inc., No. 17-12100 (LSS) (Bankr. D. Del. Nov. 15, 2017) (same).

LEGAL\62837797\6 6010823/00574256
04/20/2023

### C.    The Assumption and Assignment of the Executory Contracts and/or Unexpired Leases Should Be Approved.

69.    Section 365(a) of the Bankruptcy Code provides that a trustee, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." The standard governing bankruptcy court approval of a trustee's decision to assume or reject an executory contract or unexpired lease is whether the trustee's reasonable business judgment supports assumption or rejection. See, e.g., Sharon Steel Corp., 872 F.2d 36, 39-40 (3d Cir. 1989); In re Stable Mews Assoc., Inc., 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984). The business judgment test "requires only that the trustee demonstrate that [assumption or] rejection of the executory contract will benefit the estate." Wheeling-Pittsburgh Steel Corp. v. W. Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.), 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting Stable Mews Assoc., 41 B.R. at 596). Any more exacting scrutiny would hinder the administration of the estate and increase costs. See Richmond Leasing Co. v. Capital Bank N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

70.    In order to assign an executory contract, a trustee must first assume it. In order to assume a contract, a trustee must "cure, or provide adequate assurance that [he] will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1). Here, the Trustee proposes to circulate the Cure Notice to the Counterparties within three (3) days following the entry of the Bidding Procedures Order, which will provide Counterparties with sufficient opportunity to assess the Trustee's proposed Cure Amounts and assert any objections.

71.    Once an executory contract is assumed, the trustee may then seek to assign the contract. Pursuant to section 365(f) of the Bankruptcy Code, a trustee may assign an assumed contract only if "adequate assurance of future performance by the assignee of such contract or

28

lease is provided, whether or not there has been a default in such contract or lease." 11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." See Carlisle Homes. Inc. v. Arrari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1989); see also In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that the debtor will thrive and pay rent). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and wherewithal to manage the type of enterprise or property assigned. See In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from the debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

72.     In response to any objection to a Successful Bidder's ability to perform under any executory contract and/or unexpired lease, the Trustee will present facts at the Sale Hearing (or, if applicable, at any separately-scheduled hearing on such objection) demonstrating the financial wherewithal of each Successful Bidder, and its willingness and ability to perform under the executory contract(s) or unexpired lease(s) in question. The Sale Hearing (or, if applicable, a separately-scheduled hearing on one or more such objections), therefore, will provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of any Successful Bidder to provide adequate assurance of future performance.

> **D.**     **The Sale Should Be Approved Pursuant to Section 363(b) of the Bankruptcy Code.**

73.     Section 363(b)(1) of the Bankruptcy Code provides, "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the

estate." A court should approve a trustee's sale or use of assets outside of the ordinary course of business if the trustee demonstrates a sound business justification for the proposed transaction. See, e.g., In re Martin, 91 F.3d 389, 395 (3d Cir. 1996); In re Abbott's Dairies of Pa., Inc., 788 F.2d 143 (3d Cir. 1986). Once the trustee articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" In re S.N.A. Nut Co., 186 B.R. 98, 102 (Bankr. N.D. Ill. 1995); In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992); In re Johns-Manville Corp., 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("A presumption of reasonableness attaches to a Debtor's management decisions").

74.     The Trustee has a sound business justification for selling the Purchased Assets at this time and in the proposed manner. The fairness and reasonableness of the consideration to be paid for the Purchased Assets, as may be declared at the Sale Hearing, will be conclusively demonstrated by exposure to the marketplace. The Trustee has proposed a fair and open Sale Process for attracting the highest and best value for the Purchased Assets.

75.     Due to factors including the specialized nature of the Debtors' business, the extensive pre-petition and post-petition marketing process and exposure of the Debtors' assets to the marketplace, the Trustee's high overhead costs to preserve the assets, and the limited funding available for Akorn AG's operations, as well as the general need in the United States to increase the manufacture of drugs that are in short supply, the Trustee believes that he should proceed with the proposed sale process as expeditiously as possible. Particularly in light of these circumstances, the Trustee's proposed sale process demonstrates sound business judgment, and represents the best path to providing maximum value for the Estates.

LEGAL\62837797\6 6010823/00574256
04/20/2023

76.     The Sale of the Purchased Assets will be subjected to a competitive and open Bidding Process, enhancing the Trustee's ability to receive maximum value for the Purchased Assets. Consequently, the fairness and reasonableness of the consideration to be received by the Trustee will ultimately be demonstrated by a "market check" through the Auction process, which is the best means for establishing whether the Trustee is receiving a fair and reasonable price for the Purchased Assets.

77.     In addition, the Trustee's service of the Notice of Auction and Sale Hearing is reasonably calculated to provide timely and adequate notice to the Estates' major creditor constituencies, those parties most interested in this case, those parties potentially interested in bidding on the Purchased Assets, and others whose interests are potentially affected by the proposed Sale.

78.     Accordingly, consummating the Sale expeditiously and in the manner proposed by the Trustee is in the best interest of the Estates.

### E.      **The Sale Should be Made Free and Clear of Interests Pursuant to Section 363(f) of the Bankruptcy Code.**

79.     Section 363(f) of the Bankruptcy Code permits a trustee to sell assets free and clear of all Interests (with any such Interests attaching to the net proceeds of the sale with the same rights and priorities therein as in the sold assets).

80.     Under section 363(f), a trustee may sell all or any part of the debtor's property free and clear of any and all liens, claims, or interests in such property if: (1) such a sale is permitted under applicable non-bankruptcy law; (2) the party asserting such a lien, claim, or interest consents to such sale; (3) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (4) the interest is the subject of a bona fide dispute;

LEGAL\62837797\6 6010823/00574256
04/20/2023

or (5) the party asserting the lien, claim, or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest.

81.     As section 363(f) is written in the disjunctive, a trustee need only meet one of the five conditions of section 363(f). The Trustee will be able to demonstrate at the Sale Hearing that he can satisfy one or more of these conditions with respect to each party holding a lien on or security interest in any of the Purchased Assets. At a minimum, the Trustee expects that the second and fifth of these requirements will be satisfied.

**F.      The Successful Bidders Should Receive the Protections of Section 363(m) of the Bankruptcy Code.**

82.     Pursuant to section 363(m) of the Bankruptcy Code, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims. See In re Mark Bell Furniture Warehouse, Inc., 992 F.2d 7, 9 (1st Cir. 1993); In re Willemain v. Kivitz, 764 F.2d 1019, 1023 (4th Cir. 1985); In re Congoleum Corp., No. 03-51524, 2007 WL 1428477, at *2 (Bankr. D.N.J. May 11, 2007).

83.     In response to any objection, the Trustee will present facts at the Sale Hearing demonstrating that any Successful Bidder for the Purchased Assets has negotiated at arm's length, and that all parties were represented by their own counsel.

84.     Accordingly, the Sale Order includes a provision that each Successful Bidder for the Purchased Assets is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code. The Trustee believes that providing any Successful Bidder with such protection will ensure that the Estates will receive the maximum possible price for the Purchased Assets.

**G.      Relief from Bankruptcy Rule 6004(h) is Warranted.**

85.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after the entry of the order, unless the court

32

orders otherwise." The Trustee requests that the Court waive this 14-day stay, and that the Sale Order be effective immediately.

86.    The purpose of Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented. See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h). Although Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and waive the 14-day stay, the leading bankruptcy treatise suggests that the fourteen day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 COLLIER ON BANKRUPTCY 15th Ed. Rev., ¶ 6004.10 at 6004-18 (L. King, 15th rev. ed. 2008). The treatise further suggests that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal.

87.    As described above, time is of the essence. The Debtors have ceased all U.S. operations, and the maintenance of their assets will be costly for the Estates. The Trustee needs to move as expeditiously as possible in order to prevent a deterioration in value of the Estates' assets. Consequently, a waiver of the Bankruptcy Rule 6004(h) stay is in the Estates' best interest.

## NOTICE

88.    Notice of this Motion has been given to the Notice Parties. In light of the nature of the relief requested, the Trustee respectfully submits that no further notice is necessary.

WHEREFORE, the Trustee respectfully requests that the Court enter the Bidding Procedures Order substantially in the form attached hereto as Exhibit A: (i) approving the Bidding Procedures, (ii) scheduling the Auction and Sale Hearing, (iii) approving the Notice Procedures, and (iv) granting certain related relief, any such further relief as may be appropriate; and after a Sale Hearing, enter the Sale Order substantially in the form attached hereto as Exhibit C: (i)

approving the sale of the Purchased Assets to the Successful Bidder(s), (ii) authorizing the

assumption and assignment of executory contracts and/or unexpired leases as applicable; and (iii)

granting certain related relief, any such further relief as may be appropriate.

Dated:   April 20, 2023                                          COZEN O'CONNOR

                                                      By:    */s/  John T. Carroll, III*
                                                             John T. Carroll, III (DE No. 4060)
                                                             Simon E. Fraser (DE No. 5335)
                                                             1201 N. Market Street
                                                             Suite 1001
                                                             Wilmington, DE  19801
                                                             (302) 295-2000 Phone
                                                             (302) 295-2013 Fax No.
                                                             jcarroll@cozen.com
                                                             sfraser@cozen.com

                                                             *Counsel for the Trustee,*
                                                             *George L. Miller*