## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>AKORN HOLDING COMPANY LLC, *et al.*[1]<br><br>Debtors. | Chapter 7<br><br>Case No. 23-10253 (KBO)<br><br>(Jointly Administered)<br><br>**Hearing Date: May 25, 2023 at 9:30 a.m.**<br>**Objection Deadline: May 18, 2023 at 4:00 p.m.** |

## TRUSTEE'S MOTION FOR APPROVAL OF SHARING AGREEMENT AND CARVE-OUT WITH LENDERS, AND RELATED RELIEF

George L. Miller, the duly appointed chapter 7 trustee (the "Trustee") for the estates (the "Estates") of the above-captioned Debtors (the "Debtors"), requests entry of an order approving the *Sharing Agreement Between Chapter 7 Trustee and Administrative Agents for Secured Lenders Providing for, Among Other Things, (I) Determination and Allowance of the Secured Lenders' Pre-Petition Claims and Liens; (II) the Trustee's Sale of the Debtors' Assets and Secured Lenders' Collateral; (III) the Specified Carve-Out From the Secured Lenders' Liens; and (IV) Other Matters Concerning the Trustee's Contemplated Sale(s) of Collateral and Certain Settlements* (the "Sharing Agreement")[2] between: (A) the Trustee; (B) MidCap Funding IV Trust (as successor-by-assignment to MidCap Financial Trust) as administrative agent (the "ABL Agent") for the lender parties (the "ABL Lenders") under the ABL Credit Agreement (as defined below) and for itself as an ABL Lender; and (C) Wilmington Savings Fund Society, FSB as administrative agent and collateral agent (the "TL Agent") for the lender parties (the "TL Lenders" and, together with the ABL Lenders, the "Lenders") under the TL Credit Agreement

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of their federal tax identification numbers, and cases numbers are Akorn Holding Company LLC (9190), Case No. 23-10253 (KBO); Akorn Intermediate Company LLC (6123), Case No. 23-10254 (KBO); and Akorn Operating Company LLC (6184), Case No. 23- 10255. The Debtors' headquarters is located at 5605 CenterPoint Court, Gurnee, IL 60031.

[2] Unless otherwise indicated, capitalized terms not otherwise defined in this Motion shall have the meanings provided in the Sharing Agreement.

(as defined below), providing for, among other things, (i) the determination and allowance of the Lenders' pre-petition claims and liens; (ii) the Trustee's use of cash collateral for purposes including without limitation administering, recovering, preserving, marketing, and selling the Estates' assets and the Lenders' Collateral; (iii) the specified carve-out from the Lenders' liens; and (iv) related matters.  In support, the Trustee respectfully states:

## JURISDICTION AND VENUE

1.       The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  The Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent the consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

**A.       Introduction**

2.       On February 23, 2023 (the "Petition Date"), the Debtors commenced these jointly administered bankruptcy cases (collectively the "Bankruptcy Cases") by each filing a voluntary petition in this Court for relief under chapter 7 of the Bankruptcy Code.

3.       On or about the Petition Date, the Office of the United States Trustee appointed the Trustee as the chapter 7 trustee to the Estates.

4.       The Debtors' businesses included developing, manufacturing, and marketing specialty pharmaceuticals, including prescription, consumer health, and animal health products. The Debtors were an industry leader in branded and generic products in alternate dosage forms

such as ophthalmics, injectables, oral liquids, topicals, inhalants, and nasal sprays. The Debtors operated at numerous locations in the United States, both owned and leased, and were headquartered in Gurnee, Illinois.

5. The Debtors' operations in the U.S. have all ceased. However, their Swiss affiliate, non-Debtor Akorn AG, continues to operate. Debtor Akorn Operating Company LLC ("Akorn Operating") owns 100% of the equity in Akorn International S.á.r.l, a non-debtor based in Luxembourg. Akorn International S.á.r.l, in turn, owns 100% of the equity in Akorn AG.

6. Akorn Operating, as borrower, and Akorn Intermediate Company LLC ("Akorn Intermediate"), as guarantor, are parties to a certain asset-based credit facility (the "ABL Facility"), and a certain term loan facility (the "Term Loan Facility"), as described below.

**B.    The ABL Facility**

7. Akorn Operating and Akorn Intermediate are parties to that certain Credit Agreement, dated as of October 1, 2020 (as amended, supplemented or modified from time to time, the "ABL Credit Agreement"), together with the ABL Lenders, and ABL Agent, pursuant to which Akorn Operating as borrower received a revolving line of credit in a maximum aggregate amount of $160,000,000.

8. The ABL Facility is secured under a certain Pledge and Security Agreement also dated as of October 1, 2020 (as amended, supplemented or modified from time to time, the "ABL Pledge and Security Agreement" and, together with the ABL Credit Agreement and any and all other agreements, documents and instruments executed in connection therewith or in furtherance thereof, the "ABL Pre-Petition Financing Documents"), and if applicable under one or more other ABL Pre-Petition Financing Documents, by the following as described therein, in all instances excluding the Excluded Assets and subject to the terms of the ABL Pre-Petition

Financing Documents and the Intercreditor Agreement (as defined below) (collectively, the "ABL Pre-Petition Liens"): (i) valid, enforceable, perfected, and non-avoidable first-priority security interests and liens (the "ABL First Priority Pre-Petition Liens") in Akorn Operating's and Akorn Intermediate's Accounts; Inventory; Deposit Accounts; all cash and cash equivalents (other than cash Proceeds of collateral subject to TL First Priority Pre-Petition Liens (as defined below)); Equipment located in the United States; the Specific Real Estate Collateral;[3] to the extent evidencing or governing any of the foregoing items, all Chattel Paper, Documents, Instruments, General Intangibles, and Securities Accounts related thereto (provided that to the extent any of the foregoing also relates to the TL Collateral (as defined below) only that portion related to the foregoing are included); all books and records relating to the foregoing (including without limitation all books, databases, customer lists and records, whether tangible or electronic which contain any information relating to the foregoing); and all Proceeds of and Supporting Obligations, including, without limitation, Letter of Credit Rights, with respect to any of the foregoing and all collateral security and guarantees given by any Person in favor of any Loan Party with respect to any of the foregoing (the "ABL First Priority Collateral");[4] and (ii) valid, enforceable, perfected, and non-avoidable second-priority security interests and liens (the "ABL Second Priority Pre-Petition Liens") in all TL First Priority Collateral (as defined below) (the "ABL Second Priority Collateral," and, together with the ABL First Priority Collateral, the "ABL Collateral").

---

[3] "Specific Real Estate Collateral" means all fee owned real estate located at 225 Dixon Avenue, Amityville, NY, 369 Bayview Avenue, Amityville, NY, 13 Edison Street East, Amityville, NY, and 1222 West Grand Avenue, Decatur, IL, and improvements thereon.  For the avoidance of doubt, Specific Real Estate Collateral does not include the following: (i) 10 Edison St., Amityville, NY (Suffolk County); and (ii) 150 South Wyckles Rd., Decatur, IL (Macon County).  Notwithstanding anything herein that may be interpreted to the contrary, these real properties are Excluded Assets not part of the Collateral (as defined below).

[4] Capitalized terms used in the description of the ABL First Priority Collateral and not otherwise defined in this Agreement shall have the meanings provided in the ABL Pre-Petition Financing Documents and/or the Intercreditor Agreement (as defined below), as applicable.

4

9.      For the avoidance of doubt, the ABL Collateral excludes causes of action under chapter 5 of the Bankruptcy Code and the proceeds thereof (for the further avoidance of doubt, such exclusion shall not prevent the ABL Agent or any of the ABL Lenders from participating in any distribution to pre-petition unsecured creditors based on any deficiency claim that the ABL Agent or any of the ABL Lenders may ultimately hold).

10.     As of the Petition Date, there was $46,369,390.84 in principal outstanding under the ABL Credit Agreement (together with interest, fees, costs and charges to which the ABL Agent and ABL Lenders may be entitled under the ABL Pre-Petition Financing Documents and the Bankruptcy Code, the "ABL Claim Amount" or the "ABL Pre-Petition Obligations").

**C.      The Term Loan Facility**

11.     Akorn Operating and Akorn Intermediate are also parties to that certain Senior Secured Term Loan Agreement, dated as of October 1, 2020 (as amended, supplemented or modified from time to time, the "TL Credit Agreement"), together with the TL Lenders, and the TL Agent, pursuant to which Akorn Operating as borrower received a senior secured term loan facility in an initial aggregate amount of $370,000,000.

12.     The Term Loan Facility is secured under a certain Pledge and Security Agreement also dated as of October 1, 2020 (as amended, supplemented or modified from time to time, the "TL Pledge and Security Agreement" and, together with the TL Credit Agreement and any and all other agreements, documents and instruments executed in connection therewith or in furtherance thereof, the "TL Pre-Petition Financing Documents"), and if applicable under one or more other TL Pre-Petition Financing Documents, by the following as described therein, in all instances excluding the Excluded Assets and subject to the terms of the TL Pre-Petition Financing Documents and the Intercreditor Agreement (as defined below) (collectively, the "TL

Pre-Petition Liens"): (i) valid, enforceable, perfected, and non-avoidable first-priority security interests and liens (the "TL First Priority Pre-Petition Liens") in all of Akorn Operating's and Akorn Intermediate's Collateral (as used in the Intercreditor Agreement (as defined below)) and the proceeds thereof, but expressly excluding the ABL First Priority Collateral (the "TL First Priority Collateral"); and (ii) valid, enforceable, perfected and non-avoidable second-priority security interests and liens (the "TL Second Priority Pre-Petition Liens") in all ABL First Priority Collateral (the "TL Second Priority Collateral," and, together with the TL First Priority Collateral, the "TL Collateral").  The TL Collateral, together with the ABL Collateral, shall be referred to as the "Collateral."

13.    For the avoidance of doubt, the TL Collateral excludes causes of action under chapter 5 of the Bankruptcy Code and the proceeds thereof (for the further avoidance of doubt, such exclusion shall not prevent the TL Agent or any of the TL Lenders from participating in any distribution to pre-petition unsecured creditors based on any deficiency claim that the TL Agent or any of the TL Lenders may ultimately hold).

14.    As of the Petition Date, there was $134,454,589 in principal outstanding under the TL Credit Agreement, and together with all other obligations owing under the TL Credit Agreement plus any accrued and unpaid interest and additional fees and expenses (including, without limitation, interest, fees, premiums, indemnities, related charges and all other Obligations that are chargeable or reimbursable under the TL Credit Agreement and the Bankruptcy Code) (the "TL Claim Amount" or  the "TL Pre-Petition Obligations" and, together with the ABL Pre-Petition Obligations, the "Pre-Petition Obligations").

LEGAL\61925694\5 6010823/00574256
05/01/2023

D.    **The Intercreditor Agreement**

15.    The ABL Agent and the TL Agent are parties to that certain Intercreditor Agreement, dated as of October 1, 2020 (the "Intercreditor Agreement"), pursuant to which the parties thereto set forth, among other things, (a) their relative lien priorities in the Collateral and enforcement rights and obligations related thereto, (b) the method by and the order in which proceeds of the Collateral shall be applied by the ABL Agent and TL Agent, respectively, (c) the impact on the respective liens of the ABL Agent and TL Agent arising from the sale or disposition of Collateral, and (d) the relative rights and obligations of the ABL Agent and TL Agent upon and during the occurrence of any Insolvency Proceeding of any Loan Party (as defined in the Intercreditor Agreement).

E.    **The Sharing Agreement**

16.    Among other tasks in these cases, the Trustee is commencing the process of marketing and offering for sale substantially all of the Debtors' assets.  In order to fund the sale process, and administer the Estates generally, the Trustee needs to use cash collateral.  In addition, the Trustee has determined that he cannot, absent a carve-out from the Lenders, effectively administer the Estates because the liens and claims of the Lenders likely exceed the value of the Collateral.  Consequently, in the absence of an agreement regarding the use of cash collateral and a carve-out from the Lenders, the Trustee would likely not have the resources to administer the Estates.  Moreover, the Debtors' unsecured creditors would likely realize no benefit from such administration.

17.    After arm's length negotiations, the Trustee has reached a sharing agreement with the Lenders, memorialized in the Sharing Agreement, under which the Trustee will have the ability to use cash collateral, including cash and the other proceeds of the Debtors' existing

7

accounts receivable and inventory, to administer, recover, preserve, market, and sell the Collateral pursuant to one or more sales to be conducted under section 363 of the Bankruptcy Code ("Asset Sales") in a manner that is designed and intended to obtain the highest and best price for the Collateral.  A copy of the Sharing Agreement is attached to this Motion as Exhibit "A."

18.     In addition, subject to the terms and conditions in the Sharing Agreement, the Lenders have agreed to carve out from the proceeds of the Asset Sales certain amounts, including amounts to pay compensation for the Trustee and his professionals, amounts for payment of reasonable costs and expenses necessary to administer, recover, preserve, market, sell or otherwise dispose of property of the Estates, and amounts to be retained by Estates for distribution by the Trustee in accordance with section 726 of the Bankruptcy Code.

19.     The principal terms of the Sharing Agreement, *inter alia*, include the following:[5]

     i.      The Trustee stipulates and agrees that, as of the Petition Date, pursuant to the ABL Pre-Petition Financing Documents, Akorn Operating and Akorn Intermediate are indebted to the ABL Lenders in the ABL Claim Amount.  The Trustee stipulates and agrees that, as of the Petition Date, pursuant to the TL Pre-Petition Financing Documents, Akorn Operating and Akorn Intermediate are indebted to the TL Lenders in an amount not less than the TL Claim Amount.  *See* Sharing Agreement, ¶¶2-3.

     ii.     The Trustee further stipulates and agrees that the ABL Pre-Petition Obligations are secured by valid, enforceable, perfected and non-avoidable first-priority liens and security interests granted by Akorn Operating and Akorn Intermediate to the ABL Lenders upon and in the ABL First Priority Collateral, and valid, enforceable, perfected and non-avoidable second-priority liens and security interests granted by Akorn Operating and Akorn Intermediate to the ABL Lenders upon and in the ABL Second Priority Collateral.  For the avoidance of doubt, the ABL Pre-Petition Liens are and shall be deemed finally allowed for all purposes in the Bankruptcy Cases of Akorn Operating and Akorn Intermediate, and shall not be subject to objection, defense, counterclaim, avoidance, subordination, setoff, recharacterization, deductions, challenge, disallowance or impairment of any kind or nature by the Trustee, the Estates, or any creditor, interest holder or other party in interest.  In the event of the dismissal of one or

---

[5] The terms of the Sharing Agreement control to the extent that any conflict with this summary.

more of the Bankruptcy Cases, the findings, stipulations and agreements set forth herein regarding the amount, validity, enforceability, non-avoidability and allowance of the claim(s), liens and security interests of the ABL Lenders shall survive, and shall be binding on Akorn Operating and Akorn Intermediate, their assigns, successors-in-interest, creditors, interest holders and other parties in interest. *See id.*, ¶ 4.

iii.    The Trustee further stipulates and agrees that the TL Pre-Petition Obligations are secured by valid, enforceable, perfected and non-avoidable first-priority liens and security interests granted by Akorn Operating and Akorn Intermediate to the TL Lenders upon and in the TL First Priority Collateral, and valid, enforceable, perfected and non-avoidable second-priority liens and security interests granted by Akorn Operating and Akorn Intermediate to the TL Lenders upon and in the TL Second Priority Collateral. For the avoidance of doubt, the TL Pre-Petition Liens are and shall be deemed finally allowed for all purposes in the Bankruptcy Cases of Akorn Operating and Akorn Intermediate, and shall not be subject to objection, defense, counterclaim, avoidance, subordination, setoff, recharacterization, deductions, challenge, disallowance or impairment of any kind or nature by the Trustee, the Estates, or any creditor, interest holder or other party in interest. In the event of the dismissal of one or more of the Bankruptcy Cases, the findings, stipulations and agreements set forth herein regarding the amount, validity, enforceability, non-avoidability and allowance of the claim(s), liens and security interests of the TL Lenders shall survive, and shall be binding on Akorn Operating and Akorn Intermediate, their assigns, successors-in-interest, creditors, interest holders and other parties in interest. *See id.*, ¶ 5.

iv.    Notwithstanding anything to the contrary herein, the Trustee stipulates that the TL First Priority Collateral includes all of the cash on the Petition Date that was in the Debtors' deposit account with an account number ending in 7616 at Bank of America, N.A. (the "TL Restricted Cash") and the tax refund that was purchased by the TL Lenders from the jointly administered bankruptcy estates of Akorn, Inc. *et al.*, debtors in case No. 20-11177 (KBO) (Bankr. D. Del.) (the "TL CARES Act Refund"). Upon the Trustee's receipt of the TL CARES Act Refund, the Trustee shall promptly distribute the TL CARES Act Refund to the TL Lenders on account of their secured claims. For the avoidance of doubt, no fees owing pursuant to this Agreement shall be paid with any of the proceeds of the TL CARES Act Refund absent the express consent of the Required Lenders (as defined in the TL Credit Agreement). *See id.*, ¶6.

v.    The claims of the ABL Lenders shall be allowed, as of the Petition Date, in the sum of $47,166,646.60 representing (i) principal in the sum of $46,369,390.84, (ii) accrued interest in the sum of $264,483.94, (iii) collateral management and unused line fees of $45,649.88, and (iv) professional fees in the sum of $487,122.01. The allowed ABL Claim Amount (as it may be increased below), shall be deemed secured by the ABL Collateral to the extent of the value of the Debtors' interest in such Collateral, and neither the ABL Agent nor any of the ABL Lenders shall be required to file a proof of claim in the Bankruptcy

Cases for any secured or unsecured claim arising under the ABL Credit Agreement and related documents. Notwithstanding the foregoing, if the value of the ABL First Priority Collateral exceeds the allowed ABL Claim Amount set forth in the first sentence of this paragraph 7, then the allowed ABL Claim Amount shall be automatically increased to include the following amounts: (i) interest through the date the ABL Claim Amount is paid in full at the default rate of interest specified in the ABL Credit Agreement, (ii) a prepayment premium payable under the ABL Credit Agreement in the sum of $3,200,000, (iii) collateral management fees through the date the ABL Claim Amount is paid in full, and (iv) unpaid professional fees and expenses through the date upon which the ABL Claim Amount is paid in full, including amounts owed to Ankura Consulting Group, LLC, Vedder Price P.C., and Proskauer Rose LLP. Notwithstanding the foregoing provisions of this paragraph 7, the ABL Agent and ABL Lenders shall provide the Trustee with a written statement of outstanding balance of the ABL Claim Amount within ten (10) days of the Trustee's written request for same to enable and facilitate the Trustee's making of distributions from the Estates. *See id.*, ¶7.

vi.     The claims of the TL Lenders shall be allowed as of the Petition Date, in at least the TL Claim Amount (as it may be increased below), shall be deemed secured by the TL Collateral to the extent of the value of the Debtors' interest in such Collateral, and neither the TL Agent nor any of the TL Lenders shall be required to file a proof of claim in the Bankruptcy Cases for any secured or unsecured claim arising under or in relation to the TL Credit Agreement and related documents. Notwithstanding the foregoing, if the value of the TL Collateral exceeds the TL Claim Amount, then the allowed TL Claim Amount shall be automatically increased to include the following amounts: (i) interest through the date the TL Claim Amount is paid in full at the default rate of interest specified in the TL Credit Agreement, (ii) any prepayment premium payable under the TL Credit Agreement, and (iii) unpaid professional fees and expenses through the date upon which the TL Claim Amount is paid in full, including amounts owed to Gibson, Dunn & Crutcher LLP, Alix Partners, and Wilmer Cutler Pickering Hale and Dorr LLP. Notwithstanding the foregoing provisions of this paragraph 8, the TL Agent and/or Required Lenders shall provide the Trustee with a written statement of outstanding balance of the TL Claim Amount within ten (10) days of the Trustee's written request for same to enable and facilitate the Trustee's making of distributions from the Estates.   *See id.*, ¶8.

vii.    The Trustee, the ABL Agent, and the Required Lenders shall, in good faith, use reasonable commercial efforts to cooperate in an attempt to maximize the proceeds from the liquidation of the Collateral in a manner that is designed and intended to obtain the highest and best price for the Collateral. *See id.*, ¶9.

viii.   Subject to Court approval, the Trustee will retain Greenhill & Co., LLC as investment banker to assist him in selling the Debtors' real estate, furniture, fixtures and equipment, intellectual property, abbreviated new drug applications ("ANDAs"), and related assets in one or more transactions, subject to an

engagement letter approved by the ABL Agent and the Required Lenders. Greenhill will not be engaged or authorized by the Trustee to sell inventory or collect accounts receivable. *See id.*, ¶10.

ix.     Subject to Court approval, the Trustee may retain an advisor (other than Greenhill) reasonably acceptable to the ABL Agent and the Required Lenders to sell, collect, or otherwise liquidate any assets that Greenhill is unable or unwilling to sell (including, for the avoidance of doubt, inventory and accounts receivable), subject to an engagement letter approved by the ABL Agent and the Required Lenders. *See id.*, ¶11.

x.      Bidding procedures utilized by the Trustee to sell or otherwise dispose of Estate property shall be acceptable to the ABL Agent and the Required Lenders, and shall require bidders to allocate value and/or a portion of the aggregate purchase price for each class of property (e.g. real estate, equipment, intellectual property, ANDAs). *See id.*, ¶12.

xi.     The ABL Agent and the TL Agent (at the direction of the Required Lenders), on behalf of the Lenders, agree to subordinate their liens and claims to the following extent (the amounts set forth below referred to collectively as the ("Carve Out Amount").

> (a)     To pay Court approved professional fees for professionals retained by the Trustee, such professionals to be approved in advance by the ABL Agent and Required Lenders (other than Cozen O'Connor, Miller Coffey Tate LLP, and Greenhill, whose retention is deemed approved by the ABL Agent and the Required Lenders).

> (b)     To pay Court approved compensation for the Trustee under section 326 of the Bankruptcy Code.

> (c)     The ABL Agent and the Required Lenders consent to the Trustee's post-petition use of $2.2 million of the cash on hand (the "Cash On Hand") in the Estates for payment of reasonable costs and expenses necessary to administer, recover, preserve, market, sell, or otherwise dispose of property of the Estates (the "Costs to Administer"), and to the extent the Cash on Hand is inadequate to enable payment of the Costs to Administer, then the ABL Agent and the Required Lenders consent to use of proceeds of Collateral to pay the additional Costs to Administer.  The Trustee by 12:00 p.m. (ET) on Friday of each week will submit to counsel for the ABL Agent and the Required Lenders for approval a report of planned disbursements of such Costs to Administer for the following week and in the absence of counsel for the ABL Agent and the Required Lenders advising the Trustee of an objection to the reported planned disbursements on or before the close of business at 5:00 p.m. (ET) on the following Monday the planned disbursements are deemed to be approved by the ABL Lenders and the Required Lenders and the Trustee is

LEGAL\61925694\5 6010823/00574256
05/01/2023

authorized to make payment from the proceeds of the Collateral of the ABL Agent and the Required Lenders.

(d)    From Collateral proceeds otherwise payable to the ABL Agent and the TL Agent on behalf of the Lenders, after deducting items a., b., and c. above, five percent (5%) of such net proceeds shall be retained by the Estates for distribution by the Trustee in accordance with 11 U.S.C. § 726.

(e)    To the extent that the Estates consist of any unencumbered assets from which cash or other proceeds are generated from the disposition of such unencumbered assets (other than cash retained under item c. above), such funds will be used to pay in accordance with a periodic true-up a ratable portion of the costs and expenses set forth in items a. – c. above.

All payments to be made in this Paragraph from the Collateral shall be borne by the Lenders on a *pro rata* basis based on the percentage of proceeds realized by the ABL Agent and the TL Lenders from the Trustee's sale or disposition of their Collateral, as applicable. *See id.*, ¶13.

xii.    Upon entry of a Court order approving this Agreement, the Trustee will pay (i) the TL Agent the proceeds of account ending in (6603) and (7616) after deducting $1.1 million and (ii) the ABL Agent and the TL Agent as applicable all other cash on hand in excess of $2.2 million including the proceeds of accounts ending in (0893), (1061) and (8391).[6] *See id.*, ¶14.

xiii.    Absent the written consent of the ABL Agent and the Required Lenders, the Trustee will not market for sale, entertain offers for or seek Court approval to sell any labeler code assigned by the U.S. Food and Drug Administration free and clear of corresponding state and federal government liabilities and 340B drug pricing liabilities owed to covered entities and the Trustee shall not seek to assume or assume and assign any government contract with the Secretary of the Department of Health and Human Services, the Secretary of Veterans Affairs (the "VA"), the Health Resources and Services Administration (the "HRSA"), the Centers for Medicare and Medicaid Services or any state Medicaid agency, including without limitation any Medicaid National Drug Rebate Agreement, any master agreement with the VA and any pricing agreement with HRSA for the Section 340B Drug Pricing Program. *See id.*, ¶15.

xiv.    Upon consummation of any sale or disposition of Estate assets for consideration of $1.0 million or more, and in any event monthly, the Trustee shall furnish to counsel to the ABL Agent and the Required Lenders a detailed accounting of all Estate assets collected, all expenses incurred and paid (including Trustee compensation, professional fees and expenses, whether or not allowed) and the current cash balance on hand in the Estates. Contemporaneously with each such accounting, and subject to a reserve equal to 110% of the then current

---

[6] Subject to confirmation of account balances.

LEGAL\61925694\5 6010823/00574256
05/01/2023

Carve Out Amount, the Trustee shall pay to the ABL Agent and the TL Agent for the benefit of the Lenders as appropriate, all cash proceeds (excluding the TL Restricted Cash and the TL CARES Act Refund, as applicable) of assets constituting Collateral that were collected in the prior monthly period or in connection with the most recent asset sale. *See id.*, ¶16.

xv.    The TL Agent has received a Direction of the Required Lenders (as defined in the TL Credit Agreement) (which may be provided via email by counsel to the Required Lenders) to enter into this Agreement. All actions to be taken and approvals to be granted hereunder by the TL Agent shall be subject to the Direction of the Required Lenders. *See id.*, ¶17.

xvi.    The Trustee hereby waives and releases all claims, demands and causes of action that have or could be asserted against the ABL Agent or the TL Lenders, in their capacity as debt and/or equity holders, as applicable, the TL Agent, and each of their affiliates and advisors. *See id.*, ¶19.

xvii.    Upon reasonable notice, the Trustee shall provide the Lenders, and their consultants, accountants, agents, representatives, employees, or attorneys access to: (a) all of the Debtors' books and records for the purpose of examining, inspecting, copying, and making extracts therefrom; (b) all of the Pre-Petition Collateral for the purpose of inspecting same; and (c) any information reasonably necessary for the Lenders to determine whether the Trustee is in compliance with the terms and conditions of this Agreement. *See id.*, ¶20.

xviii.    So long as any Pre-Petition Obligations shall remain outstanding, (i) the Trustee shall not, directly or indirectly, create, incur, assume or permit to exist any security interest, encumbrance, lien or other security arrangement of any kind, on or with respect to any of the TL Collateral or ABL Collateral, or take or fail to take any action which would grant or create a lien or security interest in favor of any person in such assets, and (ii) there shall not be entered in the cases any further order which authorizes, under any section of the Bankruptcy Code, including 11 U.S.C. §§ 105 and 364, the procurement of credit or the incurring of indebtedness secured by a lien on the TL Collateral or ABL Collateral which is entitled to claim status equal to or superior to that of the Lenders on such Collateral. *See id.*, ¶21.

xix.    The automatic stay under section 362(a) of the Bankruptcy Code is hereby modified to the extent necessary to permit the ABL Agent, TL Agent and the Lenders to receive, collect and apply payments and proceeds in respect of the Pre-Petition Collateral in accordance with, and to otherwise implement and comply with, the terms and provisions of this Agreement. *See id.*, ¶22.

xx.    The Trustee's authorization to use cash collateral, and any and all obligations of the Lenders under this Agreement, as set forth above, shall immediately cease, upon the earliest of any of the following (each a "Termination Event"):

(a)    three business days following written notice to the Trustee of a default and failure to cure by the Trustee of the terms and conditions of this Agreement unless such default is waived in writing by the ABL Agent and the Required Lenders;

(b)    such time as the Trustee makes payments which are not authorized by this Agreement unless such unauthorized payment(s) is waived in writing by the ABL Agent and the Required Lenders;

(c)    the entry of any order materially modifying, reversing, revoking, staying, rescinding, vacating or amending this Agreement without the express prior written consent of the ABL Agent and the Required Lenders. *See id.*, ¶23.

xxi.    Upon termination of the Trustee's authorization to use cash collateral pursuant to this Agreement, the Trustee shall immediately cease use of cash collateral without the written consent of the ABL Lenders and the Required Lenders or order of the Court, provided, however; that the Trustee may continue to use cash collateral to pay any expense which was approved for payment by the ABL Lenders and Required Lenders prior to the Termination Event and the parties may seek authority from the Court to modify the automatic stay to allow the ABL Agent and the TL Agent (at the direction of the Required Lenders) to exercise all available rights and remedies under the ABL or TL Pre-Petition Financing Documents and applicable law. *See id.*, ¶24.

## SUMMARY OF RELIEF REQUESTED

20.    The Trustee respectfully requests that the Court enter an order, in substantially the attached form: (i) approving the Sharing Agreement; (ii) authorizing him to take all actions necessary to carry out the terms of the Sharing Agreement, and (iii) providing related relief.

## APPLICABLE AUTHORITY

21.    Sections 105, 704(a)(1), and 363(c)(2)(A) of the Bankruptcy Code, and Federal Rule of Bankruptcy Procedure 9019, provide authority for the Court to grant the Trustee's requested relief.

22.    Section 704(a)(1) provides that a trustee "shall collect and reduce to money the property of the estate . . . ." Section 105(a) provides that "[t]he court may issue any order . . . that is necessary or appropriate to carry out the provisions of this title." Section 363(c)(2)(A)

14

provides that a trustee may use cash collateral if "each entity that has an interest in such cash collateral consents."

23.     Rule 9019(a) provides, "On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  The United States Court of Appeals for the Third Circuit has emphasized that "to minimize litigation and expedite the administration of a bankruptcy estate, '[c]ompromises are favored in bankruptcy.'"  Myers v. Martin (In re Martin), 91 F. 3d 389, 393 (3d Cir. 1996) (quoting 9 COLLIER ON BANKRUPTCY ¶ 9019.03[1] (15th ed. 1993)).  The approval of compromises and settlements is committed to the sound discretion of the bankruptcy court.  See, e.g., In re Louise's, Inc., 211 B.R. 798, 801 (D. Del. 1997).

24.     Before approving a settlement under Rule 9019, a court must determine whether "the compromise is fair, reasonable, and in the interests of the estate."  In re Marvel Entm't Group, Inc., 222 B.R. 243, 249 (D. Del. 1998) (quoting Louise's, 211 B.R. at 801).  To reach such a determination, the court must assess the value of the claim that is being settled and balance it against the value to the estate of the approval of the settlement.  Martin, 91 F.3d at 393.  In striking this balance, the court should consider the following factors: (a) the probability of success in the litigation; (b) the complexity, expense and likely duration of the litigation; (c) the possibilities of collecting on any judgment which might be obtained; (d) all other factors relevant to making a full and fair assessment of the wisdom of the proposed compromise; and (e) whether the proposed compromise is fair and equitable to the debtors, their creditors, and other parties in interest.  Protective Comm. for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424-425 (1968).  See also Martin, 91 F.3d at 393.

25.     Fundamental to the process of evaluating proposed settlements is "the need to compare the terms of the compromise with the likely rewards of litigation."  TMT Trailer Ferry,

390 U.S. at 425. The <u>TMT</u> rule does not require the court to hold a full evidentiary hearing before a compromise can be approved. Rather, the court's obligation is "to canvas the issues and see whether the settlement 'falls below the lowest point in a range of reasonableness.'" 10 COLLIER ON BANKRUPTCY, ¶ 9019.2, 9019-4 (15th ed.) (quoting <u>In re Drexel Lambert Group, Inc.</u>, 134 B.R. 493 (Bankr. S.D.N.Y. 1991)).

## <u>ANALYSIS</u>

26.    The Trustee submits that entering into the Sharing Agreement would be in the best interest of the Estates and the Debtors' creditors. The Sharing Agreement would provide the Trustee with funds to market and attempt to sell the Collateral. If the Trustee is successful in selling the Collateral, a percentage of the proceeds from that sale will be available for the cost of administration and possible distribution. Without these funds, the Trustee would not be able to attempt to sell the Collateral, and the unsecured creditors would have no prospect for payment therefrom.

27.    The Trustee's entering into the Sharing Agreement is authorized under the Bankruptcy Code and Rules, and meets the applicable standards. Fist, section 704(a) of the Bankruptcy Code provides that the Trustee shall collect and reduce to money the property of the Estates. In the absence of the sharing and reimbursement provided in the Sharing Agreement, the Trustee will not have the ability to administer the Estates for the benefit of creditors, including the Lenders. Accordingly, an order approving the Sharing Agreement pursuant to section 105(a) should be issued as necessary and appropriate for the Trustee to carry out the provisions of the Bankruptcy Code, including the fulfillment of the Trustee's duties under section 704.

28.     From the Trustee's perspective, gaining the ability to use Collateral, including cash collateral, subject to the terms and conditions of the Sharing Agreement, is critical to his ability to administer the Estates and liquidate the Debtors' assets in an expeditious and prudent manner.

29.     Next, the Sharing Agreement constitutes a settlement and allowance of claim amounts and rights to the Collateral.  The Trustee submits that the settlements embodied in the Sharing Agreement meet the standards applicable under Rule 9019.  The Trustee is satisfied that the Pre-Petition Obligations constitute legal, valid, binding obligations of the Estates, enforceable in accordance with their terms, and are secured by valid, enforceable, binding, perfected and non-avoidable first-priority liens and security interests granted by the Debtors to the Lenders upon and in the Collateral.  The settlement of the Claim Amounts and rights in the Collateral embodied in the Sharing Agreement is far preferable to expensive and time-consuming litigation with the Lenders and/or a possible inability to use Collateral including cash collateral. For these reasons, the Trustee's entry into the Sharing Agreement is well within the reasonable exercise of his business judgment.

30.     Finally, the Trustee notes that under the Sharing Agreement the Lenders explicitly consent to the Trustee's use of cash collateral, subject to the terms of the Sharing Agreement. Accordingly, the Trustee's use of cash collateral pursuant to the Sharing Agreement is authorized under section 363(c)(2)(A) of the Bankruptcy Code.

31.     Based on the foregoing, the Trustee respectfully submits that the Court should approve the Sharing Agreement as being in the best interests of the Estates, and authorize the Trustee to take any and all actions necessary to implement the Sharing Agreement.

**NOTICE**

32.    The Trustee will provide notice of this Motion to the following parties: (i) the Office of the United States Trustee; (ii) the Debtors' counsel; (iii) counsel for the ABL Agent; (iv) counsel for the TL Agent; (v) known counsel to the ABL Lenders; (vi) known counsel to the TL Lenders; (vii) the Debtors' thirty largest unsecured creditors on a consolidated basis as listed in the Schedules of Assets and Liabilities prepared by the Debtors; and (viii) all parties who have requested notice pursuant to Bankruptcy Rule 2002 as of the date of this Motion.  In light of the nature of the relief requested, the Trustee submits that no further notice need be given.

WHEREFORE, the Trustee respectfully requests that the Court enter an order substantially in the form attached: (i) approving the Sharing Agreement; (ii) authorizing him to take all actions necessary to carry out the terms of the Sharing Agreement; (iii) granting related relief; and (iv) granting any further relief as may be appropriate.

Dated: May 1, 2023                           COZEN O'CONNOR

                                             */s/ John T. Carroll, III*
                                             John T. Carroll, III (No. 4060)
                                             Simon E. Fraser (No. 5335)
                                             1201 N. Market St., Ste. 1001
                                             Wilmington, DE  19801
                                             Telephone:  (302) 295-2000
                                             Facsimile:  (302) 295-2013
                                             jcarroll@cozen.com
                                             sfraser@cozen.com

                                             *Counsel for the Trustee,*
                                             *George L. Miller*

18