## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>AKORN HOLDING COMPANY LLC, *et al.*[1]<br><br>                     Debtors. | Chapter 7<br><br>Case No. 23-10253 (KBO)<br><br>(Jointly Administered)<br><br>**Re D.I. ___** |

### ORDER GRANTING TRUSTEE'S MOTION FOR APPROVAL OF SHARING AGREEMENT AND CARVE-OUT WITH LENDERS, AND RELATED RELIEF

Upon consideration of the *Trustee's Motion for Approval of Sharing Agreement and Carve-Out With Lenders, and Related Relief* (the "Motion"),[2] the Court having reviewed the Motion and having heard the statements of counsel in support of the requested relief at a hearing on the Motion; the Court finding that the relief requested in the Motion is in the best interests of the Debtors' estates, creditors, and other parties in interest; notice of the Motion and the hearing having been appropriate under the circumstances; and after due deliberation and cause appearing therefor

**IT IS HEREBY ORDERED THAT:**

1.　　　The Motion is GRANTED as set forth herein.

2.　　　The Sharing Agreement attached hereto as Exhibit "1" (the "Sharing Agreement"), and incorporated herein, is hereby APPROVED.

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of their federal tax identification numbers, and cases numbers are Akorn Holding Company LLC (9190), Case No. 23-10253 (KBO); Akorn Intermediate Company LLC (6123), Case No. 23-10254 (KBO); and Akorn Operating Company LLC (6184), Case No. 23- 10255. The Debtors' headquarters is located at 5605 CenterPoint Court, Gurnee, IL 60031.

[2] Unless otherwise defined herein, capitalized terms shall have the meanings given in the Motion.

3.     The Trustee is authorized to take any and all actions necessary to implement the Sharing Agreement in accordance with the terms and conditions set forth in the Sharing Agreement.

4.     The Debtors are indebted to the ABL Lenders in the aggregate amount of the ABL Claim Amount.   The ABL Pre-Petition Obligations constitute legal, valid, binding obligations of the Estates, enforceable in accordance with their terms, and such claims shall be allowed in the Bankruptcy Cases.  Such claims are secured by the ABL Prepetition Liens.  The ABL First Priority Pre-Petition Liens are valid, enforceable, perfected, and non-avoidable first-priority security interests and liens on the ABL First Priority Collateral, and the ABL Second Priority Pre-Petition Liens are valid, enforceable, perfected, and non-avoidable second-priority security interests and liens on the ABL Second Priority Collateral.

5.     The Debtors are indebted to the TL Lenders in the aggregate amount of the TL Claim Amount.  The TL Pre-Petition Obligations constitute legal, valid, binding obligations of the Estates, enforceable in accordance with their terms, and such claims shall be allowed in the Bankruptcy Cases.  Such claims are secured by the TL Prepetition Liens.  The TL First Priority Pre-Petition Liens are valid, enforceable, perfected, and non-avoidable first-priority security interests and liens on the TL First Priority Collateral, and the TL Second Priority Pre-Petition Liens are valid, enforceable, perfected, and non-avoidable second-priority security interests and liens on the TL Second Priority Collateral.

6.     The terms and provisions of this Order and the Sharing Agreement shall (i) be binding upon and inure to the benefit of the ABL Agent, the TL Agent, the Lenders, the Trustee, the Debtors, all creditors and equity interest holders of the Debtors, all other parties in interest, and all of their respective successors and assigns (including any trustee hereafter appointed or

2

elected under the Bankruptcy Code for the estate of any of the Debtors or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and (ii) bind any trustee hereafter appointed for the estate of any of the Debtors, under any chapter of the Bankruptcy Code.

7.     This Order shall take effect and be fully enforceable immediately upon entry. Notwithstanding any Bankruptcy Rule or other applicable law, there shall be no stay of execution or effectiveness of this Order.

3

**<u>Exhibit 1</u>**

**Sharing Agreement**

[EXECUTION VERSION]

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>AKORN HOLDING COMPANY LLC, *et al.*[1]<br><br>Debtors. | Chapter 7<br><br>Case No. 23-10253 (KBO)<br><br>(Jointly Administered) |

**SHARING AGREEMENT BETWEEN CHAPTER 7 TRUSTEE AND ADMINISTRATIVE AGENTS FOR SECURED LENDERS PROVIDING FOR, AMONG OTHER THINGS, (I) DETERMINATION AND ALLOWANCE OF THE SECURED LENDERS' PRE-PETITION CLAIMS AND LIENS; (II) THE TRUSTEE'S SALE OF THE DEBTORS' ASSETS AND SECURED LENDERS' COLLATERAL; (III) THE SPECIFIED CARVE-OUT FROM THE SECURED LENDERS' LIENS; AND (IV) OTHER MATTERS CONCERNING THE TRUSTEE'S CONTEMPLATED SALE(S) OF COLLATERAL AND CERTAIN SETTLEMENTS**

This Sharing Agreement (the "Agreement") is entered into as of the 1st day of May, 2023, by and between: (A) George L. Miller, the duly appointed chapter 7 trustee (the "Trustee") for the estates (the "Estates") of the above-captioned Debtors (the "Debtors"); (B) MidCap Funding IV Trust (as successor-by-assignment to MidCap Financial Trust) as administrative agent (the "ABL Agent") for the lender parties (the "ABL Lenders") under the ABL Credit Agreement (as defined below) and for itself as an ABL Lender; and (C) Wilmington Savings Fund Society, FSB as administrative agent and collateral agent (the "TL Agent") for the lender parties (the "TL Lenders" and, together with the ABL Lenders, the "Lenders") under the TL Credit Agreement (as defined below).

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of their federal tax identification numbers, and cases numbers are Akorn Holding Company LLC (9190), Case No. 23-10253 (KBO); Akorn Intermediate Company LLC (6123), Case No. 23-10254 (KBO); and Akorn Operating Company LLC (6184), Case No. 23- 10255. The Debtors' headquarters is located at 5605 CenterPoint Court, Gurnee, IL 60031.

## **Background**

A.        WHEREAS, on February 23, 2023 (the "Petition Date"), each Debtor filed a voluntary petition in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") for relief under chapter 7 of title 11 of the United States Code (the "Bankruptcy Code"), commencing the above-captioned bankruptcy cases (the "Bankruptcy Cases").

B.        WHEREAS, on or about the Petition Date, the Office of the United States Trustee appointed the Trustee as the chapter 7 trustee for the Estates of each of the Debtors.

C.        WHEREAS, the Debtors' businesses included developing, manufacturing, and marketing specialty pharmaceuticals, including prescription, consumer health, and animal health products.  The Debtors were an industry leader in branded and generic products in alternate dosage forms such as ophthalmics, injectables, oral liquids, topicals, inhalants, and nasal sprays.  The Debtors operated at numerous locations in the United States, both owned and leased, and were headquartered in Gurnee, Illinois.

D.        WHEREAS, the Debtors' operations in the U.S. have all ceased.  However, their Swiss affiliate, non-Debtor Akorn AG, continues to operate.  Debtor Akorn Operating Company LLC ("Akorn Operating") owns 100% of the equity in Akorn International S.á.r.l, a non-debtor based in Luxembourg.  Akorn International S.á.r.l, in turn, owns 100% of the equity in Akorn AG.

## **Pre-Petition Debt**

E.        WHEREAS, Debtors Akorn Operating, as borrower, and Akorn Intermediate Company LLC ("Akorn Intermediate"), as guarantor, are parties to a certain asset-based credit

facility (the "<u>ABL Facility</u>"), and a certain term loan facility (the "<u>Term Loan Facility</u>"), as described below.

**<u>The ABL Facility</u>.**

F.      WHEREAS, Akorn Operating and Akorn Intermediate are parties to that certain Credit Agreement, dated as of October 1, 2020 (as amended, supplemented or modified from time to time, the "<u>ABL Credit Agreement</u>"), together with the ABL Lenders, and ABL Agent, pursuant to which Akorn Operating as borrower received a revolving line of credit in a maximum aggregate amount of $160,000,000.

G.      WHEREAS, as of the Petition Date, there was $46,369,390.84 in principal outstanding under the ABL Credit Agreement (together with interest, fees, costs and charges to which the ABL Agent and ABL Lenders may be entitled under the ABL Pre-Petition Financing Documents and the Bankruptcy Code, the "<u>ABL Claim Amount</u>" or the "<u>ABL Pre-Petition Obligations</u>").

H.      WHEREAS, the ABL Facility is secured under a certain Pledge and Security Agreement also dated as of October 1, 2020 (as amended, supplemented or modified from time to time, the "<u>ABL Pledge and Security Agreement</u>" and, together with the ABL Credit Agreement and any and all other agreements, documents and instruments executed in connection therewith or in furtherance thereof, the "<u>ABL Pre-Petition Financing Documents</u>"), and if applicable under one or more other ABL Pre-Petition Financing Documents, by the following as described therein, in all instances excluding the Excluded Assets and subject to the terms of the ABL Pre-Petition Financing Documents and the Intercreditor Agreement (as defined below) (collectively, the "<u>ABL Pre-Petition Liens</u>"): (i) valid, enforceable, perfected, and non-avoidable first-priority security interests and liens (the "<u>ABL First Priority Pre-Petition Liens</u>") in Akorn Operating's and Akorn

3

Intermediate's Accounts; Inventory; Deposit Accounts; all cash and cash equivalents (other than cash Proceeds of collateral subject to TL First Priority Pre-Petition Liens (as defined below)); Equipment located in the United States; the Specific Real Estate Collateral;[2] to the extent evidencing or governing any of the foregoing items, all Chattel Paper, Documents, Instruments, General Intangibles, and Securities Accounts related thereto (provided that to the extent any of the foregoing also relates to the TL Collateral (as defined below) only that portion related to the foregoing are included); all books and records relating to the foregoing (including without limitation all books, databases, customer lists and records, whether tangible or electronic which contain any information relating to the foregoing); and all Proceeds of and Supporting Obligations, including, without limitation, Letter of Credit Rights, with respect to any of the foregoing and all collateral security and guarantees given by any Person in favor of any Loan Party with respect to any of the foregoing (the "ABL First Priority Collateral");[3] and (ii) valid, enforceable, perfected, and non-avoidable second-priority security interests and liens (the "ABL Second Priority Pre-Petition Liens") in all TL Collateral (as defined below) (the "ABL Second Priority Collateral," and, together with the ABL First Priority Collateral, the "ABL Collateral").

I.      WHEREAS, for the avoidance of doubt, the ABL Collateral excludes causes of action under chapter 5 of the Bankruptcy Code and the proceeds thereof (for the further avoidance of doubt, such exclusion shall not prevent the ABL Agent or any of the ABL Lenders from

---

[2] "Specific Real Estate Collateral" means all fee owned real estate located at 225 Dixon Avenue, Amityville, NY, 369 Bayview Avenue, Amityville, NY, 13 Edison Street East, Amityville, NY, and 1222 West Grand Avenue, Decatur, IL, and improvements thereon. For the avoidance of doubt, Specific Real Estate Collateral does not include the following: (i) 10 Edison St., Amityville, NY (Suffolk County); and (ii) 150 South Wyckles Rd., Decatur, IL (Macon County). Notwithstanding anything herein that may be interpreted to the contrary, these real properties are Excluded Assets and not part of the Collateral (as defined below).

[3] Capitalized terms used in the description of the ABL First Priority Collateral and not otherwise defined in this Agreement shall have the meanings provided in the ABL Pre-Petition Financing Documents and/or the Intercreditor Agreement (as defined below), as applicable.

4

participating in any distribution to pre-petition unsecured creditors based on any deficiency claim that the ABL Agent or any of the ABL Lenders may ultimately hold).

J.      WHEREAS, the ABL Pre-Petition Liens are: (i) valid, binding, perfected, enforceable liens, including all post-petition proceeds, products, offspring, rents and profits thereof; (ii) not subject to avoidance, recharacterization, reduction, disallowance, impairment or subordination under the Bankruptcy Code or applicable non-bankruptcy law; and (iii) subject and subordinate only to the Carve-Out Amount (as defined below) (and, with respect to the ABL Second Priority Collateral, to the TL First Priority Pre-Petition Liens (as defined below)).  The ABL Pre-Petition Financing Documents are valid and binding agreements and obligations of Akorn Operating, Akorn Intermediate, and their Estates.

K.      WHEREAS, the ABL Pre-Petition Obligations constitute legal, valid, binding obligations of Akorn Operating, Akorn Intermediate, and their Estates, enforceable in accordance with their terms, and no objection, defense, counterclaim, avoidance, subordination, setoff, recharacterization, deductions, impairment, disallowance or challenge of any kind or nature with respect to the ABL Pre-Petition Obligations exists.  None of the ABL Pre-Petition Liens, ABL Pre-Petition Obligations, or any amounts previously paid to the ABL Agent or any of the ABL Lenders on account thereof or with respect thereto, is subject to objection, avoidance, subordination, setoff, recovery, recharacterization, deductions, challenge, disallowance or impairment under the Bankruptcy Code or applicable non-bankruptcy law.  The Estates do not have, hereby forever release and are forever barred from bringing, exercising or enforcing, any claims, counterclaims, causes of action, defenses, or setoff rights, whether arising under the Bankruptcy Code or otherwise, with respect to the ABL Pre-Petition Liens, the ABL Claim

LEGAL\63292133\4
05/01/2023

Amount, the ABL Pre-Petition Obligations, and the ABL Pre-Petition Financing Documents, against the ABL Agent or any of the ABL Lenders.

**The Term Loan Facility.**

L.    WHEREAS, Akorn Operating and Akorn Intermediate are also parties to that certain Senior Secured Term Loan Agreement, dated as of October 1, 2020 (as amended, supplemented or modified from time to time, the "TL Credit Agreement"), together with the TL Lenders, and the TL Agent, pursuant to which Akorn Operating as borrower received a senior secured term loan facility in an initial aggregate amount of $370,000,000.

M.    WHEREAS, as of the Petition Date, there was $134,454,589 in principal outstanding under the TL Credit Agreement, and together with all other obligations owing under the TL Credit Agreement plus any accrued and unpaid interest and additional fees and expenses (including, without limitation, interest, fees, premiums, indemnities, related charges and all other Obligations that are chargeable or reimbursable under the TL Credit Agreement and the Bankruptcy Code) (the "TL Claim Amount" or  the "TL Pre-Petition Obligations" and, together with the ABL Pre-Petition Obligations, the "Pre-Petition Obligations").

N.    WHEREAS, the Term Loan Facility is secured under a certain Pledge and Security Agreement also dated as of October 1, 2020 (as amended, supplemented or modified from time to time, the "TL Pledge and Security Agreement" and, together with the TL Credit Agreement and any and all other agreements, documents and instruments executed in connection therewith or in furtherance thereof, the "TL Pre-Petition Financing Documents"), and if applicable under one or more other TL Pre-Petition Financing Documents, by  the following as described therein, in all instances excluding the Excluded Assets and subject to the terms of the TL Pre-Petition Financing Documents and the Intercreditor Agreement (as defined below)  (collectively, the "TL Pre-Petition

Liens"): (i) valid, enforceable, perfected, and non-avoidable first-priority security interests and liens (the "TL First Priority Pre-Petition Liens") in all of Akorn Operating's and Akorn Intermediate's Collateral (as used in the Intercreditor Agreement (as defined below)) and the proceeds thereof, but expressly excluding the ABL First Priority Collateral (the "TL First Priority Collateral"); and (ii) valid, enforceable, perfected and non-avoidable second-priority security interests and liens  (the "TL Second Priority Pre-Petition Liens") in all ABL First Priority Collateral (the "TL Second Priority Collateral," and, together with the TL First Priority Collateral, the "TL Collateral").  The TL Collateral, together with the ABL Collateral, shall be referred to as the "Collateral."

O.      WHEREAS, for the avoidance of doubt, the TL Collateral excludes causes of action under chapter 5 of the Bankruptcy Code and the proceeds thereof (for the further avoidance of doubt, such exclusion shall not prevent the TL Agent or any of the TL Lenders from participating in any distribution to pre-petition unsecured creditors based on any deficiency claim that the TL Agent or any of the TL Lenders may ultimately hold).

P.      WHEREAS, the TL Pre-Petition Liens are (i) valid, binding, perfected, enforceable liens, including all post-petition proceeds, products, offspring, rents and profits thereof, (ii) not subject to avoidance, recharacterization, reduction, disallowance, impairment or subordination under the Bankruptcy Code or applicable non-bankruptcy law, and (iii) subject and subordinate only to the Carve-Out Amount (as defined below) (and, with respect to the TL Second Priority Collateral, to the ABL First Priority Pre-Petition Liens).   The TL Pre-Petition Financing Documents are valid and binding agreements and obligations of Akorn Operating, Akorn Intermediate, and their Estates.

7

Q.      WHEREAS, the TL Pre-Petition Obligations constitute legal, valid, binding obligations of Akorn Operating, Akorn Intermediate, and their Estates, enforceable in accordance with their terms, and no objection, defense, counterclaim, avoidance, subordination, setoff, recharacterization, deductions, impairment, disallowance or challenge of any kind or nature with respect to the TL Pre-Petition Obligations exists.  None of the TL Pre-Petition Liens, TL Pre-Petition Obligations, or any amounts previously paid to the TL Agent or any of the TL Lenders on account thereof or with respect thereto, is subject to objection, avoidance, subordination, setoff, recovery, recharacterization, deductions, challenge, disallowance or impairment under the Bankruptcy Code or applicable non-bankruptcy law.  The Estates do not have, hereby forever release and are forever barred from bringing, exercising or enforcing, any claims, counterclaims, causes of action, defenses, or setoff rights, whether arising under the Bankruptcy Code or otherwise, with respect to the TL Pre-Petition Liens, the TL Claim Amount, the TL Pre-Petition Obligations, and the TL Pre-Petition Financing Documents, against the TL Agent or any of the TL Lenders.

**The Intercreditor Agreement.**

R.      WHEREAS, the ABL Agent and the TL Agent are parties to that certain Intercreditor Agreement, dated as of October 1, 2020 (the "Intercreditor Agreement"), pursuant to which the parties thereto set forth, among other things, (a) their relative lien priorities in the Collateral and enforcement rights and obligations related thereto, (b) the method by and the order in which proceeds of the Collateral shall be applied by the ABL Agent and TL Agent, respectively, (c) the impact on the respective liens of the ABL Agent and TL Agent arising from the sale or disposition of Collateral, and (d) the relative rights and obligations of the ABL Agent and TL

8

Agent upon and during the occurrence of any Insolvency Proceeding of any Loan Party (as defined in the Intercreditor Agreement).

**The Trustee's Use of Cash and Sale of Collateral**

S.      WHEREAS, the Trustee requires the ability to use cash and other proceeds of Collateral to administer, recover, preserve, market, and sell the Collateral pursuant to sales to be conducted under section 363 of the Bankruptcy Code or other methods of liquidating Collateral (e.g., collecting accounts receivable) (collectively, the "Asset Sales").

T.      WHEREAS, the Lenders are willing, subject to the terms and conditions set forth herein, to consent to the Trustee's use of cash collateral and proceeds of Collateral to administer, recover, preserve, market, and sell Collateral, and to the Trustee's conduct of Asset Sales.  Because such use is consensual, and essential to the preservation of the value of the Estates, the Bankruptcy Court should approve the Trustee's use of cash collateral under section 363(c)(2) of the Bankruptcy Code, subject to the terms and conditions set forth herein.

U.      WHEREAS, subject to the terms and conditions set forth herein, the Lenders have agreed to carve out from the proceeds of the Asset Sales certain amounts, including amounts to pay compensation for the Trustee and his professionals, amounts for payment of reasonable costs and expenses necessary to administer, recover, preserve, market, sell or otherwise dispose of property of the Estates, and amounts to be retained by Estates for distribution by the Trustee in accordance with section 726 of the Bankruptcy Code.

**NOW, THEREFORE**, with the foregoing background deemed incorporated hereinafter, the ABL Agent, the TL Agent, and the Required Lenders (as defined in the TL Credit Agreement), intending to be legally bound hereby, in consideration for the mutual covenants and promises contained herein, the sufficiency of which is hereby acknowledged, promise and agree, subject to Bankruptcy Court approval, as follows:

9

1.      The recitals set forth above are hereby incorporated in full and made a part of this Agreement.

2.      The Trustee stipulates and agrees that, as of the Petition Date, pursuant to the ABL Pre-Petition Financing Documents, Akorn Operating and Akorn Intermediate are indebted to the ABL Lenders in the ABL Claim Amount.

3.      The Trustee stipulates and agrees that, as of the Petition Date, pursuant to the TL Pre-Petition Financing Documents, Akorn Operating and Akorn Intermediate are indebted to the TL Lenders in an amount not less than the TL Claim Amount.

4.      The Trustee further stipulates and agrees that the ABL Pre-Petition Obligations are secured by valid, enforceable, perfected and non-avoidable first-priority liens and security interests granted by Akorn Operating and Akorn Intermediate to the ABL Lenders upon and in the ABL First Priority Collateral, and valid, enforceable, perfected and non-avoidable second-priority liens and security interests granted by Akorn Operating and Akorn Intermediate to the ABL Lenders upon and in the ABL Second Priority Collateral.  For the avoidance of doubt, the ABL Pre-Petition Liens are and shall be deemed finally allowed for all purposes in the Bankruptcy Cases of Akorn Operating and Akorn Intermediate, and shall not be subject to objection, defense, counterclaim, avoidance, subordination, setoff, recharacterization, deductions, challenge, disallowance or impairment of any kind or nature by the Trustee, the Estates, or any creditor, interest holder or other party in interest.  In the event of the dismissal of one or more of the Bankruptcy Cases, the findings, stipulations and agreements set forth herein regarding the amount, validity, enforceability, non-avoidability and allowance of the claim(s), liens and security interests of the ABL Lenders shall survive, and shall be binding on Akorn Operating and Akorn Intermediate, their assigns, successors-in-interest, creditors, interest holders and other parties in interest.

5.      The Trustee further stipulates and agrees that the TL Pre-Petition Obligations are secured by valid, enforceable, perfected and non-avoidable first-priority liens and security interests granted by Akorn Operating and Akorn Intermediate to the TL Lenders upon and in the TL First Priority Collateral, and valid, enforceable, perfected and non-avoidable second-priority liens and security interests granted by Akorn Operating and Akorn Intermediate to the TL Lenders upon and in the TL Second Priority Collateral.  For the avoidance of doubt, the TL Pre-Petition Liens are and shall be deemed finally allowed for all purposes in the Bankruptcy Cases of Akorn Operating and Akorn Intermediate, and shall not be subject to objection, defense, counterclaim, avoidance, subordination, setoff, recharacterization, deductions, challenge, disallowance or impairment of any kind or nature by the Trustee, the Estates, or any creditor, interest holder or other party in interest. In the event of the dismissal of one or more of the Bankruptcy Cases, the findings, stipulations and agreements set forth herein regarding the amount, validity, enforceability, non-avoidability and allowance of the claim(s), liens and security interests of the TL Lenders shall survive, and shall be binding on Akorn Operating and Akorn Intermediate, their assigns, successors-in-interest, creditors, interest holders and other parties in interest.

6.      Notwithstanding anything to the contrary herein, the Trustee stipulates that the TL First Priority Collateral includes all of the cash on the Petition Date that was in the Debtors' deposit account with an account number ending in 7616 at Bank of America, N.A. (the "TL Restricted Cash") and the tax refund that was purchased by the TL Lenders from the jointly administered bankruptcy estates of Akorn, Inc. *et al.*, debtors in case No. 20-11177 (KBO) (Bankr. D. Del.) (the "TL CARES Act Refund").  Upon the Trustee's receipt of the TL CARES Act Refund, the Trustee shall promptly distribute the TL CARES Act Refund to the TL Lenders on account of their secured claims.  For the avoidance of doubt, no fees owing pursuant to this Agreement shall be paid with

11

any of the proceeds of the TL CARES Act Refund absent the express consent of the Required Lenders (as defined in the TL Credit Agreement).

7.      The claims of the ABL Lenders shall be allowed, as of the Petition Date, in the sum of $47,166,646.60 representing (i) principal in the sum of $46,369,390.84, (ii) accrued interest in the sum of $264,483.94, (iii) collateral management and unused line fees of $45,649.88, and (iv) professional fees in the sum of $487,122.01.  The allowed ABL Claim Amount (as it may be increased below), shall be deemed secured by the ABL Collateral to the extent of the value of the Debtors' interest in such Collateral, and neither the ABL Agent nor any of the ABL Lenders shall be required to file a proof of claim in the Bankruptcy Cases for any secured or unsecured claim arising under the ABL Credit Agreement and related documents.  Notwithstanding the foregoing, if the value of the ABL First Priority Collateral exceeds the allowed ABL Claim Amount set forth in the first sentence of this paragraph 7, then the allowed ABL Claim Amount shall be automatically increased to include the following amounts: (i) interest through the date the ABL Claim Amount is paid in full at the default rate of interest specified in the ABL Credit Agreement, (ii) a prepayment premium payable under the ABL Credit Agreement in the sum of $3,200,000, (iii) collateral management fees through the date the ABL Claim Amount is paid in full, and (iv) unpaid professional fees and expenses through the date upon which the ABL Claim Amount is paid in full, including amounts owed to Ankura Consulting Group, LLC, Vedder Price P.C., and Proskauer Rose LLP.  Notwithstanding the foregoing provisions of this paragraph 7, the ABL Agent and ABL Lenders shall provide the Trustee with a written statement of outstanding balance of the ABL Claim Amount within ten (10) days of the Trustee's written request for same to enable and facilitate the Trustee's making of distributions from the Estates.

8.      The claims of the TL Lenders shall be allowed as of the Petition Date, in at least the TL Claim Amount (as it may be increased below), shall be deemed secured by the TL Collateral to the extent of the value of the Debtors' interest in such Collateral, and neither the TL Agent nor any of the TL Lenders shall be required to file a proof of claim in the Bankruptcy Cases for any secured or unsecured claim arising under or in relation to the TL Credit Agreement and related documents. Notwithstanding the foregoing, if the value of the TL Collateral exceeds the TL Claim Amount, then the allowed TL Claim Amount shall be automatically increased to include the following amounts: (i) interest through the date the TL Claim Amount is paid in full at the default rate of interest specified in the TL Credit Agreement, (ii) any prepayment premium payable under the TL Credit Agreement, and (iii) unpaid professional fees and expenses through the date upon which the TL Claim Amount is paid in full, including amounts owed to Gibson, Dunn & Crutcher LLP, Alix Partners, and Wilmer Cutler Pickering Hale and Dorr LLP.  Notwithstanding the foregoing provisions of this paragraph 8, the TL Agent and/or Required Lenders shall provide the Trustee with a written statement of outstanding balance of the TL Claim Amount within ten (10) days of the Trustee's written request for same to enable and facilitate the Trustee's making of distributions from the Estates.

9.      The Trustee, the ABL Agent, and the Required Lenders shall, in good faith, use reasonable commercial efforts to cooperate in an attempt to maximize the proceeds from the liquidation of the Collateral in a manner that is designed and intended to obtain the highest and best price for the Collateral.

10.     Subject to Bankruptcy Court approval, the Trustee will retain Greenhill & Co., LLC as investment banker to assist him in selling the Debtors' real estate, furniture, fixtures and equipment, intellectual property, abbreviated new drug applications ("ANDAs"), and related assets

in one or more transactions, subject to an engagement letter approved by the ABL Agent and the Required Lenders.  Greenhill will not be engaged or authorized by the Trustee to sell inventory or collect accounts receivable.

11.     Subject to Bankruptcy Court approval, the Trustee may retain an advisor (other than Greenhill) reasonably acceptable to the ABL Agent and the Required Lenders to sell, collect, or otherwise liquidate any assets that Greenhill is unable or unwilling to sell (including, for the avoidance of doubt, inventory and accounts receivable), subject to an engagement letter approved by the ABL Agent and the Required Lenders.

12.     Bidding procedures utilized by the Trustee to sell or otherwise dispose of Estate property shall be acceptable to the ABL Agent and the Required Lenders, and shall require bidders to allocate value and/or a portion of the aggregate purchase price for each class of property (e.g. real estate, equipment, intellectual property, ANDAs).

13.     The ABL Agent and the TL Agent (at the direction of the Required Lenders), on behalf of the Lenders, agree to subordinate their liens and claims to the following extent (the amounts set forth below referred to collectively as the ("Carve Out Amount").

    i.   To pay Bankruptcy Court approved professional fees for professionals retained by the Trustee, such professionals to be approved in advance by the ABL Agent and Required Lenders (other than Cozen O'Connor, Miller Coffey Tate LLP, and Greenhill, whose retention is deemed approved by the ABL Agent and the Required Lenders).

    ii.   To pay Bankruptcy Court approved compensation for the Trustee under section 326 of the Bankruptcy Code.

    iii.   The ABL Agent and the Required Lenders consent to the Trustee's post-petition use of $2.2 million of the cash on hand (the "Cash On Hand") in the Estates for payment of reasonable costs and expenses necessary to administer, recover, preserve, market, sell, or otherwise dispose of property of the Estates (the "Costs to Administer"), and to the extent the Cash on Hand is inadequate to enable payment of the Costs to Administer, then the ABL Agent and the Required Lenders consent to use of proceeds of Collateral to pay the additional Costs to Administer.  The Trustee by 12:00

14

p.m. (ET) on Friday of each week will submit to counsel for the ABL Agent and the Required Lenders for approval a report of planned disbursements of such Costs to Administer for the following week and in the absence of counsel for the ABL Agent and the Required Lenders advising the Trustee of an objection to the reported planned disbursements on or before the close of business at 5:00 p.m. (ET) on the following Monday the planned disbursements are deemed to be approved by the ABL Lenders and the Required Lenders and the Trustee is authorized to make payment from the proceeds of the Collateral of the ABL Agent and the Required Lenders.

iv.   From Collateral proceeds otherwise payable to the ABL Agent and the TL Agent on behalf of the Lenders, after deducting items (13)(i)–(13)(iii) above, five percent (5%) of such net proceeds shall be retained by the Estates for distribution by the Trustee in accordance with 11 U.S.C. § 726.

v.   To the extent that the Estates consist of any unencumbered assets from which cash or other proceeds are generated from the disposition of such unencumbered assets (other than cash retained under item (13)(iii) above), such funds will be used to pay in accordance with a periodic true-up a ratable portion of the costs and expenses set forth in items (13)(i)–(13)(iii) above.

All payments to be made in this Paragraph 13 from the Collateral shall be borne by the Lenders on a *pro rata* basis based on the percentage of proceeds realized by the ABL Agent and the TL Lenders from the Trustee's sale or disposition of their Collateral, as applicable.

14.   Upon entry of a Bankruptcy Court order approving this Agreement, the Trustee will pay (i) the TL Agent the proceeds of account ending in (6603) and (7616) after deducting $1.1 million and (ii) the ABL Agent and the TL Agent as applicable all other cash on hand in excess of $2.2 million including the proceeds of accounts ending in (0893), (1061) and (8391)[4].

15.   Absent the written consent of the ABL Agent and the Required Lenders, the Trustee will not market for sale, entertain offers for or seek Bankruptcy Court approval to sell any labeler code assigned by the U.S. Food and Drug Administration free and clear of corresponding state and federal government liabilities and 340B drug pricing liabilities owed to covered entities and the

---

[4] Subject to confirmation of account balances.

Trustee shall not seek to assume or assume and assign any government contract with the Secretary of the Department of Health and Human Services, the Secretary of Veterans Affairs (the "VA"), the Health Resources and Services Administration (the "HRSA"), the Centers for Medicare and Medicaid Services or any state Medicaid agency, including without limitation any Medicaid National Drug Rebate Agreement, any master agreement with the VA and any pricing agreement with HRSA for the Section 340B Drug Pricing Program.

16.    Upon consummation of any sale or disposition of Estate assets for consideration of $1.0 million or more, and in any event monthly, the Trustee shall furnish to counsel to the ABL Agent and the Required Lenders a detailed accounting of all Estate assets collected, all expenses incurred and paid (including Trustee compensation, professional fees and expenses, whether or not allowed) and the current cash balance on hand in the Estates.  Contemporaneously with each such accounting, and subject to a reserve equal to 110% of the then current Carve Out Amount, the Trustee shall pay to the ABL Agent and the TL Agent for the benefit of the Lenders as appropriate, all cash proceeds (excluding the TL Restricted Cash and the TL CARES Act Refund, as applicable) of assets constituting Collateral that were collected in the prior monthly period or in connection with the most recent asset sale.

17.    The TL Agent has received a Direction of the Required Lenders (as defined in the TL Credit Agreement) (which may be provided via email by counsel to the Required Lenders) to enter into this Agreement. All actions to be taken and approvals to be granted hereunder by the TL Agent shall be subject to the Direction of the Required Lenders.

18.    All payments to be made hereunder to the TL Lenders or the TL Agent shall be paid to the TL Agent, in its capacity as administrative agent and collateral agent under the TL

Credit Agreement, for allocation and distribution in accordance with Section 2.18(b) of the TL Credit Agreement.

19.     The Trustee hereby waives and releases all claims, demands and causes of action that have or could be asserted against the ABL Agent or the TL Lenders, in their capacity as debt and/or equity holders, as applicable, the TL Agent, and each of their affiliates and advisors.

20.     Upon reasonable notice, the Trustee shall provide the Lenders, and their consultants, accountants, agents, representatives, employees, or attorneys access to: (a) all of the Debtors' books and records for the purpose of examining, inspecting, copying, and making extracts therefrom; (b) all of the Pre-Petition Collateral for the purpose of inspecting same; and (c) any information reasonably necessary for the Lenders to determine whether the Trustee is in compliance with the terms and conditions of this Agreement.

21.     So long as any Pre-Petition Obligations shall remain outstanding, (i) the Trustee shall not, directly or indirectly, create, incur, assume or permit to exist any security interest, encumbrance, lien or other security arrangement of any kind, on or with respect to any of the TL Collateral or ABL Collateral, or take or fail to take any action which would grant or create a lien or security interest in favor of any person in such assets, and (ii) there shall not be entered in the cases any further order which authorizes, under any section of the Bankruptcy Code, including 11 U.S.C. §§ 105 and 364, the procurement of credit or the incurring of indebtedness secured by a lien on the TL Collateral or ABL Collateral which is entitled to claim status equal to or superior to that of the Lenders on such Collateral.

22.     The automatic stay under section 362(a) of the Bankruptcy Code is hereby modified to the extent necessary to permit the ABL Agent, TL Agent and the Lenders to receive, collect and

apply payments and proceeds in respect of the Pre-Petition Collateral in accordance with, and to otherwise implement and comply with, the terms and provisions of this Agreement.

23.     The Trustee's authorization to use cash collateral, and any and all obligations of the Lenders under this Agreement, as set forth above, shall immediately cease, upon the earliest of any of the following (each a "Termination Event"):

   i.   three business days following written notice to the Trustee of a default and failure to cure by the Trustee of the terms and conditions of this Agreement unless such default is waived in writing by the ABL Agent and the Required Lenders;

   ii.  such time as the Trustee makes payments which are not authorized by this Agreement unless such unauthorized payment(s) is waived in writing by the ABL Agent and the Required Lenders;

   iii. the entry of any order materially modifying, reversing, revoking, staying, rescinding, vacating or amending this Agreement without the express prior written consent of the ABL Agent and the Required Lenders.

24.     Upon termination of the Trustee's authorization to use cash collateral pursuant to this Agreement, the Trustee shall immediately cease use of cash collateral without the written consent of the ABL Lenders and the Required Lenders or order of the Bankruptcy Court, provided, however; that the Trustee may continue to use cash collateral to pay any expense which was approved for payment by the ABL Lenders and Required Lenders prior to the Termination Event and the parties may seek authority from the Court to modify the automatic stay to allow the ABL Agent and the TL Agent (at the direction of the Required Lenders) to exercise all available rights and remedies under the ABL or TL Pre-Petition Financing Documents and applicable law.

25.     Any notices in connection herewith may be transmitted by personal delivery, overnight courier, or, email as follows:

| If to the Trustee: | George L. Miller, Trustee |
| | 1628 John F. Kennedy Blvd. |
| | Suite 950 |
| | Philadelphia, PA 19103-2110 |
| | Tel: 215-561-0950 Ext. 14 |
| | Fax: 215-561-0330 |
| | Email: gmiller@mctllp.com |

with a copy to
Trustee's Counsel:

John T. Carroll, III
Cozen O'Connor
1201 North Market Street
Suite 1001
Wilmington, DE  19801
Tel: (302) 295-2028
Fax: (302) 295-2013
Email: jcarroll@cozen.com

If to the ABL Agent:

MidCap Funding IV Trust
c/o MidCap Financial Services, LLC
7255 Woodmont Ave., Suite 300
Bethesda, MD 20814
Attn:  General Counsel/Akorn Operating
Email: legalnotices@midcapfinancial.com

with a copy to
ABL Agent's counsel:

Charles A. Dale
Proskauer Rose LLP
One International Place
Boston, MA 02110
Tel: (617) 526-9870
Email: cdale@proskauer.com

Vincent Indelicato
Megan R. Volin
Proskauer Rose LLP
Eleven Times Square
New York, NY 10036
Tel: (212) 969-3000
Email: vindelicato@proskauer.com
        mvolin@proskauer.com

19

| | |
|---|---|
| If to the TL Agent: | Geoffrey J. Lewis<br>Vice President<br>Global Capital Markets<br>WSFS Institutional Services<br>500 Delaware Ave.<br>Wilmington, DE 19801<br>Tel: (302) 299-0811<br>Email: glewis@wsfsbank.com |
| with a copy to the TL Agent's counsel: | Andrew N. Goldman<br>Nathan J. Moore<br>Wilmer Cutler Pickering Hale and Dorr LLP<br>7 World Trade Center<br>250 Greenwich Street<br>New York, NY 10007<br>Tel: (212) 230-8836<br>Email: andrew.goldman@wilmerhale.com<br>nathan.moore@wilmerhale.com |
| If to the Required Lenders: | Matthew J. Williams<br>AnnElyse Scarlett Gains<br>Gibson, Dunn & Crutcher LLP<br>200 Park Avenue<br>New York, NY 10166-0193<br>Email: MJWilliams@gibsondunn.com;<br>AGains@gibsondunn.com |

Notices shall be effective (a) immediately upon personal delivery, (b) one (1) day after deposit with an overnight courier, or (c) upon receipt of email (so long as notice by first class mail is deposited with the United States Postal Service or overnight courier on the same day as the email is sent).

26.    This Agreement may be executed in any number of separate counterparts, any of which may be transmitted by facsimile or email, and each of which when so executed and delivered shall be an original, but all of which shall together constitute, one and the same agreement.

27.    No provision of this Agreement is intended to, or shall, confer any third party beneficiary or other rights or remedies upon any person other than the parties hereto.

LEGAL\63292133\4<br>05/01/2023

28.     The Bankruptcy Court shall retain exclusive jurisdiction to hear any matters or disputes arising from or relating to this Agreement.  Any request for relief brought before the Bankruptcy Court to resolve a dispute arising from or related to this Agreement, and the matters agreed to herein, shall be brought on proper notice and in accordance with the relevant Federal Rules of Bankruptcy Procedure and the Local Rules for the Bankruptcy Court.

29.     All headings used in the Agreement are for reference purposes only and do not comprise part of the terms hereof.

30.     No failure of any Party to enforce any right granted under this Agreement shall represent a waiver of such right.

31.     Except as expressly set forth herein, nothing in this Agreement constitutes a modification, alteration, or amendment of Akorn Operating's, Akorn Intermediate's, or their Estates' obligations to the Lenders, the ABL Agent, or the TL Agent under the ABL or TL Pre-Petition Financing Documents.

32.     The Trustee, the ABL Agent, and the Required Lenders agree to execute any and all documents that are reasonably necessary to implement the terms and provisions of this Agreement.

33.     No modification or amendment of any of the provisions hereof shall be effective unless set forth in writing and signed by the Trustee, the ABL Agent, and the Required Lenders and approved by the Bankruptcy Court.

34.     This Agreement is subject in all respects to Bankruptcy Court approval, in all respects acceptable to the Trustee, the ABL Agent, the Required Lenders, and the TL Agent.  The Trustee shall promptly seek such approval after the full execution of this Agreement.

35.    The Bankruptcy Court shall have jurisdiction over all matters arising from or relating to this Agreement, and any order approving the same.

**IN WITNESS WHEREOF**, the Trustee, the ABL Agent, and the TL Agent (at the direction of the Required Lenders) have executed this Agreement, intending to be legally bound, as of the date first above written.

Dated: May 1, 2023

COZEN O'CONNOR


By:   */s/ John T. Carroll, III*
    John T. Carroll, III (DE No. 4060)
    Simon E. Fraser (DE No. 5335)
    Suite 1001
    1201 North Market Street
    Wilmington, Delaware  19801
    Tel: (302) 295-2028
    Fax: (302) 295-2013
    Email:  jcarroll@cozen.com
    Email:  sfraser@cozen.com

    *Counsel to the Trustee*


Dated: May 1, 2023

WILMER CUTLER PICKERING
HALE AND DORR LLP


By:   */s/ Andrew N. Goldman*
    Andrew N. Goldman
    7 World Trade Center
    250 Greenwich Street
    New York, NY 10007
    Tel: (212) 230-8836
    Email:  andrew.goldman@wilmerhale.com

    *Counsel to the TL Agent*


Dated: May 1, 2023

PROSKAUER ROSE LLP


By:   */s/ Charles A. Dale*
    Charles A. Dale
    One International Place
    Boston, MA 02110
    Tel: (617) 526-9870
    Email:  cdale@proskauer.com

    *Counsel to MidCap Funding IV Trust*