# EXHIBIT A

AKORN | SPECIALTY GENERICS

## NON-EXCLUSIVE PACKAGING COMPONENT SUPPLY AGREEMENT

This Non-Exclusive Packaging Component Supply Agreement ("Agreement") is made and entered into as of December __, 2022 ("Effective Date"), by and between Akorn Operating Company LLC, a Delaware limited liability company having a principal place of business at 5605 Centerpoint Court, Gurnee, Illinois 60031, United States of America ("AKORN"), and M. Jacob & Sons, dba MJS Packaging ("SUPPLIER"), a Michigan corporation with headquarters at 35601 Veronica Street, Livonia, Michigan 48501 (each a "Party" and collectively the "Parties").

WHEREAS, AKORN is a pharmaceutical company and desires to source the supply of Packaging Components (as defined below); and

WHEREAS, SUPPLIER is willing to continue to supply Packaging Components to AKORN and its Affiliates on a non-exclusive basis and upon the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual promises herein, and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. **DEFINITIONS**

   1.1  "Act" means the United States Federal Food, Drug, and Cosmetic Act.

   1.2  "Affiliates" means, with respect to any Party, any person that is controlled by, controls, or is under common control with, that Party. For this purpose, "control" of a corporation or other business entity shall mean direct or indirect beneficial ownership of more than fifty percent (50%) of the voting interest in, or more than fifty percent (50%) in the equity of, or the right to appoint more than fifty percent (50%) of the directors or management of, such corporation or other business entity.

   1.3  "AKORN Indemnitees" has the meaning ascribed to it in Section 8.1.

   1.4  "Applicable Laws" means all applicable laws and regulations, including, without limitation, the United States Federal Food, Drug, and Cosmetic Act and the Public Health Service Act, and all local and municipal ordinances and the regulations of any agency or public authority having jurisdiction over the manufacture, sale and delivery of the Packaging Components or the Finished Products.

   1.5  "Contract Year" means the twelve month period commencing with the Effective Date.

   1.6  "cGMP" generally means current Good Manufacturing Practices in the Territory or a specific part of the Territory, as the case may be.

   1.7  "Confidential Information" has the meaning ascribed to it in Section 10.1.

   1.8  "FDA" means the United States Food and Drug Administration.

AKORN | SPECIALTY GENERICS

1.9 "Finished Products" means the finished dosage pharmaceutical products for human consumption to be manufactured by AKORN, AKORN'S Affiliate, or a third-party manufacturer, and packaged in the Packaging Components.

1.10 "First Commercial Shipment" means the date that SUPPLIER first ships Packaging Components to AKORN (pursuant to the terms of the applicable Purchase Order) for use in a commercial batch for Finished Product.

1.11 "Manufacturer" has the meaning ascribed to it in Section 2.1.

1.12 "Packaging Components" means the components listed on **Exhibit A**.

1.13 "Purchase Order" means an order for the Packaging Components which shall specify at least the following: (i) quantity of Packaging Components and (ii) delivery date.

1.14 "Supplier Indemnitees" has the meaning ascribed to it in Section 8.2.

1.15 "Specifications" means, with respect to the Packaging Components, the specifications or drawings approved by AKORN and SUPPLIER in writing, which may be modified from time to time upon mutual written agreement by both Parties.

1.16 "Term" has the meaning ascribed to it in Section 9.1.

1.17 "Territory" means the United States of America, and each of its territories, districts and possessions and the commonwealth of Puerto Rico.

1.18 "Trade Dress" has the meaning ascribed to it in Section 4.10.

1.19 "Transfer Price" means that amount set forth on **Exhibit A** payable by AKORN to SUPPLIER for supply of the Packaging Components hereunder.

## 2.  MANUFACTURE OF THE PACKAGING COMPONENTS

2.1 SUPPLIER's Manufacture of the Packaging Components. SUPPLIER shall, at its sole cost and expense, cause the manufacturers of the Packaging Components (each, the "Manufacturer") to manufacture the Packaging Components and SUPPLIER to supply the Packaging Components under this Agreement in conformity with (i) the applicable Specifications, (ii) all Applicable Laws, and (iii) cGMP. Each Packaging Component supplied to AKORN under this Agreement shall be manufactured at the Manufacturer's plant receiving and maintaining satisfactory cGMP inspections. SUPPLIER is responsible for ensuring that the Manufacturer maintains any and all required licensing and permits for its plant and complies with all obligations of SUPPLIER under this Agreement.

## 3.  NOTIFICATION AND RECALLS

3.1 Notifications. Each Party shall promptly advise the other of any safety or toxicity problem of which either Party becomes aware regarding the Packaging Components.

**(◯AKORN** | SPECIALTY GENERICS

SUPPLIER will, within three (3) business days following notification to SUPPLIER, inform AKORN of any FDA or other regulatory inspection relating to the Packaging Components and will immediately notify AKORN in writing of any adverse event or observations relating to the Packaging Components.

3.2 <u>Recalls.</u> Subject to the limitation of liability set forth in Section 7.3 below, to the extent that a Finished Product recall, market withdrawal or field correction is due to the Packaging Components failing to meet the requirements set forth in this Agreement or otherwise by FDA (collectively, a "Recall"), then SUPPLIER will bear all reasonable costs associated with and all expenses and losses incurred by AKORN in connection with (A) such Recall (including costs associated with receiving and administering the recalled Finished Product and notification of the recall to those persons whom AKORN deems appropriate); and (B) replacement of such Finished Product.

4.    **SUPPLY OF THE PACKAGING COMPONENTS**

4.1 <u>Purchase Order</u>. This Agreement applies to all Purchase Orders that AKORN places with SUPPLIER, and that are accepted (or deemed accepted) by SUPPLIER for the supply of the Packaging Components, regardless of whether this Agreement or its terms and conditions are referenced in that Purchase Order. No inconsistent or additional term or condition in any Purchase Order, acknowledgment or sale document from either party shall apply to purchase orders. SUPPLIER shall accept or reject all Purchase Orders in writing to AKORN. Purchase Orders that have not been responded to by SUPPLIER in writing within (7) seven days after its receipt shall be deemed accepted.

4.2 <u>Target Volume</u>. The target annual requirement for the Packaging Components is set forth in **Exhibit A**. SUPPLIER shall be obligated to provide the quantity of Packaging Components consistent with that set forth in **Exhibit A** on an annual basis and per PO requirements and will be deemed to have warranted that it has the manufacturing capacity to supply such quantity of Packaging Components. **For clarity, AKORN is not obligated to purchase any minimum or specific quantity or dollar amount of the Packaging Components under this Agreement.**

4.3 <u>Payment.</u> SUPPLIER will invoice AKORN for the Packaging Components at the corresponding Transfer Price, referencing in each such invoice (i) the Purchase Order(s) to which the invoice relates, (ii) the Transfer Price per unit of the Packaging Components, and (iii) the quantity of Packaging Components shipped. The invoice date shall not be earlier than the date of shipment from SUPPLIER's or the manufacturer's facility. AKORN shall make payment for the Transfer Price applicable to such Product by check or wire transfer to an account specified by SUPPLIER no later than sixty (60) days following receipt of an invoice for such Packaging Components which shall be issued after approved receipt of the Packaging Components by AKORN, whichever is later. All invoices will be issued in United States Dollars.

4.4 <u>Customs and Other Duties</u>. All duties and charges, including state government levy and customs duties, in the country in which SUPPLIER's manufacturing facility is located, in respect of the Packaging Components, including any duties, taxes, VATs or similar

AKORN SPECIALTY GENERICS

charges arising with respect to the manufacture, sale, exportation and shipment of Packaging Components by SUPPLIER to AKORN, shall be borne and paid by SUPPLIER.

4.5 <u>Cancelling and Rescheduling</u>. AKORN may reschedule delivery under a Purchase Order from its originally scheduled ship date one time for up to 30 days per Purchase Order, provided that it so informs SUPPLIER on or before five (5) calendar days prior to the scheduled shipment date stated in the applicable Purchase Order, without any cancelation, rescheduling or any other charges. If AKORN desires to reschedule the same Purchase Order again, SUPPLIER shall use best efforts to accommodate, subject to any an additional reasonable charge which shall be disclosed to AKORN and approved in advance by AKORN in writing. AKORN may cancel a Purchase Order and SUPPLIER will use best efforts to minimize any cost charged by the Manufacturer with such cancelled Purchase Order. AKORN shall pay the SUPPLIER for such cost, if any, incurred as a result of the cancelled Purchase Order. approved by AKORN in advance in writing

4.6 <u>Packing and Cartage</u>. The cost of packing the Packaging Components will be included in the Transfer Price herein. Damage to Packaging Components due to packing will be charged to SUPPLIER. Damage to Packaging Components by cartage will be charged to the freight provider. AKORN's order number, part number and quantity shipped shall be marked or tagged on each package and bill of lading.

4.7 <u>Shipment</u>. SUPPLIER shall ship the Packaging Components to AKORN as set forth in the respective Purchase Orders, provided that SUPPLIER may ship 95%-105% of the quantity of Packaging Components ordered. SUPPLIER shall deliver Packaging Components Ex Works (Manufacturer's facility located in the continental United States) (Incoterms 2020). Title to and risk of loss shall pass pursuant to Ex Works (Incoterms 2020). If AKORN does not furnish the instructions to SUPPLIER along with its Purchase Order, the method and route of shipment shall be at SUPPLIER's discretion. SUPPLIER agrees to provide reasonable support to assist AKORN in pursuing any claims it may have against carriers.

4.8 <u>Delays</u>. Upon learning of any potential delivery delays, SUPPLIER shall notify AKORN as to the cause of such delays and the actions taken by SUPPLIER to resolve such delays. If SUPPLIER fails to make deliveries at the specified time and such failure is caused by SUPPLIER's manufacturer, SUPPLIER shall use best efforts to have manufacturer, at no additional cost to AKORN, employ accelerated measures such as material expediting fees, premium transportation costs, or labor overtime required to meet the specified delivery schedule or minimize the lateness of deliveries.

4.9 <u>Failure-to-Supply.</u> If SUPPLIER is unable to supply AKORN with the quantities of Packaging Components set forth in an accepted Purchase Order, then SUPPLIER shall use best efforts to get replacement Packaging Components at the same or better price. If SUPPLIER fails to do so, then AKORN, subject to the limitations set forth in Section 7.3, shall be entitled to enforce its rights and remedies as set forth in this Agreement.

𝐂 AKORN  SPECIALTY
GENERICS

4.10 Trade Dress. Supplier hereby acknowledges that AKORN is the sole owner of all rights, title, and interest in and to the Akorn name and logo and any other marks (collectively, the "Trade Dress"). Supplier agrees never to use the Trade Dress except for the purpose of manufacturing Packaging Components for AKORN. To the extent Packaging Components bear AKORN's trade dress, logo or other markings, SUPPLIER shall not sell such components to a third party.

5.    **PRICING**

5.1 Pricing. The Transfer Price set forth on **Exhibit A** shall be the initial price as of the price effective date listed on Exhibit A, subject to adjustment as set forth on **Exhibit A**.

5.2 Most Favored Nation. SUPPLIER shall not sell Packaging Components at lower prices, or on better terms, than those offered to AKORN. If such better terms or pricing are provided to any person, then SUPPLIER shall promptly offer the same pricing or terms to AKORN.

6.    **DELIVERY AND ACCEPTANCE**

6.1 Batch Certifications. SUPPLIER or the Manufacturer shall (i) conduct quality control tests on the Packaging Components prior to shipment in accordance with applicable law; (ii) at AKORN's request furnish samples of the Packaging Components to AKORN; and (iii) deliver with each shipment of Packaging Components a certificate of analysis for the Packaging Components included in such shipment in accordance with the Specifications.

6.2 Acceptance of Packaging Components. AKORN shall notify SUPPLIER in writing of any shortfalls in quantities of the Packaging Components delivered. AKORN may reject a shipment of Packaging Components if the shipment does not meet Specifications. AKORN shall notify SUPPLIER in writing of particular deficiencies, including any failure of the Packaging Components to comply with its Specifications, the Purchase Order or any provisions of this Agreement, during the inspection period which period shall be forty-five (45) calendar days immediately following receipt of the shipment from SUPPLIER. AKORN shall send samples of such defective Packaging Component(s) to SUPPLIER concurrently with or as soon as practicable following AKORN's written notice pursuant to this Section 6.2. Failure to give notice of the defects shall constitute AKORN's acceptance of such Packaging Components, except to the extent such defects are latent . AKORN shall retain all allegedly defective Packaging Components for a period not to exceed sixty (60) days from the date of notice to Supplier of such defect and make it available for inspection by a representative of Supplier or Manufacturer. All defective Packaging Components replaced under warranty shall either be returned to Supplier or disposed of in accordance with instructions provided by Supplier. All costs related to the shipment and handling of such Packaging Components shall be incurred by Supplier.

AKORN SPECIALTY GENERICS

## 7. WARRANTIES

7.1 <u>Representations and Warranties</u>. Each of AKORN and SUPPLIER represents, warrants and covenants: (i) that it has the full power, right and authority to execute and deliver this Agreement and that it shall use commercially reasonable efforts to perform its obligations hereunder; (ii) that it will assign to its performance of this Agreement professional personnel, qualified to perform the process procedures consistent with the technical requirements of this Agreement; and (iii) that none of such Party's personnel to be assigned to this Agreement have or shall have been subject to debarment under the United States Generic Drug Enforcement Act or any other penalty or sanction by FDA. Under this Agreement there will be no capital investments. SUPPLIER shall ensure that the Manufacturer also complies with all of the foregoing representations and warranties.

7.2 <u>Supplier Warranties</u>. SUPPLIER represents, warrants and covenants: (i) it will comply (and it will cause the Manufacturer to comply) with *Akorn's Anti-Bribery and Anti-Corruption Terms and Conditions for Akorn's Third Party Intermediaries* (**Exhibit B**), (ii) that the Packaging Components shall be free from defects in workmanship and materials; (iii) that the Packaging Components shall meet its applicable Specifications; (iv) that the Packaging Components shall be manufactured in conformity with GMP and all Applicable Laws; and (v) the Packaging Components shall not be adulterated, contaminated, tampered with or otherwise altered, mishandled, or subjected to negligence.

7.3 <u>Limitation of Liability</u>. **TO THE FULLEST EXTENT PERMITTED BY LAW, AND INDEPENDENT OF ANY OTHER PROVISION OF THIS AGREEMENT, NO PARTY WILL BE LIABLE FOR ANY LOST PROFITS, INDIRECT, INCIDENTAL, PUNITIVE, SPECIAL, OR CONSEQUENTIAL DAMAGES ARISING OUT OF ANY PRODUCT OR SERVICE PROVIDED UNDER THIS AGREEMENT, ANY PERFORMANCE OF, OR FAILURE TO PERFORM, THIS AGREEMENT OR ANY CONDUCT IN FURTHERANCE OF THE PROVISIONS OR OBJECTIVES OF THIS AGREEMENT, REGARDLESS OF WHETHER SUCH DAMAGES ARE BASED ON TORT, WARRANTY, CONTRACT, OR ANY OTHER LEGAL THEORY, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. NOTWITHSTANDING THE ABOVE, THIS LIMITATION WILL NOT EXCLUDE A PARTY'S LIABILITY FOR DAMAGES ARISING FROM WRONGFUL DISCLOSURE OF CONFIDENTIAL INFORMATION, GROSS NEGLIGENCE, INTENTIONAL MISCONDUCT, WILLFUL INFRINGEMENT OF THE OTHER PARTY'S INTELLECTUAL PROPERTY RIGHTS, AND/OR A PARTY'S INDEMNIFICATION COVENANT UNDER SECTION 8 TO THE EXTENT RELATED TO BODILY INJURY OR DEATH TO A THIRD PARTY OR DAMAGE TO REAL OR TANGIBLE PERSONAL PROPERTY OF A THIRD PARTY (ALL OF THE FOREGOING, COLLECTIVELY, THE "EXCLUDED MATTERS").**

AKORN | SPECIALTY GENERICS

NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT (BUT SUBJECT TO THE LAST SENTENCE OF THIS PARAGRAPH), SUPPLIER'S AGGREGATE LIABILITY FOR BREACH OF ANY REPRESENTATION, WARRANTY, AND/OR COVENANT (INCLUDING ANY INDEMNIFICATION COVENANT) REGARDING THE CONDITION OF ANY PACKAGING COMPONENTS, DEFECTIVE MANUFACTURE OF THE PACKAGING COMPONENTS, OR FAILURE OF THE PACKAGING COMPONENTS TO MEET ANY PRODUCT SPECIFICATIONS REQUIRED BY THIS AGREEMENT, INCLUDING LIABILITY FOR A RECALL RESULTING FROM THE SAME (ALL OF THE FOREGOING, COLLECTIVELY, "LIABILITY FOR PRODUCT CLAIMS"), REGARDLESS OF WHETHER SUCH LIABILITY IS BASED ON TORT, CONTRACT, OR ANY OTHER LEGAL THEORY, SHALL NOT EXCEED THE TOTAL AMOUNT PAYABLE OR PAID TO SUPPLIER ON ACCOUNT OF THE PACKAGING COMPONENTS THAT WERE NOT IN THE PROPER CONDITION, FREE FROM DEFECTS IN WORKMANSHIP AND/OR MATERIALS, OR FAILED TO MEET PRODUCT SPECIFICATIONS; PROVIDED, HOWEVER, THIS LIMITATION ON LIABILITY FOR PRODUCT CLAIMS WILL NOT BE APPLICABLE TO: (A) SUPPLIER'S LIABILITY FOR DAMAGES ARISING FROM ANY EXCLUDED MATTER, AND (B) SUPPLIERS' LIABILITY FOR A BREACH OF SECTION 3.1 (NOTIFICATIONS). THE FOREGOING LIMITATION IN THIS PARAGRAPH OF SECTION 7.3 SHALL COVER SUPPLIER'S LIABILITY FOR PRODUCT CLAIMS ONLY. NOTWITHSTANDING THE FOREGOING LIMITATION ON LIABILITY, (A) IF SUPPLIER HAS LEGAL RIGHTS OR REMEDIES AGAINST THE MANUFACTURER WITH RESPECT TO ANY MATTER GIVING RISE TO LIABILITY FOR PRODUCT CLAIMS, IT SHALL USE GOOD FAITH COMMERCIALLY REASONABLE EFFORTS TO PURSUE SUCH CLAIMS FOR THE BENEFIT OF AKORN, AND (B) TO THE EXTENT LEGALLY PERMITTED, SUPPLIER SHALL ASSIGN (AND SHALL AUTOMATICALLY BE DEEMED TO HAVE ASSIGNED) TO AKORN ANY WARRANTIES GIVEN BY THE MANUFACTURER.

8.   **ALLOCATION OF RISK**

8.1   Indemnification Obligations. Subject to the limitation of liability set forth in Section 7.3 above, SUPPLIER shall indemnify, defend and hold harmless AKORN and its Affiliates, and their respective officers, directors, managers, shareholders, owners, employees, agents and representatives (collectively "AKORN Indemnitees") against all damages, claims, liabilities, losses and other expenses, including reasonable attorneys' fees and costs, whether or not a lawsuit or other proceeding is filed, that arise out of or relate to (i) a breach of any representation, warranty or covenant provided by SUPPLIER under this Agreement; (ii) any incorrect information provided by SUPPLIER or the Manufacturer to AKORN pursuant to this Agreement, including any information submitted to AKORN and used in any applications, amendments or supplemental filings submitted to the FDA; or (iii) SUPPLIER's or the Manufacturer's

AKORN | SPECIALTY GENERICS

failure to fully conform to all laws, ordinances, rules and regulations which affect the Packaging Components, Finished Products, their use, or any part thereof. In the event SUPPLIER fails to promptly indemnify and defend such claims and/or pay AKORN's expenses, as provided above, AKORN shall have the right to defend itself and shall have the right to withhold any further payments due to SUPPLIER under this Agreement, and in that case, SUPPLIER shall reimburse AKORN Indemnitees for all of their reasonable attorneys' fees, costs and damages incurred in settling or defending such claims within thirty (30) calendar days of each of AKORN's written requests.

8.2 <u>Indemnification Obligations</u>. AKORN shall indemnify, defend and hold harmless SUPPLIER and its Affiliates, and their respective officers, directors, managers, shareholders, owners employees, agents and representatives (collectively "SUPPLIER Indemnitees") against all damages, claims, liabilities, losses and other expenses, including reasonable attorneys' fees and costs, whether or not a lawsuit or other proceeding is filed, that arise out of or relate to (i) a breach of any representation, warranty or covenant provided by AKORN under this Agreement; or (ii) AKORN's failure to fully conform to all laws, ordinances, rules and regulations which affect the Packaging Components, Finished Products, their use, or any part thereof. In the event AKORN fails to promptly indemnify and defend such claims and/or pay SUPPLIER's expenses, as provided above, SUPPLIER shall have the right to defend itself, and in that case, AKORN shall reimburse SUPPLIER Indemnitees for all of their reasonable attorneys' fees, costs and damages incurred in settling or defending such claims within thirty (30) calendar days of each of SUPPLIER's written requests.

8.3 <u>Insurance</u>. Each Party shall obtain, at its expense, property, commercial and liability insurance covering its obligations hereunder, in each case in amounts appropriate to the conduct of its business, as determined in its sole and exclusive judgment. The policies of insurance obtained by the Parties hereunder must state that the insurer shall notify the other Party at least thirty (30) days prior to termination, cancellation of, or any material change in, the coverage provided. Each Party shall make available to the other Party at such other Party's request certificates of insurance evidencing satisfaction of its obligations under this Section 8.3.

## 9.    TERM AND TERMINATION

9.1 <u>Term</u>. This Agreement shall commence on the Effective Date and shall continue for a period of three (3) years from the Effective Date, unless earlier terminated under Section 9.2 (the "Term"). The parties may extend the term of this Agreement via a written amendment signed by both parties prior to the expiration of the Agreement.

9.2 <u>Termination Procedures</u>. This Agreement will terminate in the event of any of the following: (a) on the thirtieth (30th) calendar day after either Party gives written notice to the other of a material breach by the other of any term or condition of this Agreement, unless the breach is cured before the thirtieth (30th) calendar day; or (b) immediately upon the written agreement of both Parties to terminate this Agreement.

AKORN | SPECIALTY GENERICS

9.3  Effect of Termination. In the event of termination all Parties shall remain liable for each of their respective obligations hereunder that accrued prior to the date of termination. All rights and remedies conferred herein shall be cumulative and in addition to all of the rights and remedies available to each Party at law, equity or otherwise. Sections 1, 3.1, 7, 8, 8, 9.3, 10 and 11 shall survive the termination or expiration of this Agreement.

10.  **CONFIDENTIALITY**

10.1 Confidential Information. During the Term and two (2) years thereafter, each Party shall keep confidential and not disclose to others or use for any purpose, other than as authorized by this Agreement, all Confidential Information which was provided to it by the other Party or its respective employees or representatives. For purposes of this Agreement, the term "Confidential Information" means all confidential information of a Party relating to any designs, know-how, inventions, technical data, ideas, uses, processes, methods, formulae, research and development activities, work in process, or any scientific, engineering, manufacturing, marketing, business or financial information relating to the disclosing Party, its present or future products, sales, suppliers, customers, employees, investors or business, whether in oral, written, graphic or electronic form disclosed by the parties prior to or during this Agreement (which is marked confidential or reasonably known to be confidential). The restrictions of this Section shall not apply to any Confidential Information which (i) is already known to the recipient at the time of disclosure, as documented by written records in its files; (ii) is or becomes public knowledge through no fault of the recipient; (iii) is received from a third party having the lawful right to disclose the information; (iv) is independently developed by or for a receiving party completely apart from the disclosures hereunder; or (v) subject to Section 10.2, is required by law to be disclosed.

10.2 Legal Disclosure. If either Party is required under applicable law to disclose the other Party's Confidential Information by any court or to any governmental authority, the Party required to disclose the other's Confidential Information shall, prior to such disclosure, notify the other Party of such requirement and all particulars related to such requirement. The notified Party shall have the right, at its expense, to object to such disclosure and to seek confidential treatment of any of its Confidential Information to be so disclosed on such terms as it shall determine, and the notifying Party shall fully cooperate with the notified Party in this regard.

10.3 Required Disclosure. Notwithstanding anything in this Section 10 to the contrary, AKORN shall have the right to the use and disclose SUPPLIER's Confidential Information (i) to the applicable regulatory authorities and otherwise to the extent required in connection with its marketing, sale and use of Finished Products; and (ii) if AKORN determines that such information is required to be released pursuant to securities disclosure regulations or other reporting requirements, provided that AKORN will use commercially reasonable efforts to obtain confidential treatment of pricing, and of the identity of Finished Products that are not yet being sold.

11. **GENERAL TERMS**

11.1 <u>Non-Exclusive Relationship</u>. Subject to the terms and conditions of this Agreement, SUPPLIER shall contract for the Manufacturer to manufacture and shall supply the Packaging Components to AKORN and its Affiliates, and AKORN shall purchase such Packaging Components on a non-exclusive basis.

11.2 <u>Non-Circumvention</u>. Neither Party shall enter into any agreement that would conflict or interfere with obligations under this Agreement, or result in violation or breach of the terms, conditions, or provisions of this Agreement or that would otherwise violate or conflict with any Applicable Laws.

11.3 <u>Relationship of Parties</u>. The relationship between SUPPLIER and AKORN with respect to this Agreement, is only that of independent contractors. Neither Party is the agent or legal representative of the other Party, and neither Party has the right or authority to bind the other Party in any way. This Agreement creates no relationship as partners or a joint venture, and creates no pooling arrangement.

11.4 <u>Governing Law and Venue</u>. This Agreement is governed by and shall be construed in accordance with the law of the State of Illinois, excluding any conflict-of-laws rule or principle that might refer the governance or the construction of this Agreement to the law of another jurisdiction. Each Party hereby consents to the exclusive jurisdiction of the state and federal courts sitting in Illinois in any action on a claim arising out of, under or in connection with this Agreement or the transactions contemplated by this Agreement, provided such claim is not required to be arbitrated pursuant to Section 11.6.

11.5 <u>Mediation and Arbitration</u>. The Parties shall, before the commencement of arbitration proceedings, attempt in good faith to settle their dispute by mediation.

11.6 <u>Arbitration</u>. Except as otherwise provided in this Agreement, any dispute, controversy or claim arising out of or relating to this Agreement, or any breach thereof, including any claim that this Agreement, or any part hereof, is invalid, illegal or otherwise voidable or void, shall be submitted, at the request of any Party, to binding arbitration by a JAMS arbitrator, or such other arbitrator as may be agreed upon by the Parties. Hearings on such arbitration shall be conducted in Cooke County, Illinois. A single arbitrator shall arbitrate any such controversy. The arbitrator shall hear and determine the controversy in accordance with applicable law and the intention of the Parties as expressed in this Agreement, upon the evidence produced at an arbitration hearing scheduled at the request of either Party. Such pre-arbitration discovery shall be permitted to the fullest extent permitted by Illinois law applicable to arbitration proceedings, including the provisions of the Illinois Code of Civil Procedure. The arbitrator shall decide all discovery disputes. Judgment on the award of the arbitrator may be entered in any court having jurisdiction thereof.

The costs of the arbitration, including any JAMS administration fee, the arbitrator's fee, and costs for the use of facilities during the hearings, shall be borne equally by the

AKORN | SPECIALTY GENERICS

Parties to the arbitration. Attorneys' fees may be awarded to the prevailing or most prevailing Party at the discretion of the arbitrator.

11.7 <u>Assignment</u>. This Agreement shall not be assigned in whole or in part by any Party without the prior written consent of the other Party, which consent shall not be unreasonably withheld except that either party may assign this Agreement in the event of acquisition, consolidation or merger, provided that its successor in interest agrees to assume all obligations under this Agreement without condition and to comply with all terms and conditions herein.

11.8 <u>Counterparts</u>. For the convenience of the parties, this Agreement may be executed and transmitted by facsimile or via email in Portable Document Format (PDF), and in counterparts, each of which shall be deemed to be an original, and both of which taken together, shall constitute one agreement binding on both parties.

11.9 <u>Waiver</u>. The failure of any Party to enforce any of its rights hereunder or at law shall not be deemed a waiver or a continuing waiver of any of its rights or remedies against another Party, unless such waiver is in writing and signed by the Party to be charged.

11.10   <u>Severability</u>. If any provision of this Agreement, or part thereof, is declared by a court of competent jurisdiction to be invalid, void or unenforceable, each and every other provision, or part thereof, shall nevertheless continue in full force and effect.

11.11   <u>Attorneys' Fees</u>. In the event that any dispute between the Parties should result in litigation or arbitration, each party shall bear its own fees, costs, and expenses, including reasonable attorneys' fees, related to such litigation.

11.12   <u>Notice</u>. Any notice, demand, consent, election, offer, approval, request, or other communication given under this Agreement shall be in writing and shall be served personally or delivered by first class, registered or certified, return receipt requested U.S. mail, postage prepaid. Notices may also be given by email, provided a complete copy of any notice so transmitted shall also be mailed in the same manner as required for a mailed notice. Notices shall be deemed received at the earlier of actual receipt or three (3) days following deposit in U.S. mail, postage prepaid. Notices shall be directed to Parties at their addresses as specified on page 1 of this Agreement, provided a Party may change such Party's address for notice by giving written notice to the other Party in accordance with this Section 11.12.

11.13   <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between the Parties regarding the subject matter hereof, and supersedes all prior or contemporaneous understandings or agreements regarding the subject matter hereof, whether oral or written. This Agreement shall be modified or amended only by a writing signed by AKORN and SUPPLIER.

11.14   <u>Headings and Construction</u>. No rule of construction will be applied to the disadvantage of a party because that party was responsible for the preparation of this Agreement or any part of this Agreement. The Article and Section headings in this

AKORN SPECIALTY GENERICS

Agreement are for convenient reference only, and will be given no substantive or interpretive effect.

*[Signature Page Follows]*

AKORN   SPECIALTY
        GENERICS

IN WITNESS WHEREOF, the parties have executed this Agreement by their authorized representatives effective as of the Effective Date.

**Akorn Operating Company LLC**

By: *Chris Young*

Name: Chris Young

Title: EVP, Global Operations

Date: 12/19/2022

By: *Kirk Tsahalis*

Name: Kirk Tsahalis

Title: Global Procurement

Date: 12/15/2022

**M. Jacob & Sons dba MJS Packaging**

By: _____

Name: David Lubin

Title: Secretary

Date: 12/9/22

*Signature Page to Packaging Component Supply Agreement*

 **AKORN** SPECIALTY GENERICS

## EXHIBIT A
## PACKAGING COMPONENT PRICING

| Supplier Item Code | Akorn Item Code | Packaging Component | Target Volume | Fix Transfer Price |
|---|---|---|---|---|
| 422525 | 2005346 | 24-400 WHITE PDT24 HS035.025 | 2,550,400 | $81.40/M |
| 421137 | 41988 | 28-400 WHITE PP CLIC-LOC III | 2,367,200 | $113.15/M |
| 153819 | 41534 | 16 OZ WHITE HDPE AL55-003 MR | 1,347,696 | $300.22/M |
| 422628 | 41992 | 24-400 WHITE PP KCRC24 CHILD | 1,315,200 | $108.88/M |
| 421994 | 41994 | 20/400 WHITE CLIC LOC | 1,004,500 | $62.10/M |
| 188041 | 2006297 | 4 OZ AMBER PET MODERN ROUND | 980,000 | $133.50/M |
| 1416508 | 2006298 | 8 OZ AMBER PET MODERN ROUND | 980,000 | $240.00/M |
| 15-WLDBRF | 2005036 | 15CC WHITE LDPE BOSTON ROUND | 825,000 | 177.75/M |
| 452761 | 2000989 | 24MM NATURAL LDPE ORIFICE | 770,000 | 43.40/M |
| 411333 | 2006105 | 28-400 WHITE PP CR4 WORD CRC | 579,800 | $84.60/M |
| 423135 | 43288 | 28/480 WHITE CLIC LOC III | 579,700 | $131.30/M |
| 440537 | 2005011 | 20/400 FRPS WHITE CAP | 552,000 | $77.10/M |
| 422493A | 40678 | 20-400 WHITE CR4 PUSH & TURN | 526,500 | $79.70/M |

AKORN SPECIALTY GENERICS

| Supplier Item Code | Akorn Item Code | Packaging Component | Target Volume | Fix Transfer Price |
|---|---|---|---|---|
| 421338 | 43350 | 28/400 WHITE CLIC-LOC III | 501,600 | $121.60/M |
| 153817 | 41533 | 16 OZ AMBER HDPE AL55-003 MR | 443,520 | $313.51/M |
| 15MMNLDDT | 36510 | 15MM NATURAL LDPE DROPPER TIPS | 432,000 | $45.50/M |
| 183201 | 2005930 | 2 OZ LIGHT AMBER PET BOSTON RD | 403,200 | $121.55/M |
| 182771 | 40989 | 16 OZ AMBER PET OBLONG 28-480 | 286,740 | $410.20/M |
| 15-CWDTC | 39207 | 15-400 WHITE PP DROPPER TIP | 265,500 | $67.70/M |
| 411332 | 2006202 | 28-400 WHITE PP CR4 PUSH &TURN | 208,000 | $107.70/M |
| 152829 | 2005531 | 32 OZ WHITE HDPE MODERN ROUND | 450,000 | $598.00/M |
| 421135 | 41990 | 28-480 WHITE PP CLIC-LOC III | 400,000 | $104.55/M |
| 422526 | 2005347 | 28-400 WHITE PP PDT28 HS035 | 250,000 | $107.00/M |
| 451881 | 41881 | 28MM NATURAL LDPE ADAPTER | 144,000 | $69.60/M |
| 153818 | 41535 | 16 OZ WHITE HDPE 5502BN MR | 138,240 | $263.50/M |
| 422440 | 2006171 | 24-400 WHITE PP CLIC-LOC III | 126,040 | $88.95/M |

AKORN | SPECIALTY GENERICS

| Supplier Item Code | Akorn Item Code | Packaging Component | Target Volume* | Fix Transfer Price |
|---|---|---|---|---|
| 152808 | 2005530 | 8 OZ WHITE HDPE MODERN ROUND | 200,000 | $203.00/M |
| 423525 | 2006203 | 24-400 WHITE PP PDT24 CRC | 102,400 | $84.67/M |
| 183133 | 2006280 | 300ML AMBER PET ROUND PFP 28MM | 186,800 | $708.50/M |
| 422148 | 2006253 | 28-410 WHITE PP CRC CR4 WORD | 151,800 | $121.00/M |
| 1416509 | 2006299 | 16 OZ AMBER PET MODERN ROUND | 150,000 | $303.15/M |
| 422149 | 43207 | 28MM WHITE PP/PE CHILDPROOF TE | 108,000 | $128.00/M |
| 161609 | 2000164 | 4 OZ NATURAL LDPE BOSTON ROUND | 1,000,000 | $228.35/M |

Packaging Component pricing shall be adjusted for plastic resin pricing movements as announced by the Manufacturer in accordance with industry standard. Packaging Component pricing may be adjusted for items other than resin as announced by the Manufacturer. SUPPLIER shall provide AKORN 30 days' notice of any such price adjustment. If AKORN believes the price adjustment is not justified, SUPPLIER shall use best efforts to mitigate the price adjustment with the Manufacturer.

SUPPLIER shall bear all costs and expenses necessary to manufacture and supply the Packaging Components, including without limitation costs pertaining to shipping, taxes and duties, the creation of molds, and capital expenditures.

*The Target Volume is an estimate of annual purchases. **For clarity, AKORN is not obligated to purchase any minimum or specific quantity or dollar amount of the Packaging Components under this Agreement. (See Section 4.2 of the Agreement.)**



AKORN | SPECIALTY
GENERICS

EXHIBIT B

## ANTI-BRIBERY AND ANTI-CORRUPTION TERMS AND CONDITIONS FOR AKORN'S THIRD PARTY INTERMEDIARIES

This Exhibit is attached to, and hereby incorporated into and made part of, the Agreement. To the extent the terms of this Exhibit conflict with the terms of the Agreement, the terms of this Exhibit shall govern. Supplier shall cause the Manufacturer to also comply with the following terms.

SUPPLIER hereby acknowledges this *Anti-Bribery and Anti-Corruption Terms and Conditions for Akorn's Third Party Intermediaries* and agrees to comply in its entirety.

1.  <u>Anti-Bribery Compliance.</u> SUPPLIER shall comply with all applicable anti-bribery and anti-corruption laws and regulations, including without limitation the US Foreign Corrupt Practices Act and the UK Bribery Act 2010 (if applicable) (collectively, the "**Anti-Bribery Laws**").

2.  <u>Representatives.</u> SUPPLIER shall ensure that all of its subcontractors (if applicable), shareholders (if applicable), officers, directors, employees, consultants, advisors, agents and any other persons or entities acting on its behalf in connection with this Agreement (collectively, the "**Representatives**") do so only in compliance with the terms of this Exhibit (the "**Anti-Bribery Terms**"). SUPPLIER shall be responsible for the observance and performance by the Representatives of the Anti-Bribery Terms, and shall be directly liable to SUPPLIER for any breach by the Representatives of any of the Anti-Bribery Terms.

3.  <u>Improper Conduct.</u> SUPPLIER shall not make, directly or indirectly, in connection with this Agreement or in connection with any other business transaction related to AKORN, a payment or gift of, or an offer, promise or authorization to give money or anything of value to any:

    i.  Government Official or Close Family Member of a Government official;

    ii. person or entity; or

    iii. other person or entity while knowing or having reason to believe that some portion or all of the payment or thing of value will be offered, given, or promised, directly or indirectly, to a Government Official or another person or entity;

    for the purpose of:

    i.  influencing any act or decision of such Government Official or such person or entity in his/her or its official capacity, including a decision to do or omit to do any act in violation of his/her or its lawful duties or proper performance of functions; or

AKORN  SPECIALTY
GENERICS

ii.  inducing such Government Official or such person or entity to use his/her or its influence or position with any Government Entity or other person or entity to influence any act or decision;

in order to obtain or retain business for, direct business to, or secure an improper advantage for AKORN or SUPPLIER.

4.    Policies and Procedures.  SUPPLIER shall have and maintain throughout the term of this Agreement adequate policies, procedures, and controls to ensure compliance with these Anti-Bribery Terms, including at a minimum policies and procedures relating to prevention of bribery, accounting for financial transactions, due diligence on third parties and training of personnel. SUPPLIER shall enforce such policies and procedures where appropriate.

5.    Training.  SUPPLIER shall participate in anti-bribery compliance training, if so requested by AKORN. AKORN shall have the right to provide such training or designate a third party to provide such training to SUPPLIER.

6.    Certification.  When requested by AKORN from time to time, but not more than once per year, SUPPLIER shall provide a certification in form substantially similar to the certification attached hereto as ATTACHMENT 1. Such Certification shall be signed by an authorized representative of SUPPLIER and each Manufacturer, certifying that SUPPLIER and each Manufacturer is, and all of its Representatives are, in compliance with all Anti-Bribery Terms.

7.    Audit.  SUPPLIER shall maintain books and records that describe in accurate and reasonable detail all expenditures incurred by it in connection with this Agreement. AKORN may take reasonable steps to verify SUPPLIER's compliance with any Anti-Bribery Terms. AKORN shall have the right to audit or retain a third party to audit, at its sole discretion and expense, all of SUPPLIER's books and records that pertain to compliance with the Anti-Bribery Terms not more than once per year. Such documentation includes, without limitation: (i) documentation pertaining to services under this agreement, (ii) invoices and requests for expense reimbursement, and (ii) payments made to or benefits conferred by SUPPLIER on third parties in the course of SUPPLIER's performance of services under this Agreement.

8.    Breach.  SUPPLIER shall promptly report to AKORN any developments that cause the statements in this Exhibit to be inaccurate or incomplete. SUPPLIER shall promptly report to AKORN any request or demand for any undue or suspicious payment or other advantage of any kind received by SUPPLIER in connection with the performance of this Agreement. If AKORN reasonably determines, at any time, that there is credible evidence that SUPPLIER or any of its Representatives has violated any Anti-Bribery Terms, AKORN shall have the right to suspend all payments due under this Agreement while it investigates the credible evidence. Upon a good faith request by AKORN, SUPPLIER shall cooperate with AKORN's investigation to determine if such a violation has occurred. If AKORN determines reasonably and in good faith that there has been such a violation, it shall have the right to terminate this Agreement with immediate effect and without payment due of any kind except for services

AKORN | SPECIALTY GENERICS

lawfully and properly rendered under the Agreement.

9.    Indemnification. SUPPLIER shall indemnify and hold harmless AKORN and its officers, directors, employees, agents, affiliates, successors and permitted assigns (collectively, **"Indemnified Party"**) against any and all losses, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interest, awards, penalties, fines, costs or expenses of whatever kind, including reasonable attorneys' fees, that are incurred by Indemnified Party arising out of the violation of any Anti-Bribery Terms by SUPPLIER or any of its Representatives.

10.    Definitions. For purposes of this Agreement:

a.    **"Close Family Member"** means (i) the individual's spouse; (ii) the individual's and the spouse's grandparents, parents, siblings, children, nieces, nephews, aunts, uncles, and first cousins; (iii) the spouse of any persons listed in subcategories (i) and (ii); and (iv) any other person who shares the same household with the individual.

b.    **"Government Entity"** means (i) any national, state, regional or local government (including, in each case, any agency, department or subdivision of such government), and any government agency or department; (ii) any political party; (iii) any entity or business that is owned or controlled by any of those bodies listed in subcategory (i) or (ii); or (iv) any international organization, such as the United Nations or the World Bank.

c.    **"Government Official"** means (i) any director, officer, employee, agent or representative (including anyone elected, nominated, or appointed to be a director, officer, employee, agent or representative) of any Government Entity, or anyone otherwise acting in an official capacity on behalf of a Government Entity; (ii) any political party, political party official or political party employee; (iii) any candidate for public or political office; (iv) any royal or ruling family member; or (v) any agent or representative of any of those persons listed in subcategories (i) through (iv).

( AKORN SPECIALTY GENERICS

**EXHIBIT B - ATTACHMENT 1[1]**
**ANTI-BRIBERY COMPLIANCE CERTIFICATE**

Pursuant to Exhibit B of the Packaging Component Supply Agreement between Akorn Operating Company LLC ("AKORN") and M. Jacob & Sons, dba MJS Packaging ("SUPPLIER") dated _____, 2022, the undersigned hereby certifies that:

1. SUPPLIER is familiar with and understands the requirements and prohibitions of applicable Anti-Bribery Laws and the *Anti-Bribery and Anti-Corruption Terms and Conditions for Akorn's Third Party Intermediaries* (Exhibit B).

2. SUPPLIER and its Representatives have been, and continue to be, in full compliance with the Anti-Bribery Laws and the Anti-Bribery Terms of the *Anti-Bribery and Anti-Corruption Terms and Conditions for Akorn's Third Party Intermediaries* (Exhibit B).

3. After due inquiry of its Representatives, neither SUPPLIER nor any of its Representatives (a) is a Government Official; or (b) has a personal, business or other relationship or association with any Government Official or Close Family Member of any Government Official who may have responsibility for or oversight of any business activities of AKORN or Third-Party Intermediary, other than any relationships or associations that have been disclosed in writing to AKORN.

4. SUPPLIER understands and agrees that any false certification is grounds for AKORN to immediately terminate the Agreement and any other business relationship or agreement with SUPPLIER. SUPPLIER shall immediately advise AKORN if (a) subsequent developments cause the statements herein to be inaccurate or incomplete; or (b) it learns of, has reason to know of, or suspects any violation of the Anti-Bribery Terms and/or any Anti-Bribery Laws involving the Agreement or AKORN.

IN WITNESS WHEREOF, the undersigned has executed this Anti-Bribery Compliance Certificate on behalf of Third-Party Intermediary as of this _9th_ day of _December_, 2022

_M. Jacob & Sons, dba MJS Packaging_

By: _[signature]_
Name: David Lubin
Title: Secretary

---

[1] Corollary form to also be executed by the Manufacturer.