**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>AKORN HOLDING COMPANY LLC, *et al.*[1]<br><br>Debtors. | Chapter 7<br><br>Case No. 23-10253 (KBO)<br><br>(Jointly Administered)<br><br>**Re D.I. 106, 137** |

**ASSET AND SHARE PURCHASE AGREEMENT**

**dated as of May 18, 2023**
BY AND BETWEEN
**SENTISS AG**
AS PURCHASER, AND
**GEORGE L. MILLER, THE CHAPTER 7 TRUSTEE OF THE ESTATES OF AKORN HOLDING COMPANY LLC, AKORN INTERMEDIATE COMPANY LLC AND AKORN OPERATING COMPANY LLC**
AS SELLER

Dated: May 18, 2023          COZEN O'CONNOR

*/s/ John T. Carroll III*
John T. Carroll, III (DE No. 4060)
Simon E. Fraser (DE No. 5335)
1201 N. Market Street
Suite 1001
Wilmington, DE 19801
(302) 295-2000 Phone
(302) 295-2013 Fax No.
jcarroll@cozen.com
sfraser@cozen.com

*Counsel for the Trustee*
*George L. Miller*

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of their federal tax identification numbers, and cases numbers are Akorn Holding Company LLC (9190), Case No. 23-10253 (KBO); Akorn Intermediate Company LLC (6123), Case No. 23-10254 (KBO); and Akorn Operating Company LLC (6184), Case No. 23- 10255. The Debtors' headquarters is located at 5605 CenterPoint Court, Gurnee, IL 60031.

**ASSET AND SHARE PURCHASE AGREEMENT**
**dated as of May 18, 2023**

BY AND BETWEEN

SENTISS AG

AS PURCHASER, AND

GEORGE L. MILLER, THE CHAPTER 7 TRUSTEE OF THE ESTATES OF AKORN HOLDING COMPANY
LLC, AKORN INTERMEDIATE COMPANY LLC AND AKORN OPERATING COMPANY LLC

AS SELLER

# TABLE OF CONTENTS

**Page**

**ARTICLE I DEFINITIONS** ................................................................. 2

**ARTICLE II PURCHASE AND SALE OF ASSETS** ................................. 7

Section 2.1    Sale and Transfer of Purchased Assets .............................. 7
Section 2.2    Assumed Liabilities ............................................................ 7
Section 2.3    Excluded Liabilities ........................................................... 7
Section 2.4    Assumption/ Rejection of Certain Contracts/Leases. ......... 8

**ARTICLE III** ........................................................................................ 9

**CONSIDERATION** ............................................................................. 9
Section 3.1    Purchase Price ................................................................... 9
Section 3.2    Payment of the Consideration ........................................... 9
Section 3.3    Post-Closing Allocation of Purchase Price ...................... 10
Section 3.4    Withholding ...................................................................... 10

**ARTICLE IV CLOSING** ..................................................................... 10

Section 4.1    Closing ............................................................................ 10
Section 4.2    Deliveries by Seller.......................................................... 10
Section 4.3    Deliveries by Purchaser ................................................... 11

**ARTICLE V REPRESENTATIONS AND WARRANTIES OF SELLER** .......... 12

Section 5.1    Authorization; Enforceability .......................................... 12
**Section 5.2    No Other Representations or Warranties**................... 12

**ARTICLE VI REPRESENTATIONS AND WARRANTIES OF PURCHASER** ............ 12

Section 6.1    Organization...................................................................... 13
Section 6.2    Authorization; Enforceability .......................................... 13
Section 6.3    No Conflicts...................................................................... 13
Section 6.4    Consents and Approvals ................................................... 13
Section 6.5    Financial Capability ......................................................... 13
Section 6.6    Broker's, Finder's or Similar Fees ................................... 13
**Section 6.7    No Other Representations or Warranties**.................... 13

**ARTICLE VII BANKRUPTCY COURT MATTERS** ............................. 14

Section 7.1    Bankruptcy Actions .......................................................... 14
Section 7.2    Bidding Procedures .......................................................... 14
Section 7.3    Approval ........................................................................... 14
Section 7.4    Cure Amount..................................................................... 14

Section 7.5    Presentation to Bankruptcy Court/ Alternate Bid ............................................. 14
Section 7.6    Adequate Assurance of Future Performance .................................................... 15

## ARTICLE VIII COVENANTS ................................................................................................ 15

Section 8.1    Tax Matters. .................................................................................................... 15
Section 8.2    Conduct of the Business .................................................................................. 15
Section 8.3    Access to Information. ..................................................................................... 16
Section 8.4    Transfer of Marketing Authorizations ............................................................ 17
Section 8.5    Reasonable Efforts; Cooperation. ................................................................... 18
Section 8.6    Notification of Certain Matters. ..................................................................... 18
Section 8.7    Misdirected Assets .......................................................................................... 18
Section 8.8    Further Assurances .......................................................................................... 19
Section 8.9    Communications with Customers and Suppliers ............................................. 19

## ARTICLE IX CONDITIONS ................................................................................................... 19

Section 9.1    Conditions Precedent to Performance .............................................................. 19
Section 9.2    Conditions to Obligations of Purchaser .......................................................... 19
Section 9.3    Conditions to Obligations of Seller ................................................................ 20

## ARTICLE X TERMINATION .................................................................................................. 20

Section 10.1    Termination ..................................................................................................... 20
Section 10.2    Effect of Termination; Required Deposit ........................................................ 21

## ARTICLE XI MISCELLANEOUS ........................................................................................... 22

Section 11.1    Survival of Covenants, Representations and Warranties ................................. 22
Section 11.2    Amendment and Modification ........................................................................ 22
Section 11.3    Notices ............................................................................................................ 22
Section 11.4    Counterparts .................................................................................................... 23
Section 11.5    Mutual Drafting .............................................................................................. 23
Section 11.6    Entire Agreement; No Third Party Beneficiaries ............................................ 23
Section 11.7    Severability ..................................................................................................... 23
Section 11.8    Governing Law ................................................................................................ 23
Section 11.9    Exclusive Jurisdiction .................................................................................... 23
Section 11.10   Remedies ......................................................................................................... 24
Section 11.11   Specific Performance. ..................................................................................... 24
Section 11.12   Assignment ..................................................................................................... 24
Section 11.13   Headings ......................................................................................................... 24
Section 11.14   No Consequential or Punitive Damages .......................................................... 25
**Section 11.15 "As Is" Transaction** ..................................................................................... 25
Section 11.16   Bulk Transfer Notices ..................................................................................... 25
Section 11.17   Interpretation. ................................................................................................. 25

**ASPA AKORN**

## ASSET AND SHARE PURCHASE AGREEMENT

THIS ASSET AND SHARE PURCHASE AGREEMENT (this "Agreement"), dated as of May 18, 2023 (the "Execution Date"), is made and entered into by and between Sentiss AG, a company formed under the laws of Switzerland ("Purchaser"), and George L. Miller, the chapter 7 trustee (the "Trustee" or "Seller") of the chapter 7 estates (collectively, the "Estates") of Akorn Holding Company LLC ("Holdings"), Akorn Intermediate Company LLC ("Intermediate") and Akorn Operating Company LLC ("Operating", and together with Holdings and Intermediate, "Debtors" and each entity individually, a "Debtor").

## RECITALS

WHEREAS, on February 23, 2023, Debtors each filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code, as amended (the "Bankruptcy Code"), commencing a chapter 7 case (each, a "Bankruptcy Case" and, collectively, the "Bankruptcy Cases") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, the Estate of Operating is the sole shareholder of Akorn International S.a.r.l., a Luxembourg corporation (the "Company"), holding 20,001 shares of the stock of the Company (the "Shares");

WHEREAS, Purchaser desires to purchase and acquire from Seller, acting on behalf of the Estate, all of the Shares and certain other assets and rights, and to assume certain liabilities, all on the terms set forth herein;

WHEREAS, Seller desires to sell, convey, assign and transfer to Purchaser the Shares and such other assets, rights and liabilities in the manner and subject to the terms and conditions set forth herein and as authorized under, among other things, Sections 105 and 363 of the Bankruptcy Code;

WHEREAS, Seller's ability to consummate the Transactions set forth in this Agreement is subject to, among other things, the entry of the Sale Order by the Bankruptcy Court;

WHEREAS, the Seller has determined that it is advisable and in the Estates' best interests to enter into this Agreement and to consummate the Transactions provided for herein, subject to entry of the Sale Order, and has approved the same; and

WHEREAS, pursuant to that certain guaranty, made by Sentiss Pharma Pvt. Ltd., an Indian company ("Parent"), in favor of Seller (the "Parent Guaranty"), Parent has agreed to guarantee the payment of the Purchase Price (subject to the deductions set forth herein) as and when due by Purchaser to Seller hereunder.

NOW, THEREFORE, in consideration of the foregoing premises and the representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

# ARTICLE I

## DEFINITIONS

For all purposes of this Agreement, except as otherwise expressly provided or unless the context clearly requires otherwise:

"Action" means any claim, hearing, charge, action, suit, arbitration, litigation, mediation, grievance, audit, examination, inquiry, proceeding or investigation by or before any Governmental Entity or arbitrator.

"Affiliate" means, with respect to any Person, any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Agreement" or "this Agreement" means this Asset and Share Purchase Agreement, together with the Exhibits hereto and the exhibits and schedules thereto.

"Allocation Statement" has the meaning set forth in Section 3.3.

"Alternate Bid" has the meaning set forth in the Bidding Procedures.

"Alternate Bidder" has the meaning set forth in the Bidding Procedures.

"Alternative Transaction" means the sale, transfer or other disposition, directly or indirectly, including through an asset sale, share sale, merger, amalgamation or other similar transaction resulting from the Auction, of a material portion of the Estates' assets, in a transaction or series of transactions with one or more Persons other than Purchaser.

"Applicable Law" means any law, regulation, rule, order, judgment, guideline or decree of any Governmental Entity to which the Business or any Purchased Asset is, or the Company, any Subsidiaries of the Company, or Estates are, subject, or which otherwise apply to the Transactions or to any obligation of a party under this Agreement.

"Assigned Contracts/Leases" means the contracts and/or leases listed on *Schedule 2.1(a)* attached hereto, including all extension, renewal and option rights thereunder, as such list may be adjusted pursuant to Section 2.4.

"Assumed Liabilities" has the meaning set forth in Section 2.2.

"Auction" has the meaning ascribed to such term in the Bidding Procedures Order.

"Bankruptcy Case" or "Bankruptcy Cases" has the meaning set forth in the recitals hereof.

"Bankruptcy Code" has the meaning set forth in the recitals hereof.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure.

"Bidding Procedures" has the meaning set forth in Section 7.2.

"Bidding Procedures Order" has the meaning set forth in Section 7.2.

"Business" means the generic pharmaceutical research, development, manufacturing, commercialization and distribution business conducted by the Company and its Subsidiaries.

"Business Day" means any day other than a Saturday, Sunday or a day on which banks in New York are authorized or obligated by Applicable Law or executive order to close or are otherwise generally closed.

"Closing" means the consummation of all Transactions on the terms set forth in this Agreement.

"Closing Date" has the meaning set forth in Section 4.1(b).

"Company" has the meaning set forth in the recitals hereof.

"Contract" means any written or oral contract, purchase order, service order, sales order, indenture, note, bond, lease, sublease, mortgage, agreement, guarantee, license or other agreement, arrangement, instrument or commitment, in each case that is binding upon a Person.

"Conveyance Documents" means (a) the General Bill of Sale; (b) the Instrument of Assumption; and/or (c) all documents of title and instruments of conveyance necessary to Transfer record and/or beneficial ownership to Purchaser of Purchased Assets from the Estates which require execution, endorsement and/or delivery of a certificate of title or other document in order to vest record or beneficial ownership thereof in Purchaser.

"Cure Amount" means all cure costs required to be paid pursuant to Section 365 of the Bankruptcy Code in connection with the assumption by the Trustee and assignment to Purchaser of the Assigned Contracts/Leases (which, for the avoidance of doubt, shall not include Contracts that are removed as Assigned Contracts/Leases prior to Closing pursuant to Section 2.4).

"Damages" means actual out-of-pocket losses, damages, liabilities, costs or expenses, including reasonable attorneys' fees.

"Debtor" or "Debtors" has the meaning set forth in the preamble hereof.

"Estates" has the meaning set forth in the preamble hereof.

"Execution Date" has the meaning set forth in the preamble hereof.

"FDA" means the United States Food and Drug Administration.

"Finished Goods" means those items set forth on *Schedule 2.2(b)* hereto, but specifically does not include any brite stock, raw materials, packaging materials, consumables or components held by the Company and its Subsidiaries which are assets of the Business.

"General Bill of Sale" means the bill of sale substantially in the form attached as **Exhibit B-1** hereto.

"Government Approvals" means any and all consents, Permits and Orders of all Governmental Entities that are, or may become, necessary for the execution, delivery or performance by a party hereto of its obligations under this Agreement or the Conveyance Documents or otherwise for the consummation of the Transactions.

"Governmental Entity" means any foreign, national, federal, state, municipal, local, provincial, territorial, government or any department, commission, board, bureau, agency, regulatory authority or instrumentality thereof, or any court, judicial, administrative or arbitral body or public or private tribunal, including any United States or other such entity anywhere in the world.

"Health Care Laws" include, but are not limited to the following: the Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 301 et seq.) ("FDCA"); the Prescription Drug Marketing Act, as amended by the Drug Supply Chain Security Act; the Public Health Service Act (42 U.S.C. § 201 et seq.); the Federal Trade Commission Act (15 U.S.C. § 41 et seq.); the Controlled Substances Act (21 U.S.C. § 801 et seq.) ("CSA"); the Criminal Health Care Fraud Statute (18 U.S.C. § 1347); the federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)); the civil monetary penalties law (42 U.S.C. § 1320a-7a); the criminal False Claims Act (18 U.S.C. § 287); the civil False Claims Act (31 U.S.C. § 3729 et seq.); the administrative False Claims Law (42 U.S.C. § 1320a-7b(a)); any regulations promulgated pursuant to such laws; and any other state, federal or ex-U.S. laws or regulations governing the manufacturing, packaging, labeling, advertising, marketing, storage, import, export, promotion, distribution, or sale of Products, to the extent applicable to a Debtor (in connection with the Business or the Purchased Assets), the Company, or any Subsidiary of the Company.

"Indebtedness" means, as to any Person, without duplication, as of the date of determination (i) all obligations of such Person for borrowed money, including accrued and unpaid interest, and any prepayment fees or penalties, (ii) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (iii) all lease obligations of such Person capitalized in the books and records of such Person, (iv) all Indebtedness of others secured by a Lien on property or assets owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (v) all letters of credit or performance bonds issued for the account of such Person, to the extent drawn upon, and (vi) all guarantees of such Person of any of the foregoing of any other Person.

"Instrument of Assumption" means the instrument of assumption substantially in the form attached as **Exhibit B-2**.

"IRS" means the United States Internal Revenue Service.

"IRS Code" means the Internal Revenue Code of 1986, as amended.

"Liabilities" means all claims, demands, expenses, commitments and obligations (whether accrued or not, known or unknown, disclosed or undisclosed, matured or unmatured, fixed or contingent, asserted or unasserted, liquidated or unliquidated, arising prior to, at or after the commencement of the Bankruptcy Case) of or against any of the Debtors, the Estates, the Purchased Assets or the Business.

"Lien" or "Liens" means, with respect to any asset, any mortgage or deed of trust, pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any lease or title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Uniform Commercial Code of any jurisdiction) and, in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Marketing Authorization" means, with respect to a Product, any Investigational New Drug Application (as defined by the FDA), New Drug Application (as defined by the FDA), Abbreviated New Drug Application (as defined by the FDA) ("ANDA"), 510(k) clearance (as defined by the FDA), or similar regulatory application with respect to such Product that has been submitted to or approved by the FDA in the United States (other than withdrawn submissions or approvals), each as amended, supplemented or otherwise modified.  For the avoidance of doubt, "Marketing Authorization" with respect to a given ANDA shall include any CBE-30 related to such ANDA.

"Order" shall mean any order, ruling, decision, verdict, decree, writ, subpoena, mandate, precept, command, directive, consent, approval, award, judgment, injunction, or other similar determination or finding by, before, or under the supervision of any Governmental Entity, or any arbitrator, mediator, or other quasi-judicial or judicially sanctioned Person or body.

"Organizational Documents" means with respect to any Person, its certificate of incorporation, formation or organization (or comparable) document, its by-laws, partnership agreement or any certificate of formation, limited liability company agreement or operating agreement, or any other similar organizational instrument or document governing such Person or applicable to ownership.

"Permits" means permits, certificates, licenses, filings, approvals and other authorizations of any Governmental Entity.

"Person" means any individual, sole proprietorship, partnership, limited liability company, joint venture, trust, incorporated organization, association, corporation, institution, public benefit corporation, Governmental Entity or other entity.

"Prestige Documents" means (i) the Credit Agreement, dated as of March 20, 2023, by and among Akorn AG, the Company, and Prestige Brands SPE Lender, LLC (as amended or otherwise modified, the "Credit Agreement"); (ii) the Share Pledge Agreement, dated as of March 20, 2023, by and between the Company and Prestige Brands SPE Lender, LLC, as amended or otherwise modified; and (iii) the first-ranking real property lien in the amount of CHF 6,400,000 recorded in mortgage certificate no. 167 with respect to the Property (as defined in the Credit Agreement), as amended or otherwise modified.

"Products" means the pharmaceutical products listed on *Schedule 2.1(a)*.

"Purchase Price" has the meaning set forth in Section 3.1.

"Purchased Assets" means the assets and the Assigned Contracts/Leases set forth on *Schedule 2.1(a)*.  For the avoidance of doubt, "Purchased Assets" includes the Shares, the Regulatory Documentation in respect of the Marketing Authorizations, and the sales records in respect of the Products.

"Purchaser" has the meaning set forth in the preamble hereof.

"Regulatory Documentation" means (i) all regulatory applications, submissions, filings, underlying material data, datasets and supporting documents (including copies of all material correspondence with any Governmental Entity), cGMP, material CMC and any pharmacovigilance data and documentation, preclinical and clinical studies and tests (including the last sequence used in an electronic common technical document (eCTD), the most recent master batch records, exhibit batch records and test methods, stability data, and information regarding material and component sources), (ii) any 510(k) clearance application or foreign equivalent, and all regulatory files related thereto, current approved packaging and any other existing files and dossiers, including the underlying data, datasets or information used to support, maintain or obtain marketing authorization, (iii) all records maintained under record

keeping or reporting laws or regulations, including all marketing applications, annual and safety reports, master files, warning letters, notices of adverse finding letters, FDA audit reports (including any responses to such reports), periodic safety update reports, complaint files, and annual product quality reviews, and (iv) the complete complaint, adverse event or adverse reaction reporting and medical inquiry filings with respect to any Product line as required by applicable Health Care Law.

"Representatives" means, with respect to a Person, the directors, officers, employees, consultants, financial advisors, accountants, legal counsel, investment bankers and other agents, advisors and representatives of such Person and its Subsidiaries.

"Required Deposit" means **$1,775,000** of the cash portion of the Purchase Price, which was paid by Purchaser to Seller prior to execution of this Agreement, to be held in accordance with the Bidding Procedures and this Agreement.

"Sale Order" means an order of the Bankruptcy Court substantially in the form and substance of **Exhibit A,** any material change to which must be reasonably acceptable to the Purchaser.

"Seller" has the meaning set forth in the preamble hereof.

"Seller FDA Transfer Letters" means the letters from the applicable holders of a New Drug Application or Abbreviated New Drug Application for human or animal drug products, or 510(k) clearance (each as defined by the FDA), each in the form and substance of **Exhibit B-3**, duly executed, notifying the FDA of the transfer of the rights as applicable, New Drug Application, Abbreviated New Drug Application, or 510(k) clearance (each as defined by the FDA) to Purchaser.

"Subsidiary" means, with respect to any Person, (i) any corporation of which a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is owned or controlled, directly or indirectly, by such Person, or (ii) any limited liability company, partnership, association or other business entity of which a majority of the equity interest is owned or controlled, directly or indirectly, by such Person.

"Successful Bidder" has the meaning set forth in the Bidding Procedures.

"Tax" or "Taxes" means any and all United States federal, state, local or non-United States taxes, fees, levies, duties, tariffs, imposts, and other similar charges on or with respect to net income, alternative or add-on minimum, gross income, gross receipts, sales, use, *ad valorem*, franchise, capital, paid-up capital, profits, license, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property, environmental, or windfall profit tax, customs duties, value added or other tax, escheat or unclaimed property, governmental fee or other like assessment or charge of any kind whatsoever, together with any interest or any penalty, addition to tax or additional amount imposed by any Governmental Entity responsible for the imposition of any such tax.

"Tax Authority" means any Governmental Entity with responsibility for, and competent to impose, collect or administer, any form of Tax.

"Tax Return" means any return, claim, election, information return, declaration, report, statement, schedule, or other document required to be filed in respect of Taxes and amended Tax Returns and claims for refund.

**ASPA AKORN**

"Transactions" means the purchase and sale of the Purchased Assets by Seller to Purchaser, the delivery of the Purchase Price, the assumption of the Assumed Liabilities, and the other transactions provided for or contemplated by this Agreement and/or any other document required hereunder.

"Transfer" means sell, convey, assign, transfer, deliver or otherwise dispose of, and "Transferable" shall have a corollary meaning.

"Transfer Taxes" means all goods and services, harmonized sales, excise, sales, use, transfer, stamp, stamp duty, recording, value added, gross receipts, documentary, filing, and all other similar Taxes or duties, fees or other like charges, however denominated (including any real property transfer Taxes and conveyance and recording fees and notarial fees), in each case including interest, penalties or additions attributable thereto whether or not disputed, arising out of or in connection with the Transactions, regardless of whether the Governmental Entity seeks to collect the Transfer Tax from Seller or Purchaser.

"Transition Services Agreement" means a transition services agreement in substantially the form attached hereto as **Exhibit D**.

"Trustee" has the meaning set forth in the preamble herein.

## ARTICLE II

## PURCHASE AND SALE OF ASSETS

Section 2.1    Sale and Transfer of Purchased Assets.  On the terms and subject to the conditions set forth in this Agreement, on the Closing Date, Seller shall Transfer to Purchaser, and Purchaser shall purchase, acquire, assume and accept from the Estates, to the extent permitted by the Bankruptcy Code, free and clear of all Liens and Liabilities (except for any Assumed Liabilities), all of the Estates' right, title and interest in and to the Purchased Assets.  Nothing herein shall be deemed an agreement to sell Finished Goods.  Finished Goods are not included in Purchased Assets.

Section 2.2    Assumed Liabilities.  On the terms and subject to the conditions set forth herein and in the Sale Order, effective as of the Closing, Purchaser shall assume from Seller (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Seller shall convey, transfer, and assign to Purchaser, the following Liabilities of Seller (the "Assumed Liabilities"):

(a)    all Liabilities arising under the Assigned Contracts/Leases, but only to the extent that such Liabilities arise and are required to be performed following the Closing and do not relate to any failure to perform, improper performance, breach of warranty or other breach, default or violation by Seller, the Company or the Estates, or any of their respective Affiliates, at or prior to the Closing (other than the Cure Amount);

(b)    all Liabilities arising out of the ownership or operation of the Purchased Assets, in each case, by Purchaser, solely to the extent arising from periods occurring after the Closing; and

(c)    the Cure Amount.

Section 2.3    Excluded Liabilities.  Purchaser shall not assume and shall not be deemed to have assumed, nor shall Purchaser be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Actions against, Seller, the Estates, or any Debtor, or any Liabilities of  or Actions against, the Seller, the Estates, or any Debtor relating to the

**ASPA AKORN**

Purchased Assets or the Business, other than the Assumed Liabilities, including those Liabilities set forth below (collectively, the "Excluded Liabilities"):

(a)    all Liabilities of Seller or any Debtor for Indebtedness;

(b)    all Liabilities for any Taxes of Seller or any Debtor; and

(c)    all Liabilities arising out of the ownership or operation of the Purchased Assets prior to the Closing (whether such Liability arises prior to or after the Closing), including any Liabilities with respect to any commercialization, sale or recall of any Product prior to the Closing and further including all Liabilities with respect to any returns, chargebacks, rebates arising from commercialization or sale of any Product prior to the Closing.

Section 2.4      Assumption/ Rejection of Certain Contracts/Leases.

(a)    *Schedule 2.1(a)* sets forth a list of all executory Contracts and/or Leases to which a Debtor is a party which based upon Purchaser's designation are to be included in the Assigned Contracts/Leases to be assumed and assigned to Purchaser. Seller shall provide timely and proper written notice of the motion seeking entry of the Sale Order to all parties to the Assigned Contracts/Leases and take all other actions necessary or otherwise required to cause such Assigned Contracts/Leases to be assumed by Seller and assigned to Purchaser pursuant to Section 365 of the Bankruptcy Code (including (x) serving on all non-Seller counterparties to all of the Assigned Contracts/Leases a notice specifically stating that Seller is or may be seeking the assumption and assignment of such Assigned Contract(s)/Lease(s) and of the deadline for objecting to the Cure Amount or any other aspect of the proposed assumption and assignment of their Assigned Contracts and/or Leases to Purchaser and (y) taking, as promptly as practicable, all other actions reasonably requested by Purchaser to facilitate any negotiations with the counterparties to such Assigned Contracts/Leases and to obtain an Order, including a finding that the proposed assumption and assignment of the Assigned Contracts/Leases to Purchaser satisfies all applicable requirements of Section 365 of the Bankruptcy Code). The Sale Order shall provide that as of and conditioned on the occurrence of the Closing, Seller shall assign or cause to be assigned to Purchaser, as applicable, the Assigned Contracts/Leases.

(b)    Purchaser shall have the right to notify Seller in writing up to one (1) Business Day prior to Closing of (i) any Contracts and/or Leases (other than any purchase order, unless such purchase order was entered into in connection with, or is otherwise governed by, any non-Assigned Contract that it does not wish to assume) that Purchaser wishes to add, subject to Seller's prior written approval, as an Assigned Contract/Lease and (ii) of any previously designated Assigned Contracts/Leases which Purchaser no longer wishes to have assumed and assigned to Purchaser and any such Contracts and/or Leases shall be deemed removed from the Schedules of Assigned Contracts/Leases, and shall no longer constitute Assigned Contracts/Leases, without any adjustment to the Purchase Price. Any such previously considered non-Assigned Contract(s) that Purchaser wishes to add as Assigned Contracts/Leases shall be deemed added to *Schedule 2.1(a)* of Assigned Contracts/Leases, and subject to the Seller's written prior consent assumed by Seller for assumption and assignment to Purchaser without any adjustment to the Purchase Price . The addition of any new Assigned Contracts/Leases shall be subject to the prior written consent of Seller and Purchaser, and the removal by Seller of any Contracts and/or Leases from the Schedule of Assigned Contracts/Leases shall be subject to the prior written consent Purchaser. For the avoidance of doubt, Purchaser may remove any Contracts and/or Leases from the Schedule of Assigned Contracts/Leases in its sole discretion.

(c)    Notwithstanding the foregoing, a Contract shall not be an Assigned Contract/Lease hereunder and shall not be assigned to, or assumed by, Purchaser to the extent that such Contract (1) expires

**ASPA AKORN**

by its terms on or prior to such time as it is to be assumed by Purchaser as an Assigned Contract hereunder, (2) requires Government Approval (other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to Purchaser of the Seller's rights under such Contract in accordance with applicable law, and such Government Approval has not been obtained, (3) to the extent that the assignment of all or any portion of the Contract shall be prohibited by law (including by Order of a Governmental Entity), or (4) requires a consent, or advance notice to, a counterparty (if any) or requires the consent of any other third party that has not been obtained as of the Closing, and which restriction, consent right or right to advance notice cannot be effectively overridden or canceled by any order of the Bankruptcy Court or any provision of the Bankruptcy Code.  In the event that any Contract that would otherwise have been assigned to Purchaser is deemed not to be assigned pursuant to clause (2) of the first sentence of this <u>Section 2.4(c)</u>, the Closing shall, subject to the satisfaction of the conditions set forth in <u>Article IX</u>, nonetheless take place subject to the terms and conditions set forth herein and, thereafter, through the earliest of (w) such time as such Government Approval is obtained, (x) the expiration of the term of such Contract in accordance with its current term, (y) the execution of a replacement Contract by Purchaser and (z) the closing of the Bankruptcy Case.  Seller and Purchaser shall (A) use reasonable efforts to secure such Government Approval as promptly as practicable after the Closing and (B) cooperate in good faith in any lawful and commercially reasonable arrangement proposed by Purchaser, including subcontracting, licensing, or sublicensing to Purchaser any or all of Seller's rights and obligations with respect to any such Assigned Contract, under which (1) Purchaser shall receive the claims, rights, remedies and benefits under, or arising pursuant to, the terms of such Assigned Contracts/Leases with respect to which the Government Approval has not been obtained and (2) subject to receiving any such claims, rights, remedies and benefits, Purchaser shall thereafter assume and bear all Assumed Liabilities with respect to such Assigned Contract from and after the Closing (as if such Assigned Contracts/Leases had been transferred to Purchaser as of the Closing) in accordance with this Agreement (including by means of any subcontracting, sublicensing or subleasing arrangement).  Upon satisfying any requisite Government Approval requirement applicable to such Assigned Contracts/Leases after the Closing, such Assigned Contracts/Leases shall promptly be transferred and assigned to Purchaser in accordance with the terms of this Agreement, the Sale Order and the Bankruptcy Code, and otherwise without any further additional consideration.  Without limitation of the foregoing, prior to the Closing, Seller shall cooperate with Purchaser in connection with obtaining any consent, including by providing Purchaser with reasonable access to and facilitating discussions with the applicable counterparties (provided Purchaser shall provide Seller a reasonable opportunity to consult with Purchaser, and, if reasonably practicable, an opportunity to be present (but not participate) at any meeting) in respect of such consents, and shall use reasonable efforts to assist Purchaser with obtaining such consents as promptly as practicable after the date hereof and prior to the Closing.

### ARTICLE III

### CONSIDERATION

Section 3.1    <u>Purchase Price</u>.  The aggregate consideration for the sale and transfer of the Purchased Assets (the "<u>Purchase Price</u>") will be (a) Seventeen Million, Seven Hundred Fifty Thousand Dollars ($17,750,000 USD) in cash, which shall be allocated among the Purchased Assets in accordance with the Bidding Procedures ((G)(1)(iii),(iv), and (v)) as set forth in *Schedule 2.1(a)* hereto, plus (b) the Cure Amount, plus (c) the assumption by Purchaser of the Assumed Liabilities.

Section 3.2    <u>Payment of the Consideration</u>.  The parties hereto acknowledge and agree that, prior to the execution of this Agreement, the Purchaser paid the Required Deposit (as defined below) to the Seller, to be held by Seller in accordance with the terms of this Agreement (to the extent not inconsistent with the Bidding Procedures).  On the Closing Date, (a) Purchaser shall pay to Seller, by wire transfer of immediately available funds to an account or accounts designated in writing by Seller prior to the Closing Date, an amount equal to the Purchase Price less (i) the Required Deposit and (ii) the Payoff

**ASPA AKORN**

Indebtedness, and (b) the Payoff Indebtedness shall be paid by Purchaser to the applicable lenders or holders in accordance with the payoff letters contemplated by Section 4.2(k).

        Section 3.3     Post-Closing Allocation of Purchase Price.  Within sixty (60) days after the Closing Date, Purchaser shall prepare and deliver to Seller a statement allocating the sum of the Purchase Price, the Assumed Liabilities and other relevant items among the Purchased Assets in accordance with Section 1060 of the IRS Code and the treasury regulations promulgated thereunder (such statement, the "Allocation Statement"), and the Allocation Statement shall be finalized upon reasonable consultation with Seller, and with Seller's consent, which consent shall not be unreasonably withheld or delayed.  The parties shall follow the Allocation Statement for purposes of filing IRS Form 8594 (and any supplements to such form) and all other Tax Returns, and shall not voluntarily take any position for tax purposes inconsistent therewith.  If the IRS or any other Tax Authority proposes a different allocation, Seller or Purchaser, as the case may be, shall promptly notify the other party of such proposed allocation.  Seller or Purchaser, as the case may be, shall provide the other party with such information and shall take such actions (including executing documents and powers of attorney in connection with such proceedings) as may be reasonably requested by such other party to carry out the purposes of this Section.  Except as otherwise required by Applicable Law or pursuant to a "determination" under Section 1313(a) of the IRS Code (or any comparable provision of United States state, local, or non-United States law), (i) the transactions contemplated by Article II of this Agreement shall be reported for all Tax purposes in a manner consistent with the terms of this Section 3.3; and (ii) neither party (nor any of their Affiliates) will take any position inconsistent with this Section 3.3 in any Tax Return, in any refund claim or in any tax litigation. Notwithstanding the allocation of the Purchase Price set forth in the Allocation Statement, nothing in the foregoing shall be determinative of values ascribed to the Purchased Assets or the allocation of the value of the Purchased Assets by the Trustee for the purpose of his administration of the Bankruptcy Cases by way of liquidation, reorganization or otherwise.

        Section 3.4     Withholding.  Purchaser shall pay all consideration payable pursuant to this Agreement free and clear of any withholding Tax, except as required by Applicable Law. Any Tax withheld and remitted to the applicable Governmental Entity shall be treated as an amount paid to the Person in respect of which such withholding was made.

## ARTICLE IV

## CLOSING

        Section 4.1     Closing.

    (a)    Upon the terms and subject to the conditions of this Agreement, the Closing shall take place at the offices of Cozen O'Connor at 1650 Market Street, 28th Floor, Philadelphia, PA 19103 at 10:00 am local time, as specified below, unless another date, time and/or place is agreed in writing by each of the parties hereto.

    (b)    The Closing shall occur on or before the date (the "Closing Date") that is not later than the third Business Day following the satisfaction and/or waiver of all conditions to the Closing as set forth in Article IX (other than conditions which by their nature can be satisfied only at the Closing).

    (c)    If the Closing shall occur, Seller shall retain the Required Deposit.

        Section 4.2     Deliveries by Seller.  At the Closing unless otherwise provided herein, Seller shall deliver or cause to be delivered to Purchaser (unless previously delivered) each of the following:

**ASPA AKORN**

(a)      duly executed counterparts of the General Bill of Sale, the Instrument of Assumption, and each other Conveyance Document in respect of the Purchased Assets;

(b)      a duly executed counterpart of the Transition Services Agreement;

(c)      a duly executed counterpart of the trademark license agreement (the "License Agreement"), in the form and of the substance mutually agreed upon by the Trustee and Purchaser which allows Purchaser to: (i) sell existing finished product; (ii) use any existing materials with the Akorn trademark in the continued manufacturing of the Products; and (iii) otherwise manufacture the Products in accordance with the ANDAs set forth on *Schedule 2.1(a)* for a period of 12 months;

(d)      a certification of non-foreign status for the Estates in a form and manner that complies with the requirements of Section 1445 of the IRS Code and the treasury regulations promulgated thereunder;

(e)      a release, in form and substance reasonably acceptable to Purchaser, of any and all Liabilities of the Company and its Subsidiaries to the Debtors, the Seller, the Estates, or the Trustee, duly executed by Seller;

(f)      a duly executed stock power in respect of the Shares, or such other documentation as necessary to effectively transfer title of the Shares to Purchaser;

(g)      evidence that the Company has accepted the transfer of the Shares to Purchaser;

(h)      evidence that the transfer of the Shares to Purchaser has been recorded in the shareholders' register (or other applicable records) of the Company;

(i)      the duly executed Seller FDA Transfer Letters, dated as of the Closing Date;

(j)      an IRS Form W-9 or a certificate satisfying the requirements of Treasury Regulations Section 1.1445-2(b), duly executed by Seller of any assets located in the United States (or, if a Seller or Debtor is a disregarded entity within the meaning of Treasury Regulations Section 1.1445-2(b)(2)(iii), by the entity that is treated as the transferor of the relevant Purchased Assets);

(k)      customary payoff letters in connection with the repayment of the Indebtedness of the Company and its Subsidiaries under the Prestige Documents (the "Payoff Indebtedness"), the return of any promissory or other notes under the Prestige Documents for cancellation, and evidence reasonably satisfactory to Purchaser that each Lien granted in connection with the Prestige Documents has been released effective as of Closing; and

(l)      a certificate, dated as of the Closing Date, executed by Seller certifying that the conditions in Section 9.2(a) and Section 9.2(b) have been satisfied.


Section 4.3      Deliveries by Purchaser.  At the Closing, Purchaser shall deliver or cause to be delivered to Seller (unless previously delivered) each of the following:

(a)      the Purchase Price (less (i) the Required Deposit and (ii) the Payoff Indebtedness) by wire transfer of immediately available funds to an account designated by Seller;

(b)      a duly executed counterpart of the Transition Services Agreement;

(c)　　　duly executed counterparts of each Conveyance Document in respect of the Purchased Assets;

(d)　　　a duly executed counterpart of the License Agreement; and

(e)　　　the certificate referred to in <u>Section 9.3(b)</u>.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Purchaser as follows:

Section 5.1　　<u>Authorization; Enforceability</u>.　Subject to the entry of the Sale Order, Seller has all requisite power and authority to enter into, execute and deliver this Agreement and any other document to which Seller, on behalf of the Estates, is a party or is to be a party as required hereunder and to perform its obligations hereunder and thereunder. The execution, delivery and performance by Seller of this Agreement and any other document to which Seller, on behalf of the Estates, is or is to be a party as required hereunder, and the consummation by Seller of the Transactions, have been duly authorized by all necessary action on the part of Seller. This Agreement has been and, when executed and delivered, any other document to which each of them is to be a party, will be, duly and validly executed and delivered by Seller and, subject to the entry of the Sale Order, constitutes (in the case of this Agreement) and will constitute (in the case of each such other document) the valid and binding obligation of Seller, on behalf of the Estates, enforceable against Seller in accordance with its terms, subject to laws of general application relating to bankruptcy, insolvency, and the relief of debtors and other laws of general application affecting enforcement of creditors' rights generally, rules of law governing specific performance, injunctive relief and other equitable remedies.

**Section 5.2　　No Other Representations or Warranties.　EXCEPT AS EXPRESSLY PROVIDED IN THIS ARTICLE V OR IN THE SALE ORDER, PURCHASER AGREES AND ACKNOWLEDGES THAT THE TRANSFER OF THE PURCHASED ASSETS IS MADE PURSUANT TO ORDER OF THE BANKRUPTCY COURT AND IS MADE "AS IS" AND "WHERE IS", AND ACKNOWLEDGES AND AGREES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES SET FORTH IN ARTICLE V OF THIS AGREEMENT, SELLER MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND WHATSOEVER WITH RESPECT TO THE PURCHASED ASSETS OR OTHERWISE, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY REPRESENTATION OR WARRANTY REGARDING THE TITLE OR CONDITION OF THE ASSETS OR THE FITNESS, DESIRABILITY, OR MERCHANTABILITY THEREOF OR SUITABILITY THEREOF FOR ANY PARTICULAR PURPOSE, OR ANY BUSINESS PROSPECTS, OR VALUATION OF THE PURCHASED ASSETS, OR THE COMPLIANCE OF THE ASSETS IN THEIR CURRENT OR FUTURE STATE WITH APPLICABLE LAWS OR ANY VIOLATIONS THEREOF.**

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES
## OF PURCHASER

Purchaser hereby represents and warrants to Seller as follows:

**ASPA AKORN**

Section 6.1     <u>Organization</u>.  Purchaser is a company duly organized, validly existing and in good standing under the laws of Switzerland.

Section 6.2     <u>Authorization; Enforceability</u>.     Purchaser has all requisite company power and authority to enter into this Agreement and any other document to which Purchaser is a party or is to be a party as required hereunder and to perform its obligations hereunder and thereunder. The execution, delivery and performance by Purchaser of this Agreement and any other document to which Purchaser is a party as required hereunder, and the consummation by Purchaser of the Transactions, have been duly authorized by all necessary action on the part of Purchaser.  This Agreement and, when executed, any other document to which Purchaser is a party as required hereunder, have been duly and validly executed and delivered by Purchaser and, assuming due and valid execution and delivery by Seller, constitute the valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, subject to laws of general application relating to bankruptcy, insolvency, and the relief of debtors and other laws of general application affecting enforcement of creditors' rights generally, rules of law governing specific performance, injunctive relief and other equitable remedies.

Section 6.3     <u>No Conflicts</u>.     Assuming that requisite Bankruptcy Court approvals are obtained, the execution, delivery and performance of this Agreement and any other document to which Purchaser is a party as required hereunder, and the consummation of the Transactions will not (a) result in a violation of the Organizational Documents of Purchaser or (b) result in a violation of any law, statute, rule or regulation of any Governmental Entity or any applicable order of any court or any rule, regulation or order of any Governmental Entity applicable to Purchaser or by which any property or asset of Purchaser is bound.

Section 6.4     <u>Consents and Approvals</u>.  No consent, approval, authorization, order, registration or qualification of or with any Governmental Entity having jurisdiction over Purchaser or any of its properties is required for the execution and delivery by Purchaser of the Agreement and any other document to which Purchaser is a party as required hereunder and performance of and compliance by Purchaser with all of the provisions hereof and thereof and the consummation by Purchaser of the Transactions, except (a) the entry of the Sale Order and the expiration, or waiver by the Bankruptcy Court, of the 14-day period set forth in Bankruptcy Rules 6004(h) and 3020(e).

Section 6.5     <u>Financial Capability</u>.  Purchaser (a) has sufficient funds available to pay the Purchase Price and any expenses incurred by Purchaser in connection with the Transactions, and (b) has the resources and capabilities (financial or otherwise) to perform its obligations hereunder.

Section 6.6     <u>Broker's, Finder's or Similar Fees</u>.     There are no brokerage commissions, finder's fees or similar fees or commissions payable by Purchaser in connection with the Transactions.

**Section 6.7     <u>No Other Representations or Warranties</u>.  Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that none of Seller, on behalf of the Estates, the Estates' Affiliates or any other Person is making any representations or warranties whatsoever, express or implied, beyond those expressly given by Seller in <u>Article V</u>, or with respect to any other information provided to the Purchaser in connection with the Transactions, including as to the probable success or profitability of the ownership, use or operation of the Business or the Purchased Assets after Closing.  Purchaser further represents that none of Seller, on behalf of the Estates, the Estates' Affiliates or any other Person has made any representation or warranty, express or implied as to the accuracy or completeness of any information regarding Seller or the transactions contemplated by this Agreement not expressly set forth in this Agreement, and none of Seller, on behalf of the Estates, the Estates' Affiliates or any other Person**

**will have or be subject to liability to Purchaser or any other Person resulting from the distribution to Purchaser or its Representatives or Purchaser's use of, any such information, including data room information provided to Purchaser or its Representatives, in connection with the Transactions. Purchaser acknowledges that it has conducted to its satisfaction its own independent investigation of the Purchased Assets and, in making the determination to proceed with the Transactions, Purchaser has relied on the results of its own independent investigation.**

## ARTICLE VII

## BANKRUPTCY COURT MATTERS

Section 7.1    <u>Bankruptcy Actions</u>.

(a)    Seller shall use its commercially reasonable efforts to obtain the entry of the Sale Order within sixty (60) days of full execution hereof.  Purchaser covenants and agrees that it shall reasonably cooperate with Seller as necessary to obtain entry of the Sale Order, including without limitation by furnishing information or documents to Seller as necessary to satisfy the requirements for obtaining Bankruptcy Court approval of the Sale Order.

(b)    Each of Seller and Purchaser shall appear formally in the Bankruptcy Court if reasonably requested by the other party or required by the Bankruptcy Court in connection with the transactions contemplated by this Agreement and keep the other reasonably apprised of the status of material matters related to this Agreement, including, upon reasonable request promptly furnishing the other with copies of notices or other communications received by Seller from the Bankruptcy Court or any third party and/or any Governmental Entity with respect to the transactions contemplated by this Agreement.

Section 7.2    <u>Bidding Procedures</u>.  The bidding procedures to be employed with respect to the Auction process (the "<u>Bidding Procedures</u>") are those approved by the Court in the Bidding Procedures Order entered April 28, 2023. Purchaser agrees to the Bidding Procedures and agrees to comply with the Bidding Procedures Order.

Section 7.3    <u>Approval</u>.  Seller's obligations under this Agreement and in connection with the transactions contemplated hereby are subject to entry of the Sale Order, and to the terms of the Sale Order and any other orders of the Bankruptcy Court applicable to the transactions contemplated in this Agreement. Nothing in this Agreement shall require the Seller or its affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

Section 7.4    <u>Cure Amount</u>.    Subject to entry of the Sale Order and consummation of the Closing, Purchaser shall, on the Closing, pay the Cure Amount so that the Assigned Contracts/Leases may be assumed by the Seller and assigned to Purchaser in accordance with the provisions of Section 365 of the Bankruptcy Code and this Agreement.

Section 7.5    <u>Presentation to Bankruptcy Court/ Alternate Bid</u> .  The Trustee's presentation to the Bankruptcy Court of the Purchaser's Bid and the applicable Alternate Bid will not constitute the Trustee's acceptance of such Bids until such Bids are approved by the Bankruptcy Court at the Sale Hearing. Following approval of the Sale to the Purchaser, if the Purchaser fails to consummate the Sale for any reason, then the applicable Alternate Bid will be deemed to be the Successful Bid and the Trustee will be authorized, but not directed, to effect the Sale to the Alternate Bidder subject to the terms of the Alternate Bid of such Alternate Bidder without further order of the Bankruptcy Court. The Alternate Bid shall remain open until the earlier of (a) thirty (30) days following the entry of the Sale Order or (b) the

**ASPA AKORN**

consummation of the Sale to the Successful Bidder unless further extended by agreement of the Trustee and Alternate Bidder.

Section 7.6    Adequate Assurance of Future Performance.  Purchaser shall provide adequate assurance of future performance as required under Section 365 of the Bankruptcy Code for the Assigned Contracts/Leases.  Purchaser agrees that it will take actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assigned Contracts/Leases, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Purchaser's advisors available to testify before the Bankruptcy Court

## ARTICLE VIII

## COVENANTS

Section 8.1    Tax Matters.

(a)    Purchaser shall be responsible for any Transfer Taxes.  Purchaser shall promptly pay directly to the appropriate Tax Authority all applicable Transfer Taxes that may be imposed upon or payable or collectible or incurred in connection with this Agreement or the Transactions contemplated herein, or that may be imposed upon or payable or collectible or incurred in connection with the Transactions, and file all necessary Tax Returns with respect to all such Transfer Taxes.

(b)    Purchaser and Seller shall cooperate in providing each other with any appropriate certification and other similar documentation relating to exemption from Transfer Taxes (including any appropriate resale exemption certifications), as provided under Applicable Law.

(c)    Purchaser and Seller agree to furnish, or cause their Affiliates to furnish, to each other, upon request, as promptly as practicable, such information and assistance relating to the Purchased Assets (including access to books and records) as is reasonably necessary for the filing of all Tax Returns, and making of any election related to Taxes, the preparation for any audit by any Tax Authority, and the prosecution or defense of any claim, suit or proceeding relating to any Tax Return.  Purchaser and Seller shall cooperate, and cause their Affiliates to cooperate, with each other in the conduct of any audit or other proceeding related to Taxes and each shall execute and deliver such powers of attorney and other documents as are reasonably necessary to carry out the intent of this Section 8.1(c).  Purchaser and Seller shall provide, or cause their Affiliates to provide, timely notice to each other in writing of any pending or threatened Tax audits, assessments or litigation with respect to the Purchased Assets for any taxable period for which the other party may have liability under this Agreement.  Purchaser and Seller shall furnish, or cause their respective Affiliates to furnish, to each other copies of all correspondence received from any Tax Authority in connection with any Tax audit or information request with respect to any taxable period for which the other party or its Affiliates may have liability under this Agreement.

Section 8.2    Conduct of the Business.

(a)    Except as (i) required by Applicable Law, (ii) required by Order of the Bankruptcy Court or required, or authorized or restricted pursuant to the Bankruptcy Code, (iii) expressly contemplated or required by this Agreement or (iv) expressly set forth in *Schedule 8.2*, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to ARTICLE X), unless Purchaser otherwise consents in writing, Seller shall, and shall cause the Debtors, the Company and the Subsidiaries of the Company to, conduct the Business in the ordinary course in all material respects, and use commercially reasonable efforts, consistent with past practice, to (A)

maintain and preserve intact the Purchased Assets and the Business (including all assets of the Business), (B) maintain, preserve, keep available and continue the services currently provided by the Debtors to the Company (or any Subsidiary thereof) or the Business in the ordinary course, (C) maintain, preserve, and keep available the services of the current officers and employees of the Business (other than where such employee voluntarily resigns or where termination of such services is for cause), (D) maintain and preserve in all material respects the Business's present relationships with customers, suppliers, vendors, service providers, licensors, licensees, Governmental Entities, and other Persons with whom the Business has material business relations, (E) maintain and preserve in effect in all material respects the Permits used or held for use in the Business, (F) preserve and maintain all Marketing Authorizations, and (G) perform in all material respects all of its obligations under the Contracts of the Business, and all of its post-petition obligations under the Assigned Contracts/Leases, in each case as and when such obligations become due (except as Seller may negotiate for and receive applicable extended payment arrangements).

(b)    Nothing contained in this Agreement is intended to give Purchaser or its Affiliates the right to control or direct the Company's or its Subsidiaries' operations or business prior to the Closing, and nothing contained in this Agreement is intended to give the Company the right to control or direct Purchaser's or its Subsidiaries' operations.

(c)    In furtherance of Section 8.2(a) and Section 8.2(b), during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to ARTICLE X), unless Purchaser otherwise consents in writing, other than as set forth on *Schedule 8.2(c)*, Seller shall not, and shall cause the Debtors (and their respective Affiliates), the Company and the Subsidiaries of the Company not to, sell, divest, distribute, assign, license, mortgage, pledge, encumber, transfer, lease or sublease to any other Person any property, right, privilege, interest or other asset that would otherwise constitute a Purchased Asset or an asset of the Business if owned immediately prior to the Closing.

Section 8.3    Access to Information.

(a)    From the date hereof until the Closing (or the earlier termination of this Agreement pursuant to ARTICLE X), the Seller shall, and shall cause the Debtors, the Company and the Subsidiaries of the Company to, provide Purchaser and its Representatives with reasonable access, upon reasonable advance notice and during regular business hours, to the books and records (including work papers, schedules, memoranda, Tax Returns, Tax schedules and Tax rulings), documents, data, files, personnel and offices and properties of the Company and its Subsidiaries, in order for Purchaser and its Representatives to access such information regarding the Company and its Subsidiaries or the Purchased Assets as is reasonably necessary in order to consummate the transactions contemplated by this Agreement or otherwise as reasonably requested by Purchaser in connection with Purchaser's actions provided for in this Agreement; provided that (i) such access does not unreasonably interfere with the normal operations of the Company and its Subsidiaries, (ii) nothing herein will require the Seller to provide access to or disclose, or cause the Debtors, the Company or the Subsidiaries of the Company to provide access to or disclose, any information to Purchaser if such access or disclosure (A) would result in the waiver of any attorney-client, work-product or other legal privilege or accountant privilege, (B) would reasonably be expected to violate any Applicable Laws, or (C) would violate any fiduciary duty; provided further that the Seller shall, or shall cause the Debtors, the Company or the Subsidiaries of the Company to (as applicable), use commercially reasonable efforts to provide a reasonable alternative means of accessing any such information in a manner that is not inconsistent with the foregoing.

(b)    Purchaser shall use any information provided pursuant to this Section 8.3 solely for the purpose of consummating the transactions contemplated hereby or in connection with Purchaser's actions provided for in this Agreement.

(c)      From and after the Closing until the closing of the Bankruptcy Case, Purchaser will, at its own expense, provide Seller and its Representatives with reasonable access, during normal business hours and upon reasonable advance notice, to the books and records, including work papers, schedules, memoranda, and other documents transferred to Purchaser pursuant to this Agreement (for the purpose of examining and copying) relating to the Purchased Assets or the Assumed Liabilities, in each case, in Purchaser's possession or control and solely to the extent concerning periods or occurrences prior to the Closing Date, and reasonable access, during normal business hours and upon reasonable advance notice, to personnel, offices and properties of Purchaser, as may be reasonably requested by Seller in connection with the Bankruptcy Case, to comply with legal, regulatory, stock exchange and financial reporting requirements, or to satisfy any audit, accounting or similar requirement; provided, in each case, that such access does not unreasonably interfere with the normal operations of Purchaser or its Affiliates (including the Company and its Subsidiaries); provided further that nothing herein will require Purchaser to provide access to, or to disclose any information to, Seller if such access or disclosure (i) would result in the waiver of any attorney-client, work-product or other legal privilege or accountant privilege, (ii) would reasonably be expected to violate any Applicable Laws, (iii) would reasonably be expected to be in violation of the provisions of any agreement (including any confidentiality obligation) by which Purchaser or any of its Subsidiaries is bound, or (iv) would violate any fiduciary duty; provided that Purchaser will, and will cause its Subsidiaries to, use commercially reasonable efforts to provide a reasonable alternative means of accessing any such information in a manner that is not inconsistent with the foregoing; provided further that no such access shall be required in connection with a proceeding between Purchaser or any of its Affiliates, on the one hand, and Seller or any of its Affiliates, on the other hand.

(d)      Unless otherwise consented to in writing by each other party, no party hereto, for the period from and after the Closing until the closing of the Bankruptcy Case, shall destroy, alter or otherwise dispose of any of the books and records relating to any period occurring on or prior to the Closing without providing reasonable advance notice to each other party and offering to permit each such other party (at such other party's sole cost and expense) to make copies of such books and records or any portion thereof that such party may intend to destroy, alter or dispose of.

(e)      From and after the Closing until the closing of the Bankruptcy Case, Seller, at Purchaser's expense, will, and will cause the Debtors to, provide Purchaser and its Representatives with reasonable access, during normal business hours, and upon reasonable advance notice, to the books and records including work papers, schedules, memoranda, and other documents relating to the Company or its Subsidiaries (for the purpose of examining and copying), the Purchased Assets, the Assumed Liabilities or the Excluded Liabilities, in each case, in Seller's or any Debtor's possession or control and solely to the extent concerning periods or occurrences prior to the Closing Date as may be reasonably requested by Purchaser (i) to comply with legal, contractual, regulatory, stock exchange and financial reporting requirements, (ii) to satisfy any audit, accounting or similar requirement, or (iii) to satisfy any other bona fide legal compliance, accounting or tax purpose; provided that nothing herein will require Seller to provide access to, or to disclose any information to, Purchaser if such access or disclosure (A) would result in the waiver of any attorney-client, work-product or other legal privilege or accountant privilege, (B) would reasonably be expected to violate any Applicable Laws, or (C) would violate any fiduciary duty; provided that Seller will use commercially reasonable efforts to provide a reasonable alternative means of accessing any such information in a manner that is not inconsistent with the foregoing; provided further that no such access shall be required in connection with a proceeding between Purchaser or any of its Affiliates, on the one hand, and Seller or any of its Affiliates, on the other hand.

Section 8.4      Transfer of Marketing Authorizations.  On the Closing Date (or within such time after the Closing Date as permitted under Applicable Law, but no later than two (2) Business Days after the Closing Date), Seller shall, or shall cause the Debtors to (as applicable), submit to the FDA the executed Seller FDA Transfer Letters.

**ASPA AKORN**

Section 8.5    Reasonable Efforts; Cooperation.

(a)    Without prejudice to any other term or provision of this Agreement, each party shall, and shall cause its Subsidiaries and its and their respective Representatives to, use its reasonable best efforts to perform their respective obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things reasonably necessary, proper or advisable to cause the Transactions to be effected as soon as reasonably practicable in accordance with the terms hereof, and to reasonably cooperate with each other party and its Representatives in connection with any step required to be taken as a part of its obligations hereunder.

(b)    The obligations of Seller pursuant to this Agreement, including this Section 8.5(b), shall be subject to any Orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code.

Section 8.6    Notification of Certain Matters.

(a)    Seller shall promptly (and, in any event, within three (3) Business Days) notify Purchaser in writing of: (i) any notice or other communication received by Seller, any Debtor, the Company or any Subsidiary of the Company from any Person alleging that the consent of such Person is or may be required in connection with the Transactions, (ii) any notice or other communication received by Seller, any Debtor, the Company or any Subsidiary of the Company from any Governmental Entity, or any Action by any Governmental Entity, related to or in connection with the transactions contemplated by this Agreement (including that may restrain, enjoin or otherwise prohibit the consummation of the transactions contemplated by this Agreement), and (iii) the existence or occurrence of any event, fact or circumstance arising after the execution of this Agreement that would reasonably be expected to cause any condition set forth in Section 9.2 not to be satisfied; provided that the delivery of any notice pursuant to this Section 8.6(a) shall not cure any breach of any representation or warranty requiring disclosure of such matter prior to the date hereof or otherwise limit or affect the remedies available to Purchaser under or with respect to this Agreement.

(b)    Purchaser will promptly (and, in any event, within three (3) Business Days) notify Seller in writing (i) of any notice or other communication from any Governmental Entity, or any Action by any Governmental Entity, related to or in connection with the transactions contemplated by this Agreement (including that may restrain, enjoin or otherwise prohibit the consummation of the transactions contemplated by this Agreement) and (ii) the existence or occurrence of any event, fact or circumstance arising after the execution of this Agreement that would reasonably be expected to cause any condition set forth in Section 9.3 not to be satisfied; provided that the delivery of any notice pursuant to this Section 8.6(b) shall not cure any breach of any representation or warranty requiring disclosure of such matter prior to the date hereof or otherwise limit or affect the remedies available to Seller under or with respect to this Agreement.

Section 8.7    Misdirected Assets. From and after the Closing, if Seller or any Debtor, or any of their respective Affiliates (other than the Company and its Subsidiaries) receives any right, property or asset that is a Purchased Asset, Seller shall, or shall cause such Debtor or Affiliate to, promptly transfer such right, property or asset (and shall promptly endorse and deliver any such asset that is received in the form of cash, checks or other documents) to Purchaser, and such asset will be deemed the property of Purchaser held in trust by Seller for Purchaser until so transferred. From and after the Closing, if Purchaser or any of its Affiliates receives any right, property or asset of the Debtors that is not a Purchased Asset, Purchaser shall promptly transfer or cause such of its Affiliates to transfer such asset (and shall promptly endorse and deliver any such right, property or asset that is received in the form of cash, checks,

**ASPA AKORN**

or other documents) to Seller or such Debtor, and such asset will be deemed the property of Seller or such Debtor (as applicable) held in trust by Purchaser until so transferred.

Section 8.8    <u>Further Assurances</u>.  Without prejudice to any other term or provision of this Agreement, from time to time, as and when requested by any party hereto and at such requesting party's expense, any other party hereto will execute and deliver, or cause to be executed and delivered, all such documents and instruments and will take, or cause to be taken, all such further or other actions as such requesting party may reasonably deem necessary or desirable to evidence and effectuate the transactions contemplated by this Agreement and the transfer of title to the Purchased Assets to Purchaser or its designee(s) in accordance with the terms of the Agreement.

Section 8.9    <u>Communications with Customers and Suppliers</u>.  Subject to the terms of this Agreement, prior to the Closing, the parties hereto shall reasonably cooperate with each other in coordinating their communications with any customer, supplier or other contractual counterparty of the Business in relation to this Agreement and the transactions contemplated hereby.

## ARTICLE IX

## CONDITIONS

Section 9.1    <u>Conditions Precedent to Performance</u>.  The respective obligations of Seller and Purchaser to consummate the Transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by law, written waiver signed by each of Seller and Purchaser), on or prior to the Closing Date, of the following conditions:

(a)    <u>Bankruptcy Matters</u>.  By July 1, 2023, the Bankruptcy Court shall have entered the Sale Order.  The Sale Order shall have become final and non-appealable and shall not have been stayed, vacated, modified or supplemented without the prior written consent of Purchaser.

(b)    <u>No Order</u>.  No order, statute, rule, regulation, executive order, injunction, stay, decree, directive, or restraining order shall have been enacted, entered, promulgated or enforced by any court of competent jurisdiction or Governmental Entity that would (i) prevent the consummation of any of the Transactions contemplated by this Agreement or (ii) cause any of the Transactions contemplated by this Agreement to be rescinded following consummation, nor shall any such order, statute, rule, regulation, executive order, injunction, stay, decree, directive, or restraining order be in effect.  No action shall be pending before any Governmental Entity or before any arbitral body wherein an unfavorable injunction, judgment, order, decree, ruling, directive or charge would (x) prevent consummation of any of the Transactions contemplated by this Agreement or (y) cause any of the Transactions contemplated by this Agreement to be rescinded following consummation.

Section 9.2    <u>Conditions to Obligations of Purchaser</u>.  The obligations of Purchaser to consummate the Closing shall be subject to the satisfaction (or waiver by Purchaser) on or prior to the Closing Date, of each of the following conditions:

(a)    <u>Representations and Warranties</u>.  All representations and warranties made by Seller in <u>ARTICLE V</u> shall be true and correct in all material respects on and as of the Closing Date as if again made by Seller on and as of such date (or, if made as of a specific date, at and as of such date).

(b)    <u>Performance</u>.  Seller shall have performed in all material respects all obligations required under this Agreement to be performed by Seller on or before the Closing Date.

**ASPA AKORN**

(c)     Deliverables.  Seller shall have delivered, and Purchaser shall have received, all of the items set forth in Section 4.2 of this Agreement.

(d)     Legal Proceedings.  No legal proceeding shall have been commenced against Purchaser, Seller, the Company or any Subsidiary of the Company which would prevent the Closing.  No Order shall have been issued by any Governmental Entity, and be in effect, which has the effect of making the Transaction contemplated by this Agreement illegal, otherwise restraining or prohibiting consummation of this Transaction or causing any of the transactions contemplated hereunder to be rescinded following completion thereof.

The foregoing conditions in this Section 9.2 are for the sole benefit of Purchaser and may be waived by Purchaser, in whole or in part, at any time and from time to time in its sole discretion.

Section 9.3     Conditions to Obligations of Seller.  The obligations of Seller to consummate the Closing shall be subject to the satisfaction (or waiver by Seller) on or prior to the Closing Date, of the following conditions:

(a)     Representations and Warranties.  All representations and warranties made by Purchaser in Article VI of this Agreement shall be true and correct in all material respects on and as of the Closing Date as if again made by Purchaser on and as of such date (or, if made as of a specific date, at and as of such date).

(b)     Performance of the Obligations of Purchaser.  Purchaser shall have performed in all material respects all material obligations required under this Agreement to be performed by it on or before the Closing Date (except with respect to the obligation to pay the Purchase Price in accordance with the terms of this Agreement, which obligation shall be performed in all respects as required under this Agreement), and Seller shall have received a certificate dated as of the Closing Date and signed by an authorized signatory of Purchaser to that effect.

(c)     Purchaser's Deliveries.  Purchaser shall have delivered, and Seller shall have received, all of the items set forth in Section 4.3 of this Agreement.

(d)     Parent Guaranty.  The Parent Guaranty shall be in full force and effect.

The foregoing conditions in this Section 9.3 are for the sole benefit of Seller and may be waived by Seller, in whole or in part, at any time and from time to time in its sole discretion.

## ARTICLE X

## TERMINATION

Section 10.1     Termination.  This Agreement may be terminated at any time prior to the Closing Date as follows:

(a)     By the mutual written consent of Purchaser and Seller;

(b)     By either Purchaser or Seller upon written notice given to the other, if the Bankruptcy Court or any other Governmental Entity shall have issued an order, decree or ruling or taken any other action (which order, decree, ruling or other action the parties hereto shall use their reasonable efforts to prevent the entry of and remove) that permanently restrains, enjoins or otherwise prohibits the consummation of the Transactions, and such order, decree, ruling or other action shall have become final and non-appealable;

**ASPA AKORN**

(c)    By Seller upon written notice given to Purchaser, if Purchaser shall have breached or failed to perform in any material respect any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (i) would result in a failure of a condition set forth in Section 9.3 and (ii) cannot be cured within two (2) Business Days after Seller provides written notice to Purchaser of such breach;

(d)    By Purchaser upon written notice given to Seller, if Seller shall have breached or failed to perform in any material respect any of its representations, warranties or covenants of Article VIII contained in this Agreement, which breach or failure to perform (i) would result in a failure of a condition set forth in Section 9.2 and (ii) is not cured within five (5) Business Days after Purchaser provides written notice to Seller of such breach;

(e)    Subject to Purchaser's rights under the Bidding Procedures Order to amend the terms of this Agreement at the Auction, with respect to any Purchased Assets being purchased by Purchaser, by either Purchaser or Seller, if, at the conclusion of the hearing for the sale of Purchased Assets to Purchaser, Purchaser is not determined by the Bankruptcy Court to be the Successful Bidder with respect to such Purchased Assets, unless Purchaser is an Alternate Bidder; provided, however, that the Purchaser shall have the right to terminate this Agreement pursuant to this Section 10.1(e) on or at any time after the forty-fifth (45th) day following the date of the entry of the Sale Order unless the Purchaser becomes the Successful Bidder on or prior to such date; and

(f)    By Purchaser or Seller upon written notice given to the other if Seller or the Company consummates an Alternative Transaction.

For the avoidance of doubt, if the Purchaser or Seller terminates this Agreement with respect to any individual or combination of Purchased Assets, the Agreement, as amended as permitted by the Bidding Procedures Order, shall remain in full force and effect for any Purchased Assets for which Purchaser is the Successful Bidder. Any party seeking to invoke its rights to terminate this Agreement shall give written notice thereof to the other party or parties specifying the provision hereof pursuant to which such termination is made and the effective date of such termination being the date of such notice.

Section 10.2    Effect of Termination; Required Deposit.

(a)    If this Agreement is terminated by Seller or Purchaser in accordance with and pursuant to Section 10.1, then all rights and obligations of the parties under this Agreement shall terminate; provided, however, that nothing herein shall relieve any party from liability for any breach of this Agreement prior to such termination; provided further, that if this Agreement is terminated by Seller pursuant to Section 10.1(c), then Purchaser shall forfeit and Seller shall retain the Required Deposit as its sole and exclusive remedy for such breach.

(b)    If this Agreement is terminated pursuant to Section 10.1 (except pursuant to Section 10.1(c)), then Seller shall promptly (but in any event within three (3) Business Days after such termination) return the Required Deposit to Purchaser by wire transfer of immediately available funds to an account or accounts designated by Purchaser.

(c)    If this Agreement is terminated other than in a manner provided by Section 10.1, then, without limiting any other rights and remedies that may be available to Purchaser, then within five (5) Business Days after such termination, Seller shall refund the Required Deposit to Purchaser by wire transfer of immediately available funds to an account designated by Purchaser.

# ARTICLE XI

## MISCELLANEOUS

Section 11.1    <u>Survival of Covenants, Representations and Warranties</u>.   The representations and warranties set forth in <u>Article</u> V and <u>Article VI</u> shall not survive the Closing Date; <u>provided</u>, <u>however</u>, that all covenants and agreements in this Agreement shall survive the Closing Date and remain in full force and effect indefinitely, unless otherwise specified therein.

Section 11.2    <u>Amendment and Modification</u>.  This Agreement may be amended, modified and supplemented in any and all respects, but only by a written instrument signed by all of the parties hereto expressly stating that such instrument is intended to amend, modify or supplement this Agreement; provided, however, any material amendment shall be subject to approval by the Bankruptcy Court.

Section 11.3    <u>Notices</u>.  All notices and other communications hereunder shall be in writing and mailed, delivered personally, emailed (which is confirmed) or sent by an overnight courier service, such as Federal Express, to the parties at the following addresses:

| | |
|---|---|
| If to Seller: | George L. Miller, Trustee<br>1628 John F. Kennedy Blvd., Suite 950<br>Philadelphia, PA 19103-2110<br>Telephone: (215) 561-0950 Ext. 14<br>Facsimile: (215) 561-0330<br>Email:  gmiller@mctllp.com |
| with a copy to: | John T. Carroll, III<br>Cozen O'Connor<br>1201 North Market Street, Suite 1001<br>Wilmington, DE 19801<br>Telephone: (302) 295-2028<br>Facsimile: (302) 295-2013<br>Email: jcarroll@cozen.com |
| If to Purchaser: | Sentiss AG<br>Bankstrasse 4<br>8610 Uster, Switzerland<br>Attn: Deepak Bahri<br>Email: dbahri@sentisspharma.com |
| with a copy to: | K&L Gates LLP<br>599 Lexington Avenue<br>New York, NY 10022<br>Telephone: (212) 536-3915<br>Attn:  Jonathan M. Barron and A. Lee Hogewood, III<br>Email:  jonathan.barron@klgates.com and<br>          a.lee.hogewoodiii@klgates.com |

or to such other address as a party may from time to time designate in writing in accordance with this <u>Section 11.3</u>.  Each notice or other communication given to any party hereto in accordance with the

**ASPA AKORN**

provisions of this Agreement shall be deemed to have been received (i) on the Business Day it is sent, if sent by personal delivery or email during normal business hours of the recipient (otherwise, on the first Business Day thereafter), or (ii) on the first Business Day after sending, if sent by overnight delivery, properly addressed and prepaid or (iii) upon receipt, if sent by mail (regular, certified or registered); provided, however, that notice of change of address shall be effective only upon receipt. The parties agree that delivery of process or other papers in connection with any such action or proceeding in the manner provided in this Section 11.3, or in such other manner as may be permitted by law, shall be valid and sufficient service thereof.

Section 11.4    Counterparts. This Agreement may be executed by facsimile or PDF signature and in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when two or more counterparts have been signed by each of the parties and delivered to the other party.

Section 11.5    Mutual Drafting. This Agreement is the result of the joint efforts of Purchaser and Seller, and each provision hereof has been subject to the mutual consultation, negotiation and agreement of the parties and there is to be no construction against either party based on any presumption of that party's involvement in the drafting thereof.

Section 11.6    Entire Agreement; No Third Party Beneficiaries. This Agreement and other schedules, annexes, and exhibits hereto, any other document required hereunder, the Conveyance Documents and the Sale Order (i) constitute the entire agreement and supersede all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof and thereof and supersede and cancel all prior agreements, negotiations, correspondence, undertakings, understandings and communications of the parties, oral and written, with respect to the subject matter hereof, and (ii) are not intended to confer upon any Person other than the parties hereto and thereto any rights, obligations or remedies hereunder; provided further that Affiliates and representatives of each party are express third-party beneficiaries of Section 11.14 and this Section 11.6.

Section 11.7    Severability. Any term or provision of this Agreement that is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction. If the final judgment of a court of competent jurisdiction or other authority declares that any term or provision hereof is invalid, void or unenforceable, the parties agree that the court making such determination shall have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases, or to replace any invalid, void or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision.

Section 11.8    Governing Law. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE AND THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE.

Section 11.9    Exclusive Jurisdiction. All actions and proceedings arising out of or relating to this Agreement, including the resolution of any and all disputes hereunder, shall be heard and determined in the Bankruptcy Court, and the parties to this Agreement hereby irrevocably submit to the exclusive jurisdiction of such courts in any such action or proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such action or proceeding. If the Bankruptcy Court does not have or declines to exercise subject matter jurisdiction over any action or proceeding arising out of or relating to this Agreement, then each party (i) agrees that all such actions or proceedings shall be heard and

**ASPA AKORN**

determined in federal court of the United States for the District of Delaware, (ii) irrevocably submits to the jurisdiction of such courts in any such action or proceeding, (iii) consents that any such action or proceeding may be brought in such courts and waives any objection that such party may now or hereafter have to the venue or jurisdiction or that such action or proceeding was brought in an inconvenient court, and (iv) agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such party at its address as provided in <u>Section 11.3</u> (<u>provided</u> that nothing herein shall affect the right to effect service of process in any other manner permitted by Delaware law).

Section 11.10    <u>Remedies</u>.  Neither the exercise of nor the failure to exercise a right of set-off or to give notice of a claim under this Agreement will constitute an election of remedies or limit Seller or Purchaser in any manner in the enforcement of any other remedies that may be available to any of them, whether at law or in equity.

Section 11.11    <u>Specific Performance.</u>

(a)    Purchaser acknowledges and agrees that any breach of the terms of this Agreement by Purchaser would give rise to irreparable harm for which money damages would not be an adequate remedy, and, accordingly agrees that, in addition to any other remedies, Seller shall be entitled to enforce the terms of this Agreement, including, for the avoidance of doubt, Purchaser's obligation to fund the Purchase Price, by a decree of specific performance without the necessity of proving the inadequacy of money damages as a remedy and without the necessity of posting a bond.  Seller acknowledges and agrees that any breach of the terms of this Agreement by Seller would give rise to irreparable harm for which money damages would not be an adequate remedy, and, accordingly agrees that, in addition to any other remedies, Purchaser shall be entitled to enforce the terms of this Agreement, including by a decree of specific performance without the necessity of proving the inadequacy of money damages as a remedy and without the necessity of posting a bond.

(b)    Each party hereto agrees that it will not oppose the granting of an injunction, specific performance and other equitable relief when expressly available pursuant to the terms of this Agreement on the basis that (i) there is adequate remedy at law or (ii) an award of specific performance is not an appropriate remedy for any reason at law or equity.  In the event a party hereto seeks an injunction or injunctions to prevent breaches of this Agreement when expressly available pursuant to the terms of this Agreement and to enforce specifically the terms and provisions of this Agreement when expressly available pursuant to the terms of this Agreement, such party shall not be required to provide any bond or other security in connection with any such order or injunction.

Section 11.12    <u>Assignment</u>.  Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto (whether by operation of law or otherwise) without the prior written content of the other parties; provided that no such prior written consent shall be required for (a) an assignment by the Purchaser to one or more of its Affiliates, so long as the Purchaser remains liable hereunder, (b) an assignment by the Purchaser of its rights and interests hereunder after the Closing.  Subject to the first sentence of this <u>Section 11.12</u>, this Agreement shall be binding upon, inure to the benefit of and be enforceable by the parties and their respective successors and permitted assigns.

Section 11.13    <u>Headings</u>.  The article, section, paragraph and other headings contained in this Agreement are inserted for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

**ASPA AKORN**

Section 11.14    No Consequential or Punitive Damages.  NO PARTY (OR ITS AFFILIATES OR REPRESENTATIVES) SHALL, UNDER ANY CIRCUMSTANCE, BE LIABLE TO THE OTHER PARTY (OR ITS AFFILIATES OR REPRESENTATIVES) FOR ANY CONSEQUENTIAL, EXEMPLARY, SPECIAL, INCIDENTAL OR PUNITIVE DAMAGES CLAIMED BY SUCH OTHER PARTY UNDER THE TERMS OF OR DUE TO ANY BREACH OF THIS AGREEMENT, INCLUDING LOSS OF REVENUE OR INCOME, DAMAGES BASED ON ANY MULTIPLIER OF PROFITS OR OTHER VALUATION METRIC, COST OF CAPITAL, DIMINUTION OF VALUE OR LOSS OF BUSINESS REPUTATION OR OPPORTUNITY.

**Section 11.15  "As Is" Transaction.   THE PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN ARTICLE V OF THIS AGREEMENT, (i) SELLER MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE PURCHASED ASSETS, (ii)  WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLER HEREBY DISCLAIMS ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ALL OR ANY PORTION OF THE PURCHASED ASSETS AND (iii) ACCORDINGLY, THE PURCHASER WILL ACCEPT THE PURCHASED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."**

Section 11.16    Bulk Transfer Notices.   Seller and Purchaser hereby waive compliance with any bulk transfer provisions of the Uniform Commercial Code (or any similar Applicable Law), to the extent not repealed in any applicable jurisdiction, in connection with this Agreement and the Transactions.

Section 11.17    Interpretation.

(a)    When a reference is made in this Agreement to a Section, Article, subsection, paragraph, item or Exhibit, such reference shall be to a Section, Article, subsection, paragraph, item or Exhibit of this Agreement unless clearly indicated to the contrary.

(b)    Whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation."

(c)    The words "hereof," "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement.

(d)    The meaning assigned to each term defined herein shall be equally applicable to both the singular and the plural forms of such term, and words denoting any gender shall include all genders.  Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(e)    A reference to any party to this Agreement or any other agreement or document shall include such party's predecessors, successors and permitted assigns.

(f)    A reference to any legislation or to any provision of any legislation shall include any amendment to, and any modification or re-enactment thereof, any legislative provision substituted therefore and all regulations and statutory instruments issued thereunder or pursuant thereto.

(g)    References to $ are to United States Dollars.

**ASPA AKORN**

(h)      The parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement or caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first written above.

**SELLER:**

GEORGE L. MILLER, AS TRUSTEE FOR THE ESTATES

By: _____

    Name: George L. Miller

    Title: Trustee

**PURCHASER:**

SENTISS AG

By: _____

    Name: Deepak Bahri

    Title: Authorized Signatory

IN WITNESS WHEREOF, the parties hereto have executed this Agreement or caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first written above.

**SELLER:**

GEORGE L. MILLER, AS TRUSTEE FOR THE ESTATES

By: _____
      Name: George L. Miller
      Title: Trustee

**PURCHASER:**

SENTISS AG

By: _____
      Name: Deepak Bahri
      Title: Authorized Signatory

**ASPA AKORN**

**EXHIBIT A**

**<u>Sale Order</u>**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 7 |
| AKORN HOLDING COMPANY LLC, *et al.[1]*, | Case No. 23-10253 (KBO) |
| | (Jointly Administered) |
| Debtors. | **Re D.I. 106** |

**ORDER (A) APPROVING THE SALE OF CERTAIN OF THE ESTATES' ASSETS (SPECIFIC "ANDAs" and SHARES) TO SENTISS AG or its ASSIGNS, (B) APPROVING THE ASSET AND SHARE PURCHASE AGREEMENT BETWEEN THE TRUSTEE AND SENTISS AG, AND (C) GRANTING CERTAIN RELATED RELIEF**

This matter is before the Court on the Trustee's *Motion for Entry of (I) an Order (A) Approving Bidding Procedures in Connection With Sale of Substantially all of the Estates' Assets, (B) Scheduling an Auction and Hearing to Consider the Proposed Sale and (C) Approving the Form and Manner of Notice Thereof; and (II) an Order (A) Approving the Sale, (B) Authorizing the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting Certain Related Relief* (the "Sale Motion")[D.I. 106].[2] The Court granted, in part, the relief sought in the Sale Motion by its *Order Granting Trustee's Motion for Entry of an Order (A) Approving Bidding Procedures in Connection With Sale of Substantially All of the Estates' Assets, (B) Scheduling an Auction and Hearing to Consider the Proposed Sale and (C) Approving the Form and Manner of Notice Thereof* dated April 28, 2023 (the "Bidding Procedures Order") [D.I. 137] approving, among other things, the Bidding Procedures and the Notice Procedures.  As a

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of their federal tax identification numbers, and cases numbers are Akorn Holding Company LLC (9190), Case No. 23-10253 (KBO); Akorn Intermediate Company LLC (6123), Case No. 23-10254 (KBO); and Akorn Operating Company LLC (6184), Case No. 23- 10255. The Debtors' headquarters is located at 5605 CenterPoint Court, Gurnee, IL 60031.

[2] Unless otherwise defined in this Order, all capitalized terms shall have the meanings provided in the Sale Motion and/or the applicable Purchase Agreement.

consequence of the entry of the Bidding Procedures Order, numerous parties submitted bids for various "lots" of the Estates' assets allowing the Trustee to conduct an auction as provided in the Bidding Procedures Order.  The Trustee having determined, after an extensive marketing process and the Auction, that Sentiss AG (together with its assigns, as applicable, "Sentiss" or "Purchaser")[3] has submitted the highest and best bid for the Purchased Assets (defined as all of the assets and shares that are the subject of that certain asset and share purchase agreement executed and delivered by Sentiss on or about May 18, 2023 ("Sentiss ASPA"), together with all ancillary documents executed in conjunction with or as a consequence of the Sentiss ASPA  (the "Sentiss Purchase Agreement")); and adequate and sufficient notice of the Bidding Procedures, the Purchase Agreements (including, without limitation, the Sentiss Purchase Agreement), and all transactions contemplated thereunder and in this Order having been given in the manner directed by the Court in the Bidding Procedures Order; and all interested parties having been afforded an opportunity to be heard with respect to the Sale Motion and all relief related thereto; and the Court having reviewed and considered the Sale Motion and all relief related thereto, and noting that no objections were filed thereto or, to the extent objections have been filed, any such objections related to the Sentiss Purchase Agreement and/or the Purchased Assets have been resolved by the parties or overruled by the Court, and having held a hearing regarding the Sale Motion as it relates to the Sentiss Purchase Agreement and the Purchased Assets on May 19, 2023 (the "Sale Hearing"); and it appearing that the Court has jurisdiction over this matter; and it further appearing that the legal and factual bases set forth in the Sale Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation; and good and sufficient cause

---

[3] In the event that Sentiss assigns, or purports to assign, any of its rights under the Sentiss Purchase Agreement, Sentiss shall nonetheless remain fully liable and obligated to the Trustee and the Estates pursuant to full extent of the Sentiss Purchase Agreement.

appearing,

**THE COURT HEREBY FINDS AND DETERMINES THAT:**[4]

**Jurisdiction, Final Order, and Statutory Predicates**

A.      This Court has jurisdiction to hear and determine the Sale Motion pursuant to 28 U.S.C. § 1334(a). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N), and (O). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      The statutory predicates for the relief requested in the Sale Motion are sections 105(a), 363, and 365 of the Bankruptcy Code, and Bankruptcy Rules 2002(a)(2), 6004, 6006, 9007, and 9014.

C.      This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Federal Rule of Civil Procedure 54(b), as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order and accordingly the stay afforded by Bankruptcy Rules 6004(h) and 6006(d) are hereby waived.

**Notice of the Sale and Auction**

D.      Actual written notice of the Sale Motion was provided to the Notice Parties.

E.      The Trustee's Notice of Auction and Sale Hearing was reasonably calculated to provide all interested parties with timely and proper notice of the Sale, Sale Hearing, and Auction.

---

[4] These findings and conclusions constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. All findings of fact and conclusions of law announced by the Court at the Sale Hearing in relation to the Sale Motion are hereby incorporated herein to the extent not inconsistent herewith. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

F.      As evidenced by the certificates of service previously filed with the Court, proper, timely, adequate, and sufficient notice of the Sale Motion, Auction, Sale Hearing, Sale, and the transactions contemplated thereby have been provided in accordance with the Bidding Procedures Order, sections 105(a), 363, and 365 of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004, 6006, and 9007. The notices described above were good, sufficient, and appropriate under the circumstances, and no other or further notice of the Sale Motion, Auction, Sale Hearing and Sale.

G.      The disclosures made by the Trustee concerning the Sale Motion, Auction, Purchase Agreements, Sale and Sale Hearing were good, complete, and adequate.

H.      A reasonable opportunity to object and be heard with respect to the Sale and the Sale Motion and the relief requested therein has been afforded to all interested persons and entities, including but not necessarily limited to the Notice Parties.

## Good Faith of Purchasers

I.      The Sentiss Purchase Agreement was negotiated, proposed, and entered into by the Trustee and the Purchaser without collusion, in good faith, and from arm's-length bargaining positions.

J.      Neither the Trustee nor the Purchaser has engaged in any conduct that would cause or permit the Sentiss Purchase Agreement to be avoided under section 363(n) of the Bankruptcy Code. Specifically, the Purchaser has not acted in a collusive manner with any person and the Purchase Price was not controlled by any agreements among Purchaser and any other person.

K.      The Purchaser is purchasing the Purchased Assets in good faith, and are good faith buyers within the meaning of section 363(m) of the Bankruptcy Code, and are therefore entitled to all of the protections afforded by that provision, and otherwise have proceeded in good faith in all respects in connection with this proceeding in that, *inter alia*: (a) the Purchaser recognized that

4

the Trustee was free to deal with any other party interested in acquiring the Purchased Assets; (b) the Purchaser complied with the provisions in the Bidding Procedures Order; (c) the Purchaser agreed to subject its bids to the competitive bidding procedures set forth in the Bidding Procedures Order; (d) the Purchaser in no way induced or caused the filing of the Bankruptcy Cases; and (e) all payments to be made by the Purchaser in connection with the Sale have been disclosed.

### Highest and Best Offer

L.    The Trustee conducted an auction process in accordance with, and has otherwise complied in all respects with, the Bidding Procedures Order. The auction process set forth in the Bidding Procedures Order afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Purchased Assets. The auction process was duly noticed and conducted in a non-collusive, fair, and good faith manner, and a reasonable opportunity was given to any interested party to make a higher and better offer for the Purchased Assets.

M.    The Sentiss Purchase Agreement constitutes the highest and best offer for the Purchased Assets, and will provide a greater recovery for the Estates than would be provided by any other available alternative with respect to the Purchased Assets acquired by Purchaser. The Trustee's determination that the Sentiss Purchase Agreement constitutes the highest and best offer for the Purchased Assets constitutes a valid and sound exercise of the Trustee's business judgment.

### No Fraudulent Transfer

N.    The consideration provided by the Purchaser pursuant to the Sentiss Purchase Agreement (i) is fair and reasonable, (ii) constitutes the highest and/or best offers for the Purchased Assets, and (iii) constitutes reasonably equivalent value and fair consideration for the Purchased Assets. No other person or entity or group of entities has offered to purchase the Purchased Assets

5

for greater economic value to the Estates than the Purchaser.  Approval of the Sale Motion as it relates to the Sentiss Purchase Agreement and the Purchased Assets, approval of the Sentiss Purchase Agreement, and the consummation of the transactions contemplated thereby are in the best interests of the Estates.

O.     The Purchaser is not a mere continuation of the Debtors or the Estates, and no continuity of enterprise exists between the Purchaser and the Debtors or the Estates. The Purchaser is not holding itself out to the public as continuations of the Debtors or the Estates. The Purchaser is not a successor to the Debtors or the Estates, and the acquisition of the Purchased Assets by Purchaser does not amount to consolidations, mergers, or de facto mergers of the Purchaser and the Debtors or the Estates.

## Validity of Transfer

P.     The Sentiss Purchase Agreement was not entered into for the purpose of hindering, delaying, or defrauding creditors. Neither the Trustee nor the Purchaser is entering into the transactions contemplated by the Sentiss Purchase Agreement fraudulently for purposes of statutory and/or common law fraudulent conveyance and fraudulent transfer laws.

Q.     The Estates are the sole and lawful owners of the Purchased Assets. Subject to section 363(f) of the Bankruptcy Code, the transfers of the Purchased Assets to the Purchaser will be, as of the Closing Date, legal, valid, and effective transfers of the Purchased Assets, which transfer will vest the Purchaser with all right, title, and interest of the Estates to the Purchased Assets free and clear of: (a) all liens and encumbrances relating to, accruing or arising any time prior to the Closing Date (collectively, "Liens"), and (b) all claims (as that term is defined in section 101(5) of the Bankruptcy Code), liabilities, obligations, demands, guaranties, options, rights, contractual commitments, restrictions, interests, and matters of any kind and nature,

whether arising prior to or subsequent to the Petition Date, and whether imposed by agreement, understanding, law, equity, or otherwise (including, without limitation, rights with respect to Claims and Liens (i) that purport to give to any party a right of setoff or recoupment against, or a right or option to effect any forfeiture, modification, profit sharing interest, right of first refusal, purchase or repurchase right or option, or termination of, any of the Estates' or the Purchasers' interests in the Purchased Assets, or any similar rights, or (ii) in respect of taxes, restrictions, rights of first refusal, charges, or interests of any kind or nature, if any, including, without limitation, any restriction of use, voting, transfer, receipt of income, or other exercise of any attributes of ownership) (collectively, as defined in this clause (b), "Claims"), relating to, accruing, or arising any time prior to the Closing Date.

### Section 363(f) is Satisfied

R.     The conditions of section 363(f) of the Bankruptcy Code have been satisfied in full; therefore, the Trustee may sell the Purchased Assets free and clear of any interest in the property.

S.     The Purchaser would not have entered into the Purchase Agreements, and would not consummate the transactions contemplated thereby, if the sales of the Purchased Assets to the Purchaser were not free and clear of all Liens and Claims and interests. The Purchaser shall not be responsible for any Liens or Claims or interests other than Liabilities which have been expressly assumed by the Purchaser pursuant to the Sentiss Purchase Agreement.

T.     The Trustee may sell the Purchased Assets free and clear of all Liens and Claims and interests against the Estates and/or any of the Purchased Assets because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code have been satisfied. Those holders of Liens or Claims against the Estates or any of the Purchased Assets who did not object, or who withdrew their objections, to the Sale or the Sale Motion are deemed to have

consented pursuant to section 363(f)(2) of the Bankruptcy Code with respect to the Sentiss Purchase Agreement and the Purchased Assets.  All other holders of Liens or Claims related to the Purchased Assets and/or the Sentiss Purchase Agreement are adequately protected by having their Liens or Claims, if any, in each instance against the Estates or any of the Purchased Assets, attach to the net cash proceeds of the Sale ultimately attributable to the particular Purchased Assets in which such creditor alleges a Lien or Claim, in the same order of priority, with the same validity, force and effect that such Lien or Claim had prior to the Sale, subject to any claims and defenses that the Estates may possess with respect thereto.

### Compelling Circumstances for an Immediate Sale

U.  Good and sufficient reasons for approval of the Sentiss Purchase Agreement and the Sale of the Purchased Assets have been articulated.  The relief requested in the Sale Motion applicable to the Sentiss Purchase Agreement and the Purchased Assets is in the best interests of the Estates.  The Trustee has demonstrated both (i) good, sufficient, and sound business purposes and justifications, and (ii) compelling circumstances for the Sales other than in the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code in that, among other things, the immediate consummation of the Sale to the Purchaser is necessary and appropriate to maximize the value of the Estates.  Time is of the essence in consummating the Sale.

V.  Given all of the circumstances of the Bankruptcy Cases and the adequacy and fair value of the Purchase Price under the Sentiss Purchase Agreement, the proposed Sale of the Purchased Assets to the Purchaser constitutes a reasonable and sound exercise of the Trustee's business judgment and should be approved.

W.  The consummation of the Sale is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a),

363(b), 363(f), 363(m), and 365, and all of the applicable requirements of such sections have been complied with in respect of the transaction.

**NOW, THEREFORE, IT IS HEREBY ORDERED:**

<u>**General Provisions**</u>

1.      The relief requested in the Sale Motion is granted and approved as set forth herein, and the Sale to Purchaser as contemplated in the Sale Motion is approved.

2.      All objections to the Sale Motion or the relief requested therein, as applicable to the Sentiss Purchase Agreement and the Purchased Assets, that have not been withdrawn, waived, or settled as announced to the Court at the Sale Hearing or by stipulation filed with the Court, and all reservations of rights included therein, are hereby denied and overruled with prejudice.

<u>**Approval of the Sentiss Purchase Agreement**</u>

3.      The Sentiss Purchase Agreement (and all schedules and exhibits affixed thereto) and all other ancillary documents, all of the terms and conditions thereof, and the transactions contemplated therein are hereby approved and authorized.

4.      Pursuant to sections 363(b) and (f) of the Bankruptcy Code, the Trustee is authorized and empowered to take any and all actions necessary or appropriate to: (i) consummate the Sale of the Purchased Assets to the Purchaser pursuant to and in accordance with the terms and conditions of the Sentiss Purchase Agreement and this Order; (ii) close the Sale as contemplated in the Sentiss Purchase Agreement and this Order; and (iii) execute and deliver, perform under, consummate, implement, and close fully the Sentiss Purchase Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Sentiss Purchase Agreement and the Sale.

5.      This Order shall be binding in all respects upon the Trustee, the Estates, the Debtors, all creditors of, and holders of equity interests in, the Debtors, any holders of Liens, Claims, or other interests in, against, or on all or any portion of the Purchased Assets (whether known or unknown), the Purchaser and all successors and assigns of the Purchaser, and the Purchased Assets. This Order and the Sentiss Purchase Agreement shall inure to the benefit of the Estates and their creditors, the Purchaser, and the respective successors and assigns of each of the foregoing.

### **Transfer of the Purchased Assets**

6.      Pursuant to sections 105(a), 363(b), and 363(f) of the Bankruptcy Code, the Trustee is authorized to transfer the Purchased Assets to the Purchaser on the Closing Date (as defined in the Sentiss Purchase Agreement) and, upon the Closing under the Sentiss Purchase Agreement, such transfers shall constitute legal, valid, binding, and effective transfers of such Purchased Assets and shall vest the Purchaser with title to the Purchased Assets and, upon the Trustee's receipt of the full Purchase Price as set forth in the Sentiss Purchase Agreement, shall be free and clear of all Liens, Claims, and other interests of any kind or nature whatsoever, including but not limited to, successor or successor-in-interest liability and Claims, with all such Liens, Claims or other interests to attach to the net cash proceeds ultimately attributable to the property against or in which such Liens, Claims, or interests are asserted, subject to the terms thereof, with the same validity, force and effect, and in the same order of priority, that such Liens, Claims, or interests now have against the Purchased Assets. Upon the Closing, the Purchaser shall take title to and possession of the Purchased Assets free and clear of all such Liens, Claims and interests.

7.      In accordance with the written Sharing Agreement by and among the Trustee, the ABL Agent and TL Agent, as approved by the Court (the "Sharing Agreement"), upon

consummation of the Sale approved hereby, the Trustee is authorized to indefeasibly pay via wire transfer the allowed ABL Claim Amount and allowed TL Claim Amount (as such terms are defined in the Sharing Agreement); provided that if one or more additional Sale transactions must be consummated before full payment of such allowed claims is feasible, then the Trustee is authorized to make such payments as and when such other transactions are consummated.

8.     All persons and entities in possession of some or all of the Purchased Assets on the Closing Date are directed to surrender possession of such Purchased Assets to the Purchaser or its assignee at the Closing. On the Closing Date, each of the Estates' creditors is authorized and directed to execute such documents and take all other actions as may be reasonably necessary to release its Liens, Claims, or other interests in the Purchased Assets, if any, as such Liens, Claims, or interests may have been recorded or may otherwise exist.

9.     On the Closing Date, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Estates' interests in the Purchased Assets. Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreements.

10.     A certified copy of this Order may be filed with the appropriate clerk and/or recorded with the recorder to act to cancel any Liens and other encumbrances of record.

11.     If any person or entity that has filed statements or other documents or agreements evidencing Liens on, or interests in, all or any portion of the Purchased Assets shall not have delivered to the Trustee prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all

Liens, Claims, or other interests that the person or entity has or may assert with respect to all or any portion of the Purchased Assets, the Trustee is hereby authorized and directed, and the Purchaser is hereby authorized, to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to the Purchased Assets.

12.     This Order is and shall be effective as a determination that, on the Closing Date, all Liens, Claims, or other interests of any kind or nature whatsoever existing as to the Purchased Assets prior to the Closing Date, shall have been unconditionally released, discharged, and terminated, and that the conveyances described herein have been effected. This Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreements.

### Prohibition of Actions against the Purchasers

13.     Except as otherwise provided in this Order or the Sentiss Purchase Agreement, the Purchaser shall not have any liability or other obligation to the Estates arising under or related to any of the Purchased Assets. Without limiting the generality of the foregoing, and except as otherwise provided herein or in the Sentiss Purchase Agreements, the Purchasers shall not be liable for any Claims against the Estates, and the Purchasers shall have no successor or vicarious

LEGAL\63732723\2 6010823/00574256
05/18/2023

liabilities of any kind or character, including, but not limited to, under any theory of antitrust, environmental, successor or transferee liability, labor law, de facto merger, mere continuation, or substantial continuity, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated.

14.     All persons and entities holding Liens, Claims, or other interests of any kind or nature whatsoever against or in all or any portion of the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinate), hereby are forever barred, estopped, and permanently enjoined from asserting against the Purchaser, its Affiliates, their successors or assigns, their property, or the Purchased Assets, such persons' or entities' Liens, Claims, or interests in and to the Purchased Assets, including, without limitation, the following actions: (i) commencing or continuing in any manner any action or other proceeding against the Purchaser, its Affiliates, their successors, assets or properties; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Purchaser, its Affiliates, their successors, assets or properties; (iii) creating, perfecting, or enforcing any Lien or other Claim against the Purchaser, its Affiliates, their successors, assets, or properties; (iv) asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due the Purchaser, its Affiliates, or their successors; (v) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Order or other orders of the Court, or the agreements or actions contemplated or taken in respect thereof; or (vi) revoking, terminating or failing or refusing to transfer or renew any license, permit, or authorization to operate any of the Purchased Assets or conduct any of the businesses operated with the Purchased Assets. On the Closing Date,

LEGAL\63732723\2 6010823/00574256
05/18/2023

each creditor is authorized and directed to execute such documents and take all other actions as may be necessary to release Liens, Claims, and other interests in or on the Purchased Assets, if any, as provided for herein, as such Liens, Claims, or interests may have been recorded or may otherwise exist.

15.    All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Trustee to sell and transfer the Purchased Assets to the Purchaser in accordance with the terms of the Purchase Agreements and this Order.

16.    The Purchaser has given substantial consideration under the Sentiss Purchase Agreement for the benefit of the Estates. The consideration given by the Purchaser shall constitute valid and valuable consideration for the releases of any potential Claims and Liens pursuant to this Order, which releases shall be deemed to have been given in favor of the Purchaser by all holders of Liens against or interests in, or Claims against, the Estates or any of the Purchased Assets. The consideration provided by the Purchaser for the Purchased Assets under the Sentiss Purchase Agreement is fair and reasonable and may not be avoided under section 363(n) of the Bankruptcy Code.

17.    Nothing in this Order or the Sentiss Purchase Agreement releases, nullifies, or enjoins the enforcement of any liability to a governmental unit under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property after the date of entry of this Order. Nothing in this Order or the Sentiss Purchase Agreement authorizes the transfer or assignment the Purchaser of any license, permit, registration, authorization, or approval of or with respect to a governmental unit without the applicable Purchaser's complying

with all applicable legal requirements under non-bankruptcy law governing such transfers or assignments.

## **Other Provisions**

18.     The transactions contemplated by the Sentiss Purchase Agreement are undertaken by the Purchaser without collusion and in good faith, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale, unless such authorization and the Sale to Purchaser is duly stayed pending such appeal. The Purchaser is a good faith buyer and, as such, shall have the full protections of section 363(m) of the Bankruptcy Code.

19.     Pursuant to Federal Rules of Bankruptcy Procedure 7062, 9014, 6004(h), and 6006(d), this Order shall be effective immediately upon entry and the Trustee and the Purchaser are authorized to close the Sale immediately upon entry of this Order.

20.     Nothing in this Order or the Sentiss Purchase Agreement approves or provides for the transfer to the Purchaser of any avoidance claims (whether under chapter 5 of the Bankruptcy Code or otherwise) of the Estates.

21.     No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Sales.

22.     The failure specifically to reference any particular provision of the Sentiss Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Sentiss Purchase Agreement and documents executed in connection therewith or contemplated therein are authorized and approved in their entirety; provided, however, that this Order shall govern if any inconsistency exists between the Sentiss Purchase

Agreement (including all ancillary documents executed in connection therewith) and this Order. Likewise, all of the provisions of this Order are nonseverable and mutually dependent.

23.     The Sentiss Purchase Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment, or supplement does not have a material adverse effect on the Estates.

24.     The Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the Sentiss Purchase Agreement, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Trustee is party or which has been assigned by the Trustee to the Purchaser, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale, including, but not limited to, retaining jurisdiction to: (a) compel delivery of the Purchased Assets to the Purchaser; (b) interpret, implement, and enforce the provisions of this Order; (c) protect the Purchasers against any alleged Liens, Claims, or other interests in or against the Purchased Assets of any kind or nature whatsoever; and (d) enter any orders under sections 363 and/or 365 of the Bankruptcy Code with respect to the Assigned Contracts/Leases.

25.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

26.     To the extent that this Order is inconsistent with any prior order or pleading with respect to the Sale Motion, the terms of this Order shall govern.

LEGAL\63732723\2 6010823/00574256
05/18/2023

**EXHIBIT B-1**

**<u>General Bill of Sale</u>**

## BILL OF SALE

This Bill of Sale (this "**Bill of Sale**"), dated as of May [●], 2023, is made by George L. Miller, in his capacity as the Chapter 7 Trustee (the "**Seller**") of the bankruptcy estates (the "**Estates**") of Akorn Holding Company LLC, Akorn Intermediate Company LLC, and Akorn Operating Company LLC (together, the "**Debtors**") in favor of and for the benefit of Sentiss AG, a company formed under the laws of Switzerland (the "**Buyer**"). Terms used but not otherwise defined herein shall have the meanings assigned to them in that certain Asset Purchase Agreement, dated as of May [●], 2023,[1] by and among the Seller, the Buyer and Akorn International S.a.r.l., a Luxembourg corporation (the "**Purchase Agreement**").

## BACKGROUND

1.    <u>Conveyance</u>. Subject to the terms of the Sale Order and the Purchase Agreement, and for good and valuable consideration (as described in the Purchase Agreement), the receipt and adequacy of which Seller hereby acknowledges, Seller hereby irrevocably sells, assigns, transfers, conveys, grants, bargains, and delivers to Buyer, all of the Estates' right, title and interest in and to the Purchased Assets constituting tangible personal property, free and clear of all Liens and Liabilities (except for the Assumed Liabilities).

2.    <u>Disclaimer of Seller Warranties</u>. OTHER THAN THE REPRESENTATIONS AND WARRANTIES SET FORTH IN ARTICLE V OF THE PURCHASE AGREEMENT, SELLER MAKES NO REPRESENTATION OR WARRANTY WHATSOEVER WITH RESPECT TO THE PURCHASED ASSETS, INCLUDING ANY (a) WARRANTY OF MERCHANTABILITY; (b) WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE; (c) WARRANTY OF TITLE; OR (d) WARRANTY AGAINST INFRINGEMENT OF INTELLECTUAL PROPERTY RIGHTS OF A THIRD PARTY; WHETHER ARISING BY LAW, COURSE OF DEALING, COURSE OF PERFORMANCE, USAGE OF TRADE OR OTHERWISE.

3.    <u>Permits and Licenses</u>. Buyer represents and warrants to Seller that Buyer has all rights, permits, certificates, licenses, franchises, approvals and other authorizations as are reasonably necessary to purchase, take possession of, own, use, or store the Purchased Assets, at the applicable places or place of business, or other designated location.

4.    <u>Relationship to Purchase Agreement</u>. This Bill of Sale is being executed and delivered pursuant to, and is subject to the representations, warranties, covenants, terms, conditions and agreements set forth in, the Purchase Agreement. Nothing contained in this Bill of Sale shall be deemed to modify, limit, extend or amend any of the rights, obligations or representations and warranties of any party hereto under or in the Purchase Agreement and no additional representations and warranties, express, implied or otherwise (including, without limitation, warranties or merchantability and fitness for use or a particular purpose), shall be deemed to be created by this Bill of Sale. In the event of any conflict or inconsistency between the terms of this Bill of Sale and the Purchase Agreement, the terms of the Purchase Agreement shall control.

5.    <u>Further Assurances</u>. Seller for itself, its successors and assigns, hereby covenants and agrees that, at any time prior to the closing of Debtors' jointly administered bankruptcy cases, on Buyer's written request, Seller will do, execute, acknowledge, and deliver or cause to be done, executed, acknowledged, and delivered, such further acts, deeds, assignments, transfers, conveyances, powers of

---

[1] NTD: The bill of sale is effective upon closing, so it will be signed after the APA.

attorney, and assurances as may be reasonably required by Buyer in order to assign, transfer, set over, convey, assure, and confirm unto and vest in Buyer, its successors and assigns, title to the assets sold, conveyed, and transferred by this Bill of Sale.

6.      <u>Governing Law</u>. This Bill of Sale is governed by, and construed in accordance with, the laws of the State of Delaware, United States of America, without regard to the conflict of laws provisions thereof to the extent such principles or rules would require or permit the application of the laws of any jurisdiction other than those of the State of Delaware.

7.      <u>Counterparts</u>. This Bill of Sale may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Bill of Sale delivered by facsimile, e-mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Bill of Sale.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, Seller has caused this Bill of Sale to be duly executed and delivered on the date first set forth above.

**SELLER**:

GEORGE L. MILLER, AS TRUSTEE FOR THE ESTATES AKORN HOLDING COMPANY LLC, AKORN INTERMEDIATE COMPANY LLC AND AKORN OPERATING COMPANY LLC

By: _____

Name:  George L. Miller

Title:  Trustee

**BUYER**:

SENTISS AG

By: _____

Name:  Deepak Bahri

Title:   Authorized Signatory

**EXHIBIT B-2**

**<u>Instrument of Assumption</u>**

## Assignment and Assumption Agreement

This Assignment and Assumption Agreement (the "Agreement"), dated as of [ ● ], 2023, is made and entered into by and between Sentiss AG, a company formed under the laws of Switzerland ("Purchaser") and George L. Miller, the chapter 7 trustee (the "Trustee" or "Seller") of the chapter 7 estates (collectively, the "Estates") of Akorn Holding Company LLC, Akorn Intermediate Company LLC and Akorn Operating Company LLC ("Operating", and together with Holdings and Intermediate, "Debtors" and each entity individually, a "Debtor").

**WHEREAS**, on February 23, 2023, Debtors each filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code, as amended (the "Bankruptcy Code"), commencing a chapter 7 case (each, a "Bankruptcy Case" and, collectively, the "Bankruptcy Cases") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

**WHEREAS**, Seller, Purchaser and Akorn International S.a.r.l. have entered into that certain Asset Purchase Agreement, dated [__], 2023 (the "Purchase Agreement"), pursuant to which, among other things, Seller has agreed to assign all of its rights, title and interests in the Purchased Assets, and Purchaser has agreed to assume all of Seller's duties and obligations and the Assumed Liabilities (each as defined in the Purchase Agreement), in the manner and subject to the terms and conditions set forth in the Purchase Agreement and as authorized under, among other things, Sections 105 and 363 of the Bankruptcy Code; and

**WHEREAS**, the effectiveness of this Agreement is subject to the Bankruptcy Court's entry of the Sale Order, and this Agreement is subject to the terms of the Sale Order and the Purchase Agreement.

**NOW, THEREFORE**, in consideration of the mutual covenants, terms, and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      Definitions. All capitalized terms used in this Agreement but not otherwise defined herein are given the meanings set forth in the Purchase Agreement.

2.      Assignment and Assumption. Except as otherwise provided in the Purchase Agreement, upon the terms and subject to the conditions of the Purchase Agreement and this Agreement, Seller hereby assigns, conveys and transfers to Purchaser all of the Estates' right, title and interest in and to the Purchased Assets (other than the Purchased Assets constituting tangible personal property), including but not limited to the Assigned Contracts/Leases, free and clear of all Liens and Liabilities (other than the Assumed Liabilities). Purchaser hereby accepts such assignment and assumes and agrees to pay, perform and discharge, as and when due, all of the Assumed Liabilities.

3.      Terms of the Purchase Agreement. The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements and conditions relating to the Purchased Assets and the Assumed Liabilities, are hereby incorporated herein by this reference. The parties hereto acknowledge and agree that the representations, warranties, covenants, agreements and conditions contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

4.      Governing Law. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO THE CONFLICT OF LAWS PROVISIONS THEREOF TO THE EXTENT THAT SUCH PROVISIONS WOULD REQUIRE OR PERMIT THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN THOSE OF THE STATE OF DELAWARE, AND THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE.

5.      Counterparts. This Agreement may be executed by facsimile or PDF signature and in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when two or more counterparts have been signed by each of the parties and delivered to the other party.

6.      Further Assurances. Each of the parties hereto shall execute and deliver, at the reasonable request of the other party hereto, such additional documents, instruments, conveyances and assurances and take such further actions as such other party may reasonably request to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

7.      Amendments; Waivers.  This Agreement may be amended, modified and supplemented in any and all respects, but only by a written instrument signed by all of the parties hereto expressly stating that such instrument is intended to amend, modify or supplement this Agreement; provided, however, any material amendment shall be subject to approval by the Bankruptcy Court.

[SIGNATURE PAGE TO FOLLOW]

IN WITNESS WHEREOF, the parties have executed this Agreement effective as of the date first above written.

**SELLER:**

GEORGE L. MILLER, AS TRUSTEE FOR THE ESTATES

By: _____
    Name:
    Title:

**PURCHASER:**

SENTISS AG

By: _____
    Name: Deepak Bahri
    Title: Authorized Signatory

**EXHIBIT B-3**

**<u>FDA Transfer Letters</u>**

**ANDA Transfer Letter**

[**Seller Letterhead**]

[Date]

Central Document Room
Center for Drug Evaluation and Research
Food and Drug Administration
5901-B Ammendale Road
Beltsville, MD 20705-1266

**TRANSFER OF OWNERSHIP**

**ANDA # XXXXXX / Sequence # XXX**
**[Product Name & Strength]**

Dear Sir or Madam:

In accordance with 21 CFR § 314.72(a)(1), [insert company name] hereby notifies the Agency that we are transferring ownership, including all rights to ANDA # XXXXXX for [product name], to [PURCHASER]

[Insert company name] hereby confirms that a complete copy of the approved application, including supplements and records that are kept under 21 CFR § 314.81, have been provided to the new owner, [PURCHASER]

The change in ownership will be made effective once the new owner, [PURCHASER],
files the acceptance letter for this application, which is targeted to be filed in [xx] business days.

**Former Owner of Application:**                    **New Owner of Application:**

[Insert company name]                              [PURCHASER]

                                                   Address:

                                                   Contact:

                                                   Title:

                                                   Email:

                                                   Telephone:

This submission has been prepared in eCTD format and is being submitted through the Electronic Submissions Gateway.  The contents of this submission are verified to be virus free using [XXXX], on the date of this letter.  If there are any technical questions regarding this submission, please contact [Name] at [email address].

If there are any questions, please do not hesitate to contact [Name] (by phone: [phone] or email: [email address]).

Sincerely,

[Name]
[Title]

**<u>Purchaser Acceptance Letter</u>**

[Date]

Central Document Room
Center for Drug Evaluation and Research
Food and Drug Administration
5901-B Ammendale Road
Beltsville, MD 20705-1266

**ACKNOWLEDGEMENT AND ACCEPTANCE OF OWNERSHIP**

**ANDA # XXXXXX / Sequence # XXX**
**[Drug Product Name & Strength]**

Dear Sir or Madam:

In accordance with 21 CFR § 314.72, 21 CFR § 314.80 and 21 CFR § 314.81, [PURCHASER] hereby provides notification that it accepts the transfer of ownership of the above referenced ANDA from [seller].

Reference is made to the ANDA letter dated XXXXX from [seller], notifying the agency of the transfer of ownership of the application to [PURCHASER].

{PURCHASER} commits to agreements, promises, and conditions made by the former owner and contained in the application.  The transfer of ownership is effective as of [date].  [PURCHASER] has received a complete copy of the approved application, including supplements and records that are required to be kept under 21 CFR § 314.81. Further, [PURCHASER] will advise FDA regarding any change in the conditions in the approved application under 21 CFR § 314.70 and 21 CFR § 314.97.

All future correspondence regarding this application should be sent to [PURCHASER]. The new applicant contact information is provided below.

Contact Name:

Title:

Address:

Email:

Telephone:

This submission has been prepared in eCTD format and is being submitted through the Electronic Submissions Gateway.  The contents of this submission are verified to be virus free using McAfee Endpoint Security, Version 10.7.0.2174, on the date of this letter.  If there are any technical questions regarding this submission, please contact [CONTACT] via email: [EMAIL] or [PHONE].

This information is submitted for your review and retention in your files.  If there are any questions, please do not hesitate to contact me (by phone: [PHONE] or email: [EMIAL]).

Sincerely,

**EXHIBIT C**

**Bidding Procedures Order**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| AKORN HOLDING COMPANY LLC, *et al.*[1] | Case No. 23-10253 (KBO) |
| Debtors. | (Jointly Administered) |
| | **Re D.I. 106**, 136 |

## ORDER GRANTING TRUSTEE'S MOTION FOR ENTRY OF AN ORDER (A) APPROVING BIDDING PROCEDURES IN CONNECTION WITH SALE OF SUBSTANTIALLY ALL OF THE ESTATES' ASSETS, (B) SCHEDULING AN AUCTION AND HEARING TO CONSIDER THE PROPOSED SALE, (C) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, AND (D) GRANTING CERTAIN RELATED RELIEF

This matter comes before the Court upon consideration of the *Trustee's Motion for Entry of (I) an Order (A) Approving Bidding Procedures in Connection With Sale of Substantially All of the Estates' Assets, (B) Scheduling an Auction and Hearing to Consider the Proposed Sale, and (C) Approving the Form and Manner of Notice Thereof; and (II) an Order (A) Approving the Sale, (B) Authorizing the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting Certain Related Relief* (the "Sale Motion")[2] seeking, among other things, entry of an order: (i) approving the Bidding Procedures in connection with the Sale, (ii) scheduling an Auction and hearing to approve the Sale, (iii) approving the form and manner of notice thereof, and (iv) granting related relief. After due deliberation and having determined that

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of their federal tax identification numbers, and cases numbers are Akorn Holding Company LLC (9190), Case No. 23-10253 (KBO); Akorn Intermediate Company LLC (6123), Case No. 23-10254 (KBO); and Akorn Operating Company LLC (6184), Case No. 23- 10255. The Debtors' headquarters is located at 5605 CenterPoint Court, Gurnee, IL 60031.

[2] All capitalized terms used, but not otherwise defined, in this Order shall have the meanings given in the Sale Motion.

the relief requested in the Sale Motion regarding the Sale Process is in the best interest of the Estates,

**THE COURT HEREBY FINDS THAT:**[3]

A.    The Court has jurisdiction over the Sale Motion pursuant to 28 U.S.C. § 1334. This proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested in the Motion and granted herein include sections 105(a), 363(b) and (f), and 365 of the Bankruptcy Code, Bankruptcy Rules 2002(a)(2), 6004(a), (b), (c), (e) and (f), 6006(a) and (c), 9007, and 9014, and Local Rule 6004-1(c)(ii).

B.    Notice of the Sale Motion, having been given to the Notice Parties, is sufficient in light of the circumstances and the nature of the relief requested in the Sale Motion.

C.    The Trustee has articulated good and sufficient reasons for the Court to grant the relief requested in the Sale Motion regarding the Sale Process, including without limitation, (i) approval of the Bidding Procedures; and (ii) approval of, and authorization to serve, the Notice of Auction and Sale Hearing and the Cure Notice.

D.    The Notice of Auction and Sale Hearing and the service thereof, and the service of the Cure Notice on the Counterparties, are calculated to provide all interested parties with timely and proper notice of the Sale, the Sale Hearing, the Auction, and the Cure Amounts.

---

[3] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.     The Bidding Procedures, substantially in the form attached hereto as <u>Exhibit 1</u>, are hereby approved and fully incorporated into this Order.  The Trustee is authorized to undertake any and all actions necessary or appropriate to implement the Bidding Procedures.

2.     Objections, if any, to the portion of the relief requested in the Sale Motion that is granted in this Order that have not been withdrawn, waived, or settled are hereby overruled.

3.     The Notice of Auction and Sale Hearing, substantially in the form attached hereto as <u>Exhibit 2</u>: (i) is hereby approved; and (ii) shall be served, together with a copy of this Order, upon each of the Notice Parties within three (3) days of the date of this Order.

4.     Subject to the Bidding Procedures, in the event that the Trustee does not receive more than one Qualified Bid, the Trustee will not hold the Auction.  If the Trustee does not receive any Qualified Bids, the Trustee shall report the same to the Court and declare the Auction a "failed auction."  In the event that the Trustee receives only one Qualified Bid, the Trustee will not hold the Auction and may instead seek approval of such Qualified Bid and the associated purchase agreement at the Sale Hearing.  However, in the event that only one Qualified Bid is received, the Trustee may determine in his business judgment that such Qualified Bid is insufficient, and shall have the right to either postpone the Auction and Bid Deadline or declare the Auction a "failed auction."  As further described in the Bidding Procedures, in the event that the Trustee timely receives two (2) or more Qualified Bids, the Trustee shall conduct the Auction commencing on **May 10, 2023 at 10:00 a.m. (ET), and, as may be necessary, continuing through and including May 12, 2023**, at the offices of Cozen O'Connor, One Liberty Place, 1650 Market Street, Suite 2800, Philadelphia, PA 19103, or such later time or other place or manner as the Trustee shall notify all Qualified Bidders.

5.      Any person wishing to submit a higher or better offer for the Purchased Assets must do so in accordance with the terms of the Bidding Procedures.

6.      All bidders submitting a Qualified Bid are deemed to have submitted to the exclusive jurisdiction of the Court with respect to all matters related to the Auction and the terms and conditions of the transfer of the Purchased Assets.

7.      The Trustee is hereby authorized to conduct the Sale without complying with any state or local bulk transfer law or requirements.

8.      Pursuant to Local Rule 6004-1(c)(ii): (a) each bidder participating at the Auction will be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale; (b) the Auction will be conducted openly and all creditors will be permitted to attend (although only Qualified Bidders may bid); and (c) bidding at the Auction will be transcribed or videotaped.

9.      Within three (3) days of the date of this Order the Trustee shall file and serve the Cure Notice upon the Counterparties, which notice shall set out the applicable Cure Amounts, if any.  The Cure Notice shall be in substantially the form attached hereto as <u>Exhibit 3</u>, which form is hereby approved.

10.      Except as otherwise provided in this paragraph 10, objections, if any, to the Trustee's proposed Cure Amounts, and to the assumption and assignment of any executory contract and/or unexpired lease, must: (i) be in writing; (ii) state with specificity the grounds for such objection (with appropriate documentation in support thereof); (iii) comply with the Bankruptcy Rules and the Local Rules; and (iv) be filed with this Court and served upon (so as to be **<u>received</u>** by) the Service Parties on or before May 16, 2023  (the "<u>Objection Deadline</u>").

Provided, however, objections to the assignment of any executory contract and/or unexpired lease based on section 365(f)(2) of the Bankruptcy Code may be made at any time prior to, or at, the Sale Hearing.   Replies, if any, to any such objections shall be filed with the Court by May 18, 2023; provided however, replies to objections to the assignment of any executory contract and/or unexpired lease based on section 365(f)(2) of the Bankruptcy Code may be made at any time prior to, or at, the Sale Hearing.  The Court shall hold a hearing on May 19, 2023 at 10:00 a.m. (ET) (i.e., the Sale Hearing) regarding any objections to Cure Amounts and/or assumption and assignment of executory contracts and/or unexpired leases.

11.     Any party failing to timely file an objection to the Cure Amounts and/or assumption and/or assignment of any executory contract or unexpired lease shall be forever barred from objecting to the Cure Amounts and/or to such assumption and/or assignment, and will be deemed to consent to the Cure Amounts and/or assumption and assignment of such executory contract or unexpired lease.

12.     The Sale Hearing is scheduled to be held on May 19, 2023 at 10:00 a.m. (ET) before the Honorable Karen B. Owens, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 6th Floor, Courtroom No. 3, Wilmington, Delaware 19801.  The Sale Hearing may be adjourned or rescheduled at the Trustee's sole discretion.  The Trustee will seek the entry of the Sale Order at the Sale Hearing approving and authorizing the Sale to each Successful Bidder or Alternate Bidder, on terms and conditions consistent with such party's asset purchase agreement, as may be amended and/or modified by agreement between the Trustee and a Successful Bidder or Alternate Bidder.

13.     Objections, if any, to the relief requested in the Sale Motion as it relates to the Sale must: (i) be in writing and filed with the Court; (ii) comply with the Bankruptcy Rules and

the Local Rules; and (iii) be filed and served upon, so as to be **received** by, the Service Parties on or before May 16, 2023.

14.     The failure of any person or entity to timely file an objection to the Sale Motion shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Sale of the Purchased Assets to each Successful Bidder or Alternate Bidder.

15.     Notwithstanding the possible applicability of Bankruptcy Rule 6004(h), this Order shall be immediately effective and enforceable upon its entry.

16.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

17.     To the extent that any provisions of this Order may be inconsistent with the Sale Motion, the terms of this Order shall control.

**Dated: April 28th, 2023**
**Wilmington, Delaware**

**KAREN B. OWENS**
**UNITED STATES BANKRUPTCY JUDGE**

<u>Exhibit 1</u>

**Bidding Procedures**

# Bidding Procedures

George L. Miller, as chapter 7 trustee (the "**Trustee**") for the bankruptcy estates (the "**Estates**") of Akorn Holding Company LLC, *et al.*[1] (the "**Debtors**"), jointly administered debtors in Case No. 23-10253 (KBO) presently pending in the United States Bankruptcy Court for the District of Delaware (the "**Court**"), contemplates the sale (the "**Sale**") of all or substantially all of the assets of the Estates (the "**Purchased Assets**") to one or more purchasers pursuant to section 363 of title 11 of the United States Code (the "**Bankruptcy Code**").  The proposed transaction is subject to approval by the Court.  In connection with the Sale, these bidding procedures (the "**Bidding Procedures**") were approved by order of the Court dated April 28, 2023 (the "**Bidding Procedures Order**").[2]

## A.  The Bidding Process

1.      These Bidding Procedures describe, among other things, the manner in which prospective bidders may gain access to due diligence materials concerning the Purchased Assets, the manner in which bidders and bids become Qualified Bidders (as defined below) and Qualified Bids (as defined below), respectively, the receipt and negotiation of bids received, the conduct of any Auction (as defined below), the ultimate selection of a Successful Bidder and Successful Bid (each as defined below), and the Court's approval thereof (collectively, the "**Bidding Process**").

2.      Neither the Trustee nor his representatives shall be obligated to furnish any information of any kind whatsoever to any person who is not a Qualified Bidder (defined below). In the exercise of his reasonable business judgment, the Trustee may amend these Bidding Procedures in writing or orally at the Auction, so as to better promote the goals of the Bidding Process, so long as such changes are not inconsistent with any Court order, including the Bidding Procedures Order.

## B.  Sale on "as is, where is" Basis

The sale of the Purchased Assets will be on an "as is, where is" basis and without surviving representations or warranties of any kind by the Trustee or his agents.

## C.  Free and Clear of Any and All Claims and Interests

All of the Estates' right, title, and interest in and to the Purchased Assets, or any portion thereof, to be acquired, will be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests thereon and there against (collectively, the "**Interests**"), with such Interests to attach to the net proceeds of the sale of such Purchased Assets, except, with respect to a Successful Bidder, to the extent otherwise set forth in the relevant purchase agreement of such Successful Bidder.

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of their federal tax identification numbers, and cases numbers are Akorn Holding Company LLC (9190), Case No. 23-10253 (KBO); Akorn Intermediate Company LLC (6123), Case No. 23-10254 (KBO); and Akorn Operating Company LLC (6184), Case No. 23- 10255. The Debtors' headquarters is located at 5605 CenterPoint Court, Gurnee, IL 60031.

[2] Capitalized terms used, but not otherwise defined, in these Bidding Procedures shall have the meanings given in the Bidding Procedures Order.

## D.  Participation Requirements

1.      To participate in the Bidding Process each interested person or entity must:

(i)      deliver, unless previously delivered, to Greenhill an executed confidentiality agreement in form and substance satisfactory to the Trustee (to be delivered prior to the distribution of any confidential information by the Trustee to such person); and

(ii)     be deemed by the Trustee, after consultation with his professionals, to be reasonably likely to be able to fund and complete the consummation of the proposed transaction within the time frame acceptable to the Trustee if selected as a Successful Bidder (as defined below).

2.      Each Potential Bidder shall comply with all reasonable requests for information and due diligence access by the Trustee and his professionals regarding the ability of such Potential Bidder,  as applicable, to consummate its contemplated transaction.

3.      As promptly as reasonably possible, the Trustee will determine (in consultation with the Consultation Parties)[3] if such person or entity is acceptable and deem such person or entity a "**Potential Bidder**."

## E.  Due Diligence

1.      The Trustee may, in his reasonable business judgment, afford each Potential Bidder such access to due diligence materials concerning the Purchased Assets as the Trustee deems appropriate. Due diligence access may include access to written materials, verbal discussions, on-site inspections, and other material that a Potential Bidder may reasonably request and as to which the Trustee, in his reasonable business judgment, may agree. The Trustee may, in the exercise of his reasonable business judgment (in consultation with the Consultation Parties), extend a Qualified Bidder's time to conduct due diligence after the Bid Deadline (as defined below) until the Auction. The Trustee may, in his reasonable business judgment, coordinate due diligence efforts such that multiple Potential Bidders have simultaneous access to due diligence materials and/or simultaneous attendance at site inspections. The Trustee makes no representation or warranty as to the information to be provided through this due diligence process.

2.      Each Qualified Bidder shall be deemed to acknowledge, and shall represent in any asset purchase agreement, that it has had an opportunity to inspect and examine the Purchased Assets and to conduct any and all due diligence prior to making its offer, that it has relied solely upon its own independent reviews, investigations, and/or inspections in submitting its Bid, and that it did not rely upon any written or oral statements, representations, promises, warranties, or

---

[3] Each reference in these Bidding Procedures to "consultation" (or similar phrase) shall mean consultation in good faith providing sufficient time for the applicable parties to confer with each other and their clients, as applicable. Except as otherwise provided herein, the following parties constitute the "**Consultation Parties**": (a) the ABL Lenders (including the ABL Lenders' advisors) and (b) the Required Lenders (as defined in the Senior Secured Term Loan Agreement), including the advisors to the Required Lenders.

guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Purchased Assets or the completeness of any information provided in connection with the Bidding Process.

## F. Bid Deadline

A Potential Bidder that desires to make a Bid must deliver written copies of its Bid, via electronic mail, hand delivery or overnight mail, to: (i) the Trustee, care of his counsel, Cozen O'Connor, 1201 N. Market St., Ste. 1001, Wilmington, DE 19801, Attn. John T. Carroll, III, Esq. (jcarroll@cozen.com) and Simon Fraser, Esq. (sfraser@cozen.com); (ii) MidCap Funding IV Trust, care of its counsel, Proskauer Rose LLP, One International Place, Boston, MA 02110, Attn: Charles A. Dale, Esq. (cdale@proskauer.com); (iii) WSFS Institutional Services, care of its counsel, Wilmer Cutler Pickering Hale and Dorr LLP, 7 World Trade Center, 250 Greenwich Street, New York, NY 10007, Attn: Andrew N. Goldman, Esq. (andrew.goldman@wilmerhale.com) and Nathan J. Moore, Esq. (nathan.moore@wilmerhale.com); (iv) Ad Hoc TL Lender Group, care of their counsel, Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, NY 10166-0193, Attn: Matt J. Williams, Esq., (mjwilliams@gibsondunn.com) and AnnElyse Scarlett Gains, Esq., (agains@gibsondunn.com); and (v) Greenhill & Co., LLC, 1271 Avenue of the Americas, New York, NY 10020, Attn: Neil A. Augustine (neil.augustine@greenhill.com), Rupert Hill (rupert.hill@greenhill.com), Nicholas Drayson (nicholas.drayson@greenhill.com) and Sean Wright (sean.wright@greenhill.com) so that the Bid is actually received by **12:00 p.m. (Noon) (ET) on May 4, 2023** (the "Bid Deadline"). The Trustee may (in consultation with the Consultation Parties) extend the Bid Deadline once or successively but is not obligated to do so. If the Trustee extends the Bid Deadline, he shall promptly notify all Potential Bidders of such extension.

## G. Qualified Bid Requirements

1.     A proposal ("**Bid**") received from a Potential Bidder is a "**Qualified Bid**" if it complies with all of the following; provided that the Lenders shall be deemed a Qualified Bidder (and any bid submitted by them, a Qualified Bid) without the need to satisfy any of the other requirements placed on Qualified Bidders hereunder:

(i) is received by the Bid Deadline;

(ii) provides for the purchase of all or some portion of the Purchased Assets by the Potential Bidder on an "as is, where is" basis;

(iii) clearly identifies the particular Purchased Assets to be purchased

(iv) allocates value and/or a portion of the aggregate purchase price for each class of property (e.g. real estate, equipment, intellectual property, ANDAs, ANADAs and stock);

(v) if purchasing ANDAs or ANADAs on an individual basis, then must allocate purchase price per ANDA and ANADA;

(vi) includes a copy of a definitive asset purchase agreement (in substantially the form of one or more of the template asset purchase agreements posted in the data room maintained by Greenhill for Purchased Assets, as applicable (the "**Template Asset Purchase Agreements**"), signed by an authorized representative of such Potential Bidder;

(vii) is accompanied by a redline comparison showing any changes that the Potential Bidder has made to the applicable Template Purchase Agreement(s);

(viii) is not subject to any due diligence or financing conditions, board or other approval;

(ix) is accompanied by a cash deposit of not less than 10% of the proposed purchase price (the "**Required Deposit**"); *provided*, that any Bid by Lenders shall not be required to be accompanied by a deposit;

(x) includes written evidence of an unconditional commitment for financing (by a creditworthy bank or financial institution that shall provide such financing without alteration of conditions or delays) or other evidence of ability, as determined in the reasonable business judgment of the Trustee, in consultation with the Consultation Parties, to consummate the transaction. Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Trustee (in consultation with the Consultation Parties);

(xi) includes evidence that the Qualified Bidder has obtained authorization or approval from its board of directors (or comparable governing body) acceptable to the Trustee with respect to the submission, execution, and delivery of its Bid and Bid Documents, participation in the Auction, and closing of the proposed transaction(s) contemplated in such Bid. The Bid shall further state that any necessary filings under applicable regulatory, antitrust, and other laws will be made in a timely manner and that payment of the fees associated therewith shall be made by the Qualified Bidder;

(xii) disclaims any right to receive a fee analogous to a break-up fee, expense reimbursement, "topping" or termination fee, or any other similar form of compensation. For the avoidance of doubt, no Qualified Bidder  will be permitted to request, nor be granted by the Trustee, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code;

(xiii) includes (if applicable) a designation of contracts and/or leases to be assumed and assigned to the Potential Bidder, agreement to pay in full any associated cure costs, and evidence of the Potential Bidder's ability to perform future obligations under such contracts and/or leases;

(xiv) is reasonably likely (based on availability of financing, regulatory issues, experience, and other considerations) to be consummated, if selected as a Successful Bid (as defined below), within a timeframe acceptable to the Trustee (with the consent of the Consultation Parties);

(xv) contains a binding agreement by the Potential Bidder to serve as an "Alternate Bidder" (as defined below), if so selected by the Trustee in accordance with the Bidding Procedures; and

(xvi) is irrevocable until the earlier of: (a) thirty (30) days after the Bankruptcy Court authorizes and approves a Successful Bid, or Bids, for the Purchased Assets that are the subject of the Bid; and (b) the closing of the sale(s) for the Purchased Assets that are the subject of the Bid.

2.    A Potential Bidder that makes a Qualified Bid is referred to herein as a "**Qualified Bidder**."

3.    The Trustee, in his reasonable business judgment (in consultation with the Consultation Parties), shall determine whether the Bid of a Potential Bidder meets the foregoing requirements to become a Qualified Bid.

4.    Notwithstanding anything herein to the contrary, the Trustee reserves the right to work with Potential Bidders (in consultation with the Consultation Parties) to aggregate bids into a consolidated Qualified Bid, or otherwise improve bids to be Qualified Bids, prior to the Bid Deadline. Additionally, the Trustee will be authorized to approve joint Bids in his discretion (in consultation with the Consultation Parties) on a case-by-case basis.

5.    For the avoidance of doubt, any Bid that requires any form of future or current payment from the estate or the Lenders in the form of an expense reimbursement, purchase price adjustment or working capital adjustment, termination or breakup fee, or similar arrangement, shall not be considered a Qualified Bid until such concept is removed from the Bid.

6.    The Trustee, in his reasonable business judgment, may reject any proposal that entitles the Potential Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment that is not in conformity with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure or the Local Rules for the United States Bankruptcy Court for the District of Delaware, or is contrary to the best interests of the Estates.

7.    A Qualified Bid shall be valued based upon various factors including, without limitation, the net value provided by such proposal, the timing and amount of any consideration received, and the likelihood and timing of consummation of such transaction.

## H.  Lenders' Right to Credit Bid

1.    The Lenders shall have the right to at the Auction to credit bid all or any portion of the aggregate amount of their applicable outstanding secured obligations pursuant to section 363(k) of the Bankruptcy Code, and any such credit bid will be considered a Qualified Bid to the extent such bid complies with section 363(k) of the Bankruptcy Code; provided that a credit bid shall not constitute a Qualified Bid if the bid does not include a cash component sufficient to pay in full, in cash, the carve-out amount as provided for in the Sharing Agreement as approved by the Court and all claims for which there are valid, perfected, and unavoidable liens on any assets included in such Bid that are senior in priority to those of the party seeking to credit bid (unless such Lender consents to alternative treatment), if applicable.  There shall be no obligation for

any Lender to provide a Bid by the Bid Deadline if the full purchase price of the Bid is paid pursuant to a credit bid and such Lender shall be entitled to full participation at any future Auction (defined below) as a Qualified Bidder notwithstanding any requirement contained in the Bidding Procedures.

2.    Notwithstanding any other provisions herein to the contrary, in the event that a Lender wishes to submit a Bid, including without limitation a credit bid (any such bid and/or credit bid, a "Lender Bid"), the Lender shall notify the other parties listed in Section F above in writing by the Bid Deadline of its intent to submit such Lender Bid.  Absent such notification, the Lender shall not be permitted to submit or pursue in any way such Lender Bid.  Upon the transmission by a Lender of a notification of its intent to submit a Lender Bid, the Lender shall cease to be a Consultation Party with respect to all assets (including without limitation executory contracts and/or unexpired leases) subject to its Lender Bid, and the Trustee shall have no obligation otherwise to consult with such Lender regarding such assets.  For the avoidance of doubt, the Trustee is authorized to take any actions necessary to exclude such Lender from all discussions regarding any or all of the assets subject to the Lender's Lender Bid, except for discussions on the record at the Auction in which all other bidders are either present or able to be present if they so choose.

## I.  Template Asset Purchase Agreements

The Template Asset Purchase Agreement in the data room identified as "**General Asset Purchase Agreement**" should be used for the purchase of any or all assets with the exception of real property and Akorn Operating's equity interest in Akorn International S.á.r.l. The Template Asset Purchase Agreement in the data room identified as ("**Real Estate Asset Purchase Agreement**") should be used for real estate, and the Template Asset Purchase Agreement in the data room identified as ("**Stock Asset Purchase Agreement**") should be used for Akorn Operating's equity interest in Akorn International S.á.r.l.[4]

## J.  Modification of Bids

Without the prior written consent of the Trustee (in consultation with the Consultation Parties), a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the consideration contemplated by, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; provided that any Qualified Bid may be improved at the Auction as set forth herein.  Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures.

## K.  No Qualified Bids

If the Trustee does not receive any Qualified Bids, the Trustee shall (i) report the same to the Court, and (ii) declare the auction to be a "failed auction."

---

[4] Word versions of the Template Asset Purchase Agreements are available from Greenhill upon request. Additionally, Greenhill shall post a Word version of each Template Asset Purchase Agreement in the data room.

6

### L.  Only One Qualified Bid

In the event that the Trustee receives only one Qualified Bid, the Trustee will not hold the Auction and may instead seek approval of such Qualified Bid and the associated asset purchase agreement at the Sale Hearing.  However, in the event that only one Qualified Bid is received, the Trustee may determine in his reasonable business judgment (in consultation with the Consultation Parties) that such Qualified Bid is insufficient, and shall have the right to either postpone the Auction and Bid Deadline or declare the Auction a "failed auction."

### M.  Auction

1.      If at least two (2) Qualified Bids have been received, the Trustee shall conduct an auction (the "**Auction**") commencing on **May 10, 2023 at 10:00 a.m. (ET), and, as may be necessary, continuing through and including May 12, 2023**, at the offices of Cozen O'Connor, One Liberty Place, 1650 Market Street, Suite 2800, Philadelphia, PA 19103, or such later time or other place or manner as the Trustee shall notify all Qualified Bidders.  Only Qualified Bidders shall be eligible to participate in the Auction and only Qualified Bidders shall be entitled to make any subsequent Qualified Bids at the Auction.  The Trustee shall not consider a particular Bid unless the bidding party has submitted a Qualified Bid and attends the Auction.

2.      Prior to the start of the Auction, the Trustee shall evaluate all Qualified Bids received and shall determine (in consultation with the Consultation Parties) which Qualified Bid(s) constitutes the best offer(s) for all, or for one or more lots (each, a "**Lot**") of, the Purchased Assets (the "**Starting Auction Bid(s)**"); provided that the Trustee shall consult with the Consultation Parties prior to making any decision on which Bid shall be the Starting Auction Bid(s).  The Trustee, in his discretion and in consultation with the Consultation Parties, may accept as a single Qualified Bid, multiple Bids for non-overlapping Lots.  The Trustee shall announce the Starting Auction Bid(s), and, if applicable, the make-up of each Lot, at the commencement of the Auction. The make-up of each Lot shall be within the discretion of the Trustee, in consultation with his professionals and the Consultation Parties.

3.      The Trustee, in his sole discretion, and in consultation with his professionals, may at any time during the Auction conduct separate rounds of bidding for different Lots.  The Trustee, in his sole discretion and in consultation with his counsel, may alter or combine one or more Lots, and/or divide the Purchased Assets into additional Lots, as he deems appropriate at any point during the Auction.

4.      The minimum initial overbid and any subsequent overbids must be in increments of at least $100,000 in cash consideration with respect to a single Lot, and at least $1,000,000 in cash consideration with respect to all of the Purchased Assets (which amount the Trustee, in his reasonable business judgment, may modify at the Auction with respect to all of the Purchased Assets and/or one or more Lots) until the Trustee declares a Successful Bidder or Bidders.

5.      Upon a Qualified Bidder's declaration of its Bid at the Auction, it must commit on the record to pay promptly following the Auction, if such Bid were to be the Successful Bid or the Alternate Bid, the incremental amount of its Required Deposit calculated based on the

increased purchase price of such Bid, if applicable; provided that this requirement shall not apply to any Bid by the Lenders.

6.      The Trustee, after consultation with his professionals and the Consultation Parties, may employ and announce at the Auction additional and/or modified rules or procedures for conducting the Auction, provided that such rules are (i) not inconsistent with the Bidding Procedures Order or any other order of the Court, or the Bankruptcy Code, and (ii) disclosed to each Qualified Bidder at the Auction.

7.      At the conclusion of the Auction, the Trustee, in consultation with his counsel and in consultation with the Consultation Parties, shall (i) review each Qualified Bid (as may have been increased and/or modified at the Auction) on the basis of financial and contractual terms and the factors relevant to the Sale Process, including those factors affecting the speed and certainty of consummating the Qualified Bid, and (ii) identify the best bid or bids for either all of the Purchased Assets or for each Lot, as applicable (each such bid, a "**Successful Bid**") and the bidder making such best bid or bids (each such bidder, a "**Successful Bidder**").  The Trustee, in his discretion and in consultation with the Consultation Parties, may group as a single Qualified Bid the Successful Bids for non-overlapping Lots to participate in an Auction for such non-overlapping Lots as a single Lot, or to participate in an Auction for all of the Purchased Assets as a single Lot.  Promptly following the conclusion of the Auction the Trustee shall file on the docket of the Debtors' bankruptcy cases one or more "Notice(s) of Successful Bidder(s)" identifying each Successful Bidder and, for each, identifying the Purchased Assets (including executory contracts and/or unexpired leases) proposed to be sold to such Successful Bidder, and the purchase price.  If applicable, the Notice shall also identify the Alternate Bidder.

8.      All Qualified Bidders at the Auction shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and to have waived any right to a jury trial in connection with any disputes related to the Auction, and the construction and enforcement of the Qualified Bidder's proposed purchase agreement.

### N.    Notice to Counterparties to Executory Contracts and/or Unexpired Leases

If any Successful Bid or Alternate Bid includes executory contracts and/or unexpired leases to be assigned to such Bidder (each, a "Potentially Assigned Contract/Lease"), then within twenty-four (24) hours following the conclusion of the Auction, the Trustee shall serve on each counterparty to the Potentially Assigned Contracts/Leases a packet including: (1) the applicable Notice of Successful Bidder, (2) the evidence of the Successful Bidder's (and, if applicable, Alternate Bidder's) ability to perform future obligations under the applicable Potentially Assigned Contract(s)/Lease(s) previously submitted by such Successful Bidder (and, if applicable, Alternate Bidder) pursuant to section G(xiii) above; (3) any additional such evidence provided by the Successful Bidder (and, if applicable, Alternate Bidder); and (4) contact information for counsel for the Successful Bidder (and, if applicable, Alternate Bidder) and counsel for the Trustee.

## O.  The Sale Hearing

1.      A hearing is presently scheduled to take place on **May 19, 2023 at 10:00 a.m. (ET)** (the "**Sale Hearing**").  At the Sale Hearing, the Trustee shall seek entry of the Sale Order, among other things, authorizing and approving the Sale(s) of the Purchased Assets to the Successful Bidder(s) pursuant to the terms and conditions set forth in the respective Successful Bid(s).  The Trustee, in his reasonable business judgment, may adjourn or reschedule the Sale Hearing.  The Trustee shall notify all relevant parties of such adjournment or rescheduling in an appropriate manner.

2.      If the Trustee receives more than one Qualified Bid either for all of the Purchased Assets or for a given Lot, as applicable, then, at the Sale Hearing, the Trustee will seek approval of the Successful Bids, and, at the Trustee's election, in consultation with the Consultation Parties, the next best Qualified Bid(s) (the "**Alternate Bid(s)**" and the bidder(s) making such Alternate Bid(s), the "**Alternate Bidder(s)**").  The Trustee's presentation to the Court of the Successful Bid(s) and, if applicable, the Alternate Bid(s) will not constitute the Trustee's acceptance of such Bids until such Bids are approved by the Court at the Sale Hearing. Following approval of the Sale to a Successful Bidder, if the Successful Bidder fails to consummate the Sale for any reason, then the applicable Alternate Bid will be deemed to be the Successful Bid and the Trustee will be authorized, but not directed, to effect the Sale to the Alternate Bidder subject to the terms of the Alternate Bid of such Alternate Bidder without further order of the Court. The Alternate Bid shall remain open until the earlier of (a) thirty (30) days following the entry of the Sale Order or (b) the consummation of the Sale to the Successful Bidder unless further extended by agreement of the Trustee and Alternate Bidder.

3.      All Required Deposits, but excluding the Required Deposits of a Successful Bidder and Alternate Bidder (which, in the case of the Required Deposit of the Alternate Bidder, shall be returned within three (3) business days of the closing of the Sale to the Successful Bidder), shall be returned to Qualified Bidders within five (5) business days after the date of the Auction. The Trustee shall be required to maintain Required Deposits in a non-interest bearing account. Required Deposits may only be used in accordance with the provisions of these Bidding Procedures. The Trustee shall not have any liability with respect to any Required Deposits. If a Successful Bidder fails to consummate an approved sale as a result of its own default or the terms of the relevant asset purchase agreement between the Trustee and such Successful Bidder would allow the Trustee to retain such Successful Bidder's Required Deposit, the Trustee will not have any obligation to return the Required Deposit of such Successful Bidder, and such Required Deposit will become property of the Estates.

## P.  Reservation of Rights

The Trustee reserves his right, in the exercise of his fiduciary obligations, after consultation with his professionals, subject to the terms and conditions in the Sharing Agreement as approved by the Court, and in the exercise of his reasonable business judgment, to: (a) determine which Qualified Bid(s), if any, are the highest or otherwise best offer, either for all of the Purchased Assets or for each Lot, as applicable; (b) reject, at any time, any bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, the Bidding Procedures Order or any other orders applicable to the

9

Estates or the terms and conditions of the Sale, or (iii) contrary to the best interests of the Estates; and (c) modify the Bidding Procedures, including, without limitation, by (1) extending any of the deadlines set forth above for the Bidding Process, (2) modifying bidding increments, (3) adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without prior notice, (4) withdrawing from the Auction the Purchased Assets, or any Lot or portion thereof, at any time prior to or during the Auction, and/or (5) canceling the Auction, and rejecting all Qualified Bids if, in the Trustee's reasonable business judgment, and in consultation with his counsel, no such bid is for a fair and adequate price. Notwithstanding the forgoing, the Trustee shall consult with the Consultation Parties on each of the determinations above and shall not agree to any modifications of the Bidding Procedures or other terms and conditions of any Sale that conflict with the Sharing Agreement as approved by the Court absent the consent of the Consultation Parties.

**Exhibit 2**

**Notice of Auction and Sale Hearing**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| AKORN HOLDING COMPANY LLC, *et al.*[1] | Case No. 23-10253 (KBO) |
| | (Jointly Administered) |
| Debtors. | |

## NOTICE OF SALE OF ASSETS, AUCTION, AND SALE HEARING

PLEASE TAKE NOTICE OF THE FOLLOWING:

1.      On April 28, 2023, the United States Bankruptcy Court for the District of Delaware (the "Court") entered an *Order Granting the Trustee's Motion for Entry of an Order (A) Approving Bidding Procedures in Connection With Sale of Substantially All of the Estates' Assets, (B) Scheduling an Auction and Hearing to Consider the Proposed Sale and (C) Approving the Form and Manner of Notice Thereof* (the "Bidding Procedures Order"), which, among other things, establishes bidding procedures (the "Bidding Procedures") that govern the manner in which all or substantially all of the assets (the "Purchased Assets") of the above-captioned debtors (the "Debtors") are to be sold.  All capitalized terms used but not defined herein shall have the meanings assigned to them in the Bidding Procedures Order.  A copy of the Bidding Procedures is being served on you concurrently with this Notice.

2.      All interested parties are invited to make offers to purchase all or some portion of the Purchased Assets, in accordance with the terms and conditions of the Bidding Procedures.

3.      Pursuant to the Bidding Procedures, in the event that the Trustee timely receives more than one Qualified Bid (as defined in the Bidding Procedures) the Trustee will conduct an auction for the Purchased Assets (the "Auction") commencing on **May 10, 2023 at 10:00 a.m. (ET), and, as may be necessary, continuing through and including May 12, 2023**, at the offices of Cozen O'Connor, One Liberty Place, 1650 Market Street, Suite 2800, Philadelphia, PA 19103, or such later time or other place or manner as the Trustee shall notify all Qualified Bidders.

4.      Participation at the Auction is subject to the Bidding Procedures and the Bidding Procedures Order.  Any person wishing to participate in the Bidding Process must become a "Qualified Bidder."   The procedures for becoming a Qualified Bidder are contained in the Bidding Procedures.  A Potential Bidder that desires to make a Bid must deliver written copies of

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of their federal tax identification numbers, and cases numbers are Akorn Holding Company LLC (9190), Case No. 23-10253 (KBO); Akorn Intermediate Company LLC (6123), Case No. 23-10254 (KBO); and Akorn Operating Company LLC (6184), Case No. 23- 10255. The Debtors' headquarters is located at 5605 CenterPoint Court, Gurnee, IL 60031.

its Bid, via electronic mail, hand delivery or overnight mail, to: (i) the Trustee, care of his counsel, Cozen O'Connor, 1201 N. Market St., Ste. 1001, Wilmington, DE 19801, Attn. John T. Carroll, III, Esq. (jcarroll@cozen.com) and Simon Fraser, Esq. (sfraser@cozen.com); (ii) MidCap Funding IV Trust, care of its counsel, Proskauer Rose LLP, One International Place, Boston, MA 02110, Attn: Charles A. Dale, Esq. (cdale@proskauer.com); (iii) WSFS Institutional Services, care of its counsel, Wilmer Cutler Pickering Hale and Dorr LLP, 7 World Trade Center, 250 Greenwich Street, New York, NY 10007, Attn: Andrew N. Goldman, Esq. (andrew.goldman@wilmerhale.com) and Nathan J. Moore, Esq. (nathan.moore@wilmerhale.com); (iv) Ad Hoc TL Lender Group, care of their counsel, Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, NY 10166-0193, Attn: Matt J. Williams, Esq., (mjwilliams@gibsondunn.com) and AnnElyse Scarlett Gains, Esq., (agains@gibsondunn.com); and (v) Greenhill & Co., LLC, 1271 Avenue of the Americas, New York, NY 10020, Attn: Neil A. Augustine (neil.augustine@greenhill.com), Rupert Hill (rupert.hill@greenhill.com), Nicholas Drayson (nicholas.drayson@greenhill.com) and Sean Wright (sean.wright@greenhill.com) so that the Bid is actually received by **12:00 p.m. (Noon) (ET) on May 4, 2023** (the "Bid Deadline"). The Trustee may (in consultation with the Consultation Parties) extend the Bid Deadline once or successively but is not obligated to do so. If the Trustee extends the Bid Deadline, he shall promptly notify all Potential Bidders of such extension.

5.     A hearing at which the Trustee will seek approval and authorization of the Sale to the Successful Bidders (the "Sale Hearing") is scheduled to be held on **May 19, 2023 at 10:00 a.m. (ET)**, unless otherwise continued by the Trustee pursuant to terms of the Bidding Procedures Order, before the Honorable Karen B. Owens, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, Courtroom No. 3, 824 North Market Street, Wilmington, Delaware 19801. By **May 1, 2023**, the Trustee shall file and serve upon counterparties to the Debtors' executory contracts and unexpired leases (the "Counterparties") a notice informing Counterparties that the Debtors' executory contracts and unexpired leases may be assumed and assigned, and setting out what the Debtors' records show to be the applicable cure amounts, if any (the "Cure Notice"). If any Counterparty wishes to assert an objection or other response to the Cure Notice, it must file and serve such objection or other response upon the parties listed in paragraph 6 below on or before **May 16, 2023** (the "Objection Deadline"). The Court shall hold a hearing at the Sale Hearing regarding any objections to cure amounts and/or assumption and assignment of executory contracts and/or unexpired leases.

6.     Objections, if any, to the relief requested at the Sale Hearing as it relates to the Sale, must: (a) be in writing and filed with the Court, (b) comply with the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure, and (c) be filed and served on the following parties by the Objection Deadline (except that objections pursuant to 11 U.S.C. §365(f) may be made at any time prior to, or at, the Sale Hearing): (i) the Trustee, care of his counsel, Cozen O'Connor, 1201 N. Market St., Ste. 1001, Wilmington, DE 19801, Attn. John T. Carroll, III, Esq. (jcarroll@cozen.com) and Simon Fraser, Esq. (sfraser@cozen.com); (ii) MidCap Funding IV Trust, as ABL Agent care of its counsel, Proskauer Rose LLP, One International Place, Boston, MA 02110, Attn: Charles A. Dale, Esq. (cdale@proskauer.com); (iii) WSFS Institutional Services as TL Agent, care of its counsel, Wilmer Cutler Pickering Hale and Dorr LLP, 7 World Trade Center, 250 Greenwich Street, New York, NY 10007, Attn: Andrew N. Goldman, Esq.

2

(andrew.goldman@wilmerhale.com) and Nathan J. Moore, Esq. (nathan.moore@wilmerhale.com); (iv) Ad Hoc TL Lender Group, care of their counsel, Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, NY 10166-0193, Attn: Matt J. Williams, Esq., (mjwilliams@gibsondunn.com) and AnnElyse Scarlett Gains, Esq. (agains@gibsondunn.com); and (v) the Office of the United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19081, Attn: Richard Schepacarter, Esq. (Richard.Schepacarter@usdoj.gov) (collectively, the "Service Parties").

       7.     This Notice is qualified in its entirety by the Bidding Procedures Order.

Dated:  April _____ 2023            COZEN O'CONNOR

                       By:   /s/ _____
                            John T. Carroll, III (DE No. 4060)
                            Simon E. Fraser (DE No. 5335)
                            1201 N. Market Street
                            Suite 1001
                            Wilmington, DE  19801
                            (302) 295-2000 Phone
                            (302) 295-2013 Fax No.
                            jcarroll@cozen.com
                            sfraser@cozen.com

                            *Counsel for the Trustee,*
                            *George L. Miller*

LEGAL\62787564\5 6010823/00574256
04/28/2023

**Exhibit 3**

**Cure Notice**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| AKORN HOLDING COMPANY LLC, *et al.*[1] | Case No. 23-10253 (KBO) |
| Debtors. | (Jointly Administered) |

**NOTICE OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES THAT MAY BE ASSUMED AND ASSIGNED, PURSUANT TO SECTION 365 OF THE BANKRUPTCY CODE, IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, AND THE PROPOSED CURE AMOUNTS**

PLEASE TAKE NOTICE OF THE FOLLOWING:

1.     On April 28, 2023, the United States Bankruptcy Court for the District of Delaware (the "Court") entered an *Order Granting Trustee's Motion for Entry of an Order (A) Approving Bidding Procedures in Connection With Sale of Substantially All of the Estates' Assets, (B) Scheduling an Auction and Hearing to Consider the Proposed Sale and (C) Approving the Form and Manner of Notice Thereof* (the "Bidding Procedures Order"), which, among other things, establishes bidding procedures (the "Bidding Procedures") that govern the manner in which all or substantially all of the assets (the "Purchased Assets") of the above-captioned debtors (the "Debtors") are to be sold.  All capitalized terms used but not defined herein shall have the meanings assigned to them in the Bidding Procedures Order.

2.     In accordance with the Bidding Procedures, the Trustee hereby file this Notice (the "Cure Notice") identifying: (i) those executory contracts and unexpired leases that may be assumed and assigned to a potential purchaser in connection with the Trustee's sale of the Purchased Assets (the "Executory Contracts and Unexpired Leases"); and (ii) the proposed cure amount to cure any and all defaults associated with each Executory Contract and Unexpired Lease (the "Cure Amount").

3.     A list of the Executory Contracts and Unexpired Leases, together with the Cure Amount for each, is attached to this Cure Notice as Exhibit 1.

4.     You have been identified as possibly being a party to an Executory Contract or Unexpired Lease.

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of their federal tax identification numbers, and cases numbers are Akorn Holding Company LLC (9190), Case No. 23-10253 (KBO); Akorn Intermediate Company LLC (6123), Case No. 23-10254 (KBO); and Akorn Operating Company LLC (6184), Case No. 23- 10255. The Debtors' headquarters is located at 5605 CenterPoint Court, Gurnee, IL 60031.

5.      Timely objections to the Trustee's proposed Cure Amounts, if any, will be heard at a hearing scheduled to take place on **May 19, 2023 at 10:00 a.m. (ET)** before the Honorable Karen B. Owens, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, Courtroom No. 3, Floor, 824 North Market Street, Wilmington, Delaware 19801.  This hearing may be adjourned, in which case you will be informed of the new date and time.

6.      **If you wish to assert an objection to the proposed Cure Amount associated with the particular Executory Contract or Unexpired Lease to which you are a party, you must do so in accordance with the instructions in this Cure Notice, on or before May 16, 2023 (the "Objection Deadline").**

7.      In order to be considered, objections (if any) must: (i) be in writing; (ii) state with specificity the grounds for such objection (with appropriate documentation in support thereof); (iii) comply with the Federal Rules of Bankruptcy Procedure and the Local Rules for the United States Bankruptcy Court for the District of Delaware; (iv) be filed with the Bankruptcy Court, 824 N. Market Street, 3rd Floor, Wilmington, DE 19801 by the Objection Deadline; and (v) be served on the following parties via electronic mail, hand delivery or overnight mail (so as to be **received** by such parties) by the Objection Deadline: (1) the Trustee, care of his counsel, Cozen O'Connor, 1201 N. Market St., Ste. 1001, Wilmington, DE 19801, Attn. John T. Carroll, III, Esq. (jcarroll@cozen.com) and Simon Fraser, Esq. (sfraser@cozen.com); (2) MidCap Funding IV Trust, as ABL Agent care of its counsel, Proskauer Rose LLP, One International Place, Boston, MA 02110, Attn: Charles A. Dale, Esq. (cdale@proskauer.com); (3) WSFS Institutional Services as TL Agent, care of its counsel, Wilmer Cutler Pickering Hale and Dorr LLP, 7 World Trade Center, 250 Greenwich Street, New York, NY 10007, Attn: Andrew N. Goldman, Esq. (andrew.goldman@wilmerhale.com) and Nathan J. Moore, Esq. (nathan.moore@wilmerhale.com); (4) Ad Hoc TL Lender Group, care of their counsel, Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, NY 10166-0193, Attn: Matt J. Williams, Esq., (mjwilliams@gibsondunn.com) and AnnElyse Scarlett Gains, Esq. (agains@gibsondunn.com); and (5) the Office of the United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19081, Attn: Richard Schepacarter, Esq. (Richard.Schepacarter@usdoj.gov) (collectively, the "Service Parties").

8.      **If you do not file and serve a timely objection to a proposed Cure Amount listed on Exhibit 1 to this Cure Notice pursuant to the instructions set out in this Cure Notice, you shall be forever barred from objecting to such Cure Amount, and you shall be deemed to consent to such Cure Amount.**

9.      The presence of a contract or agreement on Exhibit 1 attached hereto does not constitute an admission that such contract or agreement is an executory contract, and does not constitute a representation that such contract or agreement will be assumed and assigned to any Successful Bidder.  The Trustee reserves all of his rights, claims, and causes of action with respect to the contracts and agreements listed on Exhibit 1 attached hereto.

10.     This Cure Notice is qualified in its entirety by the Bidding Procedures Order.


Dated:  April _ 2023                                        COZEN O'CONNOR


                                                By:    /s/ _____
                                                       John T. Carroll, III (DE No. 4060)
                                                       Simon E. Fraser (DE No. 5335)
                                                       1201 N. Market Street
                                                       Suite 1001
                                                       Wilmington, DE  19801
                                                       (302) 295-2000 Phone
                                                       (302) 295-2013 Fax No.
                                                       jcarroll@cozen.com
                                                       sfraser@cozen.com

                                                       *Counsel for the Trustee,*
                                                       *George L. Miller*

Exhibit 1

**EXHIBIT D**

**Transition Services Agreement**

315419167.5

## TRANSITION SERVICES AGREEMENT

This TRANSITION SERVICES AGREEMENT (this "Agreement"), dated as of [__], 2023, is by and between [George L. Miller, the chapter 7 trustee ("Provider") of the chapter 7 estates (collectively, the "Estates") of Akorn Holding Company LLC ("Holdings"), Akorn Intermediate Company LLC ("Intermediate") and Akorn Operating Company LLC ("Operating", and together with Holdings and Intermediate, "Debtors" and each entity individually, a "Debtor"),]1 and [**Sentiss AG, a company formed under the laws of Switzerland**] ("Sentiss" and, together with Provider, the "Parties" and each individually a "Party"). All capitalized terms used but not defined herein shall have the meanings given to such terms in the Purchase Agreement (as defined below).

## RECITALS

WHEREAS**,** Sentiss and Provider have entered into that certain Asset and Share Purchase Agreement, dated as of [__], 2023 (the "Purchase Agreement"), pursuant to which Sentiss is purchasing from Provider, and Provider is selling to Sentiss, the Purchased Assets; and

WHEREAS, in connection with Sentiss's purchase of the Purchased Assets, the Parties desire that Provider provides, or causes to be provided, to Sentiss certain services for a period of time following the Closing as set forth herein.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## SERVICES

1.    **Services**.

(a)    General. Provider shall provide, or cause to be provided, to Sentiss the services described and for the periods set forth on Exhibit A of this Agreement (collectively, the "Services"). Exhibit A may be amended to include additional Services upon the mutual written agreement of the Parties.

(b)    Rendering Party. Provider shall have the right to cause one or more of the Debtors or their Affiliates to perform all or any portion the Services. In addition, Provider shall have the right, subject to Sentiss's prior written consent, which shall not unreasonably be withheld, to hire qualified third-party subcontractors to provide all or part of any Service hereunder, at Sentiss's sole cost and expense.

(c)    Cooperation. The Parties shall cooperate with each other and any Affiliates or permitted third-party subcontractors in connection with the performance of the Services. Without limiting the foregoing, Provider will take direction and report to Sentiss as to the provision of Services hereunder.

---

1 NTD: Applicable parties TBD.

(d) <u>Access</u>. Sentiss shall permit Provider and Provider's employees and agents access (upon reasonable prior notice) to such data and personnel designated by Sentiss as involved in receiving or overseeing the Services, and records as reasonably requested by Provider to facilitate Provider's performance of this Agreement. Provider shall permit Sentiss and its employees and agents access during regular business hours (or otherwise upon reasonable prior notice) to individuals responsible for the Services and shall provide Sentiss with such data and records as Sentiss may reasonably request for the purposes of allowing Sentiss to exercise general oversight and to monitor the performance of the Services.

(e) <u>Transition</u>. The Parties acknowledge the transitional nature of the Services. Accordingly, as promptly as practicable following the execution of this Agreement, Sentiss agrees to use commercially reasonable efforts to make a transition of each Service to its own internal organization or to obtain alternate third-party sources to provide the Services, at Sentiss's sole cost and expense.

(f) <u>Limitations</u>. The Services will be used by Sentiss and its Affiliates that reasonably require such Services solely in connection with the operation of the Purchased Assets and/or the Business and to facilitate an orderly transition thereof following the Closing. Neither Sentiss, nor any of its Affiliates, may resell or license the use by any third party of any Services, except with the written permission of Provider.

(g) <u>Assignment to US Purchaser</u>. Provider shall assign this Agreement to the purchaser of the US assets of the Estates that are used in or necessary for the provision of the Services, and shall cause such purchaser to assume all of Provider's obligations hereunder, in each case effective as of and as a condition to the closing of such acquisition.

**2.** **Standard of Service**.

(a) Provider represents, warrants and covenants that the Services shall be provided in good faith, in accordance with Applicable Laws, and in a manner consistent with the historical provision of the Services and with the same standard of care as historically provided.

(b) EXCEPT FOR THE WARRANTIES AND UNDERTAKINGS EXPLICITLY SET FORTH HEREIN OR IN THE PURCHASE AGREEMENT, (I) THERE ARE NO WARRANTIES BY PROVIDER WITH RESPECT TO THE SERVICES AND (II) ALL WARRANTIES, STIPULATIONS AND UNDERTAKINGS AND ALL TERMS AND CONDITIONS (INCLUDING ANY IMPLIED BY STATUTE OR OTHERWISE) WITH RESPECT TO THE SERVICES (WHETHER AS TO MERCHANTABILITY, QUALITY, DESCRIPTION, SATISFACTORY QUALITY, SUITABILITY, FITNESS FOR A PARTICULAR PURPOSE WHERE MADE KNOWN OR NOT, CARE, SKILL OR OTHERWISE) ARE HEREBY EXCLUDED AND WAIVED.

**3.** **Fees; Payment**.

(a) <u>Fees</u>. In consideration for the performance of the Services, Sentiss shall pay to Provider the fees described in <u>Exhibit A</u> applicable to each performed Service (the "<u>Service Fees</u>").

315514334.4

(b)      Payment. Provider shall provide Sentiss with a monthly invoice specifying the Services performed for Sentiss in the immediately preceding month and the Service Fees due in connection therewith. Sentiss shall pay the amounts reflected on all such invoices within thirty (30) days after its receipt thereof. Any unpaid amounts shall accrue interest from the scheduled due date until the date that such amounts are fully paid to Provider at the rate equal to the lesser of (i) the maximum rate permitted by applicable Law or (ii) 1% per month.

(c)      Taxes. Sentiss shall be responsible for all sales or use Taxes imposed or assessed as a result of the provision of Services by Provider hereunder.

**4.      Proprietary Materials**. Sentiss shall acquire exclusive ownership of the Proprietary Materials (as defined below). As used herein, "Proprietary Materials" means all information, data and knowledge furnished or made available by the Provider related to the Purchased Assets, as part of the Services, or used in the performance of Services hereunder, and copies thereof, including software, documentation, techniques, tools, templates, processes, procedures, discoveries, inventions and technical data, business blueprint and process workflow (design), IT system configurations, integration diagrams and process workflows for third-party logistics providers (3PLs) used by Provider in connection with the Business or the Purchased Assets, other documents and information reasonably associate with the foregoing, including IT infrastructure and platforms, in each case. Sentiss shall grant to Provider a nonexclusive, worldwide, royalty-free license to use the Proprietary Materials solely for the purpose of, and only to the extent necessary for, providing the Services pursuant to this Agreement.

**5.      Confidentiality**.

(a)      Confidentiality. Except as otherwise permitted herein, Provider shall, and shall cause the Debtors and their Affiliates and their respective officers, directors, employees, accountants, counsel, consultants, advisors and agents to, keep all confidential information regarding the business, affairs or plans ("Confidential Information") of the Sentiss or the Purchased Assets provided pursuant to this Agreement strictly confidential. Notwithstanding the foregoing, this Section 5(a) shall not apply to Confidential Information which (i) becomes generally available to the public other than as a result of a disclosure by Provider, a Debtor, or any Affiliates thereof that received such information ("Recipient"), or (ii) is required to be disclosed by legal process, a court decision, an administrative order; *provided* that the Recipient timely informs the Sentiss so that Sentiss may to seek a protective order, confidential treatment or other remedy, if possible.

(b)      Safeguards. Provider agrees to establish and maintain administrative, physical and technical safeguards, data security procedures and other protections against the destruction, loss, unauthorized access or alteration of the Confidential Information which are no less rigorous than those otherwise maintained for its own Confidential Information but in no event using less than reasonable care.

**6.      Term; Termination**.

(a)     Term. The term of this Agreement shall commence on the date of this Agreement and shall continue until [____],2 unless sooner terminated as provided below.

(b)     Termination of Agreement. This Agreement may be terminated, either in full or solely with respect to one or more Services as follows:

(i)      upon written agreement of the Parties;

(ii)     by Sentiss upon ten (10) days' written notice to Provider; or

(iii)    by Provider immediately upon written notice to Sentiss should Sentiss fail to make (or dispute in writing) any payment by the forty-fifth (45th) day following Sentiss's receipt the relevant invoice from Provider.

(c)     Effect of Termination.

(i)      Upon termination or expiration of this Agreement, all rights and obligations of the Parties hereunder will immediately cease and terminate (except for the rights and obligations pursuant to Section 2(b), Section 4, Section 5, Section 6(c), Section 7, Section 9, Section 10, Section 11, Section 12, Section 13, Section 15, Section 16, Section 17, Section 19, Section 20, Section 21 and Section 22, which will survive such termination or expiration), and no Party will have any further obligation to the other Parties with respect to the Agreement, except for (A) charges accrued but unpaid as of the date of termination or expiration, and (B) as set forth in the provisions of this Agreement which are specifically designated herein as surviving such termination or expiration.

(ii)     Termination of this Agreement pursuant to this Section 6 will have no effect on any other agreements between Sentiss and Provider, unless otherwise mutually and specifically agreed in writing by the Parties. Notwithstanding anything to the contrary contained herein, nothing in this Agreement shall limit or alter the rights and obligations of the Parties under the Purchase Agreement. The termination or expiration of this Agreement will not relieve any Party of any liability to the others based on acts or omissions prior to the termination or expiration of this Agreement.

**7.**     **Limitation of Liability**. NOTWITHSTANDING ANY PROVISION OF THIS AGREEMENT TO THE CONTRARY, NO PARTY SHALL BE LIABLE TO ANY OTHER PARTY FOR CONSEQUENTIAL, INCIDENTAL, INDIRECT, SPECIAL, EXEMPLARY, OR PUNITIVE DAMAGES OF SUCH OTHER PARTY, INCLUDING LOSS OF FUTURE REVENUE, INCOME OR PROFITS, DIMINUTION OF VALUE OR LOSS OF BUSINESS REPUTATION OR OPPORTUNITY, OR DAMAGES DETERMINED AS A MULTIPLE OF INCOME, REVENUE OR THE LIKE, RELATING TO THE BREACH OR ALLEGED BREACH OF ANY REPRESENTATION, WARRANTY, COVENANT OR AGREEMENT IN THIS AGREEMENT OR RELATED HERETO.

---

2 NTD: End date TBD.

315514334.4

8.     **Headings**. The headings appearing herein are for convenience and reference only and shall not be deemed to govern, limit, modify or in any manner affect the scope, meaning or intent of the provisions of this Agreement.

9.     **Amendment and Waiver**. This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each Party. No waiver by any Party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the Party so waiving. No waiver by any Party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

10.    **Notices**. All notices and other communications hereunder shall be in writing and mailed, delivered personally, emailed (which is confirmed) or sent by an overnight courier service, such as Federal Express, to the Parties at the addresses set forth below (or at such other address as a Party may from time to time designate in writing in accordance with this Section). Each notice or other communication given to any Party in accordance with this Agreement shall be deemed to have been received (a) on the Business Day it is sent, if sent by personal delivery or email during normal business hours of the recipient (otherwise, on the first Business Day thereafter), (b) on the first Business Day after sending, if sent by overnight delivery, properly addressed and prepaid or (c) upon receipt, if sent by mail (regular, certified or registered); *provided*, that notice of change of address shall be effective only upon receipt.  The Parties agree that delivery of process or other papers in connection with any such action or proceeding in the manner provided in this Section 10, or in such other manner as may be permitted by law, shall be valid and sufficient service thereof.

|  |  |
|---|---|
| If to Provider: | George L. Miller, Trustee |
|  | 1628 John F. Kennedy Blvd., Suite 950 |
|  | Philadelphia, PA 19103-2110 |
|  | Telephone: (215) 561-0950 Ext. 14 |
|  | Facsimile: (215) 561-0330 |
|  | Email:  gmiller@mctllp.com |
|  |  |
| with a copy to: | John T. Carroll, III |
|  | Cozen O'Connor |
|  | 1201 North Market Street, Suite 1001 |
|  | Wilmington, DE 19801 |
|  | Telephone: (302) 295-2028 |
|  | Facsimile: (302) 295-2013 |
|  | Email: jcarroll@cozen.com |

315514334.4

If to Sentiss:      [Sentiss AG]
                        Bankstrasse 4
                        8610 Uster, Switzerland
                        Attn: Deepak Bahri
                        Email: dbahri@sentisspharma.com

with a copy to:    K&L Gates LLP
                        599 Lexington Avenue
                        New York, NY 10022
                        Telephone: (212) 536-3915
                        Attn:  Jonathan M. Barron and A. Lee Hogewood, III
                        Email: jonathan.barron@klgates.com and
                                  a.lee.hogewoodiii@klgates.com

**11.**     **Relationship of the Parties**.

        (a)     <u>Independent Contractor</u>. Nothing herein contained shall be deemed to create any partnership or agency relationship between the Parties, or confer upon any of the Parties any express, implied or apparent authority to incur any obligation or liability on behalf of the other. No Party shall bind the other Party to any obligation without the express written consent of such other Party.

        (b)     <u>Employees</u>. All employees of Provider or any Debtor (or Affiliate thereof) shall be deemed for purposes of all compensation and employee benefits to be employees of Provider or such Debtor (or Affiliate) and not employees of Sentiss or its Affiliates (including, without limitation, the Company and its Subsidiaries). In performing the Services, such employees shall be under the direction, control and supervision of Provider or a Debtor (or Affiliate thereof) and not Sentiss or its Affiliates. As between the Parties, Provider shall have the sole right to exercise all authority with respect to the employment (including termination of employment), assignment and compensation of such employees.

**12.**     **Successors and Assigns**.

        (a)     No Party may assign this Agreement or any of its rights or obligations hereunder without the prior written consent of the other Party; *provided*, that Sentiss may assign this Agreement, in whole or in part, to an Affiliate of Sentiss without the consent of Provider. Any attempted assignment or delegation in contravention hereof shall be null and void. Subject to the foregoing, this Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and permitted assigns.

        (b)     Sentiss hereby consents to the assignment of this Agreement by Provider to the purchaser of the US assets of the Estates as described in <u>Section 1(g)</u>, effective as of the closing of such acquisition.

**13.**     **No Third Party Beneficiary Rights**. This Agreement is not intended to and shall not be construed to give any Person other than the Parties (and successors and assigns permitted under <u>Section 12</u>) any interest or rights (including, without limitation, any third-party beneficiary

rights) with respect to or in connection with any agreement or provision contained herein or contemplated hereby.

**14.     Force Majeure**. If a Party (the "Impacted Party") is prevented from performing any of its obligations under this Agreement by reason of force majeure, including fire, flood, earthquake, storm, general strike, lockout, riot, war, terrorism, rebellion, accident, acts of God, and/or any other cause or externally induced casualty beyond its reasonable control which cannot reasonably be foreseen or avoided using due care (a "Force Majeure Event"), then the Impacted Party's failure to perform such obligation(s) shall be excused, and any related deadlines or scheduled deliveries set forth in this Agreement shall be extended, for the duration of such Force Majeure Event; *provided*, that the Impacted Party shall notify the other Party in writing (and provide reasonable details thereof) promptly upon becoming aware of the Force Majeure Event. The Impacted Party shall use commercially reasonable efforts to promptly restore the performance of its affected obligations hereunder. If Provider is the Impacted Party, and its inability to provide any Service due to a Force Majeure Event exceeds forty-five (45) days, then Sentiss may, at its option, obtain the affected Service from a third party for the duration of the Force Majeure Event, and the applicable Service Fees shall be reduced proportionately according to the number of days of such non-performance.

**15.     No Right of Set-Off**. Any payment to be made by any Party under this Agreement will be made free of any set-off and will be promptly remitted to the Party entitled to receive payment hereunder.

**16.     Expenses**. Except as otherwise expressly provided herein, the Parties shall bear their own respective expenses (including, but not limited to, all compensation and expenses of counsel, financial advisors, consultants and independent accountants) incurred in connection with the preparation and execution of this Agreement and consummation of the transactions contemplated hereby.

**17.     Confidentiality**.

(a)     The Parties agree that the terms of this Agreement shall not be disclosed or otherwise made available to the public and that copies of this Agreement shall not be publicly filed or otherwise made available to the public, except to the extent such disclosure, availability or filing is required by Applicable Law. In the event that such disclosure, availability or filing is required by Applicable Law, each of Sentiss and Provider (as applicable) agrees to use its commercially reasonable efforts to obtain "confidential treatment" of this Agreement with the U.S. Securities and Exchange Commission (or the equivalent treatment by any other Governmental Entity) and to redact such terms of this Agreement as the other Party shall request.

(b)     Provider acknowledges and agrees that data pertaining to the Business, including without limitation such data stored on servers, constitute proprietary and confidential information of Sentiss. In performing the Services under this Agreement, Provider shall, and shall cause Debtors and their respective employees and third party business partners and vendors to, maintain the confidentiality of such data.

18.    **Counterparts**. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

19.    **Governing Law**. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware (without giving effect to the conflict of laws principles thereof that would result in the application of the law of a different jurisdiction).

20.    **Submission to Jurisdiction**. Any dispute, controversy or claim arising out of or relating to this Agreement shall be heard and determined in the Bankruptcy Court, and the Parties hereby irrevocably submit to the exclusive jurisdiction of such courts in any such action or proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such action or proceeding. If the Bankruptcy Court does not have or declines to exercise subject matter jurisdiction over any action or proceeding arising out of or relating to this Agreement, then each Party (a) agrees that all such actions or proceedings shall be heard and determined in federal court of the United States for the District of Delaware, (b) irrevocably submits to the jurisdiction of such courts in any such action or proceeding, (c) consents that any such action or proceeding may be brought in such courts and waives any objection that such Party may now or hereafter have to the venue or jurisdiction or that such action or proceeding was brought in an inconvenient court, and (d) agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such Party at its address as provided in Section 10 (provided that nothing herein shall affect the right to effect service of process in any other manner permitted by Delaware law).

21.    **Severability**. If in any jurisdiction any term or provision hereof is determined to be invalid or unenforceable, (a) the remaining terms and provisions hereof shall be unimpaired, (b) any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction, and (c) the invalid or unenforceable term or provision shall, for purposes of such jurisdiction, be deemed replaced by a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision.

22.    **Entire Agreement**. This Agreement and the Exhibits, together with the Purchase Agreement and any other documents which this Agreement expressly requires shall be signed, shall constitute the entire understanding and agreement among the Parties to it in relation to the subject matter of this Agreement and shall together supersede all previous agreements among the Parties in relation to the same subject matter.

[SIGNATURE PAGE FOLLOWS]

315514334.4

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the date first set forth above.

**PROVIDER:**

GEORGE L. MILLER, AS TRUSTEE FOR THE ESTATES

By:_____
Name:
Title:

1

**SENTISS:**

[SENTISS AG]


By:_____
Name: Deepak Bahri
Title: Authorized Signatory

1

## EXHIBIT A

## TRANSITION SERVICES3

| Service Description | Term | Service Fee |
|---|---|---|
| [____] | [__] | $[__] |

---

3 NTD: To come.

*Schedule 2.1(a)*
*Purchased Assets*

All of the Estate's right, title and interest in and to:

Products and Marketing Authorizations:

1.  The following ANDAs:

| Product | ANDA | Portion of Purchase Price |
|---|---|---|
| Brimonidine and Timolol Maleate Ophthalmic Solution | ANDA 091086 | $900,000 |
| Ciprofloxacin and Dexamethasone Otic Suspension | ANDA PENDING | $1,000,000 |
| Erythromycin Ophthalmic Ointment | ANDA 064030 | $2,000,000 |
| Ketotifen Fumarate Ophthalmic Solution | ANDA 077958 | $100,000 |
| Loteprednol Etabonate Ophthalmic Gel | ANDA 212080 | $1,000,000 |
| Loteprednol Etabonate Ophthalmic Suspension (0.2%) | ANDA 215933 | $5,100,000 |
| Ofloxacin Ophthalmic Solution | ANDA 076407 | $1,150,000 |

Assigned Contracts/Leases:

None.

Other Purchased Assets:
1.  The Shares: $6,500,000
2.  All Regulatory Documentation in respect of the Marketing Authorizations.
3.  All sales records in respect of the Products.

**Exhibits**

**Schedule 2.1(b)**
**Finished Goods**

| Item Number | Description | Description Line 2 | Lot Serial Number | Expiry Date | Quantity On hand | Location | Product | Product Group | FG per Pallet | Total FG Pallets | 2023 NASP (per model in VDR) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 17478-0070-31 | Erythromycin Ophth Ointment | 0.5%, 1g, 50 Tubes/EA | 434825 | 10/31/2024 | 1,462 | Hettlingen | Ery 1g US | Ery | 864 | 2 | 152.46 |
| 17478-0070-31 | Erythromycin Ophth Ointment | 0.5%, 1g, 50 Tubes/EA | 434849 | 10/31/2024 | 2,916 | Hettlingen | Ery 1g US | Ery | 864 | 4 | 152.46 |
| 17478-0070-31 | Erythromycin Ophth Ointment | 0.5%, 1g, 50 Tubes/EA | 435003 | 12/19/2024 | 472 | Hettlingen | Ery 1g US | Ery | 864 | 1 | 152.46 |
| 17478-0070-31 | Erythromycin Ophth Ointment | 0.5%, 1g, 50 Tubes/EA | 435200 | 1/31/2025 | 2,968 | Hettlingen | Ery 1g US | Ery | 864 | 4 | 152.46 |
| 17478-0070-31 | Erythromycin Ophth Ointment | 0.5%, 1g, 50 Tubes/EA | 435268 | 1/31/2025 | 3,072 | Hettlingen | Ery 1g US | Ery | 864 | 4 | 152.46 |
| 17478-0070-31 | Erythromycin Ophth Ointment | 0.5%, 1g, 50 Tubes/EA | 435372 | 2/28/2025 | 2,864 | Hettlingen | Ery 1g US | Ery | 864 | 4 | 152.46 |
| 17478-0070-31 | Erythromycin Ophth Ointment | 0.5%, 1g, 50 Tubes/EA | 435432 | 2/28/2025 | 3,388 | Hettlingen | Ery 1g US | Ery | 864 | 4 | 152.46 |
| 17478-0070-35 | Erythromycin Ophth Ointment | 0.5%, 3.5g, 1 Tube / EA | 434765 | 10/31/2024 | 51,040 | Hettlingen | Ery 3.5g US | Ery | 15000 | 4 | 3.54 |
| 17478-0070-35 | Erythromycin Ophth Ointment | 0.5%, 3.5g, 1 Tube / EA | 434826 | 10/31/2024 | 25,830 | Hettlingen | Ery 3.5g US | Ery | 15000 | 2 | 3.54 |
| 17478-0070-35 | Erythromycin Ophth Ointment | 0.5%, 3.5g, 1 Tube / EA | 434916 | 11/30/2024 | 35,800 | Hettlingen | Ery 3.5g US | Ery | 15000 | 3 | 3.54 |
| 17478-0070-35 | Erythromycin Ophth Ointment | 0.5%, 3.5g, 1 Tube / EA | 434922 | 10/31/2024 | 33,880 | Hettlingen | Ery 3.5g US | Ery | 15000 | 3 | 3.54 |
| 17478-0070-35 | Erythromycin Ophth Ointment | 0.5%, 3.5g, 1 Tube / EA | 434975 | 11/30/2024 | 16,570 | Hettlingen | Ery 3.5g US | Ery | 15000 | 2 | 3.54 |
| 17478-0070-35 | Erythromycin Ophth Ointment | 0.5%, 3.5g, 1 Tube / EA | 435180 | 1/31/2025 | 54,020 | Hettlingen | Ery 3.5g US | Ery | 15000 | 4 | 3.54 |
| 17478-0070-35 | Erythromycin Ophth Ointment | 0.5%, 3.5g, 1 Tube / EA | 435401 | 2/28/2025 | 51,890 | Hettlingen | Ery 3.5g US | Ery | 15000 | 4 | 3.54 |
| 17478-0070-35 | Erythromycin Ophth Ointment | 0.5%, 3.5g, 1 Tube / EA | 435153 | 1/31/2025 | 51,900 | Hettlingen | Ery 3.5g US | Ery | 15000 | 4 | 3.54 |
| 17478-0070-35 | Erythromycin Ophth Ointment | 0.5%, 3.5g, 1 Tube / EA | 435141 | 12/31/2024 | 16,300 | Hettlingen | Ery 3.5g US | Ery | 15000 | 2 | 3.54 |
| 17478-0713-10 | Ofloxacin Ophth Sol 0.3% | 3mg/mL, 5mL, 1 Bottle / EA | 435311 | 1/31/2025 | 1,008 | Hettlingen | Ofloxacin 5ml | Oflox OS | 7200 | 1 | 2.39 |
| 17478-0713-10 | Ofloxacin Ophth Sol 0.3% | 3mg/mL, 5mL, 1 Bottle / EA | 435549 | 1/31/2025 | 57,156 | Hettlingen | Ofloxacin 5ml | Oflox OS | 7200 | 8 | 2.39 |
| 17478-0713-10 | Ofloxacin Ophth Sol 0.3% | 3mg/mL, 5mL, 1 Bottle / EA | 435493 | 12/31/2024 | 57,600 | Hettlingen | Ofloxacin 5ml | Oflox OS | 7200 | 8 | 2.39 |
| 17478-0713-10 | Ofloxacin Ophth Sol 0.3% | 3mg/mL, 5mL, 1 Bottle / EA | 435492 | 12/31/2024 | 57,420 | Hettlingen | Ofloxacin 5ml | Oflox OS | 7200 | 8 | 2.39 |
| 17478-0713-10 | Ofloxacin Ophth Sol 0.3% | 3mg/mL, 5mL, 1 Bottle / EA | 435543 | 12/31/2024 | 57,828 | Hettlingen | Ofloxacin 5ml | Oflox OS | 7200 | 9 | 2.39 |

**Exhibits**

| 17478-0713-11 | Ofloxacin Ophth Solution 0.3% | 3mg/mL, 10mL, 1 Bottle | 435102 | 11/30/2024 | 4,392 | Hettlingen | Ofloxacin 10ml | Oflox OS | 7200 | 1 | 5.44 |
| 17478-0713-11 | Ofloxacin Ophth Solution 0.3% | 3mg/mL, 10mL, 1 Bottle | 435489 | 11/30/2024 | 16,812 | Hettlingen | Ofloxacin 10ml | Oflox OS | 7200 | 3 | 5.44 |
| 17478-0717-10 | Ketotifen Fumarate Sol 0.025% | 5mL, 1 Bottle/EA | 434818 | 10/31/2025 | 67,702 | Hettlingen | Ketotifen 5ml | Ketotifen | 7200 | 10 | 3.84 |
| 17478-0717-10 | Ketotifen Fumarate Sol 0.025% | 5mL, 1 Bottle/EA | 434827 | 10/31/2025 | 69,816 | Hettlingen | Ketotifen 5ml | Ketotifen | 7200 | 10 | 3.84 |
| 17478-0717-10 | Ketotifen Fumarate Sol 0.025% | 5mL, 1 Bottle/EA | 434850 | 10/31/2025 | 63,756 | Hettlingen | Ketotifen 5ml | Ketotifen | 7200 | 9 | 3.84 |
| 17478-0717-10 | Ketotifen Fumarate Sol 0.025% | 5mL, 1 Bottle/EA | 435500 | 10/31/2025 | 46,044 | Hettlingen | Ketotifen 5ml | Ketotifen | 7200 | 7 | 3.84 |
| 17478-0717-10 | Ketotifen Fumarate Sol 0.025% | 5mL, 1 Bottle/EA | 435501 | 10/31/2025 | 71,532 | Hettlingen | Ketotifen 5ml | Ketotifen | 7200 | 10 | 3.84 |
| 17478-0830-05 | Loteprednol Etabonate Opth Gel | 5mg/g, 5gm, 1 Bottle | 434563 | 9/30/2024 | 29,568 | Hettlingen | Lote Gel | Loteprednol | 7200 | 5 | 69.81 |
| 50383-0249-71 | Bromfenac Ophthalmic Sol 1.7mL | 0.09% | 435091 | 5/31/2024 | 25,896 | Hettlingen | Bromfenac | Bromfenac | 6048 | 5 | 72.53 |

**Exhibits**