**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>AKORN HOLDING COMPANY LLC, *et al.*[1]<br><br>Debtors. | Chapter 7<br><br>Case No. 23-10253 (KBO)<br>(Jointly Administered)<br><br>**Re D.I. 106, 137** |

**ASSET PURCHASE AGREEMENT**

**dated as of May 25, 2023**
BY AND BETWEEN
HIKMA PHARMACEUTICALS USA INC.,
ALCON PHARMACEUTICALS LTD,
STIRA PHARMACEUTICALS, LLC,
EPIC PHARMA LLC,
SAPTALIS PHARMACEUTICALS, LLC,
PAI HOLDINGS LLC D/B/A PHARMACEUTICAL ASSOCIATES, INC.,
MISSION PHARMACAL COMPANY,
CHARTWELL RX SCIENCES LLC,
AUROBINDO PHARMA USA, INC.,
AND
SENTISS AG,

EACH AS AN INDIVIDUAL PURCHASER, AND
GEORGE L. MILLER, THE CHAPTER 7 TRUSTEE OF THE ESTATES OF AKORN HOLDING COMPANY LLC, AKORN INTERMEDIATE COMPANY LLC AND AKORN OPERATING COMPANY LLC
AS SELLER

Dated: May 26, 2023           COZEN O'CONNOR

                   */s/ John T. Carroll III*
                   John T. Carroll, III (DE No. 4060)
                   Simon E. Fraser (DE No. 5335)
                   1201 N. Market Street
                   Suite 1001
                   Wilmington, DE  19801
                   (302) 295-2000 Phone
                   (302) 295-2013 Fax No.
                   jcarroll@cozen.com
                   sfraser@cozen.com

                   *Counsel for the Trustee*
                   *George L. Miller*

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of their federal tax identification numbers, and cases numbers are Akorn Holding Company LLC (9190), Case No. 23-10253 (KBO); Akorn Intermediate Company LLC (6123), Case No. 23-10254 (KBO); and Akorn Operating Company LLC (6184), Case No. 23- 10255. The Debtors' headquarters is located at 5605 CenterPoint Court, Gurnee, IL 60031.

63912919\1

*Execution Version*

**ASSET PURCHASE AGREEMENT**
**dated as of May 25, 2023**

BY AND BETWEEN

HIKMA PHARMACEUTICALS USA INC.,
ALCON PHARMACEUTICALS LTD,
STIRA PHARMACEUTICALS, LLC,
EPIC PHARMA LLC,
SAPTALIS PHARMACEUTICALS, LLC,
PAI HOLDINGS LLC d/b/a PHARMACEUTICAL ASSOCIATES, INC.,
MISSION PHARMACAL COMPANY,
CHARTWELL RX SCIENCES LLC,
AUROBINDO PHARMA USA, INC.,
AND
SENTISS AG,

EACH AS AN INDIVIDUAL PURCHASER

AND

GEORGE L. MILLER, THE CHAPTER 7 TRUSTEE OF THE ESTATES OF AKORN HOLDING COMPANY LLC, AKORN INTERMEDIATE COMPANY LLC AND AKORN OPERATING COMPANY LLC

AS SELLER

# TABLE OF CONTENTS

**Page**

**ARTICLE I DEFINITIONS** ................................................................. 2

**ARTICLE II PURCHASE AND SALE OF ASSETS** ................................. 6

Section 2.1    Sale and Transfer of Purchased Assets ............................ 6
Section 2.2    Assumed Liabilities .......................................................... 6
Section 2.3    Excluded Liabilities. ........................................................ 7
Section 2.4    Assumption/ Rejection of Certain Contracts/Leases. .......... 8

**ARTICLE III** ........................................................................................ 9

**CONSIDERATION** ............................................................................. 9
Section 3.1    Purchase Price. ................................................................. 9
Section 3.2    Payment of the Consideration ......................................... 11
Section 3.3    Allocation of Purchase Price ........................................... 11
Section 3.4    Withholding .................................................................... 11

**ARTICLE IV CLOSING** .................................................................... 11

Section 4.1    Closing. ......................................................................... 11
Section 4.2    Deliveries by Seller ........................................................ 12
Section 4.3    Deliveries by Purchaser .................................................. 12

**ARTICLE V REPRESENTATIONS AND WARRANTIES OF SELLER** ......... 12

Section 5.1    Authorization; Enforceability ......................................... 12
Section 5.2    No Other Representations or Warranties ......................... 13

**ARTICLE VI REPRESENTATIONS AND WARRANTIES OF PURCHASER** ... 13

Section 6.1    Organization ................................................................... 13
Section 6.2    Authorization; Enforceability ......................................... 13
Section 6.3    No Conflicts ................................................................... 14
Section 6.4    Consents and Approvals ................................................. 14
Section 6.5    Financial Capability ....................................................... 14
Section 6.6    Broker's, Finder's or Similar Fees .................................. 14

**ARTICLE VII BANKRUPTCY COURT MATTERS** .............................. 14

Section 7.1    Bankruptcy Actions ........................................................ 14
Section 7.2    [intentionally omitted] ................................................... 14
Section 7.3    Approval ........................................................................ 14
Section 7.4    [intentionally omitted]. ................................................... 14
Section 7.5    Highest and Best Bids; Adequate Assurance. ................... 15

i

Section 7.6    Cure Amount...................................................................................... 15
Section 7.7    Sale Order .......................................................................................... 15
Section 7.8    Sale Free and Clear. .......................................................................... 15
Section 7.9    Consultation with Purchaser .............................................................. 15

**ARTICLE VIII COVENANTS AND AGREEMENTS** ....................................... 16

Section 8.1    Tax Matters. ....................................................................................... 16
Section 8.2    [intentionally omitted]. ...................................................................... 16
Section 8.3    Notification.. ...................................................................................... 16
Section 8.4    [intentionally omitted.] ...................................................................... 16
Section 8.5    Access to Information; FDA Transfer Letters. ................................... 16
Section 8.6    Recalls................................................................................................ 17
Section 8.7    Further Assurances. ........................................................................... 17

**ARTICLE IX CONDITIONS** ............................................................................... 18

Section 9.1    Conditions Precedent to Performance by Seller and Purchaser ....... 18
Section 9.2    Conditions to Obligations of Purchaser ............................................ 18
Section 9.3    Conditions to Obligations of Seller ................................................... 19

**ARTICLE X TERMINATION** ............................................................................. 19

Section 10.1   Termination........................................................................................ 19
Section 10.2   Effect of Termination......................................................................... 20

**ARTICLE XI MISCELLANEOUS** ...................................................................... 21

Section 11.1    Survival of Covenants, Representations and Warranties................... 21
Section 11.2    Amendment and Modification ........................................................... 21
Section 11.3    Notices ............................................................................................... 21
Section 11.4    Counterparts....................................................................................... 25
Section 11.5    Mutual Drafting ................................................................................. 25
Section 11.6    Entire Agreement; No Third Party Beneficiaries............................... 25
Section 11.7    Severability ........................................................................................ 25
Section 11.8    Governing Law ................................................................................... 26
Section 11.9    Exclusive Jurisdiction ........................................................................ 26
Section 11.10  Remedies............................................................................................. 26
Section 11.11  Specific Performance. ........................................................................ 26
Section 11.12  Assignment ......................................................................................... 27
Section 11.13  Headings ............................................................................................. 27
Section 11.14  No Consequential or Punitive Damages ............................................. 27
Section 11.15  "As Is" Transaction ............................................................................ 27
Section 11.16  Bulk Transfer Notices ......................................................................... 27
Section 11.17  Independent Nature of Purchasers' Obligations and Rights.. ............ 27
Section 11.18  Interpretation....................................................................................... 28

ii

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of May 25, 2023 (the "Execution Date"), is made and entered into by and between Hikma Pharmaceuticals USA Inc., ("Hikma"), Alcon Pharmaceuticals Ltd ("Alcon"), Stira Pharmaceuticals, LLC ("Stira"), Epic Pharma LLC ("Epic"), Saptalis Pharmaceuticals, LLC ("Saptalis"), PAI Holdings, LLC d/b/a Pharmaceutical Associates, Inc. ("PAI"), Mission Pharmacal Company ("Mission"), Chartwell Rx Sciences LLC ("Chartwell"), Aurobindo Pharma USA, Inc. ("Aurobindo"), and Sentiss AG ("Sentiss" and, together with Hikma, Alcon, Stira, Epic, Saptalis, PAI, Mission, Chartwell, and Aurobindo, "Purchasers" and each individually, a "Purchaser") and George L. Miller, the chapter 7 trustee (the "Trustee" or "Seller") of the chapter 7 estates (collectively, the "Estates") of Akorn Holding Company LLC ("Holdings"), Akorn Intermediate Company LLC ("Intermediate") and Akorn Operating Company LLC ("Operating", and together with Holdings and Intermediate, "Debtors" and each entity individually, a "Debtor").

## RECITALS

WHEREAS, on February 23, 2023, Debtors each filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code, as amended (the "Bankruptcy Code"), commencing a chapter 7 case (each, a "Bankruptcy Case" and, collectively, the "Bankruptcy Cases") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, each Purchaser, severally and not jointly, desires to purchase and acquire from Seller, acting on behalf of the Estates, certain assets and rights and assume certain liabilities;

WHEREAS, each Purchaser is a separate entity and no Purchaser is an affiliate of or otherwise related to any other Purchaser;

WHEREAS, this Agreement constitutes a separate agreement as to each Purchaser;

WHEREAS, Seller desires to sell, convey, assign and transfer such assets and rights and such liabilities to each respective Purchaser, in the manner and subject to the terms and conditions set forth herein and as authorized under, among other things, Sections 105 and 363 of the Bankruptcy Code;

WHEREAS, Seller's ability to consummate the Transactions set forth in this Agreement is subject to, among other things, the entry of the Sale Order by the Bankruptcy Court; and

WHEREAS, the Seller has determined that it is advisable and in the Estates' best interests to enter into this Agreement and to consummate the Transactions provided for herein, subject to entry of the Sale Order, and has approved the same.

NOW, THEREFORE, in consideration of the foregoing premises and the representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

# ARTICLE I

# DEFINITIONS

For all purposes of this Agreement, except as otherwise expressly provided or unless the context clearly requires otherwise:

"Affiliate" means, with respect to any Person, any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Agreement" or "this Agreement" means this Asset Purchase Agreement, together with the Exhibits hereto and the exhibits and schedules thereto.

"Allocation Statement" has the meaning set forth in Section 3.3.

"Alternative Transaction" means the sale, transfer or other disposition, directly or indirectly, including through an asset sale, share sale, merger, amalgamation or other similar transaction resulting from the Auction, of a material portion of the Estates' assets, in a transaction or series of transactions with one or more Persons other than Purchaser.

"Applicable Law" means any law, regulation, rule, order, judgment, guideline or decree to which any Purchased Asset is, or the Estates are, subject.

"Assigned Contracts/Leases" means, with respect to each Purchaser, the contracts and/or leases listed on such Purchaser's *Schedule 2.1(a)(i)* attached hereto, including all extension, renewal and option rights thereunder.

"Assumed Liabilities" has the meaning set forth in Section 2.2.

"Auction" has the meaning ascribed to such term in the Bidding Procedures Order.

"Bankruptcy Case" or "Bankruptcy Cases" has the meaning set forth in the recitals hereof.

"Bankruptcy Code" has the meaning set forth in the recitals hereof.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure.

"Bidding Procedures" means the bidding and auction procedures set forth in, and approved by, the Bidding Procedures Order.

"Bidding Procedures Order" means the order entered by the Bankruptcy Court in the Bankruptcy Case at Docket No. 137.

"Bill of Sale" means the bill of sale substantially in the form attached as **Exhibit B-1** hereto.

"Business Day" means any day other than a Saturday, Sunday or a day on which banks in New York are authorized or obligated by Applicable Law or executive order to close or are otherwise generally closed.

"Claim" has the meaning set forth in 11 U.S.C. § 101(5).

"Closing" means, with respect to each Purchaser, the consummation of all Transactions contemplated in this Agreement as to which such Purchaser is a party.

"Closing Date" has the meaning set forth in Section 4.1(b).

"Contract" means any written or oral contract, purchase order, service order, sales order, indenture, note, bond, lease, sublease, mortgage, agreement, guarantee, license or other agreement, arrangement, instrument or commitment, in each case that is binding upon a Person.

"Conveyance Documents" means (a) the Bill of Sale; (b) the Instrument of Assumption; (c) the Seller FDA Transfer Letters; and/or (d) all documents of title and instruments of conveyance necessary to Transfer record and/or beneficial ownership to each Purchaser of such Purchaser's Purchased Assets from the Estates which require execution, endorsement and/or delivery of a certificate of title or other document in order to vest record or beneficial ownership thereof in such Purchaser.

"Cure Amount" means all cure costs required to be paid pursuant to Section 365 of the Bankruptcy Code by a Purchaser in connection with the assumption and assignment to such Purchaser of such Purchaser's designated Assigned Contracts/Leases.

"Damages" means actual out-of-pocket losses, damages, liabilities, costs or expenses, including reasonable attorneys' fees.

"Debtor" or "Debtors" has the meaning set forth in the preamble hereof.

"Documents" means all of the Debtors' and Estates' current or historical written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies, and documents, tax returns, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, maintenance schedules, functional requirements, operating instructions, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), consulting materials, opinions and other documents commissioned by or on behalf of any Debtor, development, quality control, quality assurance, regulatory, pharmacovigilance records and other regulatory documents, and other books and records of the Debtors and the Estates, in each case whether or not in electronic form, and in each case relating to the Purchased Assets.

"Estates" has the meaning set forth in the preamble hereof.

"Execution Date" has the meaning set forth in the preamble hereof.

"FDA" means the United States Food and Drug Administration.

"Government Approvals" has the meaning set forth in Section 8.2(a).

3

"Governmental Entity" means any foreign, national, federal, state, municipal, local, provincial, territorial, government or any department, commission, board, bureau, agency, regulatory authority or instrumentality thereof, or any court, judicial, administrative or arbitral body or public or private tribunal, including any United States or other such entity anywhere in the world.

"HSR Act" means the Hart Scott Rodino Antitrust Improvements Act of 1976, as amended.

"Improvements" means all improvements located on the Land, including without limitation, any and all buildings, structures, facilities, amenities and other improvements constructed or located on or under the Land.

"Instrument of Assumption" means, as to each Purchaser, the instrument of assumption substantially in the form attached as **Exhibit B-2**.

"IRS" means the United States Internal Revenue Service.

"IRS Code" means the Internal Revenue Code of 1986, as amended.

"Liabilities" means all Claims, demands, expenses, commitments and obligations (whether accrued or not, known or unknown, disclosed or undisclosed, matured or unmatured, fixed or contingent, asserted or unasserted, liquidated or unliquidated, arising prior to, at or after the commencement of the Bankruptcy Case) of or against the Debtors or the Estates or any of the Purchased Assets.

"Lien" or "Liens" means, with respect to any asset, any mortgage or deed of trust, pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any lease or title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Uniform Commercial Code of any jurisdiction) and, in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Order" shall mean any order, ruling, decision, verdict, decree, writ, subpoena, mandate, precept, command, directive, consent, approval, award, judgment, injunction, or other similar determination or finding by, before, or under the supervision of any Governmental Entity, or any arbitrator, mediator, or other quasi-judicial or judicially sanctioned Person or body.

"Organizational Documents" means with respect to any Person, its certificate of incorporation, formation or organization (or comparable) document, its by-laws, partnership agreement or any certificate of formation, limited liability company agreement or operating agreement, or any other similar organizational instrument or document governing such Person or applicable to ownership.

"Outside Date" means the date that is sixty (60) days after entry of the Sale Order.

"Permits" means permits, certificates, licenses, filings, approvals and other authorizations of any Governmental Entity.

"Person" means any individual, sole proprietorship, partnership, limited liability company, joint venture, trust, incorporated organization, association, corporation, institution, public benefit corporation, Governmental Entity or other entity.

"Product" means each product manufactured, commercialized, developed, packaged, labeled, stored, marketed, imported, exported, distributed or sold by or on behalf of the business of the Debtors, that are regulated as human or animal drugs or combination products.

"Product Registration" means (a) any investigational new drug application, investigational new animal drug files, generic investigational new animal drug files, New Drug Application, Abbreviated New Drug Application, New Animal Drug Application, Abbreviated New Animal Drug Application (each as defined by the FDA), or similar regulatory application of the Sellers for any Product that has been submitted to or approved by the FDA in the United States (other than withdrawn submissions or approvals), including any related CBE-30s; and (b) all marketing approvals, clearances, registrations, certifications, markings, consents or other authorizations required to market the Products and granted or pending with any Governmental Entity, in each case as amended, supplemented or otherwise modified.

"Purchase Price" has the meaning, with respect to each Purchaser, set forth in Section 3.1.

"Purchased Assets" means, with respect to each Purchaser, all of the Estates' right, title and interest in and to the assets and the Assigned Contracts/Leases set forth on such Purchaser's *Schedule 2.1(a)*.

"Purchaser" has the meaning set forth in the preamble hereof.

"Registration Information" means any and all original Product Registrations, together with all Regulatory Documentation.

"Regulatory Documentation" means (i) all regulatory filings, underlying data, datasets and supporting documents (including copies of all material correspondence between any of Debtors or their Affiliates and the applicable Governmental Entity), chemical, manufacturing and controls (CMC) data and documentation, preclinical and clinical studies and tests, (ii) Product Registrations, and all regulatory files related thereto, current approved packaging and any other existing files and dossiers, including the underlying data, datasets or information used to support, maintain or obtain marketing authorization, (iii) all records maintained under record keeping or reporting laws of the FDA or any other Governmental Entity, including all marketing applications, annual and safety reports, master files, FDA warning letters, FDA notices of adverse finding letters, FDA audit reports (including any responses to such reports), periodic safety update reports, complaint files, and annual product quality reviews, and (iv) the complete complaint, adverse event and medical inquiry filings with respect to any Product line as required by applicable laws, including the Product Registrations.

"Required Deposit" means, with respect to a Purchaser, ten percent (10%) of the cash portion of the Purchase Price payable by such Purchaser to Seller upon execution of this Agreement, except to the extent already paid by such Purchaser, to be held in accordance with the Bidding Procedures.

"Sale Order" means an order of the Bankruptcy Court substantially in the form and substance of **Exhibit A,** any material change to which must be acceptable to the Purchaser. For the avoidance of doubt, a separate Sale Order will be entered with respect to each Purchaser's Transactions.

"Seller" has the meaning set forth in the preamble hereof.

"Seller FDA Transfer Letters" means the letters/filings from the applicable holders of a Product Registration constituting a Purchased Asset, including any New Drug Application, Abbreviated New Drug Application, New Animal Drug Application and Abbreviated New Animal Drug Application

(each as defined by the FDA), duly executed, notifying the FDA of the transfer of the rights to the applicable Product Registration to the respective Purchaser that is the purchaser of such Purchased Asset.

"Tax" or "Taxes" means any and all United States federal, state, local or non-United States taxes, fees, levies, duties, tariffs, imposts, and other similar charges on or with respect to net income, alternative or add-on minimum, gross income, gross receipts, sales, use, *ad valorem*, franchise, capital, paid-up capital, profits, license, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property, environmental, or windfall profit tax, customs duties, value added or other tax, governmental fee or other like assessment or charge of any kind whatsoever, together with any interest or any penalty, addition to tax or additional amount imposed by any Governmental Entity responsible for the imposition of any such tax, in each case and as to each Purchaser solely in respect of such Purchaser's Purchased Assets, Assumed Liabilities and Transactions hereunder.

"Tax Authority" means any Governmental Entity with responsibility for, and competent to impose, collect or administer, any form of Tax.

"Tax Return" means any return, claim, election, information return, declaration, report, statement, schedule, or other document required to be filed in respect of Taxes and amended Tax Returns and claims for refund.

"Transactions" means, with respect to each Purchaser, all the transactions provided for or contemplated by this Agreement and/or any other document required hereunder related to such Purchaser's Purchased Assets and Assumed Liabilities.

"Transfer" means sell, convey, assign, transfer, deliver or otherwise dispose of, and "Transferable" shall have a corollary meaning.

"Transfer Taxes" means all goods and services, harmonized sales, excise, sales, use, transfer, stamp, stamp duty, recording, value added, gross receipts, documentary, filing, and all other similar Taxes or duties, fees or other like charges, however denominated (including any real property transfer taxes and conveyance and recording fees and notarial fees), in each case including interest, penalties or additions attributable thereto whether or not disputed, arising out of or in connection with the Transactions, regardless of whether the Governmental Entity seeks to collect the Transfer Tax from Seller or a Purchaser.

"Trustee" has the meaning set forth in the preamble herein.

## ARTICLE II

## PURCHASE AND SALE OF ASSETS

Section 2.1    Sale and Transfer of Purchased Assets.  On the terms and subject to the conditions set forth in this Agreement, on the Closing Date, Seller shall Transfer to each Purchaser, severally and not jointly, and each Purchaser, severally and not jointly, shall purchase, acquire, assume and accept from the Estates, to the extent permitted by the Bankruptcy Code, free and clear of all Liens and Liabilities (except for any Assumed Liabilities), all of the Estates' right, title and interest in and to the specific Purchased Assets designated to each individual Purchaser as described in such Purchaser's *Schedule 2.1(a)*.

Section 2.2    Assumed Liabilities.

(a)    On the terms and subject to the conditions set forth herein and in the Sale Order, effective as of the Closing, each Purchaser shall assume from Seller (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Seller shall convey, transfer, and assign to each Purchaser, all Liabilities arising out of the ownership or operation of such Purchaser's respective Purchased Assets, in each case, by each such Purchaser solely to the extent arising from periods occurring after the Closing (but, in each case, excluding any of the Excluded Liabilities listed in Section 2.3(a) through Section 2.3(h)) (the "Assumed Liabilities"). The assumption by a Purchaser of the Assumed Liabilities shall not, in any way, expand the rights of any third party relating thereto. No Purchaser shall assume, nor shall be deemed to have assumed, nor shall be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities other than such Purchaser's Assumed Liabilities.

(b)    The Assumed Liabilities are several and not joint. No Purchaser shall have any liability or responsibility whatsoever with respect to any other Purchaser's Assumed Liabilities.

Section 2.3    Excluded Liabilities. Notwithstanding any other provision of this Agreement, and without limiting the generality of the last sentence of Section 2.2(a), no Purchaser shall assume nor shall be deemed to have assumed, nor shall be obligated to pay, perform, discharge or otherwise satisfy or in any other manner be liable or responsible for, any of the Liabilities set forth below, or any other Liabilities of, or Actions against, Seller, any Estate, any Debtor or any of their respective Affiliates, or Liabilities or Actions arising from or relating to such Purchaser's Purchased Assets, that are not expressly included in the Assumed Liabilities, including the following Liabilities (all of the foregoing, collectively, the "Excluded Liabilities"):

(a)    any and all Liabilities arising out of or relating to the ownership or operation of the Purchased Assets prior to the Closing (whether such Liability arises prior to or after the Closing), including any Liabilities with respect to (i) any recall or market withdrawal announced prior to or after the Closing with respect to any Product manufactured or sold by or on behalf of the Debtors or any of their respective Affiliates, including any further requirements that may be imposed by the FDA with respect to any such recall or market withdrawal (collectively, the "Recalls"), (ii) the commercialization or sale of any Product prior to the Closing (including any Liabilities with respect to any returns, chargebacks, rebates arising from commercialization or sale of any Product prior to the Closing) or (iii) any other act, omission or event occurring prior to the Closing);

(b)    any and all Liabilities in respect of any Contract that is not included in the Purchased Assets;

(c)    any and all Liabilities associated with the Products labeled under any of the Debtors' National Drug Code numbers;

(d)    any and all Liabilities with respect to any inventory of Products existing as of the Closing Date (including the commercialization or disposal thereof);

(e)    any and all Liabilities arising from or related to any Action against Seller, any Estate, any Debtor or any of their respective Affiliates, pending or threatened or having any other status or with respect to facts, actions, or omissions, including any successor liability claims or that may be owed to or assessed by, any Governmental Body or other Person, and whether commenced, filed, initiated, or threatened prior to, on or following the Closing;

7

(f)        any Liability for Taxes (x) of Seller, any Estate, any Debtor or any of their respective Affiliates, whether arising prior to, on, or after the Closing Date or (y) arising from the ownership or operation of any of the Purchased Assets by Seller on or prior to the Closing (other than Transfer Taxes);

(g)        any and all Liabilities related to any current or former employee of any Estate, any Debtor or any of their respective Affiliates; and

(h)        any and all Liabilities arising under Section 503(b)(9) of the Bankruptcy Code with respect to any Purchased Assets.

For the avoidance of doubt, no Purchaser is assuming hereunder, nor shall have any Liability to any Party for any Taxes that are attributable to taxable periods (or portions thereof) ending on or prior to such Purchaser's Closing Date.

Section 2.4        <u>Assumption/ Rejection of Certain Contracts/Leases.</u>

(a)        Each Purchaser's *Schedule 2.1(a)* sets forth a list of all executory Contracts and/or Leases to which a Debtor is a party which based upon such Purchaser's designation are to be included in the Assigned Contracts/Leases to be assumed and assigned to such Purchaser.  From time to time, a Purchaser in accordance with Section 2.4(b) may update such Purchaser's *Schedule 2.1(a)*.  Seller shall provide timely and proper written notice of the motion seeking entry of the Sale Order to all parties to any executory Contracts or unexpired leases that are Assigned Contracts/Leases and take all other actions necessary or otherwise required to cause such Contracts and/or Leases to be assumed by Seller and assigned to the respective Purchasers pursuant to Section 365 of the Bankruptcy Code to the extent that such Contracts and/or Leases are Assigned Contracts/Leases as of the Closing (including (x) serving on all non-Seller counterparties to all of the Assigned Contracts/Leases a notice specifically stating that Seller is or may be seeking the assumption and assignment of such Contract(s)/Lease(s), listing the Cure Amount associated with each such Contract(s)/Lease(s), and stating the deadline for objecting to the Cure Amount or any other aspect of the proposed assumption and assignment of their Assigned Contracts and/or Leases to each respective Purchaser and (y) taking, as promptly as practicable, all other actions reasonably requested by any Purchaser to facilitate any negotiations with the counterparties to such Assigned Contracts/Leases and to obtain an Order, including a finding that the proposed assumption and assignment of the Assigned Contracts/Leases to each Purchaser satisfies all applicable requirements of Section 365 of the Bankruptcy Code).  The Sale Order shall provide that as of and conditioned on the occurrence of the Closing, Seller shall assign or cause to be assigned to each Purchaser, as applicable, such Purchaser's respective Assigned Contracts/Leases. No Purchaser shall have any obligation to pay any Cure Amount for any Contract or Lease that is not an Assigned Contract/Lease designated by such Purchaser, including without limitation any Assigned Contract/Lease previously designated by such Purchaser that is removed from such Purchaser's *Schedule 2.1(a)* in accordance with Section 2.4(b).

(b)        Each Purchaser shall have the right to notify Seller in writing up until 12:00 p.m. ET on June 2, 2023 of any Contracts and/or Leases that such Purchaser wishes to add as an Assigned Contract/Lease ("Added Contract(s)/Lease(s)").  The Seller shall file a motion in the Bankruptcy Case on or before June 5, 2023 for entry of an order (a "Second Assumption Order") authorizing the Trustee to assume and assign such Added Contract(s)/Leases pursuant to Section 365 of the Bankruptcy Code.  Upon the entry of the Second Assumption Order, any such Added Contract(s)/Lease(s) for which assumption and assignment was approved by Second Assumption Order shall be deemed added to such Purchaser's *Schedule 2.1(a)*.  For the avoidance of doubt, the Purchaser shall be responsible for the payment of the Cure Amount if any, relating to any Added Contract(s)/Lease(s).  *Schedule 2.4(b)* includes each Purchaser's preliminary list of Added Contract(s)/Lease(s).  In addition, each Purchaser shall have up to one (1) Business Day prior to Closing to notify Seller of any previously designated Assigned Contracts/Leases

8

which such Purchaser no longer wishes to have assumed and assigned to such Purchaser and any such Contracts and/or Leases shall be deemed removed from the Schedules of Assigned Contracts/Leases, and shall no longer constitute Assigned Contracts/Leases, without any adjustment to the Purchase Price.

(c)     Notwithstanding the foregoing, a Contract shall not be an Assigned Contract/Lease hereunder and shall not be assigned to, or assumed by, a Purchaser to the extent that such Contract (1) expires by its terms on or prior to such time as it is to be assumed by a Purchaser as an Assigned Contract hereunder or is incapable of being assumed or assigned pursuant to section 365 of the Bankruptcy Code, (2) requires Government Approval (other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to a Purchaser of the Seller's rights under such Contract in accordance with applicable law, and such Government Approval has not been obtained, (3) to the extent that the assignment of all or any portion of the Contract shall be prohibited by Law (including by Order of a Governmental Entity), or (4) requires a consent, or advance notice to, a counterparty (if any) or requires the consent of any other third party that has not been obtained as of the Closing, and which restriction, consent right or right to advance notice cannot be effectively overridden or canceled by any order of the Bankruptcy Court or any provision of the Bankruptcy Code.  In the event that any Contract that would otherwise have been assigned to a Purchaser is deemed not to be assigned pursuant to clause (2) of the first sentence of this Section 2.4(c), the Closing shall, subject to the satisfaction of the conditions set forth in Article IX, nonetheless take place subject to the terms and conditions set forth herein and, thereafter, through the earliest of (w) such time as such Government Approval is obtained, (x) the expiration of the term of such Contract in accordance with its current term, (y) the execution of a replacement Contract by such Purchaser and (z) the closing of the Bankruptcy Case, Seller and such Purchaser shall (A) use reasonable efforts to secure such Government Approval as promptly as practicable after the Closing and (B) cooperate in good faith in any lawful and commercially reasonable arrangement proposed by such Purchaser, including subcontracting, licensing, or sublicensing to such Purchaser any or all of any Seller's rights and obligations with respect to any such Assigned Contract, under which (1) such Purchaser shall receive the claims, rights, remedies and benefits under, or arising pursuant to, the terms of such Assigned Contracts/Leases with respect to which the Government Approval has not been obtained and (2) subject to receiving any such claims, rights, remedies and benefits, such Purchaser shall thereafter assume and bear all Assumed Liabilities with respect to such Assigned Contract from and after the Closing (as if such Assigned Contracts/Leases had been transferred to such Purchaser as of the Closing) in accordance with this Agreement (including by means of any subcontracting, sublicensing or subleasing arrangement).  Upon satisfying any requisite Government Approval requirement applicable to such Assigned Contracts/Leases after the Closing, such Assigned Contracts/Leases shall promptly be transferred and assigned to such Purchaser in accordance with the terms of this Agreement, the Sale Order and the Bankruptcy Code, and otherwise without any further additional consideration.  Without limitation of the foregoing, prior to the Closing, Seller shall cooperate with each Purchaser in connection with obtaining any consent, including by providing each Purchaser with reasonable access to and facilitating discussions with the applicable counterparties (provided each Purchaser shall provide Seller a reasonable opportunity to consult with such Purchaser, and, if reasonably practicable, an opportunity to be present (but not participate) at any meeting) in respect of such consents, and shall use reasonable efforts to assist each Purchaser with obtaining such consents as promptly as practicable after the date hereof and prior to the Closing.

## ARTICLE III

## CONSIDERATION

Section 3.1     <u>Purchase Price</u>.

9

(a)     The aggregate consideration for the sale and transfer of the Purchased Assets to Hikma will be (a) Sixty-Four Million Three Hundred Sixty Thousand Dollars ($64,360,000 USD) in cash (the "Hikma Purchase Price"), plus (b) the Cure Amounts related to the Assumed Contracts/Leases set forth on Hikma's *Schedule 2.1(a)*, plus (c) the assumption by Hikma of the Assumed Liabilities solely to the extent related to Hikma's Purchased Assets.

(b)     The aggregate consideration for the sale and transfer of the Purchased Assets to Alcon will be (a) Nine Million Two Hundred Thousand Dollars ($9,200,000 USD) in cash (the "Alcon Purchase Price"), plus (b) the assumption by Alcon of the Assumed Liabilities solely to the extent related to Alcon's Purchased Assets.

(c)     The aggregate consideration for the sale and transfer of the Purchased Assets to Stira will be (a) Two Million Five Hundred Thousand Dollars ($2,500,000 USD) in cash (the "Stira Purchase Price"), plus (b) the Cure Amounts related to the Assumed Contracts/Leases set forth on Stira's *Schedule 2.1(a)*, plus (c) the assumption by Stira of the Assumed Liabilities solely to the extent related to Stira's Purchased Assets.

(d)     The aggregate consideration for the sale and transfer of the Purchased Assets to Epic will be (a) One Million Eight Hundred Eighty Thousand Dollars ($1,880,000 USD) in cash (the "Epic Purchase Price"), plus (b) the Cure Amounts related to the Assumed Contracts/Leases set forth on Epic's *Schedule 2.1(a)*, plus (c) the assumption by Epic of the Assumed Liabilities solely to the extent related to Epic's Purchased Assets.

(e)     The aggregate consideration for the sale and transfer of the Purchased Assets to Saptalis will be (a) One Million Five Hundred Thirty Thousand Dollars ($1,530,000 USD) in cash (the "Saptalis Purchase Price"), plus (b) the assumption by Saptalis of the Assumed Liabilities solely to the extent related to Saptalis's Purchased Assets.

(f)     The aggregate consideration for the sale and transfer of the Purchased Assets to PAI will be (a) One Million Four Hundred Seventy-Five Thousand Dollars ($1,475,000 USD) in cash (the "PAI Purchase Price"), plus (b) the assumption by PAI of the Assumed Liabilities solely to the extent related to PAI's Purchased Assets.

(g)     The aggregate consideration for the sale and transfer of the Purchased Assets to Mission will be (a) One Million Dollars ($1,000,000 USD) in cash (the "Mission Purchase Price"), plus (b) the assumption by Mission of the Assumed Liabilities solely to the extent related to Mission's Purchased Assets.

(h)     The aggregate consideration for the sale and transfer of the Purchased Assets to Chartwell will be (a) Eight Hundred Twenty-Five Thousand Dollars ($825,000 USD) in cash (the "Chartwell Purchase Price"), plus (b) the assumption by Chartwell of the Assumed Liabilities solely to the extent related to Chartwell's Purchased Assets.

(i)     The aggregate consideration for the sale and transfer of the Purchased Assets to Aurobindo will be (a) Seven Hundred Thousand Dollars ($700,000 USD) in cash (the "Aurobindo Purchase Price"), plus (b) the Cure Amounts related to the Assumed Contracts/Leases set forth on Aurobindo's *Schedule 2.1(a)*, plus (c) the assumption by Aurobindo of the Assumed Liabilities solely to the extent related to Aurobindo's Purchased Assets.

(j)     The aggregate consideration for the sale and transfer of the Purchased Assets to Sentiss will be (a) Eighteen Million Seven Hundred Thousand Dollars ($18,700,000 USD) in cash (the "Sentiss

Purchase Price") plus (b) the Cure Amounts related to the Assumed Contracts/Leases set forth on Sentiss's *Schedule 2.1(a)*, plus (c) the assumption by Sentiss of the Assumed Liabilities solely to the extent related to Sentiss's Purchased Assets.

Section 3.2    <u>Payment of the Consideration</u>.    Seller acknowledges that each Purchaser has paid its respective Required Deposit on or before the date hereof. On each Purchaser's respective Closing Date, an amount equal to the Purchase Price for such Purchaser's Purchased Assets, less the Required Deposit, shall be paid by such Purchaser to Seller by wire transfer of immediately available funds to an account or accounts to be designated in writing by Seller not less than five (5) Business Days prior to the Closing Date, to the extent not previously paid.

Section 3.3    <u>Allocation of Purchase Price</u>.    Within sixty (60) days after a Purchaser's Closing Date, such Purchaser shall prepare and deliver to Seller a statement allocating the sum of the Purchase Price, the Assumed Liabilities and other relevant items among such Purchaser's Purchased Assets in accordance with Section 1060 of the IRS Code and the treasury regulations promulgated thereunder (such statement, the "<u>Allocation Statement</u>"), and the Allocation Statement shall be finalized upon reasonable consultation with Seller, and with Seller's consent, which consent shall not be unreasonably withheld or delayed.  The parties shall follow the Allocation Statement for purposes of filing IRS Form 8594 (and any supplements to such form) and all other Tax Returns, and shall not voluntarily take any position for tax purposes inconsistent therewith.  If the IRS or any other taxation authority proposes a different allocation, Seller or Purchaser, as the case may be, shall promptly notify the other party of such proposed allocation.  Seller or Purchaser, as the case may be, shall provide the other party with such information and shall take such actions (including executing documents and powers of attorney in connection with such proceedings) as may be reasonably requested by such other party to carry out the purposes of this Section.  Except as otherwise required by Applicable Law or pursuant to a "determination" under Section 1313(a) of the IRS Code (or any comparable provision of United States state, local, or non-United States law), (i) the transactions contemplated by Article II of this Agreement shall be reported for all Tax purposes in a manner consistent with the terms of this <u>Section 3.3</u>; and (ii) neither party (nor any of their Affiliates) will take any position inconsistent with this <u>Section 3.3</u> in any Tax Return, in any refund claim or in any tax litigation.  Notwithstanding the allocation of the Purchase Price set forth in the Allocation Statement, nothing in the foregoing shall be determinative of values ascribed to the Purchased Assets or the allocation of the value of the Purchased Assets by the Trustee for the purpose of his administration of the Bankruptcy Cases by way of liquidation, reorganization or otherwise.

Section 3.4    <u>Withholding</u>.    Notwithstanding anything contained in this Agreement to the contrary, each Purchaser shall be entitled to deduct and withhold from its respective Purchase Price otherwise payable pursuant to this Agreement to Seller such amounts as such Purchaser is required to deduct and withhold under Applicable Law.  To the extent that amounts are so deducted and withheld, such amounts shall be treated for all purposes of this Agreement as having been paid to Seller.

**ARTICLE IV**

**CLOSING**

Section 4.1    <u>Closing.</u>

(a)    Seller shall hold a separate Closing with each Purchaser. No Closing with a Purchaser shall be contingent upon Seller's Closing with any other Purchaser. Each Purchaser shall only be responsible for payment of the portion of the Purchase Price allocated to such Purchaser in Section 3.1 hereof.

(b)     Upon the terms and subject to the conditions of this Agreement, each Closing shall take place remotely via the electronic exchange of documents (or, if the parties agree to hold a physical closing, at the offices of Cozen O'Connor at 1650 Market Street, 28th Floor, Philadelphia, PA 19103) at 10:00 a.m. local time, as specified below, unless another date, time and/or place is agreed in writing by each of the parties to such Closing.

(c)     Each Closing shall occur on or before the date (the "Closing Date") that is not later than the third Business Day following the satisfaction and/or waiver of all conditions to the Closing as set forth in Article IX (other than conditions which by their nature can be satisfied only at the Closing), unless otherwise agreed by the parties to such Closing.

Section 4.2     Deliveries by Seller.  At each Closing, unless otherwise provided herein, Seller shall deliver or cause to be delivered to the Purchaser that is party to that Closing (unless previously delivered) each of the following:

(a)     the duly executed Bill of Sale and duly executed counterparts of each Conveyance Document in respect of the Purchased Assets;

(b)     a duly executed Instrument of Assumption for Purchased Assets and Assumed Liabilities; and

(c)     a certification of non-foreign status for the Estates in a form and manner that complies with the requirements of Section 1445 of the IRS Code and the treasury regulations promulgated thereunder.

Section 4.3     Deliveries by Purchaser.  At each Closing, the Purchaser that is party to that Closing shall deliver or cause to be delivered to Seller (unless previously delivered) each of the following:

(a)     the balance of the Purchase Price, less the Required Deposit, by wire transfer of immediately available funds to an account designated by Seller;

(b)     duly executed counterparts of each Conveyance Document, if applicable, in respect of the Purchased Assets; and

(c)     a duly executed Instrument of Assumption, if applicable, in respect of the Purchased Assets and Assumed Liabilities.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Purchaser that the statements contained in this Article V are true and correct as of the date of this Agreement, except as otherwise stated in this Article V.

Section 5.1     Authorization; Enforceability.  Subject to the entry of the Sale Order, Seller has all requisite power and authority to enter into, execute and deliver this Agreement and any other document to which Seller, on behalf of the Estates, is a party or is to be a party as required hereunder and to perform its obligations hereunder and thereunder.  The execution, delivery and performance by Seller of this Agreement and any other document to which Seller, on behalf of the Estates, is or is to be a party as required hereunder, and the consummation by Seller of the Transactions, have been duly authorized by all

necessary action on the part of Seller.  This Agreement has been and, when executed and delivered, any other document to which each of them is to be a party, will be, duly and validly executed and delivered by Seller and, subject to the entry of the Sale Order, constitutes (in the case of this Agreement) and will constitute (in the case of each such other document) the valid and binding obligation of Seller, on behalf of the Estates, enforceable against Seller in accordance with its terms, subject to laws of general application relating to bankruptcy, insolvency, and the relief of debtors and other laws of general application affecting enforcement of creditors' rights generally, rules of law governing specific performance, injunctive relief and other equitable remedies.

**Section 5.2** **No Other Representations or Warranties**.  **EXCEPT AS EXPRESSLY PROVIDED IN THIS ARTICLE V OR IN THE SALE ORDER, EACH PURCHASER AGREES AND ACKNOWLEDGES THAT THE TRANSFER OF THE PURCHASED  ASSETS IS MADE PURSUANT TO ORDER OF THE BANKRUPTCY COURT AND IS MADE "AS IS" AND "WHERE IS", AND ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY PROVIDED HEREIN, SELLER MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND WHATSOEVER WITH RESPECT TO THE PURCHASED ASSETS OR OTHERWISE, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY REPRESENTATION OR WARRANTY REGARDING THE TITLE OR CONDITION OF THE ASSETS OR THE FITNESS, DESIRABILITY, OR MERCHANTABILITY THEREOF OR SUITABILITY THEREOF FOR ANY PARTICULAR PURPOSE, OR ANY BUSINESS PROSPECTS, OR VALUATION OF THE PURCHASED ASSETS, OR THE COMPLIANCE OF THE ASSETS IN THEIR CURRENT OR FUTURE STATE WITH APPLICABLE LAWS OR ANY VIOLATIONS THEREOF.   EACH PURCHASER FURTHER ACKNOWLEDGES THAT SELLER SHALL DELIVER TO SUCH PURCHASER ALL OF SUCH PURCHASER'S PURCHASED ASSETS IN SELLER'S OR ITS COUNSEL'S POSSESSION; BUT THAT SELLER DOES NOT HAVE POSSESSION OF ALL OF THE ASSETS, AND THAT TO THE EXTENT THE SELLER IS NOT IN POSSESSION OF AN ASSET SOLD HEREUNDER, PURCHASER WILL HAVE SOLE RESPONSIBILITY TO OBTAIN POSSESSION OF THE ASSETS; *PROVIDED, HOWEVER*, THAT SELLER SHALL REASONABLY COOPERATE WITH PURCHASER'S EFFORTS TO OBTAIN POSSESSION OF SUCH ASSETS UPON PURCHASER'S REQUEST.**

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES
## OF PURCHASER

Each Purchaser, for itself and for no other Purchaser, hereby represents and warrants to Seller that the statements contained in this Article VI are true and correct solely with respect to such Purchaser as of the date of this Agreement.

Section 6.1   Organization.   Purchaser is a corporation duly incorporated, validly existing and in good standing, or a limited liability company or other applicable entity duly organized, validly existing and in good standing, under the laws of Purchaser's jurisdiction of incorporation or organization.

Section 6.2   Authorization; Enforceability.   Purchaser has all requisite company power and authority to enter into this Agreement and any other document to which Purchaser is a party or is to be a party as required hereunder and to perform its obligations hereunder and thereunder. The execution, delivery and performance by Purchaser of this Agreement and any other document to which Purchaser is a party as required hereunder, and the consummation by Purchaser of the Transactions, have been duly authorized by all necessary action on the part of Purchaser.  This Agreement and, when executed,

13

any other document to which Purchaser is a party as required hereunder, have been duly and validly executed and delivered by Purchaser and, assuming due and valid execution and delivery by Seller, constitute the valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, subject to laws of general application relating to bankruptcy, insolvency, and the relief of debtors and other laws of general application affecting enforcement of creditors' rights generally, rules of law governing specific performance, injunctive relief and other equitable remedies.

Section 6.3    No Conflicts.  The execution, delivery and performance of this Agreement and any other document to which Purchaser is a party as required hereunder, and the consummation of the Transactions will not (a) result in a violation of the Organizational Documents of Purchaser or (b) result in a violation of any law, statute, rule or regulation of any Governmental Entity or any applicable order of any court or any rule, regulation or order of any Governmental Entity applicable to Purchaser or by which any property or asset of Purchaser is bound.

Section 6.4    Consents and Approvals.  No consent, approval, authorization, order, registration or qualification of or with any Governmental Entity having jurisdiction over Purchaser or any of its properties is required for the execution and delivery by Purchaser of the Agreement and any other document to which Purchaser is a party as required hereunder and performance of and compliance by Purchaser with all of the provisions hereof and thereof and the consummation by Purchaser of the Transactions, except (a) the entry of the Sale Order and the expiration, or waiver by the Bankruptcy Court, of the 14-day period set forth in Bankruptcy Rules 6004(h) and 3020(e).

Section 6.5    Financial Capability.  Purchaser (a) has sufficient funds available to pay the Purchase Price and any expenses incurred by Purchaser in connection with the Transactions, and (b) has the resources and capabilities (financial or otherwise) to perform its obligations hereunder.

Section 6.6    Broker's, Finder's or Similar Fees.  There are no brokerage commissions, finder's fees or similar fees or commissions payable by Purchaser in connection with the Transactions.

## ARTICLE VII

## BANKRUPTCY COURT MATTERS

Section 7.1    Bankruptcy Actions.  Seller shall use its reasonable efforts to obtain the entry of the Sale Orders within thirty (30) days of full execution hereof.  Each Purchaser covenants and agrees that it shall cooperate with Seller as necessary to obtain entry of the Sale Order related to such Purchaser's Transactions, including without limitation by furnishing information or documents to Seller to satisfy the requirements for obtaining Bankruptcy Court approval of such Sale Order.

Section 7.2    [intentionally omitted].

Section 7.3    Approval.  Seller's obligations under this Agreement and in connection with the Transactions contemplated hereby are subject to entry of the Sale Orders, and to the terms of the Sale Orders and any other orders of the Bankruptcy Court applicable to the Transactions contemplated in this Agreement.  Nothing in this Agreement shall require the Seller or its affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

Section 7.4    [intentionally omitted].

14

Section 7.5    Highest and Best Bids; Adequate Assurance.

(a)    Seller and each Purchaser acknowledge that this Agreement and the sale of the Purchased Assets are subject to Bankruptcy Court approval.  Seller and each Purchaser acknowledge that Seller must take reasonable steps to demonstrate that it has sought to obtain the highest or otherwise best price for the Purchased Assets.

(b)    [intentionally omitted].

(c)    Each Purchaser shall provide adequate assurance of future performance as required under Section 365 of the Bankruptcy Code for such Purchaser's designated Assigned Contracts/Leases.  Each Purchaser agrees that it will take actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assigned Contracts/Leases, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Purchaser's advisors available to testify before the Bankruptcy Court.

Section 7.6    Cure Amount.  Subject to entry of the Sale Order and consummation of the Closing, each Purchaser that has designated Assigned Contracts/Leases shall, on the Closing, pay the Cure Amounts and cure any and all other defaults and breaches under such Purchaser's designated Assigned Contracts/Leases so that such Contracts and/or Leases may be assumed by the Seller and assigned to such Purchaser in accordance with the provisions of Section 365 of the Bankruptcy Code and this Agreement.

Section 7.7    Sale Orders.  Seller's obligations under this Agreement and in connection with the Transactions contemplated hereby with respect to a given Purchaser are subject to entry of the Sale Order with respect to the Transactions with such Purchaser, and to the terms of such Sale Order and any other applicable Orders of the Bankruptcy Court. Without limiting Seller's obligation in Section 7.1 *supra* to use its reasonable efforts to obtain entry of the Sale Orders within thirty (30) days of full execution hereof, each Purchaser's covenants and agreements in Section 7.1 *supra* will include, without limitation, promptly furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes of demonstrating that such Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. Nothing in this Agreement shall require the Seller or its Affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

Section 7.8    Sale Free and Clear. The Sale Orders shall provide that, on each Closing Date and concurrently with each Closing, all existing Liabilities and Liens of, against or created by Seller, the Debtors or the Estates, to the fullest extent permitted by Section 363(f) of the Bankruptcy Code, shall be fully released from and with respect to the Purchased Assets subject to such Closing pursuant to Section 363(f) of the Bankruptcy Code. On each Closing Date, the Purchased Assets shall be transferred to the respective Purchaser free and clear of all Liabilities and Liens, other than the Assumed Liabilities, to the fullest extent permitted by Section 363(f) of the Bankruptcy Code, and pursuant to Section 363(f) of the Bankruptcy Code.

Section 7.9    Consultation with Purchasers.    Seller shall provide each Purchaser, at least two (2) Business Days in advance of filing with the Bankruptcy Court, a draft of any motions, orders or other pleadings that Seller proposes to file with the Bankruptcy Court seeking approval of this Agreement, excluding those already filed as of the execution of this Agreement.  To the extent practicable, Seller shall reasonably cooperate with each Purchaser, and consider in good faith the views of each Purchaser, with respect to all such filings.

15

**ARTICLE VIII**

**COVENANTS AND AGREEMENTS**

Section 8.1    Tax Matters. Each Purchaser shall be responsible for any Transfer Taxes related to such Purchaser's Purchased Assets. Each Purchaser shall promptly pay directly to the appropriate Tax Authority all applicable Transfer Taxes that may be imposed upon or payable or collectible or incurred in connection with this Agreement or the Transactions contemplated herein in respect of such Purchaser's Purchased Assets, or that may be imposed upon or payable or collectible or incurred in connection with the Transactions in respect of such Purchaser's Purchased Assets, and file all necessary Tax Returns with respect to all such Transfer Taxes.

(b)    Each Purchaser and Seller shall cooperate in providing each other with any appropriate certification and other similar documentation relating to exemption from Transfer Taxes (including any appropriate resale exemption certifications), as provided under Applicable Law.

(c)    Each Purchaser and Seller agree to furnish, or cause their Affiliates to furnish, to each other, upon request, as promptly as practicable, such information and assistance relating to such Purchaser's Purchased Assets (including access to books and records) as is reasonably necessary for the filing of all Tax Returns, and making of any election related to Taxes, the preparation for any audit by any taxing authority, and the prosecution or defense of any claim, suit or proceeding relating to any Tax Return. Each Purchaser and Seller shall cooperate, and cause their Affiliates to cooperate, with each other in the conduct of any audit or other proceeding related to Taxes and each shall execute and deliver such powers of attorney and other documents as are reasonably necessary to carry out the intent of this Section 8.1(c). Each Purchaser and Seller shall provide, or cause their Affiliates to provide, timely notice to each other in writing of any pending or threatened tax audits, assessments or litigation with respect to such Purchaser's Purchased Assets for any taxable period for which the other party may have liability under this Agreement. Each Purchaser and Seller shall furnish, or cause their respective Affiliates to furnish, to each other copies of all correspondence received from any taxing authority in connection with any tax audit or information request with respect to any taxable period for which the other party or its Affiliates may have liability under this Agreement.

Section 8.2    [intentionally omitted].

Section 8.3    Notification. Seller will promptly (and, in any event, within two (2) Business Days) notify each Purchaser in writing of the existence or occurrence of any event, fact or circumstance arising after the execution of this Agreement that would reasonably be expected to cause any of the representations and warranties contained in Article V to be untrue or inaccurate such that the condition set forth in Section 9.2(a) will not be satisfied. Notwithstanding the foregoing, the delivery of a notice pursuant to this Section 8.3 will not limit any Purchaser's remedies under or with respect to this Agreement.

Section 8.4    [intentionally omitted.]

Section 8.5    Access to Information; FDA Transfer Letters.

(a)    From the date hereof until the Closing (or the earlier termination of this Agreement pursuant to Article X), Seller will, and will cause his Advisors to, provide each Purchaser and its Advisors with reasonable access and upon reasonable advance notice and during regular business hours to the books and records, documents, data, files, personnel and offices and properties of the Debtors and their Estates, in each case to the extent the foregoing constitutes a Purchased Asset or Assumed Liability of such

16

Purchaser, in order for such Purchaser and its Advisors to access such information regarding such Purchaser's Purchased Assets and Assumed Liabilities as is reasonably necessary in order to consummate the Transactions; *provided* that (i) all requests for access will be directed to Greenhill & Co., LLC or such other Person(s) as Seller may designate in writing from time to time, (ii) nothing herein will require Seller to provide access to any properties, plants or facilities for the purposes of conducting any subsurface or invasive environmental sampling or testing and (iii) nothing herein will require Seller to provide access to, or to disclose any information to, any Purchaser if such access or disclosure (A) would result in the waiver of any attorney-client, work-product or other legal privilege or accountant privilege, (B) would reasonably be expected to violate any applicable Laws (including the HSR Act, if applicable), (C) would reasonably expected to be in violation of the provisions of any agreement (including any confidentiality obligation) by which Seller is bound or (D) would violate any fiduciary duty; *provided further* that Seller will use commercially reasonable efforts to provide a reasonable alternative means of accessing any such information in a manner that is not inconsistent with the foregoing; *provided further* that no such access shall be required in connection with a proceeding between a Purchaser or any of its Affiliates, on the one hand, and Seller, the Debtors or the Estates, on the other hand. The information provided pursuant to this Section 8.5 will be used solely for the purpose of consummating the Transactions, and will be governed by all the terms and conditions of the confidentiality agreement between each respective Purchaser and Seller. Notwithstanding the foregoing, to the extent necessary for a Purchaser to obtain the Government Pricing Data (as defined herein) with respect to such Purchaser's Purchased Assets, Seller shall provide access, including but not limited to by waiving any obligation of confidentiality, to Debtors' auditors for the limited purpose of acquiring data related to (i) the base average manufacturer's price (AMP) of each such Purchased Asset, (ii) the base AMP quarter of each such Purchased Asset, and (iii) the date of market launch of each such Purchased Asset (collectively, the "Government Pricing Data"). Neither Seller nor its Advisors make any representation or warranty as to the accuracy of any information, if any, provided pursuant to this Section 8.5, other than the representations and warranties expressly set forth in Article V.

(b)     No later than five (5) Business Days after each respective Closing Date, Seller shall, and shall cause the Debtors to, provide the Purchaser party to such Closing Date with complete copies of all Registration Information and any other books and records included in such Purchaser's Purchased Assets in electronic format wherever available (or, to the extent any such items are not available in electronic format, Seller will make physical copies of such items available to each Purchaser for pick-up at the Debtors' U.S. facility where such copies are located).

(c)     No later than five (5) Business Days after the Closing Date with respect to a Purchaser's Purchased Assets, Seller shall, and shall cause the Debtors to, execute and deliver to such Purchaser and the FDA the Seller FDA Transfer Letters with respect to such Purchaser's Purchased Assets, which shall be in form and content reasonably acceptable to such Purchaser.

Section 8.6     Recalls.  Seller will be solely responsible for conducting (or causing to be conducted) the Recalls, at no expense to any Purchaser, including all activities with respect to the collection, processing and destruction in accordance with Applicable Law of any quantities of Products that are the subject of the Recalls.

Section 8.7     Further Assurances.  Without prejudice to any other term or provision of this Agreement, from time to time, as and when requested by any Purchaser and at such Purchaser's expense, Seller will execute and deliver, or cause to be executed and delivered, all such documents and instruments and will take, or cause to be taken, all such further or other actions as such Purchaser may reasonably deem necessary or desirable to evidence and effectuate the Transactions contemplated by this Agreement and the transfer of title to the Purchased Assets to such Purchaser and place such Purchaser in possession of the Purchased Assets designated to such Purchaser under this Agreement.

## ARTICLE IX

## CONDITIONS

Section 9.1    Conditions Precedent to Performance by Seller and Purchasers. The respective obligations of Seller and each Purchaser to consummate the Transactions contemplated by this Agreement with respect to such Purchaser are subject to the satisfaction or waiver, on or prior to the Closing Date, of the following conditions:

(a)    Bankruptcy Matters.  By July 1, 2023, the Bankruptcy Court shall have entered the Sale Order with respect to such Purchaser's Transactions.  Such Sale Order shall have become final and non-appealable and shall not have been stayed, vacated, modified or supplemented without the prior written consent of such Purchaser.

(b)    No Order.  No order, statute, rule, regulation, executive order, injunction, stay, decree, directive, or restraining order shall have been enacted, entered, promulgated or enforced by any court of competent jurisdiction or Governmental Entity that would (i) prevent the consummation of the Transactions with such Purchaser contemplated by this Agreement or (ii) cause such Transactions contemplated by this Agreement to be rescinded following consummation, nor shall any such order, statute, rule, regulation, executive order, injunction, stay, decree, directive, or restraining order be in effect.  No action shall be pending before any Governmental Entity or before any arbitral body wherein an unfavorable injunction, judgment, order, decree, ruling, directive or charge would (x) prevent consummation of such Transactions contemplated by this Agreement or (y) cause such Transactions contemplated by this Agreement to be rescinded following consummation.

Section 9.2    Conditions to Obligations of Purchasers.  The obligations of each Purchaser to consummate its respective Closing shall be subject to the satisfaction (or waiver by such Purchaser) on or prior to the Closing Date, of each of the following conditions:

(a)    Representations and Warranties.  All representations and warranties made by Seller in Article V of this Agreement shall be true and correct in all respects on and as of the Closing Date as if again made by Seller on and as of such date (or, if made as of a specific date, at and as of such date).

(b)    Sale Order.  The Sale Order shall be in form and substance reasonably acceptable to Purchaser and shall include a finding that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.

(c)    Bill of Sale; Conveyance Documents.  Seller shall have duly executed and delivered to Purchaser the documents set forth in Section 4.2 that are required to be delivered at the Closing.

(d)    Legal Proceedings.  No legal proceeding shall have been commenced against Purchaser or Seller, which would prevent the Closing.  No Order shall have been issued by any Governmental Entity, and be in effect, which has the effect of making the Transaction contemplated by this Agreement illegal, otherwise restraining or prohibiting consummation of this Transaction or causing any of the transactions contemplated hereunder to be rescinded following completion thereof.

The foregoing conditions in this Section 9.2 are for the sole benefit of each respective Purchaser and may be waived by such Purchaser, in whole or in part, at any time and from time to time in its sole discretion. The failure by a Purchaser prior to Closing to exercise any of the foregoing rights shall be deemed a waiver of any such rights solely as to such Purchaser.

18

Section 9.3      Conditions to Obligations of Seller.  The obligations of Seller to consummate each respective Closing shall be subject to the satisfaction (or waiver by Seller) on or prior to the Closing Date, of the following conditions:

(a)      Representations and Warranties.  All representations and warranties made by the Purchaser that is party to the Closing in Article VI of this Agreement shall be true and correct in all respects on and as of the Closing Date as if again made by such Purchaser on and as of such date (or, if made as of a specific date, at and as of such date).

(b)      Performance of the Obligations of Purchaser.  The Purchaser that is party to the Closing shall have performed in all material respects all material obligations required under this Agreement to be performed by it on or before the Closing Date (except with respect to the obligation to pay the Purchase Price in accordance with the terms of this Agreement, which obligation shall be performed in all respects as required under this Agreement).

(c)      Purchaser's Deliveries.  The Purchaser that is party to the Closing shall have delivered, and Seller shall have received, all of the items set forth in Section 4.3 of this Agreement.

The foregoing conditions in this Section 9.3 are for the sole benefit of Seller and may be waived by Seller, in whole or in part, at any time and from time to time in its sole discretion.  The failure by Seller prior to Closing to exercise any of the foregoing rights shall be deemed a waiver of any such rights.

## ARTICLE X

## TERMINATION

Section 10.1      Termination.  This Agreement may be terminated at any time prior to the Closing Date as follows:

(a)      By the mutual written consent of a Purchaser and Seller, which mutual written consent shall only terminate this Agreement as to such Purchaser;

(b)      By any Purchaser or Seller upon written notice given to the other, if the Bankruptcy Court or any other Governmental Entity shall have issued an order, decree or ruling or taken any other action (which order, decree, ruling or other action the parties hereto shall use their reasonable efforts to prevent the entry of and remove) that permanently restrains, enjoins or otherwise prohibits the consummation of such Purchaser's Transactions, and such order, decree, ruling or other action shall have become final and non-appealable, which written notice shall only terminate this Agreement as to the Purchaser that gives or receives the notice;

(c)      By Seller upon written notice given to a Purchaser, if such Purchaser shall have breached or failed to perform in any material respect any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (i) would result in a failure of a condition set forth in Section 9.3; *provided that* (i) Seller shall have provided notice to such Purchaser of such breach at least five (5) Business Days prior to the effectiveness of such termination and, if such breach is curable, then Seller may not terminate this Agreement under this Section 10.1(c) unless such breach has not been cured by the date that is the earlier of (A) two (2) Business Days before the Outside Date and (B) thirty (30) days after such notice is delivered in accordance with Section 11.3, and (ii) the right to terminate this Agreement pursuant to this Section 10.1(c) shall not be available to Seller at any time Seller is in material breach of any covenant, representation or warranty hereunder; *provided further* that written notice

19

pursuant to this Section 10.1(c) shall only terminate this Agreement as to the Purchaser that receives the notice;

(d)      [intentionally omitted];

(e)      By any Purchaser upon written notice given to Seller, if Seller shall have breached or failed to perform in any material respect any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (i) would result in a failure of a condition set forth in Section 9.2; *provided that* (i) such Purchaser shall have provided notice to Seller of such breach at least five (5) Business Days prior to the effectiveness of such termination and, if such breach is curable, then such Purchaser may not terminate this Agreement under this Section 10.1(e) unless such breach has not been cured by the date that is the earlier of (A) two (2) Business Days before the Outside Date and (B) thirty (30) days after such notice is delivered in accordance with Section 11.3, and (ii) the right to terminate this Agreement pursuant to this Section 10.1(e) shall not be available to such Purchaser at any time such Purchaser is in material breach of any covenant, representation or warranty hereunder; *provided further* that written notice pursuant to this Section 10.1(e) shall only terminate this Agreement as to the Purchaser that gives the notice;

(f)      [intentionally omitted];

(g)      By any Purchaser or Seller upon written notice given to the other at any time following the Outside Date if the Closing has not occurred; *provided that* a party shall not have the right to terminate this Agreement pursuant to this Section 10.1(g) if the failure of the Closing to have occurred on or prior to the Outside Date is the result of the breach of such party with respect to, or action or inaction of such party in violation of, any obligation under this Agreement; *provided further* that written notice pursuant to this Section 10.1(g) shall only terminate this agreement as to the Purchaser that gives or receives the notice.

(h)      By any Purchaser upon written notice to Seller if (i) Seller withdraws or seeks authority to withdraw the Sale Motion, or (ii) the Sale order is not entered by July 1, 2023; *provided that* written notice pursuant to this Section 10.1(h) shall only terminate this Agreement as to the Purchaser that gives the notice.

For the avoidance of doubt, if this Agreement is terminated with respect to fewer than all Purchasers, the Agreement shall remain in full force and effect with respect to all other Purchasers. Any party seeking to invoke its rights to terminate this Agreement shall give written notice thereof to the other party or parties specifying the provision hereof pursuant to which such termination is made and the effective date of such termination being the date of such notice.

Section 10.2      Effect of Termination. If this Agreement is terminated by either Seller or a Purchaser in accordance with and pursuant to Section 10.1, then all rights and obligations of the Seller and such Purchaser under this Agreement as to such Purchaser's Purchased Assets, Assumed Liabilities and Transactions shall terminate (but all of Seller's rights and obligations under this Agreement with respect to any other Purchaser's Purchased Asset, Assumed Liabilities and Transactions shall remain in full force and effect); *provided, however*, that nothing herein shall relieve any party from liability for any willful breach of this Agreement prior to such termination; *provided further*, that if this Agreement is terminated by Seller pursuant to Section 10.1(c) as to a Purchaser, then such Purchaser shall forfeit and Seller shall retain the Required Deposit. In the event of any other termination of this Agreement as to a Purchaser, Seller shall promptly (but in any event within three (3) Business Days after such termination) return the Required Deposit to such Purchaser by wire transfer of immediately available funds to the account designated by such Purchaser. The forfeit of the Required Deposit by a Purchaser shall have no effect on the Required Deposit of any other Purchaser.

## ARTICLE XI

## MISCELLANEOUS

Section 11.1    <u>Survival of Covenants, Representations and Warranties</u>.    The representations and warranties set forth in <u>Article V</u> and <u>Article VI</u> shall not survive the Closing Date except as expressly provided therein; *provided, however*, that all covenants and agreements in this Agreement shall survive the Closing Date and remain in full force and effect indefinitely, unless otherwise specified therein.

Section 11.2    <u>Amendment and Modification</u>.    This Agreement may be amended, modified and supplemented in any and all respects, but only by a written instrument signed by all of the parties hereto expressly stating that such instrument is intended to amend, modify or supplement this Agreement; provided, however, any material amendment shall be subject to approval by the Bankruptcy Court.

Section 11.3    <u>Notices</u>.    All notices and other communications hereunder shall be in writing and shall be deemed given when mailed, delivered personally, emailed (which is confirmed) or sent by an overnight courier service, such as Federal Express, to the parties at the following addresses:

| If to Seller: | George L. Miller, Trustee<br>1628 John F. Kennedy Blvd., Suite 950<br>Philadelphia, PA 19103-2110<br>Telephone: (215) 561-0950 Ext. 14<br>Facsimile: (215) 561-0330<br>Email: gmiller@mctllp.com |
|---|---|
| with a copy to: | John T. Carroll, III<br>Cozen O'Connor<br>1201 North Market Street, Suite 1001<br>Wilmington, DE 19801<br>Telephone: (302) 295-2028<br>Facsimile: (302) 295-2013<br>Email: jcarroll@cozen.com |
| If to Hikma: | Hikma Pharmaceuticals USA Inc.<br>200 Connell Drive<br>Berkeley Heights, NJ 07922<br>Telephone: (908) 673-1486<br>Attn: Legal Department<br>Email: USLegal@hikma.com |
| with a copy (which shall not constitute notice) to: | Deborah Kovsky-Apap<br>Troutman Pepper LLP<br>875 Third Ave.<br>New York, NY 10022<br>Telephone: (212) 808-2726<br>Email: deborah.kovsky@troutman.com |

21

If to Alcon:                  Alcon Pharmaceuticals Ltd
                              c/o Alcon Research, LLC
                              6201 South Freeway
                              Fort Worth, Texas 76134-2099
                              Attn: VP, Global Head of BD&L
                              Email: matthew.snakenberg@alcon.com

with a copy (which
shall not constitute
notice) to:                   Alcon Vision, LLC
                              6201 South Freeway
                              Fort Worth, Texas 76134-2099
                              Attn: Head, Legal – Global Transactions
                              Email: tom.hudnall@alcon.com

                              Saul Ewing LLP
                              161 North Clark Street
                              Suite 4200
                              Chicago, Illinois 60601
                              Attn: George P. Apostolides
                              Email: george.apostolides@saul.com

If to Stira:                  Stira Pharmaceuticals, LLC
                              Attn  Satya Valiveti, Ph.D, CEO
                              161 Dwight Place
                              Fairfield, NJ  07004
                              Telephone:  (810) 240-8599
                              Email:  svaliveti@stirapharma.com

with a copy (which
shall not constitute
notice) to:                   Sam DellaFera, Jr.
                              Chiesa Shahinian & Giantomasi, PC
                              105 Eisenhower Parkway
                              Roseland, NJ  07068
                              Telephone:  (973) 530-2076
                              Email:  sdellafera@csglaw.com

If to Epic:                   Baohua Yue
                              General Manager
                              Epic Pharma, LLC
                              227-15 N.Conduit Ave, Laurelton, NY 11413
                              Cell: (718) 300 – 0676
                              Facsimile: (718) 276 1735
                              Email: b.yue@epic-pharma.com

with a copy (which
shall not constitute

22

notice) to:                 Ping Jiang
                            227-15 N Conduit Avenue
                            Laurelton, NY 11413
                            Telephone:  (347) 891-0518
                            Email:  p.jiang@epic-pharma.com


If to PAI:                  PAI Holdings, LLC
                            20 Waterview Blvd
                            Parsippany, NJ 07054
                            Telephone:  1-864-277-7282
                            Attn:  Kurt Orlofski, CEO
                            Email:  KOrlofski@PAIPHARMA.COM

with a copy (which
shall not constitute
notice) to:
                            Lowenstein Sandler LLP
                            One Lowenstein Drive
                            Roseland, New Jersey 07068
                            Telephone: (973) 597-2500
                            Attn:  Nicholas G. Mehler and Jordana Renert
                            Email: nmehler@lowenstein.com and jrenert@lowenstein.com


If to Mission:              Thomas L. James
                            General Counsel
                            Mission Pharmacal Company
                            10999 Interstate Highway 10 West, Suite 1000
                            San Antonio, TX 78230-1355
                            Telephone: (210) 581-0680
                            Email: thomas.james@missionpharmacal.com

with a copy (which
shall not constitute
notice) to:                 John Wolfel
                            Foley & Lardner LLP
                            One Independent Drive, Suite 1300
                            Jacksonville, FL 32202
                            Telephone: (904) 359-8778
                            Email:  jwolfel@foley.com


If to Chartwell:            Chartwell Pharmacuticals LLC
                            77 Brenner Drive
                            Congers, NY 10920
                            Telephone:  (845) 268-5000, Ext. 513
                            Attn:  Jack Goldenberg
                            Email: jg@chartwellpharma.com

with a copy (which
shall not constitute
notice) to:

Steve Semian
Warshaw Burstein, LLP
575 Lexington Avenue
New York, NY 10017
Telephone: (212)984-7764
Email:  ssemian@wbny.com


If to Aurobindo:

Aurobindo Pharma USA, Inc.
279 Princeton-Highstown Road
East Windsor, NJ 08520
Telephone:  (732) 839-9400
Attn:    Swami S. Iyer, Chief Executive Officer
            Biren Shah, Chief Finance Officer
Email:  ssmurty@aurobindousa.com
            bshah@aurobindousa.com

with a copy (which
shall not constitute
notice) to:

Faegre Drinker Biddle & Reath LLP
222 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Attn: Patrick A. Jackson
Telephone: (302) 467-4200
Email: patrick.jackson@faegredrinker.com

If to Sentiss:

Sentiss AG
Bankstrasse 4
8610 Uster, Switzerland
Attn:    Deepak Bahri
Email:  dbahri@sentisspharma.com

with a copy (which
shall not constitute
notice) to:

K&L Gates LLP
599 Lexington Avenue
New York, NY 10022
Attn: Jonathan M. Barron and A. Lee Hogewood, III
Email: jonathan.barron@klgates.com
            a.lee.hogewoodiii@klgates.com


If to Saptalis:

Saptalis Pharmaceuticals LLC
45 Davids Drive
Hauppauge, NY 11788
Telephone: (631) 231-2751
Attn: Poli Dondeti, CEO

Email: Poli.Dondeti@saptalis.com

with a copy (which
shall not constitute
notice) to:                Moritt Hock & Hamroff, LLP
                          400 Garden City Plaza
                          Garden City, NY 11530
                          Telephone:516 873 2000
                          Attn:  Gary C. Hisiger, Esq.
                          Email: ghisiger@moritthock.com

or to such other address as a party may from time to time designate in writing in accordance with this
Section 11.3.  Each notice or other communication given to any party hereto in accordance with the
provisions of this Agreement shall be deemed to have been received (i) on the Business Day it is sent, if
sent by personal delivery or email during normal business hours of the recipient (otherwise, on the first
Business Day thereafter), or (ii) on the first Business Day after sending, if sent by overnight delivery,
properly addressed and prepaid or (iii) upon receipt, if sent by mail (regular, certified or registered);
*provided, however*, that notice of change of address shall be effective only upon receipt.  The parties agree
that delivery of process or other papers in connection with any such action or proceeding in the manner
provided in this Section 11.3, or in such other manner as may be permitted by law, shall be valid and
sufficient service thereof.

Section 11.4    Counterparts.  This Agreement may be executed by facsimile or
PDF signature and in one or more counterparts, all of which shall be considered one and the same agreement
and shall become effective when two or more counterparts have been signed by each of the parties and
delivered to the other party.

Section 11.5    Mutual Drafting.  This Agreement is the result of the joint efforts
of PurchaserS and Seller, and each provision hereof has been subject to the mutual consultation, negotiation
and agreement of the parties and there is to be no construction against either party based on any presumption
of that party's involvement in the drafting thereof.

Section 11.6    Entire Agreement; No Third Party Beneficiaries.  This Agreement
and other schedules, annexes, and exhibits hereto, any other document required hereunder, the Conveyance
Documents and the Sale Order (i) constitute the entire agreement and supersede all prior agreements and
understandings, both written and oral, among the parties with respect to the subject matter hereof and
thereof and supersede and cancel all prior agreements, negotiations, correspondence, undertakings,
understandings and communications of the parties, oral and written, with respect to the subject matter
hereof, and (ii) are not intended to confer upon any Person other than the parties hereto and thereto any
rights, obligations or remedies hereunder; provided further that Affiliates and representatives of each party
are express third-party beneficiaries of Section 11.14 and this Section 11.6.

Section 11.7    Severability.  Any term or provision of this Agreement that is held
by a court of competent jurisdiction or other authority to be invalid, void or unenforceable in any situation
in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof
or the validity or enforceability of the offending term or provision in any other situation or in any other
jurisdiction.  If the final judgment of a court of competent jurisdiction or other authority declares that any
term or provision hereof is invalid, void or unenforceable, the parties agree that the court making such
determination shall have the power to reduce the scope, duration, area or applicability of the term or

25

provision, to delete specific words or phrases, or to replace any invalid, void or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision.

Section 11.8    Governing Law.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE AND THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE.

Section 11.9    Exclusive Jurisdiction.  All actions and proceedings arising out of or relating to this Agreement, including the resolution of any and all disputes hereunder, shall be heard and determined in the Bankruptcy Court, and the parties to this Agreement hereby irrevocably submit to the exclusive jurisdiction of such courts in any such action or proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such action or proceeding.  If the Bankruptcy Court does not have or declines to exercise subject matter jurisdiction over any action or proceeding arising out of or relating to this Agreement, then each party (i) agrees that all such actions or proceedings shall be heard and determined in federal court of the United States for the District of Delaware, (ii) irrevocably submits to the jurisdiction of such courts in any such action or proceeding, (iii) consents that any such action or proceeding may be brought in such courts and waives any objection that such party may now or hereafter have to the venue or jurisdiction or that such action or proceeding was brought in an inconvenient court, and (iv) agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such party at its address as provided in Section 11.3 (provided that nothing herein shall affect the right to effect service of process in any other manner permitted by Delaware law).

Section 11.10    Remedies.  Neither the exercise of nor the failure to exercise a right of set-off or to give notice of a claim under this Agreement will constitute an election of remedies or limit Seller or any Purchaser in any manner in the enforcement of any other remedies that may be available to any of them, whether at law or in equity.

Section 11.11    Specific Performance.

(a)    Each Purchaser acknowledges and agrees that any breach of the terms of this Agreement by such Purchaser would give rise to irreparable harm for which money damages would not be an adequate remedy, and, accordingly agrees that, in addition to any other remedies, Seller shall be entitled to enforce the terms of this Agreement, including, for the avoidance of doubt, such Purchaser's obligation to fund its respective Purchase Price, by a decree of specific performance without the necessity of proving the inadequacy of money damages as a remedy and without the necessity of posting a bond. Seller acknowledges and agrees that any breach of the terms of this Agreement by Seller would give rise to irreparable harm for which money damages would not be an adequate remedy, and, accordingly, agrees that, in addition to any other remedies, each Purchaser shall be entitled to enforce the terms of this Agreement, including by a decree of specific performance, without the necessity of proving the inadequacy of money damages as a remedy and without the necessity of posting a bond.

(b)    Each party hereto agrees that it will not oppose the granting of an injunction, specific performance and other equitable relief when expressly available pursuant to the terms of this Agreement on the basis that (i) there is adequate remedy at law or (ii) an award of specific performance is not an appropriate remedy for any reason at law or equity.  In the event a party hereto seeks an injunction or injunctions to prevent breaches of this Agreement when expressly available pursuant to the terms of this Agreement and to enforce specifically the terms and provisions of this Agreement when expressly available pursuant to the terms of this Agreement, such party shall not be required to provide any bond or other security in connection with any such order or injunction.

26

Section 11.12    Assignment.    Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto (whether by operation of law or otherwise) without the prior written content of the other party; provided that no such prior written consent shall be required for (a) an assignment by a Purchaser to any of its Affiliates, so long as such Purchaser remains liable hereunder, or (b) an assignment by such Purchaser of its rights and interests hereunder after the Closing.  Subject to the first sentence of this Section 11.12, this Agreement shall be binding upon, inure to the benefit of and be enforceable by the parties and their respective successors and permitted assigns.

Section 11.13    Headings.    The article, section, paragraph and other headings contained in this Agreement are inserted for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 11.14    No Consequential or Punitive Damages.    NO PARTY (OR ITS AFFILIATES OR REPRESENTATIVES) SHALL, UNDER ANY CIRCUMSTANCE, BE LIABLE TO THE OTHER PARTY (OR ITS AFFILIATES OR REPRESENTATIVES) FOR ANY CONSEQUENTIAL, EXEMPLARY, SPECIAL, INCIDENTAL OR PUNITIVE DAMAGES CLAIMED BY SUCH OTHER PARTY UNDER THE TERMS OF OR DUE TO ANY BREACH OF THIS AGREEMENT, INCLUDING LOSS OF REVENUE OR INCOME, DAMAGES BASED ON ANY MULTIPLIER OF PROFITS OR OTHER VALUATION METRIC, COST OF CAPITAL, DIMINUTION OF VALUE OR LOSS OF BUSINESS REPUTATION OR OPPORTUNITY.

**Section 11.15    "As Is" Transaction.    EACH PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN ARTICLE V OF THIS AGREEMENT, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE PURCHASED ASSETS.    WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLER HEREBY DISCLAIMS ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ALL OR ANY PORTION OF THE PURCHASED ASSETS.    ACCORDINGLY, THE PURCHASER WILL ACCEPT THE PURCHASED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."**

Section 11.16    Bulk Transfer Notices.    Pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of all Encumbrances, including any Encumbrance or claims arising out of any bulk transfer laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.

Section 11.17    Independent Nature of Purchasers' Obligations and Rights.    The obligations of each Purchaser hereunder are several and not joint with the obligations of any other Purchaser, and no Purchaser shall be responsible in any way for the performance or non-performance of the obligations of any other Purchaser. Nothing contained herein, and no action taken by any Purchaser pursuant hereto or thereto, shall be deemed to constitute the Purchasers as a partnership, an association, a joint venture or any other kind of entity, or create a presumption that the Purchasers are in any way acting in concert or as a group with respect to such obligations or the transactions contemplated hereby. Each Purchaser shall be entitled to independently protect and enforce its rights including, without limitation, the rights arising out of this Agreement, and it shall not be necessary for any other Purchaser to be joined as an additional party in any proceeding for such purpose. Each Purchaser has been represented by its own separate legal counsel in its review and negotiation of the Agreement. It is expressly understood and agreed that each provision contained in this Agreement is between the Seller and a Purchaser, solely, and not between the Sellers and the Purchasers collectively and not between and among the Purchasers.

27

Section 11.18    Interpretation.

(a)      When a reference is made in this Agreement to a Section, Article, subsection, paragraph, item or Exhibit, such reference shall be to a Section, Article, subsection, paragraph, item or Exhibit of this Agreement unless clearly indicated to the contrary.

(b)      Whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation."

(c)      The words "hereof," "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement.

(d)      The meaning assigned to each term defined herein shall be equally applicable to both the singular and the plural forms of such term, and words denoting any gender shall include all genders.  Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(e)      A reference to any party to this Agreement or any other agreement or document shall include such party's predecessors, successors and permitted assigns.

(f)      A reference to any legislation or to any provision of any legislation shall include any amendment to, and any modification or re-enactment thereof, any legislative provision substituted therefore and all regulations and statutory instruments issued thereunder or pursuant thereto.

(g)      References to $ are to United States Dollars.

(h)      The parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, Purchaser and Seller have executed this Agreement or caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first written above.

**SELLER:**

GEORGE L. MILLER, AS TRUSTEE FOR THE ESTATES

By: _____
    Name: George L. Miller
    Title: Trustee

IN WITNESS WHEREOF, Purchaser and Seller have executed this Agreement or caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first written above.

**PURCHASERS:**

HIKMA PHARMACEUTICALS USA INC.

By: _____
    Name:    Riad Mechlaoui
    Title:    Director

ALCON PHARMACEUTICALS LTD

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

STIRA PHARMACEUTICALS, LLC

By: _____
    Name:    Satya Valiveti
    Title:    Chief Executive Officer

PAI HOLDINGS, LLC

By: _____

Name:  Kurt Orlofski
Title:  CEO

IN WITNESS WHEREOF, Purchaser and Seller have executed this Agreement or caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first written above.

**PURCHASERS:**

HIKMA PHARMACEUTICALS USA INC.

By: _____

    Name:    Riad Mechlaoui
    Title:     Director

ALCON PHARMACEUTICALS LTD.

By: _____

    Name:    Marie-Claude Guertin
    Title:     Authorized signatory

By: _____

    Name:    ROBERT KAMFFER
    Title:     AUTHORIZED SIGNATORY

STIRA PHARMACEUTICALS, LLC

By: _____

    Name:    Satya Valiveti
    Title:     Chief Executive Officer

PAI HOLDINGS, LLC

By: _____

Name:  Kurt Orlofski
Title:   CEO

IN WITNESS WHEREOF, Purchaser and Seller have executed this Agreement or caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first written above.

**PURCHASERS:**

HIKMA PHARMACEUTICALS USA INC.

By: _____
     Name:    Riad Mechlaoui
     Title:     Director

ALCON PHARMACEUTICALS LTD

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

STIRA PHARMACEUTICALS, LLC

By: _____
     Name:    Satya Valiveti
     Title:     Chief Executive Officer

PAI HOLDINGS, LLC

By: _____

Name:  Kurt Orlofski
Title:   CEO

IN WITNESS WHEREOF, Purchaser and Seller have executed this Agreement or caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first written above.

**PURCHASERS:**

HIKMA PHARMACEUTICALS USA INC.

By: _____
    Name:    Riad Mechlaoui
    Title:     Director

ALCON PHARMACEUTICALS LTD.

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

STIRA PHARMACEUTICALS, LLC

By: _____
    Name:    Satya Valiveti
    Title:     Chief Executive Officer

PAI HOLDINGS, LLC

By: _____

Name:  Kurt Orlofski
Title:    CEO

MISSION PHARMACAL COMPANY

By: _____
     Name:     Thomas J. Dooley
     Title:      President and Chief Financial Officer


CHARTWELL RX SCIENCES LLC


By: _____
     Name:  Jack Goldenberg
     Title:  Managing Member


AUROBINDO PHARMA USA, INC.


By: _____
     Name:     Swami Iyer
     Title:      Chief Executive Officer


SENTISS AG


By: _____
     Name:     Deepak Bahri
     Title:      Authorized Signatory


SAPTALIS PHARMACEUTICALS LLC


By: _____
     Name:     Polireddy Dondeti
     Title:      President & Chief Executive Officer

2

MISSION PHARMACAL COMPANY

By: _____
      Name:     Thomas J. Dooley
      Title:      President and Chief Financial Officer


CHARTWELL RX SCIENCES LLC

By: _____
      Name:  Jack Goldenberg
      Title:  Managing Member


AUROBINDO PHARMA USA, INC.

By: _____
      Name:     Swami Iyer
      Title:      Chief Executive Officer


SENTISS AG

By: _____
      Name:     Deepak Bahri
      Title:      Authorized Signatory


SAPTALIS PHARMACEUTICALS LLC

By: _____
      Name:     Polireddy Dondeti
      Title:      President & Chief Executive Officer

2

MISSION PHARMACAL COMPANY

By: _____
      Name:    Thomas J. Dooley
      Title:     President and Chief Financial Officer

CHARTWELL RX SCIENCES LLC

By: _____
      Name:  Jack Goldenberg
      Title:  Managing Member

AUROBINDO PHARMA USA, INC.

By: _____
      Name:    Swami Iyer
      Title:     Chief Executive Officer

SENTISS AG

By: _____
      Name:    Deepak Bahri
      Title:     Authorized Signatory

SAPTALIS PHARMACEUTICALS LLC

By: _____
      Name:    Polireddy Dondeti
      Title:     President & Chief Executive Officer

MISSION PHARMACAL COMPANY

By: _____
     Name:    Thomas J. Dooley
     Title:     President and Chief Financial Officer

CHARTWELL RX SCIENCES LLC

By: _____
     Name:  Jack Goldenberg
     Title:  Managing Member

AUROBINDO PHARMA USA, INC.

By: _____
     Name:    Swami Iyer
     Title:     Chief Executive Officer

SENTISS AG

By: _____
     Name:    Deepak Bahri
     Title:     Authorized Signatory

SAPTALIS PHARMACEUTICALS LLC

By: _____
     Name:    Polireddy Dondeti
     Title:     President & Chief Executive Officer

2

MISSION PHARMACAL COMPANY

By: _____
     Name:    Thomas J. Dooley
     Title:     President and Chief Financial Officer


CHARTWELL RX SCIENCES LLC

By: _____
     Name:  Jack Goldenberg
     Title:  Managing Member


AUROBINDO PHARMA USA, INC.

By: _____
     Name:    Swami Iyer
     Title:     Chief Executive Officer


SENTISS AG

By: _____
     Name:    Deepak Bahri
     Title:     Authorized Signatory


SAPTALIS PHARMACEUTICALS LLC

By: _____
     Name:    Polireddy Dondeti
     Title:     President & Chief Executive Officer

EPIC PHARMA LLC


By: _Ping JIANG_____
     Name:    Ping Jiang
     Title:     Chief Financial Officer and Authorized
                Representative

**EXHIBIT A**

**Sale Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| AKORN HOLDING COMPANY LLC, *et al.*[1] | Case No. 23-10253 (KBO) |
| | (Jointly Administered) |
| Debtors. | **Re D.I.  106, 137** |

**ORDER (A) APPROVING THE SALE OF CERTAIN
OF THE ESTATES' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS,
ENCUMBRANCES AND INTERESTS, (B) AUTHORIZING THE TRUSTEE TO ENTER
INTO AND PERFORM HIS OBLIGATIONS TO [●] UNDER THE MASTER ASSET
PURCHASE AGREEMENT, [(C) AUTHORIZING THE ASSUMPTION
AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES,] AND (D) GRANTING CERTAIN RELATED RELIEF
(THE "[●] SALE ORDER")**

This matter is before the Court on the Trustee's *Motion for Entry of (I) an Order (A) Approving Bidding Procedures in Connection With Sale of Substantially all of the Estates' Assets, (B) Scheduling an Auction and Hearing to Consider the Proposed Sale and (C) Approving the Form and Manner of Notice Thereof; and (II) an Order (A) Approving the Sale, (B) Authorizing the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting Certain Related Relief* (the "Sale Motion") [D.I. 106],[2] seeking, among other things: (a) approval of the master asset purchase agreement (as may be amended or otherwise modified from time to time and together with all exhibits, schedules, and other documents ancillary thereto, the "Purchase Agreement"), attached hereto as **Exhibit A**; (b) authority to sell the Purchased Assets

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of their federal tax identification numbers, and cases numbers are Akorn Holding Company LLC (9190), Case No. 23-10253 (KBO); Akorn Intermediate Company LLC (6123), Case No. 23-10254 (KBO); and Akorn Operating Company LLC (6184), Case No. 23- 10255. The Debtors' headquarters is located at 5605 CenterPoint Court, Gurnee, IL 60031.

[2] Unless otherwise defined in this Order, all capitalized terms shall have the meanings provided in the Sale Motion and/or the Purchase Agreement.

designated in the "[●] Schedule 2.1(a)" attached to the Purchase Agreement (the "[●] Purchased Assets") to [●] (the "[●] Purchaser") as set forth in the Purchase Agreement, free and clear of Liens (as defined below), Claims (as defined below), and other interests, [(c) authority to assume and assign the executory contracts and/or unexpired leases designated by [●] Purchaser as Assigned Contracts/Leases (the "[●] Assigned Contracts/Leases") in the Purchase Agreement to [●] Purchaser,] and (d) related relief; and this Court, in furtherance of the Sale Motion, having entered an order on April 28, 2023 (the "Bidding Procedures Order") [D.I. 137] approving, among other things, the Bidding Procedures and the Notice Procedures; and the Trustee having determined, after an extensive marketing process, that [●] Purchaser has submitted the highest and best bid for the [●] Purchased Assets; and adequate and sufficient notice of the Bidding Procedures, the Purchase Agreement, and all transactions contemplated thereunder and in this Order having been given in the manner directed by the Court in the Bidding Procedures Order; and all interested parties having been afforded an opportunity to be heard with respect to the Sale Motion and all relief related thereto; and the Court having reviewed and considered the Sale Motion and all relief related thereto, and all objections thereto having been withdrawn, waived, settled or overruled, and having held a hearing regarding the Sale Motion on May 30, 2023 (the "Sale Hearing"); and it appearing that the Court has jurisdiction over this matter; and it further appearing that the legal and factual bases set forth in the Sale Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation; and good and sufficient cause appearing,

**THE COURT HEREBY FINDS AND DETERMINES THAT:**[3]

**Jurisdiction, Final Order, and Statutory Predicates**

A.      This Court has jurisdiction to hear and determine the Sale Motion pursuant to 28

U.S.C. § 1334(a).  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N), and (O).

Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      The statutory predicates for the relief requested in the Sale Motion are sections

105(a), 363, and 365 of the Bankruptcy Code, and Bankruptcy Rules 2002(a)(2), 6004, 6006,

9007, and 9014.

C.      This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).

Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under

Bankruptcy Rule 9014 and Federal Rule of Civil Procedure 54(b), as made applicable by

Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the

implementation of this Order.

**Notice of the Sale and Auction**

D.      Actual written notice of the Sale Motion was provided to the Notice Parties.

E.      The Trustee's Notice of Auction and Sale Hearing was reasonably calculated to

provide all interested parties with timely and proper notice of the Sale, Sale Hearing, and

Auction.

---

[3] These findings and conclusions constitute the Court's findings of fact and conclusions of law pursuant to
Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  All findings of
fact and conclusions of law announced by the Court at the Sale Hearing in relation to the Sale Motion are hereby
incorporated herein to the extent not inconsistent herewith.  To the extent that any of the following findings of fact
constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law
constitute findings of fact, they are adopted as such.

F.      As evidenced by the certificates of service previously filed with the Court, proper, timely, adequate, and sufficient notice of the Sale Motion, Auction, Sale Hearing, Sale, the Purchase Agreement and the transactions contemplated thereby[, including the assumption and assignment of the [●] Assigned Contracts/Leases] (collectively, the "[●] Transaction") have been provided in accordance with the Bidding Procedures Order, sections 105(a), 363, and 365 of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004, 6006, and 9007.  The notices described above were good, sufficient, and appropriate under the circumstances, and no other or further notice of the Sale Motion, Auction, Sale Hearing, Sale[, and assumption and assignment of the [●] Assigned Contracts/Leases] is or shall be required.

G.      The disclosures made by the Trustee concerning the Sale Motion, Auction, Purchase Agreement, Sale, [assumption and assignment of the [●] Assigned Contracts/Leases,] and Sale Hearing were good, complete, and adequate.

H.      A reasonable opportunity to object and be heard with respect to the Sale and the Sale Motion and the relief requested therein (including the assumption and assignment of the Assigned Contracts/Leases), has been afforded to all interested persons and entities, including but not necessarily limited to the Notice Parties.

I.      This Order relates only to the [●] Purchased Assets and the [●] Transaction.  This Order is separate from and unrelated to any other order entered by this Court in connection with the Sale Hearing approving the sale of any assets of the Debtors to other purchasers pursuant to the Purchase Agreement or any other asset purchase agreement other than the [●] Purchased Assets (the "Other Assets").  Any order related to the Other Assets shall be equally treated as granting the relief requested in the Sale Motion only as it related to such Other

4

Assets, except to the extent expressly provided therein.  The relief granted in any order related to the Other Assets shall not derogate from the relief granted by this Order and, in the event of any conflict between any such order and this Order, this Order shall control with respect to the [●] Purchased Assets and [●] Transaction. The relief sought in the Sale Motion relating to the [●] Purchased Assets, the Purchase Agreement and the [●] Transaction as to the [●] Purchased Assets and the [●] Transaction shall be deemed as severed from all other relief sought in the Sale Motion so that this Order shall constitute a separate final order for all purposes related to the [●] Purchased Assets, Purchase Agreement, and the [●] Transaction.  Any appeal from or request for reconsideration, rehearing, or reargument of, or for relief from, any order entered in connection with the Sale Motion and relating to the sale of any Other Assets, or any transaction other than the [●] Transaction regardless if pursuant to the Purchase Agreement or another asset purchase agreement, shall not affect or otherwise impact this Order or the finality hereof in any manner whatsoever.

### **Good Faith of Purchaser**

J.      The Purchase Agreement was negotiated, proposed, and entered into by the Trustee and the [●] Purchaser without collusion, in good faith, and from arm's-length bargaining positions.

K.      Neither the Trustee nor the [●] Purchaser has engaged in any conduct that would cause or permit the Purchase Agreement to be avoided under section 363(n) of the Bankruptcy Code.  Specifically, the [●] Purchaser has not acted in a collusive manner with any person and the Purchase Price was not controlled by any agreements among the bidders.

L.    The [●] Purchaser is purchasing the [●] Purchased Assets in good faith, and is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code, and is therefore entitled to all of the protections afforded by that provision, and otherwise has proceeded in good faith in all respects in connection with this proceeding in that, *inter alia*: (a) the [●] Purchaser recognized that the Trustee was free to deal with any other party interested in acquiring the [●] Purchased Assets; (b) the [●] Purchaser complied with the provisions in the Bidding Procedures Order; (c) the [●] Purchaser agreed to subject its bid to the competitive bidding procedures set forth in the Bidding Procedures Order; (d) the [●] Purchaser in no way induced or caused the filing of the Bankruptcy Cases; and (e) all payments to be made by the [●] Purchaser in connection with the Sale have been disclosed.

M.    The form and total consideration to be realized by the Estates under the Purchase Agreement constitutes fair value, fair, full, and adequate consideration, reasonably equivalent value, and reasonable market value for the [●] Purchased Assets.

N.    Neither the [●] Purchaser nor any of its Affiliates, officers, directors, managers, shareholders, members or any of their respective successors or assigns is an "insider" of the Debtors, as that term is defined under section 101(31) of the Bankruptcy Code. No common identity of directors, managers, controlling shareholders, or members exists between the Debtors, Trustee or the [●] Purchaser.

**<u>Highest and Best Offer</u>**

O.    The Trustee conducted an auction process in accordance with, and has otherwise complied in all respects with, the Bidding Procedures Order. The auction process set forth in the Bidding Procedures Order afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the [●] Purchased Assets. The

154389669v5
63887670\1

auction process was duly noticed and conducted in a non-collusive, fair, and good faith manner, and a reasonable opportunity was given to any interested party to make a higher and better offer for the [●] Purchased Assets.

P.     The [●] Purchase Price (as defined in the Purchase Agreement) constitutes the highest and best offer for the [●] Purchased Assets, and will provide a greater recovery for the Estates than would be provided by any other available alternative.  The Trustee's determination that the [●] Purchase Price constitutes the highest and best offer for the [●] Purchased Assets constitutes a valid and sound exercise of the Trustee's business judgment.

Q.     The [●]  Purchaser is the Successful Bidder for the [●] Purchased Assets in accordance with the Bidding Procedures Order.  The [●] Purchaser has complied in all respects with the Bidding Procedures Order and any other applicable order of this Court in negotiating and entering into the Purchase Agreement, and the sale and the Purchase Agreement likewise comply with the Bidding Procedures Order and any other applicable order of this Court.

**No Fraudulent Transfer**

R.     The consideration provided by the [●] Purchaser pursuant to the Purchase Agreement (i) is fair and reasonable, (ii) constitutes the highest and/or best offer for the [●] Purchased Assets, and (iii) constitutes reasonably equivalent value and fair consideration for the [●] Purchased Assets under the Bankruptcy Code and applicable law, including, without limitation, under the laws of the United States, and each State, territory, possession, and the District of Columbia or any other applicable jurisdiction with laws similar to the foregoing, including, without limitation, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act, and the Uniform Voidable Transactions Act.  No other person or entity or group of

entities has offered to purchase the [●] Purchased Assets for greater economic value to the Estates than the [●] Purchaser.  Approval of the Sale Motion and the Purchase Agreement (solely as to the [●] Purchaser), and the consummation of the transactions contemplated thereby to which the [●] Purchaser is a party are in the best interests of the Estates.

S.      The [●] Purchaser is not a mere continuation of the Debtors or the Estates, and no continuity of enterprise exists between the [●] Purchaser and the Debtors or the Estates.  The [●] Purchaser is not holding itself out to the public as a continuation of the Debtors or the Estates. The [●] Purchaser is not a successor to the Debtors or the Estates, and the Sale of the [●] Purchased Assets to the [●] Purchaser does not amount to a consolidation, merger, or de facto merger of the [●] Purchaser and the Debtors or the Estates.

### Validity of Transfer

T.      The Purchase Agreement was not entered into for the purpose of hindering, delaying, or defrauding creditors.  Neither the Trustee nor the [●] Purchaser is entering into the transactions contemplated by the Purchase Agreement to which the [●] Purchaser is a party fraudulently for purposes of statutory and/or common law fraudulent conveyance and fraudulent transfer laws.

U.      The Estates are the sole and lawful owners of the [●] Purchased Assets.  Subject to section 363(f) of the Bankruptcy Code, the transfers of the [●] Purchased Assets to the [●] Purchaser will be, as of the Closing Date, legal, valid, and effective transfers of the [●] Purchased Assets, which transfer will vest the [●] Purchaser with all right, title, and interest of the Estates to the [●] Purchased Assets free and clear of: (a) all Liens (as defined in the Purchase Agreement), accruing or arising any time prior to the Closing Date, and (b) all claims (as that term is defined in section 101(5) of the Bankruptcy Code), liabilities, obligations, demands,

guaranties, options, rights, contractual commitments, restrictions, interests, and matters of any kind and nature, whether arising prior to or subsequent to the Petition Date, and whether imposed by agreement, understanding, law, equity, or otherwise (including, without limitation, rights with respect to Claims and Liens (i) that purport to give to any party a right of setoff or recoupment against, or a right or option to effect any forfeiture, modification, profit sharing interest, right of first refusal, purchase or repurchase right or option, or termination of, any of the Estates' or the [●] Purchaser's interests in the [●] Purchased Assets, or any similar rights, or (ii) in respect of taxes, restrictions, rights of first refusal, charges, or interests of any kind or nature, if any, including, without limitation, any restriction of use, voting, transfer, receipt of income, or other exercise of any attributes of ownership), whether known or unknown, disclosed or undisclosed, matured or unmatured, fixed or contingent, asserted or unasserted, liquidated or unliquidated (collectively, as defined in this clause (b), "Claims"), relating to, accruing, or arising any time prior to the Closing Date.

## Section 363(f) is Satisfied

V.      The conditions of section 363(f) of the Bankruptcy Code have been satisfied in full; therefore, the Trustee may sell the [●] Purchased Assets free and clear of any interest in the property.

W.      The [●] Purchaser would not have entered into the Purchase Agreement, and would not consummate the transactions to which it is party contemplated thereby, if the sale of the [●] Purchased Assets to the [●] Purchaser were not free and clear of all Liens and Claims. The [●] Purchaser shall not be responsible for any Liens or Claims other than Assumed Liabilities (as defined in the Purchase Agreement) which have been expressly assumed by the [●] Purchaser pursuant to the Purchase Agreement.

9

X.      The Trustee may sell the [●] Purchased Assets free and clear of all Liens and Claims against the Estates and/or any of the [●] Purchased Assets because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code have been satisfied.   Those holders of Liens or Claims against the Estates or any of the [●] Purchased Assets who did not object, or who withdrew their objections, to the Sale or the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.   All other holders of Liens or Claims are adequately protected by having their Liens or Claims, if any, in each instance against the Estates or any of the [●] Purchased Assets, attach to the net cash proceeds of the Sale ultimately attributable to the particular [●] Purchased Assets in which such creditor alleges a Lien or Claim, in the same order of priority, with the same validity, force and effect that such Lien or Claim had prior to the Sale, subject to any claims and defenses that the Estates may possess with respect thereto.

### Cure/Adequate Protection

Y.      [The assumption and assignment of the [●] Assigned Contracts/Leases is integral to the transactions to which the [●] Purchaser is a party under the Purchase Agreement, is in the best interests of the Estates, and represents a reasonable exercise of sound and prudent judgment by the Trustee.   The [●] Purchaser's promise to perform the obligations under the [●] Assigned Contracts/Leases after the Closing Date shall constitute adequate assurance of future performance within the meaning of section 365(f)(2)(B) of the Bankruptcy Code.

Z.      Any objections to the assumption and assignment of the [●] Assigned Contracts/Leases are hereby overruled.]

**Compelling Circumstances for an Immediate Sale**

AA.    Good and sufficient reasons for approval of the Purchase Agreement (solely as to

the [●] Purchaser) and the Sale have been articulated.  The relief requested in the Sale Motion is

in the best interests of the Estates.  The Trustee has demonstrated both (i) good, sufficient, and

sound business purposes and justifications, and (ii) compelling circumstances for the Sale other

than in the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code in

that, among other things, the immediate consummation of the Sale of the [●] Purchased Assets to

the [●] Purchaser is necessary and appropriate to maximize the value of the Estates.  Time is of

the essence in consummating the Sale.

BB.    Given all of the circumstances of the Bankruptcy Cases and the adequacy and fair

value of the [●] Purchase Price under the Purchase Agreement, the proposed Sale of the [●]

Purchased Assets to the [●] Purchaser constitutes a reasonable and sound exercise of the

Trustee's business judgment and should be approved.

CC.    The consummation of the Sale of the [●] Purchased Assets to the [●] Purchaser

[and the assumption and assignment of the [●] Assigned Contracts/Leases] is legal, valid, and

properly authorized under all applicable provisions of the Bankruptcy Code, including, without

limitation, sections 105(a), 363(b), 363(f), 363(m), and 365, and all of the applicable

requirements of such sections have been complied with in respect of the transaction.

**NOW, THEREFORE, IT IS HEREBY ORDERED:**

**General Provisions**

1.    The relief requested in the Sale Motion, as it pertains to the [●] Transaction, is

granted and approved as set forth herein. The Trustee is authorized to sell the [●] Purchased

Assets to the [●] Purchaser and transfer, assign and convey the [●] Purchased Assets[, including

11

but not limited to the [●] Assigned Contracts/Leases] to the [●] Purchaser on the Closing Date. For the avoidance of doubt, this Order relates only to the [●] Transaction, and is independent of any other order approving or disapproving any other transactions with any other purchaser under the Purchase Agreement or any other asset purchase agreement.

2.      All objections or responses to the Sale Motion or the relief requested therein as to the [●] Transaction and the [●] Purchaser that have not been withdrawn, waived, or settled as announced to the Court at the Sale Hearing or by stipulation filed with the Court, and all reservations of rights included therein, are hereby denied and overruled with prejudice. [All non-Debtor counterparties to the [●] Assigned Contracts/Leases given notice of the Sale Motion that failed to timely object thereto are deemed to consent to the relief sought therein.]  All persons and entities given notice of the Sale Motion that failed to timely object thereto are deemed to consent to the [●] Transaction, for all purposes, including for purposes of sections 363(f)(2), 365(c)(1), and 365(e)(2) of the Bankruptcy Code.

**Approval of the Purchase Agreement**

3.      The Purchase Agreement (and all schedules and exhibits affixed thereto relating to the [●] Purchaser) and all other ancillary documents, all of the terms and conditions thereof, and the transactions contemplated therein to which the [●] Purchaser is a party are hereby approved and authorized.

4.      Pursuant to sections 363(b) and (f) of the Bankruptcy Code, the Trustee is authorized and empowered to take any and all actions necessary or appropriate to: (i) consummate the Sale of the [●] Purchased Assets to the [●] Purchaser pursuant to and in accordance with the terms and conditions of the Purchase Agreement and this Order; (ii) close the Sale of the [●] Purchased Assets to the [●] Purchaser as contemplated in the Purchase

Agreement and this Order; and (iii) execute and deliver, perform under, consummate, implement, and close fully the Purchase Agreement as to the [●] Purchaser[, including the assumption and assignment to the [●] Purchaser of the [●] Assigned Contracts/Leases], together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Purchase Agreement and the Sale with respect to the [●] Purchaser and the [●] Purchased Assets.

5.      This Order shall be binding in all respects upon the Trustee, the Estates, the Debtors, all creditors of, and holders of equity interests in, the Debtors, any holders of Liens, Claims, or other interests in, against, or on all or any portion of the [●] Purchased Assets (whether known or unknown), the [●] Purchaser and all successors and assigns of the [●] Purchaser, and the [●] Purchased Assets.  This Order and the Purchase Agreement shall inure to the benefit of the Estates and their creditors, the [●] Purchaser, and the respective successors and assigns of each of the foregoing.

6.      Subject to the terms, conditions, and provisions of this Order, all persons and entities are hereby forever prohibited, enjoined and barred from taking any action that would adversely affect or interfere, or that would be inconsistent (i) with the ability of the Trustee to sell and transfer the [●] Purchased Assets to the [●] Purchaser free and clear of all Claims in accordance with the terms of the Purchase Agreement and this Order and (ii) with the ability of the [●] Purchaser to acquire, take possession of, use and operate the [●] Purchased Assets in accordance with the terms of the Purchase Agreement and this Order.

7.      The Sale of the [●] Purchased Assets to the [●] Purchaser under the Purchase Agreement constitutes a transfer for reasonably equivalent value, fair value and fair consideration under the Bankruptcy Code and applicable law,

154389669v5
63887670\1

including, without limitation, the laws of each jurisdiction in which the [●] Purchased Assets are located, and the Sale of the [●] Purchased Assets to the [●] Purchaser may not be avoided under any statutory or common law fraudulent conveyance and fraudulent transfer theories whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof or the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing including the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act, the Uniform Voidable Transactions Act and any other applicable law.  The Sale shall not be subject to avoidance or rejected by any person, and costs or damages shall not be imposed or awarded against the [●] Purchaser under section 363(m) or any other provision of the Bankruptcy Code or applicable State or other law.

### Transfer of the [●] Purchased Assets

8.      Pursuant to sections 105(a), 363(b), and 363(f) of the Bankruptcy Code, the Trustee is authorized to transfer the [●] Purchased Assets to the [●] Purchaser on the Closing Date and, upon the Closing with the [●] Purchaser under the Purchase Agreement, such transfers shall constitute legal, valid, binding, and effective transfers of such [●] Purchased Assets and shall vest the [●] Purchaser with title to the [●] Purchased Assets and, upon the Trustee's receipt of the full [●] Purchase Price from the [●] Purchaser on account of the [●] Purchased Assets, shall be free and clear of all Liens, Claims, and other interests of any kind or nature whatsoever, including but not limited to, successor or successor-in-interest liability and Claims, with all such Liens, Claims or other interests to attach to the net cash proceeds ultimately attributable to the property against or in which such Liens, Claims, or interests are asserted, subject to the terms

154389669v5
63887670\1

thereof, with the same validity, force and effect, and in the same order of priority, that such Liens, Claims, or interests now have against the [●] Purchased Assets.  Upon the Closing, the [●] Purchaser shall take title to and possession of the [●] Purchased Assets.

9.      All persons and entities in possession of some or all of the [●] Purchased Assets on the Closing Date are directed to surrender possession of such [●] Purchased Assets to the [●] Purchaser or its assignee at the Closing.  On the Closing Date, each of the Estates' creditors is authorized and directed to execute such documents and take all other actions as may be reasonably necessary to release its Liens, Claims, or other interests in the [●] Purchased Assets, if any, as such Liens, Claims, or interests may have been recorded or may otherwise exist.

10.     On the Closing Date, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Estates' interests in the [●] Purchased Assets.  Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the [●] Transaction.

11.     A certified copy of this Order may be filed with the appropriate clerk and/or recorded with the recorder to act to cancel any Liens and other encumbrances of record.

12.     If any person or entity that has filed statements or other documents or agreements evidencing Liens on, or interests in, all or any portion of the [●] Purchased Assets shall not have delivered to the Trustee prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all Liens, Claims, or other interests that the person or entity has or may assert with respect to all or any portion of the [●] Purchased Assets, the Trustee is hereby authorized and directed, and the

15

[●] Purchaser is hereby authorized, to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to the [●] Purchased Assets.

13.     This Order is and shall be effective as a determination that, on the Closing Date, all Liens, Claims, or other interests of any kind or nature whatsoever existing as to the [●] Purchased Assets prior to the Closing Date, shall have been unconditionally released, discharged, and terminated, and that the conveyances described herein have been effected. This Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement to which Purchaser is a party.

14.     No governmental unit (as defined in section 101(27) of the Bankruptcy Code) or any representative thereof may deny, revoke, suspend or refuse to renew any permit, license or similar grant relating to the operation of the [●] Purchased Assets on account of the filing or pendency of the chapter 7 case or the consummation of the Sale to the extent that any such action by a governmental unit or any representative thereof would violate section 525 of the Bankruptcy Code.

154389669v5
63887670\1

15.     The **[●]** Purchaser is hereby authorized, in connection with the consummation of the **[●]** Transaction, to allocate the **[●]** Purchased Assets, Assumed Liabilities, and the **[●]** Assigned Contracts/Leases among its Affiliates, designees, assignees, or successors in a manner as it, in its sole discretion, deems appropriate, and to assign, sublease, sublicense, transfer or otherwise dispose of any of the **[●]** Assets or the rights under any **[●]** Assigned Contract/Leases to its Affiliates, designees, assignees, or successors with all of the rights and protections accorded under this Order and the Purchase Agreement, and the Trustee shall cooperate with and take all actions reasonably requested by the **[●]** Purchaser to effectuate any of the foregoing.  For the avoidance of confusion, nothing in this paragraph shall excuse the Purchaser from any of its obligations to the Trustee under this or any other order of the Court, or under the Purchase Agreement.

**[Assumption and Assignment of Assigned Contracts/Leases**

16.     The Trustee is hereby authorized and directed in accordance with sections 105(a) and 365 of the Bankruptcy Code to (a) assume and assign to the **[●]** Purchaser, effective upon the Closing of the Sales, the **[●]** Assigned Contracts/Leases, free and clear of all Liens, Claims, and other interests of any kind or nature whatsoever, and (b) execute and deliver to the **[●]** Purchaser such documents or other instruments as the **[●]** Purchaser reasonably deems necessary to assign and transfer the **[●]** Assigned Contracts/Leases.

17.     The counterparties to the **[●]** Assigned Contracts/Leases (the "Counterparties") shall each look solely to the **[●]** Purchaser for any amounts payable under the **[●]** Assigned Contracts/Leases from and after the Closing Date.

154389669v5
63887670\1

18.     The [●] Assigned Contracts/Leases are executory contracts under section 365 of the Bankruptcy Code.   The Trustee may assume the [●] Assigned Contracts/Leases in accordance with section 365 of the Bankruptcy Code.  The Trustee may assign the [●] Assigned Contracts/Leases in accordance with sections 363 and 365 of the Bankruptcy Code.   Any provisions in the [●] Assigned Contracts/Leases that purport to prohibit or condition the assignment of the [●] Assigned Contracts/Leases or allow the Counterparties to terminate, recapture, impose any penalty, or modify any term or condition upon the assignment of the [●] Assigned Contracts/Leases, constitute unenforceable anti-assignment provisions that are void and of no force and effect; all other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Trustee and assignment to the [●] Purchaser of the [●] Assigned Contracts/Leases have been satisfied.  The [●] Assigned Contracts/Leases shall be transferred and assigned to, and following the closing of the Sale remain in full force and effect for the benefit of, the [●] Purchaser, notwithstanding any provision in the [●] Assigned Contracts/Leases (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that purports to prohibit, restrict, or condition such assignment or transfer and, pursuant to section 365(k) of the Bankruptcy Code, the Estates shall be relieved from any further liability with respect to the [●] Assigned Contracts/Leases after such assignment to and assumption by the [●] Purchaser.  Upon Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the [●] Purchaser shall be fully and irrevocably vested in all rights and title to the [●] Assigned Contracts/Leases.

19.     The amounts necessary to cure any defaults existing as of the Closing Date under the [●] Assigned Contracts/Leases are the amounts listed on the Trustee's Cure Notice filed and served in the Bankruptcy Cases, or, if applicable, such other amount(s) upon which the Trustee,

154389669v5
63887670\1

[●] Purchaser and any of the Counterparties may have agreed (the "Cure Amounts"). The [●] Purchaser shall pay the Cure Amounts at Closing, or at such later time as may be mutually agreed upon by the [●] Purchaser and any applicable Counterparties. No other defaults exist under the [●] Assigned Contracts/Leases. The Counterparties waive, release, and are hereby precluded from asserting any claims against the Debtors, the Trustee or the Estates for any claims arising out of or in connection with the [●] Assigned Contracts/Leases. The [●] Purchaser shall pay the Cure Amounts to the Counterparties in full satisfaction of the Counterparties' claims for defaults that may have arisen under the [●] Assigned Contracts/Leases.

20.     The assignments of each of the [●] Assigned Contracts/Leases are made in good faith under sections 363(b) and (m) of the Bankruptcy Code and shall be free and clear of all Claims and Liens pursuant to section 363(f) of the Bankruptcy Code.]

**Prohibition of Actions against the Purchaser**

21.     Except as otherwise provided in this Order or the Purchase Agreement, the [●] Purchaser shall not have any liability or other obligation to the Estates arising under or related to any of the [●] Purchased Assets. Without limiting the generality of the foregoing, and except as otherwise provided herein or in the Purchase Agreement, the [●] Purchaser shall not be liable for any Claims against the Estates, and the [●] Purchaser shall have no successor or vicarious liabilities of any kind or character, including, but not limited to, under any theory of antitrust, environmental, successor or transferee liability, labor law, de facto merger, mere continuation, or substantial continuity, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated.

19

22.     All persons and entities holding Liens, Claims, or other interests of any kind or nature whatsoever against or in all or any portion of the [●] Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinate), including, without limitation, the Debtors, Estates, any and all debt security holders, equity security holders, governmental tax and regulatory authorities, lenders, customers, vendors, employees, former employees, litigation claimants, trustees, trade creditors, and any other creditors (or agent of any of the foregoing) who may or do hold Claims against the Debtors or the [●] Purchased Assets, arising under or out of, in connection with, or in any way relating to, the Debtors, the [●] Purchased Assets, the operation or ownership of the [●] Purchased Assets by the Debtors prior to the Closing Date, or the Sale, are hereby prohibited, hereby are forever barred, estopped, and permanently enjoined from asserting against the [●] Purchaser, its Affiliates, its successors or assigns, its property, or the [●] Purchased Assets, such persons' or entities' Liens, Claims, or interests in and to the [●] Purchased Assets, including, without limitation, the following actions: (i) commencing or continuing in any manner any action, whether at law or in equity, in any judicial, administrative, arbitral, or any other proceeding, against the [●] Purchaser, its affiliates, successors, assigns, [●] Purchased Assets, and/or properties; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Purchaser, its affiliates, successors, assigns, the [●] Purchased Assets, and/or properties; (iii) asserting or prosecuting any cause of action, any process or other act seeking to collect, offset, setoff, recoup or recover on account of any Claims against the [●] Purchaser, its affiliates, successors, assigns, assets (including the [●] Purchased Assets), and/or properties; (d) creating, perfecting, or enforcing any Claim against the [●] Purchaser, its affiliates, any of its respective successors, assigns, the [●] Purchased Assets,

and/or properties; (e) asserting a Claim as a setoff, right of subrogation, or recoupment of any kind against any obligation due against the [●] Purchaser, its affiliates or any of its respective successors or assigns; (f) commencing or continuing any action in any manner or place that does not comply, or is inconsistent, with the provisions of this Order, the Purchase Agreement, or the agreements or actions contemplated or taken in respect thereof, including the Trustee's ability to transfer the [●] Purchased Assets to the [●] Purchaser in accordance with the terms of this Order and the Purchase Agreement, or (g) revoking, terminating, or failing or refusing to renew any license, permit, or authorization to operate any of the [●] Purchased Assets or conduct any of the businesses operated with such assets.

23.     No Person shall assert or pursue any such Claim against the [●] Purchaser or its affiliates, successors or assigns nor shall such Person interfere with the [●] Purchaser's title to or use and enjoyment of the [●] Purchased Assets based on or related to any such Claim, or based on any act or omission of the Debtors or Trustee, including in the Bankruptcy Case.

24.     All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Trustee to sell and transfer the [●] Purchased Assets to the [●]  Purchaser in accordance with the terms of the Purchase Agreement and this Order.

25.     Neither the [●] Purchaser nor its Affiliates, successors, assigns, equity holders, employees or professionals shall have or incur any liability to, or be subject to any action by the Debtors, Trustee or any of their estates, predecessors, successors, or assigns, arising out of the negotiation, investigation, preparation, execution, delivery of the Purchase Agreement and the ancillary agreements and the entry into and consummation of the Sale of the [●] Purchased Assets, except as expressly provided in the Purchase Agreement and this Order.

26.     Neither the Trustee, the [●] Purchaser, nor any affiliate of either the Trustee or the [●] Purchaser have engaged in any collusion with other bidders or other parties or have taken any other action or inaction that would cause or permit the [●] Transaction to be avoided or costs or damages to be imposed under section 363(n) of the Bankruptcy Code or otherwise.  The [●] Purchaser has given substantial consideration under the Purchase Agreement for the benefit of the Estates.  The consideration given by the [●] Purchaser shall constitute valid and valuable consideration for the releases of any potential Claims and Liens pursuant to this Order, which releases shall be deemed to have been given in favor of the [●] Purchaser by all holders of Liens against or interests in, or Claims against, the Estates or any of the [●] Purchased Assets.  The consideration provided by the Purchaser for the [●] Purchased Assets under the Purchase Agreement is fair and reasonable and may not be avoided under section 363(n) of the Bankruptcy Code.

27.     Nothing in this Order or the Purchase Agreement releases, nullifies, or enjoins the enforcement of any liability to a governmental unit under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property after the date of entry of this Order; *provided, however,* that the foregoing shall not limit, diminish or otherwise alter the Trustee's or the [●] Purchaser's defenses, claims, causes of action, or other rights under applicable non-bankruptcy law with respect to any liability that may exist to a governmental unit at such owned or operated property.  Nothing in this Order or the Purchase Agreement authorizes the transfer or assignment to the [●] Purchaser of any license, permit, registration, authorization, or approval of or with respect to a governmental unit without the [●] Purchaser's complying with all applicable legal requirements under non-bankruptcy law governing such transfers or assignments.

22

154389669v5
63887670\1

**Other Provisions**

28.     The [●] Transaction is undertaken by the [●] Purchaser without collusion and in good faith, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale of the [●] Purchased Assets shall not affect the validity of such Sale, unless such authorization and the Sale are duly stayed pending such appeal.  The [●] Purchaser is a good faith buyer and, as such, shall have the full protections of section 363(m) of the Bankruptcy Code and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the sale shall not affect the validity of the [●] Transaction (including the assumption and assignment of the [●] Assigned Contracts/Leases), unless such authorization and consummation of the sale are duly and properly stayed pending such appeal before the occurrence of the Closing.

29.     The [●] Purchaser is not an "insider" of any of the Debtors as that term is defined in section 101(31) of the Bankruptcy Code.

30.     Pursuant to Federal Rules of Bankruptcy Procedure 7062, 9014, 6004(h), and 6006(d), this Order shall be effective immediately upon entry and the Trustee and the [●] Purchaser are authorized to close the Sale of the [●] Purchased Assets to the [●] Purchaser immediately upon entry of this Order.

31.     No bulk sales law or any similar law of any state or other jurisdiction (including those relating to taxes other than Transfer Taxes) shall apply in any way to the transactions authorized herein, including, without limitation, the Purchase Agreement and the [●] Transaction, and the [●] Purchaser shall have no liability in respect thereof.

32.     The failure specifically to reference any particular provision of the Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being

154389669v5
63887670\1

the intent of the Court that the Purchase Agreement is authorized and approved in its entirety as to the [●] Purchaser and the [●] Purchased Assets; provided, however, that this Order shall govern if any inconsistency exists between the Purchase Agreement (including all ancillary documents executed in connection therewith) and this Order.  Likewise, all of the provisions of this Order are nonseverable and mutually dependent.

33.     The Purchase Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented as to the [●] Purchaser or the [●] Purchased Assets by the Trustee and the [●] Purchaser and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment, or supplement does not have a material adverse effect on the Estates.

34.     The Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the Purchase Agreement, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Trustee is party or which has been assigned by the Trustee to the [●] Purchaser, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale of the [●] Purchased Assets to the [●] Purchaser, including, but not limited to, retaining jurisdiction to: (a) compel delivery of the [●] Purchased Assets to the [●] Purchaser; (b) interpret, implement, and enforce the provisions of this Order; (c) protect the [●] Purchaser against any alleged Liens, Claims, or other interests in or against the [●] Purchased Assets of any kind or nature whatsoever; and (d) enter any orders under sections 363 and/or 365 of the Bankruptcy Code with respect to the Assigned Contracts/Leases.

35.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

36.     To the extent that this Order is inconsistent or conflicts with the Bidding Procedures Order, any prior order or pleading with respect to the Sale Motion, or the terms of the Purchase Agreement, the terms of this Order shall govern and control.

25

**<u>EXHIBIT A</u>**

**<u>PURCHASE AGREEMENT</u>**

**EXHIBIT B-1**

**Bill of Sale**

**BILL OF SALE**
**WITH RESPECT TO THE PURCHASED ASSETS**

This Bill of Sale (this "**Bill of Sale**"), dated as of [●], 2023 is made by George L. Miller, in his capacity as the Chapter 7 Trustee (the "**Seller**") of the bankruptcy estates (the "**Estates**") of Akorn Holding Company LLC, Akorn Intermediate Company LLC, and Akorn Operating Company LLC (together, the "**Debtors**") in favor of and for the benefit of [●], a [●] [corporation/limited liability company] (the "**Purchaser**").

This Bill of Sale is being delivered in connection with the Closing under the master asset purchase agreement dated as of [●], 2023 between Seller and Purchaser (the "**Asset Purchase Agreement**"). Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in the Asset Purchase Agreement.

ARTICLE 1
BILL OF SALE

Section 1.1.    Conveyance. In accordance with and subject to the terms of the Asset Purchase Agreement and the Sale Order, and for the consideration ascribed to Purchaser as set forth in the Asset Purchase Agreement, the receipt and adequacy of which Seller hereby acknowledges, Seller hereby irrevocably sells, assigns, transfers, conveys, grants, bargains, and delivers to Purchaser, effective as of the Closing, all of the Estates' respective right, title and interest in and to the Purchased Assets designated to Purchaser under the Asset Purchase Agreement, free and clear of all Liens and Liabilities other than the Assumed Liabilities, as contemplated by Sections 2.1 and 7.8 of the Asset Purchase Agreement.

ARTICLE 2
MISCELLANEOUS

Section 2.1.    This Bill of Sale is expressly made subject to the terms of the Asset Purchase Agreement. The delivery of this Bill of Sale shall not amend, affect, enlarge, diminish, supersede, modify, replace, rescind, waive or otherwise impair any of the representations, warranties, covenants, terms or provisions of the Asset Purchase Agreement or any of the rights, remedies or obligations of Seller or Purchaser provided for therein or arising therefrom in any way. In the event of any conflict or inconsistency between the terms of the Asset Purchase Agreement and the terms of this Bill of Sale, the terms of the Asset Purchase Agreement shall control.

Section 2.2.    Further Assurances. Seller for himself, his successors and assigns, hereby covenants and agrees that, at any time prior to the closing of Debtors' jointly administered bankruptcy cases, on Purchaser's written request, Seller will do, execute, acknowledge, and deliver or cause to be done, executed, acknowledged, and delivered, such further acts, deeds, assignments, transfers, conveyances, powers of attorney, and assurances as may be reasonably required by Purchaser in order to assign, transfer, set over, convey, assure, and confirm unto and vest in Purchaser, its successors and assigns, title to the assets sold, conveyed, and transferred by this Bill of Sale; *provided, however*, that Purchaser shall bear all

costs associated with any foregoing actions of Seller undertaken at the written request of Purchaser.

        Section 2.3.    <u>Governing Law</u>. This Bill of Sale is governed by, and construed in accordance with, the laws of the State of Delaware, United States of America, without regard to the conflict of laws provisions thereof to the extent such principles or rules would require or permit the application of the laws of any jurisdiction other than those of the State of Delaware.

        Section 2.4.    <u>Counterparts</u>. This Bill of Sale may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Bill of Sale delivered by facsimile, e-mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Bill of Sale.

[SIGNATURE PAGE FOLLOWS]

2

IN WITNESS WHEREOF, Seller has caused this Bill of Sale to be duly executed and delivered on the date first set forth above.

**SELLER**:

GEORGE L. MILLER, AS TRUSTEE FOR THE ESTATES AKORN HOLDING COMPANY LLC, AKORN INTERMEDIATE COMPANY LLC AND AKORN OPERATING COMPANY LLC

By: _____
Name:  George L. Miller
Title:  Trustee

**BUYER**:

[●]

By: _____
Name: [●]
Title:  [●]

**EXHIBIT B-2**

<u>**Instrument of Assumption**</u>

## Assignment and Assumption Agreement

This Assignment and Assumption Agreement (the "**Agreement**"), dated as of [●], 2023 (the "**Execution Date**"), is made and entered into by and between [●], a [●] [corporation/limited liability company] ("**Assignee**") and George L. Miller, the chapter 7 trustee ( "**Assignor**") of the chapter 7 estates (collectively, the "**Estates**") of Akorn Holding Company LLC, Akorn Intermediate Company LLC and Akorn Operating Company LLC (together, "**Debtors**" and each entity individually, a "**Debtor**").

This Agreement is being delivered in connection with the Closing under the master asset purchase agreement dated as of [●], 2023 by and between Assignor and Assignee (the "**Asset Purchase Agreement**"). Capitalized terms used but not defined in this Agreement have the meanings given such terms in the Asset Purchase Agreement.

## 1.    ASSIGNMENT AND ASSUMPTION

1.1.  <u>Assigned Contracts/Leases</u>. In accordance with the terms and subject to the conditions of the Asset Purchase Agreement, Sale Order and this Agreement, and for the consideration ascribed to Assignee set forth in the Asset Purchase Agreement, the receipt and sufficiency of which Assignor and Assignee hereby acknowledge, Assignor hereby assigns, conveys and delivers to Assignee, effective as of the Closing, all of the Estates' respective right, title and interest in, to and under the Assigned Contracts/Leases designated by Assignee under the Asset Purchase Agreement (the "**[●] Assigned Contracts/Leases**"), free and clear of all Liens and Liabilities other than Assumed Liabilities and Cure Amounts, as contemplated by Sections 2.3 and 7.8 of the Asset Purchase Agreement.

1.2.  <u>Assumed Liabilities</u>. In accordance with the terms and subject to the conditions of the Asset Purchase Agreement, Sale Order and this Agreement, effective as of the Closing, Assignee does hereby assume from Assignor (and from and after Closing agrees to pay, perform, discharge or otherwise satisfy in accordance with their respective terms or as may otherwise be agreed between Assignee and the relevant obligee), and Assignor does hereby irrevocably convey, transfer and assign to Assignee, the Assumed Liabilities and Cure Amounts related to the [●] Assigned Contracts/Leases, as provided in Sections 2.2 and 2.3 of the Asset Purchase Agreement.

1.3.  <u>Excluded Liabilities</u>. The parties expressly acknowledge and agree that Assignee is not a successor to Assignor, the Debtors or their Estates in respect of, and does not assume and shall not be deemed to have assumed or be liable or obligated to pay, perform, or otherwise discharge or in any manner be responsible for any Liabilities other than the Assumed Liabilities and Cure Amounts related to the [●] Assigned Contracts/Leases.

## 2.    MISCELLANEOUS

2.1.  <u>Terms of the Asset Purchase Agreement</u>. The terms of the Asset Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements and conditions relating to the [●] Assigned Contracts/Leases and the Assumed Liabilities are

hereby incorporated herein by this reference. The parties hereto acknowledge and agree that the representations, warranties, covenants, agreements and conditions contained in the Asset Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Asset Purchase Agreement and the terms hereof, the terms of the Asset Purchase Agreement shall govern.

2.2    Governing Law. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO THE CONFLICT OF LAWS PROVISIONS THEREOF TO THE EXTENT THAT SUCH PROVISIONS WOULD REQUIRE OR PERMIT THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN THOSE OF THE STATE OF DELAWARE, AND THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE.

2.3    Counterparts. This Agreement may be executed by facsimile or PDF signature and in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when two or more counterparts have been signed by each of the parties and delivered to the other party.

2.4    Further Assurances. Until the closing of the Bankruptcy Cases, each of the parties hereto shall execute and deliver, at the reasonable request of the other party hereto, such additional documents, instruments, conveyances and assurances and take such further actions as such other party may reasonably request to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement; *provided, however*, that the Assignee shall be responsible for paying any costs associated with any such acts and/or actions that the Assignor performs at the Assignee's request.

2.5    Amendments; Waivers. This Agreement may be amended, modified and supplemented in any and all respects, but only by a written instrument signed by all of the parties hereto expressly stating that such instrument is intended to amend, modify or supplement this Agreement; provided, however, any material amendment shall be subject to approval by the Bankruptcy Court.

[SIGNATURE PAGE TO FOLLOW]

IN WITNESS WHEREOF, the parties have executed this Agreement effective as of the date first above written.

**SELLER:**

GEORGE L. MILLER, AS TRUSTEE FOR THE ESTATES

By: _____

    Name:
    Title:

**PURCHASER:**

[●]

By: _____

    Name: [●]
    Title:   [●]

## PURCHASED ASSETS

The Purchased Assets include, in each case with respect to the Products and/or Abbreviated New Drug Applications listed below:

(a)     other than any Documents whose transfer to Purchaser is prohibited by applicable Law, all Documents, including all Regulatory Documentation;

(b)     all rights of the Debtors or Estates against third parties (including suppliers, vendors, merchants, manufacturers and counterparties to leases, licensees, licensors of any Debtor) arising under or related to any Assigned Contract, Purchased Asset or Assumed Liability, including causes of action, claims, counterclaims, defenses, credits, rebates (including any vendor or supplier rebates, and rebates owed by Governmental Entities), demands, allowances, refunds, rights of set off, rights of recovery, rights of subrogation, rights of recoupment, rights under or with respect to express or implied guarantees, warranties, representations, covenants or indemnities made by such third parties or other similar rights, in each case with respect to the Assumed Liabilities or arising from the ownership or operation of any Purchased Assets;

(c)     to the extent transferable under applicable Law, all Permits, and all of the rights, interests and benefits accruing under such Permits or pending applications therefor;

(d)     all intellectual property owned by the Debtors or Estates related to the Purchased Assets, all rights to collect royalties and proceeds in connection therewith, all rights to sue and recover for past, present and future infringements, dilutions, misappropriations of, or other conflicts with, such intellectual property and any and all corresponding rights that, now or hereafter, may be secured throughout the world in respect of such intellectual property;

(e)     all goodwill and general intangible assets and rights of the Debtors or Estates to the extent relating to the other Purchased Assets or Assumed Liabilities;

(f)     all Product Registrations, Registration Information, and all other data and information regarding the development and commercialization of the Products, including all safety and efficacy databases, clinical data, non-clinical data and related books and records;

(g)     all rights and obligations under non-disclosure, confidentiality, and similar arrangements with (or for the benefit of) employees and agents of Sellers or with third parties (including any non-disclosure, confidentiality agreements or similar arrangements entered into in connection with or in contemplation of the filing of the Bankruptcy Case and the Auction contemplated by the Bidding Procedures Order);

(h)     all avoidance actions under Chapter 5 of the Bankruptcy Code to the extent relating to the Purchased Assets and/or Assumed Liabilities, including actions relating to vendors and service providers that are counterparties to Assigned Contracts or relating to Assumed Liabilities;

(i)     all other Product Registrations, Registration Information, Documents, intellectual property or other intangible assets not purchased by any other successful purchaser at the Auction;

(j)    Any contracts, agreements, or arrangements pertaining to lab equipment and instruments, including all associated licenses and software as well as all associated orders, work orders, or similar documents as well as all amendments thereto, if any; and

(k)    Products/Abbreviated New Drug Applications:

| | | |
|---|---|---|
| 76290 | Amityville | Lido/Prilo |
| 77847 | Amityville | Dorzolamide-Timolol |
| 203051 | Amityville | Bimatoprost (Latisse) |
| 203299 | Amityville | Bimatoprost (Latisse) |
| 40014 | Amityville | Lidocaine Solution |
| 77570 | Amityville | Fluticasone Rx |
| 40401 | Amityville | Prednisolone |
| 208024 | Amityville | Fluticasone OTC |
| 77026 | Amityville | Acyclovir |
| 74060 | Amityville | Valproic Acid |
| 209871 | Amityville | Clobetasol Shampoo |
| 208849 | Amityville | Betamethasone Dipr (aug) Lotion |
| 74650 | Amityville | Sulfameth |
| 77579 | Amityville | Calcipotriene |
| 203960 | Amityville | Megestrol |
| 78270 | Amityville | Ciclopirox |
| 40010 | Amityville | Hydroxyzine |
| 40027 | Amityville | Promethazine |
| 213757 | Amityville | Olopatadine Nasal spray |
| 77846 | Amityville | Dorzolamide |
| 75163 | Amityville | Timolol |
| 205438 | Amityville | Trifluridine |
| 203189 | Amityville | Gatifloxacin 0.5% |
| 74749 | Amityville | Albuterol Oral |
| 75183 | Amityville | Prednisolone |
| 74731 | Amityville | Minoxidil |
| 74076 | Amityville | Lactulose |
| 90601 | Amityville | Levetiracetam |
| 200169 | Amityville | Lorazepam Oral Conc |
| 208809 | Amityville | Morphine |
| 208795 | Amityville | Oxycodone |
| 208817 | Amityville | Oxycodone |
| 40151 | Amityville | Promethazine |
| 40674 | Amityville | Promethazine |
| 40675 | Amityville | Promethazine |
| 76616 | Amityville | Ofloxacin Otic |
| 12179 | Amityville | Acetic Acid Otic |
| 209484 | Amityville | Diclofenac Gel |
| 209896 | Amityville | Betamethasone Dipro Lotion |
| 76141 | Amityville | Clobetasol Gel |
| 75325 | Amityville | Clobetasol Emulsion |

**HIKMA**
*Schedule 2.1(a)*

| 74220 | Amityville | Clobetasol Cream |
|---|---|---|
| 74221 | Amityville | Clobetasol Ointment |
| 74222 | Amityville | Clobetasol Solution |
| 208836 | Amityville | Desonide |
| 65028 | CMO | Rifampin Capsules |
| | CMO | Nelarabine |
| | CMO | Enrofloxacin Tab |
| 75602 | CMO | Aminocaproic Tablets |
| 15197 | CMO | Aminocaproic Tablets |
| 15230 | CMO | Aminocaproic Oral Solution |
| 79217 | CMO | Dronabinol |
| | CMO | Buprenorphine/Naloxone |
| 20837 | CMO | Xopenex |
| 81319 | CMO | Pyrazinamide |
| 201422 | CMO | Tobramycin Inhalation |
| | CMO | Enrofloxacin 100mg |
| | CMO | Phytonadione |
| | CMO | Tulathromycin 100mg |
| | CMO | Calcium Gluconate |
| | CMO | Doramectin Inj |
| | CMO | Fluorometholone |
| | CMO | Vet Private Label |
| | CMO | Cefpodoxime Tab |
| | CMO | Protriptyline |
| 90622 | CMO | Buprenorphine |
| | CMO | Levocarnitine Tablets |
| 40881 | CMO | Lortab |
| 76485 | CMO | Myorisan |
| 65220 | CMO | Neomycin Sulfate |
| 40251 | CMO | Trihexyphenidyl |
| | CMO | Triamcinolone |

## LIST OF ASSIGNED CONTRACTS/LEASES

| | Name of Agreement | Counterparty |
|---|---|---|
| 1. | [intentionally omitted] | |
| 2. | [intentionally omitted] | |
| 3. | [intentionally omitted] | |
| 4. | [intentionally omitted] | |
| 5. | [intentionally omitted] | |
| 6. | [intentionally omitted] | |
| 7. | First Amendment to Exclusive Supply Agreement as of July 31, 2013 between Epic Pharma, LLC and Akorn, Inc. (parent company of Hi-Tech Pharmacal Co., Inc.) | Epic Pharma, LLC |

| 8. | [intentionally omitted] | |
|---|---|---|
| 9. | [intentionally omitted] | |
| 10. | [intentionally omitted] | |
| 11. | License and Supply Agreement entered into as of December 22, 2021 by and between Galenicum Health SLU and Akorn Operating Company, LLC | Galenicum Health, S.L.U. |
| 12. | [intentionally omitted] | |
| 13. | [intentionally omitted] | |
| 14. | Transfer and Scale-Up Agreement as of March 27, 2020 between Haupt Pharma Wolfratshausen GmbH, a member of the Aenova Group and Calyptus Pharmaceuticals Inc. | Haupt Pharma Wolfratshausen GmbH, a member of the Aenova Group |
| 15. | Distribution & Marketing Agreement dated April 5, 2022 by and between Intas Pharmaceuticals Limited and Akorn Operating LLC d/b/a Akorn Animal Health and Accord Healthcare Inc. | Intas Pharmaceuticals Limited |
| 16. | Supply Price Adjustment as of July 1 ,2021 to June 30, 2022 between Leadiant Biosciences, Inc. and Akorn Operating Company LLC | Leadiant Biosciences, Inc. |
| 17. | Termination of Manufacturing and Supply Agreement dated April 1, 2005, expiration on April 1, 2021 | Mikart, Inc. |
| 18. | Letter to Mikart Inc. dated October 18, 2013 titled "Re: Use of Lortab® Mark" dated re: Mikart Inc. and ECR Pharmaceuticals Inc. Manufacturing and Supply Agreement dated July 19, 2007 | Mikart, Inc. |
| 19. | Manufacturing and Supply Agreement dated April 1, 2005 by and between VersaPharm Incorporated and Mikart, Inc. – Pyrazinamide (5.4.9.2.4.6) | Mikart, Inc. |
| 20. | Agreement for Purchase of ANDAs for Aminocaproic Acid 500mg Tablets and Aminocaproic Acid 1.25g per 5 mL Oral Solution dated April 14, 2015 by and between Mikart, Inc. and VersaPharm Incorporated | Mikart, Inc. |
| 21. | First Amendment to Manufacturing and Supply Agreement dated September 5, 2008 by and between Mikart, Inc. and VersaPharm Incorporated | Mikart, Inc. |
| 22. | Agreement and Second Amendment to Manufacturing and Supply Agreement dated August 17, 2016 by and between Mikart, Inc. and Akorn, Inc. – Pyrazinamide (5.4.9.2.4.8) | Mikart, Inc. |
| 23. | [intentionally omitted] | |
| 24. | Exclusive Manufacturing Supply Agreement as of June 25, 2013 between Akorn, Inc. and Niagara Pharmaceuticals Inc. | Niagara Pharmaceuticals Inc. |
| 25. | [Intentionally omitted] | |

| 26. | License and Commercialization Agreement dated April 7, 2022 by and between Akorn Operating Company LLC and Orbicular Pharmaceutical Technologies Pvt Ltd | Orbicular Pharmaceutical Technologies Pvt Ltd |
|---|---|---|
| 27. | Development and Licensing Agreement by and between Akorn Operating Company LLC and Orbicular Pharmaceutical Technologies Pvt Ltd | Orbicular Pharmaceutical Technologies Pvt Ltd |
| 28. | Price Adjustment to Manufacturing Services Agreement as of January 1, 2021 between Patheon Pharmaceuticals Inc. and VersaPharm Incorporated | Patheon Pharmaceuticals Inc. |
| 29. | Manufacturing Services Agreement as of October 1, 2007 between Patheon Pharmaceuticals Inc. and VersaPharm Incorporated | Patheon Pharmaceuticals Inc. |
| 30. | First Amendment to Manufacturing Services Agreement as of July 8, 2013 between Patheon Pharmaceuticals Inc. and VersaPharm Incorporated dated October 1, 2007 | Patheon Pharmaceuticals Inc. |
| 31. | Manufacturing Services Agreement as of March 9, 2022 between Patheon Pharmaceuticals Inc. and VersaPharm Incorporated and successor Akorn Operating Company LLC dated October 1, 2007 and amended July 8, 2013 | Patheon Pharmaceuticals Inc. |
| 32. | Master Manufacturing and Supply Agreement as of January 1, 2018 between Akorn Inc. and Pharmasol Corporation | Pharmasol Corporation |
| 33. | [intentionally omitted] | |
| 34. | Supply Agreement dated April 22, 2011 between Siegfried (USA) Inc. and Akorn, Inc. | Siegfried (USA) Inc. |
| 35. | Second Amendment to Amended and Restated Supply Agreement entered into as of January 31, 2012 and amended on February 3, 2014 by and between Akorn, Inc. and Siegfried USA, LLC (f/k/a Siegfried (USA) Inc.) effective as of January 1, 2017 | Siegfried USA, LLC (f/k/a Siegfried (USA) Inc.) |
| 36. | Amendment is made as of February 3, 2014 to the Supply Agreement with regard to pentobarbital dated April 22, 2011 between Siegfried USA, LLC (f/k/a Siegfried (USA) Inc.) and Akorn Inc. | Siegfried USA, LLC (f/k/a Siegfried (USA) Inc.) |
| 37. | [intentionally omitted] | |
| 38. | Development and Supply Agreement dated July 28th, 2006 by and between Akorn, Inc and Sofgen Pharmaceuticals, LLC | Sofgen Pharmaceuticals, LLC |
| 39. | First Amendment to Development and Supply Agreement dated March 12, 2009 by and between Akorn, Inc and Sofgen Pharmaceuticals, LLC | Sofgen Pharmaceuticals, LLC |
| 40. | Exclusive Supply Agreement dated January 1, 2016 by and between Akorn, Inc and Sofgen Pharmaceuticals, LLC | Sofgen Pharmaceuticals, LLC |

| 41. | Addendum #2 to Exclusive Supply Agreement dated January 1, 2016 by and between Akorn, Inc and Sofgen Pharmaceuticals, LLC | Sofgen Pharmaceuticals, LLC |
|---|---|---|
| 42. | Settlement Agreement and Release dated March 10, 2016 by and between Sofgen Pharmaceuticals, LLC and Akorn, Inc | Sofgen Pharmaceuticals, LLC |
| 43. | Addendum to Exclusive Supply Agreement dated June 12, 2018 by and between Akorn, Inc and Sofgen Pharmaceuticals, LLC | Sofgen Pharmaceuticals, LLC |
| 44. | [intentionally omitted] | |
| 45. | First Amendment to Tech Transfer and Commercialization Agreement as of February 12, 2021 between Akorn Operating Company LLC (d.b.a. Akorn Animal Health, Inc.) and Tetragenx Animal Health ULD, dba Vetio | Tetragenx Animal Health ULD, dba Vetio |
| 46. | Tech Transfer and Commercialization Agreement as of November 10, 2020 between Akorn Operating Company LLC (d.b.a. Akorn Animal Health, Inc.) and Tetragenx Animal Health ULD, dba Vetio | Tetragenx Animal Health ULD, dba Vetio |
| 47. | Supply Agreement as of July 14, 2021 between The Ritedose Corporation and Akorn Operating Company LLC | The Ritedose Corporation |
| 48. | Tech Transfer and Commercialization Agreement as of April 22, 2021 between Akorn Operating Company LLC and TriRx Pharmaceutical Services | TriRx Pharmaceutical Services |
| 49. | [intentionally omitted] | |
| 50. | [intentionally omitted] | |
| 51. | Supplier Quality Agreement, by and between Akorn Pharmaceuticals and XGEN DJB Pharmaceuticals DJB, Inc., dated November 6, 2020 | XGEN DJB Pharmaceuticals DJB, Inc. |
| 52. | Supplier Quality Agreement, by and between Akorn Pharmaceuticals and XGEN DJB Pharmaceuticals DJB, Inc., dated July 20, 2022 | XGEN DJB Pharmaceuticals DJB, Inc. |
| 53. | Supplier Quality Agreement, by and between Akorn Pharmaceuticals and XGEN DJB Pharmaceuticals DJB, Inc., dated April 15, 2021 | XGEN DJB Pharmaceuticals DJB, Inc. |
| 54. | Safety Data Exchange Agreement, by and between XGEN DJB Pharmaceuticals DJB, Inc. and Akorn Operating Company, dated May 12, 2021 | XGEN DJB Pharmaceuticals DJB, Inc. |
| 55. | Supplier Quality Agreement, by and between XGen DJB Pharmaceuticals DJB, Inc. and Akorn Pharmaceuticals, dated November 6, 2020 | XGEN DJB Pharmaceuticals DJB, Inc. |

| 56. | Commercial Manufacturing Supply Agreement as of April 28, 2006 between Akorn Inc. and X-GEN Pharmaceuticals | X-GEN Pharmaceuticals |
|---|---|---|
| 57. | Amendment to License and Supply Agreement as of June 11, 2010 between X-Gen Pharmaceuticals Inc. and Hi-Tech Pharmacal Co. dated February 29, 2008 | X-Gen Pharmaceuticals Inc. |
| 58. | License and Supply Agreement as of February 29, 2008 between X-Gen Pharmaceuticals Inc. and Hi-Tech Pharmacal Co. Inc. | X-Gen Pharmaceuticals Inc. |
| 59. | Assignment and Amendment to Commercial Manufacturing Supply Agreement as of April 28, 2006 between Akorn Operating Company LLC and X-Gen Pharmaceuticals, Inc., and X-Gen Pharmaceuticals DBJ, Inc. effective October 19, 2021 | X-Gen Pharmaceuticals Inc. |
| 60. | Purchase and Sale Contract, by and between Frontier Technology, LLC d/b/a MicroAge and Akorn Operating Company, dated February 21, 2022 | Frontier Technology, LLC d/b/a MicroAge |
| 61. | [intentionally omitted] | |
| 62. | [intentionally omitted] | |
| 63. | Parking Lot Lease | Lucille Bonanno |
| 64. | Microsoft Enterprise Services Work Order (6Y03217-343979-421187), by and between Akorn Operating Company d/b/a Akorn, Inc. and Microsoft Corporation, effective as of March 30, 2012 | Microsoft Corp. |
| 65. | Microsoft Customer Agreement, including all associated licenses for servers and workstations and all associated orders, work orders, or similar documents as well as all amendments thereto, if any | Microsoft |
| 66. | Master Subscription Agreement, by and between Veeva Systems, Inc. and Akorn, Inc., dated September 10, 2014 and all associated orders, work orders, or similar documents as well as all amendments thereto, if any | Veeva Systems, Inc. |
| 67. | [intentionally omitted] | |
| 68. | [intentionally omitted] | |
| 69. | [intentionally omitted] | |
| 70. | [intentionally omitted] | |
| 71. | [intentionally omitted] | |
| 72. | [intentionally omitted] | |
| 73. | [intentionally omitted] | |
| 74. | [intentionally omitted] | |
| 75. | [intentionally omitted] | |
| 76. | [intentionally omitted] | |
| 77. | [intentionally omitted] | |
| 78. | [intentionally omitted] | |

| 79. | [intentionally omitted] | |
|-----|-------------------------|---|
| 80. | [intentionally omitted] | |
| 81. | [intentionally omitted] | |
| 82. | [intentionally omitted] | |
| 83. | [intentionally omitted] | |
| 84. | [intentionally omitted] | |
| 85. | [intentionally omitted] | |
| 86. | [intentionally omitted] | |
| 87. | [intentionally omitted] | |
| 88. | [intentionally omitted] | |
| 89. | [intentionally omitted] | |
| 90. | [intentionally omitted] | |
| 91. | [intentionally omitted] | |
| 92. | [intentionally omitted] | |
| 93. | [intentionally omitted] | |
| 94. | [intentionally omitted] | |
| 95. | [intentionally omitted] | |
| 96. | [intentionally omitted] | |
| 97. | [intentionally omitted] | |
| 98. | API Supply Agreement dated July 24, 2019 by and between Akorn, Inc. and Marcor Development, LLC – Lactulose (5.4.9.1.1.26) | Marcor Development, LLC dated |
| 99. | First Amendment to API Supply Agreement dated January 1, 2021 by and between Marcor Development, LLC and Akorn Operating Company LLC D.B.A. Akorn, Inc. – Lactulose (5.4.9.1.1.27) | Marcor Development, LLC dated |

**ALCON**
*Schedule 2.1(a)*

*Schedule 2.1*
*Purchased Assets*

The entirety of ANDA 207926 and each asset (collectively, the "<u>ANDA</u>") set forth on the Purchased Asset listing below for the Purchase Price of $9,200,000. Seller shall provide non-redacted records relating to the ANDA, including without limitation (a) material, official, written correspondence with FDA specifically related to the review and approval of the ANDA, (b) annual reports, CBE 0, CBE 30 and Prior Approval Supplements (PAS), in each case, specifically related to the ANDA, (c) warning letters and responses related to the ANDA, (d) periodic adverse event reports (PADER) specifically relating to the ANDA as of the Closing Date, (e) FDA approval letters issued with respect to the ANDA, as applicable; provided, however, that such shall not include any pricing or financial information related to the distribution of any products or any agreements with customers.

| Total Bid | $ | 9,200,000 |
|-----------|---|-----------|

| NDC # | Drug Description | Drug Name | ANDA No. |
|-------|------------------|-----------|----------|
| 17478-0201-02 | PHENYLEPHRINE 2.5% SOLN, 2ML | Phenylephrine | 207926 |
| 17478-0201-15 | PHENYLEPHRINE 2.5% SOLN, 15ML | Phenylephrine | 207926 |
| 17478-0206-05 | PHENYLEPHRINE 10% SOLN, 5ML | Phenylephrine | 207926 |

Assigned Contracts/Leases: None.

**Product Names (all included under Development Agreement described below):**

    a.  Zinc Sulfate
    b.  Cupric Chloride
    c.  Zinc Chloride
    d.  Selenious acid
    e.  gMultrys/tralement  (both higher strength and lower strength)

**Assigned Contracts/Leases:**

    a.  Development Agreement between Stira Pharmaceuticals, LLC and Akorn Operating Company LLC d/b/a Akorn, Inc., dated August 3, 2021
    b.  Assignment and Assumption Agreement among Stira Pharmaceuticals, LLC, Metrochem API Private Limited, and Akorn Operating Company LLC, dated August 23, 2022

<u>PURCHASED ASSETS</u>

The Purchased Assets include, in each case with respect to the Products and/or Abbreviated New Drug Applications listed below:

(a) other than any Documents whose transfer to Purchaser is prohibited by applicable Law, all Documents, including all Regulatory Documentation;

(b) all rights of the Debtors or Estates against third parties (including suppliers, vendors, merchants, manufacturers and counterparties to leases, licensees, licensors of any Debtor) arising under or related to any Assigned Contract, Purchased Asset or Assumed Liability, including causes of action, claims, counterclaims, defenses, credits, rebates (including any vendor or supplier rebates, and rebates owed by Governmental Entities), demands, allowances, refunds, rights of set off, rights of recovery, rights of subrogation, rights of recoupment, rights under or with respect to express or implied guarantees, warranties, representations, covenants or indemnities made by such third parties or other similar rights, in each case with respect to the Assumed Liabilities or arising from the ownership or operation of any Purchased Assets;

(c) to the extent transferable under applicable Law, all Permits, and all of the rights, interests and benefits accruing under such Permits or pending applications therefor;

(d) all intellectual property owned by the Debtors or Estates related to the Purchased Assets, all rights to collect royalties and proceeds in connection therewith, all rights to sue and recover for past, present and future infringements, dilutions, misappropriations of, or other conflicts with, such intellectual property and any and all corresponding rights that, now or hereafter, may be secured throughout the world in respect of such intellectual property;

(e) all goodwill and general intangible assets and rights of the Debtors or Estates to the extent relating to the other Purchased Assets or Assumed Liabilities;

(f) all Product Registrations, Registration Information, and all other data and information regarding the development and commercialization of the Products, including all safety and efficacy databases, clinical data, non-clinical data and related books and records;

(g) all rights and obligations under non-disclosure, confidentiality, and similar arrangements with (or for the benefit of) employees and agents of Sellers or with third parties (including any non-disclosure, confidentiality agreements or similar arrangements entered into in connection with or in contemplation of the filing of the Bankruptcy Case and the Auction contemplated by the Bidding Procedures Order);

(h) all avoidance actions under Chapter 5 of the Bankruptcy Code to the extent relating to the Purchased Assets and/or Assumed Liabilities, including actions relating to vendors and service providers that are counterparties to Assigned Contracts or relating to Assumed Liabilities;

(i) all other Product Registrations, Registration Information, Documents, intellectual property or other intangible assets not purchased by any other successful purchaser at the Auction; and

(j) Abbreviated New Drug Applications/New Drug Applications/Products/Pipeline Products:

## LIST OF PRODUCTS – EPIC PHARMA

| Appl. No. | Mkt. Status | Active Ingredient | Proprietary Name | Dosage Form | Strength |
|---|---|---|---|---|---|
| A212291 | RX | Ethambutol Hydrochloride | Ethambutol Hydrochloride | Tablet | 100 mg, 400 mg |
| A75095 | RX | Timolol Maleate | Timol Maleate | Solution/drops, Ophthalmic | EQ 0.5% Base |
| Pipeline | Pipeline | Difluprednate | Difluprednate | Emulsion, Ophthalmic | 0.05% |
| Orange Book Lots #3 All Other Orange Book – See Schedule 3, as reflected in Notice of Successful Bidders [Dkt. No. 204] and as more fully set forth below | | | | | |

## SCHEDULE 3 – UNMAPPED ASSETS NOT LISTED IN VDR #5.5.5.10

(also known as and otherwise referred to as the "mystery bag" or "grab all" during the rounds of bidding at the Auction of the Debtors' assets, as set forth on the record of the Auction, and consist of all other products not listed in VDR#5.5.5.10 at the auction, including but not limited to the following assets)

| Appl. No. | Mkt. Status | Active Ingredient | Proprietary Name | Dosage Form | Strength |
|---|---|---|---|---|---|
| A075063 | DISCN | ALBUTEROL SULFATE | ALBUTEROL SULFATE | SOLUTION | EQ 0.083% BASE |
| N015229 | DISCN | AMINOCAPROIC ACID | AMICAR | INJECTABLE | 250MG/ML **Federal Register determination that product was not discontinued or withdrawn for safety or effectiveness reasons** |
| A074759 | DISCN | AMINOCAPROIC ACID | AMINOCAPROIC ACID | SOLUTION | 0.25GM/ML |
| A076232 | DISCN | AMIODARONE HYDROCHLORIDE | AMIODARONE HYDROCHLORIDE | INJECTABLE | 50MG/ML |
| A207610 | RX | AZELASTINE HYDROCHLORIDE | AZELASTINE HYDROCHLORIDE | SPRAY, METERED | 0.137MG/SPRAY |
| A203660 | DISCN | AZELASTINE HYDROCHLORIDE | AZELASTINE HYDROCHLORIDE | SOLUTION/DROPS | 0.05% |
| N012015 | DISCN | BENZTROPINE MESYLATE | COGENTIN | INJECTABLE | 1MG/ML |
| N020079 | DISCN | CALCIUM CHLORIDE; DEXTROSE; GLUTATHIONE DISULFIDE; MAGNESIUM CHLORIDE; POTASSIUM CHLORIDE; SODIUM BICARBONATE; SODIUM CHLORIDE; SODIUM PHOSPHATE | METHOTREXATE SODIUM | SOLUTION | 0.154MG/ML; 0.92MG/ML; 0.184MG/ML; 0.2MG/ML; 0.38MG/ML; 2.1MG/ML; 7.14MG/ML; 0.42MG/ML |
| A075503 | DISCN | CALCIUM CHLORIDE; MAGNESIUM CHLORIDE; POTASSIUM CHLORIDE; SODIUM ACETATE; SODIUM CHLORIDE; SODIUM CITRATE | BALANCED SALT | SOLUTION | 0.48MG/ML; 0.3MG/ML; 0.75MG/ML; 3.9MG/ML; 6.4MG/ML; 1.7MG/ML |
| N050095 | DISCN | CAPREOMYCIN SULFATE | CAPASTAT SULFATE | INJECTABLE | EQ 1GM BASE/VIAL |

| A090475 | RX | CARBOPLATIN | CARBOPLATIN | INJECTABLE | 50MG/5ML, 150MG/15ML, 450MG/45ML |

| A091268 | RX | CARBOPLATIN | CARBOPLATIN | INJECTABLE | 600MG/60ML (10MG/ML) |
| A065305 | RX | CEFTRIAXONE SODIUM | CEFTRIAXONE | INJECTABLE | EQ 250MG, 500MG,1GM, 2GM BASE/VIAL |
| A062042 | DISCN | CHLORAMPHENICOL | CHLORAMPHENICOL | SOLUTION/DROPS | 0.5% |
| A078975 | DISCN | CICLOPIROX | CICLOPIROX | SOLUTION | 8% |
| A065513 | RX | CLINDAMYCIN PHOSPHATE | CLINDAMYCIN PHOSPHATE | SWAB | EQ 1% BASE |
| A211348 | DISCN | CLOBETASOL PROPIONATE | CLOBETASOL PROPIONATE | LOTION | 0% |
| A087969 | DISCN | CYANOCOBALAMIN | CYANOCOBALAMIN | INJECTABLE | 1MG/ML |
| A085555 | DISCN | CYCLOPENTOLATE HYDROCHLORIDE | AK-PENTOLATE | SOLUTION/DROPS | 1% |
| A065389 | RX | DEMECLOCYCLINE HYDROCHLORIDE | DEMECLOCYCLINE HYDROCHLORIDE | TABLET | 150MG, 300MG |
| A090727 | RX | DESOXIMETASONE | DESOXIMETASONE | GEL | 0.05% |
| A201005 | RX | DESOXIMETASONE | DESOXIMETASONE | OINTMENT | 0.25% |
| A084493 | DISCN | DEXAMETHASONE SODIUM PHOSPHATE | DEXAMETHASONE SODIUM PHOSPHATE | INJECTABLE | EQ 4MG PHOSPHATE/ML |
| A084855 | DISCN | DEXAMETHASONE SODIUM PHOSPHATE | DEXAMETHASONE SODIUM PHOSPHATE | SOLUTION/DROPS | EQ 0.1% PHOSPHATE |
| A206655 | RX | DICLOFENAC SODIUM | DICLOFENAC SODIUM | SOLUTION | 1.5% |
| A207084 | RX | DICYCLOMINE HYDROCHLORIDE | DICYCLOMINE HYDROCHLORIDE | INJECTABLE | 10MG/ML |
| A074382 | DISCN | DIPIVEFRIN HYDROCHLORIDE | AKPRO | SOLUTION/DROPS | 0.1% |
| A203058 | RX | DORZOLAMIDE HYDROCHLORIDE; TIMOLOL MALEATE | DORZOLAMIDE HYDROCHLORIDE AND TIMOLOL MALEATE | SOLUTION/DROPS | EQ 2% BASE; EQ 0.5% BASE |
| A203929 | DISCN | DOXERCALCIFEROL | DOXERCALCIFEROL | INJECTABLE | 2MCG/ML (2MCG/ML), 4MCG/2ML |
| N016049 | DISCN | DROPERIDOL; FENTANYL CITRATE | INNOVAR | INJECTABLE | 2.5MG/ML; EQ 0.05MG BASE/ML |
| A204055 | DISCN | EPINASTINE HYDROCHLORIDE | EPINASTINE HYDROCHLORIDE | SOLUTION/DROPS | 0.05% |
| A090163 | RX | EPIRUBICIN HYDROCHLORIDE | EPIRUBICIN HYDROCHLORIDE | INJECTABLE | 50MG/25ML (2MG/ML) |
| A090215 | RX | ERYTHROMYCIN | ERYTHROMYCIN | SWAB | 2% |
| A064101 | DISCN | ERYTHROMYCIN | ERYTHRO-STATIN | SOLUTION | 2% |
| A040686 | RX | ETHOSUXIMIDE | ETHOSUXIMIDE | CAPSULE | 250MG |
| A076324 | DISCN | FAMOTIDINE | FAMOTIDINE PRESERVATIVE FREE | INJECTABLE | 10MG/ML |
| A076322 | DISCN | FAMOTIDINE | FAMOTIDINE PRESERVATIVE FREE (PHARMACY BULK) | INJECTABLE | 10MG/ML |
| A062635 | DISCN | GENTAMICIN SULFATE | GENTAMICIN SULFATE | SOLUTION/DROPS | EQ 0.3% BASE |
| A079119 | DISCN | GRANISETRON HYDROCHLORIDE | GRANISETRON HYDROCHLORIDE | INJECTABLE | EQ 0.1MG BASE/ML (EQ 0.1MG BASE/ML) |
| A204849 | DISCN | HALOPERIDOL LACTATE | HALOPERIDOL | INJECTABLE | EQ 5MG BASE/ML |
| N017486 | DISCN | HEPARIN SODIUM | HEPARIN SODIUM | INJECTABLE | 1,000 UNITS/ML, 5,000 UNITS/ML, 10,000 UNITS/ML, 20,000 UNITS/ML, 40,000 UNITS/ML |
| N009637 | DISCN | HYDROCORTISONE ACETATE | HYDROCORTISONE ACETATE | INJECTABLE | 25MG/ML, 50MG/ML |
| A060188 | DISCN | HYDROCORTISONE ACETATE; NEOMYCIN SULFATE | COR-OTICIN | SUSPENSION/DROPS | 1.5%; EQ 3.5MG BASE/ML |

| | | | | | |
|---|---|---|---|---|---|
| N019261 | DISCN | HYDROXYAMPHETAMINE HYDROBROMIDE; TROPICAMIDE | PAREMYD | SOLUTION/DROPS | 1%; 0.25% |
| N018004 | DISCN | HYDROXYPROGESTERONE CAPROATE | HYDROXYPROGESTERONE CAPROATE | INJECTABLE | 125MG/ML |
| A090726 | RX | IRINOTECAN HYDROCHLORIDE | IRINOTECAN HYDROCHLORIDE | INJECTABLE | 40MG/2ML (20MG/ML), 100MG/5ML (20MG/ML) |
| A078399 | DISCN | KETOROLAC TROMETHAMINE | KETOROLAC TROMETHAMINE | SOLUTION/DROPS | 0.4% |
| A203376 | DISCN | KETOROLAC TROMETHAMINE | KETOROLAC TROMETHAMINE | SOLUTION/DROPS | 0.45% |
| A090887 | DISCN | LATANOPROST | LATANOPROST | SOLUTION/DROPS | 0.01% |
| A209934 | DISCN | LEVETIRACETAM | LEVETIRACETAM | INJECTABLE | 500MG/5ML (100MG/ML) |
| A074779 | DISCN | LEVOBUNOLOL HYDROCHLORIDE | AKBETA | SOLUTION/DROPS | 0.25% |
| A074780 | DISCN | LEVOBUNOLOL HYDROCHLORIDE | AKBETA | SOLUTION/DROPS | 0.5% |
| A077399 | RX | LEVOCARNITINE | LEVOCARNITINE | SOLUTION | 1GM/10ML |
| A085037 | DISCN | LIDOCAINE HYDROCHLORIDE | LIDOCAINE HYDROCHLORIDE | INJECTABLE | 1%, 2% |
| N008816 | DISCN | LIDOCAINE HYDROCHLORIDE | XYLOCAINE | JELLY | 2% **Federal Register determination that product was not discontinued or withdrawn for safety or effectiveness reasons** |
| A074974 | DISCN | LORAZEPAM | LORAZEPAM | INJECTABLE | 2MG/ML |
| A086903 | DISCN | METHYLPREDNISOLONE ACETATE | METHYLPREDNISOLONE ACETATE | INJECTABLE | 40MG/ML, 80MG/ML |
| A075494 | RX | MIDAZOLAM HYDROCHLORIDE | MIDAZOLAM HYDROCHLORIDE | INJECTABLE | EQ 1MG BASE/ML, EQ 5MG BASE/ML |
| A202916 | DISCN | MOXIFLOXACIN HYDROCHLORIDE | MOXIFLOXACIN HYDROCHLORIDE | SOLUTION/DROPS | EQ 0.5% BASE |
| A087519 | DISCN | NANDROLONE DECANOATE | NANDROLONE DECANOATE | INJECTABLE | 100MG/ML |
| A090638 | DISCN | NEDOCROMIL SODIUM | NEDOCROMIL SODIUM | SOLUTION/DROPS | 2% |
| A207217 | RX | NYSTATIN; TRIAMCINOLONE ACETONIDE | NYSTATIN AND TRIAMCINOLONE ACETONIDE | OINTMENT | 100,000 UNITS/GM; 0.1% |
| A076615 | DISCN | OFLOXACIN | OFLOXACIN | SOLUTION/DROPS | 0.3% |
| A079197 | RX | PANTOPRAZOLE SODIUM | PANTOPRAZOLE SODIUM | INJECTABLE | EQ 40MG BASE/VIAL |
| A207692 | DISCN | PARICALCITOL | PARICALCITOL | SOLUTION | 0.01MG/2ML (0.005MG/ML) |
| A084095 | DISCN | PENTOBARBITAL SODIUM | NEMBUTAL SODIUM | CAPSULE | 30MG |
| A084093 | DISCN | PENTOBARBITAL SODIUM | NEMBUTAL SODIUM | CAPSULE | 50MG |
| A083245 | DISCN | PENTOBARBITAL SODIUM | NEMBUTAL SODIUM | CAPSULE | 100MG |
| N017431 | DISCN | PILOCARPINE | OCUSERT PILO-20 | INSERT, EXTENDED RELEASE | 5MG |
| N017548 | DISCN | PILOCARPINE | OCUSERT PILO-40 | INSERT, EXTENDED RELEASE | 11MG |
| A065006 | RX | POLYMYXIN B SULFATE; TRIMETHOPRIM SULFATE | TRIMETHOPRIM SULFATE AND POLYMYXIN B SULFATE | SOLUTION/DROPS | 10,000 UNITS/ML; EQ 1MG BASE/ML |
| A088286 | DISCN | POTASSIUM CHLORIDE | POTASSIUM CHLORIDE | INJECTABLE | 2MEQ/ML |
| A083032 | DISCN | PREDNISOLONE ACETATE | PREDNISOLONE ACETATE | INJECTABLE | 25MG/ML |

| | | | | | |
|---|---|---|---|---|---|
| A084492 | DISCN | PREDNISOLONE ACETATE | PREDNISOLONE ACETATE | INJECTABLE | 50MG/ML |
| A088059 | DISCN | PREDNISOLONE ACETATE; SULFACETAMIDE SODIUM | PREDAMIDE | SUSPENSION/DROPS | 0.5%; 10% |
| A083358 | DISCN | PREDNISOLONE SODIUM PHOSPHATE | PREDNISOLONE SODIUM PHOSPHATE | SOLUTION/DROPS | EQ 0.11% PHOSPHATE, EQ 0.9% PHOSPHATE |
| A074511 | DISCN | PREDNISOLONE SODIUM PHOSPHATE; SULFACETAMIDE SODIUM | SULSTER | SOLUTION/DROPS | EQ 0.23% PHOSPHATE; 10% |
| A083955 | DISCN | PROMETHAZINE HYDROCHLORIDE | PROMETHAZINE HYDROCHLORIDE | INJECTABLE | 25MG/ML, 50MG/ML |
| A087967 | DISCN | PYRIDOXINE HYDROCHLORIDE | PYRIDOXINE HYDROCHLORIDE | INJECTABLE | 100MG/ML |
| A091078 | DISCN | RANITIDINE HYDROCHLORIDE | RANITIDINE HYDROCHLORIDE | SYRUP | EQ 15MG BASE/ML |
| A065502 | RX | RIFAMPIN | RIFAMPIN | INJECTABLE | 600MG/VIAL |
| A208635 | DISCN | SODIUM NITROPRUSSIDE | SODIUM NITROPRUSSIDE | INJECTABLE | 25MG/ML |
| A083021 | DISCN | SULFACETAMIDE SODIUM | SODIUM SULFACETAMIDE | SOLUTION/DROPS | 10%, 15%, 30% |
| A040216 | DISCN | SULFACETAMIDE SODIUM | SULFACETAMIDE SODIUM | SOLUTION/DROPS | 30% |
| A078151 | DISCN | TERBUTALINE SULFATE | TERBUTALINE SULFATE | INJECTABLE | 1MG/ML |
| A087968 | DISCN | THIAMINE HYDROCHLORIDE | THIAMINE HYDROCHLORIDE | INJECTABLE | 100MG/ML |
| A040125 | DISCN | THIORIDAZINE HYDROCHLORIDE | THIORIDAZINE HYDROCHLORIDE | CONCENTRATE | 30MG/ML, 100MG/ML |
| A205309 | DISCN | TIMOLOL | TIMOLOL | SOLUTION/DROPS | EQ 0.25% BASE, EQ 0.5% BASE |
| A074465 | DISCN | TIMOLOL MALEATE | TIMOLOL MALEATE | SOLUTION/DROPS | EQ 0.25% BASE |
| A074515 | DISCN | TIMOLOL MALEATE | TIMOLOL MALEATE | SOLUTION/DROPS | EQ 0.25% BASE |
| A074516 | DISCN | TIMOLOL MALEATE | TIMOLOL MALEATE | SOLUTION/DROPS | EQ 0.5% BASE |
| A064096 | DISCN | TOBRAMYCIN | AKTOB | SOLUTION/DROPS | 0.3% |
| A205179 | DISCN | TOBRAMYCIN SULFATE | TOBRAMYCIN SULFATE | INJECTABLE | EQ 40MG BASE/ML |
| A202373 | RX | TRANEXAMIC ACID | TRANEXAMIC ACID | INJECTABLE | 100MG/ML |
| A206594 | DISCN | TRANEXAMIC ACID | TRANEXAMIC ACID | INJECTABLE | 100MG/ML |
| A202374 | RX | TRIAMCINOLONE ACETONIDE | TRIAMCINOLONE ACETONIDE | LOTION | 0.025%, 0.1% |
| A085122 | DISCN | TRIAMCINOLONE DIACETATE | TRIAMCINOLONE DIACETATE | INJECTABLE | 25MG/ML |
| A086394 | DISCN | TRIAMCINOLONE DIACETATE | TRIAMCINOLONE DIACETATE | INJECTABLE | 40MG/ML |
| A040314 | RX | TROPICAMIDE | TROPICACYL | SOLUTION/DROPS | 0.5% |
| A088447 | DISCN | TROPICAMIDE | TROPICAMIDE | SOLUTION/DROPS | 1% |
| A207049 | RX | VORICONAZOLE | VORICONAZOLE | TABLET | 50MG,200 MG |
| A202548 | RX | ZOLEDRONIC ACID | ZOLEDRONIC ACID | INJECTABLE | EQ 4MG BASE/5ML, EQ 5MG BASE/100ML |
| A206719 | DISCN | BACITRACIN | BACITRACIN | INJECTABLE | 50,000 units/vial, *withdrawn per FDA request |
| BLA 021716 | DISCN | HYALURONIDASE INJECTION | HYDASE™ | INJECTABLE | 150 units/mL |
| A206903 | Filed | BIVALIRUDIN | BIVALIRUDIN | INJECTABLE | 250 mg/vial |
| A207339 | Filed | DAPTOMYCIN | DAPTOMYCIN | INJECTABLE | 500 mg/vial |
| A205491 | Filed | DEXAMETHASONE SODIUM PHOSPHATE | DEXAMETHASONE SODIUM PHOSPHATE | INJECTABLE | 10mg/mL, 1 mL |
| A205427 | Filed | DEXAMETHASONE SODIUM PHOSPHATE | DEXAMETHASONE SODIUM PHOSPHATE | INJECTABLE | 10mg/mL, 10 mL |

EPIC
*Schedule 2.1(a)*

| A206464 | Filed | DEXAMETHASONE SODIUM PHOSPHATE | DEXAMETHASONE SODIUM PHOSPHATE | INJECTABLE | 4 mg/mL |
|---|---|---|---|---|---|
| A208828 | Filed | FOLIC ACID | FOLIC ACID | INJECTABLE | 5 mg/mL) Multi-Dose Vial |
| A208897 | Filed | METHOCARBAMOL | METHOCARBAMOL | INJECTABLE | 100 mg/mL) per Single-dose Vial |
| A204731 | Filed | PALONOSETRON HCL | PALONOSETRON HCL | INJECTABLE | 0.25mg/5mL |
| A208734 | Filed | REMIFENTANIL HYDROCHLORIDE | REMIFENTANIL HYDROCHLORIDE | INJECTABLE | 1mg /vial and 2 mg/vial |
| A210006 | Filed | SUCCINYLCHOLINE CHLORIDE | SUCCINYLCHOLINE CHLORIDE | INJECTABLE | 20 mg/mL |
| A206293 | Filed | VANCOMYCIN HYDROCHLORIDE | VANCOMYCIN HYDROCHLORIDE | INJECTABLE | 500 mg/vial and 1 gram per vial |
| A206539 | Filed | VANCOMYCIN HYDROCHLORIDE | VANCOMYCIN HYDROCHLORIDE | INJECTABLE | 5 g per vial |
| A210202 | Filed | NEOMYCIN POLYMYXIN B DEXAMETHASONE | NEOMYCIN POLYMYXIN B DEXAMETHASONE | SUSPENSION | Eq 3.5 Mg Base/Gm; 10,000 Units/Gm; 0.1% |
| A211419 | Filed | SODIUM POLYSTYRENE SULFONATE | SODIUM POLYSTYRENE SULFONATE | SUSPENSION | 15G /60 mL |
| | | [intentionally omitted] | | | |
| | Pipeline | CIPROFLOXACIN, HYDROCORTISONE | CIPROFLOXACIN, HYDROCORTISONE | SUSPENSION | EQ 0.2% BASE; 1% |
| | Pipeline | TOBRAMYCIN, DEXAMETHASONE | TOBRAMYCIN, DEXAMETHASONE | SUSPENSION | |
| | Pipeline | BUTORPHANOL | BUTORPHANOL | INJECTABLE | 1 MG/ML, 2 MG/ML |

## Schedule 3 – other non-ANDA assets not included in VDR#5.5.5.10

| NDC # | Drug SKU | Drug Name | Comment |
|---|---|---|---|
| 50383-0771-XX | Docu Liquid (Docusate Sodium) | Docusate | OTC |
| 50383-0627-50 | Ferrous Sulfate Drops | Ferrous Sulfate Drops | Dietary Supplement |
| 50383-0778-16 | Ferrous Sulfate Elixir | Ferrous Sulfate Elixir | Dietary Supplement |
| 50383-0087-XX | Guaiatussin AC (Sugar-Free) | Guaiatussin | OTC |
| 50383-0063-XX | Guaifenesin Oral Sol Unit Dose | Guaifenesin | OTC |
| 61748-0095-01 | PYRIDOXINE TAB (B6) 50mg 100CT | Pyridoxine | Dietary Supplement |
| 17478-0404-01 | FUL-GLO 1mg OPHTH STRIPS; | FUL-GLO | Commercial right |
| 17478-0403-03 | FUL-GLO OPHTH STRIPS, 300/BX | FUL-GLO | Commercial right |

EPIC
*Schedule 2.1(a)*

LIST OF ASSIGNED CONTRACTS/LEASES

| | Appl No. | Product Name | Name of Agreement | Counterparty |
|---|---|---|---|---|
| 1. | 212291 | Timolol 0.5% UD, ophthlamic | Fareva offer regarding Akorn's request for a engineering batch and the first 3 validation batches for your speciality TIMOLOL 0,5% dated February 24, 2020 | Fareva |
| 2. | Difluprednate - Pipeline | Difluprednate emulsion, ophthalmic | Master Supply Agreement as of October 27, 2022 between Akorn Operating Company LLC and Woodstock Sterile Solutions, Inc. | Woodstock Sterile |
| 3. | Difluprednate - Pipeline | Difluprednate emulsion, ophthalmic | Product Addendum to Master Supply Agreement as of October 27, 2022 between Akorn Operating Company LLC and Woodstock Sterile Solutions, Inc. | Woodstock Sterile |
| 4. | Difluprednate - Pipeline | Difluprednate emulsion, ophthalmic | Development Agreement dated September 13, 2011 by and between Slayback Pharma LLC and Akorn, Inc | Slayback |
| 5. | 75095 | Ethambutol, tablet | Exclusive License Agreement as of June 24, 2020 between Akorn, Inc. and Epic Pharma, LLC (on behalf of itself and its affiliate PuraCap Pharmaceuticals LLC and its affiliate PuraCap Caribe) | Epic Pharma, LLC |
| 6. | 65513 | Clindamycin Phosphate Topical Solution USP, 1% (Pledgets) | Manufaturing, Sales, Marketing, and Distribution Agreement as of September 23, 2022 between Akorn Operating Company LLC and Palm Coast Pharmceuticals, LLC | Palm Coast Pharmaceutical |
| 7. | | | [intentionally omitted] | |
| 8. | | | [intentionally omitted] | |
| 9. | 40686 | Ethosuximide, capsule | Contract Manufacturing Agreement dated January 12, 2007 between Swiss Caps AG and VersaPharm Incorporated | Swiss Caps AG / Aenova |

Saptalis Purchase consists of the entirety of each asset (collectively, the "NDA/ANDA") set forth on the Purchased Asset listing below for the Purchase Price of $1,530,000. Seller shall provide non-redacted records relating to the NDA/ANDA, including without limitation (a) material, official, written correspondence with FDA specifically related to the review and approval of the NDA/ANDA, (b) annual reports, CBE 0, CBE 30 and Prior Approval Supplements (PAS), in each case, specifically related to the NDA/ANDA, (c) warning letters and responses related to the NDA/ANDA, (d) periodic adverse event reports (PADER) specifically relating to the NDA/ANDA as of the Closing Date, (e) FDA approval letters issued with respect to the NDA/ANDA, as applicable.

## LIST OF PRODUCTS  –  SAPTALIS PHARMACEUTICALS

| Appl. No. | Mkt. Status | Active Ingredient | Proprietary Name | Dosage Form/Route | Strength |
|---|---|---|---|---|---|
| N012770 | RX | ACETIC ACID, GLACIAL; HYDROCORTISONE | VOSOL HC | SOLUTION/DROPS, OTIC | 2%; 1% |
| Schedule 2.1(a)1: Orange Book Lots #1– See as set forth below | | | | | |
| Schedule 2.1(a)2: Orange Book Lots #2 - as set forth below | | | | | |

## SCHEDULE 2.1(a)1 – ORANGE BOOK LOTS #1

| Appl. No. | Active Ingredient | Proprietary Name | Dosage Form | Route | Strength |
|---|---|---|---|---|---|
| A076555 | CIPROFLOXACIN HYDROCHLORIDE | CIPROFLOXACIN HYDROCHLORIDE | SOLUTION/DROPS | OPHTHALMIC | EQ 0.3% BASE |
| | AKWA TEARS | AKWA TEARS | OINTMENT | OPHTHALMIC | |
| A074466 | TIMOLOL MALEATE | TIMOLOL MALEATE | SOLUTION/DROPS | OPHTHALMIC | EQ 0.5% BASE |
| A148982 | TIMOLOL MALEATE | TIMOLOL MALEATE | SOLUTION/DROPS | OPHTHALMIC | |
| A064028 | BACITRACIN ZINC; POLYMYXIN B SULFATE | BACITRACIN ZINC AND POLYMYXIN B SULFATE | OINTMENT | OPHTHALMIC | 500 UNITS/GM; 10,000 UNITS/GM |
| A204723 | OLOPATADINE HYDROCHLORIDE | OLOPATADINE HYDROCHLORIDE | SOLUTION/DROPS | OPHTHALMIC | EQ 0.2% BASE |
| A204532 | OLOPATADINE HYDROCHLORIDE | OLOPATADINE HYDROCHLORIDE | SOLUTION/DROPS | OPHTHALMIC | EQ 0.1% BASE |
| | HYPROMELLOSE | GONAK | SOLUTION/DROPS | OPHTHALMIC | 2.5% |
| A074706 | CROMOLYN SODIUM | CROMOLYN SODIUM | SOLUTION/DROPS | OPHTHALMIC | 4% |
| A040215 | SULFACETAMIDE SODIUM | SULFACETAMIDE SODIUM | SOLUTION/DROPS | OPHTHALMIC | 10% |
| A128192 | TOBRAMYCIN | TOBRAMYCIN | SOLUTION/DROPS | OPHTHALMIC | |
| A075386 | BETAXOLOL HYDROCHLORIDE | BETAXOLOL HYDROCHLORIDE | SOLUTION/DROPS | OPHTHALMIC | EQ 0.5% BASE |

| A064093 | GENTAMICIN SULFATE | GENTAMICIN SULFATE | OINTMENT | OPHTHALMIC | EQ 0.3% BASE |
| A090268 | LEVOFLOXACIN | LEVOFLOXACIN | SOLUTION/DROPS | OPHTHALMIC | 0.5% |
| A065088 | BACITRACIN ZINC; NEOMYCIN SULFATE; POLYMYXIN B SULFATE | NEOMYCIN AND POLYMYXIN B SULFATES AND BACITRACIN ZINC | OINTMENT | OPHTHALMIC | 400 UNITS/GM; EQ 3.5MG BASE/GM; 10,000 UNITS/GM |
| A077845 | DICLOFENAC SODIUM | DICLOFENAC SODIUM | SOLUTION/DROPS | OPHTHALMIC | 0.1% |
| A065213 | BACITRACIN ZINC; HYDROCORTISONE; NEOMYCIN SULFATE; POLYMYXIN B SULFATE | NEOMYCIN AND POLYMYXIN B SULFATES, BACITRACIN ZINC AND HYDROCORTISONE | OINTMENT | OPHTHALMIC | 400 UNITS/GM; 1%; EQ 3.5MG BASE/GM; 10,000 UNITS/GM |
| A205937 | CYCLOPENTOLATE HYDROCHLORIDE | CYCLOPENTOLATE HYDROCHLORIDE | SOLUTION/DROPS | OPHTHALMIC | 0.5% |
| A064163 | GENTAMICIN SULFATE | GENTAK | SOLUTION/DROPS | OPHTHALMIC | EQ 0.3% BASE |

## SCHEDULE 2.1(a)2 – ORANGE BOOK LOTS #2

| Appl. No. | Active Ingredient | Proprietary Name | Dosage Form | Route | Strength |
|---|---|---|---|---|---|
| A091514 | FLUOCINOLONE ACETONIDE | FLUOCINOLONE ACETONIDE | OIL | TOPICAL | 0.01% |
| A202705 | FLUOCINOLONE ACETONIDE | FLUOCINOLONE ACETONIDE | OIL/DROPS | OTIC | 0.01% |
| A074356 | CHLORHEXIDINE GLUCONATE | CHLORHEXIDINE GLUCONATE | SOLUTION | DENTAL | 0.12% |
| A207218 | CLOBETASOL PROPIONATE | CLOBETASOL PROPIONATE | SPRAY | TOPICAL | 0.05% |
| A075525 | FLUOXETINE HYDROCHLORIDE | FLUOXETINE HYDROCHLORIDE | SOLUTION | ORAL | EQ 20MG BASE/5ML |
| A074352 | LOPERAMIDE HYDROCHLORIDE | LOPERAMIDE HYDROCHLORIDE | SOLUTION | ORAL | 1MG/5ML |
| A203787 | DESOXIMETASONE | DESOXIMETASONE | CREAM | TOPICAL | 0.05% |
| A203234 | DESOXIMETASONE | DESOXIMETASONE | CREAM | TOPICAL | 0.25% |
| A206572 | DIFLORASONE DIACETATE | DIFLORASONE DIACETATE | OINTMENT | TOPICAL | 0.05% |
| A072416 | DIPHENHYDRAMINE HYDROCHLORIDE | DIPHENHYDRAMINE HYDROCHLORIDE | SYRUP | ORAL | 12.5MG/5ML |
| A206312 | TRIAMCINOLONE ACETONIDE | TRIAMCINOLONE ACETONIDE | PASTE | DENTAL | 0.1% |
| A207094 | TRIAMCINOLONE ACETONIDE | TRIAMCINOLONE ACETONIDE | SPRAY | TOPICAL | 0.147MG/GM |
| A083244 | PENTOBARBITAL | NEMBUTAL | ELIXIR | ORAL | 18.2MG/5ML |
| A083247 | PENTOBARBITAL SODIUM | NEMBUTAL | SUPPOSITORY | RECTAL | 30MG |
| A083247 | PENTOBARBITAL SODIUM | NEMBUTAL | SUPPOSITORY | RECTAL | 60MG |
| A083247 | PENTOBARBITAL SODIUM | NEMBUTAL | SUPPOSITORY | RECTAL | 120MG |
| A083247 | PENTOBARBITAL SODIUM | NEMBUTAL | SUPPOSITORY | RECTAL | 200MG |
| A210032 | AZELASTINE HYDROCHLORIDE | AZELASTINE HYDROCHLORIDE | SPRAY, METERED | NASAL | 0.2055MG/SPRAY |

The Purchased Assets also include (a) all Regulatory Documentation associated with the Purchased Marketing Authorizations and (b) all United States intellectual property rights (if any) associated with any of the Products.

Assigned Contracts/Leases: None

### *Purchased Assets*

The Purchased Assets consist of (1) the Abbreviated New Drug Applications (as defined by the FDA) set forth below in the following table (the "Purchased ANDAs"), (2) all Registration Information associated with the Purchased ANDAs and (b) all United States intellectual property rights (if any) associated with any of the Products that are the subject of the Purchased ANDAs:

| Active Ingredient | Appl. No. | Dosage Form | Route | Strength |
|---|---|---|---|---|
| ACETAMINOPHEN; CODEINE PHOSPHATE | A040119 | SOLUTION | ORAL | 120MG/5ML; 12MG/5ML |
| CIMETIDINE HYDROCHLORIDE | A074664 | SOLUTION | ORAL | EQ 300MG BASE/5ML |
| HOMATROPINE METHYLBROMIDE; HYDROCODONE BITARTRATE | A040613 | SYRUP | ORAL | 1.5MG/5ML; 5MG/5ML |
| IBUPROFEN | A205647 | SUSPENSION | ORAL | 100MG/5ML |
| LACTULOSE | A074076[1] | SOLUTION | ORAL | 10GM/15ML |
| LACTULOSE | A074077 | SOLUTION | ORAL, RECTAL | 10GM/15ML |
| MIDAZOLAM HYDROCHLORIDE | A075958 | SYRUP | ORAL | EQ 2MG BASE/ML |
| VANCOMYCIN HYDROCHLORIDE | A065478 | CAPSULE | ORAL | EQ 125MG BASE, EQ 250MG BASE |
| NYSTATIN | A064042 | SUSPENSION | ORAL | 100,000 UNITS/ML |

Assigned Contracts/Leases: None

---

[1] The inclusion of this Abbreviated New Drug Application as a Purchased Asset remains subject to ongoing negotiations with Hikma.

### PURCHASED ASSETS

| | |
|---|---|
| Product Name: | GABAPENTIN |
| NDC: | 50383-0311-47 |
| NDC: | 50383-0311-05 (inactive unit dose) |
| NDC: | 50383-0311-07 (inactive unit dose) |
| ANDA Number: | A078974 - 001 |
| ANDA Approval Date: | February 18, 2011 |
| Dosage Form/Route: | Solution/Oral |
| Dosage Strength: | 250MG/5ML |
| TE Code: | AA |

The Purchased Assets also include (a) all Regulatory Documentation associated with the Purchased Marketing Authorizations and (b) all United States intellectual property rights (if any) associated with any of the Products.

### ASSUMED CONTRACTS/LEASES

None.

## PURCHASED ASSETS

The Purchased Assets consist of the Abbreviated New Drug Applications (<u>ANDAs</u>") set forth below in the following table, together with all Regulatory Documentation associated with such ANDAs, and (b) all United States intellectual property rights (if any) associated with any of the Products:

| Active Ingredient | Appl. No. | Dosage Form | Route | Strength |
|---|---|---|---|---|
| Promethazine Hydrochloride | A040026 | Syrup | Oral | 6.25MG/5ML |
| Ketorolac Tromethamine | A078434 | Solution/Drops | Ophthalmic | 0.5% |

## ASSUMED CONTRACTS/LEASES

None.

## PURCHASED ASSETS

| Purchased Product | Regulatory Status | NDC #s | Price |
|---|---|---|---|
| Amantadine HCl Syrup, USP<br><br>Amantadine HCl Syrup USP 10mLUD 100 pk; 100 mg/10 mL | ANDA 74170 | 50383-0807-16<br><br>50383-0807-12 | $700,000 |

## ASSUMED CONTRACTS/LEASES

None.

## PURCHASED ASSETS

1. The Purchased Marketing Authorizations consist of the Abbreviated New Drug Applications set forth below in the following table:

| Product | ANDA | Portion of Purchase Price |
|---------|------|---------------------------|
| Albuterol Sulfate Inhalation Solution | ANDA 074543 | $6,200,000 |
| Bromfenac Opthalmic Solution | ANDA 203395 | $300,000 |
| Lidocaine Topical Jelly | ANDA 040433 | $8,500,000 |
| Loteprednol Etabonate Ophthalmic Suspension (0.5%) | ANDA 207609 | $3,700,000 |

2. The Purchased Assets also include (a) all Regulatory Documentation associated with the Purchased Marketing Authorizations, and all sales documents and all other Documents related to the Purchased Assets and (b) all United States intellectual property rights (if any) associated with any of the Products.

## ASSUMED CONTRACTS/LEASES

1. Proposal (No. SI2670Rev.4), effective as of November 19, 2021, by and between Akorn Operating Company LLC and Siegfried Irvine.

**Preliminary List of Added Contract(s)/Lease(s)**

| | | |
|---|---|---|
| 23. | Development Agreement as of May 22, 2018 between Akorn Animal Health, Inc. and NextPharma GmbH | NextPharma GmbH |
| 61. | ParkPlace Cisco Renewal, dated as of January 5, 2023 | MicroAge |
| 62. | Nutanix Renewal, dated as of April 21, 2023 | MicroAge |
| 67. | Enterprise Agreement dated as of May 20, 2014 and all associated orders, work orders, or similar documents as well as all amendments thereto, if any | TraceLink, Inc. |
| 68. | Master Country Agreement dated as of August 11, 2020 and all associated orders, work orders, or similar documents as well as all amendments thereto, if any | Equinix LLC |
| 69. | Enterprise License Agreement effective as of March 23, 2022 | VMWare, Inc. |
| 70. | Service Contract dated as of February 14, 2014 | inContact |
| 71. | AT&T MA Ref. No 154355UA / AT&T PS Contract ID MIS14149681 | AT&T |
| 73. | Comcast MetroE agreement, including all associated licenses for servers and workstations and all associated orders, work orders, or similar documents as well as all amendments thereto, if any | Comcast |
| 74. | Windstream agreement, including all associated licenses for servers and workstations and all associated orders, work orders, or similar documents as well as all amendments thereto, if any | Windstream |
| 75. | Palo Alto Firewalls agreement, including all associated licenses for servers and workstations and all associated orders, work orders, or similar documents as well as all amendments thereto, if any | Palo Alto Firewalls |
| 76. | CalyxIT, including all associated licenses for servers and workstations and all associated orders, work orders, or similar documents as well as all amendments thereto, if any | CalyxIT |
| 77. | Empower, including all associated licenses for servers and workstations and all associated orders, work orders, or similar documents as well as all amendments thereto, if any | Empower |
| 78. | Blue Mountain RAM, including all associated licenses for servers and workstations and all associated orders, work orders, or similar documents as well as all amendments thereto, if any | Blue Mountain |

| 79. | Silverfort on-prem MFA, including all associated licenses for servers and workstations and all associated orders, work orders, or similar documents as well as all amendments thereto, if any | Silverfort |
|---|---|---|
| 80. | Trackwise agreement, including all associated licenses for servers and workstations and all associated orders, work orders, or similar documents as well as all amendments thereto, if any | Trackwise |
| 82. | Transfer, License and Supply Agreement by and between Douglas Pharmaceuticals America Limited and VersaPharm Incorporated signed by Douglas Pharmaceuticals America Limited on March 27, 2008 and by VersaPharm Incorporated on April 1, 2008 – Myorisan (5.4.9.2.1.1; also at 5.4.5.3.4.5.7) | Douglas Pharmaceuticals America Limited |
| 83. | Letter titled "Re: Manufacture of Isotretinoin 30 mg pre ANDA approval" dated February 23, 2015 from Douglas Pharmaceuticals America Limited to VersaPharm Incorporated – Myorisan (5.4.9.2.1.2) | Douglas Pharmaceuticals America Limited |
| 84. | Letter titled "TRANSFER, LICENSE AND SUPPLY AGREEMENT DATED 27 MARCH 2008 FOR ISOTRETINOIN 10MG, 20MG AND 40MG SOFT GEL CAPSULES" dated April 23, 2012 from Douglas Pharmaceuticals America Limited to VersaPharm Incorporated intended to be the 2nd amendment to the Transfer, License and Supply Agreement – Myorisan (5.4.9.2.1.3) | Douglas Pharmaceuticals America Limited |
| 85. | Letter titled "TRANSFER, LICENSE AND SUPPLY AGREEMENT DATED 27 MARCH 2008 FOR ISOTRETINOIN 10MG, 20MG AND 40MG SOFT GEL CAPSULES" dated February 8, 2010 from Douglas Pharmaceuticals America Limited to VersaPharm Incorporated intended to be the 1st amendment to the Transfer, License and Supply Agreement – Myorisan (5.4.9.2.1.4) | Douglas Pharmaceuticals America Limited |
| 86. | Letter titled "TRANSFER, LICENSE AND SUPPLY AGREEMENT DATED 27 MARCH 2008 FOR ISOTRETINOIN 10MG, 20MG AND 40MG SOFT GEL CAPSULES" dated August 2, 2013 from Douglas Pharmaceuticals America Limited to VersaPharm Incorporated intended to be the 3rd amendment to the Transfer, License and Supply Agreement – Myorisan (5.4.9.2.1.5) | Douglas Pharmaceuticals America Limited |
| 87. | Amendment #4 to Transfer, License, and Supply agreement dated February 15, 2017 by and between Douglas Pharmaceuticals America Limited and VersaPharm Incorporated – Myorisan | Douglas Pharmaceuticals America Limited |
| 88. | Amendment #5 to Transfer, License, and Supply agreement dated March 28, 2017 by and between | Douglas Pharmaceuticals America Limited |

| | | |
|---|---|---|
| | Douglas Pharmaceuticals America Limited and VersaPharm Incorporated – Myorisan (5.4.9.2.1.7) | |
| 89. | Amendment #6 to Transfer, License, and Supply agreement dated May 8, 2018 by and between Douglas Pharmaceuticals America Limited and VersaPharm Incorporated – Myorisan (5.4.9.2.1.8) | Douglas Pharmaceuticals America Limited |
| 90. | Amendment #7 to Transfer, License, and Supply agreement dated September 1, 2019 by and between Douglas Pharmaceuticals America Limited and VersaPharm Incorporated – Myorisan (5.4.9.2.1.9) | Douglas Pharmaceuticals America Limited |
| 91. | Letter dated November 23, 2021 from Langer Grogan & Diver P.C. to Sills Cummis & Gross regarding Akorn Operating Company LLC and a Transfer, License and Supply Agreement dated April 1, 2008, involving Douglas Pharmaceuticals Limited –Myorisan (5.4.9.2.1.10) | Douglas Pharmaceuticals America Limited |
| 92. | Letter dated November 24, 2021 from Langer Grogan & Diver P.C. to Sills Cummis & Gross regarding Akorn/Douglas Agreement and alleged breaches thereof – Myorisan (5.4.9.2.1.11) | Douglas Pharmaceuticals America Limited |
| 93. | Letter dated November 22, 2021 titled "Akorn Operating Company LLC" from Sills Cummis & Gross to Douglas Pharmaceuticals America Limited | Douglas Pharmaceuticals America Limited |
| 94. | Manufacturing and Supply Agreement dated April 1, 2005 and its amendments, if any – Trihexyphenidyl (5.4.9.2.4.7) | Mikart, Inc. |
| 95. | Manufacturing and Supply Agreement dated July 19, 2007 by and between Mikart, Inc. and Atley Pharmaceuticals, Inc. – Lortab (5.4.9.2.4.14) | Mikart, Inc. |
| 97. | Contract of Supply dated September 24, 2012 – Tobramycin (5.4.9.1.1.22) | Chemworth, Inc. |

EPIC
*Schedule 2.4(b)*

### Preliminary List of Added Contract(s)/Lease(s)

| Contract | Counterparty |
|---|---|
| Price Increase and Authorized Distributor Record as of December 1, 2006 between Akorn Incorporated and Nomax, Inc. | Nomax, Inc. |