## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| AKORN HOLDING COMPANY LLC, *et al.*[1] | Case No. 23-10253 (KBO) (Jointly Administered) |
| Debtors. | **Re D.I. 106, 137** |

## ASSET PURCHASE AGREEMENT

**dated as of June 7, 2023**

BY AND BETWEEN

RAISIN HOLDINGS, INC.

AS PURCHASER, AND

GEORGE L. MILLER, THE CHAPTER 7 TRUSTEE OF THE ESTATES OF AKORN HOLDING COMPANY LLC, AKORN INTERMEDIATE COMPANY LLC AND AKORN OPERATING COMPANY LLC

AS SELLER

Dated: June 7, 2023

COZEN O'CONNOR

*/s/ John T. Carroll III*
John T. Carroll, III (DE No. 4060)
Simon E. Fraser (DE No. 5335)
1201 N. Market Street
Suite 1001
Wilmington, DE 19801
(302) 295-2000 Phone
(302) 295-2013 Fax No.
jcarroll@cozen.com
sfraser@cozen.com

*Counsel for the Trustee*
*George L. Miller*

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of their federal tax identification numbers, and cases numbers are Akorn Holding Company LLC (9190), Case No. 23-10253 (KBO); Akorn Intermediate Company LLC (6123), Case No. 23-10254 (KBO); and Akorn Operating Company LLC (6184), Case No. 23- 10255. The Debtors' headquarters is located at 5605 CenterPoint Court, Gurnee, IL 60031.
64080924\1

*Execution Version*

**ASSET PURCHASE AGREEMENT**
**dated as of June 7, 2023**

BY AND BETWEEN

RAISIN HOLDINGS, INC.

AS PURCHASER

AND

GEORGE L. MILLER, THE CHAPTER 7 TRUSTEE OF THE ESTATES OF AKORN HOLDING COMPANY LLC, AKORN INTERMEDIATE COMPANY LLC AND AKORN OPERATING COMPANY LLC

AS SELLER

**GENERAL APA AKORN**

## TABLE OF CONTENTS

Page

**ARTICLE I DEFINITIONS** ................................................................. 1

**ARTICLE II PURCHASE AND SALE OF ASSETS** ................................. 7

Section 2.1    Sale and Transfer of Purchased Assets ................................. 7
Section 2.2    Assumed Liabilities ............................................................ 7
Section 2.3    Assumption/ Rejection of Certain Contracts/Leases. ........... 7

**ARTICLE III** ...................................................................................... 9

**CONSIDERATION** ............................................................................ 9
Section 3.1    Purchase Price .................................................................. 9
Section 3.2    Payment of the Consideration ............................................ 9
Section 3.3    Allocation of Purchase Price .............................................. 9
Section 3.4    Withholding Rights ........................................................... 9

**ARTICLE IV CLOSING** ..................................................................... 10

Section 4.1    Closing. ........................................................................... 10
Section 4.2    Deliveries by Seller .......................................................... 10
Section 4.3    Deliveries by Purchaser .................................................... 10

**ARTICLE V REPRESENTATIONS AND WARRANTIES OF SELLER** ......... 11

Section 5.1    Authorization; Enforceability ........................................... 11
**Section 5.2    No Other Representations or Warranties** ........................ 11

**ARTICLE VI REPRESENTATIONS AND WARRANTIES OF PURCHASER** .... 12

Section 6.1    Organization ..................................................................... 12
Section 6.2    Authorization; Enforceability ........................................... 12
Section 6.3    No Conflicts ..................................................................... 12
Section 6.4    Consents and Approvals .................................................... 12
Section 6.5    Financial Capability .......................................................... 12
Section 6.6    Broker's, Finder's or Similar Fees ...................................... 12
**Section 6.7    No Other Representations or Warranties** ........................ 12

**ARTICLE VII BANKRUPTCY COURT MATTERS** ................................. 13

Section 7.1    Bankruptcy Actions .......................................................... 13
Section 7.2    Bidding Procedures ........................................................... 13
Section 7.3    Approval .......................................................................... 13
Section 7.4    Alternate Bidder ............................................................... 13
Section 7.5    Alternate Bids. ................................................................. 14

i

**GENERAL APA AKORN**

Section 7.6    Cure Amount...................................................................................... 14
Section 7.7    Approval ............................................................................................. 14
Section 7.8    Consultation with Purchaser ............................................................... 14

**ARTICLE VIII COVENANTS**.............................................................................. 15

Section 8.1    Tax Matters. ....................................................................................... 15
Section 8.2    Intellectual Property........................................................................... 15
Section 8.3    Cooperation......................................................................................... 15
Section 8.4    Proprietary Information; Post-Closing Access ................................... 16
Section 8.5    Further Assurances.............................................................................. 16
Section 8.6    Purchased Assets Updates................................................................... 16

**ARTICLE IX CONDITIONS** ................................................................................ 17

Section 9.1    Conditions Precedent to Performance by Seller and Purchaser........ 17
Section 9.2    Conditions to Obligations of Purchaser ............................................. 17
Section 9.3    Conditions to Obligations of Seller ................................................... 18

**ARTICLE X TERMINATION** ............................................................................... 19

Section 10.1   Termination......................................................................................... 19
Section 10.2   Effect of Termination.......................................................................... 19

**ARTICLE XI MISCELLANEOUS** ........................................................................ 20

Section 11.1    Survival of Covenants, Representations and Warranties................... 20
Section 11.2    Amendment and Modification ........................................................... 20
Section 11.3    Notices ............................................................................................... 20
Section 11.4    Counterparts....................................................................................... 21
Section 11.5    Mutual Drafting ................................................................................. 21
Section 11.6    Entire Agreement; No Third Party Beneficiaries................................ 21
Section 11.7    Announcements.................................................................................. 21
Section 11.8    Severability......................................................................................... 21
Section 11.9    Governing Law ................................................................................... 22
Section 11.10 Exclusive Jurisdiction ........................................................................ 22
Section 11.11 Remedies............................................................................................. 22
Section 11.12 Specific Performance. ......................................................................... 22
Section 11.13 Assignment ......................................................................................... 23
Section 11.14 Headings ............................................................................................. 23
Section 11.15 No Consequential or Punitive Damages .............................................. 23
**Section 11.16 "As Is" Transaction** ....................................................................... 23
Section 11.17 Bulk Transfer Notices ......................................................................... 24
Section 11.18 Interpretation....................................................................................... 24

**GENERAL APA AKORN**

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of June 7, 2023 (the "Execution Date"), is made and entered into by and between Raisin Holdings, Inc., a Delaware corporation (together with its permitted successors, designees and assigns, "Purchaser") and George L. Miller, the chapter 7 trustee (the "Trustee" or "Seller") of the chapter 7 estates (collectively, the "Estates") of Akorn Holding Company LLC ("Holdings"), Akorn Intermediate Company LLC ("Intermediate") and Akorn Operating Company LLC ("Operating", and together with Holdings and Intermediate, "Debtors" and each entity individually, a "Debtor").

## RECITALS

WHEREAS, on February 23, 2023, Debtors each filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code, as amended (the "Bankruptcy Code"), commencing a chapter 7 case (each, a "Bankruptcy Case" and, collectively, the "Bankruptcy Cases") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, Purchaser desires to purchase and acquire from Seller, acting on behalf of the Estates, certain assets and rights and assume certain liabilities;

WHEREAS, Seller desires to sell, convey, assign and transfer such assets and rights and such liabilities to Purchaser, in the manner and subject to the terms and conditions set forth herein and as authorized under, among other things, Sections 105 and 363 of the Bankruptcy Code;

WHEREAS, Seller's ability to consummate the Transactions set forth in this Agreement is subject to, among other things, the entry of the Sale Order by the Bankruptcy Court; and

WHEREAS, the Seller has determined that it is advisable and in the Estates' best interests to enter into this Agreement and to consummate the Transactions provided for herein, subject to entry of the Sale Order, and has approved the same.

NOW, THEREFORE, in consideration of the foregoing premises and the representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE I

## DEFINITIONS

For all purposes of this Agreement, except as otherwise expressly provided or unless the context clearly requires otherwise:

"Affiliate" means, with respect to any Person, any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

1

**GENERAL APA AKORN**

"Agreement" or "this Agreement" means this Asset Purchase Agreement, together with the Exhibits hereto and the exhibits and schedules thereto.

"Allocation Statement" has the meaning set forth in Section 3.3.

"Alternate Bid" has the meaning set forth in the Bidding Procedures.

"Alternate Bidder" has the meaning set forth in the Bidding Procedures.

"Alternative Transaction" means the sale, transfer or other disposition, directly or indirectly, including through an asset sale, share sale, merger, amalgamation or other similar transaction resulting from the Auction, of a material portion of the Estates' assets, in a transaction or series of transactions with one or more Persons other than Purchaser.

"Applicable Law" means any law, regulation, rule, order, judgment, guideline or decree to which any Purchased Asset is, or the Estates are, subject.

"Application" has the meaning set forth in Schedule 2.1(a).

"Application Transfer Letter" means the application transfer letter substantially in the form attached as **Exhibit D-1** hereto.

"Assigned Contracts/Leases" means the contracts and/or leases listed on *Schedule 2.1(a)(i)* attached hereto, including all extension, renewal and option rights thereunder.

"Assumed Liabilities" has the meaning set forth in Section 2.2.

"Auction" has the meaning ascribed to such term in the Bidding Procedures Order.

"Bankruptcy Case" or "Bankruptcy Cases" has the meaning set forth in the recitals hereof.

"Bankruptcy Code" has the meaning set forth in the recitals hereof.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure.

"Bidding Procedures" has the meaning set forth in Section 7.2.

"Bidding Procedures Order" has the meaning set forth in Section 7.2.

"Bill of Sale" means the bill of sale substantially in the form attached as **Exhibit B-1** hereto.

"Business Day" means any day other than a Saturday, Sunday or a day on which banks in New York are authorized or obligated by Applicable Law or executive order to close or are otherwise generally closed.

"Closing" means the consummation of all Transactions contemplated in this Agreement.

"Closing Date" has the meaning set forth in Section 4.1(b).

**GENERAL APA AKORN**

2

"Contract" means any written or oral contract, purchase order, service order, sales order, indenture, note, bond, lease, sublease, mortgage, agreement, guarantee, license or other agreement, arrangement, instrument or commitment, in each case that is binding upon a Person.

"Conveyance Documents" means (a) the Bill of Sale; (b) the Instrument of Assumption; (c) the Application Transfer Letters; (d) the Purchaser Acceptance Letters; and/or (e) all documents of title and instruments of conveyance necessary to Transfer record and/or beneficial ownership to Purchaser of Purchased Assets from the Estates which require execution, endorsement and/or delivery of a certificate of title or other document in order to vest record or beneficial ownership thereof in Purchaser.

"Cure Amount" means all cure costs required to be paid pursuant to Section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts/Leases.

"Damages" means actual out-of-pocket losses, damages, liabilities, costs or expenses, including reasonable attorneys' fees.

"Data" means all data, databases, data collections, and other scientific or technical data and information, in whatever form, whether or not embodying any Intellectual Property, including any data contained in ANDAs, ANADAs and NDAs.

"Debtor" or "Debtors" has the meaning set forth in the preamble hereof.

"Documents" means all of the Debtors' and Estates' current or historical written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies, and documents, tax returns, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, maintenance schedules, functional requirements, operating instructions, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), consulting materials, opinions and other documents commissioned by or on behalf of any Debtor, development, quality control, quality assurance, regulatory, pharmacovigilance records and other regulatory documents, and other books and records of the Debtors, in each case whether or not in electronic form, and in each case relating to the Applications.

"Estates" has the meaning set forth in the preamble hereof.

"Execution Date" has the meaning set forth in the preamble hereof.

"Governmental Entity" means any foreign, national, federal, state, municipal, local, provincial, territorial, government or any department, commission, board, bureau, agency, regulatory authority or instrumentality thereof, or any court, judicial, administrative or arbitral body or public or private tribunal, including any United States or other such entity anywhere in the world.

"Instrument of Assumption" means the instrument of assumption substantially in the form attached as **Exhibit B-2**.

"Intellectual Property" means all (a) patents and patent applications, (b) trademarks, service marks, trade dress, logos, slogans, brand names and other indicia of source or origin, and all goodwill associated therewith (collectively, "Trademarks"), (c) social media accounts and handles and Internet domain names, (d) copyrights, mask works and works of authorship, (e) trade secrets and rights in

**GENERAL APA AKORN**

confidential and proprietary information, (f) rights in Data, (g) software and any other rights in software or other technology, and (h) any registrations, applications or rights arising under applicable law or Contract relating to any of the foregoing.

"IRS" means the United States Internal Revenue Service.

"IRS Code" means the Internal Revenue Code of 1986, as amended.

"IT Systems" means all software, hardware, servers, networks, platforms, peripherals, switches, endpoints, storage, firmware, and all electronic connections between and among them, and similar or related items of information technology networks and systems (including telecommunications networks and systems for voice, data and video) owned, leased, licensed or used (including through cloud-based or other third-party service providers).

"Liabilities" means all claims, demands, expenses, commitments and obligations (whether accrued or not, known or unknown, disclosed or undisclosed, matured or unmatured, fixed or contingent, asserted or unasserted, liquidated or unliquidated, arising prior to, at or after the commencement of the Bankruptcy Case) of or against the Debtors or the Estates or any of the Purchased Assets.

"Lien" or "Liens" means, with respect to any asset, any mortgage or deed of trust, pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any lease or title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Uniform Commercial Code of any jurisdiction) and, in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Order" shall mean any order, ruling, decision, verdict, decree, writ, subpoena, mandate, precept, command, directive, consent, approval, award, judgment, injunction, or other similar determination or finding by, before, or under the supervision of any Governmental Entity, or any arbitrator, mediator, or other quasi-judicial or judicially sanctioned Person or body.

"Organizational Documents" means with respect to any Person, its certificate of incorporation, formation or organization (or comparable) document, its by-laws, partnership agreement or any certificate of formation, limited liability company agreement or operating agreement, or any other similar organizational instrument or document governing such Person or applicable to ownership.

"Permits" means permits, certificates, licenses, filings, approvals and other authorizations of any Governmental Entity.

"Person" means any individual, sole proprietorship, partnership, limited liability company, joint venture, trust, incorporated organization, association, corporation, institution, public benefit corporation, Governmental Entity or other entity.

"Pharmacovigilance Records" means any Documents or information related to pharmacovigilance, post-marketing reporting and post-marketing commitment requirements, including, but not limited to, Periodic Adverse Drug Experience Reports (PADER), field alert reports (FAR), 15-Day Alert Reports of Serious and/or Unexpected Adverse Experiences, individual case safety reports (ICSR) and follow-up reports, and any similar record required to be created and/or maintained by any Governmental Entity, solely as it relates to the Applications.

4

**GENERAL APA AKORN**

"Pre-Closing Tax Period" means any tax period ending on or prior to the Closing Date.

"Product" means the product manufactured, commercialized, developed, packaged, labeled, stored, marketed, imported, exported, distributed or sold by or on behalf of the business of the Debtors, that are regulated as human or animal drugs or combination products specifically identified on Annex I hereto.

"Product Registration" means (a) any investigational new drug application, investigational new animal drug files, generic investigational new animal drug files, NDAs, ANDAs, ANADAs, or similar regulatory application of the Sellers for any Product that has been submitted to or approved by the FDA in the United States (other than withdrawn submissions or approvals); and (b) all marketing approvals, clearances, registrations, certifications, markings, consents or other authorizations required to market the Applications.

"Proprietary Information" means trade secrets, copyrights, ideas, techniques, know-how, inventions (whether patentable or not), and/or any other information of any type relating to designs, configurations, toolings, documentation, recorded data, schematics, source code, object code, master works, master databases, algorithms, flow charts, formulae, works of authorship, mechanisms, research, manufacture, improvements, assembly, installation, marketing, forecasts or pricing.

"Proprietary Information Removal" has the meaning set forth in Section 8.4 hereof.

"Purchase Price" has the meaning set forth in Section 3.1.

"Purchased Assets" means all of the Estates' right, title and interest in and to the assets and the Assigned Contracts/Leases set forth on *Schedule 2.1(a)*.

"Purchaser" has the meaning set forth in the preamble hereof.

"Purchaser Acceptance Letter" means the purchaser acceptance letter substantially in the form attached as **Exhibit D-2** hereto.

"Quality Records" means any Documents or information maintained as part of a quality system and/or used to make quality-related decisions, including, but not limited to, procedures or work instructions, batch records for both commercial and exhibit batches, corrective and preventative actions (CAPA), complaint handling reports, non-conformance reports, deviation and/or out-of-specification (OOS) investigations and annual product quality reviews (APQR), and any similar record required to be created and/or maintained by any Governmental Entity, including, but not limited to, any Data related to the same maintained in any IT Systems.

"Regulatory Documentation" means (i) all regulatory filings, underlying material data, datasets and supporting documents (including copies of all material correspondence between any of Debtors or their affiliates and the applicable Governmental Entity), (ii) Product Registrations, and all regulatory files related thereto, current approved packaging and any other existing files and dossiers, including the underlying data, datasets or information used to support, maintain or obtain marketing authorization, (iii) all records maintained under record keeping or reporting requirements of the FDA or any other Governmental Entity, each as solely related to the Applications.

"Required Deposit" means ten percent (10%) of the cash portion of the Purchase Price payable by Purchaser to Seller upon execution of this Agreement, to be held in accordance with the Bidding Procedures.

**GENERAL APA AKORN**

"Research and Development Records" means any Documents or records related to the research and development of drug products, including, but not limited to, clinical trials, process and method development, engineering batches, and any similar record required to be created and/or maintained by any Governmental Entity, each as solely related to the Applications.

"Sale Order" means an order of the Bankruptcy Court substantially in the form and substance of **Exhibit A,** any change to which must be acceptable to the Purchaser.

"Seller" has the meaning set forth in the preamble hereof.

"Straddle Period" means any tax period including, but not ending on, the Closing Date.

"Successful Bidder" has the meaning set forth in the Bidding Procedures.

"Tax" or "Taxes" means any and all United States federal, state, local or non-United States taxes, fees, levies, duties, tariffs, imposts, and other similar charges on or with respect to net income, alternative or add-on minimum, gross income, gross receipts, sales, use, *ad valorem*, franchise, capital, paid-up capital, profits, license, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property, environmental, or windfall profit tax, customs duties, value added or other tax, governmental fee or other like assessment or charge of any kind whatsoever, together with any interest or any penalty, addition to tax or additional amount imposed by any Governmental Entity responsible for the imposition of any such tax.

"Tax Authority" means any Governmental Entity with responsibility for, and competent to impose, collect or administer, any form of Tax.

"Tax Return" means any return, claim, election, information return, declaration, report, statement, schedule, or other document required to be filed in respect of Taxes and amended Tax Returns and claims for refund.

"Transactions" means all the transactions provided for or contemplated by this Agreement and/or any other document required hereunder.

"Transfer" means sell, convey, assign, transfer, deliver or otherwise dispose of, and "Transferable" shall have a corollary meaning.

"Transfer Taxes" means all goods and services, harmonized sales, excise, sales, use, transfer, stamp, stamp duty, recording, value added, gross receipts, documentary, filing, and all other similar Taxes or duties, fees or other like charges, however denominated (including any real property transfer taxes and conveyance and recording fees and notarial fees), in each case including interest, penalties or additions attributable thereto whether or not disputed, resulting from the Purchaser's acquisition of the Purchased Assets from Seller pursuant to this Agreement, regardless of whether the Governmental Entity seeks to collect the Transfer Tax from Seller or Purchaser. For the avoidance of doubt, Transfer Taxes will exclude any income Taxes or franchise Taxes (however denominated).

"Trustee" has the meaning set forth in the preamble herein.

**GENERAL APA AKORN**

## ARTICLE II

## PURCHASE AND SALE OF ASSETS

Section 2.1     <u>Sale and Transfer of Purchased Assets</u>.  On the terms and subject to the conditions set forth in this Agreement, on the Closing Date, Seller shall Transfer to Purchaser, and Purchaser shall purchase, acquire, assume and accept from the Estates, to the extent permitted by the Bankruptcy Code, free and clear of all Liens and Liabilities (except for any Assumed Liabilities), all of the Estates' right, title and interest in and to the Purchased Assets as described in *Schedule 2.1(a)*. Notwithstanding anything to the contrary, the Purchased Assets shall not include the Estates' right, title and interest in and to any labeler codes, National Drug Codes, or Contracts or statutory entitlements related thereto.

Section 2.2     <u>Assumed Liabilities</u>.  On the terms and subject to the conditions set forth herein and in the Sale Order, effective as of the Closing, Purchaser shall assume from Seller, and Seller shall convey, transfer, and assign to Purchaser, all Liabilities arising out of the ownership or operation of the Purchased Assets by Purchaser, solely to the extent arising from periods occurring after the Closing (the "<u>Assumed Liabilities</u>"); <u>provided</u> that, for the avoidance of doubt, Purchaser will not assume any Liabilities for or related to (a) Taxes of Seller, (b) Taxes for any Pre-Closing Tax Period (or portion thereof) or the Pre-Closing Tax Period portion of a Straddle Period as determined pursuant to <u>Section 8.1(d)</u>, (c) any labeler codes or National Drug Codes or any Contracts or statutory entitlements related thereto.

Section 2.3     <u>Assumption/ Rejection of Certain Contracts/Leases</u>.

(a)     *Schedule 2.1(a)* sets forth a list of all executory Contracts and/or Leases to which a Debtor is a party which based upon Purchaser's designation are to be included in the Assigned Contracts/Leases to be assumed and assigned to Purchaser.  From time to time, Purchaser in accordance with Section 2.3(b) may update Purchaser's *Schedule 2.1(a)*.  Seller shall provide timely and proper written notice of the motion seeking entry of the Sale Order to all parties to any executory Contracts or unexpired leases that are Assigned Contracts/Leases and take all other actions necessary or otherwise required to cause such Contracts and/or Leases to be assumed by Seller and assigned to the Purchaser pursuant to Section 365 of the Bankruptcy Code to the extent that such Contracts and/or Leases are Assigned Contracts/Leases as of the Closing (including (x) serving on all non-Seller counterparties to all of the Assigned Contracts/Leases a notice specifically stating that Seller is or may be seeking the assumption and assignment of such Contract(s)/Lease(s), listing the Cure Amount associated with each such Contract(s)/Lease(s), and stating the deadline for objecting to the Cure Amount or any other aspect of the proposed assumption and assignment of their Assigned Contracts and/or Leases to each respective Purchaser and (y) taking, as promptly as practicable, all other actions reasonably requested by any Purchaser to facilitate any negotiations with the counterparties to such Assigned Contracts/Leases and to obtain an Order, including a finding that the proposed assumption and assignment of the Assigned Contracts/Leases to each Purchaser satisfies all applicable requirements of Section 365 of the Bankruptcy Code).  The Sale Order shall provide that as of and conditioned on the occurrence of the Closing, Seller shall assign or cause to be assigned to Purchaser, as applicable, Purchaser's  Assigned Contracts/Leases. Purchaser shall not have any obligation to pay any Cure Amount for any Contract or Lease that is not an Assigned Contract/Lease designated by Purchaser, including without limitation any Assigned Contract/Lease previously designated by Purchaser that is removed from Purchaser's *Schedule 2.1(a)* in accordance with Section 2.3(b).

(b)     Purchaser shall have the right to notify Seller in writing up until 12:00 p.m. ET on the date that is two (2) Business Days after the date hereof of any Contracts and/or Leases that Purchaser wishes to add as an Assigned Contract/Lease ("<u>Added Contract(s)/Lease(s)</u>").  The Seller shall file a motion in the Bankruptcy Case on or before June 9, 2023 for entry of an order (a "<u>Second Assumption Order</u>") authorizing

7

the Trustee to assume and assign such Added Contract(s)/Leases pursuant to Section 365 of the Bankruptcy Code. Upon the entry of the Second Assumption Order, any such Added Contract(s)/Lease(s) for which assumption and assignment was approved by Second Assumption Order shall be deemed added to Purchaser's *Schedule 2.1(a)*. For the avoidance of doubt, the Purchaser shall be responsible for the payment of the Cure Amount if any, relating to any Added Contract(s)/Lease(s). In addition, each Purchaser shall have up to one (1) Business Day prior to Closing to notify Seller of any previously designated Assigned Contracts/Leases which Purchaser no longer wishes to have assumed and assigned to Purchaser and any such Contracts and/or Leases shall be deemed removed from the Schedules of Assigned Contracts/Leases, and shall no longer constitute Assigned Contracts/Leases, without any adjustment to the Purchase Price. Any changes to the Assigned Contracts/Leases, including the addition of any Added Contract(s)/Lease(s), are subject to the Seller's prior written consent. All reasonable and documented costs and expenses payable prior to Closing in connection with transferring any Assigned Contracts/Leases as contemplated by this Agreement shall be borne by Purchaser.

(c)    Notwithstanding the foregoing, a Contract shall not be an Assigned Contract/Lease hereunder and shall not be assigned to, or assumed by, Purchaser to the extent that such Contract (1) expires by its terms on or prior to such time as it is to be assumed by Purchaser as an Assigned Contract/Lease hereunder or is incapable of being assumed or assigned pursuant to section 365 of the Bankruptcy Code, (2) requires Government Approval (other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to Purchaser of the Seller's rights under such Contract in accordance with applicable law, and such Government Approval has not been obtained, (3) to the extent that the assignment of all or any portion of the Contract shall be prohibited by Law (including by Order of a Governmental Entity), or (4) requires a consent of a counterparty (if any) or requires the consent of any other third party that has not been obtained as of the Closing, and which consent right cannot be effectively overridden or canceled by any order of the Bankruptcy Court or any provision of the Bankruptcy Code. In the event that any Contract that would otherwise have been assigned to Purchaser is deemed not to be assigned pursuant to clause (2) of the first sentence of this Section 2.3(c), the Closing shall, subject to the satisfaction of the conditions set forth in Article IX, nonetheless take place subject to the terms and conditions set forth herein and, thereafter, through the earliest of (w) such time as such Government Approval is obtained, (x) the expiration of the term of such Contract in accordance with its current term, (y) the execution of a replacement Contract by Purchaser and (z) the closing of the Bankruptcy Case, Seller and Purchaser shall (A) use reasonable efforts to secure such Government Approval as promptly as practicable after the Closing and (B) cooperate in good faith in any lawful and commercially reasonable arrangement proposed by Purchaser, including subcontracting, licensing, or sublicensing to Purchaser any or all of any Seller's rights and obligations with respect to any such Assigned Contract, under which (1) Purchaser shall receive the claims, rights, remedies and benefits under, or arising pursuant to, the terms of such Assigned Contracts/Leases with respect to which the Government Approval has not been obtained and (2) subject to receiving any such claims, rights, remedies and benefits, Purchaser shall thereafter assume and bear all Assumed Liabilities with respect to such Assigned Contract/Lease from and after the Closing (as if such Assigned Contracts/Leases had been transferred to Purchaser as of the Closing) in accordance with this Agreement (including by means of any subcontracting, sublicensing or subleasing arrangement). Upon satisfying any requisite Government Approval requirement applicable to such Assigned Contracts/Leases after the Closing, such Assigned Contracts/Leases shall promptly be transferred and assigned to Purchaser in accordance with the terms of this Agreement, the Sale Order and the Bankruptcy Code, and otherwise without any further additional consideration. Without limitation of the foregoing, prior to the Closing, Seller shall cooperate with Purchaser in connection with obtaining any consent, including by providing Purchaser with reasonable access to and facilitating discussions with the applicable counterparties (provided Purchaser shall provide Seller a reasonable opportunity to consult with Purchaser, and, if reasonably practicable, an opportunity to be present (but not participate) at any meeting) in respect of such

8

**GENERAL APA AKORN**

consents, and shall use reasonable efforts to assist Purchaser with obtaining such consents as promptly as practicable after the date hereof and prior to the Closing.

## ARTICLE III

## CONSIDERATION

Section 3.1  <u>Purchase Price</u>.  The aggregate consideration for the sale and transfer of the Purchased Assets will be (a) forty-five million two hundred and fifty thousand dollars ($45,250,000 USD) in cash (the "<u>Purchase Price</u>") (the Purchase Price shall be allocated among the Purchased Assets in accordance with the Bidding Procedures ((G)(1)(iii),(iv), and (v)) as set forth in *Schedule 2.1(a)* hereto), plus (b) the Cure Amounts, plus (c) the assumption by Purchaser of the Assumed Liabilities.

Section 3.2  <u>Payment of the Consideration</u>.  In connection with or prior to the execution hereof, the Purchaser has or shall pay the Required Deposit to the Seller.  On the Closing Date, an amount equal to the Purchase Price less the Required Deposit shall be paid by Purchaser to Seller by wire transfer of immediately available funds to an account or accounts designated in writing by Seller prior to the Closing Date.

Section 3.3  <u>Allocation of Purchase Price</u>.  Within ninety (90) days after the Closing Date, Purchaser shall prepare and deliver to Seller a statement allocating the sum of the Purchase Price, the Assumed Liabilities and other relevant items among the Purchased Assets in accordance with Section 1060 of the IRS Code and the treasury regulations promulgated thereunder (such statement, the "<u>Allocation Statement</u>"), and the Allocation Statement shall be finalized upon reasonable consultation with Seller, and with Seller's consent, which consent shall not be unreasonably withheld or delayed.  The parties shall follow the Allocation Statement for purposes of filing IRS Form 8594 (and any supplements to such form) and all other Tax Returns, and shall not voluntarily take any position for tax purposes inconsistent therewith.  If the IRS or any other taxation authority proposes a different allocation, Seller or Purchaser, as the case may be, shall promptly notify the other party of such proposed allocation.  Seller or Purchaser, as the case may be, shall provide the other party with such information and shall take such actions (including executing documents and powers of attorney in connection with such proceedings) as may be reasonably requested by such other party to carry out the purposes of this Section.  Except as otherwise required by Applicable Law or pursuant to a "determination" under Section 1313(a) of the IRS Code (or any comparable provision of United States state, local, or non-United States law), (i) the transactions contemplated by Article II of this Agreement shall be reported for all Tax purposes in a manner consistent with the terms of this <u>Section 3.3</u>; and (ii) neither party (nor any of their Affiliates) will take any position inconsistent with this <u>Section 3.3</u> in any Tax Return or in any refund claim, except to the extent otherwise required in connection with the settlement or compromise of any applicable Tax proceeding.  Notwithstanding the allocation of the Purchase Price set forth in the Allocation Statement, nothing in the foregoing shall be determinative of values ascribed to the Purchased Assets or the allocation of the value of the Purchased Assets by the Trustee for the purpose of his administration of the Bankruptcy Cases by way of liquidation, reorganization or otherwise.

Section 3.4  <u>Withholding Rights</u>.  Purchaser and any other applicable withholding agent shall be entitled to deduct and withhold with respect to any payments made pursuant to this Agreement such amounts that are required to be deducted and withheld with respect to any such payments under the IRS Code or any other provision of Applicable Law. Any such withheld amounts shall be treated for all purposes of this Agreement as having been paid to such Persons in respect of which such deduction and withholding was made.

**GENERAL APA AKORN**

## ARTICLE IV

## CLOSING

Section 4.1    Closing.Upon the terms and subject to the conditions of this Agreement, the Closing shall take place at the offices of Cozen O'Connor at 1650 Market Street, 28th Floor, Philadelphia, PA 19103 at 10:00 am local time, as specified below, unless another date, time and/or place is agreed in writing by each of the parties hereto.

(b)    The Closing shall occur on or before the date (the "Closing Date") that is not later than the third Business Day following the satisfaction and/or waiver of all conditions to the Closing as set forth in Article IX (other than conditions which by their nature can be satisfied only at the Closing).

Section 4.2    Deliveries by Seller.  At the Closing unless otherwise provided herein, Seller shall deliver or cause to be delivered to Purchaser (unless previously delivered) each of the following:

(a)    the duly executed Bill of Sale and duly executed counterparts of each Conveyance Document in respect of the Purchased Assets;

(b)    a duly executed Instrument of Assumption for Purchased Assets and Assumed Liabilities;

(c)    duly executed Application Transfer Letters and corresponding Purchaser Acceptance Letters in respect of each of the applicable Purchased Assets;

(d)    a properly completed and executed IRS Form W-9 from Seller;

(e)    a copy of the Sale Order entered by the Bankruptcy Court; and

(f)    a duly executed trademark assignment agreement, in a form reasonably acceptable to Purchaser and Seller.

Section 4.3    Deliveries by Purchaser.  At the Closing, Purchaser shall deliver or cause to be delivered to Seller (unless previously delivered) each of the following:

(a)    the Purchase Price less the Required Deposit by wire transfer of immediately available funds to an account designated by Seller;

(b)    a certificate of good standing of Purchaser from its jurisdiction of formation, dated no earlier than ten (10) days prior to the Closing;

(c)    duly executed counterparts of each Conveyance Document in respect of the Purchased Assets;

(d)    a duly executed Instrument of Assumption for Purchased Assets and Assumed Liabilities; and

(e)    duly executed Application Transfer Letters and corresponding Purchaser Acceptance Letters in respect of each of the applicable Purchased Assets.

10

**GENERAL APA AKORN**

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Purchaser that the statements contained in this Article V are true and correct as of the date of this Agreement, except as otherwise stated in this Article V.

Section 5.1    Authorization; Enforceability.    Subject to the entry of the Sale Order, Seller has all requisite power and authority to enter into, execute and deliver this Agreement and any other document to which Seller, on behalf of the Estates, is a party or is to be a party as required hereunder and to perform its obligations hereunder and thereunder. The execution, delivery and performance by Seller of this Agreement and any other document to which Seller, on behalf of the Estates, is or is to be a party as required hereunder, and the consummation by Seller of the Transactions, have been duly authorized by all necessary action on the part of Seller. This Agreement has been and, when executed and delivered, any other document to which each of them is to be a party, will be, duly and validly executed and delivered by Seller and, subject to the entry of the Sale Order, constitutes (in the case of this Agreement) and will constitute (in the case of each such other document) the valid and binding obligation of Seller, on behalf of the Estates, enforceable against Seller in accordance with its terms, subject to laws of general application relating to bankruptcy, insolvency, and the relief of debtors and other laws of general application affecting enforcement of creditors' rights generally, rules of law governing specific performance, injunctive relief and other equitable remedies.

**Section 5.2    No Other Representations or Warranties.    EXCEPT AS EXPRESSLY PROVIDED IN THIS ARTICLE V, SECTION 8 OF THE PURCHASE AND SALE AGREEMENT, IN THE SALE ORDER OR ANY CERTIFICATE OR DOCUMENT DELIVERED IN CONNECTION HEREWITH OR THEREWITH, PURCHASER AGREES AND ACKNOWLEDGES THAT THE TRANSFER OF THE PURCHASED  ASSETS IS MADE PURSUANT TO ORDER OF THE BANKRUPTCY COURT AND IS MADE "AS IS" AND "WHERE IS", AND ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY PROVIDED HEREIN, SELLER MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND WHATSOEVER WITH RESPECT TO THE PURCHASED ASSETS OR OTHERWISE, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY REPRESENTATION OR WARRANTY REGARDING THE TITLE OR CONDITION OF THE ASSETS OR THE FITNESS, DESIRABILITY, OR MERCHANTABILITY THEREOF OR SUITABILITY THEREOF FOR ANY PARTICULAR PURPOSE, OR ANY BUSINESS PROSPECTS, OR VALUATION OF THE PURCHASED ASSETS, OR THE COMPLIANCE OF THE ASSETS IN THEIR CURRENT OR FUTURE STATE WITH APPLICABLE LAWS OR ANY VIOLATIONS THEREOF. PURCHASER FURTHER ACKNOWLEDGES THAT SELLER SHALL DELIVER TO THE PURCHASER ALL PURCHASED ASSETS IN SELLER'S OR THE DEBTORS' OR THEIR RESPECTIVE COUNSEL'S POSSESSION; BUT THAT SUCH PERSON'S DO NOT HAVE POSSESSION OF ALL OF THE ASSETS, AND THAT TO THE EXTENT THE NONE OF SELLER, THE DEBTORS OR THEIR RESPECTIVE COUNSELS ARE IN POSSESSION OF AN ASSET SOLD HEREUNDER, PURCHASER WILL HAVE SOLE RESPONSIBILITY TO OBTAIN POSSESSION OF SUCH ASSET.**

## ARTICLE VI

**GENERAL APA AKORN**

## REPRESENTATIONS AND WARRANTIES
## OF PURCHASER

Purchaser hereby represents and warrants to Seller that the statements contained in this Article VI are true and correct as of the date of this Agreement.

Section 6.1    Organization.  Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware.

Section 6.2    Authorization; Enforceability.    Purchaser has all requisite company power and authority to enter into this Agreement and any other document to which Purchaser is a party or is to be a party as required hereunder and to perform its obligations hereunder and thereunder. The execution, delivery and performance by Purchaser of this Agreement and any other document to which Purchaser is a party as required hereunder, and the consummation by Purchaser of the Transactions, have been duly authorized by all necessary action on the part of Purchaser.  This Agreement and, when executed, any other document to which Purchaser is a party as required hereunder, have been duly and validly executed and delivered by Purchaser and, assuming due and valid execution and delivery by Seller, constitute the valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, subject to laws of general application relating to bankruptcy, insolvency, and the relief of debtors and other laws of general application affecting enforcement of creditors' rights generally, rules of law governing specific performance, injunctive relief and other equitable remedies.

Section 6.3    No Conflicts.  The execution, delivery and performance of this Agreement and any other document to which Purchaser is a party as required hereunder, and the consummation of the Transactions is not reasonably expected to (a) result in a violation of the Organizational Documents of Purchaser or (b) result in a violation of any law, statute, rule or regulation of any Governmental Entity or any applicable order of any court or any rule, regulation or order of any Governmental Entity applicable to Purchaser.

Section 6.4    Consents and Approvals.  No consent, approval, authorization, order, registration or qualification of or with any Governmental Entity having jurisdiction over Purchaser or any of its properties is required for the execution and delivery by Purchaser of the Agreement and any other document to which Purchaser is a party as required hereunder and performance of and compliance by Purchaser with all of the provisions hereof and thereof and the consummation of the Transactions, except the entry of the Sale Order and the expiration, or waiver by the Bankruptcy Court, of the 14-day period set forth in Bankruptcy Rules 6004(h) and 3020(e).

Section 6.5    Financial Capability.  Purchaser has sufficient funds available to pay the Purchase Price and any expenses incurred by Purchaser in connection with the Transactions.

Section 6.6    Broker's, Finder's or Similar Fees.    There are no brokerage commissions, finder's fees or similar fees or commissions payable by Purchaser in connection with the Transactions.

**Section 6.7    No Other Representations or Warranties.  Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that none of Seller, on behalf of the Estates, the Estates' Affiliates or any other Person is making any representations or warranties whatsoever, express or implied, beyond those expressly given by Seller in Article V, Section 8 of the Purchase and Sale Agreement, the Sale Order or any certificate or document delivered in connection herewith or therewith or with respect to any other information provided to the Purchaser in connection with the Transactions, including as to the probable success**

12

**GENERAL APA AKORN**

**or profitability of the ownership, use or operation of the Purchased Assets after Closing. Purchaser further represents that none of Seller, on behalf of the Estates, the Estates' Affiliates or any other Person has made any representation or warranty, express or implied as to the accuracy or completeness of any information regarding Seller or the transactions contemplated by this Agreement not expressly set forth in this Agreement, and none of Seller, on behalf of the Estates, the Estates' Affiliates or any other Person will have or be subject to liability to Purchaser or any other Person resulting from the distribution to Purchaser or its Representatives or Purchaser's use of, any such information, including data room information provided to Purchaser or its representatives, in connection with the Transactions. Purchaser acknowledges that it has conducted to its satisfaction its own independent investigation of the Purchased Assets and, in making the determination to proceed with the Transactions, Purchaser has relied on the results of its own independent investigation.**

**ARTICLE VII**

**BANKRUPTCY COURT MATTERS**

Section 7.1     <u>Bankruptcy Actions</u>.  Seller shall use its reasonable efforts to obtain the entry of the Sale Order within sixty (60) days of full execution hereof.  Purchaser covenants and agrees that it shall cooperate with Seller as necessary to obtain entry of the Sale Order, including without limitation by furnishing information or documents to Seller to satisfy the requirements for obtaining Bankruptcy Court approval of the Sale Order.

Section 7.2     <u>Bidding Procedures</u>.  The bidding procedures to be employed with respect to the auction process (the "<u>Bidding Procedures</u>") shall be those reflected in the Bidding Procedures Order in the form of **Exhibit C** hereto, or such form as approved by the Bankruptcy Court (the "<u>Bidding Procedures Order</u>").  Purchaser agrees and acknowledges that Seller, including through his representatives, is and may continue soliciting inquiries, proposals or offers from third parties in connection with any alternative transaction for the Purchased Assets.  Purchaser agrees to the Bidding Procedures and agrees to comply with the Bidding Procedures Order.

Section 7.3     <u>Approval</u>.  Seller's obligations under this Agreement and in connection with the transactions contemplated hereby are subject to entry of the Sale Order, and to the terms of the Sale Order and any other orders of the Bankruptcy Court applicable to the transactions contemplated in this Agreement.  Nothing in this Agreement shall require the Seller or its affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

Section 7.4     <u>Alternate Bidder</u>.  Terms used but not defined in this Section 7.4 shall have the meanings assigned to them in the Bidding Procedures Order.  Subject to the terms and conditions of the Bidding Procedures Order, Purchase acknowledges and agrees:

(a)     to serve as an Alternate Bidder, if so selected by the Trustee in accordance with the Bidding Procedures; and

(b)     that, if the Trustee receives more than one Qualified Bid either for all of the Purchased Assets or for a given Lot, as applicable, then, at the Sale Hearing, the Trustee will seek approval of the Successful Bids, and, at the Trustee's election, in consultation with the Consultation Parties, the Alternate Bid(s).  The Trustee's presentation to the Court of the Successful Bid(s) and, if applicable, the Alternate Bid(s) will not constitute the Trustee's acceptance of such Bids until such Bids are approved by the Court at the Sale Hearing.  Following approval of the Sale to a Successful Bidder, if the Successful Bidder fails

13

**GENERAL APA AKORN**

to consummate the Sale for any reason, then the applicable Alternate Bid will be deemed to be the Successful Bid and the Trustee will be authorized, but not directed, to effect the Sale to the Alternate Bidder subject to the terms of the Alternate Bid of such Alternate Bidder without further order of the Court. The Alternate Bid shall remain open until the earlier of (i) thirty (30) days following the entry of the Sale Order or (ii) the consummation of the Sale to the Successful Bidder unless further extended by agreement in writing of the Trustee and Alternate Bidder.

Section 7.5    Alternate Bids.

(a)    Seller and Purchaser acknowledge that this Agreement and the sale of the Purchased Assets are subject to higher and better bids and Bankruptcy Court approval. Seller and Purchaser acknowledge that Seller must take reasonable steps to demonstrate that it has sought to obtain the highest or otherwise best price for the Purchased Assets, including giving notice thereof to the creditors of Seller and other interested parties, providing information about the Seller to prospective bidders, entertaining higher and better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Purchased Assets, conducting an Auction.

(b)    Notwithstanding any other provision of this Agreement to the contrary, Purchaser acknowledges that Seller and its Affiliates and advisors are and may continue soliciting and/or responding to inquiries, proposals or offers for the Purchased Assets and may furnish any information with respect to, or assist or participate in, or facilitate in any other manner, any effort or attempt by any Person to do or seek to do any of the foregoing in connection with any Alternative Transaction.

(c)    Purchaser shall provide adequate assurance of future performance as required under Section 365 of the Bankruptcy Code for the Assigned Contracts/Leases. Purchaser agrees that it will take actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assigned Contracts/Leases, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Purchaser's advisors available to testify before the Bankruptcy Court.

Section 7.6    Cure Amount.    Subject to entry of the Sale Order and consummation of the Closing, Purchaser shall, on the Closing, pay the Cure Amounts and cure any and all other defaults and breaches under the Assigned Contracts/Leases so that such Contracts and/or Leases may be assumed by the Seller and assigned to Purchaser in accordance with the provisions of Section 365 of the Bankruptcy Code and this Agreement.

Section 7.7    Approval.    Seller's obligations under this Agreement and in connection with the transactions contemplated hereby are subject to entry of the Sale Order, and to the terms of the Sale Order and any other applicable Orders of the Bankruptcy Court. Nothing in this Agreement shall require the Seller or its Affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

Section 7.8    Consultation with Purchaser.    Seller shall provide Purchaser, at least two (2) business days in advance of filing with the Bankruptcy Court, a draft of any motions, orders or other pleadings that Seller proposes to file with the Bankruptcy Court seeking approval of this Agreement, excluding those already filed as of the execution of this Agreement. To the extent practicable, Seller shall reasonably cooperate with Purchaser, and consider in good faith the views of Purchaser, with respect to all such filings.

**GENERAL APA AKORN**

**ARTICLE VIII**

**COVENANTS**

Section 8.1    <u>Tax Matters</u>. Purchaser shall be responsible for any Transfer Taxes. Purchaser shall promptly pay directly to the appropriate Tax Authority all applicable Transfer Taxes that may be imposed upon or payable or collectible or incurred in connection with this Agreement or the Transactions contemplated herein, or that may be imposed upon or payable or collectible or incurred in connection with the Transactions, and file all necessary Tax Returns with respect to all such Transfer Taxes.

(b)    Purchaser and Seller shall cooperate in providing each other with any appropriate certification and other similar documentation relating to exemption from Transfer Taxes (including any appropriate resale exemption certifications), as provided under Applicable Law.

(c)    Purchaser and Seller agree to furnish, or cause their Affiliates to furnish, to each other, upon request, as promptly as practicable, such information and assistance relating to the Purchased Assets (including access to books and records) as is reasonably necessary for the preparation and filing of all Tax Returns, and making of any election related to Taxes, the preparation for any audit by any Taxing Authority, and the prosecution or defense of any claim, suit or proceeding relating to any Tax Return. Purchaser and Seller shall cooperate, and cause their Affiliates to cooperate, with each other in the conduct of any audit or other proceeding related to Taxes and each shall execute and deliver such powers of attorney and other documents as are reasonably necessary to carry out the intent of this <u>Section 8.1(c)</u>. Such cooperation shall include the retention and (upon the other party's request) the provision of records and information which are reasonably relevant to any such Tax Return or any audit, claim, suit or other proceeding related to Taxes. Purchaser and Seller shall use commercially reasonable efforts to provide, or cause their Affiliates to provide, timely notice to each other in writing of any pending or threatened tax audits, assessments or litigation with respect to the Purchased Assets for any taxable period for which the other party may have liability under this Agreement. Purchaser and Seller shall use commercially reasonable efforts to furnish, or cause their respective Affiliates to furnish, to each other copies of all correspondence received from any Taxing Authority in connection with any tax audit or information request with respect to any taxable period for which the other party or its Affiliates may have liability under this Agreement.

(d)    For all purposes of allocating Taxes in this Agreement with respect to any Straddle Period, the Pre-Closing Tax Period portion of such Straddle Period ending on the Closing Date shall be, (i) in the case of any Taxes based on income, activities, events, other transaction-based Taxes or the level of any item, gain, gross or net sales, payments, receipts, proceeds, profits or other similar items, determined based on an interim closing of the books method (and for such purpose as of the close of business on the Closing Date), and (ii) in the case of any other Taxes not described in clause (i), determined based on the total amount of such Taxes for Straddle Period, multiplied by the number of days elapsed in the Straddle Period through the Closing Date, divided by the number of total days in the Straddle Period.

Section 8.2    <u>Intellectual Property</u>. Until the Closing Date, except in connection with the marketing and sale process set forth in the Bidding Procedures, Seller shall not disclose to any Person (other than Seller's Affiliates) any trade secrets, or confidential or Proprietary Information relating to the Purchased Assets, except, in the case of confidential or Proprietary Information, in the ordinary course of business to a Person that is subject to appropriate confidentiality obligations.

Section 8.3    <u>Cooperation</u>. From the date hereof until the Closing (or the earlier termination of this Agreement in accordance with its terms), Seller will, and will cause third party advisors to, provide Purchaser with reasonable access and upon reasonable advance notice and during regular business hours to the books and records, documents, Data, files, personnel and offices and properties of the

15

**GENERAL APA AKORN**

Debtors and their Estates, in each case to the extent the foregoing constitutes a Purchased Asset or Assumed Liability, in order for Purchaser to access such information as is reasonably necessary in connection with the Transactions contemplated by this Agreement; *provided* that (i) all requests for access will be directed to Greenhill & Co., LLC or such other Person(s) as Seller may designate in writing from time to time, and (ii) nothing herein will require Seller to provide access to, or to disclose any information to, Purchaser if such access or disclosure (A) would result in the waiver of any attorney-client, work-product or other legal privilege or accountant privilege, (B) would reasonably be expected to violate any applicable Laws, (C) would reasonably expected to be in violation of the provisions of any agreement (including any confidentiality obligation) by which Seller is bound or (D) would violate any fiduciary duty; *provided further* that Seller will use reasonable best efforts to, and will use reasonable best efforts to cause third party advisors to, provide a reasonable alternative means of accessing any such information in a manner that is not inconsistent with the foregoing.   Each Party shall use reasonable best efforts and act in good faith to take, or cause to be taken, all actions, to do, or cause to be done, and to assist and cooperate with the other Party in  doing all things necessary, proper or advisable to consummate and make effective as promptly as practicable the transactions contemplated by this Agreement, including: (i) the satisfaction, but not waiver, of the closing conditions set forth in Article IX, and (ii) the granting of access to data, files, materials, information, books and records reasonably requested to facilitate the transfer and use of the Purchased Assets.

Section 8.4     Proprietary Information; Post-Closing Access.  Following the Closing, Purchaser shall provide Seller and its designees, including any vendors, contractors or consultants, access, upon reasonable notice, to the Decatur Facility and the IT Systems and Equipment to complete the removal from the IT Systems and Equipment included in the Purchased Assets of all Proprietary Information of the Estate or other third parties which is not included in the Purchased Assets (the "Proprietary Information Removal").  Purchaser and Seller shall use reasonable best efforts and act in good faith to take, or cause to be taken, all actions, to do, or cause to be done, and to assist and cooperate with the other Party in completing the Proprietary Information Removal as promptly as possible and in any event not later than sixty (60) days following Closing.  Following the Closing, Purchaser covenants and agrees not to access any Proprietary Information of the Estate or other third party which are stored on the IT Systems.  **Annex II** identifies those Purchased Assets which do not include any Proprietary Information of third parties or Proprietary Information remaining with the Estate and are thus not subject to Proprietary Information Removal.

Section 8.5     Further Assurances.   From and after the date of Closing, each Party will continue to use reasonable best efforts and act in good faith to take, or cause to be taken, all actions, to do, or cause to be done, and to assist and cooperate with the other Party in taking such further actions as may be necessary or reasonably desirable to carry out any purpose of this Agreement, including all actions set forth in Sections 8.3 and 8.4 (including to facilitate the transfer and use of any Purchased Assets not fully transferred or useable by Purchaser as of the Closing). If after Closing any further action is necessary or reasonably desirable to carry out any purpose of this Agreement, then each Party will take such further actions (including the execution and delivery of further data and documentation) as any other Party reasonably requests to carry out such purpose. If after Closing any further action is necessary or reasonably desirable to carry out any purpose of this Agreement (including the Transfer of the Purchased Assets to the Purchaser or its designee), then each Party will take such further actions (including the execution and delivery of further data and documentation) as any other Party reasonably requests to carry out such purpose.

Section 8.6     Purchased Assets Updates. From the date hereof until the date that is two (2) weeks after the Closing (or, if the Closing does not occur, the earlier termination of this Agreement in accordance with its terms), Seller agrees to consider in good faith any revisions to Schedule 2.1(a) (including the Annexes thereto) proposed by Purchaser, and to the extent Seller agrees to any such

16

**GENERAL APA AKORN**

revisions, Schedule 2.1(a) shall be modified to include such revisions (and the definition of "Purchased Assets" shall be automatically correspondingly modified). Any revised or amended Schedule 2.1(a) shall be subject to the entry of a further order of the Bankruptcy Court approving such revised or amended Schedule 2.1(a). In connection therewith, Seller will, and will cause its third party advisors to, reasonably cooperate with Purchaser and its representatives in furtherance of the prior sentence, including by providing Purchaser and such representatives with reasonable access upon reasonable notice to relevant service providers and advisors of the Seller, to the extent still so engaged, who are knowledgeable about the information contained in, and the preparation of, the Applications, Quality Records, Research and Development Records, Regulatory Documentation and Pharmacovigilance Records related to the Applications, Data owned or used by Seller in connection with the operation of the Decatur Facility or the Applications, and all machinery, equipment and IT Systems associated with the Decatur Facility or the Applications (provided that, such cooperation and access shall not include Proprietary Information of third parties or the Estates which are not included in Purchased Assets). For the avoidance of doubt, nothing in this Section 8.6 shall be a condition to Closing, and none of Seller, Debtors or the Estates shall have any liability for any breach of this Section 8.6.

## ARTICLE IX

## CONDITIONS

Section 9.1    Conditions Precedent to Performance by Seller and Purchaser. The respective obligations of Seller and Purchaser to consummate the Transactions contemplated by this Agreement are subject to the satisfaction or waiver, on or prior to the Closing Date, of the following conditions:

(a)    Bankruptcy Matters. By July 1, 2023, the Bankruptcy Court shall have entered the Sale Order. The Sale Order shall have become final and non-appealable and shall not have been stayed, vacated, modified or supplemented, in each case, without the prior written consent of Purchaser.

(b)    No Order. No order, statute, rule, regulation, executive order, injunction, stay, decree, directive, or restraining order shall have been enacted, entered, promulgated or enforced by any court of competent jurisdiction or Governmental Entity that would (i) prevent the consummation of any of the Transactions contemplated by this Agreement or (ii) cause any of the Transactions contemplated by this Agreement to be rescinded following consummation, nor shall any such order, statute, rule, regulation, executive order, injunction, stay, decree, directive, or restraining order be in effect. No action shall be pending before any Governmental Entity or before any arbitral body wherein an unfavorable injunction, judgment, order, decree, ruling, directive or charge would (x) prevent consummation of any of the Transactions contemplated by this Agreement or (y) cause any of the Transactions contemplated by this Agreement to be rescinded following consummation.

Section 9.2    Conditions to Obligations of Purchaser. The obligations of Purchaser to consummate the Closing shall be subject to the satisfaction (or waiver by Purchaser) on or prior to the Closing Date, of each of the following conditions:

(a)    Bill of Sale; Conveyance Documents. Seller shall have duly executed and delivered to Purchaser the documents set forth in Section 4.2 that are required to be delivered at the Closing.

(b)    Legal Proceedings. No legal proceeding shall have been commenced against Purchaser or Seller, which would prevent the Closing. No Order shall have been issued by any Governmental Entity, and be in effect, which has the effect of making the Transaction contemplated by this Agreement illegal,

**GENERAL APA AKORN**

otherwise restraining or prohibiting consummation of this Transaction or causing any of the transactions contemplated hereunder to be rescinded following completion thereof.

(c)    Purchase and Sale Agreement Closing.  The transactions contemplated by that certain Purchase and Sale Agreement, dated as of even date herewith, by and between George L. Miller, as seller, not individually, but solely in his capacity as the chapter 7 trustee of the bankruptcy estates of Akorn Holding Company LLC, a Delaware limited liability company, Akorn Intermediate Company LLC, a Delaware limited liability company, and Akorn Operating Company LLC, a Delaware limited liability company, and Purchaser, as buyer, shall have been consummated on the terms set forth therein prior to or concurrently with the consummation of the transactions contemplated hereby (the "Purchase and Sale Agreement").

(d)    Representations and Warranties.  All representations and warranties made by Seller in Article V of this Agreement shall be true and correct in all respects on and as of the Closing Date as if again made by Seller on and as of such date (or, if made as of a specific date, at and as of such date).

(e)    Performance of the Obligations of Seller.  Seller shall have performed in all material respects all material obligations required under this Agreement to be performed by it on or before the Closing Date, other than Section 8.6 hereof, and Purchaser shall have received a certificate dated as of the Closing Date and signed by an authorized signatory of Seller to that effect.

(f)    Seller's Deliveries.  Seller shall have delivered, and Purchaser shall have received, all of the items set forth in Section 4.2 of this Agreement.

The foregoing conditions in this Section 9.2 are for the sole benefit of Purchaser and may be waived by Purchaser, in whole or in part, at any time and from time to time in its sole discretion.  The failure by Purchaser prior to Closing to exercise any of the foregoing rights shall be deemed a waiver of any such rights.

Section 9.3    Conditions to Obligations of Seller.  The obligations of Seller to consummate the Closing shall be subject to the satisfaction (or waiver by Seller) on or prior to the Closing Date, of the following conditions:

(a)    Representations and Warranties.  All representations and warranties made by Purchaser in Article VI of this Agreement shall be true and correct in all respects on and as of the Closing Date as if again made by Purchaser on and as of such date (or, if made as of a specific date, at and as of such date).

(b)    Performance of the Obligations of Purchaser.  Purchaser shall have performed in all material respects all material obligations required under this Agreement to be performed by it on or before the Closing Date (except with respect to the obligation to pay the Purchase Price in accordance with the terms of this Agreement, which obligation shall be performed in all respects as required under this Agreement), and Seller shall have received a certificate dated as of the Closing Date and signed by an authorized signatory of Purchaser to that effect.

(c)    Purchaser's Deliveries.  Purchaser shall have delivered, and Seller shall have received, all of the items set forth in Section 4.3 of this Agreement.

The foregoing conditions in this Section 9.3 are for the sole benefit of Seller and may be waived by Seller, in whole or in part, at any time and from time to time in its sole discretion.  The failure by Seller prior to Closing to exercise any of the foregoing rights shall be deemed a waiver of any such rights.

GENERAL APA AKORN

## ARTICLE X

## TERMINATION

Section 10.1    <u>Termination</u>.  This Agreement may be terminated at any time prior to the Closing Date as follows:

(a)    By the mutual written consent of Purchaser and Seller;

(b)    By either Purchaser or Seller upon written notice given to the other, if the Bankruptcy Court or any other Governmental Entity shall have issued an order, decree or ruling or taken any other action (which order, decree, ruling or other action the parties hereto shall use their reasonable efforts to prevent the entry of and remove) that permanently restrains, enjoins or otherwise prohibits the consummation of the Transactions, and such order, decree, ruling or other action shall have become final and non-appealable;

(c)    By Seller upon written notice given to Purchaser, if Purchaser shall have breached or failed to perform in any material respect any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (i) would result in a failure of a condition set forth in <u>Section 9.3</u> and (ii) cannot be cured within five (5) Business Days after Seller provides written notice to Purchaser of such breach;

(d)    Subject to Purchaser's rights under the Bidding Procedures Order to amend the terms of this Agreement at the Auction, with respect to any Purchased Assets being purchased by Purchaser, by either Purchaser or Seller, if, at the conclusion of the hearing for the sale of Purchased Assets to Purchaser, Purchaser is not determined by the Bankruptcy Court to be the Successful Bidder with respect to such Purchased Assets, unless Purchaser is an Alternate Bidder; <u>provided</u>, <u>however</u>, that the Purchaser shall have the right to terminate this Agreement pursuant to this <u>Section 10.1(d)</u> on or at any time after the thirtieth (30th) day following the date of the entry of the Sale Order unless the Purchaser becomes the Successful Bidder on or prior to such date;

(e)    By Purchaser or Seller upon written notice given to the other if Seller consummates an Alternative Transaction; and

(f)    By Purchaser upon written notice given to Seller, if the Bankruptcy Court shall not have entered the Sale Order on or before July 1, 2023.

Any party seeking to invoke its rights to terminate this Agreement shall give written notice thereof to the other party or parties specifying the provision hereof pursuant to which such termination is made and the effective date of such termination being the date of such notice.

Section 10.2    <u>Effect of Termination</u>.  If this Agreement is terminated by either party in accordance with and pursuant to <u>Section 10.1</u>, then all rights and obligations of the parties under this Agreement shall terminate, other than this <u>Section 10.2</u> and <u>Article XI</u>; <u>*provided, however*</u>, that nothing herein shall relieve any party from liability for any breach of this Agreement (other than Section 8.6 hereof) prior to such termination; <u>*provided further*</u>, that if this Agreement is terminated by Seller pursuant to <u>Section 10.1(c)</u>, then Purchaser shall forfeit and Seller shall retain the Required Deposit.

19

**GENERAL APA AKORN**

## ARTICLE XI

## MISCELLANEOUS

Section 11.1    <u>Survival of Covenants, Representations and Warranties</u>.    The representations and warranties set forth in <u>Article V</u> and <u>Article VI</u> shall not survive the Closing Date; <u>provided</u>, <u>however</u>, that all covenants and agreements in this Agreement shall survive the Closing Date and remain in full force and effect until performed in accordance with their terms, unless otherwise specified therein.

Section 11.2    <u>Amendment and Modification</u>. This Agreement may be amended, modified and supplemented in any and all respects, but only by a written instrument signed by all of the parties hereto expressly stating that such instrument is intended to amend, modify or supplement this Agreement; provided, however, any material amendment shall be subject to approval by the Bankruptcy Court.

Section 11.3    <u>Notices</u>.  All notices and other communications hereunder shall be in writing and shall be deemed given when mailed, delivered personally, telecopied (which is confirmed) or sent by an overnight courier service, such as Federal Express, to the parties at the following addresses:

If to Seller:    George L. Miller, Trustee
1628 John F. Kennedy Blvd., Suite 950
Philadelphia, PA 19103-2110
Telephone: (215) 561-0950 Ext. 14
Facsimile: (215) 561-0330
Email:  gmiller@mctllp.com

with a copy to:    John T. Carroll, III
Cozen O'Connor
1201 North Market Street, Suite 1001
Wilmington, DE 19801
Telephone: (302) 295-2028
Facsimile: (302) 295-2013
Email: jcarroll@cozen.com

If to Purchaser:    Raisin Holdings, Inc.
2 Tower Center Boulevard, 11th Floor
East Brunswick, NJ 08816
Attn: CEO
Email: vkavuru@risingpharma.com

with a copy to:    Raisin Holdings, Inc. c/o H.I.G. Capital, LLC
1450 Brickell Ave., 31st Floor
Miami, FL 33131
Attn:  Michael Gallagher
Richard Zhang
Email: mgallagher@higcapital.com
rzhang@higcapital.com

20

**GENERAL APA AKORN**

with a copy to:      Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036
Telephone: 1-617-951-7195
Attn: Michael Roh
Email: michael.roh@ropesgray.com

or to such other address as a party may from time to time designate in writing in accordance with this Section 11.3. Each notice or other communication given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been received (i) on the Business Day it is sent, if sent by personal delivery or email, or (ii) on the first Business Day after sending, if sent by overnight delivery, properly addressed and prepaid or (iii) upon receipt, if sent by mail (regular, certified or registered); provided, however, that notice of change of address shall be effective only upon receipt. The parties agree that delivery of process or other papers in connection with any such action or proceeding in the manner provided in this Section 11.3, or in such other manner as may be permitted by law, shall be valid and sufficient service thereof.

Section 11.4   Counterparts. This Agreement may be executed by facsimile or PDF signature and in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when two or more counterparts have been signed by each of the parties and delivered to the other party.

Section 11.5   Mutual Drafting. This Agreement is the result of the joint efforts of Purchaser and Seller, and each provision hereof has been subject to the mutual consultation, negotiation and agreement of the parties and there is to be no construction against either party based on any presumption of that party's involvement in the drafting thereof.

Section 11.6   Entire Agreement; No Third Party Beneficiaries. This Agreement, the Purchase and Sale Agreement, and other schedules, annexes, and exhibits hereto and thereto, any other document required hereunder and thereunder, the Conveyance Documents and the Sale Order (i) constitute the entire agreement and supersede all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof and thereof and supersede and cancel all prior agreements, negotiations, correspondence, undertakings, understandings and communications of the parties, oral and written, with respect to the subject matter hereof, and (ii) are not intended to confer upon any Person other than the parties hereto and thereto any rights, obligations or remedies hereunder; provided further that Affiliates and representatives of each party are express third-party beneficiaries of Section 11.15 and this Section 11.6.

Section 11.7   Announcements. Neither party shall make any press release or other public announcement or disclosure concerning this transaction without the prior written consent of the other party, which shall not be unreasonably withheld or delayed. The foregoing shall not prohibit such announcements or disclosures as may be required by law. Appearances in, or filings with, the Bankruptcy Court, any dealings with the various creditor committees and notices to parties to any bankruptcy case involving the Seller, the Estates or the Debtors shall not be deemed a public announcement for purposes of this Section 11.7.

Section 11.8   Severability. Any term or provision of this Agreement that is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other

21

**GENERAL APA AKORN**

jurisdiction. If the final judgment of a court of competent jurisdiction or other authority declares that any term or provision hereof is invalid, void or unenforceable, the parties agree that the court making such determination shall have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases, or to replace any invalid, void or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision.

Section 11.9    <u>Governing Law</u>. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE AND THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE.

Section 11.10    <u>Exclusive Jurisdiction</u>. All actions and proceedings arising out of or relating to this Agreement, including the resolution of any and all disputes hereunder, shall be heard and determined in the Bankruptcy Court, and the parties to this Agreement hereby irrevocably submit to the exclusive jurisdiction of such courts in any such action or proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such action or proceeding. If the Bankruptcy Court does not have or declines to exercise subject matter jurisdiction over any action or proceeding arising out of or relating to this Agreement, then each party (i) agrees that all such actions or proceedings shall be heard and determined in federal court of the United States for the District of Delaware, (ii) irrevocably submits to the jurisdiction of such courts in any such action or proceeding, (iii) consents that any such action or proceeding may be brought in such courts and waives any objection that such party may now or hereafter have to the venue or jurisdiction or that such action or proceeding was brought in an inconvenient court, and (iv) agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such party at its address as provided in <u>Section 11.3</u> (<u>provided</u> that nothing herein shall affect the right to effect service of process in any other manner permitted by Delaware law).

Section 11.11    <u>Remedies</u>. Subject to <u>Section 11.12</u>, neither the exercise of nor the failure to exercise a right of set-off or to give notice of a claim under this Agreement will constitute an election of remedies or limit Seller or Purchaser in any manner in the enforcement of any other remedies that may be available to any of them, whether at law or in equity.

Section 11.12    <u>Specific Performance.</u>

(a)    Subject to Section <u>11.12(c)</u>, each party acknowledges and agrees that any breach of the terms of this Agreement by the other would give rise to irreparable harm for which money damages would not be an adequate remedy, and, accordingly agrees that the non-breaching party shall be entitled to enforce the terms of this Agreement, including, for the avoidance of doubt and as applicable, Purchaser's obligation to fund the Purchase Price, by a decree of specific performance without the necessity of proving the inadequacy of money damages as a remedy and without the necessity of posting a bond.

(b)    Each party agrees that it will not oppose the granting of an injunction, specific performance and other equitable relief when expressly available pursuant to the terms of this Agreement on the basis that (i) there is adequate remedy at law or (ii) an award of specific performance is not an appropriate remedy for any reason at law or equity. In the event any party seeks an injunction or injunctions to prevent breaches of this Agreement when expressly available pursuant to the terms of this Agreement and to enforce specifically the terms and provisions of this Agreement when expressly available pursuant to the terms of this Agreement, such party shall not be required to provide any bond or other security in connection with any such order or injunction.

22

**GENERAL APA AKORN**

(c)      Notwithstanding anything to the contrary in this Agreement, the Seller's right to (i) specific performance under this <u>Section 11.12</u> and (ii) following the valid termination hereof, retain the Required Deposit and/or seek monetary damages for a pre-termination breach of this Agreement pursuant to <u>Section 10.2,</u> will be the sole and exclusive remedies available to the Seller or Debtors for any and all losses suffered or incurred by the Seller or Debtors arising out of or in connection with this Agreement, the Transaction (or the abandonment or termination thereof) or any matter forming the basis for such termination and Purchaser will have no other obligation to make payments to the Seller or Debtors; and provided that, the parties agree that specific performance or similar injunctive relief shall not be available to the Seller or Debtors if the Seller has retained the Required Deposit or been awarded other monetary damages pursuant to <u>Section 10.2</u>. For the avoidance of doubt, under no circumstances shall the Seller or Debtors be permitted or entitled to receive both (x) a grant of specific performance that results in the Closing being consummated and (y) to retain the Required Deposit or obtain other monetary damages.

(d)      Purchaser expressly acknowledges that in an event of its breach of this Agreement Seller shall have the ability to recover its full damages. The Required Deposit is not a limitation of such damages and nothing herein shall deem the Required Deposit liquidated damages.

Section 11.13   <u>Assignment</u>.   Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto (whether by operation of law or otherwise) without the prior written content of the other party; <u>provided</u> that no such prior written consent shall be required for (a) an assignment by the Purchaser to any of its Affiliates, so long as the Purchaser remains liable hereunder or (b) an assignment by the Purchaser of its rights and interests hereunder after the Closing. Subject to the first sentence of this <u>Section 11.13</u>, this Agreement shall be binding upon, inure to the benefit of and be enforceable by the parties and their respective successors and permitted assigns.

Section 11.14   <u>Headings</u>.   The article, section, paragraph and other headings contained in this Agreement are inserted for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 11.15   <u>No Consequential or Punitive Damages</u>.  NO PARTY (OR ITS AFFILIATES OR REPRESENTATIVES) SHALL, UNDER ANY CIRCUMSTANCE, BE LIABLE TO THE OTHER PARTY (OR ITS AFFILIATES OR REPRESENTATIVES) FOR ANY CONSEQUENTIAL, EXEMPLARY, SPECIAL, INCIDENTAL OR PUNITIVE DAMAGES CLAIMED BY SUCH OTHER PARTY UNDER THE TERMS OF OR DUE TO ANY BREACH OF THIS AGREEMENT, INCLUDING LOSS OF REVENUE OR INCOME, DAMAGES BASED ON ANY MULTIPLIER OF PROFITS OR OTHER VALUATION METRIC, COST OF CAPITAL, DIMINUTION OF VALUE OR LOSS OF BUSINESS REPUTATION OR OPPORTUNITY.

**Section 11.16   "As Is" Transaction.   THE PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN <u>ARTICLE V</u> OF THIS AGREEMENT, SECTION 8 OF THE PURCHASE AND SALE AGREEMENT, THE SALE ORDER OR ANY CERTIFICATE OR DOCUMENT DELIVERED IN CONNECTION HEREWITH OR THEREWITH, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE PURCHASED ASSETS. WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLER HEREBY DISCLAIMS ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ALL OR ANY PORTION OF THE PURCHASED ASSETS. ACCORDINGLY, THE PURCHASER WILL ACCEPT THE PURCHASED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."**

**GENERAL APA AKORN**

Section 11.17  <u>Bulk Transfer Notices</u>.  Seller and Purchaser hereby waive compliance with any bulk transfer provisions of the Uniform Commercial Code (or any similar Applicable Law), to the extent not repealed in any applicable jurisdiction, in connection with this Agreement and the Transactions.

Section 11.18  <u>Interpretation.</u>

(a)    When a reference is made in this Agreement to a Section, Article, subsection, paragraph, item or Exhibit, such reference shall be to a Section, Article, subsection, paragraph, item or Exhibit of this Agreement unless clearly indicated to the contrary.

(b)    Whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation."

(c)    The words "hereof," "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement.

(d)    The meaning assigned to each term defined herein shall be equally applicable to both the singular and the plural forms of such term, and words denoting any gender shall include all genders.  Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(e)    A reference to any party to this Agreement or any other agreement or document shall include such party's predecessors, successors and permitted assigns.

(f)    A reference to any legislation or to any provision of any legislation shall include any amendment to, and any modification or re-enactment thereof, any legislative provision substituted therefore and all regulations and statutory instruments issued thereunder or pursuant thereto.

(g)    References to $ are to United States Dollars.

(h)    The parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

[Remainder of page intentionally left blank]

**GENERAL APA AKORN**

IN WITNESS WHEREOF, Purchaser and Seller have executed this Agreement or caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first written above.

**SELLER:**

GEORGE L. MILLER, AS TRUSTEE FOR THE ESTATES

By: _____
    Name: George L. Miller
    Title: Trustee

**PURCHASER:**

RAISIN HOLDINGS, INC.

By: _____
    Name:
    Title:

**GENERAL APA AKORN**

IN WITNESS WHEREOF, Purchaser and Seller have executed this Agreement or caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first written above.

**SELLER:**

GEORGE L. MILLER, AS TRUSTEE FOR THE ESTATES

By: _____

    Name:

    Title:

**PURCHASER:**

RAISIN HOLDINGS, INC.

By: _____

    Name: Richard Zhang

    Title: Vice President

[Signature Page to the General Asset Purchase Agreement]

**EXHIBIT A**

**<u>Sale Order</u>**

<u>(see attached)</u>

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>AKORN HOLDING COMPANY LLC, *et al.*[1]<br><br>Debtors. | Chapter 7<br><br>Case No. 23-10253 (KBO)<br><br>(Jointly Administered)<br><br>**Re D.I. 106, 137** |

## ORDER (A) APPROVING THE SALE OF ESTATES' ASSETS TO RAISIN HOLDINGS, INC., (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (C) GRANTING CERTAIN RELATED RELIEF

This matter is before the Court on the Trustee's *Motion for Entry of (I) an Order (A) Approving Bidding Procedures in Connection With Sale of Substantially all of the Estates' Assets, (B) Scheduling an Auction and Hearing to Consider the Proposed Sale and (C) Approving the Form and Manner of Notice Thereof; and (II) an Order (A) Approving the Sale, (B) Authorizing the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting Certain Related Relief* (the "Sale Motion") [D.I. 106],[2] seeking, among other things: (a) approval of the asset purchase agreements with Raisin Holdings, Inc. (the "Purchaser"), filed on the docket in these Bankruptcy Cases at docket Nos. ___ and ___ (collectively the "Purchase Agreement"); (b) authority to sell the Purchased Assets (as defined in [docket No. ___ [regular APA]) and the Property (as defined in docket No. ___ [real estate APA]) (collectively, the "Purchased Assets") free and clear of Liens (as defined below), Claims (as defined below), and other interests, (c)

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of their federal tax identification numbers, and cases numbers are Akorn Holding Company LLC (9190), Case No. 23-10253 (KBO); Akorn Intermediate Company LLC (6123), Case No. 23-10254 (KBO); and Akorn Operating Company LLC (6184), Case No. 23- 10255. The Debtors' headquarters is located at 5605 CenterPoint Court, Gurnee, IL 60031.

[2] Unless otherwise defined in this Order, all capitalized terms shall have the meanings provided in the Sale Motion and/or the Purchase Agreement.

authority to assume and assign the executory contracts and/or unexpired leases identified as Purchased Assets in the Purchase Agreement (together, the "Assigned Contracts/Leases") to the Purchaser, and (d) related relief; and this Court, in furtherance of the Sale Motion, having entered an order on April 28, 2023 (the "Bidding Procedures Order") [D.I. 137] approving, among other things, the Bidding Procedures and the Notice Procedures; and the Trustee having determined, after an extensive marketing process, that the Purchaser has submitted the highest and best bid for the Purchased Assets; and adequate and sufficient notice of the Bidding Procedures, the Purchase Agreement, and all transactions contemplated thereunder and in this Order having been given in the manner directed by the Court in the Bidding Procedures Order; and all interested parties having been afforded an opportunity to be heard with respect to the Sale Motion and all relief related thereto; and the Court having reviewed and considered the Sale Motion and all relief related thereto, and having held a hearing regarding the Sale Motion (the "Sale Hearing"); and it appearing that the Court has jurisdiction over this matter; and it further appearing that the legal and factual bases set forth in the Sale Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation; and good and sufficient cause appearing,

**THE COURT HEREBY FINDS AND DETERMINES THAT:**[3]

**Jurisdiction, Final Order, and Statutory Predicates**

A.       This Court has jurisdiction to hear and determine the Sale Motion pursuant to 28 U.S.C. § 1334(a).  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N), and (O). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[3] These findings and conclusions constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  All findings of fact and conclusions of law announced by the Court at the Sale Hearing in relation to the Sale Motion are hereby incorporated herein to the extent not inconsistent herewith.  To the extent that any of the following findings of fact constitute

B.      The statutory predicates for the relief requested in the Sale Motion are sections 105(a), 363, and 365 of the Bankruptcy Code, and Bankruptcy Rules 2002(a)(2), 6004, 6006, 9007, and 9014.

C.      This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Federal Rule of Civil Procedure 54(b), as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order.

**<u>Notice of the Sale and Auction</u>**

D.      Actual written notice of the Sale Motion was provided to the Notice Parties.

E.      The Trustee's Notice of Auction and Sale Hearing was reasonably calculated to provide all interested parties with timely and proper notice of the Sale, Sale Hearing, and Auction.

F.      As evidenced by the certificates of service previously filed with the Court, proper, timely, adequate, and sufficient notice of the Sale Motion, Auction, Sale Hearing, Sale, and the transactions contemplated thereby have been provided in accordance with the Bidding Procedures Order, sections 105(a), 363, and 365 of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004, 6006, and 9007.  The notices described above were good, sufficient, and appropriate under the circumstances, and no other or further notice of the Sale Motion, Auction, Sale Hearing, Sale, and assumption and assignment of the Assigned Contracts/Leases is or shall be required.

---

conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

G.     The disclosures made by the Trustee concerning the Sale Motion, Auction, Purchase Agreement, Sale, assumption and assignment of the Assigned Contracts/Leases, and Sale Hearing were good, complete, and adequate.

H.     A reasonable opportunity to object and be heard with respect to the Sale and the Sale Motion and the relief requested therein (including the assumption and assignment of the Assigned Contracts/Leases), has been afforded to all interested persons and entities, including but not necessarily limited to the Notice Parties.

**Good Faith of Purchaser**

I.     The Purchase Agreement was negotiated, proposed, and entered into by the Trustee and the Purchaser without collusion, in good faith, and from arm's-length bargaining positions.

J.     Neither the Trustee nor the Purchaser has engaged in any conduct that would cause or permit the Purchase Agreement to be avoided under section 363(n) of the Bankruptcy Code. Specifically, the Purchaser has not acted in a collusive manner with any person and the Purchase Price as not controlled by any agreements among the bidders.

K.     The Purchaser is purchasing the Purchased Assets in good faith, and is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code, and is therefore entitled to all of the protections afforded by that provision, and otherwise has proceeded in good faith in all respects in connection with this proceeding in that, *inter alia*: (a) the Purchaser recognized that the Trustee was free to deal with any other party interested in acquiring the Purchased Assets; (b) the Purchaser complied with the provisions in the Bidding Procedures Order; (c) the Purchaser agreed to subject its bids to the competitive bidding procedures set forth in the Bidding Procedures Order; (d) the Purchaser in no way induced or caused the filing of the Bankruptcy Cases; and (e) all payments to be made by the Purchaser in connection with the Sale have been disclosed.

**Highest and Best Offer**

L.       The Trustee conducted an auction process in accordance with, and has otherwise complied in all respects with, the Bidding Procedures Order.  The auction process set forth in the Bidding Procedures Order afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Purchased Assets.  The auction process was duly noticed and conducted in a non-collusive, fair, and good faith manner, and a reasonable opportunity was given to any interested party to make a higher and better offer for the Purchased Assets.

M.       The Purchase Agreement constitutes the highest and best offer for the Purchased Assets, and will provide a greater recovery for the Estates with respect to the Purchased Assets than would be provided by any other available alternative.  The Trustee's determination that the Purchase Agreement constitutes the highest and best offer for the Purchased Assets constitutes a valid and sound exercise of the Trustee's business judgment.

**No Fraudulent Transfer**

N.       The consideration provided by the Purchaser pursuant to the Purchase Agreement (i) is fair and reasonable, (ii) constitutes the highest and/or best offers for the Purchased Assets, and (iii) constitutes reasonably equivalent value and fair consideration for the Purchased Assets. No other person or entity or group of entities has offered to purchase the Purchased Assets for greater economic value to the Estates than the Purchaser.  Approval of the Sale Motion and the Purchase Agreement, and the consummation of the transactions contemplated thereby are in the best interests of the Estates.

O.       The Purchaser is not mere continuations of the Debtors or the Estates, and no continuity of enterprise exists between the Purchaser and the Debtors or the Estates.  The Purchaser

is not holding itself out to the public as a continuation of the Debtors or the Estates.  The Purchaser is not a successor to the Debtors or the Estates, and the Sale does not amount to a consolidation, merger, or de facto merger of the Purchaser and the Debtors or the Estates.

### Validity of Transfer

P.    The Purchase Agreement was not entered into for the purpose of hindering, delaying, or defrauding creditors.  Neither the Trustee nor the Purchaser are entering into the transactions contemplated by the Purchase Agreement fraudulently for purposes of statutory and/or common law fraudulent conveyance and fraudulent transfer laws.

Q.    The Estates are the sole and lawful owners of the Purchased Assets.  Subject to section 363(f) of the Bankruptcy Code, the transfers of the Purchased Assets to the Purchaser will be, as of the Closing Date, legal, valid, and effective transfers of the Purchased Assets, which transfer will vest the Purchaser with all right, title, and interest of the Estates to the Purchased Assets free and clear of: (a) all liens and encumbrances relating to, accruing or arising any time prior to the Closing Date (collectively, "Liens"), and (b) all claims (as that term is defined in section 101(5) of the Bankruptcy Code), liabilities, obligations, demands, guaranties, options, rights, contractual commitments, restrictions, interests, and matters of any kind and nature, whether arising prior to or subsequent to the Petition Date, and whether imposed by agreement, understanding, law, equity, or otherwise (including, without limitation, rights with respect to Claims and Liens (i) that purport to give to any party a right of setoff or recoupment against, or a right or option to effect any forfeiture, modification, profit sharing interest, right of first refusal, purchase or repurchase right or option, or termination of, any of the Estates' or the Purchaser's interests in the Purchased Assets, or any similar rights, or (ii) in respect of taxes, restrictions, rights of first refusal, charges, or interests of any kind or nature, if any, including, without limitation, any

restriction of use, voting, transfer, receipt of income, or other exercise of any attributes of ownership) (collectively, as defined in this clause (b), "<u>Claims</u>"), relating to, accruing, or arising any time prior to the Closing Date.

**Section 363(f) is Satisfied**

R.       The conditions of section 363(f) of the Bankruptcy Code have been satisfied in full; therefore, the Trustee may sell the Purchased Assets free and clear of any interest in the property.

S.       The Purchaser would not have entered into the Purchase Agreement, and would not consummate the transactions contemplated thereby, if the sale of the Purchased Assets to the Purchaser was not free and clear of all Liens and Claims.  The Purchaser shall not be responsible for any Liens or Claims other than Liabilities which have been expressly assumed by the Purchaser pursuant to the Purchase Agreement.

T.       The Trustee may sell the Purchased Assets free and clear of all Liens and Claims against the Estates and/or any of the Purchased Assets because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code have been satisfied.  Those holders of Liens or Claims against the Estates or any of the Purchased Assets who did not object, or who withdrew their objections, to the Sale or the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.  All other holders of Liens or Claims are adequately protected by having their Liens or Claims, if any, in each instance against the Estates or any of the Purchased Assets, attach to the net cash proceeds of the Sale ultimately attributable to the particular Purchased Assets in which such creditor alleges a Lien or Claim, in the same order of priority, with the same validity, force and effect that such Lien or Claim had prior to the Sale, subject to any claims and defenses that the Estates may possess with respect thereto.

**Cure/Adequate Protection**

U.      The assumption and assignment of the Assigned Contracts/Leases is integral to the Purchase Agreement, is in the best interests of the Estates, and represents a reasonable exercise of sound and prudent judgment by the Trustee.  The Purchaser's promises to perform the obligations under the Assigned Contracts/Leases after the Closing Date shall constitute adequate assurance of future performance within the meaning of section 365(f)(2)(B) of the Bankruptcy Code.

V.      Any objections to the assumption and assignment of the Assigned Contracts/Leases are hereby overruled.

**Compelling Circumstances for an Immediate Sale**

W.      Good and sufficient reasons for approval of the Purchase Agreement and the Sale have been articulated.  The relief requested in the Sale Motion with respect to the Purchase Agreement is in the best interests of the Estates.  The Trustee has demonstrated both (i) good, sufficient, and sound business purposes and justifications, and (ii) compelling circumstances for a Sale other than in the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code in that, among other things, the immediate consummation of the Sale to the Purchaser is necessary and appropriate to maximize the value of the Estates.  Time is of the essence in consummating the Sale.

X.      Given all of the circumstances of the Bankruptcy Cases and the adequacy and fair value of the Purchase Price under the Purchase Agreement, the proposed Sale of the Purchased Assets to the Purchaser constitutes a reasonable and sound exercise of the Trustee's business judgment and should be approved.

Y.      The consummation of the Sale and the assumption and assignment of the Assigned Contracts/Leases is legal, valid, and properly authorized under all applicable provisions of the

Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), and 365, and all of the applicable requirements of such sections have been complied with in respect of the transaction.

**NOW, THEREFORE, IT IS HEREBY ORDERED:**

**General Provisions**

1.      The relief requested in the Sale Motion is granted and approved with respect to the sale of the Purchased Assets to the Purchaser, and the assumption and assignment to the Purchaser of the Assigned Contracts/Leases, as set forth herein, and the Sale contemplated in the Sale Motion is approved with respect to the Purchaser, the Purchased Assets, and the Assigned Contracts/Leases.

2.      All objections to the Sale Motion or the relief requested therein with respect to the Purchase Agreement, the sale of the Purchased Assets to the Purchaser, and the assumption and assignment to the Purchaser of the Assigned Contracts/Leases, that have not been withdrawn, waived, or settled as announced to the Court at the Sale Hearing or by stipulation filed with the Court, and all reservations of rights included therein, are hereby denied and overruled with prejudice.

**Approval of the Purchase Agreement**

3.      The Purchase Agreement (and all schedules and exhibits affixed thereto) and all other ancillary documents, all of the terms and conditions thereof, and the transactions contemplated therein are hereby approved and authorized.

4.      Pursuant to sections 363(b) and (f) of the Bankruptcy Code, the Trustee is authorized and empowered to take any and all actions necessary or appropriate to: (i) consummate the Sale of the Purchased Assets to the Purchaser pursuant to and in accordance with the terms and

conditions of the Purchase Agreement and this Order; (ii) close the Sale as contemplated in the Purchase Agreement and this Order; and (iii) execute and deliver, perform under, consummate, implement, and close fully the Purchase Agreement, including the assumption and assignment to the Purchaser of the Assigned Contracts/Leases, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Purchase Agreement and the Sale.

5.      This Order shall be binding in all respects upon the Trustee, the Estates, the Debtors, all creditors of, and holders of equity interests in, the Debtors, any holders of Liens, Claims, or other interests in, against, or on all or any portion of the Purchased Assets (whether known or unknown), the Purchaser and all successors and assigns of the Purchaser, and the Purchased Assets. This Order and the Purchase Agreement shall inure to the benefit of the Estates and their creditors, the Purchaser, and the respective successors and assigns of each of the foregoing.

### Transfer of the Purchased Assets

6.      Pursuant to sections 105(a), 363(b), and 363(f) of the Bankruptcy Code, the Trustee is authorized to transfer the Purchased Assets to the Purchaser on the Closing Date and, upon the Closing under the Purchase Agreement, such transfers shall constitute legal, valid, binding, and effective transfers of such Purchased Assets and shall vest the Purchaser with title to the Purchased Assets and, upon the Trustee's receipt of the full Purchase Price, shall be free and clear of all Liens, Claims, and other interests of any kind or nature whatsoever, including but not limited to, successor or successor-in-interest liability and Claims, with all such Liens, Claims or other interests to attach to the net cash proceeds ultimately attributable to the property against or in which such Liens, Claims, or interests are asserted, subject to the terms thereof, with the same validity, force and

effect, and in the same order of priority, that such Liens, Claims, or interests now have against the Purchased Assets.  Upon the Closing, the Purchaser shall take title to and possession of the Purchased Assets.

7.      In accordance with the written Sharing Agreement by and among the Trustee, the ABL Agent and TL Agent, to the extent approved by the Court or as modified by later Order of the Court (the "Sharing Agreement"), upon consummation of the Sale approved hereby, the Trustee is authorized to indefeasibly pay via wire transfer the allowed ABL Claim Amount and allowed TL Claim Amount (as such terms are defined in the Sharing Agreement); provided that if one or more additional Sale transactions must be consummated before full payment of such allowed claims is feasible, then the Trustee is authorized to make such payments as and when such other transactions are consummated.

8.      All persons and entities in possession of some or all of the Purchased Assets on the Closing Date are directed to surrender possession of such Purchased Assets to the Purchaser or its assignee at the Closing.  On the Closing Date, each of the Estates' creditors is authorized and directed to execute such documents and take all other actions as may be reasonably necessary to release its Liens, Claims, or other interests in the Purchased Assets, if any, as such Liens, Claims, or interests may have been recorded or may otherwise exist.

9.      On the Closing Date, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Estates' interests in the Purchased Assets.  Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

10.     A certified copy of this Order may be filed with the appropriate clerk and/or recorded with the recorder to act to cancel any liens and other encumbrances of record.

11.     If any person or entity that has filed statements or other documents or agreements evidencing Liens on, or interests in, all or any portion of the Purchased Assets shall not have delivered to the Trustee prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all Liens, Claims, or other interests that the person or entity has or may assert with respect to all or any portion of the Purchased Assets, the Trustee is hereby authorized and directed, and the Purchaser is hereby authorized, to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to the Purchased Assets.

12.     This Order is and shall be effective as a determination that, on the Closing Date, all Liens, Claims, or other interests of any kind or nature whatsoever existing as to the Purchased Assets prior to the Closing Date, shall have been unconditionally released, discharged, and terminated, and that the conveyances described herein have been effected.  This Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to

accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

**<u>Assumption and Assignment of Assigned Contracts/Leases</u>**

13.     The Trustee is hereby authorized and directed in accordance with sections 105(a) and 365 of the Bankruptcy Code to (a) assume and assign to the Purchaser, effective upon the Closing of the Sale, the Assigned Contracts/Leases free and clear of all Liens, Claims, and other interests of any kind or nature whatsoever, and (b) execute and deliver to the Purchaser such documents or other instruments as the Purchaser reasonably deems necessary to assign and transfer the Assigned Contracts/Leases.

14.     The counterparties to the Assigned Contracts/Leases (the "<u>Counterparties</u>") shall each look solely to the Purchaser for any amounts payable under the Assigned Contracts/Leases from and after the Closing Date.

15.     The Assigned Contracts/Leases are executory contracts under section 365 of the Bankruptcy Code.  The Trustee may assume the Assigned Contracts/Leases in accordance with section 365 of the Bankruptcy Code.  The Trustee may assign the Assigned Contracts/Leases in accordance with sections 363 and 365 of the Bankruptcy Code.  Any provisions in the Assigned Contracts/Leases that purport to prohibit or condition the assignment of the Assigned Contracts/Leases or allow the Counterparties to terminate, recapture, impose any penalty, or modify any term or condition upon the assignment of the Assigned Contracts/Leases, constitute unenforceable anti-assignment provisions that are void and of no force and effect; all other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Trustee and assignment to the Purchaser of the Assigned Contracts/Leases have been satisfied.  The Assigned Contracts/Leases shall be transferred and assigned to, and following

the closing of the Sale remain in full force and effect for the benefit of, the Purchaser, notwithstanding any provision in the Assigned Contracts/Leases (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that purports to prohibit, restrict, or condition such assignment or transfer and, pursuant to section 365(k) of the Bankruptcy Code, the Estates shall be relieved from any further liability with respect to the Assigned Contracts/Leases after such assignment to and assumption by the Purchaser.  Upon Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Purchaser shall be fully and irrevocably vested in all rights and title to the applicable Assigned Contracts/Leases.

16.    The amounts necessary to cure any defaults existing as of the Closing Date under the Assigned Contracts/Leases are the amounts listed on the Trustee's Cure Notice filed and served in the Bankruptcy Cases, or, if applicable, such other amount(s) upon which the Trustee and any of the Counterparties may have agreed (the "Cure Amounts").  The Purchaser shall pay the applicable Cure Amounts at Closing, or at such later time as may be mutually agreed upon by the Purchaser and any applicable Counterparties.  No other defaults exist under the Assigned Contracts/Leases.  The Counterparties waive, release, and are hereby precluded from asserting any claims against the Debtors, the Trustee or the Estates for any claims arising out of or in connection with the Assigned Contracts/Leases.  The Purchaser shall pay the Cure Amounts to the Counterparties in full satisfaction of the Counterparties' claims for defaults that may have arisen under the Assigned Contracts/Leases.

## Prohibition of Actions against the Purchaser

17.    Except as otherwise provided in this Order or the Purchase Agreement, the Purchaser shall not have any liability or other obligation to the Estates arising under or related to any of the Purchased Assets.  Without limiting the generality of the foregoing, and except as

otherwise provided herein or in the Purchase Agreement, the Purchaser shall not be liable for any Claims against the Estates, and the Purchaser shall have no successor or vicarious liabilities of any kind or character, including, but not limited to, under any theory of antitrust, environmental, successor or transferee liability (including, for the avoidance of doubt, any Claims arising from the release or migration of any hazardous substance or other contamination beyond the boundaries of the Debtors' real property interests prior to the Closing Date), labor law, de facto merger, mere continuation, or substantial continuity, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated.

18.     All persons and entities holding Liens, Claims, or other interests of any kind or nature whatsoever against or in all or any portion of the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinate), hereby are forever barred, estopped, and permanently enjoined from asserting against the Purchaser, its Affiliates, its successors or assigns, its property, or the Purchased Assets, such persons' or entities' Liens, Claims, or interests in and to the Purchased Assets, including, without limitation, the following actions:   (i) commencing or continuing in any manner any action or other proceeding against the Purchaser, its Affiliates, its successors, assets or properties; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Purchaser, is Affiliates, its successors, assets or properties; (iii) creating, perfecting, or enforcing any Lien or other Claim against the Purchaser, its Affiliates, its successors, assets, or properties; (iv) asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due the Purchaser, its Affiliates, or its successors; (v) commencing or continuing any action, in any manner or place, that does not comply or is

inconsistent with the provisions of this Order or other orders of the Court, or the agreements or actions contemplated or taken in respect thereof; or (vi) revoking, terminating or failing or refusing to transfer or renew any license, permit, or authorization to operate any of the Purchased Assets or conduct any of the businesses operated with the Purchased Assets.  On the Closing Date, each creditor is authorized and directed to execute such documents and take all other actions as may be necessary to release Liens, Claims, and other interests in or on the Purchased Assets, if any, as provided for herein, as such Liens, Claims, or interests may have been recorded or may otherwise exist.

19.    All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Trustee to sell and transfer the Purchased Assets to the Purchaser in accordance with the terms of the Purchase Agreement and this Order.

20.    The Purchaser has given substantial consideration under the Purchase Agreement for the benefit of the Estates.  The consideration given by the Purchaser shall constitute valid and valuable consideration for the releases of any potential Claims and Liens pursuant to this Order, which releases shall be deemed to have been given in favor of the Purchaser by all holders of Liens against or interests in, or Claims against, the Estates or any of the Purchased Assets.  The consideration provided by the Purchaser for the Purchased Assets under the Purchase Agreement is fair and reasonable and may not be avoided under section 363(n) of the Bankruptcy Code.

21.    Nothing in this Order or the Purchase Agreement releases, nullifies, or enjoins the enforcement of any liability to a governmental unit under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property after the date of entry of this Order.  Nothing in this Order or the Purchase Agreement authorizes the transfer or

assignment to the Purchaser of any license, permit, registration, authorization, or approval of or with respect to a governmental unit without the Purchaser's complying with all applicable legal requirements under non-bankruptcy law governing such transfers or assignments.

## Other Provisions

22.    The transactions contemplated by the Purchase Agreement are undertaken by the Purchaser without collusion and in good faith, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale, unless such authorization and the Sale are duly stayed pending such appeal.   The Purchaser is a good faith buyer and, as such, shall have the full protections of section 363(m) of the Bankruptcy Code.

23.    Pursuant to Federal Rules of Bankruptcy Procedure 7062, 9014, 6004(h), and 6006(d), this Order shall be effective immediately upon entry and the Trustee and the Purchaser are authorized to close the Sale immediately upon entry of this Order.

24.    Nothing in this Order or the Purchase Agreement approves or provides for the transfer to the Purchaser of any avoidance claims (whether under chapter 5 of the Bankruptcy Code or otherwise) of the Estates.

25.    No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Sale.

26.    The failure specifically to reference any particular provision of the Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Purchase Agreement is authorized and approved in its entirety; provided, however, that this Order shall govern if any inconsistency exists between the Purchase

Agreement (including all ancillary documents executed in connection therewith) and this Order. Likewise, all of the provisions of this Order are nonseverable and mutually dependent.

27.     The Purchase Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment, or supplement does not have a material adverse effect on the Estates.

28.     The Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the Purchase Agreement, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Trustee is party or which has been assigned by the Trustee to the Purchaser, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale, including, but not limited to, retaining jurisdiction to: (a) compel delivery of the Purchased Assets to the Purchaser; (b) interpret, implement, and enforce the provisions of this Order; (c) protect the Purchaser against any alleged Liens, Claims, or other interests in or against the Purchased Assets of any kind or nature whatsoever; and (d) enter any orders under sections 363 and/or 365 of the Bankruptcy Code with respect to the Assigned Contracts/Leases.

29.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

30.     To the extent that this Order is inconsistent with any prior order or pleading with respect to the Sale Motion, the terms of this Order shall govern.

**EXHIBIT B-1**

**Form of Bill of Sale**

(see attached)

## BILL OF SALE

This Bill of Sale (this "**Bill of Sale**"), dated as of _____, 2023 is made by George L. Miller, in his capacity as the Chapter 7 Trustee (the "**Seller**") of the bankruptcy estates (the "**Estates**") of Akorn Holding Company LLC, Akorn Intermediate Company LLC, and Akorn Operating Company LLC (together, the "**Debtors**") in favor of and for the benefit of _____, a Delaware corporation (the "**Buyer**"). Terms used but not otherwise defined herein shall have the meanings assigned to them in that certain Asset Purchase Agreement dated even herewith, by and between the Seller and the Buyer (the "**Purchase Agreement**").

## BACKGROUND

1.    <u>Conveyance</u>. Subject to the entry of an order of the Bankruptcy Court substantially in the form and substance of **Exhibit A** (the "**Sale Order**"), subject to the terms of the Sale Order, and for good and valuable consideration in the aggregate amount of $[●] paid to Seller by wire transfer of immediately available funds to an account or accounts designated in writing by Seller, the receipt and adequacy of which Seller hereby acknowledges, Seller hereby irrevocably sells, assigns, transfers, conveys, grants, bargains, and delivers to Buyer, all of the Estates' right, title and interest in and to the Purchased Assets set forth on Schedule I, attached hereto. For the avoidance of doubt, Seller and Buyer hereby acknowledge and agree that the Purchases Assets conveyed pursuant to this Bill of Sale are *not* subject to and are *not* being sold, assigned, transferred, conveyed or otherwise disposed of pursuant to any agreement, purchase order, statement of work or understanding, whether written or verbal, between the parties hereto, other than the Purchase Agreement and this Bill of Sale.

2.    <u>Disclaimer of Seller Warranties</u>. EXCEPT AS SET FORTH IN THE PURCHASE AGREEMENT OR ANY OTHER DOCUMENT OR CERTIFICATE CONTEMPLATED THEREIN OR OTHERWISE ENTERED INTO OR DELIVERED IN CONNECTION THEREWITH, SELLER MAKES NO REPRESENTATION OR WARRANTY WHATSOEVER WITH RESPECT TO THE PURCHASED ASSETS, INCLUDING ANY (a) WARRANTY OF MERCHANTABILITY; (b) WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE; (c) WARRANTY OF TITLE; OR (d) WARRANTY AGAINST INFRINGEMENT OF INTELLECTUAL PROPERTY RIGHTS OF A THIRD PARTY; WHETHER ARISING BY LAW, COURSE OF DEALING, COURSE OF PERFORMANCE, USAGE OF TRADE OR OTHERWISE. BY ACCEPTING THIS BILL OF SALE, BUYER ACKNOWLEDGES THAT IT HAS NOT RELIED ON ANY REPRESENTATION OR WARRANTY MADE BY SELLER, OR ANY OTHER PERSON ON SELLER'S BEHALF, EXCEPT AS SPECIFICALLY PROVIDED IN THE HEREIN OR IN THE PURCHASE AGREEMENT OR ANY OTHER DOCUMENT OR CERTIFICATE CONTEMPLATED THEREIN OR OTHERWISE ENTERED INTO OR DELIVERED IN CONNECTION THEREWITH.

3.    <u>Permits and Licenses</u>. Except as set forth in the Purchase Agreement or any other document or certificate contemplated therein or otherwise entered into or delivered in connection therewith, notwithstanding anything contained in this Bill of Sale to the contrary, Buyer acknowledges and agrees that neither Seller, nor any of its affiliates or any other person is making any representations or warranties whatsoever, express or implied, in connection with the conveyance of the Purchased Assets, including without limitation as to the probable success or profitability of the ownership, use or operation of the Purchased Assets after the date of this Bill of Sale.

4.    <u>Further Assurances</u>. Seller for itself, its successors and assigns, hereby covenants and agrees that, at any time prior to the closing of Debtors' jointly administered bankruptcy cases, on Buyer's written request, Seller will do, execute, acknowledge, and deliver or cause to be done, executed,

acknowledged, and delivered, such further acts, deeds, assignments, transfers, conveyances, powers of attorney, and assurances as may be reasonably required by Buyer in order to assign, transfer, set over, convey, assure, and confirm unto and vest in Buyer, its successors and assigns, title to the assets sold, conveyed, and transferred by this Bill of Sale; *provided, however*, that, to the extent provided for in the Purchase Agreement, Buyer shall bear all reasonable and documented costs associated with any foregoing actions of Seller undertaken at the written request of Buyer.

5.      <u>Governing Law</u>. This Bill of Sale is governed by, and construed in accordance with, the laws of the State of Delaware, United States of America, without regard to the conflict of laws provisions thereof to the extent such principles or rules would require or permit the application of the laws of any jurisdiction other than those of the State of Delaware.

6.      <u>Counterparts</u>. This Bill of Sale may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Bill of Sale delivered by facsimile, e-mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Bill of Sale.

[SIGNATURE PAGE FOLLOWS]

2

IN WITNESS WHEREOF, Seller has caused this Bill of Sale to be duly executed and delivered on the date first set forth above.

**SELLER**:

GEORGE L. MILLER, AS TRUSTEE FOR THE ESTATES AKORN HOLDING COMPANY LLC, AKORN INTERMEDIATE COMPANY LLC AND AKORN OPERATING COMPANY LLC

By: _____
Name:  George L. Miller
Title:  Trustee

**BUYER**:

By: _____
Name:
Title:

135346118_4

**EXHIBIT A**

**Sale Order**

Schedule I

Purchased Assets

**EXHIBIT B-2**

**<u>Form of Instrument of Assumption</u>**

<u>(see attached)</u>

**Assignment and Assumption Agreement**

This Assignment and Assumption Agreement (the "<u>Agreement</u>"), dated as of [ ● ], 2023 (the "<u>Execution Date</u>"), is made and entered into by and between [Purchaser LLC], a **[ ● ]** ("<u>Purchaser</u>") and George L. Miller, the chapter 7 trustee (the "<u>Trustee</u>" or "<u>Seller</u>") of the chapter 7 estates (collectively, the "<u>Estates</u>") of Akorn Holding Company LLC, Akorn Intermediate Company LLC and Akorn Operating Company LLC ("<u>Operating</u>", and together with Holdings and Intermediate, "<u>Debtors</u>" and each entity individually, a "<u>Debtor</u>").

**WHEREAS**, on February 23, 2023, Debtors each filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code, as amended (the "<u>Bankruptcy Code</u>"), commencing a chapter 7 case (each, a "<u>Bankruptcy Case</u>" and, collectively, the "<u>Bankruptcy Cases</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>").

**WHEREAS**, Seller and Purchaser have entered into that certain Asset Purchase Agreement, dated of even date herewith (the "<u>Purchase Agreement</u>"), pursuant to which, among other things, Seller has agreed to assign all of its rights, title and interests in the Purchased Assets, and Purchaser has agreed to assume all of Seller's duties and obligations and the Assumed Liabilities (each as defined in the Purchase Agreement), in the manner and subject to the terms and conditions set forth in the Purchase Agreement and as authorized under, among other things, Sections 105 and 363 of the Bankruptcy Code.

**WHEREAS**, the effectiveness of this Agreement is subject to the Bankruptcy Court's entry of the Sale Order, and this Agreement is subject to the terms of the Sale Order and the Purchase Agreement.

**NOW, THEREFORE**, in consideration of the mutual covenants, terms, and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    <u>Definitions</u>. All capitalized terms used in this Agreement but not otherwise defined herein are given the meanings set forth in the Purchase Agreement.

2.    <u>Assignment and Assumption</u>. Except as otherwise provided in the Purchase Agreement, upon the terms and subject to the conditions of the Purchase Agreement and this Agreement, Seller hereby assigns to Purchaser the Purchased Assets. Purchaser hereby (i) accepts such assignment and assumes all of Seller's duties and obligations under the Assumed Liabilities and (ii) agrees to pay, perform and discharge, as and when due, all of the obligations of Seller under the Assumed Liabilities, in each case of (i) and (ii), to the extent provided for in the Purchase Agreement.

3.    <u>Terms of the Purchase Agreement</u>. The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements and conditions relating to the Purchased Assets and the Assumed Liabilities are hereby incorporated herein by this reference. The parties hereto acknowledge and agree that the representations, warranties, covenants, agreements and conditions contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

4.    <u>Governing Law</u>. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO THE CONFLICT OF LAWS PROVISIONS THEREOF TO THE EXTENT THAT SUCH

PROVISIONS WOULD REQUIRE OR PERMIT THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN THOSE OF THE STATE OF DELAWARE, AND THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE.

5.      <u>Counterparts</u>. This Agreement may be executed by facsimile or PDF signature and in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when two or more counterparts have been signed by each of the parties and delivered to the other party.

6.      <u>Further Assurances</u>. Until the closing of the Bankruptcy Cases, each of the parties hereto shall execute and deliver, at the reasonable request of the other party hereto, such additional documents, instruments, conveyances and assurances and take such further actions as such other party may reasonably request to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.  Provided, however, that the Buyer shall be responsible for paying any costs associated with any such acts and/or actions that the Trustee performs at the Buyer's request, to the extent provided for in the Purchase Agreement.

7.      <u>Amendments; Waivers</u>.  This Agreement may be amended, modified and supplemented in any and all respects, but only by a written instrument signed by all of the parties hereto expressly stating that such instrument is intended to amend, modify or supplement this Agreement; provided, however, any material amendment shall be subject to approval by the Bankruptcy Court.

[SIGNATURE PAGE TO FOLLOW]

IN WITNESS WHEREOF, the parties have executed this Agreement effective as of the date first above written.

**SELLER:**

GEORGE L. MILLER, AS TRUSTEE FOR THE ESTATES

By: _____
    Name:
    Title:

**PURCHASER:**

[    ]

By: _____
    Name:
    Title:

**EXHIBIT C**

**Bidding Procedures Order**

(see attached)

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| AKORN HOLDING COMPANY LLC, *et al.*[1] | Case No. 23-10253 (KBO) |
| Debtors. | (Jointly Administered) |
| | **Re D.I. 106**, 136 |

**ORDER GRANTING TRUSTEE'S MOTION FOR ENTRY OF
AN ORDER (A) APPROVING BIDDING PROCEDURES IN CONNECTION
WITH SALE OF SUBSTANTIALLY ALL OF THE ESTATES' ASSETS, (B)
SCHEDULING AN AUCTION AND HEARING TO CONSIDER THE PROPOSED
SALE, (C) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, AND (D)
GRANTING CERTAIN RELATED RELIEF**

This matter comes before the Court upon consideration of the *Trustee's Motion for Entry of (I) an Order (A) Approving Bidding Procedures in Connection With Sale of Substantially All of the Estates' Assets, (B) Scheduling an Auction and Hearing to Consider the Proposed Sale, and (C) Approving the Form and Manner of Notice Thereof; and (II) an Order (A) Approving the Sale, (B) Authorizing the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting Certain Related Relief* (the "Sale Motion")[2] seeking, among other things, entry of an order: (i) approving the Bidding Procedures in connection with the Sale, (ii) scheduling an Auction and hearing to approve the Sale, (iii) approving the form and manner of notice thereof, and (iv) granting related relief.  After due deliberation and having determined that

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of their federal tax identification numbers, and cases numbers are Akorn Holding Company LLC (9190), Case No. 23-10253 (KBO); Akorn Intermediate Company LLC (6123), Case No. 23-10254 (KBO); and Akorn Operating Company LLC (6184), Case No. 23- 10255. The Debtors' headquarters is located at 5605 CenterPoint Court, Gurnee, IL 60031.

[2] All capitalized terms used, but not otherwise defined, in this Order shall have the meanings given in the Sale Motion.

the relief requested in the Sale Motion regarding the Sale Process is in the best interest of the Estates,

**THE COURT HEREBY FINDS THAT:**[3]

A.      The Court has jurisdiction over the Sale Motion pursuant to 28 U.S.C. § 1334. This proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested in the Motion and granted herein include sections 105(a), 363(b) and (f), and 365 of the Bankruptcy Code, Bankruptcy Rules 2002(a)(2), 6004(a), (b), (c), (e) and (f), 6006(a) and (c), 9007, and 9014, and Local Rule 6004-1(c)(ii).

B.      Notice of the Sale Motion, having been given to the Notice Parties, is sufficient in light of the circumstances and the nature of the relief requested in the Sale Motion.

C.      The Trustee has articulated good and sufficient reasons for the Court to grant the relief requested in the Sale Motion regarding the Sale Process, including without limitation, (i) approval of the Bidding Procedures; and (ii) approval of, and authorization to serve, the Notice of Auction and Sale Hearing and the Cure Notice.

D.      The Notice of Auction and Sale Hearing and the service thereof, and the service of the Cure Notice on the Counterparties, are calculated to provide all interested parties with timely and proper notice of the Sale, the Sale Hearing, the Auction, and the Cure Amounts.

---

[3]The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.      The Bidding Procedures, substantially in the form attached hereto as <u>Exhibit 1</u>, are hereby approved and fully incorporated into this Order.   The Trustee is authorized to undertake any and all actions necessary or appropriate to implement the Bidding Procedures.

2.      Objections, if any, to the portion of the relief requested in the Sale Motion that is granted in this Order that have not been withdrawn, waived, or settled are hereby overruled.

3.      The Notice of Auction and Sale Hearing, substantially in the form attached hereto as <u>Exhibit 2</u>: (i) is hereby approved; and (ii) shall be served, together with a copy of this Order, upon each of the Notice Parties within three (3) days of the date of this Order.

4.      Subject to the Bidding Procedures, in the event that the Trustee does not receive more than one Qualified Bid, the Trustee will not hold the Auction.   If the Trustee does not receive any Qualified Bids, the Trustee shall report the same to the Court and declare the Auction a "failed auction."   In the event that the Trustee receives only one Qualified Bid, the Trustee will not hold the Auction and may instead seek approval of such Qualified Bid and the associated purchase agreement at the Sale Hearing.   However, in the event that only one Qualified Bid is received, the Trustee may determine in his business judgment that such Qualified Bid is insufficient, and shall have the right to either postpone the Auction and Bid Deadline or declare the Auction a "failed auction."   As further described in the Bidding Procedures, in the event that the Trustee timely receives two (2) or more Qualified Bids, the Trustee shall conduct the Auction commencing on **May 10, 2023 at 10:00 a.m. (ET), and, as may be necessary, continuing through and including May 12, 2023**, at the offices of Cozen O'Connor, One Liberty Place, 1650 Market Street, Suite 2800, Philadelphia, PA 19103, or such later time or other place or manner as the Trustee shall notify all Qualified Bidders.

5.      Any person wishing to submit a higher or better offer for the Purchased Assets must do so in accordance with the terms of the Bidding Procedures.

6.      All bidders submitting a Qualified Bid are deemed to have submitted to the exclusive jurisdiction of the Court with respect to all matters related to the Auction and the terms and conditions of the transfer of the Purchased Assets.

7.      The Trustee is hereby authorized to conduct the Sale without complying with any state or local bulk transfer law or requirements.

8.      Pursuant to Local Rule 6004-1(c)(ii): (a) each bidder participating at the Auction will be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale; (b) the Auction will be conducted openly and all creditors will be permitted to attend (although only Qualified Bidders may bid); and (c) bidding at the Auction will be transcribed or videotaped.

9.      Within three (3) days of the date of this Order the Trustee shall file and serve the Cure Notice upon the Counterparties, which notice shall set out the applicable Cure Amounts, if any.  The Cure Notice shall be in substantially the form attached hereto as <u>Exhibit 3</u>, which form is hereby approved.

10.     Except as otherwise provided in this paragraph 10, objections, if any, to the Trustee's proposed Cure Amounts, and to the assumption and assignment of any executory contract and/or unexpired lease, must: (i) be in writing; (ii) state with specificity the grounds for such objection (with appropriate documentation in support thereof); (iii) comply with the Bankruptcy Rules and the Local Rules; and (iv) be filed with this Court and served upon (so as to be **<u>received</u>** by) the Service Parties on or before May 16, 2023  (the "<u>Objection Deadline</u>").

Provided, however, objections to the assignment of any executory contract and/or unexpired lease based on section 365(f)(2) of the Bankruptcy Code may be made at any time prior to, or at, the Sale Hearing.   Replies, if any, to any such objections shall be filed with the Court by May 18, 2023; provided however, replies to objections to the assignment of any executory contract and/or unexpired lease based on section 365(f)(2) of the Bankruptcy Code may be made at any time prior to, or at, the Sale Hearing.  The Court shall hold a hearing on May 19, 2023 at 10:00 a.m. (ET) (i.e., the Sale Hearing) regarding any objections to Cure Amounts and/or assumption and assignment of executory contracts and/or unexpired leases.

11.     Any party failing to timely file an objection to the Cure Amounts and/or assumption and/or assignment of any executory contract or unexpired lease shall be forever barred from objecting to the Cure Amounts and/or to such assumption and/or assignment, and will be deemed to consent to the Cure Amounts and/or assumption and assignment of such executory contract or unexpired lease.

12.     The Sale Hearing is scheduled to be held on May 19, 2023 at 10:00 a.m. (ET) before the Honorable Karen B. Owens, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 6th Floor, Courtroom No. 3, Wilmington, Delaware 19801.  The Sale Hearing may be adjourned or rescheduled at the Trustee's sole discretion.  The Trustee will seek the entry of the Sale Order at the Sale Hearing approving and authorizing the Sale to each Successful Bidder or Alternate Bidder, on terms and conditions consistent with such party's asset purchase agreement, as may be amended and/or modified by agreement between the Trustee and a Successful Bidder or Alternate Bidder.

13.     Objections, if any, to the relief requested in the Sale Motion as it relates to the Sale must: (i) be in writing and filed with the Court; (ii) comply with the Bankruptcy Rules and

the Local Rules; and (iii) be filed and served upon, so as to be **received** by, the Service Parties on or before May 16, 2023.

14.     The failure of any person or entity to timely file an objection to the Sale Motion shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Sale of the Purchased Assets to each Successful Bidder or Alternate Bidder.

15.     Notwithstanding the possible applicability of Bankruptcy Rule 6004(h), this Order shall be immediately effective and enforceable upon its entry.

16.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

17.     To the extent that any provisions of this Order may be inconsistent with the Sale Motion, the terms of this Order shall control.

**Dated: April 28th, 2023**
**Wilmington, Delaware**

**KAREN B. OWENS**
**UNITED STATES BANKRUPTCY JUDGE**

**Exhibit 1**

**Bidding Procedures**

## Bidding Procedures

George L. Miller, as chapter 7 trustee (the "**Trustee**") for the bankruptcy estates (the "**Estates**") of Akorn Holding Company LLC, *et al.*[1] (the "**Debtors**"), jointly administered debtors in Case No. 23-10253 (KBO) presently pending in the United States Bankruptcy Court for the District of Delaware (the "**Court**"), contemplates the sale (the "**Sale**") of all or substantially all of the assets of the Estates (the "**Purchased Assets**") to one or more purchasers pursuant to section 363 of title 11 of the United States Code (the "**Bankruptcy Code**").   The proposed transaction is subject to approval by the Court.  In connection with the Sale, these bidding procedures (the "**Bidding Procedures**") were approved by order of the Court dated April 28, 2023 (the "**Bidding Procedures Order**").[2]

### A.   The Bidding Process

1.      These Bidding Procedures describe, among other things, the manner in which prospective bidders may gain access to due diligence materials concerning the Purchased Assets, the manner in which bidders and bids become Qualified Bidders (as defined below) and Qualified Bids (as defined below), respectively, the receipt and negotiation of bids received, the conduct of any Auction (as defined below), the ultimate selection of a Successful Bidder and Successful Bid (each as defined below), and the Court's approval thereof (collectively, the "**Bidding Process**").

2.      Neither the Trustee nor his representatives shall be obligated to furnish any information of any kind whatsoever to any person who is not a Qualified Bidder (defined below). In the exercise of his reasonable business judgment, the Trustee may amend these Bidding Procedures in writing or orally at the Auction, so as to better promote the goals of the Bidding Process, so long as such changes are not inconsistent with any Court order, including the Bidding Procedures Order.

### B.   Sale on "as is, where is" Basis

The sale of the Purchased Assets will be on an "as is, where is" basis and without surviving representations or warranties of any kind by the Trustee or his agents.

### C.   Free and Clear of Any and All Claims and Interests

All of the Estates' right, title, and interest in and to the Purchased Assets, or any portion thereof, to be acquired, will be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests thereon and there against (collectively, the "**Interests**"), with such Interests to attach to the net proceeds of the sale of such Purchased Assets, except, with respect to a Successful Bidder, to the extent otherwise set forth in the relevant purchase agreement of such Successful Bidder.

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of their federal tax identification numbers, and cases numbers are Akorn Holding Company LLC (9190), Case No. 23-10253 (KBO); Akorn Intermediate Company LLC (6123), Case No. 23-10254 (KBO); and Akorn Operating Company LLC (6184), Case No. 23- 10255. The Debtors' headquarters is located at 5605 CenterPoint Court, Gurnee, IL 60031.

[2] Capitalized terms used, but not otherwise defined, in these Bidding Procedures shall have the meanings given in the Bidding Procedures Order.

## D.  Participation Requirements

1.      To participate in the Bidding Process each interested person or entity must:

(i)      deliver, unless previously delivered, to Greenhill an executed confidentiality agreement in form and substance satisfactory to the Trustee (to be delivered prior to the distribution of any confidential information by the Trustee to such person); and

(ii)     be deemed by the Trustee, after consultation with his professionals, to be reasonably likely to be able to fund and complete the consummation of the proposed transaction within the time frame acceptable to the Trustee if selected as a Successful Bidder (as defined below).

2.      Each Potential Bidder shall comply with all reasonable requests for information and due diligence access by the Trustee and his professionals regarding the ability of such Potential Bidder,  as applicable, to consummate its contemplated transaction.

3.      As promptly as reasonably possible, the Trustee will determine (in consultation with the Consultation Parties)[3] if such person or entity is acceptable and deem such person or entity a "**Potential Bidder**."

## E.  Due Diligence

1.      The Trustee may, in his reasonable business judgment, afford each Potential Bidder such access to due diligence materials concerning the Purchased Assets as the Trustee deems appropriate. Due diligence access may include access to written materials, verbal discussions, on-site inspections, and other material that a Potential Bidder may reasonably request and as to which the Trustee, in his reasonable business judgment, may agree. The Trustee may, in the exercise of his reasonable business judgment (in consultation with the Consultation Parties), extend a Qualified Bidder's time to conduct due diligence after the Bid Deadline (as defined below) until the Auction. The Trustee may, in his reasonable business judgment, coordinate due diligence efforts such that multiple Potential Bidders have simultaneous access to due diligence materials and/or simultaneous attendance at site inspections. The Trustee makes no representation or warranty as to the information to be provided through this due diligence process.

2.      Each Qualified Bidder shall be deemed to acknowledge, and shall represent in any asset purchase agreement, that it has had an opportunity to inspect and examine the Purchased Assets and to conduct any and all due diligence prior to making its offer, that it has relied solely upon its own independent reviews, investigations, and/or inspections in submitting its Bid, and that it did not rely upon any written or oral statements, representations, promises, warranties, or

---

[3] Each reference in these Bidding Procedures to "consultation" (or similar phrase) shall mean consultation in good faith providing sufficient time for the applicable parties to confer with each other and their clients, as applicable. Except as otherwise provided herein, the following parties constitute the "**Consultation Parties**": (a) the ABL Lenders (including the ABL Lenders' advisors) and (b) the Required Lenders (as defined in the Senior Secured Term Loan Agreement), including the advisors to the Required Lenders.

guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Purchased Assets or the completeness of any information provided in connection with the Bidding Process.

## F. Bid Deadline

A Potential Bidder that desires to make a Bid must deliver written copies of its Bid, via electronic mail, hand delivery or overnight mail, to: (i) the Trustee, care of his counsel, Cozen O'Connor, 1201 N. Market St., Ste. 1001, Wilmington, DE 19801, Attn. John T. Carroll, III, Esq. (jcarroll@cozen.com) and Simon Fraser, Esq. (sfraser@cozen.com); (ii) MidCap Funding IV Trust, care of its counsel, Proskauer Rose LLP, One International Place, Boston, MA 02110, Attn: Charles A. Dale, Esq. (cdale@proskauer.com); (iii) WSFS Institutional Services, care of its counsel, Wilmer Cutler Pickering Hale and Dorr LLP, 7 World Trade Center, 250 Greenwich Street, New York, NY 10007, Attn: Andrew N. Goldman, Esq. (andrew.goldman@wilmerhale.com) and Nathan J. Moore, Esq. (nathan.moore@wilmerhale.com); (iv) Ad Hoc TL Lender Group, care of their counsel, Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, NY 10166-0193, Attn: Matt J. Williams, Esq., (mjwilliams@gibsondunn.com) and AnnElyse Scarlett Gains, Esq., (agains@gibsondunn.com); and (v) Greenhill & Co., LLC, 1271 Avenue of the Americas, New York, NY 10020, Attn: Neil A. Augustine (neil.augustine@greenhill.com), Rupert Hill (rupert.hill@greenhill.com), Nicholas Drayson (nicholas.drayson@greenhill.com) and Sean Wright (sean.wright@greenhill.com) so that the Bid is actually received by **12:00 p.m. (Noon) (ET) on May 4, 2023** (the "Bid Deadline"). The Trustee may (in consultation with the Consultation Parties) extend the Bid Deadline once or successively but is not obligated to do so. If the Trustee extends the Bid Deadline, he shall promptly notify all Potential Bidders of such extension.

## G. Qualified Bid Requirements

1.     A proposal ("**Bid**") received from a Potential Bidder is a "**Qualified Bid**" if it complies with all of the following; provided that the Lenders shall be deemed a Qualified Bidder (and any bid submitted by them, a Qualified Bid) without the need to satisfy any of the other requirements placed on Qualified Bidders hereunder:

(i) is received by the Bid Deadline;

(ii) provides for the purchase of all or some portion of the Purchased Assets by the Potential Bidder on an "as is, where is" basis;

(iii) clearly identifies the particular Purchased Assets to be purchased

(iv) allocates value and/or a portion of the aggregate purchase price for each class of property (e.g. real estate, equipment, intellectual property, ANDAs, ANADAs and stock);

(v) if purchasing ANDAs or ANADAS on an individual basis, then must allocate purchase price per ANDA and ANADA;

3

(vi) includes a copy of a definitive asset purchase agreement (in substantially the form of one or more of the template asset purchase agreements posted in the data room maintained by Greenhill for Purchased Assets, as applicable (the "**Template Asset Purchase Agreements**"), signed by an authorized representative of such Potential Bidder;

(vii) is accompanied by a redline comparison showing any changes that the Potential Bidder has made to the applicable Template Purchase Agreement(s);

(viii) is not subject to any due diligence or financing conditions, board or other approval;

(ix) is accompanied by a cash deposit of not less than 10% of the proposed purchase price (the "**Required Deposit**"); *provided*, that any Bid by Lenders shall not be required to be accompanied by a deposit;

(x) includes written evidence of an unconditional commitment for financing (by a creditworthy bank or financial institution that shall provide such financing without alteration of conditions or delays) or other evidence of ability, as determined in the reasonable business judgment of the Trustee, in consultation with the Consultation Parties, to consummate the transaction. Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Trustee (in consultation with the Consultation Parties);

(xi) includes evidence that the Qualified Bidder has obtained authorization or approval from its board of directors (or comparable governing body) acceptable to the Trustee with respect to the submission, execution, and delivery of its Bid and Bid Documents, participation in the Auction, and closing of the proposed transaction(s) contemplated in such Bid. The Bid shall further state that any necessary filings under applicable regulatory, antitrust, and other laws will be made in a timely manner and that payment of the fees associated therewith shall be made by the Qualified Bidder;

(xii) disclaims any right to receive a fee analogous to a break-up fee, expense reimbursement, "topping" or termination fee, or any other similar form of compensation. For the avoidance of doubt, no Qualified Bidder  will be permitted to request, nor be granted by the Trustee, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code;

(xiii) includes (if applicable) a designation of contracts and/or leases to be assumed and assigned to the Potential Bidder, agreement to pay in full any associated cure costs, and evidence of the Potential Bidder's ability to perform future obligations under such contracts and/or leases;

(xiv) is reasonably likely (based on availability of financing, regulatory issues, experience, and other considerations) to be consummated, if selected as a Successful Bid (as defined below), within a timeframe acceptable to the Trustee (with the consent of the Consultation Parties);

(xv) contains a binding agreement by the Potential Bidder to serve as an "Alternate Bidder" (as defined below), if so selected by the Trustee in accordance with the Bidding Procedures; and

(xvi) is irrevocable until the earlier of: (a) thirty (30) days after the Bankruptcy Court authorizes and approves a Successful Bid, or Bids, for the Purchased Assets that are the subject of the Bid; and (b) the closing of the sale(s) for the Purchased Assets that are the subject of the Bid.

2.    A Potential Bidder that makes a Qualified Bid is referred to herein as a "**Qualified Bidder**."

3.    The Trustee, in his reasonable business judgment (in consultation with the Consultation Parties), shall determine whether the Bid of a Potential Bidder meets the foregoing requirements to become a Qualified Bid.

4.    Notwithstanding anything herein to the contrary, the Trustee reserves the right to work with Potential Bidders (in consultation with the Consultation Parties) to aggregate bids into a consolidated Qualified Bid, or otherwise improve bids to be Qualified Bids, prior to the Bid Deadline. Additionally, the Trustee will be authorized to approve joint Bids in his discretion (in consultation with the Consultation Parties) on a case-by-case basis.

5.    For the avoidance of doubt, any Bid that requires any form of future or current payment from the estate or the Lenders in the form of an expense reimbursement, purchase price adjustment or working capital adjustment, termination or breakup fee, or similar arrangement, shall not be considered a Qualified Bid until such concept is removed from the Bid.

6.    The Trustee, in his reasonable business judgment, may reject any proposal that entitles the Potential Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment that is not in conformity with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure or the Local Rules for the United States Bankruptcy Court for the District of Delaware, or is contrary to the best interests of the Estates.

7.    A Qualified Bid shall be valued based upon various factors including, without limitation, the net value provided by such proposal, the timing and amount of any consideration received, and the likelihood and timing of consummation of such transaction.

## H.  Lenders' Right to Credit Bid

1.    The Lenders shall have the right to at the Auction to credit bid all or any portion of the aggregate amount of their applicable outstanding secured obligations pursuant to section 363(k) of the Bankruptcy Code, and any such credit bid will be considered a Qualified Bid to the extent such bid complies with section 363(k) of the Bankruptcy Code; provided that a credit bid shall not constitute a Qualified Bid if the bid does not include a cash component sufficient to pay in full, in cash, the carve-out amount as provided for in the Sharing Agreement as approved by the Court and all claims for which there are valid, perfected, and unavoidable liens on any assets included in such Bid that are senior in priority to those of the party seeking to credit bid (unless such Lender consents to alternative treatment), if applicable.  There shall be no obligation for

any Lender to provide a Bid by the Bid Deadline if the full purchase price of the Bid is paid pursuant to a credit bid and such Lender shall be entitled to full participation at any future Auction (defined below) as a Qualified Bidder notwithstanding any requirement contained in the Bidding Procedures.

2.      Notwithstanding any other provisions herein to the contrary, in the event that a Lender wishes to submit a Bid, including without limitation a credit bid (any such bid and/or credit bid, a "<u>Lender Bid</u>"), the Lender shall notify the other parties listed in Section F above in writing by the Bid Deadline of its intent to submit such Lender Bid.  Absent such notification, the Lender shall not be permitted to submit or pursue in any way such Lender Bid.  Upon the transmission by a Lender of a notification of its intent to submit a Lender Bid, the Lender shall cease to be a Consultation Party with respect to all assets (including without limitation executory contracts and/or unexpired leases) subject to its Lender Bid, and the Trustee shall have no obligation otherwise to consult with such Lender regarding such assets.  For the avoidance of doubt, the Trustee is authorized to take any actions necessary to exclude such Lender from all discussions regarding any or all of the assets subject to the Lender's Lender Bid, except for discussions on the record at the Auction in which all other bidders are either present or able to be present if they so choose.

## I.  <u>Template Asset Purchase Agreements</u>

The Template Asset Purchase Agreement in the data room identified as "**General Asset Purchase Agreement**" should be used for the purchase of any or all assets with the exception of real property and Akorn Operating's equity interest in Akorn International S.á.r.l. The Template Asset Purchase Agreement in the data room identified as ("**Real Estate Asset Purchase Agreement**") should be used for real estate, and the Template Asset Purchase Agreement in the data room identified as ("**Stock Asset Purchase Agreement**") should be used for Akorn Operating's equity interest in Akorn International S.á.r.l.[4]

## J.  <u>Modification of Bids</u>

Without the prior written consent of the Trustee (in consultation with the Consultation Parties), a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the consideration contemplated by, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; provided that any Qualified Bid may be improved at the Auction as set forth herein.  Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures.

## K.  <u>No Qualified Bids</u>

If the Trustee does not receive any Qualified Bids, the Trustee shall (i) report the same to the Court, and (ii) declare the auction to be a "failed auction."

---

[4] Word versions of the Template Asset Purchase Agreements are available from Greenhill upon request. Additionally, Greenhill shall post a Word version of each Template Asset Purchase Agreement in the data room.

### L.  Only One Qualified Bid

In the event that the Trustee receives only one Qualified Bid, the Trustee will not hold the Auction and may instead seek approval of such Qualified Bid and the associated asset purchase agreement at the Sale Hearing.  However, in the event that only one Qualified Bid is received, the Trustee may determine in his reasonable business judgment (in consultation with the Consultation Parties) that such Qualified Bid is insufficient, and shall have the right to either postpone the Auction and Bid Deadline or declare the Auction a "failed auction."

### M.  Auction

1.      If at least two (2) Qualified Bids have been received, the Trustee shall conduct an auction (the "**Auction**") commencing on **May 10, 2023 at 10:00 a.m. (ET), and, as may be necessary, continuing through and including May 12, 2023**, at the offices of Cozen O'Connor, One Liberty Place, 1650 Market Street, Suite 2800, Philadelphia, PA 19103, or such later time or other place or manner as the Trustee shall notify all Qualified Bidders.  Only Qualified Bidders shall be eligible to participate in the Auction and only Qualified Bidders shall be entitled to make any subsequent Qualified Bids at the Auction.  The Trustee shall not consider a particular Bid unless the bidding party has submitted a Qualified Bid and attends the Auction.

2.      Prior to the start of the Auction, the Trustee shall evaluate all Qualified Bids received and shall determine (in consultation with the Consultation Parties) which Qualified Bid(s) constitutes the best offer(s) for all, or for one or more lots (each, a "**Lot**") of, the Purchased Assets (the "**Starting Auction Bid(s)**"); provided that the Trustee shall consult with the Consultation Parties prior to making any decision on which Bid shall be the Starting Auction Bid(s).  The Trustee, in his discretion and in consultation with the Consultation Parties, may accept as a single Qualified Bid, multiple Bids for non-overlapping Lots.  The Trustee shall announce the Starting Auction Bid(s), and, if applicable, the make-up of each Lot, at the commencement of the Auction. The make-up of each Lot shall be within the discretion of the Trustee, in consultation with his professionals and the Consultation Parties.

3.      The Trustee, in his sole discretion, and in consultation with his professionals, may at any time during the Auction conduct separate rounds of bidding for different Lots.  The Trustee, in his sole discretion and in consultation with his counsel, may alter or combine one or more Lots, and/or divide the Purchased Assets into additional Lots, as he deems appropriate at any point during the Auction.

4.      The minimum initial overbid and any subsequent overbids must be in increments of at least $100,000 in cash consideration with respect to a single Lot, and at least $1,000,000 in cash consideration with respect to all of the Purchased Assets (which amount the Trustee, in his reasonable business judgment, may modify at the Auction with respect to all of the Purchased Assets and/or one or more Lots) until the Trustee declares a Successful Bidder or Bidders.

5.      Upon a Qualified Bidder's declaration of its Bid at the Auction, it must commit on the record to pay promptly following the Auction, if such Bid were to be the Successful Bid or the Alternate Bid, the incremental amount of its Required Deposit calculated based on the

increased purchase price of such Bid, if applicable; provided that this requirement shall not apply to any Bid by the Lenders.

6.      The Trustee, after consultation with his professionals and the Consultation Parties, may employ and announce at the Auction additional and/or modified rules or procedures for conducting the Auction, provided that such rules are (i) not inconsistent with the Bidding Procedures Order or any other order of the Court, or the Bankruptcy Code, and (ii) disclosed to each Qualified Bidder at the Auction.

7.      At the conclusion of the Auction, the Trustee, in consultation with his counsel and in consultation with the Consultation Parties, shall (i) review each Qualified Bid (as may have been increased and/or modified at the Auction) on the basis of financial and contractual terms and the factors relevant to the Sale Process, including those factors affecting the speed and certainty of consummating the Qualified Bid, and (ii) identify the best bid or bids for either all of the Purchased Assets or for each Lot, as applicable (each such bid, a "**Successful Bid**") and the bidder making such best bid or bids (each such bidder, a "**Successful Bidder**").  The Trustee, in his discretion and in consultation with the Consultation Parties, may group as a single Qualified Bid the Successful Bids for non-overlapping Lots to participate in an Auction for such non-overlapping Lots as a single Lot, or to participate in an Auction for all of the Purchased Assets as a single Lot.  Promptly following the conclusion of the Auction the Trustee shall file on the docket of the Debtors' bankruptcy cases one or more "Notice(s) of Successful Bidder(s)" identifying each Successful Bidder and, for each, identifying the Purchased Assets (including executory contracts and/or unexpired leases) proposed to be sold to such Successful Bidder, and the purchase price.  If applicable, the Notice shall also identify the Alternate Bidder.

8.      All Qualified Bidders at the Auction shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and to have waived any right to a jury trial in connection with any disputes related to the Auction, and the construction and enforcement of the Qualified Bidder's proposed purchase agreement.

### N.   **Notice to Counterparties to Executory Contracts and/or Unexpired Leases**

If any Successful Bid or Alternate Bid includes executory contracts and/or unexpired leases to be assigned to such Bidder (each, a "Potentially Assigned Contract/Lease"), then within twenty-four (24) hours following the conclusion of the Auction, the Trustee shall serve on each counterparty to the Potentially Assigned Contracts/Leases a packet including: (1) the applicable Notice of Successful Bidder, (2) the evidence of the Successful Bidder's (and, if applicable, Alternate Bidder's) ability to perform future obligations under the applicable Potentially Assigned Contract(s)/Lease(s) previously submitted by such Successful Bidder (and, if applicable, Alternate Bidder) pursuant to section G(xiii) above; (3) any additional such evidence provided by the Successful Bidder (and, if applicable, Alternate Bidder); and (4) contact information for counsel for the Successful Bidder (and, if applicable, Alternate Bidder) and counsel for the Trustee.

## O.  The Sale Hearing

1.    A hearing is presently scheduled to take place on **May 19, 2023 at 10:00 a.m. (ET)** (the "**Sale Hearing**").  At the Sale Hearing, the Trustee shall seek entry of the Sale Order, among other things, authorizing and approving the Sale(s) of the Purchased Assets to the Successful Bidder(s) pursuant to the terms and conditions set forth in the respective Successful Bid(s).  The Trustee, in his reasonable business judgment, may adjourn or reschedule the Sale Hearing.  The Trustee shall notify all relevant parties of such adjournment or rescheduling in an appropriate manner.

2.    If the Trustee receives more than one Qualified Bid either for all of the Purchased Assets or for a given Lot, as applicable, then, at the Sale Hearing, the Trustee will seek approval of the Successful Bids, and, at the Trustee's election, in consultation with the Consultation Parties, the next best Qualified Bid(s) (the "**Alternate Bid(s)**" and the bidder(s) making such Alternate Bid(s), the "**Alternate Bidder(s)**").  The Trustee's presentation to the Court of the Successful Bid(s) and, if applicable, the Alternate Bid(s) will not constitute the Trustee's acceptance of such Bids until such Bids are approved by the Court at the Sale Hearing. Following approval of the Sale to a Successful Bidder, if the Successful Bidder fails to consummate the Sale for any reason, then the applicable Alternate Bid will be deemed to be the Successful Bid and the Trustee will be authorized, but not directed, to effect the Sale to the Alternate Bidder subject to the terms of the Alternate Bid of such Alternate Bidder without further order of the Court. The Alternate Bid shall remain open until the earlier of (a) thirty (30) days following the entry of the Sale Order or (b) the consummation of the Sale to the Successful Bidder unless further extended by agreement of the Trustee and Alternate Bidder.

3.    All Required Deposits, but excluding the Required Deposits of a Successful Bidder and Alternate Bidder (which, in the case of the Required Deposit of the Alternate Bidder, shall be returned within three (3) business days of the closing of the Sale to the Successful Bidder), shall be returned to Qualified Bidders within five (5) business days after the date of the Auction. The Trustee shall be required to maintain Required Deposits in a non-interest bearing account. Required Deposits may only be used in accordance with the provisions of these Bidding Procedures. The Trustee shall not have any liability with respect to any Required Deposits. If a Successful Bidder fails to consummate an approved sale as a result of its own default or the terms of the relevant asset purchase agreement between the Trustee and such Successful Bidder would allow the Trustee to retain such Successful Bidder's Required Deposit, the Trustee will not have any obligation to return the Required Deposit of such Successful Bidder, and such Required Deposit will become property of the Estates.

## P.  Reservation of Rights

The Trustee reserves his right, in the exercise of his fiduciary obligations, after consultation with his professionals, subject to the terms and conditions in the Sharing Agreement as approved by the Court, and in the exercise of his reasonable business judgment, to: (a) determine which Qualified Bid(s), if any, are the highest or otherwise best offer, either for all of the Purchased Assets or for each Lot, as applicable; (b) reject, at any time, any bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, the Bidding Procedures Order or any other orders applicable to the

9

Estates or the terms and conditions of the Sale, or (iii) contrary to the best interests of the Estates; and (c) modify the Bidding Procedures, including, without limitation, by (1) extending any of the deadlines set forth above for the Bidding Process, (2) modifying bidding increments, (3) adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without prior notice, (4) withdrawing from the Auction the Purchased Assets, or any Lot or portion thereof, at any time prior to or during the Auction, and/or (5) canceling the Auction, and rejecting all Qualified Bids if, in the Trustee's reasonable business judgment, and in consultation with his counsel, no such bid is for a fair and adequate price.  Notwithstanding the forgoing, the Trustee shall consult with the Consultation Parties on each of the determinations above and shall not agree to any modifications of the Bidding Procedures or other terms and conditions of any Sale that conflict with the Sharing Agreement as approved by the Court absent the consent of the Consultation Parties.

10

<u>**Exhibit 2**</u>

**Notice of Auction and Sale Hearing**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| AKORN HOLDING COMPANY LLC, *et al.*[1] | Case No. 23-10253 (KBO) |
| Debtors. | (Jointly Administered) |

## NOTICE OF SALE OF ASSETS, AUCTION, AND SALE HEARING

PLEASE TAKE NOTICE OF THE FOLLOWING:

1.      On April 28, 2023, the United States Bankruptcy Court for the District of Delaware (the "Court") entered an *Order Granting the Trustee's Motion for Entry of an Order (A) Approving Bidding Procedures in Connection With Sale of Substantially All of the Estates' Assets, (B) Scheduling an Auction and Hearing to Consider the Proposed Sale and (C) Approving the Form and Manner of Notice Thereof* (the "Bidding Procedures Order"), which, among other things, establishes bidding procedures (the "Bidding Procedures") that govern the manner in which all or substantially all of the assets (the "Purchased Assets") of the above-captioned debtors (the "Debtors") are to be sold.  All capitalized terms used but not defined herein shall have the meanings assigned to them in the Bidding Procedures Order.  A copy of the Bidding Procedures is being served on you concurrently with this Notice.

2.      All interested parties are invited to make offers to purchase all or some portion of the Purchased Assets, in accordance with the terms and conditions of the Bidding Procedures.

3.      Pursuant to the Bidding Procedures, in the event that the Trustee timely receives more than one Qualified Bid (as defined in the Bidding Procedures) the Trustee will conduct an auction for the Purchased Assets (the "Auction") commencing on **May 10, 2023 at 10:00 a.m. (ET), and, as may be necessary, continuing through and including May 12, 2023**, at the offices of Cozen O'Connor, One Liberty Place, 1650 Market Street, Suite 2800, Philadelphia, PA 19103, or such later time or other place or manner as the Trustee shall notify all Qualified Bidders.

4.      Participation at the Auction is subject to the Bidding Procedures and the Bidding Procedures Order.  Any person wishing to participate in the Bidding Process must become a "Qualified Bidder."  The procedures for becoming a Qualified Bidder are contained in the Bidding Procedures.  A Potential Bidder that desires to make a Bid must deliver written copies of

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of their federal tax identification numbers, and cases numbers are Akorn Holding Company LLC (9190), Case No. 23-10253 (KBO); Akorn Intermediate Company LLC (6123), Case No. 23-10254 (KBO); and Akorn Operating Company LLC (6184), Case No. 23- 10255. The Debtors' headquarters is located at 5605 CenterPoint Court, Gurnee, IL 60031.

its Bid, via electronic mail, hand delivery or overnight mail, to: (i) the Trustee, care of his counsel, Cozen O'Connor, 1201 N. Market St., Ste. 1001, Wilmington, DE 19801, Attn. John T. Carroll, III, Esq. (jcarroll@cozen.com) and Simon Fraser, Esq. (sfraser@cozen.com); (ii) MidCap Funding IV Trust, care of its counsel, Proskauer Rose LLP, One International Place, Boston, MA 02110, Attn: Charles A. Dale, Esq. (cdale@proskauer.com); (iii) WSFS Institutional Services, care of its counsel, Wilmer Cutler Pickering Hale and Dorr LLP, 7 World Trade Center, 250 Greenwich Street, New York, NY 10007, Attn: Andrew N. Goldman, Esq. (andrew.goldman@wilmerhale.com) and Nathan J. Moore, Esq. (nathan.moore@wilmerhale.com); (iv) Ad Hoc TL Lender Group, care of their counsel, Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, NY 10166-0193, Attn: Matt J. Williams, Esq., (mjwilliams@gibsondunn.com) and AnnElyse Scarlett Gains, Esq., (agains@gibsondunn.com); and (v) Greenhill & Co., LLC, 1271 Avenue of the Americas, New York, NY 10020, Attn: Neil A. Augustine (neil.augustine@greenhill.com), Rupert Hill (rupert.hill@greenhill.com), Nicholas Drayson (nicholas.drayson@greenhill.com) and Sean Wright (sean.wright@greenhill.com) so that the Bid is actually received by **12:00 p.m. (Noon) (ET) on May 4, 2023** (the "Bid Deadline"). The Trustee may (in consultation with the Consultation Parties) extend the Bid Deadline once or successively but is not obligated to do so. If the Trustee extends the Bid Deadline, he shall promptly notify all Potential Bidders of such extension.

5.      A hearing at which the Trustee will seek approval and authorization of the Sale to the Successful Bidders (the "Sale Hearing") is scheduled to be held on **May 19, 2023 at 10:00 a.m. (ET)**, unless otherwise continued by the Trustee pursuant to terms of the Bidding Procedures Order, before the Honorable Karen B. Owens, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, Courtroom No. 3, 824 North Market Street, Wilmington, Delaware 19801. By **May 1, 2023**, the Trustee shall file and serve upon counterparties to the Debtors' executory contracts and unexpired leases (the "Counterparties") a notice informing Counterparties that the Debtors' executory contracts and unexpired leases may be assumed and assigned, and setting out what the Debtors' records show to be the applicable cure amounts, if any (the "Cure Notice"). If any Counterparty wishes to assert an objection or other response to the Cure Notice, it must file and serve such objection or other response upon the parties listed in paragraph 6 below on or before **May 16, 2023** (the "Objection Deadline"). The Court shall hold a hearing at the Sale Hearing regarding any objections to cure amounts and/or assumption and assignment of executory contracts and/or unexpired leases.

6.      Objections, if any, to the relief requested at the Sale Hearing as it relates to the Sale, must: (a) be in writing and filed with the Court, (b) comply with the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure, and (c) be filed and served on the following parties by the Objection Deadline (except that objections pursuant to 11 U.S.C. §365(f) may be made at any time prior to, or at, the Sale Hearing): (i) the Trustee, care of his counsel, Cozen O'Connor, 1201 N. Market St., Ste. 1001, Wilmington, DE 19801, Attn. John T. Carroll, III, Esq. (jcarroll@cozen.com) and Simon Fraser, Esq. (sfraser@cozen.com); (ii) MidCap Funding IV Trust, as ABL Agent care of its counsel, Proskauer Rose LLP, One International Place, Boston, MA 02110, Attn: Charles A. Dale, Esq. (cdale@proskauer.com); (iii) WSFS Institutional Services as TL Agent, care of its counsel, Wilmer Cutler Pickering Hale and Dorr LLP, 7 World Trade Center, 250 Greenwich Street, New York, NY 10007, Attn: Andrew N. Goldman, Esq.

(andrew.goldman@wilmerhale.com) and Nathan J. Moore, Esq. (nathan.moore@wilmerhale.com); (iv) Ad Hoc TL Lender Group, care of their counsel, Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, NY 10166-0193, Attn: Matt J. Williams, Esq., (mjwilliams@gibsondunn.com) and AnnElyse Scarlett Gains, Esq. (agains@gibsondunn.com); and (v) the Office of the United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19081, Attn: Richard Schepacarter, Esq. (Richard.Schepacarter@usdoj.gov) (collectively, the "<u>Service Parties</u>").

      7.     This Notice is qualified in its entirety by the Bidding Procedures Order.

Dated:  April \_\_\_\_ 2023           COZEN O'CONNOR

                                    By:   /s/
                                          John T. Carroll, III (DE No. 4060)
                                        Simon E. Fraser (DE No. 5335)
                                        1201 N. Market Street
                                        Suite 1001
                                        Wilmington, DE 19801
                                        (302) 295-2000 Phone
                                        (302) 295-2013 Fax No.
                                        jcarroll@cozen.com
                                        sfraser@cozen.com

                                        *Counsel for the Trustee,*
                                        *George L. Miller*

**Exhibit 3**

**Cure Notice**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| AKORN HOLDING COMPANY LLC, *et al.*[1] | Case No. 23-10253 (KBO) |
| Debtors. | (Jointly Administered) |

**NOTICE OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES THAT MAY BE ASSUMED AND ASSIGNED, PURSUANT TO SECTION 365 OF THE BANKRUPTCY CODE, IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, AND THE PROPOSED CURE AMOUNTS**

PLEASE TAKE NOTICE OF THE FOLLOWING:

1.     On April 28, 2023, the United States Bankruptcy Court for the District of Delaware (the "Court") entered an *Order Granting Trustee's Motion for Entry of an Order (A) Approving Bidding Procedures in Connection With Sale of Substantially All of the Estates' Assets, (B) Scheduling an Auction and Hearing to Consider the Proposed Sale and (C) Approving the Form and Manner of Notice Thereof* (the "Bidding Procedures Order"), which, among other things, establishes bidding procedures (the "Bidding Procedures") that govern the manner in which all or substantially all of the assets (the "Purchased Assets") of the above-captioned debtors (the "Debtors") are to be sold.  All capitalized terms used but not defined herein shall have the meanings assigned to them in the Bidding Procedures Order.

2.     In accordance with the Bidding Procedures, the Trustee hereby file this Notice (the "Cure Notice") identifying: (i) those executory contracts and unexpired leases that may be assumed and assigned to a potential purchaser in connection with the Trustee's sale of the Purchased Assets (the "Executory Contracts and Unexpired Leases"); and (ii) the proposed cure amount to cure any and all defaults associated with each Executory Contract and Unexpired Lease (the "Cure Amount").

3.     A list of the Executory Contracts and Unexpired Leases, together with the Cure Amount for each, is attached to this Cure Notice as Exhibit 1.

4.     You have been identified as possibly being a party to an Executory Contract or Unexpired Lease.

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of their federal tax identification numbers, and cases numbers are Akorn Holding Company LLC (9190), Case No. 23-10253 (KBO); Akorn Intermediate Company LLC (6123), Case No. 23-10254 (KBO); and Akorn Operating Company LLC (6184), Case No. 23- 10255. The Debtors' headquarters is located at 5605 CenterPoint Court, Gurnee, IL 60031.

5.      Timely objections to the Trustee's proposed Cure Amounts, if any, will be heard at a hearing scheduled to take place on **May 19, 2023 at 10:00 a.m. (ET)** before the Honorable Karen B. Owens, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, Courtroom No. 3, Floor, 824 North Market Street, Wilmington, Delaware 19801.  This hearing may be adjourned, in which case you will be informed of the new date and time.

6.      **If you wish to assert an objection to the proposed Cure Amount associated with the particular Executory Contract or Unexpired Lease to which you are a party, you must do so in accordance with the instructions in this Cure Notice, on or before May 16, 2023 (the "Objection Deadline").**

7.      In order to be considered, objections (if any) must: (i) be in writing; (ii) state with specificity the grounds for such objection (with appropriate documentation in support thereof); (iii) comply with the Federal Rules of Bankruptcy Procedure and the Local Rules for the United States Bankruptcy Court for the District of Delaware; (iv) be filed with the Bankruptcy Court, 824 N. Market Street, 3rd Floor, Wilmington, DE 19801 by the Objection Deadline; and (v) be served on the following parties via electronic mail, hand delivery or overnight mail (so as to be **received** by such parties) by the Objection Deadline: (1) the Trustee, care of his counsel, Cozen O'Connor, 1201 N. Market St., Ste. 1001, Wilmington, DE 19801, Attn. John T. Carroll, III, Esq. (jcarroll@cozen.com) and Simon Fraser, Esq. (sfraser@cozen.com); (2) MidCap Funding IV Trust, as ABL Agent care of its counsel, Proskauer Rose LLP, One International Place, Boston, MA 02110, Attn: Charles A. Dale, Esq. (cdale@proskauer.com); (3) WSFS Institutional Services as TL Agent, care of its counsel, Wilmer Cutler Pickering Hale and Dorr LLP, 7 World Trade Center, 250 Greenwich Street, New York, NY 10007, Attn: Andrew N. Goldman, Esq. (andrew.goldman@wilmerhale.com) and Nathan J. Moore, Esq. (nathan.moore@wilmerhale.com); (4) Ad Hoc TL Lender Group, care of their counsel, Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, NY 10166-0193, Attn: Matt J. Williams, Esq., (mjwilliams@gibsondunn.com) and AnnElyse Scarlett Gains, Esq. (agains@gibsondunn.com); and (5) the Office of the United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19081, Attn: Richard Schepacarter, Esq. (Richard.Schepacarter@usdoj.gov) (collectively, the "Service Parties").

8.      **If you do not file and serve a timely objection to a proposed Cure Amount listed on Exhibit 1 to this Cure Notice pursuant to the instructions set out in this Cure Notice, you shall be forever barred from objecting to such Cure Amount, and you shall be deemed to consent to such Cure Amount.**

9.      The presence of a contract or agreement on Exhibit 1 attached hereto does not constitute an admission that such contract or agreement is an executory contract, and does not constitute a representation that such contract or agreement will be assumed and assigned to any Successful Bidder.  The Trustee reserves all of his rights, claims, and causes of action with respect to the contracts and agreements listed on Exhibit 1 attached hereto.

10.     This Cure Notice is qualified in its entirety by the Bidding Procedures Order.

Dated:   April _ 2023                                    COZEN O'CONNOR

                                                        By:    /s/
                                                               _____
                                                               John T. Carroll, III (DE No. 4060)
                                                               Simon E. Fraser (DE No. 5335)
                                                               1201 N. Market Street
                                                               Suite 1001
                                                               Wilmington, DE  19801
                                                               (302) 295-2000 Phone
                                                               (302) 295-2013 Fax No.
                                                               jcarroll@cozen.com
                                                               sfraser@cozen.com

                                                               *Counsel for the Trustee,*
                                                               *George L. Miller*

Exhibit 1

**EXHIBIT D-1**

**Form of Application Transfer Letter**

(see attached)

<u>**ANDA Transfer Letter**</u>

[**Seller Letterhead**]


[Date]


Central Document Room
Center for Drug Evaluation and Research
Food and Drug Administration
5901-B Ammendale Road
Beltsville, MD 20705-1266

**TRANSFER OF OWNERSHIP**

**ANDA # XXXXXX / Sequence # XXX**
**[Product Name & Strength]**


Dear Sir or Madam:

In accordance with 21 CFR § 314.72(a)(1), [insert company name] hereby notifies the Agency that we are transferring ownership, including all rights to ANDA # XXXXXX for [product name], to [PURCHASER]

[Insert company name] hereby confirms that a complete copy of the approved application, including supplements and records that are kept under 21 CFR § 314.81, have been provided to the new owner, [PURCHASER]

The change in ownership will be made effective once the new owner, [PURCHASER],
files the acceptance letter for this application, which is targeted to be filed in [xx] business days.


**Former Owner of Application:**          **New Owner of Application:**

[Insert company name]                     [PURCHASER]

                                          Address:

                                          Contact:

                                          Title:

                                          Email:

                                          Telephone:

This submission has been prepared in eCTD format and is being submitted through the Electronic Submissions Gateway.  The contents of this submission are verified to be virus free using [XXXX], on the date of this letter.  If there are any technical questions regarding this submission, please contact [Name] at [email address].

If there are any questions, please do not hesitate to contact [Name] (by phone: [phone] or email: [email address]).

Sincerely,

[Name]
[Title]

2

**EXHIBIT D-2**

**<u>Form of Purchaser Acceptance Letter</u>**

<u>(see attached)</u>

**<u>Purchaser Acceptance Letter</u>**

[Date]

Central Document Room
Center for Drug Evaluation and Research
Food and Drug Administration
5901-B Ammendale Road
Beltsville, MD 20705-1266

**ACKNOWLEDGEMENT AND ACCEPTANCE OF OWNERSHIP**

**ANDA # XXXXXX / Sequence # XXX**
**[Drug Product Name & Strength]**

Dear Sir or Madam:

In accordance with 21 CFR § 314.72, 21 CFR § 314.80 and 21 CFR § 314.81, [PURCHASER] hereby provides notification that it accepts the transfer of ownership of the above referenced ANDA from [seller].

Reference is made to the ANDA letter dated XXXXX from [seller], notifying the agency of the transfer of ownership of the application to [PURCHASER].

{PURCHASER] commits to agreements, promises, and conditions made by the former owner and contained in the application.  The transfer of ownership is effective as of [date].  [PURCHASER] has received a complete copy of the approved application, including supplements and records that are required to be kept under 21 CFR § 314.81. Further, [PURCHASER] will advise FDA regarding any change in the conditions in the approved application under 21 CFR § 314.70 and 21 CFR § 314.97.

All future correspondence regarding this application should be sent to [PURCHASER]. The new applicant contact information is provided below.

Contact Name:

Title:

Address:

Email:

Telephone:

This submission has been prepared in eCTD format and is being submitted through the Electronic Submissions Gateway.  The contents of this submission are verified to be virus free using McAfee Endpoint Security, Version 10.7.0.2174, on the date of this letter.  If there are any technical questions regarding this submission, please contact [CONTACT] via email: [EMAIL] or [PHONE].

This information is submitted for your review and retention in your files.  If there are any questions, please do not hesitate to contact me (by phone: [PHONE] or email: [EMIAL]).

Sincerely,

*Schedule 2.1(a)*
*Purchased Assets*

Contracts and/or Leases
1. None.

Pipeline Products, Applications, Inventory and Intellectual Property
1. (A) The pipeline Products, Abbreviated New Animal Drug Applications ("ANADA"), Abbreviated New Drug Applications ("ANDA"), New Drug Applications ("NDA") listed on **Annex I**, (collectively, the "Applications") and (B) all Quality Records, Research and Development Records, and Pharmacovigilance Records related to the Applications.
2. Books and records related to the Applications.
3. The following trademarks:

| Trademark | Country | Application # | File Date | Registration # | Registration Date | Owner Name |
|---|---|---|---|---|---|---|
| NEMBUTAL | Canada | 0181445 | 8/22/1942 | UCA17215 | 8/22/1942 | OAK PHARMACEUTICALS, INC. |
| ALLERGY BUSTER | Canada | 1,449,252 | 8/24/2009 | TMA 787,366 | 1/14/2011 | HI-TECH PHARMACAL CO., INC. |
| AKTEN | Israel | 291476 | 1/25/2017 | 291476 | 8/1/2018 | AKORN, INC. |
| PAREMYD | United States | 75/839,701 | 11/4/1999 | 2,775,998 | 10/21/2003 | Akorn Operating Company LLC |
| CAPASTAT | United States | 72/221,381 | 6/17/1965 | 808,363 | 5/17/1966 | Akorn Operating Company LLC |
| NEMBUTAL | United States | 71/308,321 | 11/26/1930 | 285,003 | 7/14/1931 | Akorn Operating Company LLC |
| BUTORPHIC | United States | 77/492,827 | 6/6/2008 | 3,648,627 | 6/30/2009 | Akorn Operating Company LLC |
| GENTAK | United States | 73/652,684 | 4/2/1987 | 1,464,244 | 11/10/1987 | Akorn Operating Company LLC |
| AKWA TEARS | United States | 90/499,665 | 1/30/2021 | | | Akorn Operating Company LLC |
| ANASED | Canada | 0,878,555 | 5/14/1998 | TMA 526,130 | 3/30/2000 | AKORN ANIMAL HEALTH, INC. |
| PROPOSED | United States | 88/677,131 | 11/1/2019 | | | Akorn Operating Company LLC |
| YOBINE | United States | 73/815,446 | 7/28/1989 | 1,587,410 | 3/20/1990 | Akorn Operating Company LLC |
| ANASED | United States | 73/815,445 | 7/28/1989 | 1,589,685 | 4/3/1990 | Akorn Operating Company LLC |

4. All Product Registrations, Registration Information, and all other Data and information regarding the development and commercialization of the Applications, including all safety and efficacy databases, clinical data, non-clinical data and related books and records, expressly excluding pricing.
5. Purchased Assets shall expressly exclude Lab Notebooks.

IT Systems, Equipment and Permits
1. All items included in **Annex II**

2.  All Permits held by the Debtors that are required or held for the use or operation of the Purchased Assets and the Decatur Facility.

*Annex I – Specified Pipeline Products, ANADAs, ANDAs and NDAs*

| Product | Regulatory Status |
|---|---|
| Adenosine Injection Usp, 3 Mg/Ml (2 Ml) | ANDA 078076 |
| Adenosine Injection Usp, 3 Mg/Ml (20 Ml And 30 Ml) | ANDA 090450 |
| Apraclonidine Ophthalmic Solution Usp, 0.5% 5 Ml And 10 Ml Fill | ANDA 077764 |
| Acetylcysteine Injection, 200 Mg/Ml (6 G/30 Ml) 30 Ml Fill | ANDA 203173 |
| Brimonidine Tartrate Ophthalmic Solution, 0.2% 5Ml, 10Ml And 15Ml Fill | ANDA 076439 |
| Clindamycin Injection In 5% Dextrose 6 Mg/Ml; 12 Mg/Ml; 18 Mg/Ml 50 Ml Fill | ANDA 203048 |
| Cyclopentolate Hydrochloride Ophthalmic Solution, 1%  2Ml, 5Ml And 15Ml Fill | ANDA 040164 |
| Cyclopentolate Hydrochloride Ophthalmic Solution, 2%  2Ml, 5Ml And 15Ml Fill | ANDA 040165 |
| Dexmedetomidine Hydrochloride Injection 100 Mcg (Base)/Ml – 2 Ml Vials | ANDA 202585 |
| Diltiazem Hydrochloride Injection 5 Ml, 10 Ml And 25 Ml Fill | ANDA 075086 |
| Eptifibatide Injection 75 Mg/100 Ml, 20 Mg/10 Ml, 200 Mg/100 Ml Single-Dose Vials | ANDA 204589 |
| Granisetron Hydrochloride Injection, 1 Mg/Ml 1 Ml And 4 Ml Fill | ANDA 079078 |
| Hydralazine Hydrochloride Injection Usp, 20Mg/Ml 1Ml Fill | ANDA 040730 |
| Hydromorphone High Potency Injection Usp,  10 Mg/Ml 50 Ml Fill | ANDA 078228 |
| Hydromorphone High Potency Injection Usp,  10 Mg/Ml 1Ml And 5 Ml Ampule | ANDA 078261 |
| Labetalol Hcl Injection, 5Mg/Ml[Vial])-20Ml(100Mg) And 40Ml (200Mg) Multi-Dose Vials | ANDA 075431 |
| Labetalol Hcl Injection Labetalol Hcl Injection, 5Mg/Ml [Syringe])-4Ml (20Mg) And 8Ml Syringes | ANDA 075524 |
| Levofloxacin Injection, 25 Mg/Ml 20 Ml And 30 Ml Fill | ANDA 091644 |
| Lorazepam Injection, 2Mg/Ml-Vial 2 Mg/Ml -1 Ml Fill | ANDA 075025 |
| Midazolam Hydrochloride Injection | ANDA 075494[1] |
| Mycophenolate Mofetil For Injection Usp, 500 Mg/Vial | ANDA 204043 |
| Naphazoline Hydrochloride Ophthalmic Solution, 0.1% 15 Ml Fill | ANDA 083590 |
| Naphazoline Hydrochloride, 0.025% And Pheniramine Maleate, 0.3% Ophthalmic Solution Usp  15 Ml Fill | ANDA 202795 |
| Naloxone Hydrochloride Injection Usp, 4 Mg/10 Ml (0.4 Mg/Ml)  Single-Dose Vials | ANDA 208871 |
| Naloxone Hydrochloride Injection Usp, 0.4 Mg/Ml, Multiple-Dose Vials | ANDA 208872 |
| Orphenadrine Citrate Injection, 60 Mg (30Mg/Ml) 2 Ml Fill | ANDA 040484 |
| Pentobarbitoal Sodium Injeciton | ANDA 083246 |
| Pilocarpine Hydrochloride Ophthalmic Solution, Usp 1%, 2% And 4% 15 Ml Fill | ANDA 204398 |
| Propracaine Hydrochloride Ophthalmic Solution, 0.5% 15 Ml Fill | ANDA 040277 |
| Ropivacaine Hydrochloride Injection Usp, 0.5% (5 Mg/Ml) 30 Ml Fill | ANDA 203955 |
| Ropivacaine Hydrochloride Injection Usp, 0.2% (2 Mg/Ml) 100 Ml And 200 Ml Fill | ANDA 204636 |
| Tetracaine Hcl Injection, 10Mg/Ml | Unapproved-other |
| Tranexamic Acid Injection, 100 Mg/10 Ml (100 Mg/Ml)  10 Ml Single-Dose Amplule | ANDA 206634 |
| Tropicamide Ophthalmic Solution, 1% 2 Ml And 15 Ml Fill | ANDA 040315 |
| Alfenta® Alfentanil Hcl Injection 500 Mcg/ 2Ml, 5Ml And 10Ml Ampules | NDA 019353 |
| Diuril® (Chlorothiazide Sodium) Injection 0.5G/Vial | NDA 011145 |
| Ephedrine Sulfate Injection, Usp, 50 Mg/Ml. (Nda 208609) 10Ml Vials | NDA 208609 |
| Inapsine® Droperidol Injection 1Ml And 2Ml Ampules | NDA 016796 |
| Sublimaze® Fentanyl Citrate Injection 2Ml, 5Ml, 10Ml And 20Ml Ampulesfill | NDA 016619 |
| Sufenta® Sufentanyl Citrate Injection, Usp 50Mcg/Ml 1Ml, 2Ml, 5Ml Ampules | NDA 019050 |

[1] ANDA number 0754814 is associated with the discontinued version of this product. ANDA number 075494 is associated with the active version of this product.

| Product | Regulatory Status |
|---|---|
| Atropine Sulfate Ophthalmic Solution, Usp, 1%. - 2 Ml. 5 Ml And 15 Ml Fill | NDA 206289 |
| Anased® Injection (20 Mg/Ml And 100 Mg/Ml Xylazine) (Vet) | NADA 139236 |
| Tolazine® Injection 100 Mg/Ml Tolazoline) (Vet) | NADA 140994 |
| Yobine® Injection (2.0 Mg/Ml Yohimbine) (Vet) | NADA 140866 |
| Butorphic® Injection (10 Mg/Ml Butorphanol) (Vet) | ANADA 200332 |
| Vetaket® Injection (100 Mg/Ml Ketamine) (Vet) | ANADA 200055 |
| Dicyclomine HCl Solution | A207084 |
| Atipamezole | Atipamezole |
| Detomidine | ANADA 200611 |
| Ketamine 50ml | Ketamine 50ml |
| Phystostigmine | Phystostigmine |
| Ciprofloxacin Hci Ophthalmic Solution Usp, 0.3% 2.5Ml, 5Ml And 10Ml Fill | ANDA 076555 |
| Sodium Chloride Ophthalmic Solution 5.0% | OTC-Monograph |

ANNEX II

**Network Equipment**

| Rack | Brand | Model | Serial Number | Power Supply Quantity | OS / Firmware Version | Management IP Address | Role | Subject to Proprietary Information Removal (Y/N) |
|------|-------|-------|---------------|----------------------|----------------------|----------------------|------|---------------------------------------------------|
| N/A | Palo Alto | PA-VM | 007051000108776 | N/A | 10.1 | 10.104.106.249 | Firewall | No, but Administration Access will be retained by Trustee until agreed upon date. |
| N/A | Palo Alto | PA-VM | 007051000108777 | N/A | 10.1 | 10.104.106.248 | Firewall | No, but Administration Access will be retained by Trustee until agreed upon date. |
| RACK #2 | Cisco | WS-C3850-48P-E | FCW2246DHBC | 2 | 16.12.5 | 10.104.106.190 | Switch | No |
| RACK #2 | Cisco | WS-C3850-48P-E | FOC1749U01X | 1 | 16.12.5 | 10.104.106.189 | Switch | No |
| RACK #1 | Cisco | C9300L-48P-4X | FOC2329L04Q | 1 | 16.12.02 | 10.104.106.199 | Switch | No |
| RACK #1 | Cisco | C9300L-48P-4X | FOC2328L30W | 1 | 16.12.02 | 10.104.106.200 | Switch | No |
| RACK #1 | Cisco | C9300L-48P-4X | FOC2329L04J | 1 | 16.12.02 | 10.104.106.197 | Switch | No |
| RACK #1 | Cisco | C9300L-48P-4X | FOC2329L056 | 1 | 16.12.02 | 10.104.106.198 | Switch | No |
| Mounted | Allen-bradley | 1783-BMS20CGP | FDO2449J0LU | 1 | 15.2(7)E2 | 10.104.116.4 | Switch | No |
| Mounted | Allen-bradley | 1783-BMS20CGP | FDO2449J0J0 | 1 | 15.2(7)E2 | 10.104.116.5 | Switch | No |
| Mounted | Allen-bradley | 1783-BMS10CGP | FDO2335J4LK | 1 | 15.2(7)E2 | 10.104.116.8 | Switch | No |
| RACK #3 | Cisco | WS-C3850-48P-S | FOC1723V0HM | 2 | 16.3.6 | 10.104.106.7 | Switch | No |
| RACK #3 | Cisco | WS-C3850-48P-S | FOC1749U0PV | 2 | 16.3.6 | 10.104.106.7 | Switch | No |
| RACK #1 | Cisco | WS-C2960X-48LPD-L | FOC1750S0RZ | 1 | 15.2(2)E7 | 10.104.106.2 | Switch | No |
| RACK #1 | Cisco | WS-C2960X-48LPD-L | FOC1750S0SJ | 1 | 15.2(2)E7 | 10.104.106.2 | Switch | No |
| RACK #1 | Cisco | WS-C2960X-48FPD-L | FCW1944B36E | 1 | 15.2(2)E7 | 10.104.106.2 | Switch | No |
| RACK #1 | Cisco | WS-C2960X-48FPD-L | FCW1944B38A | 1 | 15.2(2)E7 | 10.104.106.2 | Switch | No |
| RACK #1 | Cisco | WS-C2960X-48FPD-L | FCW1944B386 | 1 | 15.2(2)E7 | 10.104.106.2 | Switch | No |
| RACK #1 | Cisco | WS-C2960X-48LPS-L | FOC1726W26A | 1 | 15.2(2)E7 | 10.104.106.2 | Switch | No |
| RACK #1 | Cisco | WS-C2960X-48FPD-L | FOC2017S50P | 1 | 15.2(2)E7 | 10.104.106.25 | Switch | No |
| RACK #1 | Cisco | WS-C2960X-48FPD-L | FOC2018Y0A4 | 1 | 15.2(2)E7 | 10.104.106.25 | Switch | No |
| RACK #2 | Cisco | WS-C2960X-48FPD-L | FJC2223W2RF | 1 | 15.2(2)E7 | 10.104.106.9 | Switch | No |

| RACK #2 | Cisco | WS-C2960X-48FPD-L | FJC2223W2W4 | 1 | 15.2(2)E7 | 10.104.106.9 | Switch | No |
|---------|-------|-------------------|-------------|---|-----------|--------------|--------|-----|
| RACK #2 | Cisco | WS-C2960X-48FPD-L | FCW2021A6CJ | 1 | 15.2(2)E7 | 10.104.106.9 | Switch | No |
| RACK #2 | Cisco | WS-C2960X-48FPD-L | FJC24031073 | 1 | 15.2(2)E7 | 10.104.106.9 | Switch | No |
| RACK #2 | Cisco | WS-C2960X-48FPD-L | FJC2403104K | 1 | 15.2(2)E7 | 10.104.106.9 | Switch | No |
| RACK #2 | Cisco | WS-C2960X-48FPD-L | FJC2403105Z | 1 | 15.2(2)E7 | 10.104.106.9 | Switch | No |
| RACK #1 | Cisco | WS-C2960X-48FPD-L | FOC2018Y0CC | 1 | 15.2(2)E7 | 10.104.106.26 | Switch | No |
| RACK #1 | Cisco | WS-C2960X-48FPD-L | FOC2018Y0A3 | 1 | 15.2(2)E7 | 10.104.106.26 | Switch | No |
| EAST RACK 03 | Cisco | WS-C2960X-48FPD-L | FJC2223W28Q | 1 | 15.2(2)E7 | 10.104.106.5 | Switch | No |
| EAST RACK 03 | Cisco | WS-C2960X-48FPD-L | FJC2219W2VM | 1 | 15.2(2)E7 | 10.104.106.5 | Switch | No |
| RACK #1 | Cisco | WS-C2960X-48FPD-L | FJC2211W2S9 | 1 | 15.2(2)E7 | 10.104.106.22 | Switch | No |
| RACK #1 | Cisco | WS-C2960X-48FPD-L | FJC2211W2LD | 1 | 15.2(2)E7 | 10.104.106.22 | Switch | No |
| RACK #1 | Cisco | WS-C2960X-48FPD-L | FJC2211W2JB | 1 | 15.2(2)E7 | 10.104.106.22 | Switch | No |
| RACK #1 | Cisco | WS-C2960X-48FPD-L | FJC2211W2LJ | 1 | 15.2(2)E7 | 10.104.106.22 | Switch | No |
| RACK #1 | Cisco | WS-C2960X-48FPD-L | FJC2211W2L0 | 1 | 15.2(2)E7 | 10.104.106.22 | Switch | No |
| RACK #1 | Cisco | WS-C2960X-48FPD-L | FJC2211W2LL | 1 | 15.2(2)E7 | 10.104.106.22 | Switch | No |
| RACK #1 | Cisco | WS-C2960X-48FPD-L | FJC2211W2LH | 1 | 15.2(2)E7 | 10.104.106.22 | Switch | No |
| RACK #1 | Cisco | WS-C2960X-48FPD-L | FJC2214W1R9 | 1 | 15.2(2)E7 | 10.104.106.22 | Switch | No |
| RACK #1 | Cisco | WS-C2960X-48FPD-L | FJC2212W01X | 1 | 15.2(2)E7 | 10.104.106.23 | Switch | No |
| RACK #1 | Cisco | WS-C2960X-48FPD-L | FJC2212W017 | 1 | 15.2(2)E7 | 10.104.106.23 | Switch | No |
| RACK #1 | Cisco | WS-C2960X-48FPD-L | FJC2211W2J9 | 1 | 15.2(2)E7 | 10.104.106.23 | Switch | No |
| RACK #1 | Cisco | WS-C2960X-48FPD-L | FJC2214W1N9 | 1 | 15.2(2)E7 | 10.104.106.23 | Switch | No |
| EAST RACK 05 | Cisco | AIR-CT5520-K9 | FCH2148V167 | 2 | 8.2.166.0 | 10.104.106.20 | WLC | No |
| RACK #1 | Palo Alto | PA-220 | 012801025788 | 1 | 9.0.5 | 10.103.106.250 | Firewall | No, but Administration Access will be retained by Trustee until agreed upon date. |
| RACK #1 | Cisco | ISR4321 | FLM2133V1AP | 1 | 15.5(3)S6b | 10.103.106.251 | Router | No |
| RACK #1 | Cisco | C9500-24Y4C | CAT2410L2K0 | 2 | 16.12.04 | 10.103.96.1 | L3 Switch | No |
| RACK #1 | Cisco | C9500-24Y4C | CAT2410L2KT | 2 | 16.12.04 | 10.103.96.1 | L3 Switch | No |
| RACK #2 | Cisco | WS-C3850-48F-S | FOC1937X1D1 | 1 | 16.3.6 | 10.103.106.5 | Switch | No |
| RACK #2 | Cisco | WS-C3850-48F-S | FOC1937U1CK | 1 | 16.3.6 | 10.103.106.5 | Switch | No |

| RACK #2 | Cisco | WS-C3850-48F-S | FOC1952X0KA | 1 | 16.3.6 | 10.103.106.5 | Switch | No |
|---|---|---|---|---|---|---|---|---|
| RACK #2 | Cisco | WS-C3850-48F-S | FOC1937X1DB | 1 | 16.3.6 | 10.103.106.5 | Switch | No |
| RACK #2 | Cisco | WS-C3850-48F-S | FCW1937C14C | 1 | 16.3.6 | 10.103.106.5 | Switch | No |
| RACK #2 | Cisco | WS-C3850-48F-S | FCW1937C1BZ | 1 | 16.3.6 | 10.103.106.5 | Switch | No |
| RACK #1 | Cisco | WS-C2960X-48FPD-L | FCW2035A06R | 1 | 15.2(2)E7 | 10.103.106.4 | Switch | No |
| RACK #1 | Cisco | WS-C2960X-48FPD-L | FOC1948S5EM | 1 | 15.2(2)E7 | 10.103.106.4 | Switch | No |
| RACK #1 | Cisco | WS-C2960X-48FPD-L | FCW2226B18C | 1 | 15.2(2)E7 | 10.103.106.3 | Switch | No |
| RACK #1 | Cisco | WS-C2960X-48FPD-L | FCW2226B1CH | 1 | 15.2(2)E7 | 10.103.106.3 | Switch | No |
| RACK #1 | Cisco | C9300-48P | FJZ261219L9 | 1 | 17.3.4 | 10.104.106.8 | Switch | No |

**VLAN**

| VLAN | Site Location | VLAN Name | VLAN Type | IP Address Range | Description | Subject to Proprietary Information Removal (Y/N) |
|---|---|---|---|---|---|---|
| 1 | Decatur-Grand | N/A | VLAN | N/A | N/A | No |
| 50 | Decatur-Grand | FW-Outside | VLAN | N/A | N/A | No |
| 51 | Decatur-Grand | AT&T MPLS | Subnet | 10.103.96.224/30 | AT&T MPLS BBEC.503933ATI | No |
| 100 | Decatur-Grand | Data | Subnet | 10.104.100.0/23 | Data | No |
| 102 | Decatur-Grand | Voice | Subnet | 10.104.102.0/23 | Voice | No |
| 104 | Decatur-Grand | Server | Subnet | 10.104.104.0/24 | Server | No |
| 106 | Decatur-Grand | Management | Subnet | 10.104.106.0/24 | N/A | No |
| 107 | Decatur-Grand | Engineering | Subnet | 10.104.107.0/24 | Engineering | No |
| 108 | Decatur-Grand | WiFi Employee | Subnet | 10.104.108.0/24 | Wireless Employees | No |
| 110 | Decatur-Grand | WiFi Guest | Subnet | 10.104.110.0/23 | Guest WiFi | No |
| 120 | Decatur-Grand | Lab Devices | Subnet | 10.104.120.0/24 | Lab Devices | No |
| 122 | Decatur-Grand | Display clocks Production | Subnet | 10.104.122.0/24 | Display clocks Production | No |
| 123 | Decatur-Grand | Siemens BAS | Subnet | 10.104.123.0/24 | Siemens BAS | No |
| 124 | Decatur-Grand | Vaisala | Subnet | 10.104.124.0/24 | Vaisala | No |
| 125 | Decatur-Grand | Security Cameras | Subnet | 10.104.125.0/24 | Security Cameras | No |
| 126 | Decatur-Grand | Door Locks | Subnet | 10.104.126.0/24 | Door Locks | No |
| 600 | Decatur-Grand | iSCSI 10.104.112.0/27 | VLAN | N/A | N/A | No |

| 627 | Decatur-Grand | IOT-internet-only | Subnet | 10.104.127.0/25 | IOT Internet-only network | No |
|-----|---------------|-------------------|--------|-----------------|---------------------------|-----|
| 628 | Decatur-Grand | IOT-internal-access | Subnet | 10.104.127.128/25 | IOT internal Access | No |
| 700 | Decatur-Grand | AN-Mgmt | Subnet | 10.104.116.0/26 | AN-Mgmt | No |
| 701 | Decatur-Grand | AN-RedundantPLC | Subnet | 10.104.116.64/27 | AN-RedundantPLC | No |
| 706 | Decatur-Grand | AN-Lyo2 | Subnet | 10.104.116.224/27 | AN Lyo2 | No |
| 707 | Decatur-Grand | AN-Lyo3 | Subnet | 10.104.117.0/27 | AN Lyo3 | No |
| 708 | Decatur-Grand | AN-LYO-Cart | Subnet | 10.104.117.32/27 | AN-LYO Cart | No |
| 714 | Decatur-Grand | AN Jump Boxes | Subnet | 10.104.117.225/27 | AN Jump Boxes | No |
| 777 | Decatur-Grand | AN-VMHost-Backup | Subnet | 10.104.118.128/28 | AN-VMHost-Backup | No |
| 778 | Decatur-Grand | AN-Wonderware | Subnet | 10.104.118.144/28 | AN Wonderware Cluster | No |
| 779 | Decatur-Grand | AN Domain Controlers | Subnet | 10.104.118.161/28 | AN Domain Controlers | No |
| 798 | Decatur-Grand | AN-WFI2 | Subnet | 10.104.119.224/28 | AN-WFI2 | No |
| 799 | Decatur-Grand | AN-KCPScale | Subnet | 10.104.119.240/28 | AN-KCPScale | No |
| 800 | Decatur-Grand | FW-01-Inside | Subnet | 10.104.96.232/30 | FW-01 Inside Xconnect | No |
| 801 | Decatur-Grand | RT-01-Inside | Subnet | 10.104.96.228/30 | RT-01 Inside Xconnect | No |
| 802 | Decatur-Grand | Comcast Metro-E DEG-DEW | Subnet | 10.103.1.16/28 | Comcast Metro-E DEG-DEW | No |
| 803 | Decatur-Grand | ANFW-20-Inside | Subnet | 10.104.96.236/30 | ANFW-20-Inside | No |
| 850 | Decatur-Grand | PMS | VLAN | N/A | N/A | No |
| 999 | Decatur-Grand | BitBucket | VLAN | N/A | N/A | No |
| N/A | Decatur-Grand | N/A | Block | 10.104.96.0/19 | N/A | No |
| 1 | Decatur-Wyckles | N/A | VLAN | N/A | N/A | No |
| 50 | Decatur-Wyckles | ATT-Internet | VLAN | N/A | N/A | No |
| 51 | Decatur-Wyckles | ATT-MPLS | VLAN | N/A | N/A | No |
| 90 | Decatur-Wyckles | N/A | Subnet | 10.103.90.0/29 | N/A | No |
| 100 | Decatur-Wyckles | Data | Subnet | 10.103.100.0/23 | Data | No |
| 102 | Decatur-Wyckles | Voice | Subnet | 10.103.102.0/23 | Voice | No |
| 104 | Decatur-Wyckles | Server | Subnet | 10.103.104.0/24 | Servers and Printers | No |
| 106 | Decatur-Wyckles | Management | Subnet | 10.103.106.0/24 | Management | No |
| 107 | Decatur-Wyckles | Engineering | Subnet | 10.103.107.0/24 | Engineering | No |

| 108 | Decatur-Wyckles | Wireless | Subnet | 10.103.108.0/24 | Wireless Employees | No |
| 110 | Decatur-Wyckles | Guest-WiFi | Subnet | 10.103.110.0/23 | Guest WiFi | No |
| 112 | Decatur-Wyckles | R&D | VLAN | N/A | N/A | No |
| 123 | Decatur-Wyckles | Siemens BAS | Subnet | 10.103.123.0/24 | Siemens BAS | No |
| 125 | Decatur-Wyckles | Security Cameras | Subnet | 10.103.125.0/24 | Security Cameras | No |
| 126 | Decatur-Wyckles | Door Locks | Subnet | 10.103.126.0/24 | Door Locks | No |
| 414 | Decatur-Wyckles | N/A | Subnet | 10.103.114.0/27 | Serialization LM's | No |
| 600 | Decatur-Wyckles | Nikka.IOT | Subnet | 10.103.127.0/28 | Nikka.IOT | No |
| 627 | Decatur-Wyckles | IoT.External | Subnet | 10.103.124.0/25 | IoT.External | No |
| 628 | Decatur-Wyckles | IoT.Internal | Subnet | 10.103.124.128/25 | IoT.Internal | No |
| 802 | Decatur-Wyckles | N/A | Subnet | 10.103.1.16/28 | Comcast Metro-E DEG-DEW | No |
| 899 | Decatur-Wyckles | Vendor.IOT | Subnet | 10.103.127.224/27 | N/A | No |
| 999 | Decatur-Wyckles | Bitbucket | VLAN | N/A | N/A | No |
| N/A | Decatur-Wyckles | N/A | Subnet | 10.103.96.228/30 | RT-01 G0/0/1 | No |
| N/A | Decatur-Wyckles | N/A | Subnet | 10.103.96.232/30 | FW-01 E1/2 inside | No |
| N/A | Decatur-Wyckles | N/A | Block | 10.103.0.0/16 | N/A | No |
| 3010 | Decatur-Grand | Metro_E_Global-3010 | VLAN | N/A | N/A | No |
| 3010 | Decatur-Wyckles | Metro_E_Global-3010 | VLAN | N/A | N/A | No |

**Wireless**

| SSID | Encryption | Authentication | Decatur Grand | Decatur Wyckles | Description / Notes | Subject to Proprietary Information Removal (Y/N) |
|------|------------|----------------|---------------|-----------------|--------------------|--------------------------------------------------|
| Akorn | WPA2 | 802.1X Per-User | x | x | Akorn devices | No |
| Akorn Guest | WPA2 | PSK | x | x | | No |
| DE Sky | WPA2 | PSK | x | x | Akorn devices | No |
| DE Guest | WPA2 | PSK | x | x | | No |
| DE-RF | WPA2 | PSK | x | x | Scan Guns | No |

**Racks**

| Site | Location | Rack Name/Label | Subject to Proprietary Information Removal (Y/N) |
|------|----------|-----------------|--------------------------------------------------|

| | | | | | |
|---|---|---|---|---|---|
| Decatur-Grand | X1C | EAST RACK 01 | | No | |
| Decatur-Grand | X1C | EAST RACK 02 | | No | |
| Decatur-Grand | X1C | EAST RACK 03 | | No | |
| Decatur-Grand | X2W | RACK #1 | | No | |
| Decatur-Grand | X2E | RACK #1 | | No | |
| Decatur-Grand | 2IDF | RACK #3 | | No | |
| Decatur-Grand | BPMS | RACK #1 | | No | |
| Decatur-Grand | BIDF | RACK #1 | | No | |
| Decatur-Grand | LIDF | RACK #1 | | No | |
| Decatur-Grand | LIDF | RACK #2 | | No | |
| Decatur-Grand | LPMS | RACK #1 | | No | |
| Decatur-Wyckles | MDF | RACK #1 | | No | |
| Decatur-Wyckles | MDF | RACK #2 | | No | |
| Decatur-Wyckles | MDF | RACK #3 | | No | |
| Decatur-Wyckles | OWH | RACK #1 | | No | |
| Decatur-Wyckles | NWH | RACK #1 | | No | |
| Decatur-Wyckles | Trailer | RACK #1 | | No | |

**UPS**

| Name | Label | Site | Location | Rack | Brand | Model | Serial Number | IP address | Subject to Proprietary Information Removal (Y/N) |
|---|---|---|---|---|---|---|---|---|---|
| DEG-PDUX1C-01 | DEG-PDUX1C-01 | Decatur-Grand | X1C | EAST RACK 04 | APC | AP8941 | ZA1747003329 | 10.104.106.62 | No |
| DEG-PDUX1C-02 | DEG-PDUX1C-02 | Decatur-Grand | X1C | EAST RACK 04 | APC | AP8941 | ZA1747003276 | 10.104.106.63 | No |
| DEG-PDUX1CIDF-03 | DEG-PDUX1CIDF-03 | Decatur-Grand | X1C | EAST RACK 05 | APC | AP8941 | ZA1747003359 | 10.104.106.64 | No |
| DEG-PDUX1CIDF-04 | DEG-PDUX1CIDF-04 | Decatur-Grand | X1C | EAST RACK 05 | APC | AP8941 | ZA1747003355 | 10.104.106.65 | No |
| DEG-ATS-2IDF-03 | DEG-ATS-2IDF-03 | Decatur-Grand | 2IDF | RACK #3 | Tripp-Lite | PDUMH20ATNET | 2738FV0PD890C00158 | 10.104.106.29 | No |
| DEG-ATS-BIDF-01 | DEG-ATS-BIDF-01 | Decatur-Grand | BIDF | RACK #1 | Tripp-Lite | PDUMH20ATNET | 2703FV0PD886500092 | 10.104.106.70 | No |
| DEG-UPS-BIDF-01 | DEG-UPS-BIDF-01 | Decatur-Grand | BIDF | RACK #1 | Tripp-Lite | SU2200RTXL2Ua | 2739VLCPS719300357 | 10.104.106.71 | No |
| DEG-UPS-BIDF-02 | DEG-UPS-BIDF-02 | Decatur-Grand | BIDF | RACK #1 | Tripp-Lite | SU2200RTXLCD2U | 2849JLCPS795200042 | 10.104.106.16 | No |
| DEG-ATS-BIDF-02 | DEG-ATS-BIDF-02 | Decatur-Grand | BIDF | RACK #1 | Tripp-Lite | PDUMH20ATNET | 2914PV0PD890C00018 | 10.104.106.17 | No |
| DEG-ATS-LIDF-01 | DEG-ATS-LIDF-01 | Decatur-Grand | LIDF | RACK #2 | Tripp-Lite | PDUMH20ATNET | 2750JV0PD890C00407 | 10.104.106.27 | No |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| DEG-ATS-LIDF-02 | DEG-ATS-LIDF-02 | Decatur-Grand | LIDF | RACK #1 | Tripp-Lite | PDUMH20ATNET | 2750JV0PD890C00403 | 10.104.106.28 | No |
| DEG-UPS-LIDF-01 | DEG-UPS-LIDF-01 | Decatur-Grand | LIDF | RACK #1 | Tripp-Lite | SU2200RTXLCD2U | 2949JLCPS795200036 | 10.104.106.15 | No |
| DEG-ATS-X1C-03 | DEG-ATS-X1C-03 | Decatur-Grand | X1C | EAST RACK 03 | Tripp-Lite | PDUMH20ATNET | 2749JV0PD890C00106 | 10.104.106.66 | No |
| DEG-UPS-X1C-01 | DEG-UPS-X1C-01 | Decatur-Grand | X1C | EAST RACK 04 | Tripp-Lite | SU5000RT4UHV | 2737CLCPS87A800014 | 10.104.106.60 | No |
| DEG-UPS-X1C-02 | DEG-UPS-X1C-02 | Decatur-Grand | X1C | EAST RACK 05 | Tripp-Lite | SU5000RT4UHV | 2737CLCPS87A800027 | 10.104.106.61 | No |
| DEG-ATS-X2E-01 | DEG-ATS-X2E-01 | Decatur-Grand | X2E | RACK #1 | Tripp-Lite | PDUMH20ATNET | 2749JV0PD890C00168 | 10.104.106.73 | No |
| DEG-ATS-X2W-01 | DEG-ATS-X2W-01 | Decatur-Grand | X2W | RACK #1 | Tripp-Lite | PDUMH20ATNET | 2749JV0PD890C00108 | 10.104.106.67 | No |
| DEG-UPS-LPMS-01 | DEG-UPS-LPMS-01 | Decatur-Grand | LPMS | RACK #1 | Tripp-Lite | SU2200RTXLCD2U | 2848JLCPS795200134 | 10.104.106.47 | No |
| DEG-UPS-BPMS-01 | DEG-UPS-BPMS-01 | Decatur-Grand | BPMS | RACK #1 | Tripp-Lite | SU2200RTXLCD2U | 2848JLCPS795200167 | 10.104.106.49 | No |
| DEW-UPS-MDF-01 | DEW-UPS-MDF-01 | Decatur-Wyckles | MDF | RACK #1 | Tripp-Lite | SU2200RTXL2Ua | 2702ULCPS719300006 | 10.103.106.25 | No |
| DEW-ATS-MDF-01 | DEW-ATS-MDF-01 | Decatur-Wyckles | MDF | RACK #1 | Tripp-Lite | PDUMH20ATNET | 2750JV0PD890C00043 | 10.103.106.26 | No |
| DEW-ATS-MDF-03 | DEW-ATS-MDF-03 | Decatur-Wyckles | MDF | RACK #3 | Tripp-Lite | PDUMH30HVATNET | 2712GV0PD88CA00077 | 10.103.106.27 | No |
| DEW-UPS-MDF-03 | DEW-UPS-MDF-03 | Decatur-Wyckles | MDF | RACK #3 | Tripp-Lite | SU5000RT4UHV | 2730CLCPS87A800011 | 10.103.106.28 | No |
| DEW-ATS-NWH-01 | DEW-ATS-NWH-01 | Decatur-Wyckles | NWH | RACK #1 | Tripp-Lite | PDUMH20ATNET | 2721EV0PD890C00158 | 10.103.106.32 | No |
| DEW-UPS-NWH-01 | DEW-UPS-NWH-01 | Decatur-Wyckles | NWH | RACK #1 | Tripp-Lite | SU22000RTXL2Ua | 2702ULCPS719300012 | 10.103.106.33 | No |
| DEW-UPS-OWH-01 | DEW-UPS-OWH-01 | Decatur-Wyckles | OWH | RACK #1 | Tripp-Lite | SU2200RTXLCD2U | 2914JLCPS795200123 | 10.103.106.31 | No |
| DEW-ATS-OWH-01 | DEW-ATS-OWH-01 | Decatur-Wyckles | OWH | RACK #1 | Tripp-Lite | PDUMH20ATNET | 2703FV0PD886500115 | 10.103.106.30 | No |
| DEG-ATS-LPMS-01 | DEG-ATS-LPMS-01 | Decatur-Wyckles | LPMS | RACK #1 | Tripp-Lite | PDUMH20ATNET | 2849MV0PD890C00018 | 10.104.106.46 | No |
| DEG-ATS-BPMS-01 | DEG-ATS-BPMS-01 | Decatur-Wyckles | BPMS | RACK #1 | Tripp-Lite | PDUMH20ATNET | 2849MV0PD890C00067 | 10.104.106.48 | No |
| DEW-ATS-MDF-02 | DEW-ATS-MDF-03 | Decatur-Wyckles | MDF | RACK #2 | Tripp-Lite | PDUMH20ATNET | 2914PV0PD890C00265 | 10.103.106.24 | No |
| DEW-UPS-MDF-02 | DEW-UPS-MDF-02 | Decatur-Wyckles | MDF | RACK #2 | Tripp-Lite | SU2200RTXLCD2U | 2848JLCPS795200141 | 10.103.106.29 | No |

(a)  HVAC

| Site | Location | Brand/Model | Serial Number | Subject to Proprietary Information Removal (Y/N) |
|------|----------|-------------|---------------|--------------------------------------------------|
| Decatur-Grand | X1C | Building air conditioning system from the ceiling | | No |
| Decatur-Wyckles | MDF | Building air conditioning system from the ceiling | | No |

(b)  Anti-Fire System

| Building | Location | Fire Prevention System | Fire Extinguishing System | Subject to Proprietary Information Removal (Y/N) |
|----------|----------|------------------------|---------------------------|--------------------------------------------------|
| Decatur-Grand | X1C | | Water sprinklers | No |
| Decatur-Wyckles | MDF | | Water Sprinklers | No |

**Virtual Machine Images Requirements**

| Location | Name | DNS Name | Subject to Proprietary Information Removal (Y/N) |
|----------|------|----------|--------------------------------------------------|
| Decatur-Grand | CWUGR530 | CWUGR530 | No |
| Decatur-Grand | CWUGR913.decatur.local | CWUGR913 | No |
| Decatur-Grand | CWUGR915.decatur.local | CWUGR915 | No |
| Decatur-Grand | DE1-BAS01.corp.akorn.com | DE1-BAS01 | No |
| Decatur-Grand | DE1-DC01.decatur.local | DE1-DC01 | No |
| Decatur-Grand | DE1-LEN01.Corp.Akorn.Com | DE1-LEN01 | No |
| Decatur-Grand | DE1-P-AMMS01 | DE1-P-AMMS01 | No |
| Decatur-Grand | DE1-P-CLIMET01 (Climet DataPro app and SQL DB) | DE1-P-CLIMET01 | No |
| Intentionally Omitted | | | No |
| Intentionally Omitted | | | No |
| Decatur-Grand | DE1-WKS-0002 | DE1-WKS-0002 | No |
| Decatur-Grand | DE1-WKS002 Climet DataPro client machine | DE1-WKS002 | No |
| Decatur-Grand | DE1-WKS-0099 | DE1-WKS-0099 | No |
| Decatur-Grand | PMS_LYO_Server | LYO_server | No |
| Decatur-Grand | PMS-Liquid-Server | server | No |
| Decatur-Grand | Restored-Trane2 (Liquid) | Trane2 | No |
| Decatur-Grand | Restored-Trane-PC (Lyo) | Trane-PC | No |
| Decatur-Grand | Scada-PC (Boiler PC) | Scada-PC | No |
| Decatur-Grand | CWUGR920 | | No |
| Decatur-Grand | CWUGR920 | | No |
| Decatur-Grand | CWUGR923 | CWUGR923 | No |
| Decatur-Grand | CWUGR920 | | No |
| Decatur-Wyckles | OPTEL5 | OPTEL5 | No |

**Decatur MFG Lab Systems**

| *** | = Subject to Proprietary Information Removal.  ETA 6-8 weeks from Closing. | |

| Equipment Description | Equipment Description | Equipment Description |
|---|---|---|
| #1 Alpha Check Weigher | Calman | Darwin Cooler #2 |
| #1 Bosch Vial Inspection | Card Access System Grand | Darwin Stability Chamber #1 |
| #1 Bosch Vial Washer | Card Access System Wyckles | Darwin Stability Chamber #2 |
| #2 Alpha Check Weigher | CARY UV Workstation*** | Darwin Stability Chamber #3 |
| #2 Newman Labler | Chromeleon 7 SDK Shared Components 7.1.1.1*** | Darwin Stability Chamber #4 |
| #3 Alpha Check Weigher | Chromeleon 7.2 SR2*** | Darwin Stability Chamber #5 |
| #4 Newman Labler | Chromeleon 7.2 SR2*** | DataPro2*** |
| #5 Newman Labler | Chromeleon 7.2 SR2*** | DataPro3 v. 2.40*** |
| AMMS (new) | Chromeleon 7.2 SR2*** | Drive-In Cooler #7 |
| Area AG Mengibar Vial Washer - Worst Case Vial | Chromeleon 7.2 SR2*** | Drive-In Cooler #8 |
| Area L Mengibar Vial Washer - Worst Case Vial | Chromeleon 7.2 SR2*** | EISA Inspection Room |
| Autoclave #3 - 20 Minute Vacuum Cycle | Chromeleon 7.2 SR2*** | EISAI Ampule Inspection #1 |
| Autoclave #3 - 40 Minute Vacuum Cycle | Chromeleon 7.2 SR2*** | EISAI Ampule Inspection #3 |
| Autoclave #3 - 70 Minute Vacuum Cycle | Chromeleon 7.2 SR2*** | Eisai Vial Inspection Machine 1 |
| Autoclave #3 - Empty Chamber | Chromeleon 7.2 SR2*** | Eisai Vial Inspection Machine 3 |
| Autoclave #4 - 1C MEDIA Cycle | Chromeleon 7.2 SR2*** | ESI Stability Cabinet #1 |
| Autoclave #4 - 2BVLMEDIA Cycle | Chromeleon 7.2 SR2*** | ESI Stability Cabinet #3 |
| Autoclave #4 - 3BMEDAXL Cycle | Chromeleon 7.2 SR2*** | ESI Stability Cabinet #4 |
| Autoclave #4 - Empty Chamber Liquid Cycle | Chromeleon 7.2 SR2*** | FactoryTalk View Site Edition 8.10.00 |
| Autoclave #4 - Empty Chamber Pre Vacuum Cycle | Chromeleon 7.2 SR2*** | Fedegari Autoclave |
| Autoclave #4 - Pre Vacuum Cycle | Chromeleon 7.2 SR2*** | Fedegari Autoclave # 1 Program # 3 (Stopper Load) |
| Autopol V+*** | Chromeleon 7.2 SR2*** | Fedegari Autoclave #1 Program # 14,15,16 |
| Autopol V+ v3.2.6.1006*** | Chromeleon 7.2 SR2*** | Fedegari Autoclave #1 Program # 5 (Bucket Load) |
| Balance-Mettler Toledo | Chromeleon 7.2 SR2*** | Fedegari Autoclave #1 Program # 6 (Glass Barrel & Support; Trays Load) |
| Balance-Mettler Toledo | Chromeleon 7.2 SR2*** | Fedegari Autoclave #1 Program # 8 (Room K Stopper Load) |
| Binder Incubator #1 | Cincinnati Stability Chamber | Fill Line AG Tunnel - 5mL Vials |
| Boiler Management Sys. | CLiMET DataPro 3 V. 2.40 | Fill Line C Tunnel - 5mL Ampoules |
| Bosch AIM 5021 | Comp. Maint. Mgmt. Sys. *** | Fill Line K Tunnel - 200mL Vials |
| Calibration Manager | Darwin Cooler #1 | Finished Goods Vault |
| Fisher Incubator #1 | LabX*** | OMNIC*** |
| Fisher Refrigerator #2 | LabX*** | Omnic v9*** |
| Fisher Scientific Incubator #2 | LabX*** | OpenLAB ECM 3.4.1.691*** |
| Fisher Scientific Incubator #3 | LabX Pro*** | Optel Linemaster #1 |
| Fisher Scientific Incubator #4 | LabX v. 8.0.1 Build 412*** | Optel Linemaster #2 |
| Fisher Scientific Incubator #5 | LabX v. 8.0.1 Build 412*** | Optel Linemaster #3 |
| Fisher Scientific Incubator #6 | LabX v. 8.0.1 Build 412*** | Optel Linemaster #5 |
| Fisher Scientific Incubator #7 | LabX v. 8.0.1 Build 412*** | Optel Linemaster #6 |
| Fisher Scientific Incubator #8 | LabX v. 8.0.1 Build 412*** | OptelVision #1 |
| FMS Database 1.1.0.1 | LabX_12*** | OptelVision #10 |
| FMS Oxygen GxP*** | LabX_V_12*** | OptelVision #11 |

| | | |
|---|---|---|
| FMS Oxygen GxP*** | Larkin Walk-In Cooler #3 | OptelVision #12 |
| Freezer Refrigerator Rev-03 | Lighthouse FMS Software v. 4.9.5.3 | OptelVision #13 |
| Freezer Refrigerator Rev-04 | Lighthouse FMS Software v. 4.9.5.3 | OptelVision #14 |
| GCG091301*** | Low Temp Incubator #2 | OptelVision #2 |
| GE Stability Freezer #1 | Lyo Girton Parts Washer | OptelVision #3 |
| Girton Equipment Washer | Lyophilizer #2 - SIP Cycle | OptelVision #4 |
| Girton Parts Washer | Lyophilizer #3 - SIP Cycle | OptelVision #5 |
| Girton Parts Washer | Mass Hunter*** | OptelVision #6 |
| Girton Washer #2 | Mass Hunter 4.2 vC.01.02 Build 470.11 Patch 2*** | OptelVision #9 |
| Girton Washer #3 | MECO Compression Still | Palltronic Filter Tester 1 |
| HPLC 27*** | MECO Distillation Unit | Palltronic Filter Tester2 |
| ICG041801 | Mesa Torque Tester | Particle Counter Sensor*** |
| ICP031601*** | Mesa Torque Tester #2 | pH Meter- Thermo Scientific Orion*** |
| IR#2*** | Micro Fedegari Autoclave | PharmSpec*** |
| iStability*** | Nikka Densok Pin-Hole Leak Detection Machine 1 | PharmSpec v. 3.4.0*** |
| Kalish Bottle trayer | Nikka Densok Pin-Hole Leak Detection Machine 2 | Precision Incubator |
| Kuhlman Autoclave - 13mm Stopper Loads | Nikka Densok Pin-Hole Leak Detection Machine 3 | Precision Incubator |
| Kuhlman Autoclave - Empty Chamber | Norlake Stability Chamber #10 | Pyros EQS v. 1.2*** |
| Kuhlman Autoclave - Filling Gear and Filters | Norlake Stability Chamber #11 | Pyros EQS v. 1.2*** |
| Kuhlman Autoclave- VAC 35 mins Filling Equipment | Norlake Stability Chamber #5 | QAS GC #1*** |
| Kuhlman Autoclave- VAC 60 mins Filling Equipment | Norlake Stability Chamber #6 | QC GC #13*** |
| QC GC #3*** | Steriline KB Capper | Tank 44 |
| QC HPLC #25*** | Steriline Tunnel #1 | Tank 45 |
| QC HPLC #26*** | Steriline Tunnel #2 | Tank 47 |
| QC melting Point Apparatus #2*** | Steriline Tunnel #2 | Tank 7 |
| QC Refractometer #2*** | Steriline Tunnel #3 | Tank 8 |
| Rheocalc v. 1.2.19 | Steriline Tunnel #3 | Tank 99 |
| Rheocalc v. 1.2.19 | Syncovery v8.23 | Tank A1 |
| RheocalcT*** | Tank 1 | Tank A2 |
| RheocalcT*** | Tank 13 | Tank A4 |
| Room 2021 QC Vault | Tank 14 | Tank H4 |
| Room AH TL Filler | Tank 18 | Tank J1 |
| Room C Filler | Tank 20 | Tank J2 |
| Room K Filamatic Filler | Tank 23 | TH4Rstart -- Fedegari Autoclave |
| Room P Filamatic Filler | Tank 24 | Thema 4 SDS |
| SBM Autoclave - ADV Cycle, Empty Chamber | Tank 25 | Ultralow Temperature Freezer #1 |
| SBM Autoclave - Ampoule Load, Worst Case | Tank 2549 | Vaisala 4.3 |
| SBM Autoclave - SDR Cycle, Empty Chamber | Tank 27 | VisionSecurity*** |
| SBM Autoclave - Vial Load, Worst Case | Tank 3 | VisionSecurity*** |
| Security Suite (OMNIC) | Tank 30 | VisionSecurity v4.45.0 |
| Serail Freeze Dryer #2 | Tank 31 | VisionSecurity v4.45.0 |
| Serail Freeze Dryer #3 | Tank 32 | Vitek*** |
| Shel Lab Incubator #1 | Tank 33 | VMC Walk in Cooler #4 |
| SKAN AG Wireless GT v. 1.0.7 | Tank 34 | VMC Walk-In Cooler #2 |
| SKAN Isolator | Tank 35 | VMC Walk-In Cooler #3 |
| SPP011502 | Tank 36 | VWR Freezer #1 |
| SQL Server 2012 | Tank 37 | VWR Refrigerator #1 |
| SSW | Tank 38 | VWR Water Jacketed Incubator #1 |

| | | |
|---|---|---|
| Steriline Ampoule Washer - Worst Case Ampoule | Tank 39 | VWR Water Jacketed Incubator #2 |
| Steriline AS Capper | Tank 4 | Walk in Cooler #8 |
| Steriline AX Capper | Tank 40 | Walk-In Cooler #1 |
| Steriline Capper #1 | Tank 42 | Walk-In Cooler #2 |
| Steriline Capper #2 | Tank 43 | WFI Hot Loop System |
| WFI Hot Loop System #2 | | |
| Windows Server2008 R2 Standard | | |
| Wireless Glove Tester 1 | | |
| Wireless Glove Tester 2 | | |
| Wireless Glove Tester 3 | | |
| Wireless Glove Tester 4 | | |
| Wireless GT | | |
| Wyckles Warehouse | | |
| | | |

**Miscellaneous**

| | |
|---|---|
| *** | = Subject to Proprietary Information Removal.  ETA 6-8 weeks from Closing. |

1. Intentionally omitted
2. All End user computing devices, peripherals located at Decatur facilities – Grand and Wyckles, expressly excluding personal computers and laptops.***
3. Access Control and Security Controls, Burglar Alarms - limited to physical systems
4. Surveillance Systems, Monitor - limited to physical systems/ PC
5. Intentionally omitted

6. Master Credentials – Administrator User Names and Passwords.
7. IT Policies and Procedures.
8. IT Vendor and Contacts
9. Intentionally Omitted.
10. Site Master File (List of SOP's, Equipment, Instruments, Software, Utilities, etc.,)
11. Validation Master Plan
12. IT and Data Integrity Policy  (Roles and Responsibilities, Access Rights)
13. (same line - see above)
14. List of CAPA's
15. List of CAPA's Regulatory Agency Inspections
16. List of OOS's, OOT and Manufacturing Deviations since the last FDA inspection related to Products listed on  Schedule 2.1(a)
17. List of market complaints since the last FDA inspection related to products being acquired by Rising.
18. Intentionally Omitted.
19. List of samples in Stability Chambers and Retention Sample Area
20. List of Materials Stock at Warehouse (Raw/Packing Materials/In process/Finished Products) with Expiry and Retest Dates
21. List of contracts and contacts with third party vendors undertaking periodic maintenance/qualification
22. Approved Site layout
23. List of Qualified Vendors and Contract Labs (HVAC, Sterile Garmets, Equipment Calibrations, Instrument Calibration Facilities Calibration)
24. Site Asset master list (Tabs II and III contain site IT assets).
25. Qualification Documents for GMP assets in the Manufacturing, Packaging and Laboratory Area for the Products listed on Schedule 2.1(a).
26. All Validation Protocols and Reports for the products being acquired for the Products listed on Schedule 2.1(a).
27. All Analytical Methods, Specifications for the products being acquired and associated components.
28. Annual Product Quality Reports for Products listed on Schedule 2.1(a)
29. Electronic copies of Master Batch Manufacturing and Packaging Records for the Products listed on Schedule 2.1(a)
30. All SOP's and Forms being used for GMP activities like batch manufacturing, packaging.
31. Intentionally Omitted.
32. Intentionally Omitted.
33. Method Files
34. Method Validation Files.

35.  Instrument Qualifications
36.  Instrument Maintenance Data
37.  Software Program files for Instrument Operations other than enterprise application solution***
38.  Software Licenses to the extent identified and assumed pursuant to the Agreement for all equipment excluding enterprise application solution***
39.  Intentionally Omitted.
40.  Stability Chambers Monitoring Records
41.  Production equipment data.
42.  Intentionally Omitted.
43.  Intentionally Omitted.
44.  Intentionally Omitted.
45.  Stability Chambers (ICDAS application) daily and monthly data, in hard copy (as opposed to electronic) form
46.  Intentionally Omitted.
47.  Intentionally Omitted.
48.  Intentionally Omitted.
49.  EMS
50.  Intentionally Omitted.
51.  Intentionally Omitted.
52.  Intentionally Omitted.
53.  Intentionally Omitted.
54.  Intentionally Omitted.
55.  Intentionally Omitted.
56.  Intentionally Omitted.
57.  Building Management System Software and Qualifications Data.
58.  Water treatment systems software and qualifications data.
59.  Manufacturing Equipment Operating Systems Software and qualification data.***
60.  Intentionally Omitted.
61. Factory Qualifications data
62. Utilities Qualifications data
63. Process validation for all ANDAs bought
64. Cleaning Validation Data.
65. Environmental Monitoring Data.
66. Stability studies report
67. Software qualifications and reports for automated Control Systems.
68. Chromeleon data in CMB format***
69. JDE data extracts in CSV format
70. Solely with regards to the Applications, the safety database download (xls format), and XML files for any submitted adverse events, all PADERs submitted, procedures associated with PADER & Signal Detection, any Signal Evaluation/Detection reports, and FDA PV correspondence (redacted)(if any).