# EXHIBIT "B"

# TRANSITION SERVICES AGREEMENT

This TRANSITION SERVICES AGREEMENT (this "Agreement"), dated as of June 26, 2023, is by and between George L. Miller, in his capacity as the chapter 7 trustee ("Provider") of the chapter 7 estates (collectively, the "Estates") of Akorn Holding Company LLC ("Holdings"), Akorn Intermediate Company LLC ("Intermediate") and Akorn Operating Company LLC ("Operating", and together with Holdings and Intermediate, "Debtors" and each entity individually, a "Debtor"), and Sentiss AG, a company formed under the laws of Switzerland ("Sentiss" and, together with Provider, the "Parties" and each individually a "Party"). All capitalized terms used but not defined herein shall have the meanings given to such terms in the Purchase Agreement (as defined below).

## RECITALS

**WHEREAS,** Sentiss and Provider have entered into that certain Asset and Share Purchase Agreement, dated as of May 18, 2023 (the "Purchase Agreement"), pursuant to which Sentiss is purchasing from Provider, and Provider is selling to Sentiss, the Purchased Assets; and

WHEREAS, in connection with Sentiss's purchase of the Purchased Assets, the Parties desire that Provider provides, or causes to be provided, to Sentiss and/or its Affiliates, as applicable, certain services for a period of time following the Closing as set forth herein.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## SERVICES

**1. Services**.

(a) <u>General</u>. Provider shall provide, or cause to be provided, to Sentiss and/or its Affiliates, as applicable, during the Term the services set forth on Exhibits A-1 and A-2 of this Agreement (the "Services"). Exhibit A-1 and Exhibit A-2 may be amended to include additional Services upon the mutual written agreement of the Parties.

(b) <u>Rendering Party; Recipient Party</u>. Provider shall have the right to cause one or more of the Estates of the Debtors or their Affiliates to perform all or any portion the Services. In addition, Provider shall have the right, subject to Sentiss's prior written consent, which shall not unreasonably be withheld, to hire qualified third-party subcontractors to provide all or part of any Service hereunder, at Sentiss's sole cost and expense.

(c) <u>Cooperation</u>. The Parties shall cooperate with each other and any Affiliates or permitted third-party subcontractors in connection with the performance of the Services. Without limiting the foregoing, Provider will take reasonable direction from and report to Sentiss as to the provision of Services hereunder.

(d) <u>Access</u>. Sentiss shall, and shall cause its applicable Affiliates to, permit Provider and Provider's employees and agents access (upon reasonable prior notice) to such data and personnel designated by Sentiss as involved in receiving or overseeing the Services, and

records as reasonably requested by Provider to facilitate Provider's performance of this Agreement. Provider shall permit Sentiss and/or Sentiss's Affiliates receiving Services hereunder (as applicable), and their respective employees and agents, access during regular business hours (or otherwise upon reasonable prior notice) to individuals responsible for the Services and shall provide Sentiss or its Affiliate with such data and records as Sentiss or its Affiliate may reasonably request for the purposes of allowing Sentiss or its Affiliate to exercise general oversight and to monitor the performance of the Services.

(e) Transition. The Parties acknowledge the transitional nature of the Services. Accordingly, as promptly as practicable following the execution of this Agreement, Sentiss agrees to use commercially reasonable efforts to make a transition of each Service to its own internal organization or to obtain alternate third-party sources to provide the Services, at Sentiss's sole cost and expense, subject in each case to Sentiss's ability to acquire the TSA Assets pursuant to, and as defined in, Section 6. Provider shall provide such assistance as Sentiss may reasonably request in order to obtain any consents from, and/or negotiate any replacement arrangements with, third-party Service providers in connection with the transition.

(f) Further Cooperation. In the event a provider of the Services set forth on Exhibit A-2 declines or fails to enter into an agreement with Sentiss to continue to provide such Services after the conclusion of the Term and Sentiss is unable to obtain an alternative provider before the conclusion of the Term (after making commercially reasonable efforts to do so as required in the above subparagraph (e)), then Provider shall, upon Sentiss's request (which request must be made no later than thirty (30) days prior to the expiration of the Term), timely file and prosecute such motion or motions as may be appropriate to seek the assumption and assignment of the Debtors' executory contracts set forth on Exhibit A-2, but only to the extent that such assumption and assignment is permissible under section 365 of the Bankruptcy Code, and provided that Sentiss pays any applicable cure costs; *provided*, *however*, that Sentiss shall, if requested by counsel for the Provider, (i) cause its counsel to assist in the preparation, filing and prosecution of any such motion and (ii) provide truthful in person testimony and necessary documentary evidence before the Bankruptcy Court at any hearing that may be scheduled in connection with such motion. Sentiss shall pay the Court approved legal fees and expenses of counsel for the Trustee in connection with any motion filed pursuant to this Section 1(f).

(g) Limitations. The Services will be used by Sentiss and its Affiliates that reasonably require such Services solely in connection with the operation of the Purchased Assets and/or the Business and to facilitate an orderly transition thereof following the Closing. Neither Sentiss, nor any of its Affiliates, may resell or license the use by any third party of any Services, except with the written permission of Provider.

**2. Standard of Service**.

(a) Provider represents, warrants and covenants that the Services shall be provided in good faith, in accordance with Applicable Laws, and in a manner consistent with the historical provision of the Services and with the same standard of care as historically provided.

(b) EXCEPT FOR THE WARRANTIES AND UNDERTAKINGS EXPLICITLY SET FORTH HEREIN OR IN THE PURCHASE AGREEMENT, (I) THERE ARE

NO WARRANTIES BY PROVIDER WITH RESPECT TO THE SERVICES AND (II) ALL WARRANTIES, STIPULATIONS AND UNDERTAKINGS AND ALL TERMS AND CONDITIONS (INCLUDING ANY IMPLIED BY STATUTE OR OTHERWISE) WITH RESPECT TO THE SERVICES (WHETHER AS TO MERCHANTABILITY, QUALITY, DESCRIPTION, SATISFACTORY QUALITY, SUITABILITY, FITNESS FOR A PARTICULAR PURPOSE WHERE MADE KNOWN OR NOT, CARE, SKILL OR OTHERWISE) ARE HEREBY EXCLUDED AND WAIVED.

3. **Fees; Payment**.

(a) Fees. In consideration for the performance of the Services, Sentiss shall pay to Provider the fees described in Exhibits A-1 and A-2 applicable to each performed Service (the "Service Fees").

(b) Payment. Provider shall provide Sentiss with a monthly invoice specifying the Services performed for Sentiss (and its Affiliates) in the immediately preceding month and the Service Fees due in connection therewith. Sentiss shall pay the amounts reflected on all such invoices within thirty (30) days after its receipt thereof. Any unpaid amounts shall accrue interest from the scheduled due date until the date that such amounts are fully paid to Provider at the rate equal to the lesser of (i) the maximum rate permitted by applicable Law or (ii) 1% per month.

(c) Taxes. Sentiss shall be responsible for all sales or use Taxes imposed or assessed as a result of the provision of Services by Provider hereunder.

4. **Proprietary Materials**. Sentiss (or its designee) shall acquire exclusive ownership of the Proprietary Materials (as defined below). As used herein, "Proprietary Materials" means all information, data and knowledge of the Estates furnished or made available by the Provider related to the Purchased Assets, as part of the Services, or used in the performance of Services hereunder, and copies thereof, including, documentation, techniques, tools, templates, processes, procedures, discoveries, inventions and technical data, business blueprint and process workflow (design), integration diagrams and process workflows for third-party logistics providers (3PLs) used by Provider in connection with the Business or the Purchased Assets, other documents and information reasonably associate with the foregoing. Sentiss shall, or shall cause its Affiliate to, grant to Provider a nonexclusive, worldwide, royalty-free license to use the Proprietary Materials solely for the purpose of, and only to the extent necessary for, providing the Services pursuant to this Agreement.

5. **Confidentiality**.

(a) Confidentiality. Except as otherwise permitted herein, Provider shall, and shall cause the Estates of the Debtors and their respective employees, accountants, counsel, consultants, advisors and agents to, keep all confidential information regarding the business, affairs or plans ("Confidential Information") of Sentiss, Sentiss's Affiliates or the Purchased Assets provided pursuant to this Agreement strictly confidential. Sentiss shall, and shall cause its Affiliates and their respective officers, directors, employees, accountants, counsel, consultants, advisors and agents to, keep all Confidential Information of the Estates of the Debtors which is not included in Purchased Assets confidential. Notwithstanding the foregoing, this Section 5(a) shall

not apply to Confidential Information which (i) becomes generally available to the public other than as a result of a disclosure by Provider, a Debtor, or any Affiliates thereof that received such information ("Recipient"), or (ii) is required to be disclosed by legal process, a court decision, an administrative order; *provided* that the Recipient timely informs Sentiss so that Sentiss may to seek a protective order, confidential treatment or other remedy, if possible.

(b) Safeguards. Provider agrees to establish and maintain administrative, physical and technical safeguards, data security procedures and other protections against the destruction, loss, unauthorized access or alteration of the Confidential Information which are no less rigorous than those otherwise maintained for its own Confidential Information but in no event using less than reasonable care.

**6. Term; Termination.**

(a) Term. The initial term of this Agreement shall commence on the date of this Agreement and shall continue until the date that is sixty (60) days after the date hereof (the "Initial Term"), unless sooner terminated as provided below. Thereafter, Sentiss shall have the right to extend the term of this Agreement for one thirty (30)-day period (the "Extension Period") by delivering written notice to Provider at least five (5) days before the end of the Initial Term. As used herein, "Term" shall mean the Initial Term as extended by the Extension Period (if applicable).

(b) Termination of Agreement. This Agreement may be terminated, either in full or solely with respect to one or more Services as follows:

(i) upon written agreement of the Parties;

(ii) by Sentiss upon ten (10) days' written notice to Provider; or

(iii) by Provider immediately upon written notice to Sentiss should Sentiss fail to make (or dispute in writing) any payment by the forty-fifth (45th) day following Sentiss's receipt the relevant invoice from Provider.

(c) Effect of Termination.

(i) Upon the expiration or earlier termination of this Agreement, all rights and obligations of the Parties hereunder will immediately cease and terminate (except for the rights and obligations pursuant to Section 2(b), Section 4, Section 5, Section 6(c), Section 7, Section 9, Section 10, Section 11, Section 12, Section 13, Section 15, Section 16, Section 17, Section 19, Section 20, Section 21 and Section 22, which will survive such termination or expiration), and no Party will have any further obligation to the other Parties with respect to the Agreement, except for (A) charges accrued but unpaid as of the date of termination or expiration, and (B) as set forth in the provisions of this Agreement which are specifically designated herein as surviving such termination or expiration.

(ii) Upon the expiration or earlier termination of this Agreement, subject to Bankruptcy Court approval of such transfer, Provider shall execute and deliver to Sentiss a duly executed (A) Bill of Sale, in form and substance reasonably acceptable to Sentiss, effecting the

transfer to Sentiss (or its designee) of the tangible assets of the Estates set forth on <u>Exhibit B</u> hereto (collectively, the "<u>Tangible Assets</u>"), for no additional consideration beyond the Service Fees, and (B) Assignment and Assumption Agreement, in form and substance reasonably acceptable to Sentiss, effecting the assignment to and assumption by Sentiss (or its designee) of all of the intangible assets of the Estates' assets set forth on <u>Exhibit C</u> hereto (collectively, the "<u>Intangible Assets</u>" and, together with the Tangible Assets, the "<u>TSA Assets</u>"), for no additional consideration beyond the Service Fees; *provided*, that prior to such expiration or termination, Sentiss shall have the right, upon written notice to Provider, to exclude any asset as a TSA Asset.

(iii) Prior to delivery of the TSA Assets to Sentiss (or its designee) pursuant to <u>Section 6(c)(ii)</u>, Provider shall remove, delete or otherwise destroy any documentation, data and other information which is exclusively related to an asset that Provider sold to a third party in the Auction (such assets, the "<u>Excluded Assets</u>"), for no additional consideration beyond the Service Fees and, unless such removal services cannot be reasonably performed by Provider's consultants, then Sentiss shall pay the costs of third party service providers for such removal services.

(iv) Upon the expiration or earlier termination of this Agreement, Sentiss will cooperate with Provider as reasonably necessary to provide Provider with access, during normal business hours and upon reasonable prior notice, to any documentation, data and other information in Sentiss's control to the extent related to an Excluded Asset, at Provider's sole cost and expense.

(v) Termination of this Agreement pursuant to this <u>Section 6</u> will have no effect on any other agreements between Sentiss and Provider, unless otherwise mutually and specifically agreed in writing by the Parties. Notwithstanding anything to the contrary contained herein, nothing in this Agreement shall limit or alter the rights and obligations of the Parties under the Purchase Agreement. The termination or expiration of this Agreement will not relieve any Party of any liability to the others based on acts or omissions prior to the termination or expiration of this Agreement.

7. **Limitation of Liability**. NOTWITHSTANDING ANY PROVISION OF THIS AGREEMENT TO THE CONTRARY, NO PARTY SHALL BE LIABLE TO ANY OTHER PARTY FOR CONSEQUENTIAL, INCIDENTAL, INDIRECT, SPECIAL, EXEMPLARY, OR PUNITIVE DAMAGES OF SUCH OTHER PARTY, INCLUDING LOSS OF FUTURE REVENUE, INCOME OR PROFITS, DIMINUTION OF VALUE OR LOSS OF BUSINESS REPUTATION OR OPPORTUNITY, OR DAMAGES DETERMINED AS A MULTIPLE OF INCOME, REVENUE OR THE LIKE, RELATING TO THE BREACH OR ALLEGED BREACH OF ANY REPRESENTATION, WARRANTY, COVENANT OR AGREEMENT IN THIS AGREEMENT OR RELATED HERETO.

8. **Headings**. The headings appearing herein are for convenience and reference only and shall not be deemed to govern, limit, modify or in any manner affect the scope, meaning or intent of the provisions of this Agreement.

9. **Amendment and Waiver**. This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each Party. No waiver by any Party of any of

the provisions hereof shall be effective unless explicitly set forth in writing and signed by the Party so waiving. No waiver by any Party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**10.** **Notices**. All notices and other communications hereunder shall be in writing and mailed, delivered personally, emailed (which is confirmed) or sent by an overnight courier service, such as Federal Express, to the Parties at the addresses set forth below (or at such other address as a Party may from time to time designate in writing in accordance with this Section). Each notice or other communication given to any Party in accordance with this Agreement shall be deemed to have been received (a) on the Business Day it is sent, if sent by personal delivery or email during normal business hours of the recipient (otherwise, on the first Business Day thereafter), (b) on the first Business Day after sending, if sent by overnight delivery, properly addressed and prepaid or (c) upon receipt, if sent by mail (regular, certified or registered); *provided*, that notice of change of address shall be effective only upon receipt.  The Parties agree that delivery of process or other papers in connection with any such action or proceeding in the manner provided in this Section 10, or in such other manner as may be permitted by law, shall be valid and sufficient service thereof.

      If to Provider:      George L. Miller, Trustee
1628 John F. Kennedy Blvd., Suite 950
Philadelphia, PA 19103-2110
Telephone: (215) 561-0950 Ext. 14
Facsimile: (215) 561-0330
Email:  gmiller@mctllp.com

      with a copy to:      John T. Carroll, III
Cozen O'Connor
1201 North Market Street, Suite 1001
Wilmington, DE 19801
Telephone: (302) 295-2028
Facsimile: (302) 295-2013
Email: jcarroll@cozen.com

      If to Sentiss:      Sentiss AG
Bankstrasse 4
8610 Uster, Switzerland
Attn: Juerg Pfister
Email: juerg.pfister@sentiss.ch

      with a copy to:      K&L Gates LLP

599 Lexington Avenue
New York, NY 10022
Telephone: (212) 536-3915
Attn: Jonathan M. Barron and A. Lee Hogewood, III
Email: jonathan.barron@klgates.com and
a.lee.hogewoodiii@klgates.com

11. **Relationship of the Parties**.

(a) Independent Contractor. Nothing herein contained shall be deemed to create any partnership or agency relationship between the Parties, or confer upon any of the Parties any express, implied or apparent authority to incur any obligation or liability on behalf of the other. No Party shall bind the other Party to any obligation without the express written consent of such other Party.

(b) Employees. All employees of Provider or any Debtor (or Affiliate thereof) shall be deemed for purposes of all compensation and employee benefits to be employees of Provider or such Debtor (or Affiliate) and not employees of Sentiss or its Affiliates (including, without limitation, the Company and its Subsidiaries). In performing the Services, such employees shall be under the direction, control and supervision of Provider or a Debtor (or Affiliate thereof) and not Sentiss or its Affiliates. As between the Parties, Provider shall have the sole right to exercise all authority with respect to the employment (including termination of employment), assignment and compensation of such employees.

12. **Successors and Assigns**.

No Party may assign this Agreement or any of its rights or obligations hereunder without the prior written consent of the other Party; *provided*, that Sentiss may assign this Agreement, in whole or in part, to an Affiliate of Sentiss without the consent of Provider. Any attempted assignment or delegation in contravention hereof shall be null and void. Subject to the foregoing, this Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and permitted assigns.

13. **No Third Party Beneficiary Rights**. This Agreement is not intended to and shall not be construed to give any Person other than the Parties (and successors and assigns permitted under Section 12) any interest or rights (including, without limitation, any third-party beneficiary rights) with respect to or in connection with any agreement or provision contained herein or contemplated hereby.

14. **Force Majeure**. If a Party (the "Impacted Party") is prevented from performing any of its obligations under this Agreement by reason of force majeure, including fire, flood, earthquake, storm, general strike, lockout, riot, war, terrorism, rebellion, accident, acts of God, and/or any other cause or externally induced casualty beyond its reasonable control which cannot reasonably be foreseen or avoided using due care (a "Force Majeure Event"), then the Impacted Party's failure to perform such obligation(s) shall be excused, and any related deadlines or scheduled deliveries set forth in this Agreement shall be extended, for the duration of such Force Majeure Event; *provided*, that the Impacted Party shall notify the other Party in writing (and

provide reasonable details thereof) promptly upon becoming aware of the Force Majeure Event. The Impacted Party shall use commercially reasonable efforts to promptly restore the performance of its affected obligations hereunder. If Provider is the Impacted Party, and its inability to provide any Service due to a Force Majeure Event exceeds forty-five (45) days, then Sentiss may, at its option, obtain the affected Service from a third party for the duration of the Force Majeure Event, and the applicable Service Fees shall be reduced proportionately according to the number of days of such non-performance.

15. **No Right of Set-Off**. Any payment to be made by any Party under this Agreement will be made free of any set-off and will be promptly remitted to the Party entitled to receive payment hereunder.

16. **Expenses**. Except as otherwise expressly provided herein, the Parties shall bear their own respective expenses (including, but not limited to, all compensation and expenses of counsel, financial advisors, consultants and independent accountants) incurred in connection with the preparation and execution of this Agreement and consummation of the transactions contemplated hereby.

17. **Confidentiality**.

(a) The Parties agree that the terms of this Agreement shall not be disclosed or otherwise made available to the public and that copies of this Agreement shall not be publicly filed or otherwise made available to the public, except to the extent such disclosure, availability or filing is required by Applicable Law. In the event that such disclosure, availability or filing is required by Applicable Law, each of Sentiss and Provider (as applicable) agrees to use its commercially reasonable efforts to obtain "confidential treatment" of this Agreement with the U.S. Securities and Exchange Commission (or the equivalent treatment by any other Governmental Entity) and to redact such terms of this Agreement as the other Party shall request.

(b) Provider acknowledges and agrees that data pertaining to the Business, including without limitation such data stored on servers, constitute proprietary and confidential information of Sentiss. In performing the Services under this Agreement, Provider shall, and shall cause the Estates of the Debtors and their respective employees and third party business partners and vendors to, maintain the confidentiality of such data.

18. **Counterparts**. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

19. **Governing Law**. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware (without giving effect to the conflict of laws principles thereof that would result in the application of the law of a different jurisdiction).

20. **Submission to Jurisdiction**. Any dispute, controversy or claim arising out of or relating to this Agreement shall be heard and determined in the Bankruptcy Court, and the Parties hereby irrevocably submit to the exclusive jurisdiction of such courts in any such action or

proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such action or proceeding. If the Bankruptcy Court does not have or declines to exercise subject matter jurisdiction over any action or proceeding arising out of or relating to this Agreement, then each Party (a) agrees that all such actions or proceedings shall be heard and determined in federal court of the United States for the District of Delaware, (b) irrevocably submits to the jurisdiction of such courts in any such action or proceeding, (c) consents that any such action or proceeding may be brought in such courts and waives any objection that such Party may now or hereafter have to the venue or jurisdiction or that such action or proceeding was brought in an inconvenient court, and (d) agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such Party at its address as provided in Section 10 (provided that nothing herein shall affect the right to effect service of process in any other manner permitted by Delaware law).

21. **Severability**. If in any jurisdiction any term or provision hereof is determined to be invalid or unenforceable, (a) the remaining terms and provisions hereof shall be unimpaired, (b) any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction, and (c) the invalid or unenforceable term or provision shall, for purposes of such jurisdiction, be deemed replaced by a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision.

22. **Entire Agreement**. This Agreement and the Exhibits, together with the Purchase Agreement and any other documents which this Agreement expressly requires shall be signed, shall constitute the entire understanding and agreement among the Parties to it in relation to the subject matter of this Agreement and shall together supersede all previous agreements among the Parties in relation to the same subject matter.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the date first set forth above.

**PROVIDER:**

GEORGE L. MILLER, AS TRUSTEE FOR THE ESTATES

By: _____/s/ George L. Miller_____
Name: George L. Miller
Title: Trustee

315514334.4

**SENTISS:**

SENTISS AG

By: _____
Name: Deepak Bahri
Title: Authorized Signatory

# EXHIBIT A-1

## TRANSITION SERVICES: PART 1

| **Service Description** |
|---|
| ERP System JD Edwards 9.2 including existing historical data |
| QMS System Veeva incl. existing historical data and Managed Service support for e.g. problem solving, unlocking QEs etc |
| Operation of IT system located in CH3 datacenter incl. daily backup, monitoring, security |
| US Akorn Op Co LLC available members of the transition team. |
| Wissen Network Engineer |
| Support contract: Navisite DBA |

**EXHIBIT A-2**

**TRANSITION SERVICES: PART 2**

[Spreadsheet to be attached]

# EXHIBIT B

## SPECIFIED TANGIBLE ASSETS

1. CH3 Hardware

    i. Nutanix cluster

    ii. DataDomain

    iii. Network HW incl. Core switches

    iv. Firewalls PaloAlto

    v. Cisco ASA

    vi. TapeLibrary

2. Hardware installed in Hettlingen and Winterthur

    i. Nutanix cluster

    ii. Network HW

    iii. Firewalls

## EXHIBIT C

## SPECIFIED INTANGIBLE ASSETS

1. Ownership of domain **«akorn.com»** for managing mail forwarding and relevant Akorn.com website(s) for pharmacovigilance reporting. Subject to a royalty free license of the domain to the Provider until conclusion of the applicable bankruptcy case.

2. Phone system and 800 customer service telephone number for product complaints and call routing