**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 7 |
| AKORN HOLDING COMPANY LLC, *et al.* [1] | Case No. 23-10253 (KBO) |
| Debtors. | (Jointly Administered) |
| | **Re D.I. 832** |

**CHAPTER 7 TRUSTEE'S OBJECTION TO DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING AND APPROVING THE CONVERSION OF THESE CHAPTER 7 CASES  TO CASES UNDER CHAPTER 11**

George L. Miller, as chapter 7 trustee (the "Trustee") of the estates (the "Estates") of the above-captioned debtors (the "Debtors"), through his undersigned counsel, hereby objects (the "Objection") to the *Debtors' Motion for Entry of an Order Authorizing and Approving the Conversion of These Chapter 7 Cases  to Cases Under Chapter 11* [D.I. 832] (the "Conversion Motion").  In support of this Objection, the Trustee respectfully states:

## BACKGROUND

**A.  Introduction**

1.      On February 23, 2023 (the "Petition Date"), the Debtors commenced these jointly administered bankruptcy cases (collectively the "Chapter 7 Cases") by each filing a voluntary petition in this Court for relief under chapter 7 of the Bankruptcy Code.  The Debtors had ceased operating as of the Petition Date, and the Trustee has not operated the business.

2.      As described in more detail below, in 2023 the Trustee sold substantially all of the Debtors' assets in a series of sale transactions which upon information and belief were some of the

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of their federal tax identification numbers, and cases numbers are Akorn Holding Company LLC (9190), Case No. 23-10253 (KBO); Akorn Intermediate Company LLC (6123), Case No. 23-10254 (KBO); and Akorn Operating Company LLC (6184), Case No. 23-10255.  The Debtors' headquarters is located at 5605 CenterPoint Court, Gurnee, IL 60031.

most successful chapter 7 sales in recent history in the District of Delaware.  The Trustee has since distributed the majority of the proceeds, and is in the process of making further additional large distributions subject to court approval in advance of the approval of the Trustee's Final Report. The Trustee believes that by mid 2025 the Estates will have been fully administered, with the possible exception of certain limited and discrete matters.

**B.  The Debtors' History; Existing Chapter 11 Cases; and Cancellation of LLC Certificate**

3.    The Debtors' predecessors (together with the Debtors, as applicable, the "Company") founded their business in 1971 in Abita Springs, Louisiana, and initially focused on ophthalmic drugs.  In 1997, the Company relocated its corporate headquarters to the Chicago, Illinois area.  In April 2007, the Debtors' predecessor Akorn, Inc.'s stock was listed publicly on the NASDAQ exchange.

4.    Between 1971 and 2018, the Company made strategic acquisitions to grow the business, including Taylor Pharmacal in 1992 (a contract manufacturer of injectables, based in Decatur, Illinois), Advanced Remedies Inc. in 1998 (which owned an ophthalmic manufacturing and research and development facility in Somerset, New Jersey), Advanced Vision Research, Inc. in 2011 (an ophthalmic company that developed and marketed eye care products under the TheraTears and MacuTrition brand names), Hi-Tech Pharmacal in 2014 (which traces its roots back to the Success Chemical Co., founded in Brooklyn, New York in 1930), and VersaPharm in 2014 (which focused on niche therapeutic categories of dermatology, tuberculosis, and hemophilia).  The Company also grew by launching its animal health business in 2012, and expanding its manufacturing presence into Europe in 2015 with the acquisition of Swiss operations, which included indirect ownership of a plant in Hettlingen, Switzerland, and laboratory and office space in Winterthur, Switzerland.

2

5.      In 2018, however, after nearly fifty years of growth, the Company began to struggle under the weight of expensive litigation, investigations by the U.S. Food and Drug Administration (the "FDA"), significant remediation costs, debt, and other burdens. By 2019, the Company found itself capital-constrained, with hundreds of millions of dollars of secured debt under imminent threat of default. Throughout 2019, with the help of legal and financial advisors, the Company explored restructuring options that would fully refinance or pay down the Company's debts. After conducting due diligence, however, none of the prospective investors were willing to undertake the complete refinancing that the Company required. In December 2019, the Company began to explore options for selling its business.

6.      In 2020, after the foregoing efforts had proven unsuccessful, the Company commenced cases under chapter 11 of the Bankruptcy Code jointly administered as case no. 20-11177 (KBO) in the United States Bankruptcy Court for the District of Delaware (the "Existing Chapter 11 Cases"). Following a marketing and sale process, the Company, as debtors-in-possession, sold their business in the Existing Chapter 11 Cases under section 363 of the Bankruptcy Code as a going-concern to their then-lenders for a sale price consisting essentially of a credit bid, assumption of certain liabilities, and a cash sum sufficient to fund a wind-down.[2] The Existing Chapter 11 Cases remain pending before this Court.

7.      The sale in the Existing Chapter 11 Cases closed on October 1, 2020. The purchasers in the sale from the Existing Chapter 11 Cases formed the three entities which are the Debtors in these Chapter 7 Cases, with Debtor Akorn Operating Company LLC ("Akorn Operating") becoming the new direct owner of substantially all of the assets that comprised the

---

[2] See Order (A) Approving the Asset Purchase Agreement, (B) Authorizing the Sale of Assets, (C) Authorizing the Assumption and Assignment of Contracts and Leases, and (D) Granting Related Relief, Case No. 20-11177 (KBO) (Bankr. D. Del. Sept. 2, 2020), D.I. 656 (the "Chapter 11 Sale Order"). The wind-down budget attached to this sale order lists a "total wind-down budget" of slightly over $35 million.

business.  Akorn Operating is 100% owned by Debtor Akorn Intermediate Company LLC ("Akorn Intermediate"), which in turn is 100% owned by Debtor Akorn Holding Company LLC ("Akorn Holding").  The Debtors' corporate organization chart is attached as Exhibit "A."

8.      As former lenders (or successors in interest to former lenders) of the debtors-in-possession in the Existing Chapter 11 Cases, Movants (as defined below) in the instant Conversion Motion were therefore among the credit bid purchasers in the original Existing Chapter 11 Cases.

9.      Promptly after the sale closed, the Debtors (at this point in the corporate structure that exists today) began exploring opportunities to sell their newly-acquired business as a going concern, and at the same time began to jettison parts and pieces of it in a quest to achieve profitability.  The Debtors sold the consumer health division to Prestige Consumer Healthcare in June of 2021, and the branded ophthalmics division to Thea Pharma Inc. in March of 2022.  The Debtors' inability to sell their whole business as a going-concern stemmed in part from certain quality control issues, and the FDA's issuance of certain warning letters to the Debtors.

10.      In June of 2022, the Debtors launched a sale process for substantially all of the remaining assets as a going-concern.  The Debtors thoroughly marketed the assets and solicited bids over a period of approximately seven months.  This effort, however, was unsuccessful, as no party was willing to bid in excess of the Debtors' then-existing secured debt.

11.      By early 2023, the Debtors were carrying principal balances under two separate secured loan facilities in an aggregate amount of over $189 million, for which substantially all of the assets served as security, and faced total filed claims of over $240 million.  Having failed with all attempts to reorganize, streamline, or sell themselves as a going concern, the Debtors accepted the reality that a chapter 7 bankruptcy filing, and an accompanying cessation of operations, was inevitable in order to preserve the value of the assets and obtain maximum possible value through

a sale on a non-operating basis.  In February 2023, the Debtors terminated all of their employees and ceased all operations, and all of their directors resigned.  Shortly thereafter on the Petition Date, the Debtors commenced these Chapter 7 Cases.

12.     The State of Delaware cancelled the Debtors' certificates of formation in June of 2023.  None of the Debtors have paid their franchise tax since 2021, and the Delaware Secretary of State's records reflect that they are not in good standing.

**C.  These Chapter 7 Cases; the Trustee's Asset Sales; Distributions to Creditors**

13.     On or about the Petition Date, the Office of the United States Trustee appointed the Trustee as the chapter 7 trustee for the Debtors' Estates.  On April 7, 2023, the Trustee held the meeting of creditors pursuant to section 341 of the Bankruptcy Code, and has since served as the permanent Trustee for the Estates pursuant to section 702(d) of the Bankruptcy Code.

14.     Upon permanently ceasing operations prior to the Petition Date, the Debtors' business included developing, manufacturing, and marketing specialty pharmaceuticals, including prescription, consumer health, and animal health products, and including branded and generic products.  The Debtors occupied several locations in the United States, both owned and leased, and were headquartered in Gurnee, Illinois.  In addition to the U.S. based operations, Akorn Operating owned 100% of the equity in a certain Luxembourg-based non-debtor holding company called Akorn International S.á.r.l.  Akorn International S.á.r.l, in turn, owned 100% of the equity in Akorn AG, a Swiss-based operating company.

15.     Immediately following his appointment, the Trustee prepared to market and sell substantially all of the Estates' assets.  The timeline for the sale was highly accelerated due to the deteriorating nature of the assets as well as the drug supply shortages plaguing the United States at the time.  On April 20, 2023, the Trustee filed the *Trustee's Motion for Entry of (I) an Order (A) Approving Bidding Procedures in Connection with Sale of Substantially all of the Estates'*

5

*Assets, (B) Scheduling an Auction and Hearing to Consider the Proposed Sale, and (C) Approving*

*the Form and Manner of Notice Thereof; and (II) an Order (A) Approving the Sale, (B) Authorizing*

*the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting*

*Certain Related Relief* [D.I. 106] (the "Sale Motion")[3] and sought expedited approval of his

proposed bidding procedures and related procedural relief.  On April 28, 2023, the Court entered

an order approving the Trustee's bidding procedures on an expedited basis [D.I. No. 137].

16.     At approximately the same time, the Trustee negotiated, and entered into, a Sharing

and Carve-Out Agreement with the lenders under the Debtors' secured credit facilities, in order to

both fund the sale process, and ensure a portion of the sale proceeds would be available for

unsecured creditors (which carve-out ended up being unnecessary, due to the overwhelming

success of the asset sales enabling the secured credit facilities to be paid in full with excess

proceeds available for unsecured creditors).

17.     In accordance with the bidding procedures, the Trustee and his professionals

reviewed and analyzed fifty-nine (59) individual bid packages, fifty-eight (58) of which they

deemed qualified bidders to participate in the auction.  Quickly thereafter, on May 10th, 11th, and

12th, 2023, the Trustee and his professionals conducted a live in-person Auction that lasted three

(3) consecutive days.  The Auction was attended in person by approximately 130 parties comprised

of lawyers, brokers, bankers, and pharmaceutical representatives from around the world.

Additionally, approximately 222 parties registered and observed the auction virtually via Zoom.

18.     At the conclusion of the Auction, the Trustee identified numerous successful

purchasers, and consortiums of purchasers, for various assets and packages of assets, for an

aggregate purchase price of approximately $309 million.  See  D.I. 204 (Notice of Successful

---

[3] Capitalized terms not otherwise defined in this Section (B) shall have the meanings provided in the Sale
Motion.

Bidders and Alternate Bidders).   Immediately following the auction, the Trustee and his professionals negotiated and finalized thirteen (13) different asset purchase agreements, which the Court subsequently approved in a series of twenty (20) sale orders entered on June 8th and 9th, 2023 (the "Auction Sales").  See D.I. 351, 352, 353, 354, 355, 356, 357, 358, 359, 360, 361, 362, 363, 368, 369, 370, 371, 372, 376, 382].  To secure the entry of these sale orders, the Trustee and his professionals negotiated consensual resolutions to seventeen (17) separately filed objections to the assumption/assignment of executory contracts and/or leases that were integral to various of the purchased assets.

19.    Immediately following the entry of these sale orders, the Trustee and his professionals performed the transaction and closing work necessary to consummate all of the Auction Sales, and successfully closed twenty-one (21)[4] individual sale transactions arising from the auction proceedings within a forty-five (45) day period.  The Auction Sales were especially complicated for reasons including that they involved a myriad of different asset classes located in different jurisdictions in the United States and in foreign countries, including but not limited to real estate, drug manufacturing facilities, equipment, FDA approved ANDAs (Abbreviated New Drug Applications) and ANADAs (Abbreviated New Animal Drug Applications), the stock equity of Akorn International S.á.r.l, (the non-debtor Luxembourg subsidiary and owner of Swiss affiliate, Akorn AG), and the disposal of controlled drug substances, which were subject to very stringent regulation.

20.    Following the Auction Sales, various miscellaneous assets remained, including certain ANDAs, inventory, raw materials, and equipment.  Throughout the remainder of 2023, the

---

[4] Certain of the successful bidders/consortiums of bidders at the auction purchased assets in multiple transactions.  In addition, certain bidders acting together as a consortium entered into a single "group" APA, which governed each consortium member's individual purchases.

Trustee marketed and sold substantially all of these remaining assets via a series of seven (7) additional, private, sales (the "Private Sales," and together with the Auction Sales, the "Asset Sales"), which the Court approved in seven (7) separate orders entered between May and November of 2023.  See D.I. 214, 300, 560, 624, 628, 662, 684.  The Private Sales brought in an additional $3 million.

21.     All of the aforesaid Asset Sales have closed, and been successfully consummated by the Trustee.  In total, the Asset Sales by the Trustee on behalf of the Chapter 7 Estates of the Debtors brought in approximately $313 million.  In contrast, prior to the Trustee's sale efforts, representatives of the Debtors had indicated that sale proceeds in the Chapter 7 Cases for ANDA's would likely not exceed $15 million. Of all of the various efforts to sell the business prior to the Chapter 7 Petition Date undertaken by various groups, with the assistance of various advisors, no one had ever obtained an offer in excess of $66 million.

22.     The Assets Sales by the Trustee in the Chapter 7 were a resounding success, in terms of their recoveries for the Estates of approximately $313 million, and their speed considering the size and complexity of the cases (i.e. 106 days passed between the Petition Date and the entry of the last Auction Sale Order).  Indeed, these Asset Sales transactions were awarded both the American Bankruptcy Institute Asset Sale of the Year Award for 2023, and the M&A Advisor's 18th Annual Turnaround Award for Section 363 Sale of the Year (Over $250 Million) for 2023.

23.     On or about July 6, 2023, the Trustee distributed approximately $204 million in sale proceeds to the lenders under both of the Debtors' secured credit facilities, which repaid the Debtors' secured debt in full.  In the aggregate, as of the date of this Objection, the Trustee has distributed a total of approximately $242 million, leaving approximately $87 million remaining in the Chapter 7 Estates for distribution to other creditors.

71206797\5 6010823/00574256
07/09/2024

24.     Having concluded 2023 so successfully, in early 2024 the Trustee turned to the review of priority claims and other claims asserted against the Debtors in an effort to facilitate periodic distributions being made in advance of the filing of the Trustee's Final Report.  After analyzing the claims asserted by, or otherwise owing to, the Debtors' former employees, the Trustee has determined that he is in a position to pay priority claims under section 507(a)(4) of the Bankruptcy Code up to the full statutory cap.  On May 31, 2024, the Trustee filed a *Motion for an Order Authorizing Distribution of Funds to Holders of Administrative Claims and Granting Related Relief* [D.I. 817] (the "Administrative Claim Distribution Motion"), in which the Trustee requested authority to pay holders of certain allowed administrative priority claims, in an aggregate amount of slightly under $1 million.  On June 25, 2024, the Court entered an order granting the Administrative Claim Distribution Motion [D.I. 836], and the Trustee subsequently paid these claims.

25.     On July 3, 2024, the Trustee filed a *Motion for an Order Authorizing First Distribution of Funds to Holders of Allowed Priority Claims Under Section 507(a)(4) of the Bankruptcy Code and Granting Related Relief* [D.I. 849] (the "507(a)(4) Distribution Motion"), in which the Trustee requests authority to pay holders of certain allowed section 507(a)(4) priority claims of former employees up to the full amount of the statutory cap of $15,150.  As capped, the proposed distributions to former employees under the 507(a)(4) Distribution Motion total $1,321,307.  The 507(a)(4) Distribution Motion is scheduled to be heard on August 8th.  If the 507(a)(4) Distribution Motion is granted, the Trustee will promptly thereafter pay these section 507(a)(4) priority claims.

26.     At the same time, the Trustee and his professionals have been analyzing the WARN Act claims asserted by the Debtors' former employees in a putative class action adversary

proceeding, which is pending before this Court at AP No. 23-50117 (the "WARN Act Claims").

The Trustee is close to resolving the WARN Act Claims via a settlement in which a class would

be certified pursuant to Federal Rule of Civil Procedure 23(e), and these claims would be paid in

full (subject to class counsel's fees and other applicable fees/costs) subject to the class settlement

procedures of Rule 23 and settlement approval order.  A mediation session regarding the WARN

Act Claims is presently scheduled for July 25, 2024, and the Trustee anticipates that he and the

WARN Act Claimants will have reached a settlement in principle on or before that date.  The

Trustee anticipates filing a motion to approve settlement of the WARN Act Claims within the next

few weeks.

27.     At this point, almost all of the Estates' assets have been liquidated, a majority of

the proceeds have been distributed, and the Trustee is in the process of distributing another large

portion of the proceeds.[5]  The only material assets remaining in the Estates are certain accounts

receivable, a potential tax refund that may be paid from the Existing Chapter 11 Cases, if collected,

which was transferred to the Debtor in accordance with the Chapter 11 Sale Order, any potential

D&O insurance claims that may exist, and any chapter 5 avoidance actions that the Trustee may

determine should be commenced.  The Trustee has retained special counsel, and has commenced

adversary proceedings to collect the accounts receivable.  The Trustee is similarly in the process

of pursuing the tax refund in connection with the Existing Chapter 11 Cases.  The Trustee

anticipates being in a position to complete administration of these Chapter 7 Cases of the Debtors

by submission of the Trustee's Final Report ("TFR") on or before December 31, 2025, subject to

having concluded any outstanding litigation.

---

[5] The Trustee's settlement with the putative WARN Act claimant class is not final, and accordingly the
Trustee is not currently in a position to publicly disclose a dollar figure.

**D.  The Conversion Motion**

28.     On June 21, 2024, a group self-styled as "the Controlling Shareholders" (the "Movants") purported to authorize the Debtors to file the Conversion Motion.  As evidence for this purported authorization, the Conversion Motion attaches a document titled "Action by Written Consent of the Board of Directors and Members of Akorn Holding Company LLC in Lieu of Meeting" (the "Purported Consent").  The Purported Consent purports to be an action by written consent of the board and members holding a majority of outstanding common units of Akorn Holding, and sets out four purported "resolutions" of this group, including the purported appointment of a Mr. Lloyd Sprung as the "sole director" of Akorn Holdings' board of directors (the "Limited Director").

29.     The Purported Consent, and the Movants' characterization thereof, suffer from several flaws.  First, the title of the Purported Consent itself is inaccurate.  The board of Akorn Holdings no longer exists, as all of its members resigned prior to the Petition Date.  Accordingly, the "board" of Akorn Holdings could not have taken any actions.

30.     Secondly, the Movants falsely purport to act on behalf of Akorn Intermediate and Akorn Operating.  The Movants may be members of Akorn Holdings (the Trustee reserves all rights in this regard), but they are not members of Akorn Intermediate or Akorn Operating.  The Movants have no authority whatsoever to control Akorn Intermediate or Akorn Operating, or otherwise cause these entities to act.  On the contrary, the Trustee, standing in the shoes of Akorn Holdings and Akorn Intermediate, is the only person (or entity) with any legal authority to act for these entities.  Because the 100% ownership interests in these two entities constitute Estates' property, the Movants have violated the automatic stay by taking actions to attempt to assert

control over these ownership interests.[6]  Without limitation, the Movants' execution of the Purported Consent, and filing of the Conversion Motion, constitute violations of the automatic stay with respect to the Estates' 100% ownership interests in Akorn Intermediate and Akorn Operating.

31.     Thirdly, the Movants ignore the fact that the Debtors' certificates of formation have been cancelled.  As previously indicated and/or described in more detail below, when the State of Delaware cancelled the certificates of formation, the entities ceased to exist as legal entities under Delaware law.

32.     Additionally, the appointment of the Limited Director violates the terms of Akorn Holdings' Operating Agreement, as well as basic principles of corporate governance and professional responsibility.  As detailed further below, the Purported Consent grants the Limited Director no authority to manage Akorn Holdings whatsoever, and instead, delegates all decision-making authority to the Movants' proposed law firms, Glenn Agre Bergman & Fuentes LLP (the "Glenn Firm") and Morris Nichols, Arsht & Tunnell LLP.  In short, the Movants would have no real "board" of Akorn Holdings but rather purport to abdicate to these firms the ability to take all actions necessary and appropriate to prosecute the Chapter 11 cases.

## ANALYSIS

**I.      The Conversion Motion Should be Denied Under Sections 706(a) and (d), 1112(b), and 105(a) of the Bankruptcy Code**

**A.   The right to convert a chapter 7 case to a case under chapter 11 is not absolute**

33.     The right to convert a case under section 706(a) of the Bankruptcy Code is not absolute.  On the contrary, section 706(d) conditions conversion as follows:  "Notwithstanding any other provision of this section, a case may not be converted to a case under another chapter of this title unless the debtor may be a debtor under such chapter."  The Supreme Court recognized this

---

[6] The Trustee reserves all rights to seek sanctions against the Movants.

71206797\5 6010823/00574256
07/09/2024

important limitation in <u>Marrama v. Citizens Bank of Massachusetts</u>, 549 U.S. 365, 372, 127 S. Ct. 1105, 1110 (2007) ("More importantly, the broad description of the right as 'absolute' fails to give full effect to the express limitation in subsection (d). The words 'unless the debtor may be a debtor under such chapter' expressly conditioned [the chapter 7 debtor's] right to convert on his ability to qualify as a 'debtor' under Chapter 13.").

34.     Courts, including this Court, have recognized that the Supreme Court's holding in this regard applies with equal force to a request to convert a case from chapter 7 to chapter 11. <u>See</u>, <u>e.g.</u>, <u>In re NLG, LLC</u>, No. 21-11269, 2023 WL 2053920, * 5 (Bankr. D. Del. Feb. 16, 2023) (citing to <u>Marrama</u> and section 706(d), and holding that "section 706(a) does not give the debtor the absolute right to convert the chapter 7 case to a case under chapter 11. Case law instructs that section 706(a) cannot be read in isolation but rather must be read in conjunction with section 706(d)."); <u>In re Woodruff</u>, 580 B.R. 291, 296 (Bankr. D. Ga. 2018) ("Though <u>Marrama</u> applies § 706(a) to a chapter 13 conversion, subsequent decisions agree <u>Marrama</u>'s reasoning applies when a chapter 7 debtor seeks to convert to a chapter 11.") (citing <u>Levesque v. Shapiro (In re Levesque)</u>, 473 B.R. 331, 339 (9th Cir. BAP 2012) ("[T]he language of § 706(a) applies the same whether the chosen chapter for conversion is chapter 11 or chapter 13."); <u>In re Miller</u>, 496 B.R. 469, 476 (Bankr. E.D. Tenn. 2013) (applying <u>Marrama</u> where the debtor sought to convert to chapter 11); <u>In re Sammut</u>, 486 B.R. 404, 408 (Bankr. E.D. Mich. 2012) (same)).

35.     Accordingly, as this Court held last year in <u>NLG</u>, a right to convert a case under section 706(a) of the Bankruptcy Code is not absolute. Rather, this right is subject to section 706(d) of the Bankruptcy Code.

71206797\5 6010823/00574256
07/09/2024

**B. The Movants cannot meet their burden under the applicable standard**

 **(i)**  **Applicable Standard**

 36. As this Court has noted, the party seeking to convert a case from chapter 7 to chapter 11 bears the burden of proof to show that the case should be converted.  See NLG, 2023 WL 2053920 at *4 ("The burden of proof is on the moving party to show that the case should be converted.").

 37. In its opinion last year in NLG, this Court set out the standard that applies when a debtor seeks to convert a chapter 7 case to a case under chapter 11:[7]

> A debtor may not qualify as a "debtor" under chapter 11, if pursuant to 11 U.S.C. § 1112(b)(1), "cause" exists for the court to convert a debtor's chapter 11 case to a chapter 7 case or dismiss it.  In deciding a contested motion to convert under section 706(a), with sections 706(d) and 1112(b)(4) in mind, courts consider the "totality of the circumstances," including the factors set forth in 1112(b)(4).  The Court of Appeals for the Eleventh Circuit explained in Daughtrey v. Rivera (considering conversion from a chapter 7 to a chapter 11 case):

> "A court 'shall convert' a case under Chapter 11 to Chapter 7 or dismiss it, whichever is in the best interests of creditors and the estate, for cause.  A non-exhaustive list of 'causes' includes, among other things, substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation, or a debtor's inability to effectuate substantial consummation of a confirmed plan.

> Thus, § 706(d) 'provides adequate authority' to deny a motion to convert to Chapter 11 when "cause" exists under § 1112(b)(4).  If, as Debtors argue, conversion to Chapter 11 must occur before § 1112(b)(1) comes into play, it means that the bankruptcy court must go through the formality of granting conversion and then, in the next breath, dismiss the case or convert it to a Chapter 7.  This would place form over substance and defy common sense.

Id. at *6 (quoting Daughtrey v. Rivera, 896 F.3d 1255, 1275-76 (11th Cir. 2018)).  See also Woodruff, 580 B.R. at 296-97 ("Clearly, the law directs this Court to deny a motion to convert to

---

[7] As explained in this Objection, as a matter of law the Movants cannot be deemed to be acting on the Debtors' behalves in filing and prosecuting the Conversion Motion.  As this Court has recognized, "[A] non-debtor, cannot seek conversion under section 706(a)."  NLG, 2023 WL 2053920 at *5.

Chapter 11 when the facts and circumstances of the case would create grounds for subsequent dismissal or re-conversion."); In re Dan Tomason & Assocs., LLC, No. 10-00379, 2010 WL 3385025, *2 (N.D. Tex. Aug. 25, 2010) ("Courts readily apply Marrama to deny Chapter 7 to Chapter 11 conversions if facts establish that one of the 'causes' to dismiss or convert a Chapter 11 case are present.").

> **(ii)**     **"Cause" exists under section 1112(b)(4), as there is a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation."**

38.     As this Court pointed out in NLG, one of the "causes" listed in section 1112(b)(4) is "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A). A number of courts have pointed to this particular "cause" as a basis for denying motions to convert cases from chapter 7 to chapter 11. See, e.g., In re Daughtrey, 896 F.3d 1255, 1276 (11th Cir. 2018) (denying motion to convert chapter 7 case to chapter 11 on grounds including "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation."); NLG, 2023 WL 2053920 at *6 (same); Woodruff, 500 B.R. at 296 (same); In re Gordon, No. 312-09605, 2015 WL 5553506, *2 (Bankr. M.D. Tenn. Sept. 18, 2015) (same); In re Hunter, 597 B.R. 287, 292-93 (Bankr. M.D.N.C. 2019) (same).

39.     Importantly, in the context of section 1112(b), "rehabilitation" means that the "plan is likely to produce viable on-going operations to the benefit of interested parties . . . ." Woodruff, 580 B.R. at 298. As another court phrased the standard, "In this context, rehabilitation means to put back in good condition and reestablish on a sound basis." In re BH S & B Holdings, LLC, 439 B.R. 342, 347 (Bankr. S.D.N.Y. 2010). As another court explained, "Courts have consistently understood 'rehabilitation' to refer to the debtor's ability to restore the viability of its business." Loop Corp. v. United States Trustee, 379 F.3d 511, 516 (8th Cir. 2004). See also Hunter, 597 B.R.

15

at 293 ("Rehabilitation is a more demanding standard than reorganization, and is defined by whether the debtor will be able to reestablish his business on a firm, sound basis.").

40.     Specifically, a liquidation of the debtor's assets – whether via a liquidating plan or otherwise – cannot constitute a "rehabilitation" for purposes of section 1112(b). See, e.g., Loop Corp., 379 F.3d at 516 ("Because the debtors here intended to liquidate their assets rather than restore their business operations, they had no reasonable likelihood of rehabilitation."); Hunter, 597 B.R. at 293 ("Where a debtor proposes a plan of pure liquidation, there is no likelihood of rehabilitation."); Woodruff, 580 B.R. at 298 ("Because this analysis [section 1112(b)(4)(A)] requires a court to determine whether the plan is likely to produce viable on-going operations to the benefit of interested parties, many courts have held a liquidating Chapter 11 plan generally does not rehabilitate the debtor."); BH S & B Holdings, LLC, 439 B.R. at 347 ("[T]he Debtors' intention to liquidate (rather than rehabilitate), demonstrates that there is no likelihood of rehabilitation."); In re the Ledges Apartments, 58 B.R. 84, 87 (Bankr. D. Vt. 1986) ("Rehabilitation is not reorganization.  Reorganization encompasses rehabilitation, and may contemplate liquidation.  Rehabilitation, on the other hand, may not include liquidation.").

41.     The fact that a liquidating plan may potentially be confirmable under chapter 11, and thus technically constitute a "reorganization" does not alter this definition of "rehabilitation" under section 1112(b). See, e.g., Woodruff, 580 B.R. at 298 ("Congress consciously used the word 'rehabilitation' and not 'reorganization.'  The intent behind this word-choice was to focus the court on the question of whether a debtor can propose a financially viable plan for continuing operations, not on whether the debtor can propose a confirmable plan.");  In re Khan, Nos. 11-1542, 11-36527, 2012 WL 2043074, *6 (Bankr. C.D. Cal. June 6, 2012) ("The issue of rehabilitation for purposes of § 1112(b)(4)(A) 'is not the technical one of whether the debtor can confirm a plan, but, rather,

whether the debtor's business prospects justify continuance of the reorganization effort.'") (quoting In re Wallace, 2010 WL 378351 at *4 (Bankr. D. Idaho Jan. 26, 2010)).

42.    Here, the Movants' expressly stated goal is to propose a chapter 11 plan of liquidation.  See Conversion Motion at p.2.  Thus, by their own admission, the Movants have no intention – much less any ability – to rehabilitate the Debtors.  Accordingly, for purposes of section 1112(b)(4)(A), the Debtors do not have a reasonable likelihood of rehabilitation.  On the contrary, that likelihood is nil.

43.    Equally uncontroverted is that "substantial or continuing loss to or diminution of the estate" is occurring.  This element will be present in any case in which the debtor has stopped operating.  As one court explained, "In the context of a debtor who has ceased business operations and liquidated virtually all of its assets, any negative cash flow – including that resulting only from administrative expenses – effectively comes straight from the pockets of the creditors. This is enough to satisfy the first element of § 1112(b)(1)."  Loop Corp., 379 F.3d at 516 (citing In re Citi-Toledo Partners, 170 B.R. 602, 606 (Bankr. N.D. Ohio 1994) (first requirement of § 1112(b)(1) satisfied because administrative expenses eroded the position of the estate's creditors and diminished the value of the estate)).  See also Woodruff, 580 B.R. at 298 ("Accordingly, a Chapter 11 case with negative cash flows, mounting costs to the estate, and no indication of operating as a going concern has no likelihood of rehabilitation.").

44.    In these Chapter 7 Cases, not only do the Estates have no operations whatsoever, but almost all of their assets – and all of their tangible assets and all of their assets related to the operation of their former business – have already been liquidated.  All that remains to be liquidated are accounts receivable collection lawsuits, a potential tax refund, whatever D&O causes of action, if any, that may exist, and any chapter 5 avoidance actions that the Trustee may determine should

be commenced.  Substantially all of the Debtors' other assets have already been converted to cash, much of which the Trustee has either already distributed or is presently in the process of distributing.  By definition, at this late stage of a liquidation proceeding, the Estates are not going to have any income.  Rather, the Estates will generally only have outflows as winding up expenses are paid.

45.     For these reasons, "cause" exists under section 1112(b)(4)(A), as the Estates are experiencing "substantial or continuing loss [] or diminution," and have no likelihood whatsoever of rehabilitation.  Because "cause" exists under section 1112(b), the Movants cannot meet their burden to show that the Chapter 7 Cases should be converted to cases under chapter 11.  Accordingly, for this reason alone, the Conversion Motion should be denied.

**C.  Conversion of the Chapter 7 Cases to cases under chapter 11 would prejudice the creditor body and negatively impact the administration of the Estates**

46.     Under the "totality of the circumstances" approach described above for determining whether "cause" exists under section 1112(b), a court may deny a motion to convert a case from chapter 7 to chapter 11 if the requested conversion would prejudice the creditors and/or negatively impact the administration of the estate.  See, e.g., Woodruff, 580 B.R. at 298 ("[C]ourts have denied conversion where circumstances indicated a Chapter 11 proceeding would prejudice creditors."); In re Gedda, No. 13-02238, 2015 WL 1396605, *5 (Bankr. M.D. Fla. March 24, 2015) (denying a motion to convert a case, stating, "Conversion of this case to Chapter 11 is not in the best interests of the creditors and will have a negative impact on administration of the estate."); In re Watkins, 134 B.R. 781, 782 (Bankr. S.D. Fla. 1991) (denying motion to convert case from chapter 7 to chapter 11 on grounds including the fact that "the Court is concerned with the administrative expense that will accrue by virtue of the conversion.  The estate will have to bear the cost of the preparation and filing of the disclosure statement and plan . . . .").

47.     The Movants assert that one of their objectives is to save creditors from having to pay the Trustee's commission on distributions.  First, as a matter of public policy, this surely cannot be a justification for converting a chapter 7 case to chapter 11.  If it were, then every debtor could simply wait in the wings while a chapter 7 trustee liquidated all of the assets, and then come out of the woodwork just prior to the end of the case and displace the trustee by converting the case to one under chapter 11.  Not to mention the basic unfairness, such a rule would disincentivize chapter 7 trustees from maximizing the cash in the estate, as the more flush the estate's coffers, the more attractive a target it would be for opportunists wishing to gain control over the distributions.

48.     Next, any "savings" to creditors in these Chapter 7 Cases from such a scheme would be far outweighed by the increased administrative costs that the Estates would face in other respects.  For example, if the Chapter 7 Cases were converted, a creditors committee may likely be appointed, and the Estates would bear all of the associated costs, including attorneys' and other professionals' fees and costs in performing investigations and getting up to speed.  The Trustee and his professionals are already up to speed, and have already performed necessary investigations and done all of the related work to liquidate substantially all of the assets and substantially complete the administration of the Estates.  Given the complexity of these Chapter 7 Cases, that work has been difficult and challenging.  Not only would the work done by any committee be expensive and redundant, but it would also be time-consuming, and delays would result.

49.     The Debtors' new chapter 11 professionals would also need to get up to speed.  This work would be duplicative of work already done by the Trustee's professionals, and further duplicative of the similar getting-up-to-speed being done by any committee's professionals.  On this point, the Trustee notes that the Movants' would-be general bankruptcy counsel, the Glenn

Firm, appears to charge hourly rates considerably higher than those of the Trustee's general bankruptcy counsel, Cozen O'Connor ("Cozen").  Attached as Exhibit "B" is a summary of Glenn's bankruptcy attorneys' hourly rates, taken from a final fee application filed in another case last month.[8]  Andrew Glenn's hourly rate is $1,700, and hourly rates of other partners who billed material amounts of time range from $1,600 to $1,250.  Associates' hourly rates range from $1,075 (for a 2013 graduate) to $725 (for a 2021 graduate).  Based on the figures in Glenn's table, its blended hourly rate for this particular fee application was $1,000.39.

50.     Cozen's rates as Trustee's counsel are considerably lower.  Attached as Exhibit "C" is a summary of Cozen's bankruptcy attorneys' hourly rates, taken from their first fee application filed in these Chapter 7 Cases.[9]  The hourly rate of John T. Carroll, III, the attorney primarily responsible for the engagement and the only shareholder to bill a material amount of time, is $915. The hourly rates of members in Cozen's bankruptcy group range from $615 to $755.  The hourly rates of associates range from $415 (for a 2021 graduate) to $560 (for a 2015 graduate)[10].  Cozen's blended hourly rate for this fee application was $720.

51.     Once up to speed, the new professionals (likely including financial advisors, in addition to the Glenn Firm, and the Glenn Firm's local Delaware counsel) would need to negotiate and prepare a disclosure statement and plan, obtain approval of the disclosure statement, solicit acceptances from the large creditor body in this case, and then attempt to obtain confirmation of

---

[8] That case is In re Sorrento Therapeutics, Inc., et al., Case No. 23-90085 (Jointly Administered) (Bankr. S.D. Tx.).  The fee application is the *First Interim and Final Application of Glenn Agre Bergman & Fuentes LLP for Compensation for Professional Services Rendered and Reimbursement of Actual and Necessary Expenses Incurred as Counsel to the Official Committee of Equity Securities Holders of Sorrento Therapeutics, Inc. for the Period of April 11, 2023 Through April 10, 2024* [D.I. 2254].  Excerpted is the section of the pleading titled "Total Fees by Attorney and Paraprofessional."

[9] See *Application of Cozen O'Connor as Counsel to the Trustee for Allowance of First Interim Compensation and Reimbursement of Expenses for the Period February 27, 2023 Through July 31, 2023* [D.I. 688] at pp. 21-23.

[10] The fee application refers to Christina Sanfelippo as a member.  Ms. Sanfelippo is in fact an associate.

71206797\5 6010823/00574256
07/09/2024

the plan.  If successful, they would then likely need to set up a liquidating trust and appoint a trustee.  Following the incurrence of all of these fees and delays, the trust would then need to retain its own professionals (including perhaps the Glenn Firm), whose fees – as well as the liquidating trustee's own fees and the other costs of the trust's operations – would accrue on a regular basis into the future.

52.     The fact that so very little work, and so few open items, remain in these Chapter 7 Cases makes these fees and delays particularly wasteful and unnecessary, and harmful to the creditors to whom distributions are currently being made and/or planned to be made by the Trustee in the near future.  Following all of the steps summarized above (again, <u>if</u> successful), the debtors-in-possession upon conversion – and ultimately the liquidating trustee – would eventually find themselves in precisely the same position that the Trustee is <u>already in</u> at the present time!  The only difference, however, is that the chapter 11 path would have caused many months of delay, and generated large sums of unnecessary professional fees and other expenses.

53.     Moreover, the majority of the sale proceeds in these Chapter 7 Cases have already been distributed by the Trustee, and more still are presently in the process of being distributed by the Trustee.  Essentially, only the general unsecured creditors remain to be paid at this stage.  Thus, the general unsecured creditor body would bear the full brunt of these needless costs, and suffer the full brunt of these needless delays.

54.     Trustee notes also that a large portion of his ultimate commission has already been earned.  As mentioned above, the Trustee has already completed $242 million in distributions, including $204 million to the lenders under each of the secured credit facilities, and his associated commissions have therefore already accrued and been earned.  Of the Estates' remaining $87 million on hand, the Trustee is in the process of distributing a material portion to priority claimants

and thereafter contemplates distributions to general unsecured creditors in advance of the Trustee's Final Report to the extent possible. Accordingly, only a relatively small portion of the Trustee's total commission remains unearned.

55.     In addition to increased fees, costs and delays, the Estates and parties-in-interest would also be prejudiced by the numerous fundamental procedural alterations and irregularities that would arise from conversion. As one example, if these cases were converted to cases under chapter 11 a new bar date would likely be set, which would cause chaos and confusion throughout the universe of parties-in-interest. Whether or not a new bar date were set, uncertainty would exist among creditors regarding whether they would be required to file new claims, and/or have an opportunity to file new claims. Doubtless many would see an opportunity to improve their lot, especially in light of the Trustee's extremely successful liquidation. Likely also is that others would not realize that such an opportunity may exist, quite justifiably believing that the concrete had set long ago on the claims pool. Any creditors in the former group who ended up improving their lot would do so at the expense of the latter group.

56.     As another example, under chapter 11, unlike under chapter 7, scheduled claims for which proofs of claim have not been filed would be entitled to presumptive validity. This change would fundamentally alter the claims landscape, and among other effects would cause the claims pool to expand. Among other strange consequences, by rule a new section 341 meeting would need to be held, which would be absurd, as the Debtors' assets have already been liquidated and their Estates almost fully administered. In addition, if these cases were converted to cases under chapter 11, this Court would find itself with two separate Akorn chapter 11 cases simultaneously pending – these cases and the Existing Chapter 11 Cases. This circumstance alone would likely cause significant confusion.

57.     Finally, as an example of the confusion and uncertainty that may result from any conversion of these Chapter 7 Cases, the Trustee notes that one particular creditor who received notice of the Conversion Motion reached out to the Trustee's bankruptcy counsel by email to ask what effect this conversion would have on his claim.  The email communication with this party speaks volumes about the effect that any conversion would have on these cases.  This email communication is attached as Exhibit "D."

**D. Section 105(a) of the Bankruptcy Code provides additional authority for the Court to deny the Conversion Motion**

58.     Section 105(a) of the Bankruptcy Code can serve as a separate basis for a court's denial of a motion to convert a case from chapter 7 to chapter 11.  Pursuant to section 105(a), "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

59.     In Marrama, the Supreme Court held:

> [T]he broad authority granted to bankruptcy judges to take any action that is necessary or appropriate "to prevent an abuse of process" described in § 105(a) of the Code, is surely adequate to authorize an immediate denial of a motion to convert filed under § 706 in lieu of a conversion order that merely postpones the allowance of equivalent relief and may provide a debtor with an opportunity to take action prejudicial to creditors.

Marrama, 549 U.S. at 375, 127 S. Ct. 1105 at 1112.  See also Woodruff, 580 B.R. at 296 (in denying motion to convert case from chapter 7 to chapter 11, citing to Marrama and stating, "Courts may use § 105 authority to protect against diminution of the estate or to ensure an equitable distribution of estate assets.").

60.     While the "totality of the circumstances" analysis contemplates a broad inquiry, the Trustee submits that the Court's authority under section 105(a) is broader still.  As well as the welfare of the Estates and creditor body, and the administration of these Chapter 7 Cases, the

23

Trustee submits that the Court may take into account the absurdity of the Movants' assertions, and their likely motives.

61.     The Movants justify their request by alleging that "[t]he Debtors' Chapter 7 cases have progressed at a glacial pace," and that "minimal progress in this case" has been made.  See Conversion Motion at pp.1-2.  The Movants claim that their motivation is simply to "distribute cash quickly through a plan of liquidation without paying the 3% fee that the Chapter 7 Trustee will charge."  Id.  The allegations about the progress in these Chapter 7 Cases are simply false and the Movants' professed altruistic motivation is suspect when one considers that equity is now attempting to step back into the cases to control distributions to general unsecured creditors, and possibly receive distributions, under the guise of being Debtors' management.  The Trustee notes also that Certain of the Movants have already received substantial payments as secured lenders.

62.     As described in detail above, these Chapter 7 Cases are among the largest and most complex chapter 7 cases in recent history in the District of Delaware, and in the sixteen months since the Petition Date the Trustee has largely concluded his administration of the Estates.  Almost all of the Debtors' assets, and all of their tangible and their operating assets, have been liquidated, the majority of the proceeds have been distributed, and additional large portions of proceeds are presently in the process of being distributed.

63.     Also, as mentioned above, the sales process proceeded on an expedited time frame, driven in part by the deteriorating nature of the assets and widespread drug shortages plaguing the nation in 2023.  The sales were further complicated by factors including the many different jurisdictions in which the assets were located, both foreign and domestic, and the many different classes of assets that existed, including without limitation real estate, drug manufacturing facilities, equipment, FDA approved ANDAs (Abbreviated New Drug Applications) and ANADAs

(Abbreviated New Animal Drug Applications), stock of Akorn International S.á.r.l, (the non-debtor Luxembourg subsidiary and owner of Swiss affiliate, Akorn AG), and controlled substances that were subject to strict regulation, including criminal regulation.

64.     The Asset Sales comprised of twenty-eight (28) separate sales, and were approved by twenty-seven (27) separate orders from this Court entered throughout the year in 2023.  As also mentioned above, the Asset Sales transactions were awarded the American Bankruptcy Institute Asset Sale of the Year Award, and the M&A Advisor's 18th Annual Turnaround Award for Section 363 Sale of the Year (Over $250 Million) for 2023.

65.     The Trustee realized approximately $313 million from these sales.  The Trustee has already distributed $242 million, and is in the process of distributing another large portion of the remaining proceeds.   The Trustee's bringing these large, complex cases to near-completion in only sixteen months, and in such a successful manner, represents a result that is both expeditious and truly exceptional.

66.     In comparison, the Movants themselves, in the approximately two and a half years of their previous stewardship,[11] were never able to sell the business despite their near-constant efforts to do so, were unable or unwilling to fund yet another chapter 11 case, and, having never achieved profitability, eventually gave up and put the business into chapter 7. Multiple others had tried unsuccessfully to sell, reorganize, or otherwise generate positive value from these Debtors. No one except the Trustee was ever successful.  To the best of the Trustee's knowledge no one except the Trustee was ever able to obtain an offer above even $66 million.

---

[11] As mentioned above, the Movants are former lenders (or successors in interest to former lenders) of the debtors-in-possession in the Existing Chapter 11 Cases, and were in effect among the purchasers, by credit bid, of the business in the section 363 sale approved by the Court in October 2021 in the Existing Chapter 11 Cases.

71206797\5 6010823/00574256
07/09/2024

67.     Incredibly, with the hard work of liquidation and estate administration already substantially complete, this same unsuccessful group now wants to swoop in and displace the Trustee to wrest control over the remaining cash recovered by the Trustee and control the claims distribution process to general unsecured creditors.  Simply put it would not be in the best interest of the Estates to turn the fiduciary duties of the Estates over to the Movants.

68.     Absurd also would be the consequences of any conversion of these Chapter 7 Cases to chapter 11.  As mentioned above, doing so would add multiple layers of fees, costs and delays. Together with the Existing Chapter 11 Cases, two separate Akorn chapter 11 cases would then be pending before this Court.  This, and the other procedural irregularities described above, would risk confusion among creditors and parties-in-interest.  The incurring of unnecessary costs, delays, and confusion are anathema to the goals and core tenants of the bankruptcy process.  Accordingly, the Trustee believes that section 105(a) amply authorizes the Court to deny the Conversion Motion.

69.     At this point, the Trustee requests that the Court take into account all of the facts and circumstances described in this Objection, and note the fact that the Movants appear to be mainly well-backed financial institutions and very sophisticated actors.  Without questioning the integrity of any of the individuals involved, the Trustee doubts that this group is motivated primarily by a desire to expedite distributions to unrelated third parties (i.e, the general unsecured creditor body) and/or by a desire to save general unsecured creditors the Trustee's commission (particularly through a strategy that would very obviously add fees and costs in excess of these purported savings).

## II.     The Movants Lack Authority to Attempt to Convert These Chapter 7 Cases, and, in so Attempting, They Have Violated the Automatic Stay of 11 U.S.C. 362 as well as Akorn Holdings' Operating Agreement

70.     The Conversion Motion suffers from additional fatal defects.  First, the Trustee is the sole member of both Akorn Intermediate and Akorn Operating and has exclusive managerial

26

authority over these entities.  These interests and rights are Estates' property.  The Movants' attempt to exert control over these two Debtors violated the automatic stay and is void.  <u>Second</u>, as a "cancelled" entity under Delaware law, Akorn Holdings lacks the ability to act.  <u>Third</u>, the operating agreement for Akorn Holdings provides that it is a manager-managed limited liability company under Delaware law and Movants' attempt to place all decision-making authority in their law firm's hands undermines fundamental principles of corporate law and professional responsibility.

**A. Akorn Intermediate and Akorn Operating are member-managed, meaning that the Trustee has the sole right to manage those companies.  The Movants' attempt to manage and control the companies is invalid and a violation of the automatic stay**

71.     The Trustee is sole member and manager of both Akorn Intermediate and Akorn Operating.  The Movants' attempt to exercise control over these Debtors is thus ineffective and, separately, void as a violation of the automatic stay.  11 U.S.C. § 362(a)(3).

72.     Akorn Holding is the sole member of Akorn Intermediate, which in turn is the sole member of Akorn Operating.  The operating agreements for both Akorn Intermediate and Akorn Operating provide that the companies are "member-managed" under Delaware law.  Both operating agreements provide as follows:

> (a) The Sole Member of the Company shall manage the Company in accordance with this Agreement. The actions of the Sole Member taken in such capacity and in accordance with this Agreement shall bind the Company. The Company shall not have any "manager," as that term is defined in the [Delaware Limited Liability Company Act].

> (b) The Sole Member shall have full, exclusive and complete discretion to manage and control the business and affairs of the Company, to make all decisions affecting the business, operations and affairs of the Company and to take all such actions as the Sole Member deems necessary or appropriate to accomplish the purpose of the Company as set forth herein.  Subject to the provisions of this Agreement, the Sole Member (and the officers appointed under Section 4(c) below) shall have general and active management of

27

> the day-to-day business and operations of the Company. In addition, the Sole Member shall have such other powers and duties as may be prescribed by this Agreement. Such duties may be delegated by the Sole Member to officers, agents or employees of the Company as the Sole Member may deem appropriate from time to time.

Limited Liability Company Agreement of Akorn Intermediate Company, LLC at § 4; Limited Liability Company Agreement of Akorn Operating Company, LLC at § 4 (collectively, the "Subsidiary Agreements").

73.     Therefore, by operation of section 541(a)(1) of the Bankruptcy Code, the Trustee is: (i) the sole member-manager of Akorn Intermediate (as the Trustee of Akorn Holding) and (ii) the sole-member manager of Akorn Operating (as the Trustee of Akorn Intermediate). In re Thomas, No. 16-27850-L, 2020 WL 2569993, at *9 (Bankr. W.D. Tenn. May 8, 2020) ("Because TI Properties is a member-managed LLC, upon the appointment of the Trustee, the right to manage the LLC passed to the Trustee."); In re B & M Land & Livestock, LLC, 498 B.R. 262, 266 (Bankr. D. Nev. 2013) ("In a Chapter 7 bankruptcy, the trustee controls the property of the bankruptcy estate, all of Debtor's legal and equitable interests, including the right to control a single-member [member-managed] LLC. In obtaining the debtor's rights, the trustee is not a mere assignee, but steps into a debtor's shoes as to all rights, including the rights to control a single-member LLC.").

74.     The Purported Consent and the Conversion Motion are thus wholly ineffective as to Akorn Intermediate and Akorn Operating. The Trustee, as the sole member-manager of both companies, has "full, exclusive and complete discretion to manage and control the business and affairs" of those companies. Subsidiary Agreements § 4. The Movants are wholly without authority to make decisions on behalf of the companies or to otherwise cause the companies to act.

75.     By enacting the Purported Consent, the Movants are attempting to exercise control over Akorn Intermediate and Akorn Operating to the exclusion of the Trustee's authority under

the Subsidiary Agreements.  The Purported Consent – and the filing of the Conversion Motion itself – therefore violate the automatic stay.  See 11 U.S.C. § 362(a)(3) (filing of bankruptcy petition "operates as a stay, applicable to all entities, of— any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate"); In re Altman, No. 6:16-BK-15248-MW, 2018 WL 3133164, at *6 (B.A.P. 9th Cir. June 26, 2018) ("In sum, under the Operating Agreement, Mr. Altman had the prepetition contractual right to manage DSF.  The bankruptcy court correctly found that this non-economic contractual right to manage DSF was property of Mr. Altman's estate under § 541(a)(1) and therefore protected by the automatic stay."); In re Warner, 480 B.R. 641, 647 (Bankr. N.D.W. Va. 2012) ("Because non-economic rights are property of the estate and fit under the canopy of § 362(a)(3), the provision in the Defendants' Resolution that disassociates the Debtor is void.").

**B. Akorn Holdings' certificate of formation has been cancelled, and as such, cannot seek to convert its case**

76.     Under section 18-104 of the Delaware Limited Liability Company Act, a limited liability company must maintain in the State of Delaware a registered agent for service of process.  See Del. Code Ann. tit. 6, § 18-104(a).  When Akorn Holdings' registered agent resigned without appointing a successor, the Act gave the company 30 days to designate a new registered agent.  Id. at § 18-104(d).  No registered agent was designated during that 30-day period (or ever), and consequently, on June 4, 2023, the Delaware Secretary of State cancelled Holdings' certificate of formation.  Id. ("If such limited liability company fails to obtain and designate a new registered agent as aforesaid prior to the expiration of the period of 30 days after the filing by the registered agent of the certificate of resignation, the certificate of formation of such limited liability company shall be canceled.").  See Exhibit "E" (printout of the Delaware Secretary of State website showing cancellation of Akorn Holdings' certificate of formation).

77.     Once an entity is cancelled, its "legal existence ends." In re Reinz Wisconsin Gasket, LLC, No. CV 2022-0859-MTZ, 2023 WL 3300042, at *2 (Del. Ch. May 8, 2023), cert. denied, (Del. Ch. 2023) (holding LLC whose certificate of formation was cancelled could not retain counsel). The cancelled company "cannot otherwise make any decisions or take any action." Id. at *5-6.  See Del. Code Ann. tit. 6, § 18-201(b) ("A limited liability company formed under this chapter shall be a separate legal entity, the existence of which as a separate legal entity shall continue *until cancellation* of the limited liability company's certificate of formation.") (emphasis added).

78.     The acts of a cancelled LLC are invalid and of no force or effect.  See Favourite Ltd. v. Cico, 181 A.D.3d 426, 427, 120 N.Y.S.3d 309, 311 (2020) (holding that because certificate of formation of Delaware LLC was cancelled, company lacked standing to sue as a plaintiff); Matthew v. Laudamiel, No. CIV.A. 5957-VCN, 2012 WL 605589, at *21 (Del. Ch. Feb. 21, 2012) ("After the certificate of cancellation has been filed, suits generally may not be brought by or against an LLC.").

79.     Here, Akorn Holdings is not a legal entity that may act on its own behalf and thus lacks legal competency and standing to seek conversion of its bankruptcy case.  See Favourite Ltd., 181 A.D.3d at 427.

80.     All of Akorn Holdings' officers and directors have resigned.  Even if the Purported Consent was valid (which it is not, as discussed below), the authority of the Limited Director is expressly limited to "authorizing and approving the filing of the Conversion Motion." Accordingly, the Limited Director would lack authority to submit the paperwork necessary to revive the company's standing (including, without limitation, a required statement that the Limited Director is authorized to act on behalf of the company).

81.     In sum, Akorn Holdings is no longer a valid entity under Delaware law.  The
Conversion Motion should therefore be dismissed for lack of standing.

## C.  The appointment of a Limited Director is incompatible with Akorn Holdings' operating agreement, as well as the law of limited liability companies and professional responsibility

82.     Akorn Holdings is a "manager-managed" limited liability company.   Its operating
agreement provides that the company's business and affairs are managed "by or under the direction
of a Board of one (1) or more directors (the "<u>Board</u>")," which has "all powers . . . possessed by
managers of a limited liability company under the laws of the States of Delaware."  Agmt.
§ 6.1(a).  The directors are "agents of the Company for the purposes of the Company's
business."  Agmt. § 6.11.   The Board appoints the officers of the Company, including the Chief
Executive Officer, who has "general and active management of the property, business and affairs
of the Company."  Agmt. § 6.12.  Members do not have authority to act for the company.  Agmt.
§ 5.1 ("[N]o member shall, in its capacity as such, have the authority to act for or on behalf of the
company in any manner.").

83.     Under Akorn Holdings' operating agreement, the company's Board shall "initially"
have nine (9) seats, but "may be increased or decreased from time to time by resolution of the
Board."  Agmt. § 6.2(a).   The operating agreement requires that the Board be composed of one
director who is the CEO of the Company (the CEO is appointed by the Board), with the remaining
seats filled by Independent Directors.  *See* Agmt. 6.2(d)(iii).  As of the Petition Date, there were
eight seats on the Board, including the chief executive officer.  *See* Akorn Holdings' Statement of
Financial Affairs [D.I. 71].  When an Independent Director resigns, a majority of the holders of
Common Units may elect a replacement for each vacant seat "for the remainder of the current term
of the Board," provided they give "prompt notice" to all members when proceeding by written
consent.  Agmt. §§ 5.5(b), 6.3(e)(iii).

84.     The appointment of the Limited Director – appointed for the "limited and exclusive purpose" of authorizing the filing of the Conversion Motion – violates both the company's operating agreement and the Delaware Limited Liability Company Act.  *See* Del. Code Ann. tit. 6, § 18-402 (If an operating agreement provides that it is manager-managed, "the management of the limited liability company, to the extent so provided, shall be vested in the manager who shall be chosen in the manner provided in the limited liability company agreement.  The manager shall also hold the offices and have the responsibilities accorded to the manager by or in the manner provided in a limited liability company agreement.") (emphasis added).  There is no provision in Akorn Holdings' operating agreement for appointment of a "sole" director, much less one stripped of any executive authority whatsoever.

85.     The appointment of the Limited Director is more than a mere technical violation of the operating agreement and the Act.  Under the Purported Consent, the Limited Director's only authority is to approve the Conversion Motion.  Upon conversion to Chapter 11, the debtor-in-possession would owe fiduciary duties to the bankruptcy estate and creditors.  *In re Marvel Ent. Grp., Inc.*, 140 F.3d 463, 474 (3d Cir. 1998) ("When the chapter 11 petition was filed in this case, the debtor-in-possession assumed the same fiduciary duties as would an appointed trustee.").  But the Debtors have no board, officer, or other principal to oversee and take responsibility for the company's actions in any hypothetical chapter 11 case.  In other words, there would be no individual at the company that would owe fiduciary duties.

86.     Instead, the Purported Consent purports to give carte blanche authority to the Movants' outside law firm, who is authorized to "take all actions necessary and appropriate to prosecute the Conversion Motion."  There is no management to make business decisions – all decisions in the would-be chapter 11 case would be made by attorneys, undirected (and

32

unconstrained) by an officer or director of the company. This arrangement upends a central tenet of attorney-client relations, namely that a company's management makes business decisions, not its attorney. Del. R. Prof. Cond. § 1.13 cmt. 3. ("Decisions concerning policy and operations . . . are not as such in the lawyer's province."); *In re Hickory Mill Apartments of Columbus, Ltd.*, 133 B.R. 898, 901 (Bankr. S.D. Ohio 1991) ("Counsel's role can be to advise that management structure about the legal effects of potential decisions and actions or to point out various choices for such legal and business decisions. . . . The attorney cannot make the client's management decisions, however.").

87. The reason for not appointing an actual board member and CEO with authority, as required by Akorn Holdings' operating agreement, is clear. A board member has fiduciary duties even if merely acting in a nominal capacity. But when the Estates have no operating business and merely hold cash and causes of action, it begs the question as to why a purported newly installed Limited Director with sole responsibility to file the instant Conversion Motion and accordingly no attendant fiduciary duties, rather than the Trustee with fiduciary duties to general unsecured creditors, should be permitted to oversee the Estates. Additionally, the Debtors' lack of management would independently be grounds for "cause" to reconvert the cases to chapter 7. *In re Broad Creek Edgewater, LP*, 371 B.R. 752, 756, 759 (Bankr. D.S.C. 2007) (denying motion to convert chapter 7 case to chapter 11 where, among other things, debtor had no remaining corporate management, and equating an "un-managed" debtor with a "grossly mismanaged" one).

71206797\5 6010823/00574256
07/09/2024

WHEREFORE, the Trustee respectfully requests the Court enter an order, substantially in the form attached hereto, denying the Conversion Motion in its entirety, and granting such other and further relief as the Court deems just.

Dated:  July 9, 2024                                    COZEN O'CONNOR

                                          By:    /s/ John T. Carroll, III
                                                 John T. Carroll, III (DE No. 4060)
                                                 Simon E. Fraser (DE No. 5335)
                                                 1201 N. Market Street
                                                 Suite 1001
                                                 Wilmington, DE  19801
                                                 (302) 295-2000 Phone
                                                 (302) 295-2013 Fax No.
                                                 jcarroll@cozen.com
                                                 sfraser@cozen.com

                                                 David R. Doyle (IL ARDC 6303215)
                                                 (Admitted in IL/Not admitted in DE)
                                                 123 N. Wacker Drive
                                                 Suite 1800
                                                 Chicago, IL  60606
                                                 (312) 474-1648 Phone
                                                 (312) 382-8910 Fax
                                                 daviddoyle@cozen.com

                                                 *Counsel to George L. Miller,*
                                                 *Chapter 7 Trustee*

71206797\5 6010823/00574256
07/09/2024