IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|   |   |
|---|---|
| In re: | Chapter 7 |
| AKORN HOLDING COMPANY LLC, *et al.*,[1] | Case No. 23-10253 (KBO) |
| Debtors. | (Jointly Administered) |
|   | Re: D.I. 832, 858 |

**DEBTORS' REPLY IN FURTHER SUPPORT OF MOTION FOR ENTRY OF AN ORDER AUTHORIZING AND APPROVING THE CONVERSION OF THESE CHAPTER 7 CASES TO CASES UNDER CHAPTER 11**

Akorn Holding Company LLC ("Akorn Holdings"), Akorn Intermediate Company LLC ("Akorn Intermediate") and Akorn Operating Company LLC ("Akorn Operating" and collectively, the "Debtors") respectfully submit this reply ("Reply") in further support of its motion (D.I. 832) (the "Motion") for entry of an order pursuant to Section 706(a) of title 11 of the United States Code (the "Bankruptcy Code"), authorizing and approving the conversion of the above-captioned Chapter 7 cases (the "Chapter 7 Cases") to cases under Chapter 11 of the Bankruptcy Code and in response to the objection (D.I. 858) (the "Objection") of George L. Miller, Chapter 7 trustee (the "Trustee").[2] For this Reply, the Debtors respectfully state as follows:

**INTRODUCTION**

Section 706(a) of the Bankruptcy Code affords a debtor a one-time *statutory right* to convert a case from Chapter 7 to Chapter 11 without cause. This is the Debtors' first request to

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of their federal tax identification numbers and case numbers are Akorn Holding Company LLC (9190), Case No. 23-10253 (KBO); Akorn Intermediate Company LLC (6123), Case No. 23-10254 (KBO); and Akorn Operating Company LLC (6184), Case No. 23-10255. The Debtors' headquarters is located at 5605 CenterPoint Court, Gurnee, IL 60031.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

convert this case to Chapter 11 with the sole goal of maximizing value to confirm a plan of liquidation in good faith. That alone should suffice to warrant conversion and grant the Motion.

The Chapter 7 Trustee is *the only objector to the Motion*. The shareholders supporting the Motion—which include prominent investment funds and other major financial institutions—have spent tens of thousands of dollars on a notice of the Motion to thousands of the Debtors' creditors. Tellingly, none of such creditors have objected. In other words, the practical reality is that the Trustee is seeking to keep his own job and to forestall economic stakeholders from determining the outcome of these cases. But entrenchment is not a salutary objective of bankruptcy proceedings. Stakeholder involvement, negotiation, and voting are.

The Trustee's opening salvo in his Objection asserts that the Motion fails because the Debtors failed to maintain their good standing with the Delaware Secretary of State. But the Trustee himself was the party with the purse strings to maintain the standing of these legal entities, and he was the party that failed to comply with this obligation. Nonetheless, the Debtors, at the shareholders' expense, have revived their good standing with the Secretary of State, which moots this ministerial argument.

The Trustee also argues that none of the steps required to submit the Motion—the appointment of a director, the retention of counsel, and related matters—are effective because they somehow violated the automatic stay and because the Trustee himself controls these entities. But the Trustee ignores bedrock law that the automatic stay does not apply to corporate governance. And by the Trustee's logic, no corporate debtor could ever move to convert a case because a bankruptcy trustee's authority precludes it. That is nonsensical.

2

Turning to the actual merits, there is absolutely no doubt that the Debtors satisfy the requirements for conversion. They are debtors eligible for Chapter 11 and they will not reconvert to Chapter 7. Nor is there any evidence that the Motion was filed in bad faith.

The Trustee argues that these cases will be promptly converted back to Chapter 7 if the Court grants the Motion. Not so. Indeed, as the Trustee has admitted, this is not a "no-asset" case contingent on litigation recoveries, and the Trustee's own authorities preclude conversion to Chapter 11 only in these extreme circumstances that are inapplicable here. The Chapter 7 Trustee is holding $87 million in cash, which should go to creditors promptly under a plan rather than sitting idly in his bank account. The Supreme Court has held that this is a valid exercise of the rights and powers of a Chapter 11 case, and this Court has confirmed hundreds, if not thousands, of liquidating plans that allow stakeholders to determine the process, distributions, and governance for such plans as the preferable alternative to Chapter 7 liquidations. There is simply no argument that the Debtors are administratively insolvent and, thus, there is every reason to believe that a plan will be confirmed.

This Court is distinguished for its steadfast goal of allowing corporate debtors to pursue plans—whether to reorganize or to liquidate—that give stakeholders the best opportunity to determine outcomes that maximize value in a swift and efficient manner. The Motion seeks to achieve that goal. It should be granted for all of the reasons herein.

## REPLY

I. **The Bankruptcy Code Gives the Debtors an Automatic Right to Convert These Cases to Chapter 11.**

1. Preliminary, it bears underscoring what the Motion explains but the Objection ignores: Section 706(a) of the Bankruptcy Code explicitly gives a debtor the one-time right to automatically convert a Chapter 7 case to Chapter 11. *See* Motion ¶ 8; 11 U.S.C. § 706(a)

3

(providing that a debtor "may convert a case under this chapter to a case under chapter 11 . . . at any time"). As explained in the Motion, the requirements of Section 706(d)—which mandate that a debtor must first qualify as a debtor under the Bankruptcy Code chapter for which the debtor seeks to convert—are satisfied here: (i) the Debtors may be a debtor under Chapter 11 because they qualify under Section 109 of the Bankruptcy Code; and (ii) pursuant to Section 1112(b), "cause" does not exist such that these cases would immediately convert back to Chapter 7. *See* Motion ¶¶ 8-9. For these reasons alone, the Motion should be granted and the Objection denied.

**II.    The Trustee Misstates the Burden of Proof for Conversion Under Section 706(a).**

2. As a threshold matter, in the Objection the Trustee applies the wrong burden of proof standard to argue that it is the *Debtors* who must first establish that the cases should be converted. *See* Objection ¶ 36. The Trustee is wrong.

3. As the Motion explains, pursuant to 11 U.S.C. § 706(a), it is a debtor's burden to first make a *prima facie* case for its eligibility to convert a case. After such a showing, the burden then shifts to any objecting party to prove ineligibility. *See* Motion ¶ 10; *see also In re FMO Assocs. II, LLC*, 402 B.R. 546, 551 (Bankr. E.D.N.Y. 2009) (holding that under Section 706(a), "[i]t is the [Trustee's] burden to demonstrate by a preponderance of evidence why the Debtor, which qualifies under § 109 of the Bankruptcy Code to be a debtor under Chapter 11, should not be permitted to convert its case to a case under Chapter 11"). Indeed, *In re NLG*, cited by the Trustee in the Objection, holds that the initial burden on a debtor concerns "proving *entitlement* to conversion," nothing more. *In re NLG, LLC*, 2023 WL 2053920, at *5 (Bankr. D. Del. Feb. 16, 2023). As the Motion explains, the Debtors have indisputably satisfied this burden. *See* Motion ¶ 11 (explaining the Debtors "are entitled to convert the Chapter 7 Cases to cases under Chapter 11 of the Bankruptcy Code because (i) the Chapter 7 Cases have not been converted previously

4

and (ii) the Debtors may be debtors in Chapter 11"). Accordingly, the burden now sits with the Trustee to prove the Debtors' ineligibility.[3] As explained herein, the Trustee wholly fails this test.

III. **The Trustee Fails to Prove "Cause" Under Section 706(a)'s Conversion Standard.**

4. In his Objection, the Trustee argues that "cause" exists to support an immediate conversion back to Chapter 7 because there will be both a "substantial or continuing loss to or diminution of the estate" and because there is an "absence of a reasonable likelihood of rehabilitation" by the Debtors. *See* Objection ¶ 38. As shown below, the Trustee is wrong.

 A. **There Is No Risk of a "Substantial or Continuing Loss" to the Estates.**

5. To begin, the Trustee's heavy reliance on *In re NLG* throughout the Objection fails. 2023 WL 2053920, at *1. In *In re NLG*, the debtor had **no assets, no cash on hand, and no operating income**. *See id.* at *6, 8-9. It had nothing. Thus, the *NLG* court understandably held that a Chapter 11 plan was not likely to be consummated as there was no money to fund a Chapter 11 process nor any assets to distribute to creditors. *See id.* at *8-9. In addition, the *NLG* court denied conversion because it found that it would be an abuse of process by the non-debtor movant because the primary purpose of the movant's request was to gain a tactical litigation advantage in other non-bankruptcy lawsuits. *See id.* at *9. Here, in contrast, although the Debtors have no operating income, the Debtors' estates are flush with cash following their 2023 asset sales to the tune of $87 million. *See* Objection ¶ 23. But more importantly, after conversion, the Debtors expect significant funds to flow into the estates for the benefit of the Debtors' stakeholders (as discussed more fully below) from collections of accounts receivables, tax refunds and litigation recoveries. And unlike *NGL,* there are no allegations that the Debtors seek to convert these cases

---

[3] The Debtors note that there is no legal authority that stands for the proposition that the automatic conversion mandates of Section 706(a) do not apply simply because a bankruptcy trustee considers his services to be "the most successful . . . in recent history." Objection ¶ 2.

5

to gain a tactical litigation advantage. *NGL* is accordingly inapposite to the facts of these cases and should be applied in no-asset cases.

6.      In the Motion, the Debtors explained that they believe that the Debtors' estates are not only potentially solvent and that there is still property available to distribute to creditors, but also that additional value will be created for the estates post-conversion. *See* Motion ¶ 15. In addition to the approximately $87 million in cash on hand, the Debtors have access to several buckets of value that have not yet been realized. Specifically, by the Trustee's own admission, these value sources include a tax refund that is due and owing in the tens of millions of dollars, avoidance actions, D&O causes of action, and accounts receivable. *See* Objection ¶ 27. In this case, the facts indicate that the Debtors would not suffer from some continual negative cash flow or a decline in asset values while in Chapter 11.

7.      In his Objection, the Trustee spills much ink on possible fee burn. *See* Objection ¶ 52. But there is no evidence that administrative fees (such as fees of the U.S. Trustee or of the Debtors' bankruptcy counsel) would be higher than they already are in the Chapter 7 Cases. Clearly, the Trustee will eventually charge the estates a 3% fee on all distributions he has yet to even make. Thus, assuming the allegedly $87 million remaining in distributions to creditors, the Trustee's commission would still amount to approximately $2,610,000, a hefty sum that would not be due and owing if these distributions were instead made through a Chapter 11 liquidation plan as the Debtors contemplate, and this number will only increase as tens of millions of additional distributions are made. *See In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 986 (Bankr. N.D.N.Y. 1988) ("In certain instances, a Chapter 11 liquidating plan is preferable to a Chapter 7 proceeding because the disposition of assets will be conducted in a less expensive, swifter and more orderly manner by a debtor-in-possession, as opposed to a trustee."). And this

6

does not account for the fees of the Trustee's retained professionals on account of making these remaining distributions, all of which would also be due and owing as administrative expenses. Given the Trustee's current estimate that he does not anticipate these cases closing ***until the end of 2025***, the Trustee's accrued professional fees will be significant. There is, however, no reason to believe such fees would be substantially less in Chapter 7 than those charged in an expedited Chapter 11 case.

8.  The Trustee's additional argument regarding the Debtors' counsel's fees is baseless. *See* Objection ¶¶ 49-50 (arguing Debtors' proposed counsel's hourly rates are "considerably higher than those of the Trustee's general bankruptcy counsel"). Here, Glenn Agre and Morris Nichols have been retained by the Debtors to effect an expedited Chapter 11 process at discounted rates that will be substantially different in nature to the Chapter 7 liquidation that the Trustee has needlessly drawn out. Focusing on differences between hourly rates between law firms, moreover, misses the forest for the trees: there is an estimated $2,610,000 still left of the Trustee's commission to be paid, which is an amount significantly higher than any difference in individual attorney rates between law firms. And unlike in the Chapter 7 Cases, where nearly $11.5 million of accrued professional fees is attributable to the retention of just one investment banker,[4] there will be no need for the Debtors to utilize such a professional in Chapter 11 because there are no significant asset sales left to pursue.[5] In other words, the potential for any professional fees in Chapter 11 to dwarf the Trustee's past and future fees is plainly unfounded.

---

[4] *See First and Final Fee Application of PJT Partners LP as Investment Banker to the Debtors and Debtors-In-Possession for Allowance (and Final Approval) of Compensation for Services Rendered and for the Reimbursement of All Actual and Necessary Expenses Incurred for the Period of May 20, 2020 Through September 4, 2020* [Docket No. 860] (requesting $11,365,967.75 in compensation and $251.22 in expenses).

[5] On this point, the Debtors note that the Trustee's self-serving characterizations of the sale process belies the fact that the Debtors' lenders' hand-picked advisor ran it under their direction, not the Trustee's.

### B. The Debtors' "Likelihood of Rehabilitation" is Irrelevant.

9. The Objection argues that an "absence of a reasonable likelihood of rehabilitation" of the Debtors constitutes cause to immediately convert the cases back to Chapter 7. *See* Objection ¶¶ 40-42. The Objection further argues that there is sufficient "cause" under Section 1112(b) because the Debtors want to confirm a plan of liquidation. *See id*. ¶¶ 40-42. The Trustee is again mistaken.

10. The U.S. Supreme Court has explained that the two primary purposes of Chapter 11 are "(1) preserving going concerns and (2) maximizing property available to satisfy creditors." *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 119 (3d Cir. 2004) (quoting *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999)) (internal quotations omitted). Liquidating plans, moreover, are unquestionably an appropriate use of Chapter 11. *See id*. at 120 n.4 ("Reorganization, however, is not the only 'appropriate use of Chapter 11 since the Code clearly contemplates liquidating plans under 11 U.S.C. § 1123(b)(4), whereby a debtor may develop a Chapter 11 plan to sell off all of its assets.'") (quoting *In re PPI Enters. (U.S.), Inc.*, 324 F.3d 197, 211 (3d Cir. 2003)). As the Third Circuit has explained, "[t]o say that liquidation under Chapter 11 maximizes the value of an entity is to say that there is some value that otherwise would be lost outside of bankruptcy." *Id*. at 120. And specific to the conversion context, "liquidating plan[s], which [are] permitted under § 1123(b)(4) of the Bankruptcy Code, do[] not render conversion an exercise in futility." *FMO Associates*, 402 B.R. at 553.

11. Here, the second element of Section 1112(b)(4)(A) is simply not applicable. As explained in the Motion, rehabilitation would not be the Debtors' goal in Chapter 11 as they instead intend to pursue confirmation of a plan of liquidation. In the Debtors' view, this is the most

efficient course of action to maximize remaining value. *See, e.g.*, Motion ¶ 15. Once in Chapter 11, the Debtors intend to file a liquidating plan that will maximize remaining property and value sources available by, among other things, permitting the Debtors to efficiently reconcile claims, collect accounts receivable, sell the remainder of the Debtors' assets, prosecute litigation against former directors and officers, and distribute cash quickly. *See id*. The Trustee cites no reason or authority for why this is not a more than an appropriate use of Chapter 11.

12. Accordingly, for the foregoing reasons, "cause" pursuant to Section 1112(b)(4)(A) does not exist. The Court should grant the Motion and convert these cases to Chapter 11.

## IV. The Trustee's Remaining Sections 1112(b) and 105(a) Arguments Against the Motion Are Unpersuasive.

### A. The "Totality of the Circumstances" Do Not Warrant Denial of the Motion.

13. In his Objection, the Trustee refers to a "totality of the circumstances" approach to determine whether "cause" exists under Section 1112(b) above and beyond the enumerated items in Section 1112(b)(4). *See* Objection ¶ 46. According to the Trustee, "a court may deny a motion to convert a case from chapter 7 to chapter 11 if the requested conversion would prejudice the creditors and/or negatively impact the administration of the estate." *Id*. Here, the facts and circumstances of these cases do not warrant denial of the Motion.

14. In this Circuit, courts apply a five-factor test to determine whether the "totality of circumstances" warrant denial of a motion to convert under Section 706(a): (1) whether the debtor is seeking to convert in good faith, (2) whether the debtor can propose a confirmable plan, (3) the impact on the debtor of denying conversion weighed against the prejudice to creditors caused by allowing conversion; (4) the effect of conversion on the efficient administration of the bankruptcy estate; and (5) whether conversion would further an abuse of the bankruptcy process. *See In re*

*Murray*, 377 B.R. 464, 469 (Bankr. D. Del. 2007); *In re Pakuris*, 262 B.R. 330, 335-36 (E.D. Pa. 2001).

15. That said, courts in this district primarily apply the "totality of the circumstances" test in individual bankruptcy cases, not cases involving corporate debtors. *Murray* and *Pakuris*, for example, involved individual debtors that sought or obtained conversion to Chapter 13. *Murray* sustained conversion after the Chapter 7 trustee there sought to reverse it on the basis of bad faith. *In re Murray*, 377 B.R. at 470. Although the *Murray* debtor had failed to disclose the existence of a valuable license plate, the court held that this oversight was inadvertent, did not amount to bad faith, and upheld conversion to Chapter 13. *Id*. In *Pakuris*, the individual debtor, which had already been discharged, sought conversion to assume control of marital litigation, and had no resources to contribute to a plan absent success in that litigation, which the Court held could prejudice creditors. *See In re Pakuris*, 262 B.R. at 337-338. The facts of individual cases applying the "totality of the circumstances" test such as these cases simply are not relevant to the Court's inquiry here.

16. Even so, putting aside the fact the Trustee's Objection cites no legal framework for his "totality of the circumstances" arguments, the Trustee tellingly focuses solely on factors three and four—prejudice to creditors and efficient administration—and ignores the rest of the applicable standard. A full analysis of all five factors, however, confirms denial of the Motion is unwarranted:

    i. <u>Factor 1: Good Faith</u>. In *Marrama v. Citizens Bank of Mass.*, the U.S. Supreme Court unambiguously held that "bad faith" is an extremely high bar to meet. 549 U.S. 365 (2007). While not expressly defining "bad faith," the Supreme Court posited that only "atypical" or "extraordinary" behavior would qualify as such. *See id*. at 375 n.11. Thus, in considering a motion to convert, courts in this circuit have evaluated "bad faith" by looking at three factors in particular: (1) the timing of the motion; (2) the debtor's motive in filing the motion; and (3) whether the debtor has

10

been forthcoming with the bankruptcy court and creditors. *See In re Murray*, 377 B.R. at 469-70.

Here, the motives and timing of the Debtor's motion are related solely to the Debtors' desire to effect distributions and pursue additional value sources in a speedy manner. There is no evidence indicating that the Debtors have any other ulterior motive in seeking to convert. *Cf. In re Pakuris*, 262 B.R. at 336 (case in which debtor had already obtained the benefit of a chapter 7 discharge but wanted to convert solely to regain control over certain litigation). Similarly, there is no evidence that the Debtors have been less than forthcoming with the court or creditors, such as attempting to conceal or shelter certain assets or misrepresentations with regards to such assets. *See generally In re Kerivan*, 2010 WL 2472674, at *3-4 (Bankr. S.D.N.Y. 2010) (discussing case law interpreting what fact scenarios would constitute behavior rising to the level of bad faith, none of which are alleged here). In short, the Debtors have demonstrated only "good faith" intentions in seeking to convert.

ii. <u>Factor 2: Confirmable Plan</u>. For this factor, "[c]ourts have recognized that conversion should not be permitted when it would serve no point, for example, in matters when the ***debtor is demonstrably incapable of proposing a feasible plan***." *See In re Pakuris*, 262 B.R. at *337 (emphasis added). In *In re Pakuris*, the court found that a plan was not likely to be confirmed because the debtor did not have sufficient income to fund its plan. *See id*. In contrast, the Trustee cites no reason why the Debtors would not be able to confirm a Chapter 11 plan. As evidenced by the Trustee's own statements in his Objection, the Debtors clearly have the financial ability to fund a Chapter 11 case and plan. *See* Objection ¶ 23 (disclosing that the Debtors presently have $87 million cash on hand). This confirms the Debtors' financial wherewithal to fund a Chapter 11 process that would not only expedite distributions but also further maximize value by funding the pursuit of remaining value sources that the Trustee has so far neglected.

iii. <u>Factor 3: Prejudice to Creditors</u>. For this factor, courts weigh the impact of denying conversion against the prejudice, if any, on the creditor body. In its Objection, the Trustee argues that increased fees, costs, and delays due to conversion would prejudice creditors. *See* Objection ¶¶ 48, 55. While the Debtors acknowledge that there will be a new bar date and Section 341 meeting scheduled after conversion, the Objection's unsupported speculation about "chaos and confusion" is wholly theoretical. In fact, it is just as likely that creditors will *benefit* from conversion as they will be prejudiced by it: as noted above, the Debtors intend to pursue for the benefit of the Debtors' stakeholders a multimillion-dollar potential tax refund, accounts receivable collection lawsuits, the D&O causes of action, and Chapter 5 avoidance actions, all of which the Trustee indicates he will not vigorously pursue. *See id*. ¶ 44 ("[A]t this late stage of a liquidation proceeding, the Estates are not going to have any income. Rather, the Estates will generally only have outflows as winding up expenses are paid."). As explained herein, an expedited Chapter 11 process would be more beneficial for creditors, especially in this district where plan confirmation can be reached in a matter of months. *Cf.* Objection ¶ 27 (Trustee

11

stating he "anticipates being in a position to complete administration of these Chapter 7 Cases . . . on or before December 31, 2025").

Crucially, ***not a single creditor has supported the Trustee's Objection***. This is despite the fact that the Debtors noticed over three thousand parties in interest with its Motion. The absence of any primary creditors objecting to conversion indicates creditors will be far from prejudiced. *See In re FMO Assoc. II, LLC*, 402 B.R. at 552 (finding conversion to Chapter 11 from Chapter 7 appropriate in part because primary creditor did not object to conversion).

 iv. <u>Factor 4: Efficient Administration of the Bankruptcy Estate</u>. In its Objection, and as it relates to efficient estate administration, the Trustee merely repackages his arguments regarding possible prejudice to creditors. *See* Objection ¶ 51 (arguing any new Chapter 11 professionals would need to get up to speed on the cases, get to plan confirmation, and ultimately set up a liquidating trust to make distributions). But the Trustee's contentions sidestep the Debtors' intent: conversion is warranted precisely because the current administration of the estates is inefficient and delayed. Despite the Trustee making much noise in its Objection about his accomplishments, awards, and the time it would take to jumpstart a Chapter 11, the simple fact is that these cases have sat idle for several months. All the while, and by the Trustee's own admission, sources of untapped value that would maximize recoveries remain unexploited. *See* Objection ¶ 27. To put it bluntly, for conversion to render the administration of the estates inefficient, estate administration must be ongoing in the first place.

 v. <u>Factor 5: Abuse of the Bankruptcy Process</u>: For factor five, courts look at whether the conversion would further an abuse of the bankruptcy process. *See In re Pakuris*, 262 B.R. at 338 ("[A] motion to convert can be abusive when it is filed to frustrate the bankruptcy process, rather than to implement the Congressional policy of repayment of creditors."). While the Objection does not directly address this factor, the Trustee implies that the Debtors are seeking to abuse the bankruptcy process for all of the reasons it claims conversion will prejudice creditors. *See e.g.*, Objection ¶¶ 47-57, 60-69 (alleging increased fees, costs, and delays due to conversion.). But as explained above, courts maintain a high bar to find that such an abuse of process has occurred or will occur. *See e.g., Culp v. Stanziale (In re Culp)*, 545 B.R. 827, 841-42 (D. Del. 2016)), *aff'd*, 681 F. App'x 140 (3d Cir. 2017) (debtors improperly sought conversion to circumvent bid procedures order). And here, the Debtors are not attempting to frustrate any process whatsoever. This is not a case like *NLG*, cited by the Trustee, where the non-debtor movant sought conversion primarily as a litigation tactic. *See In re NLG, LLC*, 2023 WL 2053920, at *9. There are no facts in these cases that support any allegation rising to the level of misrepresentations or fraudulent conduct that would support denial of the Motion.

17. For the foregoing reasons, in addition to the reasons stated herein, the totality of the circumstances does not warrant denial of the Motion as a matter of law.

12

### B. Denial of the Motion Pursuant to Section 105(a) is Unnecessary.

18. The Trustee devotes a section of his Objection to discussing why this Court should exercise its broad authority pursuant to Section 105(a) of the Bankruptcy Code to deny the Motion. But beyond quoting a sentence in *Marrama*, the Objection provides no basis for why such an exercise is warranted. Indeed, *Marrama*'s reference to a bankruptcy court's Section 105(a) authority was made in the context of preventing an "abuse of process" by a movant, not regarding the merits of conversion generally. *See Marrama*, 549 U.S. at 375 (holding the "broad authority granted to bankruptcy judges to take any action that is necessary or appropriate 'to prevent an abuse of process' described in § 105(a) of the Code, is surely adequate to authorize an immediate denial of a motion to convert"). As explained above, the Trustee has not (because he cannot) alleged any actual "abuse" has occurred, is occurring, or will occur.

## V. The Controlling Shareholders Did Not Violate the Automatic Stay And Have Complied with All Corporate Governance Obligations.

### A. The Automatic Stay Has Not Been Violated.

19. Preliminarily, without citing a single applicable legal authority or case, the Trustee baldly alleges that the Controlling Shareholders' written consent appointing the limited director "violate[s] the automatic stay" because it is an "attempt to exercise control over these Debtors." *See id*. ¶¶ 71, 75. Not so.

20. In this District, it is well-settled that "the automatic stay provisions of the Bankruptcy Code are not implicated by the exercise of shareholders' corporate governance rights[.]" *In re Marvel Ent. Grp., Inc.*, 209 B.R. 832, 838 (D. Del. 1997). In *In re Marvel*, a committee of bondholders whose claims were secured by a pledge by a debtor's co-debtors' stock sought to foreclose on and vote the stock post-petition. In rejecting the bankruptcy court's holding that the bondholders needed to obtain specific relief from the stay prior to a post-petition exercise

of voting rights to replace a board of directors, the District Court held that "it would be inappropriate to apply the automatic stay merely because of speculation that a new board elected by the bondholders might take some action that would violate the automatic stay."[6] *Id.* at 839-84. The District Court went on to hold that the bondholders were *not* prohibited from exercising their voting rights post-petition and further agreed that the bondholders retained such authority *without* obtaining relief from the stay. *See id.*

21. The same corporate principles apply here. The Controlling Shareholders did not violate the automatic stay in voting the majority of interests of Akorn Holdings and thereby appointing the limited director because it was an exercise of the Controlling Shareholders' basic corporate governance rights. *See In re SS Body Armor I, Inc.*, 527 B.R. 597, 606-07 (Bankr. D. Del. 2015) ("The right of a shareholder to compel a shareholder's meeting for the purpose of election of a new board of directors continues during bankruptcy and the automatic stay is inapplicable to the exercise of that right[.]"). *Cf. In re Johns-Manville Corp.*, 801 F.2d 60, 64 (2d Cir. 1986) ("As a consequence of the shareholders' right to govern their corporation, a prerogative ordinarily uncompromised by reorganization, a bankruptcy court should not lightly employ its equitable power to block an election of a new board of directors.") (internal quotations omitted); *Matter of Am. Media Distributors, LLC*, 216 B.R. 486, 489 (Bankr. E.D.N.Y. 1998) ("Like those of ordinary corporate shareholders, their rights to participate in the governance of the business in which they hold equity interests are neither enjoined automatically nor abrogated upon the filing of a bankruptcy petition."). The Objection's contentions to the contrary are incorrect.

---

[6] While the bondholders in *In re Marvel* had previously sought and obtained stay relief from the bankruptcy court, that relief concerned foreclosing on the pledged shares of stock as a result of a default under the relevant indentures. *See id.* at 834.

14

22. Accordingly, the Trustee is wrong that the automatic stay has been violated. The Objection should be denied.

### B. Akorn Holdings Was Revived and Its Governance Acts Are Accordingly Ratified.

23. In the Objection, the Trustee argues that because Akorn Holdings' certificate of formation was canceled, its acts "are invalid and of no force or effect" such that Akorn Holdings "lacks legal competency and standing to seek conversion of its bankruptcy case." Objection ¶¶ 76-81. The Trustee further contends that "the Debtors' lack of management would independently be grounds for 'cause' to reconvert the cases to Chapter 7." *Id.* ¶ 87. The Trustee is again wrong.

24. The filing of a certificate of revival has the effect of rendering actions taken by a company during the time when the certificate of formation was canceled valid and enforceable as if the certificate of formation had remained in effect all along. *See Rochdale Sec., LLC v. Entwistle & Cappucci, LLP*, 2019 WL 13214771, at *1 (D. Conn. 2019) ("However, plaintiff has received a Certificate of Revival that renders plaintiff's LLC status in effect nunc pro tunc under Delaware law.") As the relevant statute states:

> "Upon the filing of a certificate of revival of limited liability company, a limited liability company. . .shall be revived with the same force and effect as if the certificate of formation of the limited liability company had not been canceled pursuant to § 18-104(d). . .of this title. . . . Such revival shall validate all contracts, acts, matters and things made, done and performed by the limited liability company. . . or by the members, managers, employees and agents of the limited liability company…during the time when the certificate of formation of the limited liability company was canceled pursuant to § 18-104(d). . .of this title, with the same force and effect and to all intents and purposes as if the certificate of formation of the limited liability company had remained in full force and effect."

*See* 6 Del. C. § 18-1109(c).

15

25. Therefore, the written consents appointing the limited director and authorizing him to execute the Certificate of Revival,[7] which were "acts, matters, and things made, done and performed" by Akorn Holdings "during the time when the certification of formation. . .was canceled" apply "with the same force and effect . . . as if the certificate of formation . . . had remained in full force and effect." *See id.* The Trustee's contention that the limited director lacked authority to file the papers necessary to revive the Company's standing is thus plainly incorrect. *See* Objection ¶ 80.

26. Further, under Delaware state law, a member or manager of a limited liability company is expressly permitted to delegate their authority to any non-member or non-manager, unless the LLC agreement provides otherwise.[8] *See* 6 Del. C. § 18-407. The LLC agreement here does not provide otherwise, and instead expressly provides the board with the power to delegate. *See* Company Agreement, § 6.15 ("[T]he Board may, from time to time, delegate in writing to any Person such authority and powers to act on behalf of the Company as it shall deem advisable in its sole and absolute discretion.").

27. The Trustee's contention that the limited director's delegation of authority to Glenn Agre and Morris Nichols to prosecute the Motion is somehow equivalent to "plac[ing] all decision-making authority in their law firm's hands undermin[ing] fundamental principles of corporate law and professional responsibility" is a wild overstatement. *See* Objection ¶ 70. The limited director has simply delegated authority to the company's law firms solely to prosecute the Motion,

---

[7] *See* **Exhibit A**.

[8] Del. C. § 18-407 states in pertinent part: "Unless otherwise provided in the limited liability company agreement, a member or manager of a limited liability company has the power and authority to delegate to 1 or more other persons any or all of the member's or manager's, as the case may be, rights, powers and duties to manage and control the business and affairs of the limited liability company . . ."

16

something boards of LLC's and corporations do regularly and not only in the context of bankruptcy cases but also in regards to all types of significant litigation.

28. That this delegation somehow amounts to an abdication of the limited director's fiduciary duties and violates the "central tenet of attorney-client relations, namely that a company's management makes business decisions, not its attorney," is thus a highly exaggerated depiction of what is in reality a quotidian type of delegation of a board's authority acting at the request of a substantial majority of shareholders. Further, Akorn Holdings' LLC agreement expressly waives fiduciary duties owed by any director, member, officer, or employee, which waiver is expressly permitted under Delaware state law. *See* Limited Liability Company Agreement of Akorn Holding Company LLC, § 6.13; *CSH Theatres, LLC v. Nederlander of San Francisco Assocs.*, 2015 WL 1839684, at *11 (Del. Ch. 2015) ("The drafters of an LLC agreement can modify the traditional duties of care and loyalty or displace them altogether, but they cannot eliminate the covenant of good faith and fair dealing.").

29. In short, Akorn Holdings' limited delegation of authority to its law firms does not amount to a handing over of "carte blanche authority" to these law firms such that "[t]here is no management to make business decisions – all decisions in the would-be chapter 11 case would be made by attorneys, undirected (and unconstrained) by an officer or director of the company." *See* Objection ¶ 86. While the limited director has been appointed initially for the narrow purpose of authorizing the filing of this Conversion Motion, should the cases successfully convert, the Controlling Shareholders will necessarily need to expand the scope of the limited director's appointment to include the purpose of completing the administration of these bankruptcy cases to a swift and efficient conclusion.

**C. The Controlling Shareholders Have Authority Over Akorn Intermediate and Akorn Operating.**

30. In his Objection, the Trustee argues that because he is the "sole member and manager of both Akorn Intermediate and Akorn Operating," the written consent is "wholly ineffective as to Akorn Intermediate and Akorn Operating" because the Controlling Shareholders "are wholly without authority to make decisions on behalf other companies or to otherwise cause the companies to act." Objection ¶¶ 71, 74. The Trustee is misguided.

31. Akorn Holdings is the sole member of Akorn Intermediate, which in turn is the sole member of Akorn Operating. Both Akorn Intermediate and Akorn Operating are member-managed LLC's. *See* Limited Liability Company Agreement of Akorn Intermediate Company, LLC at § 4; Limited Liability Company Agreement of Akorn Operating Company, LLC at § 4. Thus, Akorn Holdings, by way of its limited director, has the absolute authority to manage the business and affairs of both Akorn Intermediate and Akorn Operating. And as *In re Marvel*, discussed above, dictates, corporate governance rights of shareholders are unaffected by the imposition of the automatic stay attendant to a bankruptcy filing. *See supra* ¶¶ 19-20.

**NOTICE**

32. Notice of this Reply will be given to the following parties or their respective counsel: (a) the Trustee; and (b) any party that has requested or that is required to receive notice pursuant to Bankruptcy Rule 2002.

**CONCLUSION**

For all of the foregoing reasons, the Debtors respectfully request that the Motion be granted to convert these cases to Chapter 11.

WHEREFORE, for these additional reasons, the Debtors respectfully request that the Court grant the Motion and such other and afford such further relief as may be just and proper.

Dated: July 31, 2024
Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNEL LLP**

*/s/ Robert J. Dehney, Sr.*
Robert J. Dehney, Sr. (No. 3578)
Daniel B. Butz (No. 4227)
1201 N. Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone: (302) 658-9200
Email: rdehney@morrisnichols.com
        dbutz@morrisnichols.com

- and -

**GLENN AGRE BERGMAN & FUENTES LLP**
Andrew K. Glenn (admitted *pro hac vice*)
Shai Schmidt (admitted *pro hac vice*)
Richard C. Ramirez (admitted *pro hac vice*)
Malak S. Doss (admitted *pro hac vice*)
1185 Avenue of the Americas, 22nd Floor
New York, New York 10036
Telephone: (212) 970-1600
Email: aglenn@glennagre.com
        stecklin@glennagre.com
        sschmidt@glennagre.com
        rramirez@glennagre.com
        mdoss@glennagre.com

*Proposed Counsel to the Debtors*