IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>AKORN HOLDING COMPANY LLC, *et al.*[1]<br><br>Debtors. | Chapter 7<br><br>Case No. 23-10253 (KBO)<br>(Jointly Administered)<br><br>Objection Deadline: March 25, 2025 at 4:00 p.m. (ET)<br>Hearing Date: April 11, 2025 at 10:00 a.m. (ET) |

**MOTION OF CHAPTER 7 TRUSTEE FOR AN ORDER PURSUANT TO 11 U.S.C. §§ 105(a), 326, 330 AND 331 ALLOWING TRUSTEE'S INTERIM COMPENSATION**

George L. Miller, in his capacity as the Chapter 7 Trustee (the "Trustee") for the bankruptcy estates (the "Estates") of Akorn Holding Company LLC *et al* ("Akorn") and the related above-captioned jointly administered Debtors (collectively, the "Debtors"), hereby moves this Court (the "Motion") for an order pursuant to Sections 105(a), 326, 330, and 331 of Title 11 of the United States Code for an order approving the Trustee's interim compensation in the amount of $8,033,685 (the "Trustee's Interim Compensation"). In support of the Motion, the Trustee respectfully represents as follows:

**JURISDICTION AND VENUE**

1. This Court has jurisdiction over the subject matter of the Motion pursuant to 28 U.S.C. §§ 157 and 1334, and venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409. The Trustee has standing to request the relief stated in the Motion. This is a core proceeding under 28 U.S.C. § 157(b)(2). The statutory predicates for the relief sought herein are sections 105(a), 326, 330, and 331 of Title 11 of the United States Code (the "Bankruptcy Code").

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of their federal tax identification numbers, and cases numbers are Akorn Holding Company LLC (9190), Case No. 23-10253 (KBO); Akorn Intermediate Company LLC (6123), Case No. 23-10254 (KBO); and Akorn Operating Company LLC (6184), Case No. 23-10255. The Debtors' headquarters is located at 5605 CenterPoint Court, Gurnee, IL 60031.

**BACKGROUND**

A. **Introduction**

2.  On February 23, 2023 (the "Petition Date"), the Debtors commenced these jointly administered bankruptcy cases (collectively the "Chapter 7 Cases") by each filing a voluntary petition in this Court for relief under chapter 7 of the Bankruptcy Code. The Debtors had ceased operating as of the Petition Date, and the Trustee has not operated the business.

3.  As described in more detail below, in 2023 the Trustee sold a substantial portion of the Debtors' assets in a series of sale transactions which upon information and belief were some of the most successful chapter 7 sales in recent history in the District of Delaware. The Trustee has since distributed the majority of the proceeds, and is in the process of making further additional large distributions subject to court approval in advance of the approval of the Trustee's Final Report.

B. **The Debtors' History; Existing Chapter 11 Cases**

4.  The Debtors' predecessors (the "Company") founded their business in 1971 in Abita Springs, Louisiana, and initially focused on ophthalmic drugs. In 1997, the Company relocated its corporate headquarters to the Chicago, Illinois area. In April 2007, the Debtors' predecessor Akorn, Inc.'s stock was listed publicly on the NASDAQ exchange.

5.  Between 1971 and 2018, the Company made strategic acquisitions to grow the business, including Taylor Pharmacal in 1992 (a contract manufacturer of injectables, based in Decatur, Illinois), Advanced Remedies Inc. in 1998 (which owned an ophthalmic manufacturing and research and development facility in Somerset, New Jersey), Advanced Vision Research, Inc. in 2011 (an ophthalmic company that developed and marketed eye care products under the TheraTears and MacuTrition brand names), Hi-Tech Pharmacal in 2014 (which traces its roots

back to the Success Chemical Co., founded in Brooklyn, New York in 1930), and VersaPharm in 2014 (which focused on niche therapeutic categories of dermatology, tuberculosis, and hemophilia). The Company also grew by launching its animal health business in 2012, and expanding its manufacturing presence into Europe in 2015 with the acquisition of Swiss operations, which included indirect ownership of a plant in Hettlingen, Switzerland, and laboratory and office space in Winterthur, Switzerland.

6. In 2018, however, after nearly fifty years of growth, the Company began to struggle under the weight of expensive litigation, investigations by the U.S. Food and Drug Administration (the "FDA"), significant remediation costs, debt, and other burdens. By 2019, the Company found itself capital-constrained, with hundreds of millions of dollars of secured debt under imminent threat of default. Throughout 2019, with the help of legal and financial advisors, the Company explored restructuring options that would fully refinance or pay down the Company's debts. After conducting due diligence, however, none of the prospective investors were willing to undertake the complete refinancing that the Company required. In December 2019, the Company began to explore options for selling its business.

7. In 2020, after the foregoing efforts had proven unsuccessful, the Company commenced cases under chapter 11 of the Bankruptcy Code jointly administered as case no. 20-11177 (KBO) in the United States Bankruptcy Court for the District of Delaware (the "Existing Chapter 11 Cases"). Following a marketing and sale process, the Company, as debtors-in-possession, sold their business in the Existing Chapter 11 Cases under section 363 of the Bankruptcy Code as a going-concern to their then-lenders for a sale price consisting essentially

of a credit bid, assumption of certain liabilities, and a cash sum sufficient to fund a wind-down.[2] The Existing Chapter 11 Cases remain pending before this Court.

8.      The sale in the Existing Chapter 11 Cases closed on October 1, 2020. The purchasers in the sale from the Existing Chapter 11 Cases formed the three entities which are the Debtors in these Chapter 7 Cases, with Debtor Akorn Operating Company LLC ("Akorn Operating") becoming the new direct owner of substantially all of the assets that comprised the business. Akorn Operating is 100% owned by Debtor Akorn Intermediate Company LLC ("Akorn Intermediate"), which in turn is 100% owned by Debtor Akorn Holding Company LLC ("Akorn Holding").

9.      Promptly after the aforesaid sale in the Existing Chapter 11 Cases closed, the Debtors (at this point in the corporate structure that exists today) began exploring opportunities outside of bankruptcy to sell their newly-acquired business as a going concern, and at the same time began to jettison parts and pieces of it in a quest to achieve profitability. The Debtors sold the consumer health division to Prestige Consumer Healthcare in June of 2021, and the branded ophthalmics division to Thea Pharma Inc. in March of 2022. The Debtors' inability to sell their whole business as a going-concern stemmed in part from certain quality control issues, and the FDA's issuance of certain warning letters to the Debtors.

10.     In June of 2022, the Debtors launched a sale process for substantially all of the remaining assets as a going-concern. The Debtors thoroughly marketed the assets and solicited

---

[2] See Order (A) Approving the Asset Purchase Agreement, (B) Authorizing the Sale of Assets, (C) Authorizing the Assumption and Assignment of Contracts and Leases, and (D) Granting Related Relief, Case No. 20-11177 (KBO) (Bankr. D. Del. Sept. 2, 2020), D.I. 656 (the "Chapter 11 Sale Order"). The wind-down budget attached to this sale order lists a "total wind-down budget" of slightly over $35 million.

bids over a period of approximately seven months.  This effort, however, was unsuccessful, as no party was willing to bid in excess of the Debtors' then-existing secured debt.

11.     By early 2023, the Debtors were carrying principal balances under two separate secured loan facilities in an aggregate amount of over $204 million, for which substantially all of the assets served as security, and faced additional filed claims of over $240 million.  Having failed with all attempts to reorganize, streamline, or sell themselves as a going concern, the Debtors accepted the reality that a chapter 7 bankruptcy filing, and an accompanying cessation of operations, was inevitable in order to preserve the value of the assets and obtain maximum possible value through a sale on a non-operating basis.  In February 2023, the Debtors terminated all of their employees and ceased all operations, and all of their directors resigned.  Shortly thereafter on the Petition Date, the Debtors commenced these Chapter 7 Cases.

**C. These Chapter 7 Cases; the Trustee's Asset Sales; Distributions to Creditors**

12.     On or about the Petition Date, the Office of the United States Trustee appointed the Trustee as the chapter 7 trustee for the Debtors' Estates.  On April 7, 2023, the Trustee held the meeting of creditors pursuant to section 341 of the Bankruptcy Code, and has since served as the permanent Trustee for the Estates pursuant to section 702(d) of the Bankruptcy Code.

13.     Upon permanently ceasing operations prior to the Petition Date, the Debtors' business included developing, manufacturing, and marketing specialty pharmaceuticals, including prescription, consumer health, and animal health products, and including branded and generic products.  The Debtors occupied several locations in the United States, both owned and leased, and were headquartered in Gurnee, Illinois.  In addition to the U.S. based operations, Akorn Operating owned 100% of the equity in a certain Luxembourg-based non-debtor holding

5

company called Akorn International S.á.r.l.  Akorn International S.á.r.l, in turn, owned 100% of the equity in Akorn AG, a Swiss-based operating company.

14. Immediately following his appointment, the Trustee prepared to market and sell substantially all of the Estates' assets.  The timeline for the sale was highly accelerated due to the deteriorating nature of the assets as well as the drug supply shortages plaguing the United States at the time.  On April 20, 2023, the Trustee filed the *Trustee's Motion for Entry of (I) an Order (A) Approving Bidding Procedures in Connection with Sale of Substantially all of the Estates' Assets, (B) Scheduling an Auction and Hearing to Consider the Proposed Sale, and (C) Approving the Form and Manner of Notice Thereof; and (II) an Order (A) Approving the Sale, (B) Authorizing the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting Certain Related Relief* [D.I. 106] (the "Sale Motion")[3] and sought expedited approval of his proposed bidding procedures and related procedural relief.  On April 28, 2023, the Court entered an order approving the Trustee's bidding procedures on an expedited basis [D.I. No. 137].

15. At approximately the same time, the Trustee negotiated, and entered into, a Sharing and Carve-Out Agreement with the lenders under the Debtors' secured credit facilities, in order to both fund the sale process, and ensure a portion of the sale proceeds would be available for unsecured creditors (which carve-out ended up being largely unnecessary, due to the overwhelming success of the asset sales enabling the secured credit facilities to be paid in full with excess proceeds available for unsecured creditors).

16. In accordance with the bidding procedures, the Trustee and his professionals reviewed and analyzed fifty-nine (59) individual bid packages, fifty-eight (58) of which they

---

[3] Capitalized terms not otherwise defined in this Section (B) shall have the meanings provided in the Sale Motion.

deemed qualified bidders to participate in the auction. Quickly thereafter, on May 10th, 11th, and 12th, 2023, the Trustee and his professionals conducted a live in-person Auction that lasted three (3) consecutive days. The Auction was attended in person by approximately 130 parties comprised of lawyers, brokers, bankers, and pharmaceutical representatives from around the world. Additionally, approximately 222 parties registered and observed the auction virtually via Zoom.

17. At the conclusion of the Auction, the Trustee identified numerous successful purchasers, and consortiums of purchasers, for various assets and packages of assets, for an aggregate purchase price of approximately $309 million. See D.I. 204 (Notice of Successful Bidders and Alternate Bidders). Immediately following the auction, the Trustee and his professionals negotiated and finalized thirteen (13) different asset purchase agreements, which the Court subsequently approved in a series of twenty (20) sale orders entered on June 8th and 9th, 2023 (the "Auction Sales"). See D.I. 351, 352, 353, 354, 355, 356, 357, 358, 359, 360, 361, 362, 363, 368, 369, 370, 371, 372, 376, 382]. To secure the entry of these sale orders, the Trustee and his professionals negotiated consensual resolutions to seventeen (17) separately filed objections to the assumption/assignment of executory contracts and/or leases that were integral to various of the purchased assets.

18. Immediately following the entry of these sale orders, the Trustee and his professionals performed the transaction and closing work necessary to consummate all of the Auction Sales, and successfully closed twenty-one (21)[4] individual sale transactions arising from the auction proceedings within a forty-five (45) day period. The Auction Sales were especially

---

[4] Certain of the successful bidders/consortiums of bidders at the auction purchased assets in multiple transactions. In addition, certain bidders acting together as a consortium entered into a single "group" APA, which governed each consortium member's individual purchases.

complicated for a variety of reasons including that they involved a myriad of different asset classes located in different jurisdictions in the United States and in foreign countries which asset classes included, but were not limited to real estate, drug manufacturing facilities, equipment, FDA approved ANDAs (Abbreviated New Drug Applications) and ANADAs (Abbreviated New Animal Drug Applications), the stock equity of Akorn International S.á.r.l, (the non-debtor Luxembourg subsidiary and owner of Swiss affiliate, Akorn AG), and required the disposal of controlled drug substances, which were subject to very stringent regulation.

19. Following the Auction Sales, various miscellaneous assets remained, including certain ANDAs, inventory, raw materials, and equipment. Throughout the remainder of 2023, the Trustee marketed and sold substantially all of these remaining assets via a series of seven (7) additional, private, sales (the "Private Sales," and together with the Auction Sales, the "Asset Sales"), which the Court approved in seven (7) separate orders entered between May and November of 2023. See D.I. 214, 300, 560, 624, 628, 662, 684. The Private Sales brought in an additional $3 million.

20. All of the aforesaid Asset Sales have closed, and been successfully consummated by the Trustee and his professionals. In total, the Asset Sales by the Trustee on behalf of the Chapter 7 Estates of the Debtors brought in approximately $313 million. In contrast, prior to the Trustee's sale efforts, representatives of the Debtors had indicated that sale proceeds in the Chapter 7 Cases for ANDA's would likely not exceed $15 million. Of all of the various efforts to sell the business prior to the Chapter 7 Petition Date undertaken by various groups, with the assistance of various advisors, no one had ever obtained an offer in excess of $66 million.

21. The Assets Sales by the Trustee in the Chapter 7 were a resounding success, in terms of their recoveries for the Estates of approximately $313 million, and their speed

8

considering the size and complexity of the cases (i.e. 106 days passed between the Petition Date and the entry of the last Auction Sale Order). Indeed, these Asset Sales transactions were awarded both the American Bankruptcy Institute Asset Sale of the Year Award for 2023, and the M&A Advisor's 18th Annual Turnaround Award for Section 363 Sale of the Year (Over $250 Million) for 2023.

22. On or about July 6, 2023, the Trustee distributed approximately $204 million in sale proceeds to the lenders under both of the Debtors' secured credit facilities, which repaid the Debtors' secured debt in full.

23. Having concluded 2023 so successfully, in early 2024 the Trustee turned to the review of priority claims and other claims asserted against the Debtors in an effort to facilitate periodic distributions being made in advance of the filing of the Trustee's Final Report. After analyzing the claims asserted by creditors seeking allowance as administrative claims under Sections 503(b)(9) and 507(a)(2), the Trustee determined that he was in a position to pay certain of such claims as allowed administrative claims under the Bankruptcy Code. Accordingly, on May 31, 2024, the Trustee filed a *Motion for an Order Authorizing Distribution of Funds to Holders of Administrative Claims and Granting Related Relief* [D.I. 817] (the "Administrative Claim Distribution Motion"), in which the Trustee requested authority to pay holders of certain allowed administrative priority claims, in an aggregate amount of $991,715. On June 25, 2024, the Court entered an order granting the Administrative Claim Distribution Motion [D.I. 836], and the Trustee subsequently paid allowed administrative claims as identified in the Administrative Claim Distribution Motion.

24. On July 3, 2024, the Trustee filed a *Motion for an Order Authorizing First Distribution of Funds to Holders of Allowed Priority Claims Under Section 507(a)(4) of the*

*Bankruptcy Code and Granting Related Relief* [D.I. 849] (the "507(a)(4) Distribution Motion"), in which the Trustee requested authority to pay holders of certain allowed section 507(a)(4) priority claims of former employees up to the full amount of the statutory cap of $15,150. As capped, the proposed distributions to former employees under the 507(a)(4) Distribution Motion total $1,321,307, plus any applicable employer payroll tax obligations. On August 7, 2024, the Court entered an order granting the 507(a)(4) Distribution Motion [D.I. 920], and the Trustee subsequently paid these claims.

25. On August 19, 2024, the Trustee filed a *Motion for an Order Authorizing Second Distribution of Funds to Holders of Allowed Priority Claims Under Section 507(a)(4) of the Bankruptcy Code and Granting Related Relief* [D.I. 928] (the "Second 507(a)(4) Distribution Motion"), in which the Trustee requested authority to pay holders of certain allowed section 507(a)(4) priority claims of former employees up to the full amount of the statutory cap of $15,150. As capped, the proposed distributions to former employees under the Second 507(a)(4) Distribution Motion total $1,508,344.86, plus any applicable employer payroll tax obligations. On September 5, 2024, the Court entered an order granting the Second 507(a)(4) Distribution Motion [D.I. 954], and the Trustee subsequently paid these claims.

26. On November 26, 2024, the Trustee filed a *Motion for an Order Authorizing Third Distribution of Funds to Holders of Allowed Priority Claims Under Section 507(a)(4) of the Bankruptcy Code and Granting Related Relief* [D.I. 999] (the "Third 507(a)(4) Distribution Motion"), in which the Trustee requested authority to also pay additional holders of certain allowed section 507(a)(4) priority claims of former employees up to the full amount of the statutory cap of $15,150. As capped, the proposed distributions to former employees under the Third 507(a)(4) Distribution Motion total $1,753,818.11, plus any applicable employer payroll

tax obligations. On December 16, 2024, the Court entered an order granting the Third 507(a)(4) Distribution Motion [D.I. 1021], and the Trustee has subsequently paid these claims.

27. On November 26, 2024, the Trustee filed a *Motion of George L. Miller, Chapter 7 Trustee for an Order Authorizing Trustee's First Distribution to Holders of General Unsecured Claims* [D.I. 1000] (the "General Unsecured Distribution Motion"), in which the Trustee requested authority to pay holders of allowed general unsecured claims under the General Unsecured Distribution Motion in the aggregate amount of $2,507,976.59. On December 16, 2024, the Court entered an order granting the General Unsecured Distribution Motion [D.I. 1023], and the Trustee subsequently paid these claims.

28. Additionally, the Trustee and his professionals have analyzed the WARN Act claims asserted by the Debtors' former employees in a putative class action adversary proceeding, which is pending before this Court at AP No. 23-50117 (the "WARN Act Claims"). The Trustee reached a resolution of the WARN Act Claims via a Settlement Agreement in which a class would be certified pursuant to Federal Rule of Civil Procedure 23(e), and the allowed portion of these claims would be paid (subject to class counsel's fees and other applicable fees/costs) pursuant to the terms of the Settlement Agreement and class settlement procedures of Rule 23.

29. On October 20, 2024, the Trustee filed a *Joint Motion of Chapter 7 Trustee and Proposed Class Representatives, Pursuant to Section 105 of the Bankruptcy Code and Bankruptcy Rules 9019 and 7023 to: (I) Approve the Settlement Agreement Pursuant to Bankruptcy Rule 9019, (II) Preliminarily Approve the Settlement Agreement Pursuant to Bankruptcy Rule 7023, (III) Certify the Warn Class for Settlement Purposes, Including the Appointment of Class Counsel and the Class Representatives, (IV) Approve the Form and*

*Manner of Notice to Class Members of the Settlement, (V) Schedule a Fairness Hearing to Consider Final Approval of the Settlement Agreement, (VI) Finally Approve the Settlement Agreement Following the Fairness Hearing, and (VII) Grant Related Relief* [D.I. 975] (the "WARN ACT Settlement"). On November 19, 2024, the Court entered a Preliminary Order approving the WARN Act Settlement [D.I. 993] and subsequently entered a Final Order approving the WARN Act Settlement on January 13, 2025 [D.I. 1030]. The WARN ACT Settlement resulted in the Trustee making an interim priority distribution on the WARN Act Claims (inclusive of class counsel's fees) in the aggregate amount of $8,790,119.

30. At this point, almost all of the Estates' saleable assets have been liquidated and a majority of the proceeds have been distributed. The only material assets remaining in the Estates being administered by the Trustee are certain accounts receivable, a potential tax refund that may be paid from the Existing Chapter 11 Cases, if collected, which was transferred to the Debtor in accordance with the Chapter 11 Sale Order, and chapter 5 litigation assets which the Trustee is pursuing. The Trustee has retained special counsel, and has commenced adversary proceedings to collect the accounts receivable and chapter 5 avoidance actions. The Trustee is similarly in the process of pursuing the tax refund which is under audit by the Internal Revenue Service in connection with the Existing Chapter 11 Cases. The Trustee anticipates being in a position to complete administration of these Chapter 7 Cases of the Debtors by submission of the Trustee's Final Report ("TFR") after conclusion of any outstanding litigation and once all assets are collected (including the tax refund from the Existing Chapter 11 Cases).

31. The Trustee's efforts have enabled the Estate to make substantial interim disbursements to parties in interest as of February 28, 2025 in the aggregate amount of $267,014,502 as more fully described on the Summary of Chapter 7 Trustee Receipts and

Disbursements schedule attached hereto as Exhibit "A" (the "Interim Disbursements"). The Trustee and his professionals continue to review and evaluate claims and anticipate making additional interim distributions to holders of allowed claims prior to submission of the TFR.

32.  The Trustee respectfully submits that in light of his significant and highly successful efforts on behalf of the Estates and creditors, he is entitled to the maximum amount of commissions and compensation that is allowable pursuant to Section 326 of the Bankruptcy Code based upon the Interim Disbursements in the amount of $267,014,502 as of February 28, 2025 as more fully described on the Chapter 7 Trustee Statutory Commission Calculation schedule attached hereto as Exhibit "B" (the "Trustee's Interim Compensation") and calculated as follows:

|     | Range     |                     | Statutory Commission |
|-----|-----------|---------------------|----------------------|
| 25% | -         | 5,000               | 1,250                |
| 10% | 5,000     | 50,000              | 4,500                |
| 5%  | 50,000    | 1,000,000           | 47,500               |
| 3%  | 1,000,000 | Excess 266,014,502  | 7,980,435            |
| **Total Statutory Commission** | | | **$8,033,685** |

### RELIEF REQUESTED

33.  The Trustee respectfully requests that the Court authorize and approve the payment of the Trustee's Interim Compensation, on an interim basis, on account of the above-described services and disbursements pursuant to Sections 105(a), 326, 330, and 331 of the Bankruptcy Code.

**BASIS FOR RELIEF REQUESTED**

34. The Trustee submits that the relief requested herein represents a sound exercise of business judgment because the Trustee holds sufficient funds on hand to pay the Trustee's Interim Compensation and will have remaining funds which the Trustee has determined will be adequate to pay any final Chapter 7 administrative expenses.

35. Further, the payment of the Trustee's Interim Compensation shall be subject to disgorgement by the Trustee in the event of an administrative shortfall in the payment of other Chapter 7 administrative expenses. The Trustee believes that the amount and timing of the Trustee's Interim Compensation are reasonable and appropriate given the services rendered by the Trustee and given that the Trustee has already made Interim Disbursements as identified in Exhibit "A" hereto in the aggregate amount of $267,014,502 as of February 28, 2025 to parties in interest including holders of secured claims leaving approximately $80 million remaining in the Chapter 7 Estates.

Section 331 of the Bankruptcy Code provides that:

> A trustee, an examiner, a debtor's attorney, or any professional person employed under section 327 or 1103 of this title may apply to the court not more than once every 120 days after an order for relief in a case under this title, or more often if the court permits, for such compensation for services rendered before the date of such an application or reimbursement for expenses incurred before such date as is provided under section 330 of this title. After notice and a hearing, the court may allow and disburse to such applicant such compensation or reimbursement.

11 U.S.C. § 331.

36. In *In re King Resources Company*, 651 F.2d 1349, 1352 (10th Cir. 1981) the court explained the necessity for adequate and timely compensation for trustees and their professionals in order for bankruptcy to work when it stated:

14

> Were it not for the fee and compensation provisions applicable to these … proceedings for accountants, managers, lawyers, trustees, experts, and fiduciaries the system would not have functioned. Compensation is the lubricant which makes the bankruptcy machinery work when applied in the proper places in the proper amount. The expectation of compensation and the "right" to compensation of those who perform valuable services based on the provisions of statute is for this group and others a substantive matter. It is also substantive in other aspects of bankruptcy. Compensation is a basic, essential, and independent part of the system… Those who in good faith provide valuable services have a right to rely on the provisions for compensation.

*Id.* The Trustee in this case has actually made the above-referenced Interim Disbursements, but case law also supports the view that a trustee may be compensated in the early stages of the case without regard to a percentage of funds actually disbursed after rendering valuable services to the Estates. *See, e.g., In re Heatherly,* 179 B.R. 872 (Bankr. W.D. Tenn. 1995) (concluding that trustee is entitled to allowance of interim compensation for services rendered and should be treated no differently than other professionals in the case who are allowed interim compensation under section 331); *In re Stewart*, 157 B.R. 893, 897 (9th Cir. BAP 1993) (holding, after its analysis of sections 326, 330 and 331, that the Bankruptcy Code allows a trustee to be paid interim compensation after rendition of "services," rather than restricting the trustee's compensation to a time period after disbursement of funds or limiting such compensation to a percentage of disbursements already made).

37. The Trustee has performed the necessary and valuable services described above which have benefited the Estates and resulted in the Interim Disbursements to parties in interest in the amount of $267,014,502 as of February 28, 2025. All of these actions by the Trustee resulted in an extraordinary outcome and generated funds which have enabled the aforesaid Interim Disbursements to parties in interest in excess of $267 million as identified on Exhibit "A". Accordingly, the Trustee submits that his request for interim compensation is reasonable and appropriate, and should be allowed in the maximum amount permitted under 11 U.S.C. §326 of $8,033,685.

**NOTICE**

38. Notice of this Motion together with a copy of the Motion will be given to the following parties: (the "Notice Parties"): (a) the Office of the United States Trustee; (b) Counsel to the Debtors; (c) the largest thirty (30) unsecured creditors with names and addresses appearing in Schedule F of the Schedules of Assets and Liabilities prepared by the Debtors; and (d) all parties who have requested notice pursuant to Federal Rule of Bankruptcy Procedure 2002 as of the date hereof. In light of the nature of the relief requested herein and the cost that would be incurred by providing notice to the entire body of creditors in this case, the Trustee respectfully requests a determination by the Court that his limiting notice to the Notice Parties is appropriate, and that no other or further notice need be given.

**WHEREFORE**, the Trustee respectfully requests that this Court enter an order granting the Motion (i) allowing the Trustee's Interim Compensation on an interim basis in the amount of $8,033,685 (ii) authorizing the Trustee to promptly pay the Trustee's Interim Compensation, and (iii) grant such other and further relief as the Court deems just.

Dated:  March 4, 2025                                       COZEN O'CONNOR

                                                          By:     */s/ John T. Carroll, III*
                                                                 John T. Carroll, III (DE No. 4060)
                                                                 1201 N. Market Street
                                                                 Suite 1001
                                                                 Wilmington, DE  19801
                                                                 (302) 295-2028 Phone
                                                                 (302) 295-2013 Fax No.
                                                                 jcarroll@cozen.com

                                                                *Counsel to George L. Miller,*
                                                                *Chapter 7 Trustee*